UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Dakota Plains Holdings, Inc., | Case No. 16-43711 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Transloading, LLC, | Case No. 16-43712 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Sand, LLC, | Case No. 16-43715 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Marketing, LLC, | Case No. 16-43716 |
| Debtor. | Chapter 11 Case |
| DPTS Marketing LLC, | Case No. 16-43717 |
| Debtor. | Chapter 11 Case |
| Dakota Petroleum Transport Solutions, LLC, | Case No. 16-43718 |
| Debtor. | Chapter 11 Case |
| DPTS Sand, LLC, | Case No. 16-43721 |
| Debtor. | Chapter 11 Case |

**NOTICE OF MOTION OF THE DEBTORS FOR ENTRY OF (I) AN EXPEDITED
ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS IN
CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
ASSETS, (B) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,
(C) SCHEDULING AN AUCTION AND SALE HEARING, (D) APPROVING
PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS, AND
(E) GRANTING RELATED RELIEF AND (II) AN ORDER (A) APPROVING THE
ASSET PURCHASE AGREEMENT BETWEEN THE DEBTORS AND THE
PURCHASER, (B) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,
AND INTERESTS, (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF
CONTRACTS, (D) AUTHORIZING THE DISTRIBUTION OF EXCESS SALE
PROCEEDS TO SECURED CREDITORS, AND (E) GRANTING RELATED RELIEF**

TO:  The parties-in-interest as defined in Local Rule 9013-3(a)(2).

1.      Dakota Plains Holdings, Inc. and its affiliated debtors and debtors in possession in

these proceedings (collectively, the "**Debtors**"), file this motion (the "**Motion**") requesting the

relief described below, and give notice of hearing.

2.      The Court will hold a hearing on the portion of this Motion seeking (I) an Expedited Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief at 9:00 a.m. (prevailing Central Time) on December 29, 2016 (the "**Bid Procedures Hearing**") in Courtroom No. 7 West, U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota, 55415. A hearing on the portion of this Motion seeking (II) an Order (A) Approving the Asset Purchase Agreement between the Debtors and the Purchaser, (B) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, (D) Authorizing the Distribution of Excess Sale Proceeds to Secured Creditors, and (E) Granting Related Relief at a date, time and location to be determined (the "**Sale Hearing**").

3.      Local Rule 9006-1(c) provides deadlines for responses to this Motion. However, given the expedited basis on which the Motion is being heard in connection with the Bid Procedures, the Bid Protections, the form and manner of notice thereof, the scheduling of the Auction and Sale Hearing, and the approval of the Assumption Procedures, the Debtors hereby waive any objections to written responses thereto being served and filed up to two hours prior to the Bid Procedures Hearing. Any responses to the Motion in connection with Sale of the Debtors' Assets and the assumption and assignment of the Contracts must be filed and served in accordance with Local Rule 9006-1(c). **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE RELIEF REQUESTED HEREIN WITHOUT HOLDING A HEARING**.

4.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, Rule 5005 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule 1070-1.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  On December 20, 2016 (the "**Petition Date**"), each of the above-captioned Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**").  The cases are currently pending in this Court.

5.    This Motion arises under sections 105, 363, 365, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.  This Motion is filed under Local Rules 9013-1, 9013-2, 9013-3 and 6004-1.  Notice of the hearing on this Motion is provided pursuant to Local Rules 9013-2(a), 9013-3(a)(2) and 6004-1(e).

6.    Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed.

7.    A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the Declaration of Marty Beskow in Support of Chapter 11 Petitions and First Day Motions (the "**First Day Declaration**").

## PRELIMINARY STATEMENT

8.    The Debtors have determined that the best alternative for preserving and maximizing the value of their estates for the benefit of creditors is to consummate a going-concern sale of their assets.  The Debtors were able to reach an agreement with their prepetition

lenders on the terms of a postpetition financing arrangement that addresses the Debtors' liquidity needs during an expedited sale process.  If approved by this Court, the proposed debtor in possession financing facility will provide funds necessary to allow the Debtors to continue normal business operations while they move forward with the sale process.

9.      The Debtors were also able to identify a party to serve as their stalking horse bidder.  Specifically, the Debtors and BioUrja Trading, LLC (the "**Stalking Horse Bidder**") have entered into a Stalking Horse Purchase Agreement (as defined below), whereby the Stalking Horse Bidder proposes to purchase substantially all of the Debtors' assets for cash consideration of approximately $8.550 million (the "**Purchase Price**"), which will serve as a competitive baseline of recovery for the Debtors' stakeholders.

10.     By this Motion, the Debtors seek to consummate a sale to the Stalking Horse Bidder or another purchaser willing to offer a higher and otherwise better offer for the Debtors' assets.  To this end, the Debtors seek the entry of an order substantially in the form attached hereto as **Exhibit A** (the "**Bid Procedures Order**") approving the Bid Procedures (as defined below) and, following the conclusion of the Sale Hearing (as defined below), the entry of an order substantially in the form attached hereto as **Exhibit B** (the "**Sale Order**") approving the sale of the Debtors' assets to the Successful Bidder (as defined below).  The Debtors also request that any excess sale proceeds from the sale be distributed to the Debtors' secured creditors, after repayment of the debtor in possession financing facility and after funds are set aside as budgeted in accordance with the Interim DIP Order and any Final DIP Order.

## BACKGROUND

11.     On December 20, 2016, each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

***The Debtors' Business and Operations***

12.     The Debtors are an integrated midstream energy company whose headquarters are located in Wayzata, Minnesota.  Founded in 2008, the Debtors own and operate a 200-acre rail terminal (the "**Pioneer Terminal**") in the heart of the Bakken and Three Forks plays of the Williston Basin in North Dakota—Mountrail, McKenzie, Williams and Dunn.  The Pioneer Terminal is located at the terminus of the Canadian Pacific line and has strategic proximity to the only Missouri River Bridge crossing for nearly 80 miles.

13.     The Debtors' business is comprised of "outbound operations," which includes transloading crude oil from trucks and pipelines, storing in tanks and transloading onto trains, and "inbound operations," which includes offloading frac sand from trains, storing in silos and transloading onto trucks.  In 2013, the Pioneer Terminal had nearly $70 million in capital expenditure projects for crude oil and frac sand operations.  In the fiscal year 2015, the Debtors transloaded approximately 16.8 million barrels of crude oil and 600,000 tons of sand, which generated a total revenue of approximately $29 million.

14.     The Debtors fortunes changed as a result in the global decline in oil prices, which adversely impacted the demand for the services offered by the Debtors at the Pioneer Terminal. For twelve months ended December 31, 2015, the Debtors had a net income of approximately $8.5 million and an adjusted EBITDA of approximately $23.4 million.  For the nine months ended September 30, 2016, the Debtors had an adjusted EBITDA loss of approximately $4.5

million.   As of September 30, 2016, the Debtors had cash and cash equivalents and trade receivables of approximately $7.0 million and accounts payable and accrued expenses of approximately $13.4 million.   The Debtors have approximately 25 employees, the majority of which work at the Pioneer Terminal.   A key goal of these proceedings is to complete a sale that preserves these jobs.

### The Debtors' Prepetition Marketing Efforts

15.   Before the Petition Date, the Debtors explored several strategic alternatives to address balance sheet issues and the financial pressures caused by the global decline in oil prices, including (a) engaging in discussions with SunTrust Bank focused on restructuring the existing promissory note obligations, (b) minimizing capital expenditures, (c) reducing general and administrative expenses, (d) managing the operating costs at the transloading facility, and (e) considering bankruptcy protection.   Having explored these alternatives, the Debtors have determined that a sale of substantially all of their assets would maximize the value of their assets for all stakeholders.

16.   To that end, the Debtors negotiated a $2.0 million postpetition financing facility with SunTrust Bank, as administrative agent (the "**Agent**") on behalf of financial institutions comprised of certain prepetition lenders (the "**Lenders**"), to provide them with sufficient liquidity to execute a value-maximizing sale process.   Pursuant to the proposed *Interim Order (I) Granting an Expedited Hearing, (II) Authorizing the Debtors (A) to Utilize Cash Collateral of the Prepetition Secured Parties, (B) to Obtain Postpetition Secured Financing, and (C) to Provide Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "**Interim DIP Order**"), the Debtors are required to expeditiously move toward a number of sale milestones.   The sale milestones are structured to

allow for the Debtors' sale of substantially all of their assets to be closed within approximately 60 days of the start of these cases.

17.     In order to fully and adequately market their assets, the Debtors engaged Canaccord Genuity Inc. ("**Canaccord**") to serve as their investment banker.  Over the past six (6) months, Canaccord has employed a comprehensive marketing process to identify potential bidders for the Debtors' assets.

18.     Beginning in June 2016, Canaccord initially contacted sixty-six (66) potential bidders, representing both financial and strategic potential buyers, using its proprietary databases and market knowledge.   Of these contacted potential bidders, all either reviewed a teaser document or participated in high-level discussions about the transaction.  Twelve (12) of these initial bidders ultimately negotiated non-disclosure agreements ("**NDAs**") and were either provided access to a virtual data room ("**VDR**") containing detailed information about the Debtors' assets, the confidential information memorandum ("**CIM**") or to management to conduct substantial due diligence.

19.     Interested parties participated in initial discussions with Canaccord to conduct preliminary diligence.  Parties that indicated additional interest and provided reasonable proof of financial wherewithal received a NDA.  Upon executing the NDA, parties were provided with further due diligence, including a copy of the CIM as well as access to a VDR with over 4,500 pages of information.   In addition to the detailed diligence opportunity, Canaccord hosted multiple management calls and had extensive discussions regarding the assets, transaction timing and purchase price.  Two parties submitted term sheets; however, one party declined to proceed with its offer and the other term sheet was not deemed actionable.  As of the end of August 2016, Canaccord was unable to locate a buyer for all or substantially all of the Debtors' assets.

20.     Following the initial submission of term sheets, Canaccord continued to field inbound inquiries from third parties and address due diligence requests.  During this time, four (4) additional parties executed the NDA and received access to the due diligence materials, including the CIM and VDR.

21.     Beginning in October 2016, Canaccord contacted the sixteen (16) parties that had previously executed an NDA with the Debtors up to that point and communicated to them SunTrust Bank's "release price" range.  Initial feedback was positive and eleven (11) of the parties sought access to a revised CIM and updated VDR.  Beginning on November 2, 2016, Canaccord initiated a larger outreach process, contacting over one hundred and nine (109) total parties, forty-three (43) of which were new process participants in addition to those initially contacted during the summer of 2016.  In total, thirty-one (31) parties signed NDAs and received the CIM, process letter and were granted access to the VDR.

22.     Canaccord's re-marketing process was successful.   On November 18, 2016, Canaccord received five (5) signed letters of intent ("**LOIs**").  Following receipt of the LOIs, Canaccord posted the Debtors' form of purchase agreement and related schedules to the VDR. In addition, Canaccord circulated to all bidders a new process letter outlining the procedures to conduct final due diligence and describing the timeline and requirements to submit a qualified stalking horse bid.  To assist bidders in completing their diligence, Canaccord facilitated three (3) onsite visits to the Debtors' Pioneer Terminal, three (3) customer calls, eleven (11) diligence and purchase agreement discussion calls and numerous supplemental document requests.

23.     On December 13, 2016, Canaccord received four (4) bids, including marked purchase agreements.  Following the bid deadline, Canaccord held numerous discussions with all bidders in an effort to improve the economic terms of their bids.  As a result of these discussions,

BioUrja Trading, LLC agreed to increase its original purchase price by $200,000, along with consenting to other considerations requested by the Debtors in order to strengthen their bid terms.  Following Canaccord's recommendation, and after consultation with the Debtors' senior lender, the Debtors selected BioUrja Trading, LLC as their Stalking Horse Bidder and the Debtors began immediately negotiating definitive documents.

24.      On December 19, 2016, the Debtors and the Stalking Horse Bidder entered into an *Asset Purchase Agreement* (including all exhibits and schedules related thereto, the "**Stalking Horse Purchase Agreement**"), whereby the Stalking Horse Bidder proposes to purchase substantially all of the Debtors' assets for cash consideration of approximately $8.550 million. The Stalking Horse Purchase Agreement will serve as a competitive baseline of recovery for the Debtors' stakeholders.  The proposed transaction, if approved, will generate significant value for the Debtors' estates, and among other things, satisfy a significant portion of the prepetition claims against the Debtors.

25.      The Debtors now seek to consummate a sale to the Stalking Horse Bidder or another purchaser willing to offer a higher and otherwise better offer for the Debtors' assets.  To this end, the Debtors seek the entry of the Bid Procedures Order approving the Bid Procedures (as defined below) and, following the conclusion of the Sale Hearing (as defined below), the entry of the Sale Order approving the sale of the Debtors' assets to the Successful Bidder (as defined below).

## **RELIEF REQUESTED**

26.      The Debtors seek entry of the Bid Procedures Order:

    a.    authorizing and approving the Bidding Procedures attached to the Bidding Procedures Order as **Exhibit 1** and approving the Bid Protections (as defined below) in connection with the sale of substantially all of the Debtors' assets (the "**Assets**");

b.      approving the form and manner of notice of an auction (the "**Auction**") and sale hearing (the "**Sale Hearing**") with respect to the sale of the Assets free and clear of liens, claims, encumbrances, and other interests (the "**Sale**"), attached as **Exhibit 2** to the Bidding Procedures Order (the "**Sale Notice**");

c.      scheduling the Auction and Sale Hearing;

d.      approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "**Contracts**"); and

e.      granting related relief.

27.     In addition, at the conclusion of the Sale Hearing, the Debtors will seek the entry of the Sale Order:

a.      authorizing and approving the Sale of the Assets to the Successful Bidder (as defined in the Bidding Procedures) on the terms substantially set forth in the Successful Bid;

b.      authorizing and approving the Sale of all or substantially all of the Assets free and clear of liens, claims, encumbrances, and other interests to the extent set forth in the Successful Bid;

c.      authorizing the assumption and assignment of the Contracts;

d.      authorizing the distribution of excess sale proceeds to secured creditors; and

e.      granting any related relief.

28.     The Debtors reserve the right to file and serve any supplemental pleadings or declaration that the Debtors deem appropriate or necessary in their reasonable business judgment, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of their request for entry of the Sale Order before the Sale Hearing.

## THE PROPOSED SALE

**I.      The Proposed Stalking Horse Purchase Agreement and Section 363 Sale**

29.     The Debtors entered into arm's-length negotiations with the Stalking Horse Bidder to finalize mutual and agreeable terms of the Stalking Horse Bid for the sale of the

Assets.  The Debtors believe that a prompt Sale of the Assets represents the best alternative available for all stakeholders in these chapter 11 cases.  Moreover, it is important for the Debtors to execute on their proposed Sale transaction within the timeframe contemplated by the Stalking Horse Purchase Agreement.   Under the DIP Credit Agreement, the Debtors are required to consummate a sale transaction within 60 days after the Petition Date; otherwise, the Debtors will trigger an event of default under the DIP Credit Agreement.

30.     The Debtors request that the Court approve the following general timeline:

> **Contract Cure Obligation Deadline**.   4:00 p.m. (prevailing Central Time) seven (7) calendar days from service of the Contract Notice (as defined herein), as the deadline to object to the cure amount listed in the Contract Notice;

> **Bid Deadline**.  11:59 p.m. (prevailing Central Time), on or before January 19, 2017, as the deadline by which bids for the Assets (as well as the deposit and all other documentation required under the Bidding Procedures for Qualified Bidders (as defined in the Bidding Procedures)) must be actually received (the "**Bid Deadline**");

> **Auction**.  January 23, 2017 at 10:00 a.m. (prevailing Central Time), as the date and time of the Auction, if needed, will be held at the offices of Baker & Hostetler LLP, located at 811 Main Street, Suite 1100, Houston, Texas 77002-6111;

> **Sale Objection Deadline**.   4:00 p.m. (prevailing Central Time), on or before seven (7) calendar days after the Bid Deadline, as the deadline to object to the Sale; and

> **Sale Hearing**.   On or before January 27, 2017 at 10:00 a.m. (prevailing Central Time), as the date and time for the Sale Hearing.

31.     The Debtors believe that this timeline maximizes the prospect of receiving a higher or otherwise better offer without unduly prejudicing these chapter 11 estates.  To further ensure that the Debtors' proposed Auction and Sale process maximize value to the benefit of the Debtors' estates, the Debtors will use the time following the Petition Date to continue to actively market the Assets in an attempt to solicit higher or otherwise better bids.  The Debtors believe

the relief requested by this Motion is in the best interests of their creditors, their other

stakeholders, and all other parties in interest, and should be approved.

## II.    Material Terms of the Stalking Horse Purchase Agreement

32.    The following chart summarizes the terms and conditions of the Stalking Horse

Purchase Agreement (attached hereto as **Exhibit C**):[1]

| Stalking Horse Purchase Agreement Provision | Summary Description |
|---|---|
| **Stalking Horse Purchase Agreement Parties** | Sellers:  The Debtors.<br><br>Purchaser:  BioUrja Trading, LLC. |
| **Purchase Price, Including Credit Bid** | Purchase Price:  Cash in an amount equal to $8.550 million *less* the aggregate amount of (i) all Cure Costs, if any, for contracts that are designated as Assigned Contracts and (ii) the dollar amount of real or personal property taxes allocated to the Purchaser (the "**Purchase Price**"). |
| **Stalking Horse Bid Protections** | Breakup Fee:  A break-up fee shall not exceed 3.5% of the Purchase Price (the "**Breakup Fee**"), payable as set forth in Sections 3.5 and 7.1 of the Stalking Horse Purchase Agreement in the event that the Stalking Horse Purchase Agreement is terminated.<br><br>Overbid Protections:  The aggregate consideration proposed by each Bid must equal or exceed the sum of (i) the Bid Value set forth in the Stalking Horse Bid, (ii) the Breakup Fee, and (iii) $100,000 (the "**Initial Minimum Overbid**").  Any overbid following the Initial Minimum Overbid or following any subsequent prevailing highest bid shall be in increments of $50,000 (the "**Overbid Increment**" and together with the Breakup Fee and the Initial Minimum Overbid, the "**Bid Protections**"). |
| **Acquired Assets** | All or substantially all Assets of the Sellers. |
| **Assumed Liabilities** | The Assumed Liabilities identified in Section 1.3 of the Stalking Horse Purchase Agreement |
| **Assumed Contracts** | The Assumed Contracts identified on Exhibit B of the Stalking Horse Purchase Agreement, subject to the Purchaser's right to amendment and reject such identified contracts. |
| **Excluded Assets** | The Excluded Assets identified in Section 1.2 of the Stalking Horse Purchase Agreement. |
| **Representations and Warranties** | Customary representations and warranties by the Sellers and the Purchaser. |
| **Agreements with** | The Debtors' management and the Stalking Horse Bidder have discussed the possibility that some or all of the current management may be retained by the Stalking |

---

[1]  This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement shall govern in all respects.  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Stalking Horse Purchase Agreement.  All references to schedules or sections in the following summary shall refer to the schedules or sections of the Stalking Horse Purchase Agreement.

| Stalking Horse Purchase Agreement Provision | Summary Description |
|---|---|
| **Management** | Horse post-Closing. |
| **Releases** | None. |
| **Private Sale / No Competitive Bidding** | No.  The Debtors have proposed an open Auction and Sale process. |
| **Closing and Other Deadlines** | Entry of Bidding Procedures Order:  December 23, 2016.<br><br>Bid Deadline:   On or before January 19, 2017 at 11:59 p.m. (prevailing Central Time).<br><br>Auction:  January 23, 2017 at 10:00 a.m. (prevailing Central Time).<br><br>Sale Hearing:  January 27, 2017 at 10:00 a.m. (prevailing Central Time).<br><br>Closing:  On or before February 10, 2017. |
| **Good Faith Deposit** | Deposit:  $1.71 million. |
| **Interim Arrangements with Proposed Buyer** | Prior to closing, the Debtors and the Stalking Horse Bidder shall perform and satisfy all conditions to each of their respective obligations to consummate the transactions contemplated by the Stalking Horse Purchase Agreement that are to be performed or satisfied by such party under the Stalking Horse Purchase Agreement and to cause the Closing to occur as promptly as possible. |
| **Tax Exemption** | None. |
| **Sale of Avoidance Actions** | The Stalking Horse Purchase Agreement contemplates that all avoidance claims relating to vendors and service providers, which are collectively listed on Schedule 1.1(r), are Purchased Assets. |
| **Requested Findings as to Successor Liability** | All of the Assets shall be sold free and clear of all liens, interests, and other encumbrances (other than the Assumed Liabilities and Permitted Encumbrances[2]). |
| **Executory Contracts and Unexpired Leases** | The Stalking Horse Purchase Agreement requires the Debtors to assume and assign certain Contracts to the Stalking Horse Bidder.  The Stalking Horse Bidder shall assume and pay all Cure Costs. |
| **Credit Bid** | Any Qualified Bidder who has a valid, perfected, and unavoidable lien on any assets of the Debtors' estates shall have the right to credit bid all or a portion of the value of such secured claim within the meaning of section 363(k) of the Bankruptcy Code. |
| **Relief from Bankruptcy Rules 6004(h) and 6006(d)** | To maximize the value received for the Assets, the Debtors are seeking to close the transactions contemplated by the Successful Bidder's Purchase Agreement as soon as possible after the Sale Hearing.  The Debtors, therefore, have requested a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h) and 6006(d). |

---

[2]   Permitted Encumbrances shall not include any liens listed on Schedule 4.5 to the Stalking Horse Purchase Agreement (including prepetition secured lender's liens and tax liens).

## THE BIDDING PROCEDURES ORDER

### I.    The Bidding Procedures

33.    To optimally solicit, receive, and evaluate bids in a fair and accessible manner,

the Debtors have developed and proposed the Bidding Procedures, attached as **Exhibit 1** to the

Bidding Procedures Order.  The following describes the salient points of the Bidding Procedures.

a.    **Bid Requirements**.  Any bid by an Acceptable Bidder must be submitted in writing and determined by the Debtors, in their reasonable business judgment, to have satisfied by following requirements:

i.    *Assets and Purchase Price*.  Each Bid must be a bulk bid to purchase all or substantially all of the Assets, and must clearly state which liabilities of the Debtors the Acceptable Bidder is agreeing to assume.  Each Bid must clearly set forth the Purchase Price to be paid, including and identifying separately any cash and non-cash components.

ii.    *Deposit*.  Each Bid, including the Stalking Horse Bid, must be accompanied by a cash deposit in the amount equal to twenty percent of the aggregate cash purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "**Deposit**").

iii.    *Minimum Bid*.  The aggregate cash consideration proposed by each Bid must equal to, or exceed, the sum of (A) the Bid Value set forth in the Stalking Horse Bid; (B) the Breakup Fee; plus (C) $100,000 (the "**Initial Minimum Overbid**").

iv.    *The Same or Better Terms*.  Except as otherwise provided herein, each Bid must, in the Debtors' business judgment and in consultation with the Agent and the Committee Representative, be on terms the same as or better than the Stalking Horse Purchase Agreement.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transaction contemplated in the Bid (the "**Bid Documents**").  The Bid Documents shall include a schedule of Assumed Contracts (pursuant to the Stalking Horse Purchase Agreement) to the extent applicable to the Bid, and a copy of the Stalking Horse Purchase Agreement clearly marked to show all changes requested by the Acceptable Bidder (including those related to the Purchase Price and Assets to be acquired by such Acceptable Bidder), as well as all other material documents integral to such Bid.

- 14 -

     v.    ***Sources of Financing***.  The Bid must indicate the source of cash consideration, including proposed funding commitments and confirm that such consideration is not subject to any contingencies. The Bid should include a detailed sources and uses schedule.

     vi.    ***Structure***.  The Bid must identify the structure proposed for undertaking the Sale, including the specific Assets of the Debtors, the proposed steps to accomplish such acquisition, and any financial, legal, or tax consequences upon which the Bid's proposed structure relies.

     vii.    ***Tax Structure***.  The Bid must specify with particularity its tax structure, including whether it is intended to be structured in a tax-free manner or if any incremental tax liabilities will be incurred by the Debtors under the Bid.

     viii.    ***Assumption***.  The Bid must specify which, if any, of the obligations of the Debtors the Bidder proposes to assume.

b.    ***Bid Deadline***.  Each bid must be transmitted via email (in .pdf or similar format) or other means so as to be ***actually received*** by the Debtors, counsel to the Debtors, the Debtors' investment banker, the Stalking Horse Bidder, and counsel to the Stalking Horse Bidder on or before January 19, 2017 at 11:59 p.m. (prevailing Central Time) (the "**Bid Deadline**").

c.    ***Right to Credit Bid***.  The Agent shall be deemed to be a Qualified Bidder and is not required to make any Deposit.  The Agent may credit bid at any time, in its sole and absolute discretion, any portion and up to the entire amount of the Agent's and the Lenders' claims, including, without limitation, both the Lenders' prepetition claims and all obligations under the Interim DIP Order and any Final DIP Order, at any time on any individual Asset, portion of the Assets, or all of the Assets constituting the Prepetition Collateral or the DIP Collateral (as each are defined in the Interim DIP Order or any Final DIP Order) in conjunction with the sale of the Debtors' Assets (the "**Credit Bid Right**").  Upon exercise of the Credit Bid Right, the Agent shall not be required to take title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), or be deemed to have taken title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), any individual Asset, portion of the Assets, or all of the Assets, and the Agent shall have the right to designate any person or entity in its sole and absolute discretion that shall take title to the individual Asset, portion of the Assets, or all of the Assets that are subject to the Credit Bid Right.  Except for the holders of any Senior Third Party Liens (as defined in the Interim DIP Order or any Final DIP Order), no other person may credit bid unless the entire amount of the Lenders' claims (including all prepetition and debtor in possession financing

claims) will be indefeasibly paid in full in cash on the closing of the proposed sale.  In the event the Agent exercises the Credit Bid Right, and the amount of the credit bid of the Agent exceeds the total amount of the highest bids for the Assets subject to the Credit Bid, such credit bid will be deemed the highest and best bid and such credit bid will be accepted by the Debtors and presented for approval to the Bankruptcy Court.

Subject to the prior paragraph, at the Auction, any Qualified Bidder, including the Stalking Horse Bidder, who has a valid, perfected, and unavoidable lien on any assets of the Debtors' estates (a "**Secured Creditor**") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; <u>provided</u> that a Secured Creditor shall have the right to credit bid its claim only with respect to collateral by which such Secured Creditor is secured; <u>provided</u>, <u>further</u>, that for purposes of such Secured Creditor's Qualified Bid, the Secured Creditor's claim shall be deemed to have the value it possesses on the date of the Auction.

d.      ***The Auction***.  If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Bid), the Debtors, in connection with the Agent and the Committee Representatives, will not conduct the Auction and shall designate the Stalking Horse Bidder's Qualified Bid as the Successful Bid unless the Agent indicates that it intends to exercise its Credit Bid Right as set forth above.

e.      ***Bidding Increments***.   Any Overbid following the Initial Minimum Overbid or following any subsequent Prevailing Highest Bid shall be in increments of $50,000.

f.      ***Backup Bidder***.  Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction for the Assets, as determined by the Debtors in the exercise of their reasonable business judgment, shall be required to serve as a backup bidder (the "**Backup Bidder**"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors (the "**Backup Bid**").  The Agent will not be a Backup Bidder unless the Agent consents in writing otherwise.

g.      ***Highest or Otherwise Best Bid***.   When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors, in consultation with the Agent and the Committee Representatives deem appropriate:  (i) the number, type, and nature of any changes to the Stalking Horse Purchase Agreement requested by the Qualified Bidder, including the type and amount of Assets sought and obligations to be assumed in the Bid; (ii) the amount and nature of the total consideration; (iii) the likelihood of the Bidder's ability to close a

transaction and the timing thereof; and (iv) the net economic effect of any changes to the value to be received by the Debtors' estate from the transaction contemplated by the Bid Documents.

h.   ***Reservation of Rights***.   The Debtors reserve their rights to modify the Bidding Procedures (after consultation with the Agent and the Committee) in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets.

34.   Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value and, as such, do not impair the Debtors' ability to consider all qualified bid proposals and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

**II.   Form and Manner of Sale Notice**

35.   On or with three (3) days after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice to be served on the following parties or their respective counsel, if known:   (a) the United States Trustee for the District of Minnesota (the "**U.S. Trustee**"); (b) proposed counsel to the Committee (if any); (c) counsel to the Stalking Horse Bidder; (d) counterparties to the Contracts (the "**Contract Counterparties**"); (e) all parties who have expressed a written interest in some or all of the Assets; (f) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Assets; (g) the District Counsel and the District Director of the Internal Revenue Service; (h) the Collection Division of the Minnesota Department of Revenue, (i) all applicable state and local taxing authorities; (j) all of the creditors listed on the Debtors' matrix filed under Local Rule 1007-2(a); (k) the United States Attorney for the District of Minnesota; (l) the United States Bureau of Land Management; (m) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (n) all parties that have

requested or that are required to receive notice pursuant to Bankruptcy Rule 2002 and Local Rules 6004-1(e), 2002-1(b) and 2002-4(a).

36.     The Debtors respectfully submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) a reasonably specific identification of the Assets; (e) instructions for promptly obtaining a copy of the Stalking Horse Purchase Agreement; (f) a description of the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of the Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Assignment (or to another Successful Bidder arising from the Auction, if any).[3]

37.     The Debtors further submit that notice of this Motion and the related hearing to consider the entry of the Bidding Procedures Order, coupled with service of the Sale Notice, the Contract Notice, and the Assumption Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. The Debtors propose that no other or further notice of the Sale shall be required. Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

---

[3]  Pursuant to the Bidding Procedures Order, notice of the proposed assumption and assignment of the Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Purchase Agreement (or to another Successful Bidder arising from the Auction, if any), the proposed cure amounts relating thereto, and the right, procedures, and deadlines for objecting thereto, will be provided in separate notices, attached to the Bidding Procedures Order as **Exhibit 3** (the "**Contract Notice**") and **Exhibit 4** (the "**Assumption Notice**") to be sent to the applicable Contract Counterparties.

III.     **Summary of the Assumption Procedures**

38.     The Debtors are also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Contracts in connection with the Sale (the "**Assumption Procedures**").  Because the Bidding Procedures Order set forth the Assumption Procedures in detail, they are not restated herein.   Generally, however, the Assumption Procedures:  (a) outline the process by which the Debtors will serve notice to all Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right and the procedures to object thereto; and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Contracts to the extent necessary.

<u>REQUEST FOR EXPEDITED RELIEF</u>

39.     The Debtors request expedited relief on this Motion.  The Debtors do not seek the entry of an order approving the Sale on an expedited basis.  Rather, the expedited relief sought is limited to the approval of the Bidding Procedures and the Bid Protections, the form and manner of notice thereof, the scheduling of the Auction and the Sale Hearing, and the approval of the Assumption Procedures.  Given the extent to which the Debtors marketed their Assets prior to the Petition Date, the Debtors believe that such relief is appropriate on an expedited basis and should be granted in order to ensure that the Debtors comply with the sale milestones set forth in the proposed Interim DIP Order and the Final DIP Order.

<u>LOCAL RULE 9013-2</u>

40.     Pursuant to Local Rule 9013-2, this Motion is verified and is accompanied by a memorandum of law (attached hereto as **Exhibit D**), a proposed order and proof of service.

41.     Pursuant to Local Rule 9013-2, the Debtors give notice that they may, if necessary, call (i) Gabriel G. Claypool, Chief Executive Officer of Dakota Plains Holdings, Inc.,

294 Grove Lane East, Wayzata, MN  55391 or (ii) Marty Beskow, Chief Financial Officer, Dakota Plains Holdings, Inc., 294 Grove Lane East, Wayzata, MN  55391, and/or (iii) Michael V. Balistreri of Canaccord Genuity, Inc., 350 Madison Avenue, New York, NY  10017 to testify at the hearing on the Motion regarding the facts set forth herein.

### WAIVER OF BANKRUPTCY RULES 6004(h) AND 6006(d)

42.      In order to maximize the value received for the Assets, the Debtors seek to close the Sale as soon as possible after the Sale Hearing.  Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

### NOTICE

43.      Notice of this Motion has been given to all parties entitled to notice under Local Rule 9013-3(a)(2).  In light of the nature of the relief requested, the Debtors submit that no further notice is necessary.

### NO PRIOR REQUEST

44.      No prior request for the relief sought in this Motion has been made by the Debtors to this or any other court.

### CONCLUSION

WHEREFORE, the Debtors respectfully requests that the Court enter (a) the Bid Procedures Order and (b) the Sale Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  December 21, 2016                    Respectfully submitted,


/e/ Michael F. McGrath
Michael F. McGrath (#168610)
Will R. Tansey (#323056)
RAVICH MEYER KIRKMAN MCGRATH NAUMAN
& TANSEY, PA
150 S. Fifth Street, Suite 3450
Minneapolis, MN  55402
Telephone:  612.317.4744
Email: mfmcgrath@ravichmeyer.com
         wrtanser@ravichmeyer.com


Elizabeth A. Green
Jimmy D. Parrish
BAKER & HOSTETLER LLP
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL  32801-3432
Telephone:  407.649.4000
Email: egreen@bakerlaw.com
         jparrish@bakerlaw.com


Eric R. Goodman
BAKER & HOSTETLER LLP
Key Tower, 127 Public Square
Suite 2000
Cleveland, OH  44114-1214
Telephone:  216.621.0200
Email: egoodman@bakerlaw.com


*Proposed Counsel for the Debtors and Debtors
in Possession*

## VERIFICATION

I, Marty Beskow, Chief Financial Officer of Dakota Plains Holdings, Inc., based upon my personal information and belief, declare under penalty of perjury that the facts set forth in the preceding Motion of the Debtors for Entry of (I) an Expedited Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief and (II) an Order (A) Approving the Asset Purchase Agreement Between the Debtors and the Purchaser, (B) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, (D) Authorizing the Distribution of Excess Sale Proceeds to Secured Creditors and (E) Granting Related Relief are true and correct to the best of my knowledge, information and belief.

Dated:  December 20, 2016          Signed:  _Marty J Beskow_
                                            Marty Beskow

**<u>EXHIBIT A</u>**

BID PROCEDURES ORDER

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Dakota Plains Holdings, Inc.,<br><br>        Debtor. | Case No. 16-43711<br>Chapter 11 Case |
| Dakota Plains Transloading, LLC,<br><br>        Debtor. | Case No. 16-43712<br>Chapter 11 Case |
| Dakota Plains Sand, LLC,<br><br>        Debtor. | Case No. 16-43715<br>Chapter 11 Case |
| Dakota Plains Marketing, LLC,<br><br>        Debtor. | Case No. 16-43716<br>Chapter 11 Case |
| DPTS Marketing LLC,<br><br>        Debtor. | Case No. 16-43717<br>Chapter 11 Case |
| Dakota Petroleum Transport Solutions, LLC,<br><br>        Debtor. | Case No. 16-43718<br>Chapter 11 Case |
| DPTS Sand, LLC,<br><br>        Debtor. | Case No. 16-43721<br>Chapter 11 Case |

**EXPEDITED ORDER (A) APPROVING BIDDING PROCEDURES AND BID
PROTECTIONS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF
THE DEBTORS' ASSETS, (B) APPROVING THE FORM AND MANNER OF NOTICE
THEREOF, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D)
APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF
CONTRACTS, AND (E) GRANTING RELATED RELIEF**

THIS MATTER having come before the Court upon the motion, dated December 21,

2016 (the "**Motion**")[1] of Dakota Plains Holdings, Inc. and the above-captioned debtors and

debtor in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the

"**Cases**"), for the entry of an order:

      i.      authorizing and approving the bidding procedures attached hereto as **Exhibit 1**
              (the "**Bidding Procedures**");

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion or
the Bidding Procedures, as applicable.

ii.     approving the Breakup Fee in connection with the sale of certain assets of the Debtors (the "**Assets**");

iii.    approving the form and manner of notice of the Auction and the Sale Hearing with respect to the Debtors' Assets; and

iv.     scheduling an Auction and a Sale Hearing.

The Court having considered the Motion and the evidence submitted at the Hearing held before this Court to consider the entry of this Order; and in accordance with Bankruptcy Rules 2002, 6004, 6006 and 9014, and the Local Rules 9013-1, 9013-2, 9013-3 and 6004-1(e), due and proper notice of the Motion and the Hearing having been given; and it appearing that the approval of the Bidding Procedures and the Bid Protections, the form and manner of notice thereof, the scheduling of the Auction and the Sale Hearing, and the approval of the Assumption Procedures on an expedited basis is necessary and appropriate; and it appearing that approval of the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS THAT**:

A.      **Findings of Fact and Conclusions of Law**.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      **Jurisdiction and Venue**.  The Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334.  Consideration of the Motion constitute a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Cases and the proceedings on the Motion is proper in this district

pursuant to 28 U.S.C. §§ 1408 and 1409.

        C.    **Bases for Relief**.  The bases for the relief requested in the Motion are: (i) sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"); (ii) Rules 2002(a)(2), 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and (iii) Rule 6004-1(e) of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the District of Minnesota (the "**Local Rules**").

        D.    **Notice**.  Notice of the Bid Procedures Hearing has been provided by the Debtors, email, overnight courier and/or hand delivery, to all parties entitled to notice under Local Rule 9013-3(a)(2) (collectively, the "**Notice Parties**").  Under the circumstances, such notice of the Bid Procedures Hearing and the relief requested in the Motion complies with Bankruptcy Rule 2002 and Local Rules 6004-1(e), 2002-1(b) and 2002-4(a).

        E.    **Sufficient Reasons**.  The Debtors have articulated good and sufficient reasons for this Court to:  (i) approve the Bidding Procedures; (ii) schedule the Auction and Sale Hearing and approve the manner of notice of the Auction and Sale Hearing; (iii) approve the procedures for the assumption and assignment of the Contracts, including notice of proposed cure amounts; and grant the Breakup Fee as provided in the Stalking Horse Purchase Agreement and in this Order.

        F.    **Breakup Fee**.  The Breakup Fee:  (i) shall, if triggered, be deemed an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code; (ii) is commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder; (iii) is reasonable and appropriate, including in light of the size and nature of the proposed Sale and

comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Bidder, notwithstanding that the proposed Sale is subject to better and higher offers; and (iv) was necessary to induce the Stalking Horse Bidder to pursue the Sale and to be bound by the Stalking Horse Purchase Agreement.

G.    **Bid Protections**.  The Breakup Fee and the Initial Minimum Overbid (jointly, the "**Bid Protections**") were a material inducement to, and express condition of, the Stalking Horse Bidder's willingness to submit a bid through execution of the Stalking Horse Purchase Agreement that will serve as a minimum or floor bid on which the Debtors, their creditors, suppliers, vendors, and other bidders may rely.  The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that, given the circumstances, the best possible price for the Assets will be received.  Accordingly, the Bidding Procedures and the Bid Protections are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates.

H.    **Good Faith**.   The Bidding Procedures and the Stalking Horse Purchase Agreement were negotiated by the parties at arms' length and in good faith by the Debtors and the Stalking Horse Bidder.

I.    **Assumption and Assignment Procedures**.  The Motion, this Order, and the assumption and assignment procedures set forth herein are reasonably calculated to provide counterparties to any Contracts to be assumed by the Debtors and assigned to the Successful Bidder with proper notice of the intended assumption and assignment of their Contracts, the procedures in connection therewith, and any cure amounts relating thereto.

J.    **Sale Notice**.  The sale notice, substantially in the form attached hereto as **Exhibit 2** (the "**Sale Notice**"), is reasonably calculated to provide interested parties with timely

and proper notice of the proposed sale, including, without limitation:  (i) the date, time, and place

of the Auction (if one is held); (ii) the Bidding Procedures; (iii) the deadline for filing objections

to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing;

(iv) reasonably specific identification of the Assets to be sold; (v) instructions for promptly

obtaining copies of the Stalking Horse Purchase Agreement; (vi) a description of the Sale as

being free and clear of liens, claims, encumbrances, and other interests (except as set forth in the

applicable Purchase Agreement), with all such liens, claims, encumbrances, and other interests

attaching with the same validity and priority to the Sale proceeds; (vii) notice of the proposed

assumption and assignment of Contracts to the Stalking Horse Bidder pursuant to the Stalking

Horse Purchase Agreement (or to another Successful Bidder arising from the Auction, if any),

and no other or further notice of the sale shall be required.

NOW, **THEREFORE**, on the Motion of the Debtors and the record before this Court

with respect to the Motion, including the record made during the Hearing, and good and

sufficient cause appearing therefor,

**IT IS SO ORDERED** that:

1.     **Motion Granted**.  The Motion is granted to the extent provided herein.  Any

objections to the Motion with respect to entry of this Order to the extent not withdrawn, waived

or otherwise resolved, and all reservation of rights included therein, are hereby denied and

overruled.

## I.      Important Dates and Deadlines

2.     **Sale Hearing**.  The Sale Hearing shall commence on or before January 27, 2017,

at 10:00 a.m. (prevailing Central Time) before the Honorable Michael E. Ridgway, at Courtroom

No. 7 West, U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota,  55415.  Upon

entry of this Order, the Debtors are authorized to perform any obligations of the Debtors set forth

in the Stalking Horse Purchase Agreement or other applicable Purchase Agreement that are intended to be performed prior to the Sale Hearing or entry of the Sale Order. The Sale Hearing may be adjourned by announcement in open Court or on the Court's calendar without any further notice required.

3. **Sale Objection Deadline**. Objections, if any, to the Sale must be made on or before seven (7) calendar days after the Bid Deadline, at 4:00 p.m. (prevailing Central Time) (the "**Sale Objection Deadline**"). Objections must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be actually received no later than the Sale Objection Deadline by the following parties (the "**Notice Parties**"):

| Proposed Counsel to the Debtors | Counsel to the Stalking Horse Bidder |
|---|---|
| Baker & Hostetler LLP<br>Attn: Elizabeth Green<br>SunTrust Center, Suite 2300<br>200 South Orange Avenue<br>Orlando, Florida 32801-3432 | BioUrja Trading, LLC<br>Eldridge Oaks I<br>1080 Eldridge Pkwy, Suite 1175<br>Houston, TX 770077 |
| **The United States Trustee** | **Counsel to the Agent** |
| Office of the United States Trustee<br>1015 U.S. Courthouse<br>300 South Fourth Street<br>Minneapolis, Minnesota 55415 | Moore & VanAllen<br>Attn: Alan W. Pope<br>100 North Tryon Street, Suite 4700<br>Charlotte, North Carolina 28202-4003 |
| **Proposed Counsel to the Committee** | |
| [TBD] | |

4. **Failure to Object**. A party's failure to timely file or make an objection in accordance with this Order shall forever bar the assertion of any objection to the Motion, entry of the Sale Order, and/or consummation of the Sale with the Successful Bidder pursuant to the

applicable Purchase Agreement, including the assumption and assignment of the Contracts to the Successful Bidder pursuant to the applicable Purchase Agreement, and shall be deemed to constitute any such party's consent to entry of the Sale Order and consummation of the Sale and all transactions related thereto, including, without limitation, such assumption and assignment.

5.      **Bid Deadline**.  The deadline by which all Bids for the Debtors' Assets must be actually received by the parties specified in the Bidding Procedures is 11:59 p.m. (prevailing Central Time), on January 19, 2017 (the "**Bid Deadline**").

6.      **Auction**.  January 23, 2017 at 10:00 a.m. (prevailing Central Time), is the date and time the Auction, if one is needed.  Such Auction will be held at the offices of counsel to the Debtors:  Baker & Hostetler LLP, 811 Main Street, Suite 1100, Houston, Texas  77002-6111, or such later time on such day or other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids.  As set forth more fully in the Bidding Procedures, only Qualified Bidders shall be permitted to participate at the Auction.

**II.      Auction, Bidding Procedures, and Related Relief**

7.      The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to the proposed sale of the Assets.  Any party desiring to bid on the Assets shall comply with the Bidding Procedures and this Order.  The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.

8.      The Stalking Horse Bidder is deemed a Qualified Bidder, and the Stalking Horse Bid as set forth in the Stalking Horse Purchase Agreement is deemed a Qualified Bid.

9.      If the Debtors do not receive any Qualified Bids (other than the Stalking Horse Bid) and there is a written waiver of the Credit Bid Right (as defined in the Bidding Procedures): (a) the Debtors will not hold the Auction; (b) the Stalking Horse Bidder will be deemed the

Successful Bidder for the Assets; and (c) the Debtors shall be authorized to seek approval of the Stalking Horse Purchase Agreement at the Sale Hearing.

10.     If the Debtors receive one or more Qualified Bids from Qualified Bidders (other than the Stalking Horse Bidder), or if the Agent indicates that it intends to exercise its Credit Bid Right, then the Debtors shall conduct the Auction in accordance with the Bidding Procedures.

11.     Each bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale, as set forth in the Bidding Procedures.  The Auction shall be conducted openly and may be transcribed or videotaped.

12.     The Agent shall be deemed to be a Qualified Bidder and is not required to make any Deposit.  The Agent shall have its Credit Bid Right.  Upon exercise of the Credit Bid Right, the Agent shall not be required to take title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), or be deemed to have taken title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), any individual asset, portion of the assets, or all of the assets, and the Agent shall have the right to designate any person or entity in its sole and absolute discretion that shall take title to the individual asset, portion of the assets, or all of the assets that are subject to the Credit Bid Right.  Except for the holders of any Senior Third Party Liens (as defined in the Interim DIP Order or any Final DIP Order), no other person may credit bid unless the entire amount of the Lenders' claims (including all prepetition and debtor in possession financing claims) will be indefeasibly paid in full in cash on the closing of the proposed sale.  In the event the Agent exercises the Credit Bid Right, and the amount of the credit bid of the Agent exceeds the total amount of the highest bids for the assets subject to the Credit Bid Right, such credit bid will be deemed the highest and best bid and such credit bid will be accepted by the Debtors and

- 8 -

presented for approval to the Bankruptcy Court.  The Agent will not be a Backup Bidder unless the Agent consents in writing otherwise.

13.     Subject to the terms of the Bidding Procedures and the prior paragraph of this Order, in the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to credit bid the value of the Breakup Fee.

14.     Any credit bid made by a Successful Bidder must include a cash component sufficient to pay the Breakup Fee.

15.     So long as acceptable to the Agent in its reasonable discretion, the Debtors may (a) determine which Qualified Bid is the highest or otherwise best offer; (b) reject at any time before entry of an Order of the Bankruptcy Court approving the Successful Bid, any Bid (other than the Stalking Horse Bid) that, in the discretion of the Debtors, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors; and (c) at or before the conclusion of the Auction, may impose such other terms and conditions upon Qualified Bidders (except the Stalking Horse Bidder) as the Debtors determines to be in the best interests of the Debtors' estates in these cases.

16.     No person or entity, other than the Stalking Horse Bidder, shall be entitled to any expense reimbursement, breakup fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this court any request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

### III.    Breakup Fee

17.    The Breakup Fee are approved on the terms set forth in the Stalking Horse Purchase Agreement.  The Debtors are authorized to pay any and all such amounts owing to the Stalking Horse Bidder on account of the Breakup Fee in accordance with the terms of the Stalking Horse Purchase Agreement without further action or order by the Court and as and when due and payable under the Stalking Horse Purchase Agreement.

18.    The obligations of the Debtors to pay the Breakup Fee (if payable under the Stalking Horse Purchase Agreement in accordance with its terms and the terms of this Order, and until such Breakup Fee are paid) (a) shall be an allowed administrative expense claim in these Cases pursuant to sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code, (b) shall not be subordinate to any other administrative expense claim against the Debtors, except as set forth in the Interim DIP Order or any Final DIP Order, and (c) shall survive the termination of the Stalking Horse Purchase Agreement in accordance with Section 3.6 thereof.

### IV.    Assumption and Assignment Procedures

19.    The following procedures regarding the assumption and assignment of the Contracts in connection with the Sale are approved to the extent set forth herein, and shall govern the assumption and assignment of all Contracts proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder (or other Successful Bidder following the Auction, if any) pursuant to section 365(f) of the Bankruptcy Code under the Stalking Horse Purchase Agreement or other applicable Purchase Agreement.

20.    **Notices for Contracts**.  As soon as practicable, the Debtors shall serve on all non-Debtor counterparties to any Contract (the "**Contract Notice Parties**") that may be assumed by the Debtors and assigned to the Successful Bidder a "**Contract Notice**," substantially in the

form attached hereto as **Exhibit 3**, that identifies, to the extent applicable:  (a) the Contract that

may be assumed and assigned; (b) the name of the non-Debtor counterparty to such Contract;

(c) the Debtors' asserted cure amount for such Contract if it becomes assumed and assigned;

(d) the deadlines by which any such Contract counterparty must file an objection (each, a

"**Contract Objection**") to the proposed cure amount, assumption and assignment, or adequate

assurance; (e) identifying the Stalking Horse Bidder; and (f) providing the counterparties to the

Contracts (the "**Contract Counterparties**") with the Stalking Horse Bidder's assurance of future

performance; provided that the presence of a Contract on a Contract Notice does not constitute

an admission that such Contract is an executory contract or unexpired lease; provided, further,

that the presence of a Contract on the Contract Notice or Assumption Notice shall not prevent the

Debtors from subsequently withdrawing such request for assumption or rejecting such Contract

at any time before such Contract is actually assumed and assigned pursuant to an Order of the

Court.  Such Contract Notice shall be without prejudice to the Stalking Horse Bidder's rights

under the Stalking Horse Purchase Agreement to subsequently exclude such items from

assumption and assignment or add additional items.  As soon as practicable after the Bid

Deadline, the Debtors shall file with the Court and serve on the Contract Notice Parties who are

parties to a Contract to be assumed and assigned a further notice substantially in the form

attached hereto as **Exhibit 4** (the "**Assumption Notice**") identifying all Qualified Bidders each

of whom will be permitted to participate in the Auction, stating which Contracts may be assumed

and assigned, and providing such parties with the Qualified Bidders' assurance of future

performance.  To the extent the Debtors subsequently identify prior to the Sale Hearing any

additional Contracts to be assumed by the Debtors and assigned to the Successful Bidder, the

Debtors shall serve on any counterparty to such Contract the Contract Notice and/or Assumption

Notice, as applicable, along with the Successful Bidder's assurance of future performance, as soon as practicable. Such counterparty shall have seven (7) days from service of the Contract Notice and/or Assumption Notice, as applicable, to file an objection to the proposed cure amount or assumption and assignment of its Contract in accordance with the procedures set forth herein.

21. **Objections to Assumption of Contracts**. Any non-Debtor counterparty to a Contract who objects to the cure or assignment of their Contracts (the "**Objecting Party**") shall file Contract Objections pursuant to the following procedures:

> ➢ ***Contract Objection***. All Contract Objections to the cure amounts listed in the Contract Notice, the Debtors' ability to assign a Contract, or adequate assurance of future performance solely by the Stalking Horse Bidder shall be filed with the Court by 4:00 p.m. (prevailing Central Time) seven (7) days from service of the Contract Notice or any amendment or supplement to the Contract Notice.

> ➢ ***Supplemental Adequate Assurance Objection***. All Contract Objections to adequate assurance of future performance of Contracts by any Successful Bidder other than the Stalking Horse Bidder shall be filed with the Court at or prior to the Sale Hearing; provided that for parties identified on any supplemental Assumption Notice issued by the Debtors after the initial Assumption Notice, such parties shall have seven (7) days from service of such notice to file such Contract Objection.

> ➢ ***No Objection***. If no Objection is received in accordance with the deadlines set forth above, such counterparty: (a) shall be deemed to have consented to the cure amounts and assumption and assignment of its Contract to the Successful Bidder; (b) shall be forever barred, estopped, and enjoined from asserting any additional cure amount under the Contracts; and (c) shall be forever barred from objecting to the assignment of the Contracts to the Successful Bidder or the adequacy of the Successful Bidder's assurance of future performance.

> ➢ ***Resolution Period***. If any timely filed Contract Objection cannot be resolved by the Successful Bidder and the Objecting Party, the Court shall resolve such Contract Objection prior to assumption and assignment of such designated Contract, and upon entry of an order by the Court resolving such Contract Objection, the assignment, if approved by the Court, shall be deemed effective as of the date such Objecting Party receives the Assumption Notice. To the extent that any Contract Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Contract

Objection, to be determined in the Stalking Horse Bidder's or other Successful Bidder's reasonable discretion, and until such time as the Contract Objection can be resolved, the Contract shall be conditionally assumed and assigned pending a resolution of the Contract Objection after notice and a hearing.

➢ ***Form of Objections***.   Contract Objections must:   (a) be in writing; (b) state with specificity the nature of such objection and alleged cure amount, including applicable and appropriate documentation in support of such alleged cure amount; and (c) comply with the Bankruptcy Rules and the Local Rules.

## V.     Sale Hearing Notice

22.     The Sale Notice is hereby approved.   On or within three (3) business days following entry of this Order, the Debtors shall cause the Sale Notice to be served on:  (a) United States Trustee for the District of Minnesota (the "**U.S. Trustee**"); (b) proposed counsel to the Committee (if any); (c) counsel to the Stalking Horse Bidder; (d) the Contract Counterparties; (e) all parties who have expressed a written interest in some or all of the Assets; (f) all known holders of liens, encumbrances, and other claims secured by the Assets; (g) the District Counsel and the District Director of the Internal Revenue Service; (h) the Collection Division of the Minnesota Department of Revenue; (i) all applicable state and local taxing authorities; (j) all of the creditors listed on the Debtors' matrix filed under Local Rule 1007-2(a); (k) the United States Attorney for the District of Minnesota; (l) the United States Bureau of Land Management; (m) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (n) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002 and Local Rules 6004-1(e), 2002-1(b) and 2002-4(a).

## VI.     Miscellaneous

23.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

24.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

25.     This Court exclusive retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.


Dated:                                          _____
                                                Michael E. Ridgway
                                                United States Bankruptcy Judge

## **EXHIBIT 1**

BIDDING PROCEDURES

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | | |
|---|---|---|
| Dakota Plains Holdings, Inc., | | Case No. 16-43711 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Transloading, LLC, | | Case No. 16-43712 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Sand, LLC, | | Case No. 16-43715 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Marketing, LLC, | | Case No. 16-43716 |
| | Debtor. | Chapter 11 Case |
| DPTS Marketing LLC, | | Case No. 16-43717 |
| | Debtor. | Chapter 11 Case |
| Dakota Petroleum Transport Solutions, LLC, | | Case No. 16-43718 |
| | Debtor. | Chapter 11 Case |
| DPTS Sand, LLC, | | Case No. 16-43721 |
| | Debtor. | Chapter 11 Case |

**BIDDING PROCEDURES FOR THE SALE OF CERTAIN OF THE DEBTORS' ASSETS**

On December 19, 2016, the Debtors entered into an asset purchase agreement (the "**Stalking Horse Purchase Agreement**") with BioUrja Trading, LLC (the "**Stalking Horse Bidder**") pursuant to which the Stalking Horse Bidder proposes to purchase, acquire, and take assignment and delivery of, free and clear of all liens, claims, encumbrances, and other interests (except as otherwise provided in the Stalking Horse Purchase Agreement), substantially all of the assets of the Debtors (the "**Assets**").

On December [__], 2016, the United States Bankruptcy Court for the District of Minnesota (the "**Court**") entered an order approving these bidding procedures (these "**Bidding Procedures**," and such order, the "**Bidding Procedures Order**"),[1] in the Debtors' jointly-administered chapter 11 cases (the "**Cases**"). The Bankruptcy Court will have jurisdiction with respect to any dispute that may arise with respect to these Bidding Procedures.

These Bidding Procedures set forth the process by which the Debtors are authorized to conduct an auction for the sale (the "**Sale**") of the Assets.

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Bidding Procedures Order.

The Debtors selected the Stalking Horse Bid (as defined below) after a closed bidding process (the "**Stalking Horse Bidding Process**").  After announcing the Stalking Horse Bid, the Debtors will conduct a round of open bidding (the "**Open Bidding Process**") culminating in an auction intended to obtain a higher or otherwise best bid for the Transaction (the "**Auction**").

I.      **Submission to the Debtors**

All submissions to the Debtors required to be made under these Bidding Procedures must be directed to each the following persons unless otherwise provided (collectively, the "**Debtors' Representatives**"):

A.    **Debtors**.    Dakota Plains Holdings, Inc., 294 Grove Lane East, Wayzata, Minnesota  55391, Attn.:  Gabriel G. Claypool, Chief Executive Officer;

B.    **Counsel**.  Counsel to the Debtors, Baker & Hostetler LLP, SunTrust Center, Suite 2300, 200 South Orange Avenue, Orlando, Florida  32801-3432, Attn:  Elizabeth A. Green (lgreen@bakerlaw.com), Jimmy D. Parrish (jparrish@bakerlaw.com), Jorian    L.    Rose    (jrose@bakerlaw.com),    and    Eric    R.    Goodman (egoodman@bakerlaw.com); and

C.    **Investment Banker**.  Investment Banker to the Debtors, Canaccord Genuity Inc., 535 Madison Avenue, New York, New York  10022, Attn:  Geoffrey Richards (grichards@canaccordgenuity.com),          Michael          Balistreri (mbalistreri@canaccordgenuity.com),         and         Alexander         Ferreira (aferreira@canaccordgenuity.com).

The Debtors' Representatives shall reasonably promptly send all such submissions to the Agent (as defined below) and the Committee Representatives (as defined below).

II.     **Participation Requirements**

A.      **Potential Bidders**

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating the Transaction (a "**Potential Bidder**") must deliver or have previously delivered, if determined to be necessary by the Debtors in their sole discretion by no later than five (5) business days prior to the Bid Deadline:

1.    an executed confidentiality agreement on terms acceptable to the Debtors (a "**Confidentiality Agreement**"); and

2.    preliminary proof by the Potential Bidder of its financial capacity to close a proposed transaction, which may include financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, the party that will bear liability for a breach), the adequacy of

- 2 -

which will be assessed by the Debtors and their advisors in their sole discretion.

### B.        Notice of Acceptable Bidder

The Debtors' advisors will notify each Potential Bidder whether such Potential Bidder has submitted adequate documentation so that such Potential Bidder may submit a Bid (each, an "**Acceptable Bidder**"); provided that the Debtors shall consult with the official committee of unsecured creditors (the "**Committee**") in the event they determine that a Potential Bidder does not constitute an Acceptable Bidder.  Notwithstanding anything herein to the contrary, the Debtors reserve the right to work with Potential Bidders to aggregate partial Bids into a consolidated Acceptable Bid prior to the Acceptable Bid Deadline.  The Stalking Horse Bidder shall be deemed an Acceptable Bidder and a Qualified Bidder at all times.

### III.      Obtaining Due Diligence Access

Only Acceptable Bidders shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Debtors.  No Acceptable Bidder will be permitted to conduct any due diligence without entry into a Confidentiality Agreement.  The Debtors will provide to each Acceptable Bidder reasonable due diligence information, as requested by such Acceptable Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post substantially all written due diligence provided to any Acceptable Bidder to the Debtors' electronic data room.  The due diligence period will end on the Bid Deadline (as defined herein) and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.

In connection with the provision of due diligence information to Acceptable Bidders, the Debtors shall not furnish any confidential information relating to the Assets, liabilities of the Debtors, or the Sale to any person except to an Acceptable Bidder or to such Acceptable Bidder's duly authorized representatives to the extent provided in the applicable Confidentiality Agreement.

The Debtors and their advisors shall coordinate all reasonable requests from Acceptable Bidders for additional information and due diligence access; provided that the Debtors may decline to provide such information to Acceptable Bidders who, at such time and in the Debtors' reasonable business judgment, have not established, or who have raised doubt, that such Acceptable Bidder intends in good faith to, or has the capacity to, consummate the Sale.

**All due diligence requests must be directed to Canaccord Genuity Inc., Attn: Geoffrey Richards (grichards@canaccordgenuity.com), Michael Balistreri (mbalistreri@canaccordgenuity.com), and Alexander Ferreira (aferreira@canaccordgenuity.com)**.

### A.        Communications with Qualified Bidders

Notwithstanding anything to the contrary in these Bidding Procedures, all substantive direct communications with Qualified Bidders shall be through the Debtors' Representatives.

**B.      Due Diligence from Qualified Bidders**

Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of such Qualified Bidder to consummate its contemplated transaction.  Failure by a Qualified Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such bidder is no longer a Qualified Bidder or that a bid made by such bidder is not a Qualified Bid.

**IV.      Committee Access and Information**

The Debtors and the Debtors' Representatives shall regularly consult with, and make the same information that is provided to Acceptable Bidders and the Debtors available to SunTrust Bank, as Agent (the "**Agent**")[2] on behalf of a the prepetition lenders (the "**Lenders**") and representatives of the Committee, including but not limited to the Committee's professionals (the "**Committee Representatives**").

The Debtors and their advisors and representatives will reasonably and promptly consult with the Agent and the Committee Representatives with respect to negotiations with Acceptable Bidders and Qualified Bidders, the terms and conditions of draft agreements with Acceptable Bidders and Qualified Bidders, and the progress of the Open Bidding Process and the Auction.

The Debtors shall also reasonably provide the Agent and the Committee Representatives with relevant information the Debtors receive relating to any Bidders or Bids, including, but not limited to, information regarding the identity of all Potential Bidders, Acceptable Bidders, and Qualified Bidders (as defined below), the terms and conditions of any Bid, the structure (including, without limitation, the proposed tax structure) and form of consideration of any Bid, other information related to the Bid Requirements, and any other information necessary for the Agent and the Committee Representatives to evaluate the Bids (such  information, the "**Bid Information**").

**V.      Due Diligence from Acceptable Bidders and Confidentiality**

If an Acceptable Bidder proposes to use its own or an affiliate's securities as all or part of the financial consideration in its Bid or otherwise makes a Bid that would make relevant the Debtor's or their creditors' need for information from the Bidder concerning the Bidder, the Acceptable Bidder shall comply with all reasonable requests for information from the Debtors and their advisors and representatives regarding the Acceptable Bidder (the "**Bidder Due Diligence Information**," and together with any Bid Information shared during the Stalking Horse Bidding Process, the "**Bidder Confidential Information**").  The Acceptable Bidder may request that the Debtors enter into a confidentiality agreement, if the Debtors have not done so, with respect to the Bidder Due Diligence Information satisfactory to the Debtors and the Acceptable Bidder.  Failure by an Acceptable Bidder to comply with reasonable requests for

---

[2]  The term "**Agent**" shall include the representatives and professionals of the Agent as to all information and consulting rights.

information may be a basis for the Debtors and their advisors and representatives to determine that such bidder no longer qualifies as an Acceptable Bidder.

The Debtors and each of their respective advisors and representatives and the Committee Representatives shall be obligated to maintain in confidence any Bidder Confidential Information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures. Each recipient of Bidder Confidential Information agrees to use, and to instruct their advisors and representatives to use, such Bidder Confidential Information only in connection with the evaluation of Bids during the Bidding Process or otherwise in connection with the Cases or in accordance with the terms of any applicable confidentiality agreement.

Notwithstanding the foregoing and the provisions contained in any applicable confidentiality agreement, the Debtors and the Debtors' Representatives, the Agent, and the Committee Representatives may disclose Bidder Confidential Information, as applicable: (a) with the prior written consent of such Bidder and the Debtors; (b) to the Committee Representatives (who may share such information with members of the Committee pursuant to the terms of the Committee's bylaws); (c) to the applicable Bidder; (d) in accordance with the Open Bidding Process as set forth in Sections VI and VII of these Bidding Procedures; (e) to the Lenders; and (f) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular Bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

## VI.    Bid Requirements

Any proposal, solicitation, or offer (each, a "**Bid**") shall be in cash, must be submitted by an Acceptable Bidder, and must be submitted on or before the Bid Deadline, in writing and determined by the Debtors, in their reasonable business judgment, and in consultation with the Agent and the Committee Representatives, to have satisfied the following requirements (collectively, the "**Bid Requirements**").

### A.    Consideration and Structure

1.    *Total Consideration*. The Bid must identify the form and amount of the total consideration to be provided to the Debtors in cash (the "**Bid Value**").

2.    *Consolidated Bids*. Bids must identify whether or not the Acceptable Bidder is willing to aggregate its Bid into an acceptable consolidated Acceptable Bid with other Potential Bidders.

3.    *Minimum Bid*. The aggregate cash consideration proposed by each Bid must equal to, or exceed, the sum of (A) the Bid Value set forth in the Stalking Horse Bid; (B) the Breakup Fee; plus (C) $100,000.

4.    *Deposit*. Each Bid, including the Bid of the Stalking Horse Bidder (the "**Stalking Horse Bid**"), must be accompanied by a cash deposit in the amount equal to 20% of the aggregate cash purchase price of the Bid to be

held in an interest-bearing escrow account to be identified and established by the Debtors (the "**Deposit**").

5.    ***Same or Better Terms***.  Except as otherwise provided herein, each Bid must, in the Debtors' business judgment and in consultation with the Agent and the Committee Representatives, be on terms the same as or better than the terms of the Stalking Horse Purchase Agreement.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "**Bid Documents**").  The Bid Documents shall include a schedule of Assumed Contracts (pursuant to the Stalking Horse Purchase Agreement) to the extent applicable to the Bid, and a copy of the Stalking Horse Purchase Agreement clearly marked to show all changes requested by the Acceptable Bidder (including those related to the Purchase Price and Assets to be acquired by such Acceptable Bidder), as well as all other material documents integral to such Bid.

6.    ***Sources of Financing***.    The Bid must indicate the source of cash consideration, including proposed funding commitments and confirm that such consideration is not subject to any contingencies.  The Bid should include a detailed sources and uses schedule.

7.    ***Structure***.  The Bid must identify the structure proposed for undertaking the Transaction, including the specific assets of the Debtors, the proposed steps to accomplish such acquisition, and any financial, legal, or tax considerations upon which the Bid's proposed structure relies.

8.    ***Tax Structure***.  The Bid must specify with particularity its tax structure, including whether it is intended to be structured in a tax-free manner or if any incremental tax liabilities will be incurred by the Debtors under the Bid.

9.    ***Assumption***.  The Bid must specify which, if any, of the obligations of the Debtors the Bidder proposes to assume.

**B.    Other Requirements**

1.    ***Binding and Irrevocable***.  The Bid must by its terms remain binding and irrevocable until three (3) months after the date of selection of the Successful Bid, subject to extension by the Debtors for up to three (3) months in the event that any necessary or advisable regulatory approval has not been received as of such date; provided that if the Bid is not selected as the Successful Bid or Backup Bid, the Bid may be revoked after approval of such Successful Bid by the Bankruptcy Court.

2.    ***Regulatory Approvals and Covenants***.  Each Bid must describe in detail (a) the efforts that each party must utilize in connection with seeking and obtaining all regulatory approvals required to complete the Sale and

(b) any limitations on the Bidder's obligation to take all actions necessary or advisable to obtain such regulatory approvals.

3.   ***Employees***.  The Bid must detail the treatment of the employees of the Debtors and their subsidiaries.

4.   ***Conditions to Closing***.  The Bid must identify with particularity each and every condition to Closing.

5.   ***No Financing, Approval, or Diligence Outs***.  The Bid must not be conditioned on obtaining any of the following:  (a) financing; (b) board of directors or other similar approval; or (c) the outcome or completion of a due diligence review by the Acceptable Bidder.

6.   ***Due Diligence Acknowledgement***.  The Bid must include a written acknowledgement and representation that the Bidder:  (a) has had an opportunity to conduct any and all due diligence regarding the Sale before making its offer; (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Sale in making its Bid; and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Sale or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's proposed form of definitive agreement.

7.   ***No Collusion***.  The Bidder must acknowledge in writing (a) that it has not engaged in any collusion with respect to any Bids or the Sale, specifying that it did not agree with any Bidders or Potential Bidders to control price; and (b) agree not to engage in any collusion with respect to any Bids, the Auction, or the Sale.

8.   ***Good Faith Offer***.  The Bid must constitute a good faith, *bona fide* offer to consummate the Sale.

9.   ***Identification Information***.  The Bidder must fully disclose the identity of each entity or person that will be consummating the Sale or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the Bidder and each such entity is legally empowered, by power of attorney or otherwise, to complete the Sale on the terms contemplated by the parties.

10.   ***Consent to Jurisdiction***.  The Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, and the Sale documents and the Closing, as applicable.

11. ***Disclaimer of Fees***.  Each Bid (other than the Stalking Horse Bid) must disclaim any right to receive a fee analogous to a breakup fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Qualified Bidder (as defined herein) (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a breakup fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

**VII.   Open Bid Requirements**

The Debtors will only consider Bids during the Open Bidding Process from Acceptable Bidders that satisfy the Bid Requirements.  Multiple Bids will be permitted during the Open Bidding Process.  In addition, Acceptable Bidders during the Open Bidding Process must satisfy the following requirements (the "**Open Bid Requirements**").

A. ***Minimum Value***.  The Bid must provide for Bid Value equal to at least:  (i) the Bid Value set forth in the Stalking Horse Bid, (ii) the Breakup Fee payable under the Stalking Horse Bid, plus (iii) $100,000 (the "**Initial Minimum Overbid**").

B. ***Documentation***.  The Bid must include a marked version of the Stalking Horse Agreement.

C. ***No Other Bid Protections***.  A Bid may not propose any bid protections.

Bids submitted during the Open Bidding Process and fulfilling all of the Bid Requirements and Open Bid Requirements may, at the Debtors' discretion, in consultation with the Agent and the Committee Representatives, be deemed to be "**Qualified Bids**," and those parties submitting Qualified Bids may, at the Debtors' discretion, in consultation with the Agent and the Committee Representatives, be deemed to be "**Qualified Bidders**."  To be eligible to be selected as a Qualified Bidder, a Bidder must be an Acceptable Bidder and must submit a Bid that is actually received no later than 11:59 p.m. (prevailing Central Time) on January 19, 2017 (the "**Bid Deadline**") by each of the Debtors' Representatives.  Acceptable Bidders that do not submit a Bid by the Bid Deadline will not be eligible to be selected as Qualified Bidders.

By no later than three (3) business days after the Bid Deadline, the Debtors shall determine which Acceptable Bidders are Qualified Bidders after consultation with the Agent and the Committee's Representatives, and will notify the Acceptable Bidders whether Bids submitted constitute Qualified Bids so as to enable such Qualified Bidders to bid at the Auction.  Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors.  The Stalking Horse Bid shall constitute a Qualified Bid.

## VIII.   Auction

If the Debtors receive a Qualified Bid, other than the Stalking Horse Bid, or if the Agent indicates that it intends to exercise its Credit Bid Right (as defined below) within five (5) business days after receiving from the Debtors the Bids and Qualified Bids and such other information as the Agent may reasonably request, the Debtors will conduct the Auction to determine the Successful Bidder with respect to the Debtors' Assets.  If the Debtors do not receive a Qualified Bid (other than the Stalking Horse Bid), the Debtors, in consultation with the Agent and the Committee Representatives, will not conduct the Auction and shall designate the Stalking Horse Bidder's Qualified Bid as the Successful Bid unless the Agent indicates that it intends to exercise its Credit Bid Right as set forth above.

No later than three (3) calendar days after the Bid Deadline at 12:00 p.m. (prevailing Central Time), the Debtors will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, as determined in the Debtors' reasonable business judgment, in consultation with the Agent and the Committee Representatives (the "**Baseline Bid**"), and provide copies of the Bid Documents supporting the Baseline Bid to all Qualified Bidders.  The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors, in consultation with the Agent and the Committee Representatives, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things:  (a) the number, type, and nature of any changes to the Stalking Horse Purchase Agreement requested by the Qualified Bidder, including the type and amount of Assets sought and Assumed Obligations to be assumed in the Bid; (b) the total cash consideration; (c) the likelihood of the Bidder's ability to close a transaction, the conditions thereto, and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Bid Documents; and (e) the tax consequences of such Qualified Bid (collectively, the "**Bid Assessment Criteria**"); provided that the Debtors, with the Agent's written consent, may allow Qualified Bid's to include cash equivalents or other forms of value acceptable to the Agent.

The Auction shall take place at 10:00 a.m. (prevailing Central Time) on January 23, 2017, at the offices of Baker Hostetler LLP, 811 Main Street, Suite 1100, Houston, Texas 77002-6111, or such later date and time as selected by the Debtors.  The Auction shall be conducted in a timely fashion according to the following procedures.

### A.      The Debtors Shall Conduct the Auction

The Debtors and their professionals shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid.  All incremental Bids made thereafter must be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders.  The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid.

Only Qualified Bidders and their legal and financial advisors, the Agent, the Lenders, and the Committee and their legal and financial advisors shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or

through duly authorized representatives.  Only Qualified Bidders shall be entitled to bid at the Auction.

**B.      Terms of Overbids**

"**Overbid**" means any cash bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid.  Each Overbid must comply with the following conditions.

1.    *Minimum Overbid Increment*.    Any Overbid following the Initial Minimum Overbid or following any subsequent Prevailing Highest Bid (as defined below) shall be in increments in cash of $50,000 (the "**Overbid Increment**").

2.    *Conclusion of Each Overbid Round*.    Upon the solicitation of each round of Overbids, the Debtors, following consultation with the Agent and the Committee Representatives, may announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "**Overbid Round Deadline**") by which time any Overbids must be submitted to the Debtors.

3.    *Overbid Alterations*.    Each Overbid must contain the Overbid Increment and may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates, or the allocation of value to the Agent and Lenders, than any prior Qualified Bid or Overbid, as determined in the Debtors' reasonable business judgment, following consultation with the Agent and the Committee Representatives, but shall otherwise comply with the terms of these Bidding Procedures.

4.    *Announcing Highest Bid*.    Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors have identified, an Overbid as being higher or otherwise better than the Initial Minimum Overbid, in the initial Overbid round, or, in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "**Prevailing Highest Bid**").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

**C.      Consideration of Overbids**

The Debtors reserve the right, in their reasonable business judgment, and in consultation with the Agent and the Committee Representatives and the Stalking Horse Bidder and the Agent, to adjourn the Auction one or more times to, among other things (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount.

D.    **Closing the Auction**

    1.    The Auction shall continue until there is only one Qualified Bid that the Debtors determine, in their reasonable business judgment and in consultation with the Agent and the Committee Representatives, to be the highest or otherwise best Qualified Bid for the Assets. Such Qualified Bid shall be declared the "**Successful Bid**," and such Qualified Bidder, the "**Successful Bidder**" and at which point the Auction will be closed. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.

    2.    For the avoidance of doubt, nothing in these Bidding Procedures shall prevent the Debtors from exercising their respective fiduciary duties under applicable law.

    3.    The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

    4.    As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Bid Documents for the Successful Bid and Backup Bid (defined below) to be filed with the Court.

E.    **No Collusion; Good Faith *Bona Fide* Offer**

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the Sale or bidding (including that it has no agreement with any other Bidder or Qualified Bidder to control the price), and (ii) its Qualified Bid is a good faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

IX.    **Backup Bidder**

    A.    Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction for the Assets, as determined by the Debtors in the exercise of their reasonable business judgment and in consultation with the Agent and the Committee Representatives (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.

    B.    The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors, at the conclusion of the Auction at the same time the Debtors announce the identity of

the Successful Bidder.  The Backup Bidder shall be required to keep its Qualified Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the closing of the transaction with the Successful Bidder.  The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the Successful Bidder.

C.      If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors, in consultation with the Agent and the Committee Representatives, may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.  In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

## X.      Highest or Otherwise Best Bid

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors, in consultation with the Agent and the Committee Representatives, may consider the following factors in addition to any other factors that the Debtors, the Agent, and the Committee Representatives deem appropriate:  (a) the number, type, and nature of any changes to the Stalking Horse Purchase Agreement requested by the Qualified Bidder, including the type and amount of Assets sought and obligations to be assumed in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Bid Documents; and (e) the tax consequences of such Qualified Bid.

## XI.     Rights of Agent / Other Rights to Credit Bid

The Agent shall be deemed to be a Qualified Bidder and is not required to make any Deposit.  The Agent may credit bid at any time, in its sole and absolute discretion, any portion and up to the entire amount of the Agent's and the Lenders' claims, including, without limitation, both the Lenders' prepetition claims and all obligations under the Interim DIP Order and any Final DIP Order, at any time on any individual Asset, portion of the Assets, or all of the Assets constituting the Prepetition Collateral or the DIP Collateral (as each are defined in the Interim DIP Order or any Final DIP Order) in conjunction with the sale of the Debtors' Assets (the "**Credit Bid Right**").  Upon exercise of the Credit Bid Right, the Agent shall not be required to take title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), or be deemed to have taken title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), any individual Asset, portion of the Assets, or all of the Assets, and the Agent shall have the right to designate any person or entity in its sole and absolute discretion that shall take title to the individual Asset, portion of the Assets, or all of the Assets that are subject to the Credit Bid Right.  Except for the holders of any Senior Third Party Liens (as defined in the Interim DIP Order or any Final DIP

Order), no other person may credit bid unless the entire amount of the Lenders' claims (including all prepetition and debtor in possession financing claims) will be indefeasibly paid in full in cash on the closing of the proposed sale.  In the event the Agent exercises the Credit Bid Right, and the amount of the credit bid of the Agent exceeds the total amount of the highest bids for the Assets subject to the Credit Bid, such credit bid will be deemed the highest and best bid and such credit bid will be accepted by the Debtors and presented for approval to the Bankruptcy Court. The Agent will not be a Backup Bidder unless the Agent consents in writing otherwise.  So long as acceptable to the Agent in its reasonable discretion, the Debtors may (a) determine which Qualified Bid is the highest or otherwise best offer; (b) reject at any time before entry of an Order of the Bankruptcy Court approving the Successful Bid, any Bid that, in the discretion of the Debtors, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors; and (c) at or before the conclusion of the Auction, may impose such other terms and conditions upon Qualified Bidders as the Debtors determines to be in the best interests of the Debtors' estates in these cases.  All terms and provisions of this paragraph shall control over any conflicting provision of these Bidding Procedures.

Subject to the prior paragraph, at the Auction, any Qualified Bidder, including the Stalking Horse Bidder, who has a valid, perfected, and unavoidable lien on any assets of the Debtors' estates (a "**Secured Creditor**") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; provided that a Secured Creditor shall have the right to credit bid its claim only with respect to collateral by which such Secured Creditor is secured; provided, further, that for purposes of such Secured Creditor's Qualified Bid, the Secured Creditor's claim shall be deemed to have the value it possesses on the date of the Auction.

Any credit bid made by a Successful Bidder must include a cash component sufficient to pay the Breakup Fee.

## XII.    Reservation of Rights

The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment, in consultation with the Agent and the Committee Representatives, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation:  (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing (as defined below) in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids.

Notwithstanding the foregoing and subject in all respects to the Stalking Horse Purchase Agreement, the Debtors may not impair or modify the Stalking Horse Bidder's rights and obligations under the Stalking Horse Purchase Agreement and the Bidding Protections as part of any Bid at the Auction or otherwise.

## XIII.   Consent to Jurisdiction

All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Bid Documents, as applicable.

## XIV.   Sale Hearing

A hearing to consider approval of the Sale of all or substantially all of the Debtors' Assets to the Successful Bidder (or to approve the Stalking Horse Purchase Agreement if no Auction is held) (the "**Sale Hearing**") is currently scheduled to take place on or before January 27, 2017, at 10:00 a.m. (prevailing Central Time), before the Honorable Michael E. Ridgway, Courtroom No. 7 West, U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota, 55415.

The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder).

At the Sale Hearing, the Debtors shall present the Successful Bid to the Court for approval.

## XV.   Stalking Horse Purchase Agreement and Stalking Horse Rights

Notwithstanding anything in these Bidding Procedures to the contrary, the Stalking Horse Purchase Agreement and related transaction documents shall remain in full force and effect until such agreements have terminated in accordance with their respective terms and regardless of whether the Stalking Horse Bidder is designated the Successful Bidder or the Backup Bidder.

To provide an incentive and to compensate the Stalking Horse Bidder for performing the substantial due diligence and incurring the expenses necessary and entering into a Stalking Horse Purchase Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to pay the Stalking Horse Bidder, under the conditions and in the amount set forth in Sections 3.5 and 7.1 of the Stalking Horse Purchase Agreement and the Bidding Procedures Order, a Breakup Fee (as defined in the Stalking Horse Purchase Agreement) not to exceed three percent (3.5%) of the Purchase Price (as defined in the Stalking Horse Purchase Agreement).  The Breakup Fee shall be paid in accordance with the Bidding Procedures Order and Stalking Horse Purchase Agreement.

The Stalking Horse Bidder shall have standing to appear and be heard on all issues related to the Auctions, the Sale and related matters, including the right to object to the sale of the Assets or any portion thereof (including the conduct of the Auctions and interpretation of these Bidding Procedures).

## XVI.   Return of Deposit

The Deposit of the Successful Bidder shall be applied to the purchase price of such transaction at closing.  Deposits for each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Stalking Horse Bidder, the Successful Bidder, and the Backup Bidder) on or within three business days after the Auction.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Debtors will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the proposed transaction with the applicable Backup Bidder without the need for an additional hearing or order of the Court.

## XVII.  Fiduciary Out

Nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of a Debtor to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations.

[*Remainder of Page Intentionally Left Blank*]

Dated:  December [__], 2016

RAVICH MEYER KIRKMAN MCGRATH NAUMAN & TANSEY, PA

/s/ Michael F. McGrath
Michael F. McGrath (#168610)
Will R. Tansey (#323056)
150 S. Fifth Street, Suite 3450
Minneapolis, MN  55402
Telephone:  612.317.4744
Email: mfmcgrath@ravichmeyer.com
        wrtanser@ravichmeyer.com

Elizabeth A. Green
Jimmy D. Parrish
BAKER & HOSTETLER LLP
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL  32801-3432
Telephone:  407.649.4000
Email: egreen@bakerlaw.com
        jparrish@bakerlaw.com

Eric R. Goodman
BAKER & HOSTETLER LLP
Key Tower, 127 Public Square
Suite 2000
Cleveland, OH  44114-1214
Telephone:  216.621.0200
Email: egoodman@bakerlaw.com

*Proposed Counsel for the Debtors and Debtors in Possession*

## **EXHIBIT 2**

SALE NOTICE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | | |
|---|---|---|
| Dakota Plains Holdings, Inc., | | Case No. 16-43711 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Transloading, LLC, | | Case No. 16-43712 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Sand, LLC, | | Case No. 16-43715 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Marketing, LLC, | | Case No. 16-43716 |
| | Debtor. | Chapter 11 Case |
| DPTS Marketing LLC, | | Case No. 16-43717 |
| | Debtor. | Chapter 11 Case |
| Dakota Petroleum Transport Solutions, LLC, | | Case No. 16-43818 |
| | Debtor. | Chapter 11 Case |
| DPTS Sand, LLC, | | Case No. 16-43721 |
| | Debtor. | Chapter 11 Case |

## NOTICE OF SALE BY AUCTION AND SALE HEARING

**PLEASE TAKE NOTICE** that, on December 21, 2016, Dakota Plains Holdings, Inc. and the above-captioned debtors and debtor in possession (collectively, the "**Debtors**") filed the Notice of Motion of the Debtors for Entry of (I) an Expedited Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief and (II) an Order (A) Approving the Asset Purchase Agreement Between the Debtors and the Purchaser, (B) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, (D) Authorizing the Distribution of Excess Sale Proceeds to Secured Creditors, and (E) Granting Related Relief ECF No. [__] (the "**Sale Motion**") with the United States Bankruptcy Court for the District of Minnesota (the "**Court**").

**PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the sale (the "**Sale**") of substantially all of the Debtors' assets (the "**Assets**") consistent with the bidding procedures (the "**Bidding Procedures**") approved by the Expedited Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and a Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of

Contracts, and (E) Granting Related Relief ECF No. [__] (the "**Bid Procedures Order**")[1] entered by the Court on December [__], 2016.  **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order**.  To the extent that there are any inconsistencies between this Notice and the Bidding Procedures or Bidding Procedures Order, the Bidding Procedures or Bidding Procedures Order, as applicable, shall govern in all respects.

      **PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing bids within the requirements and time frame specified by the Bidding Procedures, the Debtors will conduct an auction (the "**Auction**") of the Assets on January 23, 2017 at 10:00 a.m. (prevailing Central Time) at Baker & Hostetler LLP's office at 811 Main Street, Suite 1100, Houston, Texas  77002-6111 (or at any other location as the Debtors may hereafter designate on proper notice).

      **PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale at a hearing (the "**Sale Hearing**") to be held on January 27, 2017 at [__:__ _].m. (prevailing Central time) before the Honorable Michael E. Ridgway, United States Bankruptcy Judge for the District of Minnesota, in Courtroom No. 7 West, U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota,  55415.

      **PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bidding Procedures Order with respect to any objections to proposed cure amounts or the assumption and assignment of Contracts, objections to the relief requested in the Sale Motion must:  (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be actually received by 4:00 p.m. (prevailing Central Time) on or before seven (7) calendar days after the Bid Deadline by the following parties (the "**Notice Parties**"):

| **Proposed Counsel to the Debtors** | **Counsel to the Stalking Horse Bidder** |
|---|---|
| Baker & Hostetler LLP<br>Attn:  Elizabeth Green<br>SunTrust Center, Suite 2300<br>200 South Orange Avenue<br>Orlando, Florida  32801-3432 | BioUrja Trading, LLC<br>Eldridge Oaks I<br>1080 Eldridge Pkwy, Suite 1175<br>Houston, TX  770077 |
| **The United States Trustee** | **Counsel to the Agent** |
| Office of the United States Trustee<br>1015 U.S. Courthouse<br>300 South Fourth Street<br>Minneapolis, Minnesota  55415 | Moore & VanAllen<br>Attn:  Alan W. Pope<br>100 North Tryon Street, Suite 4700<br>Charlotte, North Carolina  28202-4003 |

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Bid Procedures Order.

| Proposed Counsel to the Committee | |
|---|---|
| [TBS] | |

**UNLESS A RESPONSE OPPOSING THE SALE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE SALE MOTION ON A FINAL BASIS WITHOUT A HEARING**.

<u>**NO SUCCESSOR OR TRANSFEREE LIABILITY**</u>

The Stalking Horse Purchase Agreement and proposed Sale Order provide that the Stalking Horse Bidder and/or Successful Bidder, if applicable, will have no responsibility for, and the Assets will be sold free and clear of, any successor liability, including the following:  (a) any liability or other obligation of the Debtors' estates or related to the Assets other than as expressly set forth in the applicable Purchase Agreement; or (b) any claims against the Debtors, their estates, or any of their predecessors or affiliates.  Except as expressly provided in the Sale Order or the applicable Purchase Agreement, the Stalking Horse Bidder or Successful Bidder shall have no liability whatsoever with respect to the Debtors' estates' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' estates' (or their predecessors' or affiliates') obligations (as described below, "**Successor or Transferee Liability**") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, or substantial continuity, whether known or unknown as of the Closing Date (as defined in the applicable Purchase Agreement), now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the closing of the Sale, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Assets prior to the closing of the Sale.

**PLEASE TAKE FURTHER NOTICE** that copies of the Sale Motion, the Bidding Procedures, and the Bidding Procedures Order may be obtained for a fee at http://www.mnb.uscourts.gov/

[*Remainder of Page Intentionally Left Blank*]

Dated:  December [__], 2016

RAVICH MEYER KIRKMAN MCGRATH NAUMAN
& TANSEY, PA


/s/ Michael F. McGrath
Michael F. McGrath (#168610)
Will R. Tansey (#323056)
150 S. Fifth Street, Suite 3450
Minneapolis, MN  55402
Telephone:  612.317.4744
Email: mfmcgrath@ravichmeyer.com
        wrtanser@ravichmeyer.com


Elizabeth A. Green
Jimmy D. Parrish
BAKER & HOSTETLER LLP
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL  32801-3432
Telephone:  407.649.4000
Email: egreen@bakerlaw.com
        jparrish@bakerlaw.com


Eric R. Goodman
BAKER & HOSTETLER LLP
Key Tower, 127 Public Square
Suite 2000
Cleveland, OH  44114-1214
Telephone:  216.621.0200
Email: egoodman@bakerlaw.com


*Proposed Counsel for the Debtors and Debtors
in Possession*

## **EXHIBIT 3**

CONTRACT NOTICE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | | |
|---|---|---|
| Dakota Plains Holdings, Inc., | | Case No. 16-43711 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Transloading, LLC, | | Case No. 16-43712 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Sand, LLC, | | Case No. 16-43715 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Marketing, LLC, | | Case No. 16-43716 |
| | Debtor. | Chapter 11 Case |
| DPTS Marketing LLC, | | Case No. 16-43717 |
| | Debtor. | Chapter 11 Case |
| Dakota Petroleum Transport Solutions, LLC, | | Case No. 16-43718 |
| | Debtor. | Chapter 11 Case |
| DPTS Sand, LLC, | | Case No. 16-43721 |
| | Debtor. | Chapter 11 Case |

**NOTICE OF PROPOSED ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

TO:     Contract Counterparties.

**PLEASE TAKE NOTICE** that, on December 21, 2016, Dakota Plains Holdings, Inc. and the above-captioned debtors and debtor in possession (collectively, the "**Debtors**") filed the Notice of Motion of the Debtors for Entry of (I) an Expedited Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief and (II) an Order (A) Approving the Asset Purchase Agreement Between the Debtors and the Purchaser, (B) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, (D) Authorizing the Distribution of Excess Sale Proceeds to Secured Creditors, and (E) Granting Related Relief ECF No. [__] (the "**Sale Motion**") with the United States Bankruptcy Court for the District of Minnesota (the "**Court**").

**PLEASE TAKE FURTHER NOTICE** that the Court entered an Expedited Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice Thereof,

(C) Scheduling an Auction and a Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief ECF No. [__] (the "**Bid Procedures Order**")[1] on December [__], 2016 granting certain of the relief requested in the Sale Motion, including, among other things, approving:  (a) the bidding procedures (the "**Bidding Procedures**") for the sale (the "**Sale**") of substantially all of the Debtors' assets (the "**Assets**"); and (b) procedures (the "**Assumption Procedures**") for the assumption and assignment of executory contracts and unexpired leases (collectively, the "**Contracts**").

 **PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale at a hearing (the "**Sale Hearing**") to be held on January 27, 2017 at [__:__ _].m. (prevailing Central time) before the Honorable Michael E. Ridgway, United States Bankruptcy Judge for the District of Minnesota, in Courtroom No. 7 West, U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota,  55415.

 **PLEASE TAKE FURTHER NOTICE** that upon the closing of the Sale, the Debtors intend to assume and assign to BioUrja Trading, LLC (the "**Stalking Horse Bidder**"), or any other Successful Bidder arising from the Auction (as defined in the Bidding Procedures Order), the Contracts and any modifications thereto (collectively, the "**Assigned Contracts**") set forth on **Exhibit A** attached hereto, subject to (a) the Stalking Horse Bidder's right to designate additional Contracts as Assigned Contracts or remove certain Contracts from the list of Assigned Contracts or (b) any similar right of any other Successful Bidder arising from the Auction.  In addition, the cure amounts, if any, necessary for the assumption and assignment of the Assigned Contracts (the "**Cure Amounts**") are set forth on **Exhibit A** attached hereto.

 **PLEASE TAKE FURTHER NOTICE** that the Debtors have evaluated the financial wherewithal of the Stalking Horse Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Contracts) and believe that the Stalking Horse Bidder's financial health, agreement to pay cure amounts related to the Assigned Contracts, and commitment to pay obligations as they come due satisfies the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code.

 **PLEASE TAKE FURTHER NOTICE** that, after the Bid Deadline has occurred, the Debtors will separately identify the Contracts designated for assumption and assignment by each Qualified Bidder and furnish adequate assurance information demonstrating the ability of each Qualified Bidder (other than the Stalking Horse Bidder) to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code, including, without limitation, each Qualified Bidder's financial wherewithal and willingness to perform under the Assigned Contracts.

 **PARTIES LISTED ON EXHIBIT A ATTACHED HERETO ARE RECEIVING THIS NOTICE BECAUSE THE STALKING HORSE BIDDER HAS IDENTIFIED THEM AS A COUNTERPARTY TO AN ASSIGNED CONTRACT**.  Under the terms of the Assumption Procedures, the Stalking Horse Bidder or Successful Bidder may modify the list of

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Bid Procedures Order.

Assigned Contracts in accordance with the Stalking Horse Purchase Agreement or the Successful Bidder's Purchase Agreement, as applicable. Any counterparty added to the list of Assigned Contracts by such a modification will receive notice thereof (the "**Assumption Notice**") and will have an opportunity to object to the proposed cure amount or assumption and assignment of the Assigned Contract, if applicable.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Assumption Procedures, objections to the proposed assumption and assignment of an Assigned Contract, including any objection relating to the Cure Amount and/or adequate assurance of future performance (collectively, a "**Contract Objection**"), must: (a) be in writing; (b) state with specificity the nature of such objection and alleged Cure Amount, including applicable and appropriate documentation in support of such alleged Cure Amount; (c) comply with the Bankruptcy Rules and the Local Rules; (d) for Contract Objections to any Cure Amount set forth on **Exhibit A** attached hereto or to the assumption and assignment of an Assigned Contract to the Stalking Horse Bidder, be filed with the Court and served so as to be actually received by 4:00 p.m. (prevailing Central Time) seven days from service of this notice; and (e) for Contract Objections to the adequate assurance of future performance by a Qualified Bidder other than the Stalking Horse Bidder, be filed with the Court and served so as to be actually received at or prior to the Sale Hearing, which is scheduled on or before January 27, 2017, at 10:00 a.m. (prevailing Central Time).

Any timely filed Contract Objections made prior to the Sale Hearing will be considered at the Sale Hearing, or another date agreed to by the parties, and must be served on the following parties:

| Proposed Counsel to the Debtors | Counsel to the Stalking Horse Bidder |
|---|---|
| Baker & Hostetler LLP<br>Attn: Elizabeth Green<br>SunTrust Center, Suite 2300<br>200 South Orange Avenue<br>Orlando, Florida 32801-3432 | BioUrja Trading, LLC<br>Eldridge Oaks I<br>1080 Eldridge Pkwy, Suite 1175<br>Houston, TX 770077 |
| **The United States Trustee** | **Counsel to the Agent** |
| Office of the United States Trustee<br>1015 U.S. Courthouse<br>300 South Fourth Street<br>Minneapolis, Minnesota 55415 | Moore & VanAllen<br>Attn: Alan W. Pope<br>100 North Tryon Street, Suite 4700<br>Charlotte, North Carolina 28202-4003 |
| **Proposed Counsel to the Committee** | |
| [TBD] | |

**PLEASE TAKE FURTHER NOTICE** that if any timely filed Contract Objection cannot be resolved by the Stalking Horse Bidder or Successful Bidder arising from the Auction,

if any, and the objecting party, the Court shall resolve such Contract Objection prior to assumption and assignment of such designated Contract, and upon entry of an order by the Court resolving such Contract Objection, the assignment, if approved by the Court, shall be deemed effective as of the date such objecting party receives the Assumption Notice.  To the extent that any Contract Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Contract Objection, to be determined in the reasonable discretion of the Stalking Horse Bidder or other Successful Bidder arising from the Auction, if any, and until such time as the Contract Objection can be resolved, the Contract shall be conditionally assumed and assigned pending a resolution of the Contract Objection after notice and a hearing.

<u>CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION</u>

**ANY COUNTERPARTY TO AN ASSIGNED CONTRACT WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF AN ASSIGNED CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON EXHIBIT A ATTACHED HERETO IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER AND THE ASSUMPTION PROCEDURES SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF THE ASSIGNED CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON EXHIBIT A ATTACHED HERETO, INCLUDING ASSERTING ADDITIONAL CURE AMOUNTS WITH RESPECT TO THE ASSIGNED CONTRACT RELATING TO ANY PERIOD PRIOR TO THE TIME OF ASSUMPTION AND ASSIGNMENT**.

**PLEASE TAKE FURTHER NOTICE** that copies of the Sale Motion, the Bidding Procedures, and the Bidding Procedures Order may be obtained for a fee at http://www.mnb.uscourts.gov/

[*Remainder of Page Intentionally Left Blank*]

Dated:  December [__], 2016

RAVICH MEYER KIRKMAN MCGRATH NAUMAN & TANSEY, PA

/s/ Michael F. McGrath
Michael F. McGrath (#168610)
Will R. Tansey (#323056)
150 S. Fifth Street, Suite 3450
Minneapolis, MN  55402
Telephone:  612.317.4744
Email: mfmcgrath@ravichmeyer.com
        wrtanser@ravichmeyer.com

Elizabeth A. Green
Jimmy D. Parrish
BAKER & HOSTETLER LLP
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL  32801-3432
Telephone:  407.649.4000
Email: egreen@bakerlaw.com
        jparrish@bakerlaw.com

Eric R. Goodman
BAKER & HOSTETLER LLP
Key Tower, 127 Public Square
Suite 2000
Cleveland, OH  44114-1214
Telephone:  216.621.0200
Email: egoodman@bakerlaw.com

*Proposed Counsel for the Debtors and Debtors in Possession*

# **EXHIBIT A**

ASSIGNED CONTRACTS

## ASSIGNED CONTRACTS[1]

| Debtor | Counterparty | Description of Assigned Contracts or Leases | Cure Amount |
|---|---|---|---|
| Dakota Petroleum Transport Solutions, LLC | US Oil & Refining Company | Crude Oil Services Master Agreement between US Oil & Refining Company and Dakota Petroleum Transport Solutions, LLC, dated October 31, 2015, and the related Term and Allocation Agreement set to terminate March 31, 2017 | $0.00 |
| Dakota Petroleum Transport Solutions, LLC | Murex, LLC | Crude Oil Services Master Agreement between Murex, LLC and Dakota Petroleum Transport Solutions, LLC, dated June 30, 2015, and any current related Term and Allocation Agreement (month to month). | $0.00 |
| Dakota Petroleum Transport Solutions, LLC | Canadian Pacific Railway Company | Locomotive Use and Liability Agreement, Canadian Pacific Railway Company and Dakota Petroleum Transport Solutions, LLC, dated December 31, 2014, as subsequently amended, for the use of Canadian Pacific locomotives.  Set to expire June 30, 2017. | $0.00 |
| DPTS Sand, LLC | Unimin Corporation | Terminal Operating Contract, dated July 31, 2013, by and between Unimin Corporation and DPTS Sand, LLC for sand transloading.  Set for renegotiation on May 31, 2018. | $0.00 |
| Dakota Petroleum Transport Solutions, LLC | Pelican Gathering Systems, LLC | Pipeline Interconnection Agreement between Pelican Gathering Systems, LLC and Dakota Petroleum Transport Solutions, LLC, dated as of August 26, 2013.  Term expires August 26, 2043. | $0.00 |
| Dakota Petroleum Transport Solutions, LLC | Hiland Crude, LLC | Pipeline Interconnection Agreement between Hiland Crude, LLC and Dakota Petroleum Transport Solutions, LLC, dated as of August 4, 2014.  Term expires August 4, 2024. | $0.00 |
| Dakota Plains Holdings, Inc. | Unimin Corporation | Lease dated July 31, 2013 by and between Dakota Plains Holdings, Inc., and Unimin Corporation for the land lese to construct a sand terminal.  Initial term set to expire on January 1, 2024. | $0.00 |

---

[1]  The presence of a contract or lease on this **Exhibit A** does not constitute an admission by the Debtors that such contract is an executory contract or such lease is an unexpired lease pursuant to section 365 of the Bankruptcy Code or any other applicable law, and the Debtors reserve all rights to withdraw any proposed assumption and assignment or to reject any contract or lease at any time before such contract or lease is assumed and assigned pursuant to an order of the Court.

## **EXHIBIT 4**

ASSUMPTION NOTICE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Dakota Plains Holdings, Inc., | Case No. 16-43711 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Transloading, LLC, | Case No. 16-43712 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Sand, LLC, | Case No. 16-43715 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Marketing, LLC, | Case No. 16-43716 |
| Debtor. | Chapter 11 Case |
| DPTS Marketing LLC, | Case No. 16-43717 |
| Debtor. | Chapter 11 Case |
| Dakota Petroleum Transport Solutions, LLC, | Case No. 16-43718 |
| Debtor. | Chapter 11 Case |
| DPTS Sand, LLC, | Case No. 16-43721 |
| Debtor. | Chapter 11 Case |

**NOTICE OF PROPOSED ASSIGNMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES**

TO:    Contract Counterparties.

**PLEASE TAKE NOTICE** that, on December 21, 2016, Dakota Plains Holdings, Inc. and the above-captioned debtors and debtor in possession (collectively, the "**Debtors**") filed the Notice of Motion of the Debtors for Entry of (I) an Expedited Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief and (II) an Order (A) Approving the Asset Purchase Agreement Between the Debtors and the Purchaser, (B) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, (D) Authorizing the Distribution of Excess Sale Proceeds to Secured Creditors, and (E) Granting Related Relief ECF No. [__] (the "**Sale Motion**") with the United States Bankruptcy Court for the District of Minnesota (the "**Court**").

**PLEASE TAKE FURTHER NOTICE** that the Court entered an Expedited Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice Thereof,

(C) Scheduling an Auction and a Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief ECF No. [__] (the "**Bid Procedures Order**")[1] on December [__], 2016 granting certain of the relief requested in the Sale Motion, including, among other things, approving:  (a) the bidding procedures (the "**Bidding Procedures**") for the sale (the "**Sale**") of substantially all of the Debtors' assets (the "**Assets**"); and (b) procedures (the "**Assumption Procedures**") for the assumption and assignment of executory contracts and unexpired leases (collectively, the "**Contracts**").

        **PLEASE TAKE FURTHER NOTICE** that, accordingly, pursuant to the Assumption Procedures and by this written notice, the Debtors hereby notify you that they have determined, in the exercise of their business judgment, that the Contracts and any modifications thereto set forth on **Exhibit A** attached hereto (collectively, the "**Assigned Contracts**") shall be assumed and assigned to BioUrja Trading, LLC (the "**Stalking Horse Bidder**"), subject to the Stalking Horse Bidder's payment of the cure amounts set forth on **Exhibit A**, or such other cure amounts that are agreed to by the parties.

        **PLEASE TAKE FURTHER NOTICE** that the Stalking Horse Bidder has the right under certain circumstances to designate additional Contracts as Assigned Contracts or remove certain Contracts from the list of Assigned Contracts prior to Closing (as defined in the Stalking Horse Purchase Agreement).

        **PLEASE TAKE FURTHER NOTICE** that, except as otherwise provided by the Bidding Procedures Order, the time for filing objections to (a) the cure amounts related to the Assigned Contracts, (b) the Debtors' ability to assume and assign any Assigned Contract, and (c) adequate assurance of future performance by the assumption and assignment to the Stalking Horse Bidder has passed and no further notice or action is necessary with respect to such matters.

        **PLEASE TAKE FURTHER NOTICE** that copies of the Sale Motion, the Bidding Procedures, and the Bidding Procedures Order may be obtained for a fee at http://www.mnb.uscourts.gov/

[*Remainder of Page Intentionally Left Blank*]

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Bid Procedures Order.

Dated:  December [__], 2016

RAVICH MEYER KIRKMAN MCGRATH NAUMAN & TANSEY, PA

/s/ Michael F. McGrath
Michael F. McGrath (#168610)
Will R. Tansey (#323056)
150 S. Fifth Street, Suite 3450
Minneapolis, MN  55402
Telephone:  612.317.4744
Email: mfmcgrath@ravichmeyer.com
        wrtanser@ravichmeyer.com

Elizabeth A. Green
Jimmy D. Parrish
BAKER & HOSTETLER LLP
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL  32801-3432
Telephone:  407.649.4000
Email: egreen@bakerlaw.com
        jparrish@bakerlaw.com

Eric R. Goodman
BAKER & HOSTETLER LLP
Key Tower, 127 Public Square
Suite 2000
Cleveland, OH  44114-1214
Telephone:  216.621.0200
Email: egoodman@bakerlaw.com

*Proposed Counsel for the Debtors and Debtors in Possession*

## **EXHIBIT A**

ASSIGNED CONTRACTS

## ASSIGNED CONTRACTS[1]

| Debtor | Counterparty | Description of Assigned Contracts or Leases | Cure Amount |
|---|---|---|---|
| Dakota Petroleum Transport Solutions, LLC | US Oil & Refining Company | Crude Oil Services Master Agreement between US Oil & Refining Company and Dakota Petroleum Transport Solutions, LLC, dated October 31, 2015, and the related Term and Allocation Agreement set to terminate March 31, 2017 | $0.00 |
| Dakota Petroleum Transport Solutions, LLC | Murex, LLC | Crude Oil Services Master Agreement between Murex, LLC and Dakota Petroleum Transport Solutions, LLC, dated June 30, 2015, and any current related Term and Allocation Agreement (month to month). | $0.00 |
| Dakota Petroleum Transport Solutions, LLC | Canadian Pacific Railway Company | Locomotive Use and Liability Agreement, Canadian Pacific Railway Company and Dakota Petroleum Transport Solutions, LLC, dated December 31, 2014, as subsequently amended, for the use of Canadian Pacific locomotives.  Set to expire June 30, 2017. | $0.00 |
| DPTS Sand, LLC | Unimin Corporation | Terminal Operating Contract, dated July 31, 2013, by and between Unimin Corporation and DPTS Sand, LLC for sand transloading. Set for renegotiation on May 31, 2018. | $0.00 |
| Dakota Petroleum Transport Solutions, LLC | Pelican Gathering Systems, LLC | Pipeline Interconnection Agreement between Pelican Gathering Systems, LLC and Dakota Petroleum Transport Solutions, LLC, dated as of August 26, 2013.  Term expires August 26, 2043. | $0.00 |
| Dakota Petroleum Transport Solutions, LLC | Hiland Crude, LLC | Pipeline Interconnection Agreement between Hiland Crude, LLC and Dakota Petroleum Transport Solutions, LLC, dated as of August 4, 2014.  Term expires August 4, 2024. | $0.00 |
| Dakota Plains Holdings, Inc. | Unimin Corporation | Lease dated July 31, 2013 by and between Dakota Plains Holdings, Inc., and Unimin Corporation for the land lese to construct a sand terminal.  Initial term set to expire on January 1, 2024. | $0.00 |

---

[1] The presence of a contract or lease on this **Exhibit A** does not constitute an admission by the Debtors that such contract is an executory contract or such lease is an unexpired lease pursuant to section 365 of the Bankruptcy Code or any other applicable law, and the Debtors reserve all rights to withdraw any proposed assumption and assignment or to reject any contract or lease at any time before such contract or lease is assumed and assigned pursuant to an order of the Court.

## **EXHIBIT B**

PROPOSED FORM OF SALE ORDER

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Dakota Plains Holdings, Inc., <br>                                Debtor. | Case No. 16-43711 <br> Chapter 11 Case |
| Dakota Plains Transloading, LLC, <br>                                Debtor. | Case No. 16-43712 <br> Chapter 11 Case |
| Dakota Plains Sand, LLC, <br>                                Debtor. | Case No. 16-43715 <br> Chapter 11 Case |
| Dakota Plains Marketing, LLC, <br>                                Debtor. | Case No. 16-43716 <br> Chapter 11 Case |
| DPTS Marketing LLC, <br>                                Debtor. | Case No. 16-43717 <br> Chapter 11 Case |
| Dakota Petroleum Transport Solutions, LLC, <br>                                Debtor. | Case No. 16-43718 <br> Chapter 11 Case |
| DPTS Sand, LLC, <br>                                Debtor. | Case No. 16-43721 <br> Chapter 11 Case |

**ORDER (A) APPROVING THE ASSET PURCHASE AGREEMENT BETWEEN THE DEBTORS AND THE PURCHASER, (B) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS, (D) AUTHORIZING THE DISTRIBUTION OF EXCESS SALE PROCEEDS TO SECURED CREDITORS, AND (E) GRANTING RELATED RELIEF**

THIS MATTER having come before the Court upon the motion, dated December 21, 2016 (the "**Sale Motion**")[1] of Dakota Plains Holdings, Inc. and the above-captioned debtors and debtor in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Cases**"), for the entry of an order (the "**Sale Order**"):

        i.        approving that certain asset purchase agreement, a copy of which is attached

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Sale Motion, or the Agreement (as defined herein), as applicable.

hereto as **Exhibit 1**, dated as of December [__], 2016, by and between the Debtors and [_____] (the "**Purchaser**") (as amended from time to time, the "**Agreement**");

ii.      authorizing and approving the sale (the "**Sale**") of the Assets free and clear of all liens, liabilities, claims, interests, and other encumbrances as set forth in the Agreement;

iii.      authorizing the Debtors to assume and assign the contracts set forth on **Exhibit 2** attached hereto (the "**Assumed Contracts**") to the Purchaser as set forth in the Agreement; and

iv.      granting certain related relief.

The Court having entered an order on December [__], 2016 at Docket No. [__] (the "**Bid Procedures Order**") approving, among other things, the proposed Bidding Procedures appended to the Bidding Procedures Order, the notice of the Sale, and procedures for determining and fixing cure costs to be paid in respect of Assumed Contracts; and the Debtors having determined, after an extensive marketing process, that the Purchaser has submitted the highest and best bid for the Assets; and upon adequate and sufficient notice of the Sale Motion, the Bidding Procedures, the Auction, the Agreement, and all other related transactions contemplated thereunder and in this Sale Order having been given in the manner directed by the Court in the Bidding Procedures Order; and all interested parties having been afforded an opportunity to be heard with respect to the Sale Motion and all relief related thereto; and the Court having reviewed and considered (i) the Sale Motion and all relief related thereto, (ii) the objections thereto and (iii) the Court having heard statements of counsel and the evidence presented in support of the relief requested by the Debtors in the Sale Motion at a hearing before the Court on January 27, 2017 (the "**Sale Hearing**"); and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest; and upon the record of the Sale Hearing and all other pleadings and proceedings in these Cases, including the Sale Motion; and after due deliberation thereon; and good and sufficient

cause appearing therefor,

**THE COURT HEREBY FINDS AND DETERMINES THAT**:

     A.    **Findings of Fact and Conclusions of Law**.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

     B.    **Jurisdiction and Venue**.  The Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. § 1334.  Consideration of the Sale Motion constitute a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Cases and the proceedings on the Sale Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

     C.    **Bases for Relief**.  The bases for the relief requested in the Sale Motion are: (i) sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"); (ii) Rules 2002(a)(2), 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and (iii) Rule 6004-1(e) of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the District of Minnesota (the "**Local Rules**").

     D.    **Final Order**.  This Sale Order constitutes a final order within the meaning of  28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, waives any stay and expressly directs

entry of judgment as set forth herein.

<u>**Notice of Sale, Auction, and Cure Amounts**</u>

E.      Actual written notice of the Sale Motion, and a reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein, has been afforded to all known interested entities and parties, including, but not limited to the following entities and parties (the "**Notice Parties**"):  (i) the United States Trustee for the District of Minnesota (the "**U.S. Trustee**"); (ii) counsel to the Committee; (iii) counsel to the Stalking Horse Bidder; (iv) counterparties to the Contracts (the "**Contract Counterparties**"); (v) all parties who have expressed a written interest in some or all of the Assets; (vi) all known holders of liens, encumbrances, and other claims secured by the Assets; (vii) the District Counsel and the District Director of the Internal Revenue Service; (viii) the Collection Division of the Minnesota Department of Revenue; (ix) all applicable state and local taxing authorities; (x) all of the creditors listed on the Debtors' matrix filed under Local Rule 1007-2(a); (xi) the United States Attorney for the District of Minnesota; (xii) the United States Bureau of Land Management; (xiii) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (xiv) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002 and Local Rules 6004-1(e), 2002-1(b) and 2002-4(a).

F.      Actual written notice of the auction for the Sale of the Assets that was scheduled for January 23, 2017 (the "**Auction**"), the Sale Hearing, the Sale of the Assets, and a reasonable opportunity to object or be heard with respect thereto, has been afforded to all known interested entities and parties, including, but not limited to the Notice Parties.

G.      Notice of the Auction, Sale Hearing, and Sale was timely, proper, and reasonably

- 4 -

calculated to provide the Notice Parties and all other interested entities and parties with timely and proper notice of the Auction, the Sale, and the Sale Hearing.

H.      In accordance with the provisions of the Bidding Procedures Order, the Debtors have served notice upon the Contract Counterparties:  (i) that the Debtors seek to assume and assign to the Purchaser the Assumed Contracts on the Closing Date (as defined in the Agreement) and (ii) of the relevant Cure Amounts (defined below).   The service of such notice was good, sufficient, and appropriate under the circumstances, and no further notice need be given in respect of establishing a Cure  Amount for the Contracts.   Each of the Contract Counterparties has had or will have had an opportunity to object to the Cure Amounts set forth in the notice and to the assumption and assignment to the Purchaser of the applicable Assumed Contract.

I.      As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Sale Motion, the Auction, the Sale Hearing, the Sale, and the transactions contemplated thereby, including without limitation, the assumption and assignment of the Assumed Contracts to the Purchaser, has been provided in accordance with the Bidding Procedures Order and sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9008.  The notices described herein were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, the Auction, the Sale Hearing, the Sale, or the assumption and assignment of the Assumed Contracts to the Purchaser is required.

J.      The disclosures made by the Debtors concerning the Sale Motion, the Agreement, the Auction, the Sale Hearing, the Sale, and the assumption and assignment of the Assumed Contracts to the Purchaser were good, complete, and adequate.

K.      A reasonable opportunity to object and be heard with respect to the Sale and the

Sale Motion and the relief requested therein (including the assumption and assignment of

Assumed Contracts to the Purchaser and any Cure Costs related thereto), has been afforded to all

interested persons and entities, including the Notice Parties.

### Good Faith of Purchaser

L.      The Agreement was negotiated, proposed, and entered into by the Debtors and the

Purchaser without collusion, in good faith, and from arms'-length bargaining positions.

M.      Neither the Debtors nor the Purchaser have engaged in any conduct that would

cause or permit the Agreement to be avoided under section 363(n) of the Bankruptcy Code.  The

Purchaser has not acted in a collusive manner with any person and the Purchase Price was not

controlled by any agreement among the bidders.

N.      The Purchaser is purchasing the Assets in good faith and is a good faith buyer

within the meaning of section 363(m) of the Bankruptcy Code.  The Purchaser has proceeded in

good faith in all respects in connection with the Sale including, but not limited to:  (i) agreeing to

subject its bid to the competitive bidding process contemplated in the Bidding Procedures Order

in good faith, (ii) complying with the provisions in the Bidding Procedures Order, (iii) neither

inducing nor causing the chapter 11 filings by the Debtors; and (iv) disclosing all payments to be

made by the Purchaser in connection with the Sale.  The Purchaser is therefore entitled to all of

the protections afforded under section 363(m) of the Bankruptcy Code.

### Highest and Best Offer

O.      The Debtors conducted a sale process in accordance with, and have otherwise

complied in all respects with, the Bidding Procedures Order.  The sale process set forth in the

Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any person or

entity to make a higher or otherwise better offer to purchase the Assets.  The Auction was duly noticed in a non-collusive, fair, and good faith manner, and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Assets.

P.      The Agreement constitutes the highest and best offer for the Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  The Debtors' determination that the Agreement constitutes the highest and best offer for the Assets constitutes a valid and sound exercise of the Debtors' business judgment.

Q.      The Agreement represents a fair and reasonable offer to purchase the Assets under the circumstances of these Cases.  No other entity or group of entities has offered to purchase the Assets for greater overall value to the Debtor's estates than the Purchaser.

R.      Approval of the Sale Motion and the Agreement and the consummation of the transactions contemplated thereby are in the best interests of the Debtors' chapter 11 estates, their creditors, and other parties in interest.

## No Fraudulent Transfer or Merger

S.      The consideration provided by the Purchaser pursuant to the Agreement (i) is fair and reasonable, (ii) is the highest or best offer for the Assets, and (iii) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.  No other person or entity or group of entities has offered to purchase the Assets for greater overall value to the Debtors' estates than the Purchaser. Approval of the Sale Motion and the Agreement and the consummation of the transactions contemplated thereby are in the best interests of the Debtors, their estates, creditors,

and other parties in interest.

T.       The Purchaser is not a mere continuation of the Debtors or their estates and there is no continuity of enterprise between the Purchaser and the Debtors.  The Purchaser is not holding itself out to the public as a continuation of the Debtors.  The Purchaser is not a successor to the Debtors or their estates and the Sale does not amount to a consolidation, merger, or *de facto* merger of Purchaser and the Debtors.

### Validity of Transfer

U.       Each Debtor has, to the extent necessary or applicable, (i) full corporate power and authority to execute and deliver the Agreement and all other documents contemplated thereby, (ii) all corporate authority necessary to consummate the transactions contemplated by the Agreement, and (iii) taken all corporate action necessary to authorize and approve the Agreement and the consummation of the transactions contemplated thereby.  The Sale has been duly and validly authorized by all necessary corporate action.  No consents or approvals, other than those expressly provided for in the Agreement, are required for the Debtors to consummate the Sale, the Agreement, or the transactions contemplated thereby.

V.       The Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia.  Neither the Debtors nor the Purchaser is entering into the transactions contemplated by the Agreement fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

W.       The Debtors are the sole and lawful owners of the Assets.  Subject to section 363(f) of the Bankruptcy Code, the transfer of each of the Assets to the Purchaser will be, as of the Closing Date, a legal, valid, and effective transfer of the Assets, which transfer vests or will

vest the Purchaser with all right, title, and interest of the Debtors to the Assets free and clear of

(i) all liens and encumbrances relating to, accruing, or arising any time prior to the Closing Date

(collectively, the "**Liens**") and (ii) all debts arising under, relating to, or in connection with any

act of the Debtors or claims (as that term is defined in section 101(5) of the Bankruptcy Code),

liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual

commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to

or subsequent to the commencement of these cases, and whether imposed by agreement,

understanding, law, equity or otherwise (including, without limitation, rights with respect to

Claims (as defined below) and Liens (a) that purport to give to any party a right of setoff or

recoupment against, or a right or option to effect any forfeiture, modification, profit sharing

interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the

Debtors' or the Purchaser's interests in the Assets, or any similar rights, or (b) in respect of taxes,

restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including,

without limitation, any restriction of use, voting, transfer, receipt of income or other exercise of

any attributes of ownership) (collectively, as defined in this clause (ii), "**Claims**"), relating to,

accruing or arising any time prior to the Closing Date, with the exception of Permitted

Encumbrances[2] and Assumed Liabilities that are expressly assumed by Purchaser under the

Agreement, including, for the avoidance of doubt, Cure Costs or any obligations arising at or

after Closing arising under the Assumed Contracts.

### **Section 363(f) Is Satisfied**

X.      The conditions of section 363(f) of the Bankruptcy Code have been satisfied in

---

[2] Permitted Encumbrances shall not include any liens listed on Schedule 4.5 to the Agreement (including prepetition secured lender's liens and tax liens).

full; therefore, the Debtors may sell the Assets free and clear of any interest in the property other than the Permitted Encumbrances and Assumed Liabilities.

Y.      The Purchaser would not have entered into the Agreement and would not consummate the transactions contemplated thereby if the sale of the Assets to the Purchaser and the assumption of any Assumed Liabilities by the Purchaser were not free and clear of all Liens and Claims, other than Permitted Encumbrances and the Assumed Liabilities, or if the Purchaser would, or in the future could, be liable for any of such Liens and Claims (other than Permitted Encumbrances and the Assumed Liabilities).  Unless otherwise expressly included in Permitted Encumbrances or Assumed Liabilities, the Purchaser shall not be responsible for any Liens or Claims, including in respect of the following:  (i) any labor or employment agreements, (ii) all mortgages, deeds of trust and security interests, (iii) intercompany loans and receivables among the Debtors, (iv) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of any Debtor, (v) any other employee, workers' compensation, occupational disease, or unemployment or temporary disability related claim, (vi) Claims or Liens arising under any Environmental Law (as defined in the Agreement) with respect to the Business, Excluded Liabilities, the Assets, Excluded Assets, or assets owned or operated by Debtors or any corporate predecessor at any time prior to the Closing Date, (vii) any bulk sales or similar law, (viii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and (ix) any theories of successor liability.

Z.      The Debtors may sell the Assets free and clear of all Liens and Claims against the Debtors, their estates or any of the Assets (except the Permitted Encumbrances and Assumed Liabilities) because, in each case, one or more of the standards set forth in section 363(f)(l)-(5) of

the Bankruptcy Code has been satisfied.  Those holders of Liens or Claims against the Debtors,

their estates, or any of the Assets who did not object, or who withdrew their objections, to the

Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the

Bankruptcy Code.  All other holders of Liens or Claims (except to the extent that such Liens or

Claims are Assumed Liabilities or Permitted Encumbrances) are adequately protected by having

their Liens or Claims, if any, in each instance against the Debtors, their estates, or any of the

Assets, attach to the cash proceeds of the Sale ultimately attributable to the Assets in which such

creditor alleges a Lien or Claims, in the same order of priority, with the same validity, force, and

effect that such Liens or Claims had prior to the Sale, subject to any claims and defenses the

Debtors and their estates may possess with respect thereto.

## Cure / Adequate Protection

AA.    The assumption and assignment of the Assumed Contracts pursuant to the terms

of this Sale Order is integral to the Agreement and is in the best interests of the Debtors and their

estates, their creditors, and all other parties in interest, and represents the reasonable exercise of

sound and prudent business judgment by the Debtors.  Subject to the Agreement, the Purchaser

shall:  (i) to the extent necessary, cure or provide adequate assurance of cure, of any default

existing prior to the date hereof with respect to the Contracts, within the meaning of 11 U.S.C.

§§ 365(b)(1)(A) and 365(f)(2)(A), and (ii) to the extent necessary, provide compensation or

adequate assurance of compensation to any party for any actual pecuniary loss to such party

resulting from a default prior to the date hereof with respect to the Assumed Contracts, within

the meaning of 11 U.S.C. §§ 365(b)(1)(B) and 365(f)(2)(A).  The Purchaser's promise to pay the

Cure Amounts and to perform the obligations under the Assumed Contracts after the Closing

Date shall constitute adequate assurance of future performance within the meaning of 11 U.S.C.

§§ 365(b)(1)(C) and 365(f)(2)(B).

BB.     Any objections to the assumption and assignment of any of the Assumed Contracts to the Purchaser are hereby overruled or withdrawn.  Any objections to the Cure Amounts are hereby overruled or withdrawn.  To the extent that any counterparty failed to timely object to its Cure Amount or the assumption and assignment of its Contract to the Purchaser, such counterparty is deemed to have consented to such Cure Amount and the assignments of its respective Contracts to the Purchaser.

### Compelling Circumstances for an Immediate Sale

CC.     Good and sufficient reasons for approval of the Agreement and the Sale have been articulated.  The relief requested in the Sale Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest.  The Debtors have demonstrated both (i) good, sufficient, and sound business purposes and justifications for approving the Agreement and (ii) compelling circumstances for the Sale outside the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code before, and outside of, a plan of reorganization, in that, among other things, the immediate consummation of the Sale to the Purchaser is necessary and appropriate to maximize the value of the Debtors' estates and the Sale will provide the means for the Debtors to maximize distributions to creditors.

DD.     To maximize the value of the Assets and preserve the viability of the business to which the Assets relate, it is essential that the Sale of the Assets occur within the time constraints set forth in the Agreement.  Time is of the essence in consummating the Sale.

EE.     Given all of the circumstances of these Cases and the adequacy and fair value of the Purchase Price under the Agreement, the proposed Sale of the Assets to Purchaser constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

FF.     The Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.  The Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a liquidating chapter 11 plan for the Debtors.

GG.     The consummation of the Sale and the assumption and assignment of the Contracts is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and 365, and all of the applicable requirements of such sections have been complied with in respect of the transaction.

**NOW**, **THEREFORE**, on the Sale Motion of the Debtors and the record before this Court with respect to the Sale Motion, including the record made during the Hearing, and good and sufficient cause appearing therefor,

**IT IS SO ORDERED** that:

<u>**General Provisions**</u>

1.      The Sale Motion is **GRANTED**.

2.      The relief requested in the Sale Motion and the transactions contemplated thereby and by the Agreement are approved as set forth in this Sale Order and on the record of the Sale Hearing, which is incorporated herein as if set forth fully in this Sale Order, and the Sale contemplated thereby is approved.

3.      All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled by announcement to the Court during the Sale Hearing or by stipulation filed with the Court, including any and all reservations of rights included in such objections or otherwise, are hereby denied and overruled on the merits with prejudice.  Those

- 13 -

parties who did not object or withdrew their objections to the Sale Motion are deemed to have

consented pursuant to section 363(f)(2) of the Bankruptcy Code.

4.      This Court's findings of fact and conclusions of law set forth in the Bidding

Procedures Order are incorporated herein by reference.

## Approval of the Agreement

5.      The Agreement and all other ancillary documents, and all of the terms and

conditions thereof, are hereby approved.

6.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtors are

authorized, empowered, and directed to use their reasonable best efforts to take any and all

actions necessary or appropriate to (a) consummate the Sale pursuant to and in accordance with

the terms and conditions of the Agreement, (b) close the Sale as contemplated in the Agreement

and this Sale Order, and (c) execute and deliver, perform under, consummate, implement, and

fully close the Agreement, including the assumption and assignment to the Purchaser of the

Assigned Contracts and Assigned Leases and Interests (in each case as such terms are defined in

the Agreement), together with all additional instruments and documents that may be reasonably

necessary or desirable to implement the Agreement and the Sale.  The Purchaser shall not be

required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy

Code to enforce any of its remedies under the Agreement or any other Sale related document.

The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the

extent necessary to implement the preceding sentence and the other provisions of this Sale Order.

7.      This Sale Order shall be binding in all respects upon the Debtors, their estates, all

creditors of, and holders of equity interests in, any Debtor, any holders of Liens, Claims, or other

interests (whether known or unknown) in, against or on all or any portion of the Assets, all

Contract Counterparties, the Purchaser and all successors and assigns of the Purchaser, the

Assets, and any trustees, if any, subsequently appointed in any of the Cases or upon a conversion

to chapter 7 under the Bankruptcy Code of any of the Cases.  This Sale Order and the Agreement

shall inure to the benefit of the Debtors, their estates and creditors, the Purchaser, and the

respective successors and assigns of each of the foregoing.

### Transfer of the Assets

8.      Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the

Debtors are authorized and directed to use reasonable best efforts to transfer the Assets to the

Purchaser on the Closing Date and such transfer shall constitute a legal, valid, binding, and

effective transfer of such Assets and shall vest Purchaser with title to the Assets and, upon the

Debtors' receipt of the Purchase Price, other than Permitted Encumbrances and Assumed

Liabilities, shall be free and clear of all Liens, Claims, and other interests of any kind or nature

whatsoever, including but not limited to, (a) successor or successor-in-interest liability and

(b) Claims in respect of the Excluded Liabilities, with all such Liens, Claims, or other interests to

attach to the cash proceeds ultimately attributable to the property against or in which such Liens,

Claims, or other interests are asserted, subject to the terms thereof, with the same validity, force,

and effect, and in the same order of priority, which such Liens, Claims, or other interests now

have against the Assets, subject to any rights, claims, and defenses the Debtors or their estates, as

applicable, may possess with respect thereto.  Upon the Closing, the Purchaser shall take title to

and possession of the Assets subject only to the Permitted Encumbrances and Assumed

Liabilities.

9.      All persons and entities that are in possession of some or all of the Assets on the

Closing Date are directed to surrender possession of such Assets to the Purchaser or its assignee

at the Closing.  On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Liens, Claims, or other interests in the Assets, if any, as such Liens, Claims or interests may have been recorded or may otherwise exist.

10.     The Debtors are hereby authorized and directed to use reasonable best efforts to take any and all actions necessary to consummate the Agreement, including any actions that otherwise would require further approval by shareholders, members, or its board of directors, as the case may be, without the need of obtaining such approvals.

11.     The transfer of the Assets to the Purchaser pursuant to the Agreement does not require any consents other than as specifically provided for in the Agreement.  On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Sellers' interests in the Assets. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

12.     A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder of any state, county, or local authority to act to cancel any of the Liens, Claims, and other encumbrances of record except those assumed as Assumed Liabilities or Permitted Encumbrances.

13.     If any person or entity which has filed statements or other documents or agreements evidencing Claims or Liens on, or interests in, all or any portion of the Assets (other than statements or documents with respect to Permitted Encumbrances) shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate

parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Claims, Liens, or interests which the person or entity has or may assert with respect to all or any portion of the Assets, the Debtors are hereby authorized and directed, and the Purchaser is hereby authorized, on behalf of the Debtors and the Debtors' creditors, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Assets; provided that the provisions of this Sale Order authorizing the transfer of the Assets free and clear of all Liens, Claims, and Interests (except only Permitted Encumbrances and Assumed Liabilities) shall be self-executing, and the Debtors, the Purchaser, and creditors shall not be required to execute or file releases, termination statements, assignments, consents, or other instruments in order for the provisions of this Sale Order to be effectuated, consummated and/or implemented.

14.    On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtors' interests in the Assets and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the Assets to the Purchaser.  This Sale Order is and shall be effective as a determination that, on the Closing Date, all Liens, Claims, Interests, or other interest of any kind or nature whatsoever existing as to the Assets prior to the Closing Date, other than Permitted Encumbrances and Assumed Liabilities, or as otherwise provided in this Order, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected.

15.    This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title

companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal, state, and local officials, and all

other persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register, or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any lease; and each of

the foregoing persons and entities is hereby directed to accept for filing any and all of the

documents and instruments necessary and appropriate to consummate the transactions

contemplated by the Agreement.

16.     Subject to the terms, conditions, and provisions of this Sale Order, all persons and

entities are hereby forever prohibited and enjoined from taking any action that would adversely

affect or interfere with the ability of the Debtors to sell and transfer the Assets to the Purchaser in

accordance with the terms of this Agreement and this Sale Order.

17.     To the greatest extent available under applicable law, the Purchaser shall be

authorized, as of the Closing Date, to operate under any license, permit, registration, and

governmental authorization or approval of the Debtors with respect to the Assets, and all such

licenses, permits, registrations, and governmental authorizations and approvals are deemed to

have been, and hereby are, deemed to be transferred to the Purchaser as of the Closing Date.

18.     To the extent permitted by section 525 of the Bankruptcy Code, no governmental

unit may revoke or suspend any permit or license relating to the operation of the Assets sold,

transferred, or conveyed to the Purchaser on account of the filing or pendency of the Cases or the

consummation of the transactions contemplated by the Agreement.

**Assumption and Assignment of Contracts**

19.      The Debtors are hereby authorized and directed in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to Purchaser, effective upon the Closing of the Sale, the Assumed Contracts free and clear of all Liens, Claims, and other interests of any kind or nature whatsoever (other than the Permitted Encumbrances and Assumed Liabilities), and (b) execute and deliver to Purchaser such documents or other instruments as Purchaser reasonably deems may be necessary to assign and transfer the Assumed Contracts, Permitted Encumbrances, and Assumed Liabilities to Purchaser.

20.      With respect to the Assumed Contracts:  (a) the Debtors may assume each of the Assumed Contracts in accordance with section 365 of the Bankruptcy Code, (b) the Debtors may assign each Assumed Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the party to such Assumed Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions which are void and of no force and effect, (c) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to Purchaser of each Assumed Contract have been satisfied, (d) the Assumed Contracts shall be transferred and assigned to, and following the closing of the Sale remain in full force and effect for the benefit of, Purchaser, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the

Assumed Contracts after such assignment to and assumption by Purchaser, and (e) upon Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title and interest of each Assumed Contract.

21.     Unless otherwise agreed and stated on the record at the Sale Hearing, the respective amounts set forth under the "**Cure Amount**" column on **Exhibit 2** attached hereto reflects the sole amounts necessary under section 365(b) of the Bankruptcy Code to cure all monetary defaults and pay all pecuniary losses under the Assumed Contracts (collectively, the "**Cure Amounts**"), and no other amounts are or shall be due in connection with the assumption by the Debtors and the assignment to the Purchaser of the Contracts.

22.     All defaults or other obligations of the Debtors under the Assumed Contracts arising or accruing prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Purchaser at the Closing or as soon thereafter as practicable by payment of the Cure Amounts.

23.     Except for a Contract Counterparty who files or has filed a timely objection to the Cure Amount by [_____], 2017, at 4:00 p.m. (prevailing Central Time) (whose objection shall be resolved in accordance with the procedures set forth in the Bidding Procedures Order) (a "**Contract Objection**"), such counterparty is deemed to have consented to such Cure Amount.

24.     Except for a Contract Counterparty who files or has filed a timely Contract Objection to the Debtors' proposed assignment of such Assumed Contract to the Purchaser (whose objection shall be resolved in accordance with the procedures set forth in the Bidding Procedures Order), such counterparty is deemed to have consented to assumption and assignment, and the Purchaser shall be deemed to have demonstrated adequate assurance of

- 20 -

future performance with respect to such Assumed Contract pursuant to sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

25.     With respect to any timely-filed Contract Objections, such objections shall be resolved in accordance with the procedures set forth in the Bidding Procedures Order.  The provisions of this Sale Order shall be effective and binding upon Contract Counterparties to the extent set forth in, and in accordance with, such procedures.  Nothing in this Sale Order, the Sale Motion, or in any notice or any other document is or shall be deemed an admission by the Debtors that any contract or Contract is an executory contract or unexpired lease or must be assumed and assigned pursuant to the Agreement or in order to consummate the Sale.

26.     Upon the Debtors' assignment of the Assumed Contracts to the Purchaser under the provisions of this Sale Order and any additional orders of this Court and Purchaser's payment of any Cure Amounts pursuant to the terms hereof, no default shall exist under any Contract, and no counterparty to any Contract shall be permitted (a) to declare a default by the Purchaser under such Contract or (b) otherwise take action against the Purchaser as a result of any Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Assumed Contract.  Except insofar as a Contract Counterparty has filed or may timely file and prosecute a Contract Objection as provided by the Bidding Procedures Order, each non-Debtor party to a Contract hereby is also forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors or Purchaser, or the property of any of them, any default or Claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the Closing, or, against Purchaser, any counterclaim, defense, setoff, or any other Claim asserted or assertable against the Debtors and (ii) imposing or charging against Purchaser or its affiliates any rent accelerations, assignment fees, increases, or any other fees as a

result of the Debtors' assumption and assignments to Purchaser of the Assumed Contracts.  The

validity of such assumption and assignments of the Assumed Contracts shall not be affected by

any dispute between the Debtors and any non-Debtor party to an Assumed Contract relating to

such Assumed Contract's respective Cure Amount.

27.     Except as provided in the Agreement or this Sale Order, after the Closing, the

Debtors and their estates shall have no further liabilities or obligations with respect to any

Assumed Liabilities and all holders of such Claims are forever barred and estopped from

asserting such Claims against the Debtors, their successors or assigns, their property or their

assets or estates.

28.     The failure of the Debtors or Purchaser to enforce at any time one or more terms

or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of

the Debtors' and Purchaser's rights to enforce every term and condition of the Contracts.

### Prohibition of Actions Against the Purchaser

29.     Except for the Permitted Encumbrances and Assumed Liabilities, or as otherwise

expressly provided for in this Sale Order or the Agreement, the Purchaser shall not have any

liability or other obligation of the Debtors arising under or related to any of the Assets.  Without

limiting the generality of the foregoing, and except as otherwise specifically provided herein or

in the Agreement, the Purchaser shall not be liable for any Claims against the Debtors or any of

their predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities

of any kind or character, including, but not limited to, under any theory of antitrust,

environmental, successor, or transferee liability, labor law, de facto merger, mere continuation,

or substantial continuity, whether known or unknown as of the Closing Date, now existing or

hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or

equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account

of warranties, intercompany loans, and receivables among the Debtors, Environmental

Liabilities, and any taxes arising, accruing, or payable under, out of, in connection with, or in any

way relating to the operation of any of the Assets prior to the Closing.

30.     Except with respect to Permitted Encumbrances and Assumed Liabilities, or as

otherwise permitted by the Agreement or this Sale Order, all persons and entities, including, but

not limited to, all debt security holders, equity security holders, governmental, tax and regulatory

authorities, lenders, trade creditors, litigation claimants, and other creditors, holding Liens,

Claims, or other interests of any kind or nature whatsoever against or in all or any portion of the

Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or

non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in

connection with, or in any way relating to the Debtors, the Assets, the operation of the Debtors'

Business prior to the Closing Date, or the transfer of the Assets to the Purchaser, hereby are

forever barred, estopped and permanently enjoined from asserting against the Purchaser, any of

the foregoing's affiliates, successors, or assigns, their property or the Assets, such persons' or

entities' Liens, Claims, or interests in and to the Assets, including, without limitation, the

following actions:  (a) commencing or continuing in any manner any action or other proceeding

against the Purchaser, its Affiliates, its successors, assets or properties, (b) enforcing, attaching,

collecting, or recovering in any manner any judgment, award, decree, or order against the

Purchaser, its Affiliates, its successors, assets or properties, (c) creating, perfecting, or enforcing

any Lien or other Claim against the Purchaser, its Affiliates, its successors, assets, or properties,

(d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation

due the Purchaser, its Affiliates or its successors, (e) commencing or continuing any action, in

any manner or place, that does not comply or is inconsistent with the provisions of this Sale
Order or other orders of the Court, or the agreements or actions contemplated or taken in respect
thereof, or (f) revoking, terminating or failing or refusing to transfer or renew any license,
permit, or authorization to operate any of the Assets or conduct any of the businesses operated
with the Assets.  On the Closing Date, each creditor is authorized and directed, and the Purchaser
is hereby authorized, on behalf of each of the Debtors' creditors, to execute such documents and
take all other actions as may be necessary to release Liens, Claims, and other interests in or on
the Assets (except Permitted Encumbrances and Assumed Liabilities or as otherwise provided in
this Order), if any, as provided for herein, as such Liens, Claims, and other interests may have
been recorded or may otherwise exist.

31.    All persons and entities are hereby forever prohibited and enjoined from taking
any action that would adversely affect or interfere with the ability of the Debtors to sell and
transfer the Assets to the Purchaser in accordance with the terms of the Agreement and this Sale
Order.

32.    The Purchaser has given substantial consideration under the Agreement for the
benefit of the Debtors, their estates, and their creditors.  The consideration given by the
Purchaser shall constitute valid and valuable consideration for the releases of any potential
Claims and Liens pursuant to this Sale Order, which releases shall be deemed to have been given
in favor of the Purchaser by all holders of Liens against or interests in, or Claims against any of
the Debtors or any of the Assets, other than holders of Liens or Claims relating to the Permitted
Encumbrances or Assumed Liabilities.  The consideration provided by the Purchaser for the
Assets under the Agreement is fair and reasonable and, accordingly, the Sale may not be avoided
under section 363(n) of the Bankruptcy Code.

33.     Unless otherwise set forth in this Sale Order, notwithstanding any provision in the Agreement to the contrary, nothing therein or in this Sale Order shall be deemed to impair valid outstanding liabilities of any affiliate of the Debtors whose equity is being sold to the Purchaser.

## Other Provisions

34.     For the avoidance of doubt, only those Liens, Claims, interests, and other encumbrances in or on the Assets being transferred to the Purchaser pursuant to the Agreement and any ancillary agreements contemplated thereby are being transferred free and clear pursuant to the terms of this Order, and any and all other assets of the Debtors that the Purchaser is not acquiring shall remain subject to all valid pre-existing Liens, Claims, interests and other encumbrances. Any releases, terminations, termination statements, assignments, consents, or other instruments relating to Liens or other encumbrances in or on the Assets shall properly be limited to the Assets being transferred to, and Assumed Liabilities being assumed by, Purchaser.

35.     The consideration provided by the Purchaser to the Debtors pursuant to the Agreement for the Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and under the laws of the United States, any state, territory, possession or the District of Columbia.

36.     The transactions contemplated by the Agreement are undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and such Sale are duly stayed pending such appeal.  The Purchaser is a good faith buyer within

the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

37.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these chapter 11 cases, (b) any subsequent chapter 7 case into which any such chapter 11 case may be converted, or (c) any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the Agreement or the terms of this Sale Order.

38.     For cause shown, pursuant to Bankruptcy Rules 6004(h) and 7062(g), this Sale Order shall not be stayed, shall be effective immediately upon entry, and the Debtors and Purchaser are authorized to close the Sale immediately upon entry of this Sale Order.

39.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

40.     The failure to specifically include any particular provision of the Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety; provided that this Sale Order shall govern if there is any inconsistency between the Agreement (including all ancillary documents executed in connection therewith) and this Sale Order.  Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

41.     The Agreement and any related agreements, documents or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates or lower the amount of cash proceeds paid; provided that prior notice shall be provided to the Agent and the

Committee with respect to any modification, amendment, or supplement, and the Agent and the Committee shall have the opportunity to object to any material modification, amendment, or supplement that has a material adverse effect on the Debtors' estates.

42.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which any Debtor is a party or which has been assigned by the Debtors to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Assets to the Purchaser, (b) interpret, implement, and enforce the provisions of this Sale Order; (c) protect Purchaser against any Liens, Claims, or other interest in or against the Sellers or the Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale, and (d) enter any orders under sections 363 and 365 of the Bankruptcy Code with respect to the Assumed Contracts.

43.     The Debtors are authorized to distribute proceeds from the Sale to SunTrust Bank on account of the debtor in possession loan and as a prepetition secured creditor, in the amount equal to [_____], which amount shall exclude amounts budgeted by the Debtors to confirm a prospective plan of liquidation and such other amounts as budgeted in accordance with the Final DIP Order.

44.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

45.     Nothing in this Sale Order or the Agreement (a) releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or

regulations that any entity would be subject to as the owner or operator of property after the date

of entry of this Sale Order and (b) authorizes the transfer or assignment to Purchaser of any

license, permit, registration, authorization, or approval of or with respect to a governmental unit

without Purchaser's complying with all applicable legal requirements under non-bankruptcy law

governing such transfers or assignments.

46.     To the extent that this Sale Order is inconsistent with any prior order or pleading

with respect to the Sale Motion in these Cases, the terms of this Sale Order shall govern.

47.     This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Order.


Dated:                                                    _____

                                                          Michael E. Ridgway
                                                          United States Bankruptcy Judge

## **EXHIBIT 1**

ASSET PURCHASE AGREEMENT

**<u>EXHIBIT 2</u>**

CONTRACTS

## CONTRACTS

| Debtor | Counterparty | Description of Assigned Contracts or Leases | Cure Amount |
|---|---|---|---|
| Dakota Petroleum Transport Solutions, LLC | US Oil & Refining Company | Crude Oil Services Master Agreement between US Oil & Refining Company and Dakota Petroleum Transport Solutions, LLC, dated October 31, 2015, and the related Term and Allocation Agreement set to terminate March 31, 2017 | $0.00 |
| Dakota Petroleum Transport Solutions, LLC | Murex, LLC | Crude Oil Services Master Agreement between Murex, LLC and Dakota Petroleum Transport Solutions, LLC, dated June 30, 2015, and any current related Term and Allocation Agreement (month to month). | $0.00 |
| Dakota Petroleum Transport Solutions, LLC | Canadian Pacific Railway Company | Locomotive Use and Liability Agreement, Canadian Pacific Railway Company and Dakota Petroleum Transport Solutions, LLC, dated December 31, 2014, as subsequently amended, for the use of Canadian Pacific locomotives.  Set to expire June 30, 2017. | $0.00 |
| DPTS Sand, LLC | Unimin Corporation | Terminal Operating Contract, dated July 31, 2013, by and between Unimin Corporation and DPTS Sand, LLC for sand transloading.  Set for renegotiation on May 31, 2018. | $0.00 |
| Dakota Petroleum Transport Solutions, LLC | Pelican Gathering Systems, LLC | Pipeline Interconnection Agreement between Pelican Gathering Systems, LLC and Dakota Petroleum Transport Solutions, LLC, dated as of August 26, 2013.  Term expires August 26, 2043. | $0.00 |
| Dakota Petroleum Transport Solutions, LLC | Hiland Crude, LLC | Pipeline Interconnection Agreement between Hiland Crude, LLC and Dakota Petroleum Transport Solutions, LLC, dated as of August 4, 2014.  Term expires August 4, 2024. | $0.00 |
| Dakota Plains Holdings, Inc. | Unimin Corporation | Lease dated July 31, 2013 by and between Dakota Plains Holdings, Inc., and Unimin Corporation for the land lese to construct a sand terminal.  Initial term set to expire on January 1, 2024. | $0.00 |

## **EXHIBIT C**

STALKING HORSE PURCHASE AGREEMENT

Execution Version

---

**ASSET PURCHASE AGREEMENT**

**Dated as of December 19, 2016**

**By and Among**

**BioUrja Trading, LLC**

**as Purchaser,**

**and**

**Dakota Plains Holdings, Inc. and Dakota Petroleum Transport Solutions, LLC**

**as Sellers.**

---

# TABLE OF CONTENTS

**Page**

ARTICLE I.   PURCHASE AND SALE OF THE PURCHASED ASSETS;
ASSUMPTION OF ASSUMED LIABILITIES ....................................................2

1.1   Purchase and Sale of the Purchased Assets ............................................2
1.2   Excluded Assets ....................................................................................4
1.3   Assumption of Liabilities.......................................................................5
1.4   Excluded Liabilities ..............................................................................5
1.5   Post-Closing Liabilities.........................................................................7
1.6   Assumption of Assigned Contracts and Permits.....................................7
1.7   **Disclaimer** .........................................................................................8

ARTICLE II.   CONSIDERATION ...........................................................................8

2.1   Consideration ........................................................................................8
2.2   Deposit ..................................................................................................9
2.3   Payments on the Closing Date ...............................................................9
2.4   Cure Costs ...........................................................................................10

ARTICLE III. CLOSING AND TERMINATION.......................................................10

3.1   Closing ................................................................................................10
3.2   Closing Deliveries by Sellers...............................................................10
3.3   Closing Deliveries by Purchaser ..........................................................11
3.4   Termination of Agreement....................................................................12
3.5   Procedures Upon Termination ..............................................................13
3.6   Effect of Termination ..........................................................................14

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF THE SELLERS....................14

4.1   Organization and Qualification.............................................................14
4.2   Authorization of Agreement .................................................................14
4.3   Conflicts; Consents; Compliance with Law ..........................................15
4.4   Brokers and Finders .............................................................................15
4.5   Title to Purchased Assets .....................................................................15
4.6   Real Property .......................................................................................15
4.7   Litigation .............................................................................................16
4.8   Permits .................................................................................................16
4.9   Assigned Contracts ..............................................................................16
4.10  Environmental Matters.........................................................................16

- i -

# TABLE OF CONTENTS
## (continued)

| | | Page |
|---|---|---|

4.11    Absence of Certain Changes................................................................17

4.12    No Other Representations or Warranties ............................................17

ARTICLE V.   REPRESENTATIONS AND WARRANTIES OF PURCHASER......................17

5.1     Organization and Qualification..........................................................17

5.2     Authority ............................................................................................18

5.3     No Inconsistent Obligations...............................................................18

5.4     Conflicts; Consents ...........................................................................18

5.5     Brokers ...............................................................................................19

5.6     Adequate Assurances Regarding Assigned Contracts ........................19

5.7     No Litigation ......................................................................................19

5.8     AS-IS Sale..........................................................................................19

ARTICLE VI. [Reserved]..................................................................................20

ARTICLE VII.   BANKRUPTCY COURT MATTERS................................................20

7.1     Approval of Break-Up Fee and Overbid Protection ...........................20

7.2     Competing Bid and Other Matters .....................................................20

7.3     Sale Order ..........................................................................................21

7.4     Contracts ............................................................................................21

7.5     Bankruptcy Filings.............................................................................22

7.6     Sale Free and Clear ...........................................................................22

ARTICLE VIII.   COVENANTS AND AGREEMENTS ................................................22

8.1     Conduct of Business of Sellers ..........................................................22

8.2     Access to Information.........................................................................23

8.3     [intentionally omitted] .......................................................................23

8.4     Reasonable Efforts; Cooperation ......................................................23

8.5     Further Assurances ............................................................................25

8.6     Notification of Certain Matters ..........................................................25

8.7     Confidentiality ...................................................................................25

8.8     Material Adverse Effect......................................................................25

8.9     Casualty Loss .....................................................................................25

8.10    No Successor Liability ........................................................................26

8.11    Delivery of Disclosure Schedules; Update of Disclosure Schedules....................26

610117643.1

**TABLE OF CONTENTS**

**(continued)**

Page

ARTICLE IX. CONDITIONS TO CLOSING ..................................................27

    9.1    Conditions Precedent to the Obligations of Purchaser and Sellers.......................27

    9.2    Conditions Precedent to the Obligations of Sellers ............................................27

    9.3    Conditions Precedent to the Obligations of Purchaser ........................................27

ARTICLE X.  ADDITIONAL DEFINITIONS..................................................28

    10.1    Definitions...........................................................................................................28

ARTICLE XI. TAXES....................................................................................37

    11.1    Certain Taxes......................................................................................................38

    11.2    Allocation of Purchase Price...............................................................................38

    11.3    Cooperation on Tax Matters................................................................................38

    11.4    FIRPTA Certificate.............................................................................................38

    11.5    Tax Refunds........................................................................................................39

ARTICLE XII.    MISCELLANEOUS.............................................................39

    12.1    Payment of Expenses..........................................................................................39

    12.2    Survival of Representations and Warranties; Survival of Confidentiality.............39

    12.3    Entire Agreement; Amendments and Waivers .....................................................39

    12.4    Execution of Agreement; Counterparts; Electronic Signatures.............................39

    12.5    Governing Law ...................................................................................................40

    12.6    Jurisdiction, Waiver of Jury Trial .......................................................................40

    12.7    Notices................................................................................................................40

    12.8    Binding Effect; Assignment................................................................................41

    12.9    Severability ........................................................................................................42

    12.10    Post-Closing Access to Information ....................................................................42

    12.11    Post-Closing Access to Information.. ..................................................................42

    12.12    Bulk Sales Laws..................................................................................................42

    12.13    Purchase Guarantee.............................................................................................42

610117643.1

## INDEX OF EXHIBITS

EXHIBIT A      FORM OF BILL OF SALE

EXHIBIT B      FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT C      BIDDING PROCEDURES ORDER

EXHIBIT D      SALE ORDER

610117643.1

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "***Agreement***"), dated as of November 18, 2016 (the "***Agreement Date***"), by and among BioUrja Trading, LLC, a Delaware limited liability company ("***Purchaser***") and Dakota Plains Holdings, Inc., a Nevada corporation and Dakota Petroleum Transport Solutions, LLC, a Minnesota limited liability company (jointly, the "***Companies***" or "***Sellers***").  Purchaser and the Sellers are collectively referred to the assets used in and related to herein as the "***Parties***" and individually as a "***Party***".  For the purposes of this Agreement, capitalized terms used herein shall have the meanings set forth herein or in <u>Article X</u>.  Amit Bhandari shall be a party just as to Section 12.13 hereof.

## RECITALS

WHEREAS, the Sellers intend to file a petition (the "***Chapter 11 Petition***") for relief under Chapter 11 of the United States Bankruptcy Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Minnesota (the "***Bankruptcy Court***") commencing a chapter 11 case (the "***Bankruptcy Case***").

WHEREAS, the Sellers, upon filing the Chapter 11 Petition, intend to manage their assets as "***debtor-in-possession***" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code;

WHEREAS, the Sellers wish to sell the Purchased Assets, as defined hereunder;

WHEREAS, Purchaser desires to purchase the Purchased Assets and assume the Assumed Liabilities from the Sellers and the Sellers desire to sell, convey, assign and transfer to Purchaser the Purchased Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code;

WHEREAS, the Purchased Assets and Assumed Liabilities shall be purchased and assumed by Purchaser pursuant to a Sale Order approving such sale, free and clear of all Claims and Encumbrances (other than Permitted Encumbrances), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, which order will include the authorization for the assumption by Sellers and assignment to Purchaser of the Assigned Contracts and the assumed liabilities thereunder in accordance with Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court (together, the "***Bankruptcy Rules***"); and

WHEREAS, the Board of Directors (or similar governing body) of Sellers has determined that it is advisable and in the best interests of Sellers and their constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and has approved the same.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable

consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows:

ARTICLE I.

PURCHASE AND SALE OF THE PURCHASED ASSETS;
ASSUMPTION OF ASSUMED LIABILITIES

1.1    <u>Purchase and Sale of the Purchased Assets</u>.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth herein, at the Closing, Sellers shall sell, transfer, assign, convey and deliver to Purchaser or its designee ("***Purchaser Designee***"), free and clear of all Encumbrances other than Permitted Encumbrances, and Purchaser shall purchase, acquire and accept from Sellers all of Sellers' right, title and interest in, to and their Pioneer Terminal located at 3889 88th Ave NW, New Town, North Dakota 58763  (the "***Terminal***"), including the following, but excluding the Excluded Assets, (the "***Purchased Assets***") as of the Closing:

(a)    all of Sellers' properties, rights, claims and assets (other than the Excluded Assets) of every kind and description, wherever situated or located, real, personal or mixed, tangible or intangible, contingent, owned, leased, or licensed, for use in or relating to the Terminal, whether or not reflected on the books and records of Sellers, as the same shall exist on the Closing Date;

(b)    all of Sellers' rights, title and interests in any intellectual property, including, but not limited to any copyrights, trades secrets, trademarks, service marks, patents, or applications therefor;

(c)    all Documents relating to the Purchased Assets or Assumed Liabilities;

(d)    the Owned Real Property listed on <u>Schedule 1.1(d)</u>;

(e)    the improvements on the Owned Real Property;

(f)    all tangible assets of Sellers relating to the Terminal, indicating whether the assets are owned by the Sellers as set forth on <u>Schedule 1.1(f)</u>, including, without limitation, the tangible assets of Sellers located at the Locations listed on <u>Schedule 1.1(f)</u>;

(g)    any chattel paper owned or held by Sellers relating to the Purchased Assets other than the Excluded Assets;

(h)    all other or additional assets, properties, privileges, rights (including prepaid expenses) and interests of Sellers relating to the Purchased Assets other than the Excluded Assets of every kind and description and wherever located, whether known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, and whether or not specifically referred to in this Agreement;

(i)    all Permits and all pending applications therefor listed on <u>Schedule 1.1(i)</u>;

2

(j)     all express or implied guarantees, warranties, representations, covenants, indemnities, rights, claims, counterclaims, defenses, credits, causes of action or rights of set off against third parties relating to the Purchased Assets (including, for the avoidance of doubt, those arising under, or otherwise relating to the utility services agreements) or Assumed Liabilities, including rights under vendors' and manufacturers' warranties, indemnities and guaranties;

(k)     the Sellers' Documents, and without limiting the foregoing, each of the following: financial accounting and other books and records, Tax Returns, checkbooks and canceled checks, correspondence, supplier agreements, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other records, in each case arising under or relating to the Purchased Assets or the Assumed Liabilities provided, however, that Sellers have the right to retain copies of all of the foregoing at Purchaser's expense;

(l)     to the extent transferable, all rights and obligations under or arising out of the insurance policies set forth on Schedule 1.1(l) relating to the Purchased Assets or Assumed Liabilities (including returns and refunds of any premiums paid, or other amounts due back to Sellers, with respect to cancelled policies);

(m)     All rights of Sellers under the contracts and agreements set forth on Schedule 1.1(m) hereto (collectively, the "**Assigned Contracts**");

(n)     all Tax assets net of any liability (including all state and federal Tax refunds (or the right to such state and federal refunds of Taxes, whether claimed or unclaimed) for all taxable periods (or portions thereof), whether ending on, prior to, or after the Closing Date (the "*Tax Refunds*"));

(o)     to the extent owned by Sellers, all fixed assets and other personal property and interests related to the Purchased Assets, wherever located, including all vehicles, tools, parts and supplies, fuel, machinery, equipment, furniture, furnishing, appliances, fixtures, office equipment and supplies, owned and licensed computer hardware and related documentation, stored data, communication equipment, trade fixtures and leasehold improvements, in each case with any freely transferable warranty and service rights of the applicable Sellers with respect to such Purchased Assets;

(p)     telephone, fax numbers and email addresses;

(q)     all of Sellers' rights to receive refunds, payments or overpayments, clawbacks or other amounts in respect of any and all claims, potential claims, purported claims and similar related items, with the exception of the Excluded Claims;

(r)     all of Sellers' claims or causes of action under applicable laws relating to the Purchased Assets and/or Assumed Liabilities, including all actions relating to vendors and service providers, which are collectively listed on Schedule 1.1(r) (the "*Vendor Actions*"), which shall not include the Excluded Claims; and

610117643.1

(s)    all Crude Oil Inventory, wherever located and whether or not obsolete or carried on the Seller's books of account.

1.2    <u>Excluded Assets</u>.  Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign or convey, and Sellers shall retain all right, title and interest to, in and under only the following assets, properties, interests and rights of Sellers (collectively, the "***Excluded Assets***"):

(a)    copies of any and all information not relating to the Purchased Assets that is stored on Sellers' computer systems, data networks or servers;

(b)    all agreements and contracts of Sellers other than those agreements and contracts included in the Purchased Assets;

(c)    all Documents and all personnel records of Sellers' employees;

(d)    all shares of capital stock or other equity interests issued by Sellers or securities convertible into, exchangeable or exercisable for any such shares of capital stock or other equity interests;

(e)    any avoidance claims or causes of action under the Bankruptcy Code or applicable Law (including, without limitation, any preference or fraudulent conveyance), and all other claims or causes of action under any other provision of the Bankruptcy Code or applicable laws, including those listed on Schedule 1.2(e) (the "***Excluded Claims***");

(f)    all Claims that Sellers may have against any Person solely with respect to any Excluded Assets or any Excluded Liabilities;

(g)    Sellers' rights under this Agreement, the Purchase Price hereunder, any agreement, certificate, instrument or other document executed and delivered by Purchaser to Sellers in connection with the transactions contemplated hereby, or any side agreement between Sellers and Purchaser entered into on or after the Agreement Date;

(h)    all current and prior director and officer insurance policies of the Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(i)    the Sellers' financial accounting books and records, corporate charter, minute and stock record books, income tax returns, corporate seal, checkbooks and canceled checks that do not constitute Purchased Assets;

(j)    the properties and assets set forth on <u>Schedule 1.2(j)</u>;

(k)    all Benefit Plans (including all assets, trusts, insurance policies and administration service contracts related thereto);

(l)    all Pension Plans;

4

(m)     all assets of Unimin Corporation or its affiliates located on Sellers' real property;

(n)     all of Sellers' Cash and Cash Equivalents; and

(o)     any and all claims, deposits, prepayments, refunds, rebates, causes of action, rights of recovery, rights of set-off and rights of recoupment relating to or in respect of an Excluded Asset.

1.3     <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, effective as of the Closing, Purchaser shall assume from the Sellers (and pay, perform, discharge or otherwise satisfy in accordance with their respective terms), and the Sellers shall irrevocably convey, transfer and assign to Purchaser, the following Liabilities (and only the following Liabilities) (collectively, the "***Assumed Liabilities***"):

(a)     all Liabilities of Sellers arising from the ownership of the Purchased Assets, arising after the Closing Date;

(b)     all Liabilities and obligations of Sellers under the Assigned Contracts, including, without limitation, (i) all pre-petition cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (such pre-petition cure costs are, collectively, the "***Cure Costs***") and (ii) any post-Closing liabilities;

The assumption by Purchaser of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

1.4     <u>Excluded Liabilities</u>.  Notwithstanding any provision in this Agreement to the contrary, Purchaser is assuming only the Assumed Liabilities and is not assuming, and shall not be deemed to have assumed, any other Liabilities of Sellers of whatever nature (whether arising prior to, at the time of, or subsequent to Closing), whether absolute, accrued, contingent or otherwise, whether due or to become due and whether or not assets, and whether or not known or unknown or currently existing or hereafter arising or matured or unmatured, direct or indirect, and the Sellers shall be solely and exclusively liable for any and all such Liabilities, including those relating to, arising out of or in connection with the Purchased Assets (including the use and ownership thereof) at any time prior to the Closing Date, and including, without limitation, those Liabilities set forth below (collectively, the "***Excluded Liabilities***"):

(a)     all Liabilities of the Sellers relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(b)     all guarantees of third party obligations and reimbursement obligations to guarantors of Sellers' obligations or under letters of credit;

(c)     any and all (i) Liabilities of the Sellers for any Taxes (including any Taxes owed by Sellers and arising in connection with the consummation of the transactions contemplated by this Agreement), (ii) any Taxes imposed on any Person that are the responsibility of the Sellers pursuant to <u>Section 11.1</u>, (iii) Taxes attributable to the Purchased

Assets or the operation of any related business for any Pre-Closing Tax Period and (iv) any Taxes arising from or in connection with an Excluded Asset;

(d)     any and all Liabilities of the Sellers in respect of Contracts other than Assigned Contracts;

(e)     all Liabilities with respect to compensation, severance or benefits of any nature owed to any current or former employee, officer, director, member, partner or independent contractor of Sellers or any ERISA Affiliate (or any beneficiary or dependent of any such individual), including, but not limited to those that (A) arise out of or relate to the employment, service provider or other relationship between Sellers or ERISA Affiliate and any such individual, including the termination of such relationship, (B) arise out of or relate to any Benefit Plan or (C) arise out of or relates to events or conditions occurring on, before or after the Closing Date;

(f)     draft or checks outstanding at the Closing;

(g)     all Liabilities under any futures contracts, options on futures, swap agreements or forward sale agreements;

(h)     all Liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by Sellers in connection with this Agreement or the administration of the Bankruptcy Case (including all fees and expenses of professionals engaged by Sellers) and administrative expenses and priority claims accrued through the Closing Date and specified post-closing administrative wind-down expenses of the bankrupt estates pursuant to the Bankruptcy Code (which such amounts shall be paid by the Sellers from the proceeds collected in connection with the Excluded Assets) and all costs and expenses incurred in connection with (i) the negotiation, execution and consummation of the transactions contemplated under this Agreement and each of the other documents delivered in connection herewith, (ii) the preparation and submission of any filing or notice required to be made or given in connection with any of the transactions contemplated by this Agreement, and the obtaining of any consent required to be obtained in connection with any of such transactions; (iii) the negotiation, execution and consummation of any DIP financing agreements and use thereof, and (iv) the consummation of the transactions contemplated by this Agreement, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of Sellers payable as a result of the consummation of the transactions contemplated by this Agreement and the documents delivered in connection herewith;

(i)     all Liabilities related to the WARN Act, to the extent applicable, with respect to Employees, and for any action resulting from Employees' separation of employment prior to, on, or after the Closing Date;

(j)     all Liabilities of Sellers to their equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise, and any liability of Sellers pursuant to any Affiliate Agreement;

6

(k)      all Liabilities arising out of or relating to any business or property formerly owned or operated by Sellers, any Affiliate or predecessor thereof, but not presently owned and operated by the Sellers;

(l)      all Liabilities relating to claims, actions, suits, arbitrations, litigation matters, proceedings or investigations (in each case whether involving private parties, Authorities, or otherwise) involving, against, or affecting any Purchased Asset, Sellers, or any assets or properties of Sellers, whether commenced, filed, initiated, or threatened before or after the Closing and whether relating to facts, events, or circumstances arising or occurring before or after the Closing;

(m)      all obligations of the Sellers arising and to be performed prior to the Closing Date arising from or related to the Purchased Assets;

(n)      all Environmental Liabilities and Obligations set forth on Schedule 1.4(n);

(o)      all Liabilities of Sellers or their predecessors arising out of any contract, agreement, Permit, franchise or claim that is not transferred to Purchaser as part of the Purchased Assets or, is not transferred to Purchaser because of any failure to obtain any third-party or governmental consent required for such transfer; and

(p)      all Liabilities set forth on Schedule 1.4(p).

1.5      Post-Closing Liabilities.      Purchaser acknowledges that Purchaser shall be responsible for all Liabilities and obligations relating to Purchaser's ownership or use of, or right to use, the Purchased Assets and the Assumed Liabilities after the Closing Date, including without limitation all Taxes arising out of or related to the Purchased Assets or the operation thereof acquired pursuant to this Agreement for all Tax periods beginning on or after the Closing Date.

1.6      Assumption of Assigned Contracts and Permits.

(a)      Assignment and Assumption at Closing.

(i)      Schedule 1.1 (i), and Schedule 1.1(n) respectively set forth a list of all Permits and Assigned Contracts to which, to the Sellers' Knowledge, Sellers are a party and which are to be included in the Purchased Assets.

(ii)      Sellers shall take all commercially reasonable actions required to assign the Assigned Contracts and Permits to Purchaser (other than payment of Cure Costs, if so required), including taking all actions required to facilitate any negotiations with the counterparties to such Assigned Contracts or Permits and to obtain an Order containing a finding that the proposed assumption and assignment of the Assigned Contracts and Permits to Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code. To the extent the Sellers have a good faith dispute regarding the amount of any of the Cure Costs, the Sellers may establish an appropriate reserve for such amounts pending determination by the Bankruptcy Court with respect to the

7

appropriate amount thereof.  To the extent the Sellers reserves the appropriate amount of Cure Cost, this shall be deemed paid or cured for the purposes hereunder.

(iii)     At Closing, (x) Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement, assign to Purchaser (the consideration for which is included in the Purchase Price) each of the Assigned Contracts and Permits that is capable of being assumed and assigned, and (y) Purchaser shall pay promptly all Cure Costs (if any) in connection with such assumption and assignment (as agreed to among the various counterparties, Purchaser and Sellers, or as determined by the Bankruptcy Court) and assume and perform and discharge the Assumed Liabilities (if any) under the Assigned Contracts, pursuant to the Assignment and Assumption Agreement, as applicable.

1.7     **Disclaimer**.  **PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS PROVIDED IN THIS AGREEMENT, THE SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS. WITHOUT LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS.  PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS PURCHASER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS.**

ARTICLE II.

CONSIDERATION

2.1     Consideration.

(a)     The aggregate consideration (collectively, the "***Purchase Price***") to be paid for the purchase of the Purchased Assets shall be: (i) the assumption of Assumed Liabilities, and (ii) cash in an amount equal to eight million five hundred and fifty thousand dollars ($8,550,000) minus the Cure Cost Reduction, if any, and minus the dollar amount of real or personal property Taxes allocated to Sellers pursuant to Section 11.1(b) (including any real or personal property taxes for a pre-closing period that Purchaser either pays at Closing or assumes and agrees to pay after Closing); provided, however, that Purchaser reserves the right to increase the Purchase Price, subject to the Bidding Procedures Order and applicable Law.

8

(b)      Limitation on Purchaser Liability.  For the avoidance of doubt, Purchaser shall have no liability with respect to any costs, fees or expenses of any nature incurred by the Sellers following the Closing Date.

2.2      Deposit.  Within seven (7) days of execution of this Agreement, Purchaser will make an earnest money deposit (the "**Deposit**") in the amount of $1,710,000 to the Escrow Agent.  The Deposit shall be applied against payment of the Purchase Price on the Closing Date. If this Agreement shall be terminated by any Party hereto pursuant to Sections 3.4(a), (b), (c), (d), (e), (f), (h), and (j) hereof, or in the event that a party other than Purchaser or an Affiliate of Purchaser purchases all or a significant portion of the Purchased Assets, then the Deposit shall be returned to Purchaser within five (5) Business Days after Sellers' receipt of Purchaser's written request therefore, except in the case of termination of this Agreement pursuant to Section 3.4 (h) hereof, in which case Sellers shall return the Deposit to Purchaser immediately upon the closing of the Alternative Transaction.  If this Agreement shall be terminated by the Sellers pursuant to Sections 3.4 (i) hereof or otherwise by reason of the failure of any condition precedent under Section 9.2 hereof resulting primarily from Purchaser materially breaching any representation, warranty or covenant contained herein, then Sellers shall retain the Deposit; provided such failure or breach was not caused by a breach of this Agreement by Sellers.  The Parties agree that the Sellers' right to retain the Deposit, as set forth herein, is not a penalty, but rather is compensatory damages, and Sellers are (i) expressly waiving their right to seek additional compensatory damages for any breach of this Agreement that was not on account of Crude Business, but are not (ii) expressly waiving their right to seek additional compensatory damages if such breach is related to the Crude Business or a Material Adverse Effect related to the Crude Business.  Provided that, in no event, shall Sellers be entitled to any damages in excess of the Purchase Price and reasonable costs and expenses in connection with enforcement of this Agreement.

2.3      Payments on the Closing Date.

(a)      Not later than three (3) Business Days prior to the Closing Date, Sellers shall deliver to Purchaser a written statement setting forth the actual Cure Costs, if any, reasonably satisfactory to Purchaser and signed by an officer of Sellers (the "**Closing Statement**").

(b)      Not later than three (3) Business Days prior to the Closing Date, Purchaser shall deliver to Sellers a written statement, reasonably satisfactory to Sellers ("**Purchaser Statement**") setting forth the dollar amount of real and personal property Taxes allocated to Sellers pursuant to Section 11.1(b).

(c)      Should Purchaser object to any of the amounts or calculations in the Closing Statement, or should Sellers object to any of the amounts or calculations in the Purchaser Statement, Purchaser and Sellers shall cooperate in a diligent good faith manner to resolve such objections prior to the Closing, and the Closing Statement or Purchaser Statement, as applicable, shall be adjusted prior to the Closing to reflect any changes agreed to by the Purchaser and Sellers prior to the Closing Date.

9

(d)     At the Closing, Purchaser shall pay to Sellers in cash by wire transfer of immediately available funds to the account of Sellers set forth in the Closing Statement an amount equal to the Cash Consideration minus the Deposit  (such amount to be paid to Sellers, the "***Closing Date Payment***").

(e)     "***Cash Consideration***" means $8,550,000 <u>minus</u> the Cure Cost Reduction, if any and minus the dollar amount of real and personal property Taxes allocated to Sellers pursuant to <u>Section 11.1(b)</u> (including any real or personal property Taxes for any Pre-Closing Tax Period that Purchaser either pays at the Closing or assumes and agrees to pay after the Closing).

2.4     <u>Cure Costs</u>. If the actual Cure Costs (as determined by an order of the Bankruptcy Court) set forth on the Closing Statement exceed $50,000 in the aggregate, then the Purchase Price shall be reduced by the amount ("***Cure Cost Reduction***") equal to the actual Cure Costs <u>minus</u> $50,000.

ARTICLE III.

CLOSING AND TERMINATION

3.1     <u>Closing</u>.  Subject to the satisfaction or waiver by the appropriate Party of the conditions set forth in <u>Article IX</u>, the closing of the purchase and sale of the Purchased Assets, the payment of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "***Closing***") shall occur as soon as practicable following the satisfaction or waiver of all conditions set forth in this Agreement (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions).  The Closing shall take place at the offices of Baker Hostetler or at such other place as the Parties may agree.  Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title and interest of the Sellers in the Purchased Assets to be acquired by Purchaser hereunder shall be deemed to have passed to Purchaser and the assumption of all of the Assumed Liabilities shall be deemed to have occurred as of 12:01 a.m. Eastern Time on the Closing Date.

3.2     <u>Closing Deliveries by Sellers</u>.  At or prior to the Closing, the Sellers shall deliver to Purchaser:

(a)     bill of sale substantially in the form of <u>Exhibit A</u> (the "***Bill of Sale***") selling all of the Purchased Assets, other than any Owned Real Property or Assigned Contracts, duly executed by the Sellers;

(b)     assignment and assumption agreement substantially in the form of <u>Exhibit B</u> (the "***Assignment and Assumption Agreement***") assigning the Assigned Contracts and Permits to Purchaser, duly executed by the Sellers;

(c)     entry of the Sale Order;

10

(d)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Sellers certifying that the conditions set forth in <u>Section 9.3</u> have been satisfied;

(e)     a copy of the resolutions adopted by the Board of Directors of the Sellers evidencing the authorization of the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, certified by an authorized officer of Sellers;

(f)     an irrevocable waiver of Sellers' and Sellers' affiliates' rights to any intellectual property infringement claims related to the use of any equipment, processes, or designs at the Terminal, regardless of how modified by Purchaser or its assigns, executed accordingly by the Sellers;

(g)     possession of each Owned Real Property, together with duly executed deeds for each Owned Real Property conveying the Owned Real Property, existing surveys, legal descriptions and title policies that are in the possession of the Sellers, subject only to Permitted Encumbrances;

(h)     possession of the Purchased Assets;

(i)     certificates executed by Sellers, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that Sellers are not a foreign person within the meaning of Section 1445(0)(3) of the Code;

(j)     such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Purchaser, as Purchaser may reasonably request to vest in Purchaser all of Sellers' right, title and interest of Sellers in, to or under any or all the Purchased Assets, including all Owned Real Property;

(k)     such ordinary and customary documents (including any factually accurate affidavits) as may be required by any title company or title insurance underwriter to enable Purchaser to acquire, at Purchaser's sole election and Purchaser's sole cost and expense, one or more owner policies of title insurance issued by such title company covering any or all of the Owned Real Property;

(l)     an updated Phase I environmental assessment report, dated within ninety days of the execution of this Agreement, that demonstrates that there are no recognized environmental conditions that impact the Terminal, or otherwise meets the satisfaction of Purchaser; and

(m)     a duly completed FIRPTA Certificate.

3.3     <u>Closing Deliveries by Purchaser</u>.  At the Closing, Purchaser shall deliver to (or at the direction of) the Sellers:

(a)     the Assignment and Assumption Agreement duly executed by Purchaser;

(b)      satisfactory evidence of payment of the Cure Costs or readiness to make such payments;

(c)      an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 9.2(a) and 9.2(b) have been satisfied; and

(d)      all other certificates, agreements and other documents required by this Agreement (or as the Sellers may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement) to be delivered by Purchaser at or prior to the Closing in connection with the transactions contemplated by this Agreement.

3.4      Termination of Agreement.   This Agreement may be terminated only in accordance with this Section 3.4.  This Agreement may be terminated at any time prior to the Closing, as follows:

(a)      by the mutual written consent of the Sellers and Purchaser;

(b)      by written notice of either the Sellers or Purchaser to such other Party, if the Closing shall not have been consummated prior to April 30, 2017 (the "**Outside Date**"); provided, however, that the Outside Date may be extended by the mutual written consent of Sellers and Purchaser, for a period up to seven (7) days to the extent that all conditions to Closing set forth in this Agreement are capable of being satisfied as of such time; provided further, however, that a Party shall not be permitted to terminate this Agreement pursuant to this Section 3.4(b) if such Party is in material breach of this Agreement; provided, however, that if the Closing has not occurred by the Outside Date, but on such date all of the conditions set forth in Article 9 have been satisfied or waived (to the extent such conditions may be waived), then the Outside Date shall automatically be extended until thirty (30) days after such initial Outside Date (and such extended date shall be deemed to be the "Outside Date" for all purposes hereunder) unless two (2) Business Days prior to the end of the second month following the original Outside Date, Purchaser provides written notice to Sellers that it is no longer extending the Outside Date pursuant to this Section 3.4(b);

(c)      by written notice from Purchaser to the Sellers, if (i) Sellers seeks to have the Bankruptcy Court enter an Order dismissing, or converting into a case under chapter 7 of the Bankruptcy Code, the Bankruptcy Case, or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner with enlarged power relating to the operation, use or ownership of the Purchased Assets (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or (ii) an order of dismissal, conversion or appointment is entered for any reason and is not reversed or vacated within fourteen (14) days after entry thereof;

(d)      by written notice from Purchaser, if (i) the Bidding Procedures Order shall not have been approved by the Bankruptcy Court by the close of business on the date that is 30 days from the Petition Date, (ii) the Bankruptcy Court issues an order granting leave to any Person to commence an appeal of the Bidding Procedures Order or (iii) following its entry, the

12

Bidding Procedures Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect without the prior written consent of Purchaser;

(e)     by written notice from Purchaser if (i) the Bankruptcy Court has not entered the Sale Order on or prior to 90 days after the Petition Date, or (ii) the Sale Order shall have been stayed (and such stay results in the Closing not being consummated prior to the Outside Date), vacated, modified or supplemented without Purchaser's prior written consent;

(f)     by written notice from Purchaser, if (i) the Sale Order has not become a Final Order within fourteen (14) days after the entry thereof and (ii) following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed (and such stay results in the Closing not being consummated prior to the Outside Date), reversed, modified or amended in any respect without the prior written consent of Purchaser;

(g)     [intentionally omitted];

(h)     automatically upon the consummation of an Alternative Transaction;

(i)     by written notice from the Sellers to Purchaser, if Purchaser materially breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform: (i) would give rise to the failure of a condition set forth in Article IX, (ii) cannot be or has not been cured within thirty (30) days following delivery of notice to Purchaser of such breach or failure to perform and (iii) has not been waived by the Sellers; or

(j)     by written notice from Purchaser to the Sellers, if Sellers materially breach or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform: (i) would give rise to the failure of a condition set forth in Article IX, (ii) cannot be or has not been cured within thirty (30) days following delivery of notice to the Sellers of such breach or failure to perform and (iii) has not been waived by Purchaser.

Each condition set forth in this Section 3.4, pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in this Section 3.4 is applicable, the applicable Party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated. The Parties acknowledge and agree that no notice of termination or extension of the Outside Date provided pursuant to this Section 3.4 shall become effective until two (2) Business Days after the delivery of such notice to the other Parties, and only if such notice shall not have been withdrawn during such two (2) Business Day period.

3.5     Procedures Upon Termination. In the event of termination and abandonment by Purchaser or Sellers, or both such Parties, pursuant to Section 3.4 hereof, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate, and the purchase of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall be abandoned, without further action by Purchaser or Sellers. If this Agreement is terminated as provided herein, each Party shall return if requested all documents, work papers and other material of any other Party relating to the transactions contemplated hereby, whether so obtained

13

before or after the execution hereof, to the Party furnishing the same. If this Agreement is terminated pursuant to Section 3.4 (h), Sellers shall pay within 5 business days of such termination to Purchaser the Break-Up Fee, and the Parties shall have no further obligations to one another except for any obligations that, by their terms, survive the termination of this Agreement, as described in Section 3.6.

3.6     Effect of Termination.  In the event of termination of this Agreement pursuant to Section 3.4, this Agreement shall forthwith become null and void and there shall be no liability on the part of any Party or any of its partners, officers, directors or shareholders; provided, however, that this Section 3.6, Section 3.5, the Sellers' obligation to pay the Break-Up Fee pursuant to Section 7.1, Article XII (Miscellaneous), and the Bidding Procedures Order (if entered) shall survive any such termination.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.  Each Party acknowledges that the agreements contained in this Section 3.6 and in Section 3.5 are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement, and that any amounts payable pursuant to this Section 3.6 and Section 3.5 do not constitute a penalty.

ARTICLE IV.

REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Subject to the exceptions noted in the schedules delivered by the Sellers concurrently herewith (the "**_Disclosure Schedules_**"), the Sellers represents and warrants to Purchaser as follows as of the date hereof and as of the Closing Date:

4.1     Organization and Qualification.  Sellers are duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of their incorporation. Sellers have all requisite power and authority to own, lease and operate their properties and to carry on their business as it is now being conducted, subject to the provisions of the Bankruptcy Code.  Sellers have previously delivered to Purchaser complete and correct copies of their Organizational Documents, as amended and in effect on the Agreement Date.  Sellers are duly qualified or licensed to do business and are in good standing in each jurisdiction where the character of their business or the nature of their properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

4.2     Authorization of Agreement.  Subject to the entry of the Sale Order, Sellers have all requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which they are a party, to perform their obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and each of the Ancillary Documents to which they are a party, the performance by Sellers of their obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary company action on the part of Sellers.  This Agreement has been, and at or prior to the Closing, each of the Ancillary Documents to which they are a party will be, duly and validly executed and delivered by Sellers and (assuming the due authorization, execution and delivery

14

by the other Party, and the entry of the Sale Order) this Agreement constitutes, and each Ancillary Document to which they are a party when so executed and delivered (assuming the due authorization, execution and delivery by the other parties thereto) will constitute, legal, valid and binding obligations of Sellers, enforceable against Sellers in accordance with its terms.  Subject to entry of the Sale Order, except (a) for entry of the Sale Order, (b) for notices, filings and consents required in connection with the Bankruptcy Case and (c) for the notices, filings and consents set forth on Schedule 4.2, Sellers are not required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from, any Person (including any Governmental Body) in connection with the execution and delivery of this Agreement and each of the Ancillary Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, other than such notices, registrations, declarations, filings, consents, waivers, or approvals, the failure of which to make or obtain would not have a Material Adverse Effect.

4.3    Conflicts; Consents; Compliance with Law.  If any other section of Article IV deals expressly with respect to a specific Law, then that section shall contain the sole and exclusive representations and warranties relating to such Law.

(a)    Except as set forth on Schedule 4.3(a) and subject to entry of the Sale Order, the execution, delivery and performance by Sellers of this Agreement or any Ancillary Document to which they are a party, the compliance by Sellers with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby and the taking by Sellers of any other action contemplated hereby or thereby, do not and will not contravene, violate or conflict with any term or provision of their Organizational Documents.

(b)    Sellers are in compliance, in all material respects with all applicable Laws. Except as set forth on Schedule 4.3(b), Sellers have not received any written notice from any Governmental Body regarding any actual or possible material violation of, or failure to comply in any material respect with, any Law the subject of which remains outstanding or unresolved. Sellers are not in default in any material respect of any order, writ, injunction, judgment or decree applicable to the Purchased Assets.

4.4    Brokers and Finders.  Except as set forth on Schedule 4.4, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers in connection with the transactions contemplated by this Agreement and Purchaser is not or will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transactions contemplated by this Agreement based upon any arrangement made by or on behalf of Sellers.

4.5    Title to Purchased Assets.  Other than the Permitted Encumbrances and as set forth on Schedule 4.5, Sellers has good title to the Purchased Assets and, at the Closing, Purchaser, pursuant to and subject to entry of the Sale Order, shall acquire good and marketable title in, and under all of such Purchased Assets, in each case free and clear of all Encumbrances to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

4.6    Real Property.  Schedule 1.1(d) sets forth a true, correct and complete list of all Owned Real Property, specifying the street address, the current owner and the current use of

each parcel of Owned Real Property in which Sellers have any title interest and which is related to, used, useful or held for use in connection with the Terminal (the ***"Owned Real Property"***). Except for Permitted Encumbrances and as set forth on Section 4.5, Sellers have good and marketable title in the Owned Real Property set forth on <u>Schedule 1.1(d)</u>. To Sellers' Knowledge, other than as noted on <u>Schedules 1.1(d) and 4.5</u>, none of the Owned Real Property is subject to any lease or grant to any Person of any right to the use, purchase, occupancy or enjoyment of such Owned Real Property or any portion thereof required to operate or use the Purchased Assets. Except for Permitted Encumbrances and as set forth on <u>Schedule 4.5</u>, the Owned Real Property is not subject to any Encumbrances or to any use restrictions, exceptions, reservations or limitations. There are no pending or, to Sellers' Knowledge, threatened condemnation proceedings relating to any of the Owned Real Property.

4.7    <u>Litigation</u>.  Except as set forth on <u>Schedule 4.7</u> and other than in connection with the Bankruptcy Case, there is no suit, action, litigation, intellectual property infringement actions, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to the best of Sellers' Knowledge, threatened against or relating to Sellers or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, might adversely affect the ability of Sellers to enter into this Agreement or to consummate the transactions contemplated hereby and Sellers has no Knowledge of any existing ground on which any such action, suit or proceeding may be commenced with any reasonable likelihood of success.

4.8    <u>Permits</u>.  Sellers are in compliance with the material terms of all issued Permits listed in <u>Schedule 1.1(i)</u>, and all such Permits are valid and in full force and effect, and no proceeding is pending or, to the Knowledge of Sellers, threatened, the object of which is to revoke, limit or otherwise affect any such Permit.

4.9    <u>Assigned Contracts</u>.  Except as set forth on <u>Schedule 4.9</u>, Sellers have not, and, to Sellers' Knowledge, no other party to any Assigned Contract has, commenced any action against any of the parties to any Assigned Contract or given or received any written notice of any default or violation under any Assigned Contract that has not been withdrawn or dismissed except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Costs.  Assuming payment of the Cure Costs, each Assigned Contract is, or will be upon the Closing, valid, binding and in full force and effect in accordance with its terms.

4.10    <u>Environmental Matters</u>.  The representations and warranties contained in this <u>Section 4.10</u> are the sole and exclusive representations and warranties of the Sellers pertaining to or relating to any environmental matters, including any matter arising under any Environmental Laws.  Except as set forth on <u>Schedule 4.10</u> and except for facts, circumstances or conditions that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) with respect to the Purchased Assets, there is no Order with any Governmental Body nor has Sellers received any verbal or written notice, complaint or inquiry from a Governmental Body respecting Environmental Laws, (b) with respect to the Purchased Assets, there is no investigation, action or proceeding pending, or, to the Knowledge of Sellers, threatened that could reasonably be expected to result in Sellers or Purchaser incurring any Environmental Liabilities or Obligations, (c) Sellers are not aware of and has not caused or

16

allowed the Release of Hazardous Materials at, on or under the Owned Real Property and (d) Sellers maintains, has obtained, and has complied in all material respects with all Permits, and all Permits remain effective as are required under or pursuant to Environmental Laws for the operation of the Purchased Assets.  Sellers have delivered or made available to Purchaser copies of all Permits, Permit applications, reports, assessments or tests with respect to compliance of the Purchased Assets with any Environmental Laws or the presence of Hazardous Material which are in the Sellers' possession, custody or control or available to it from an Affiliate, including the following records:  (i) reports concerning the removal of underground storage tanks from the Owned Real Property and Remedial Actions (ii) correspondence from Governmental Bodies informing Sellers that no further action is required to address Releases which have been the subject of Remedial Action conducted by or on behalf of Sellers; (iii) the most recent final Phase I Environmental Site Assessment reports for the Owned Real Property; (v) Permits, Permit applications, and Permit disapprovals; and (iv) inventories of asbestos and asbestos-containing materials, if any, for the Purchased Assets.

4.11    Absence of Certain Changes.

(a)    Since the date of this Agreement, there has not been a Material Adverse Effect.

(b)    Since November 18, 2016 and the date of this Agreement, there has not been a Material Adverse Effect.

4.12    No Other Representations or Warranties.    Except for the representations, warranties and covenants of Sellers expressly contained herein, neither Sellers nor their representatives, nor any other Person, makes any other express or implied warranty (including, without limitation, any implied warranty of merchantability or fitness for a particular purpose) on behalf of Sellers, including, without limitation, (a) the probable success or profitability of ownership, use or operation of the Purchased Assets by Purchaser after the Closing, (b) the probable success or results in connection with the Bankruptcy Court and the Sale Order, or (c) the value, use or condition of the Purchased Assets, which are being conveyed hereby on an "As Is", "Where Is" condition at the Closing Date, without any warranty whatsoever (including, without limitation, any implied warranty of merchantability or fitness for a particular purpose).

ARTICLE V.

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Subject to the exceptions noted in the schedules delivered by Purchaser concurrently herewith, Purchaser represents and warrants to the Sellers as follows as of the date hereof and as of the Closing Date:

5.1    Organization and Qualification.  Purchaser is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.  Purchaser has all requisite power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted, except as would not reasonably be expected to have, individually or in the

17

aggregate, a Material Adverse Effect on the Purchaser's ability to consummate the transactions contemplated hereby.

      5.2    <u>Authority</u>.  Purchaser has the requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder, to consummate the transactions contemplated hereby and thereby and to assume and perform the Assumed Liabilities.  The execution and delivery of this Agreement by Purchaser and each of the Ancillary Documents to which it is a party, the performance by Purchaser of its obligations hereunder and thereunder, the consummation of the transactions contemplated hereby and thereby and the assumption and performance of the Assumed Liabilities have been duly and validly authorized by all necessary actions on the part of Purchaser.  This Agreement has been, and at or prior to the Closing, each of the Ancillary Documents to which it is a party will be, duly and validly executed and delivered by Purchaser.  Assuming the due authorization, execution and delivery of this Agreement and the Ancillary Documents by the Sellers and subject to the effectiveness of the Sale Order, this Agreement constitutes, and each Ancillary Document to which Purchaser is a party when so executed and delivered will constitute, legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with its terms.  Purchaser has sufficient funds to pay the Purchase Price and perform its obligations under this Agreement.

      5.3    <u>No Inconsistent Obligations</u>.  Neither the execution and delivery of this Agreement or any other documents contemplated hereby, nor the consummation of the transactions contemplated herein or therein in accordance with the Sale Order, will, to Purchaser's knowledge, result in a violation or breach of, or constitute a default under, (a) the certificate of incorporation, as amended, the bylaws, or other organizational instruments of Purchaser, (b) any applicable ruling or order of any Governmental Authority, (c) any term or provision of any contract or agreement, (d) any writ, order, judgment, decree, law, rule, regulation or ordinance, (e) any other commitment or restriction to which Purchaser is a party, nor will such actions result in the creation of an Encumbrance.

      5.4    <u>Conflicts; Consents</u>.

      (a)    The execution, delivery and performance by Purchaser of this Agreement or any Ancillary Document to which it is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby and the taking by Purchaser of any other action contemplated hereby or thereby, do not and will not contravene, violate or conflict with any term or provision of its Organizational Documents.

      (b)    Except for obtaining Sellers' and third party consents related to the Assigned Contracts, no consent, waiver, approval, order or authorization of, or registration, qualification, designation or filing with any Person or Governmental Body is required in connection with the execution, delivery and performance by Purchaser of this Agreement or the Ancillary Documents to which it is a party, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the assumption and performance of the Assumed Liabilities or the taking by Purchaser of any other action contemplated hereby or thereby, other than such filings, notices or consents,

18

the failure of which to make or obtain would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Purchaser's ability to perform its obligations under this Agreement and the Ancillary Documents to which it is a party, to assume and perform the Assumed Liabilities or to consummate on a timely basis the transactions contemplated hereby or thereby.

5.5     <u>Brokers</u>.  No Person has acted, directly or indirectly, as a broker, finder or advisor for Purchaser.  Sellers are not and will not become obligated to pay any fee or commission or like payment to any broker, finder or advisor as a result of the consummation of the transactions contemplated by this Agreement based upon any arrangement made by or on behalf of Purchaser.

5.6     <u>Adequate Assurances Regarding Assigned Contracts</u>.  As of the Closing, Purchaser will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

5.7     <u>No Litigation</u>.  To Purchaser's knowledge, there are no material actions, suits, claims, investigations, hearings, or proceedings of any type pending (or, to the knowledge of Purchaser, threatened) instituted against Purchaser challenging the legality of the transactions contemplated in this Agreement (other than with respect to any objection which may be filed in connection with the Bankruptcy Case).

5.8     <u>AS-IS Sale</u>.

(a)     <u>AS-IS WHERE-IS SALE; DISCLAIMERS; RELEASE</u>.  EXCEPT AS OTHERWISE PROVIDED IN ARTICLE IV OR ELSEWHERE IN THIS AGREEMENT, IT IS UNDERSTOOD AND AGREED THAT, UNLESS EXPRESSLY STATED HEREIN, SELLERS ARE NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PURCHASED ASSETS, INCLUDING BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(b)     EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, PURCHASER ACKNOWLEDGES AND AGREES THAT, UPON THE CLOSING, SELLERS SHALL SELL AND CONVEY TO PURCHASER, AND PURCHASER SHALL ACCEPT, THE PURCHASED ASSETS "<u>AS IS, WHERE IS, WITH ALL FAULTS</u>." PURCHASER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLERS ARE NOT LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PURCHASED ASSETS OR RELATING THERETO MADE OR FURNISHED BY SELLERS OR THEIR REPRESENTATIVES, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, EXCEPT AS EXPRESSLY STATED HEREIN.  PURCHASER ALSO ACKNOWLEDGES THAT THE TOTAL PURCHASE PRICE REFLECTS AND TAKES INTO ACCOUNT THAT THE PURCHASED ASSETS ARE BEING SOLD "AS IS, WHERE IS, WITH ALL FAULTS."

(c)     WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SUBJECT TO OBTAINING THE SALE ORDER, PURCHASER WAIVES ANY CLAIM ARISING OUT OF OR IN CONNECTION WITH THE VALIDITY AND CONDITION OF THE PURCHASED ASSETS AS OF THE CLOSING.

ARTICLE VI.

[Reserved]

ARTICLE VII.

BANKRUPTCY COURT MATTERS

7.1     Approval of Break-Up Fee and Overbid Protection.  Subject to the entry of the Bidding Procedures Order, in consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation hereof and the identification and quantification of assets of Sellers, Sellers shall pay to Purchaser promptly upon the effective date of termination of this Agreement in accordance with, and only to the extent provided in, the provisions of Section 3.5, the payment of a break-up fee of 3.5% of the total cash Purchase Price (the "**Break-Up Fee**"). In addition, the Bidding Procedures Order shall provide for an initial overbid protection in the amount of one hundred thousand dollars ($100,000) over and above the aggregate of the Purchase Price and the Break-Up Fee, and minimum bid increments thereafter of Fifty Thousand Dollars ($50,000) (the "**Overbid Protection**").  The obligations of Sellers to pay the Break-Up Fee (i) shall be entitled to administrative expense claim status under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code, (ii) shall not be subordinate to any other administrative expense claim against the Sellers, other than as provided by any administrative expense claims to which SunTrust Bank, N.A. is entitled pursuant to any Bankruptcy Court order or otherwise and any other adequate protection order in existence at the time the Break-Up Fee are approved, and (iii) shall survive the termination of this Agreement in accordance with Section 3.6.  The Bidding Procedures Order shall approve the Break-Up Fee as set forth in this paragraph.

7.2     Competing Bid and Other Matters.

(a)     Within seven days of the Agreement Date, Sellers shall file with the Bankruptcy Court an application or motion seeking approval of (i) the Bidding Procedures Order and (ii) the form of this Agreement (a true and complete copy of which shall be attached to such application or motion without schedules) and the Sellers' authority to enter into this Agreement (the "**Sale and Bidding Procedures Motion**"); provided, that such application or motion and all exhibits thereto shall be in form and substance acceptable to Purchaser, in its sole discretion.

(b)     This Agreement and the transactions contemplated hereby are subject to Sellers' absolute right and ability to consider higher or better competing bids with respect to Sellers' assets and a material portion of the Purchased Assets pursuant to the Bidding Procedures Order (each a "**Competing Bid**").  Following completion of the Auction, if Purchaser is the Prevailing Bidder, Sellers shall not initiate contact with, solicit or encourage submission of any

20

inquiries, proposals or offers by, any Person in connection with any sale or other disposition of the Purchased Assets.  In addition, unless otherwise directed by the Bankruptcy Court, Sellers shall not after completion of the Auction respond to or pursue any proposed Alternative Transaction or perform any other acts related thereto.

(c)     If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "***Prevailing Bidder***"), Purchaser shall, if its bid is determined to be the next highest bid serve as a back-up bidder (the "***Back-up Bidder***") and keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Eastern time) on the date which is 14 days after the date of the Sale Hearing (the "***Outside Back-up Date***"); provided, however, that notwithstanding the foregoing, in no event shall the Outside Back-up Date be later than April 30, 2017.  Following the Sale Hearing and prior to the Outside Back-up Date, if the Prevailing Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Prevailing Bidder, the Back-up Bidder will be deemed to have the new prevailing bid, and Sellers will be authorized, without further order of the Bankruptcy Court, to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) with the Back-up Bidder.

(d)     The Sellers shall promptly serve true and correct copies of the Sale and Bidding Procedures Motion and all related pleadings in accordance with the Bidding Procedures Order, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the United States Bankruptcy Court for the District of Minnesota and any other applicable order of the Bankruptcy Court.

7.3     Sale Order.  The Sale Order shall be entered by the Bankruptcy Court.  The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement, (B) the sale of the Purchased Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (C) the performance by Sellers of their obligations under this Agreement; (ii) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts; and (iii) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to Sellers and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (a) demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (b) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

7.4     Contracts.  Sellers shall serve on all non-Sellers counterparties to all of their Assigned Contracts a notice specifically stating that Sellers are or may be seeking the assumption and assignment of such contracts and shall notify such non-Sellers counterparties of the deadline

21

for objecting to the Cure Costs, if any, which deadline shall not be less than three (3) Business Days prior to the Sale Hearing.

7.5    <u>Bankruptcy Filings</u>.  From and after the Agreement Date and until the Closing Date, Sellers shall deliver to Purchaser drafts of any and all material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement for Purchaser's prior review and comment, including any Tax motions, and such filings shall be acceptable to Purchaser in its sole discretion to the extent they relate to the Purchased Assets, any Assumed Liabilities or any of Purchaser's obligations hereunder.  Seller agrees to diligently prosecute the entry of the Bidding Procedures Order and the Sale Order.  In the event the entry of the Bidding Procedures Order or the Sale Order shall be appealed, Sellers shall use their best efforts to defend such appeal.  Sellers shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, or (ii) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

7.6    <u>Sale Free and Clear</u>.  Sellers acknowledges and agrees, and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances of, against or created by Sellers or their bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Purchased Assets. On the Closing Date, the Purchased Assets shall be transferred to Purchaser free and clear of all obligations, Liabilities and Encumbrances, other than Permitted Encumbrances and the Assumed Liabilities to the fullest extent permitted by Section 363 of the Bankruptcy Code.

ARTICLE VIII.

COVENANTS AND AGREEMENTS

8.1    <u>Conduct of Business of Sellers</u>.  During the Pre-Closing Period, Sellers shall use commercially reasonable efforts, except as otherwise required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, to: (A) maintain the Purchased Assets (normal wear and tear excepted), (B) pay all of their post-petition obligations in the Ordinary Course of Business, and (C) continue to use or maintain the Purchased Assets in all material respects in compliance with all applicable Laws. Without limiting the generality of the foregoing, and except (i) as otherwise expressly provided in or contemplated by this Agreement, or (ii) required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, on or prior to the Closing Date, Sellers may not, without the prior written consent of Purchaser, take any of the following actions with respect to the Purchased Assets:

(a)    except as set forth in <u>Schedule 8.1(a)</u>, remove or permit to be removed from any building, facility, real property or any asset other than Excluded Assets;

(b)    sell, lease or otherwise dispose of, mortgage, hypothecate or otherwise encumber any asset;

22

(c)     fail to use commercially reasonable efforts to maintain all insurance policies, utility services agreements or Permits of Sellers, listed on any schedules hereto;

(d)     file any Tax Return (other than consistent with past practice and applicable Law) or make, change or rescind any Tax election or file any amended Tax Return or change their fiscal year or financial or Tax accounting methods, policies or practices or settle any Tax Liability, except in each case as would not reasonably be expected to result in any Liability to, or have any adverse effect on, the Purchaser or the Purchased Assets;

(e)     agree, whether in writing or otherwise, to do any of the foregoing.

8.2     Access to Information.  Sellers agrees that, between the Agreement Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 3.4, Purchaser shall be entitled, through its officers, employees, legal counsel, accountants and other authorized representatives, agents and contractors ("***Representatives***"), to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties, assets, Employees, accountants, auditors, counsel and operations of Sellers related to the Purchased Assets as Purchaser's Representatives may reasonably request, but such information shall not include any information subject to the attorney-client privilege or any other applicable privilege.  Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances. Sellers shall use commercially reasonable efforts to cause its Representatives to reasonably cooperate with Purchaser and Purchaser's Representatives in connection with such investigations and examinations, and Purchaser shall, and use its commercially reasonably efforts to cause its Representatives to, reasonably cooperate with the Sellers and their Representatives, and shall use its commercially reasonable efforts to minimize any disruption to the use or operation of the Purchased Assets.

8.3     [intentionally omitted].

8.4     Reasonable Efforts; Cooperation.

(a)     Subject to the other provisions hereof, each Party shall use its commercially reasonable efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and shall cooperate in a commercially reasonable manner with each other Party and its Representatives in connection with any step required to be taken as a part of its obligations hereunder.

(b)     In the event that any of the Parties to this Agreement discovers a Contract related to the Purchased Assets or the Assumed Liabilities during the period from and after the Agreement Date, and such Contract (i) was unknown as of the Agreement Date, and (ii) is a Contract that Purchaser wishes to assume the rights and obligations of, then Purchaser and Sellers shall execute, acknowledge and deliver such other instruments and take such further actions as are reasonably practicable for Purchaser to assume the rights and obligations under such Contract.

(c)     The obligations of Sellers pursuant to this <u>Section 8.4</u> shall be subject to any orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), and Sellers' obligations as a debtor-in-possession to comply with any order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and Sellers' duty to seek and obtain the highest or otherwise best price for the assets required by the Bankruptcy Code.

(d)     Sellers, on the one hand, and Purchaser, on the other hand, will provide each other with such cooperation and information as either of them may reasonably request of the other in connection with filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes (such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings and other determinations by Tax authorities).  In addition, Purchaser shall make available to Sellers, without charge to Sellers, such office space and employee support reasonably necessary to assist Sellers to wind up Sellers' operations following the Closing, resolve the Bankruptcy Case, dissolve any or all of the Sellers and prepare and file the Tax Returns; provided Sellers follows Purchaser's reasonable instructions while using Purchaser's premises. Any information obtained under this <u>Section 8.4(d)</u> shall be kept confidential except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding.

(e)     Sellers, on the one hand, and Purchaser, on the other hand, (i) shall promptly inform each other of any communication from any Governmental Body concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Body in response thereto. In addition, none of Parties shall agree to participate in any meeting with any Governmental Body in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Body, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to restrictions under any Law, each of Purchaser, on the one hand, and Sellers, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Body or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Purchased Assets) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Body in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

(f)     In the event that any of the Updating Information discloses a Contract, Permit, required notice or consent related to the Purchased Assets or the Assumed Liabilities during the period from and after the Agreement Date, and such Contract, Permit, required notice or consent (i) is a Contract, Permit, required notice or consent that Purchaser wishes, or that affects the assignability or ability of Purchaser, to assume the rights and obligations of and (ii) would not be deemed an Excluded Asset or Excluded Liability, as the case may be, Purchaser and Sellers shall execute, acknowledge and deliver such other documents, agreements and instruments and take such further actions as are reasonably required by Purchaser in order to assume the rights and obligations under such Contract or Permit, or to deliver such required notice or obtain such consent.

8.5     <u>Further Assurances</u>.  Each Party shall execute and cause to be delivered to each other Party such instruments and other documents, and shall take such other actions, as such other Party may reasonably request (prior to, at or after the Closing) for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement.  After the Closing, Sellers shall promptly transfer or deliver to Purchaser cash, checks (which shall be properly endorsed) or other property that Sellers may receive in respect of any deposit, prepaid expense, receivable or other item that constitutes part of the Purchased Assets or relates to the Assumed Liabilities.

8.6     <u>Notification of Certain Matters</u>.  Sellers shall give prompt notice to Purchaser, and Purchaser shall give prompt notice to Sellers, of (i) any notice or other communication from any Person alleging that the consent of such Person which is or may be required in connection with the transactions contemplated by this Agreement or the Ancillary Documents is not likely to be obtained prior to Closing, (ii) any written objection or proceeding that challenges the transactions contemplated hereby or the entry of the approval of the Bankruptcy Court and (iii) the status of matters relating to the completion of the transactions contemplated hereby, including promptly furnishing the other with copies of notices or other communications received by Sellers or Purchaser or by any of their respective Affiliates (as the case may be), from any third party and/or any Governmental Body with respect to the transactions contemplated by this Agreement.

8.7     <u>Confidentiality</u>.  Purchaser acknowledges that the confidential information provided to them in connection with this Agreement, and the consummation of the transactions contemplated hereby, is subject to the terms and conditions of the Confidentiality Agreement.

8.8     <u>Material Adverse Effect</u>.  Sellers shall promptly inform Purchaser in writing of the occurrence of any event that has had, or is reasonably expected to have, a Material Adverse Effect. Notwithstanding anything herein, any reduction in the Sellers' crude-by-rail revenue shall not be considered a default, Material Adverse Effect or reason for termination of any kind.

8.9     <u>Casualty Loss</u>.  Notwithstanding any provision of this Agreement to the contrary, if, before the Closing, all or any portion of the Purchased Assets is (a) condemned or taken by eminent domain, or (b) is damaged or destroyed by fire, flood or other casualty, Sellers shall notify Purchaser promptly in writing of such fact, (i) in the case of condemnation or taking, Sellers shall assign or pay, as the case may be, any proceeds thereof to Purchaser at the Closing, and (ii) in the case of fire, flood or other casualty, Sellers shall assign the insurance proceeds therefrom to Purchaser at Closing.  Notwithstanding the foregoing, the provisions of this <u>Section</u>

25

8.9 shall not in any way modify Purchaser's other rights under this Agreement, including any applicable right to terminate the Agreement if any condemnation, taking, damage or other destruction resulted in a Material Adverse Effect.

8.10   No Successor Liability.    The Parties intend that, except where expressly prohibited under applicable Law, upon the Closing, Purchaser shall not be deemed to: (i) be the successor of Sellers, (ii) have, *de facto*, or otherwise, merged with or into Sellers, (iii) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers, or (iv) be liable for any acts or omissions of Sellers in the conduct of any business or arising under or related to the Purchased Assets other than as set forth in this Agreement.   Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties intend that Purchaser shall not be liable for any Encumbrance (other than Assumed Liabilities and Permitted Encumbrances) against Sellers or any of Sellers' predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Purchased Assets or any Liabilities of Sellers arising prior to the Closing Date.  The Parties agree that the provisions substantially in the form of this Section 8.10 shall be reflected in the Sale Order.

8.11   Delivery of Disclosure Schedules; Update of Disclosure Schedules.

(a)    Except as otherwise provided herein, Sellers shall provide Purchaser with the Disclosure Schedules within 7 days after the Agreement Date; and until 10 days before the Auction  or such later date as the parties may otherwise agree, each Party has the continuing right and obligation (i) to supplement, modify, reject or amend, with respect to any matter hereafter arising or events or conditions arising after the date hereof and prior to the Closing, the information required to be set forth on the Disclosure Schedules as to representations made by such Party with respect to any matter hereafter arising or discovered which, if existing or known at the Agreement Date, would have been required to have been set forth on such Disclosure Schedules, and (ii) if necessary or appropriate to correct any inaccuracy in a representation made by such Party, to add a schedule to the Disclosure Schedules with a corresponding reference in this Agreement (such information and additional schedules collectively being called the "***Updating Information***");

(b)    To the extent Updating Information (i) contains Liabilities in excess of $25,000 in the aggregate, all such Liabilities in excess of that amount shall be Excluded Liabilities and Purchaser shall not assume nor be deemed to have assumed such excess Liabilities and (ii) discloses in the reasonable commercial opinion of Purchaser, a material impediment to the ownership or operations of the Purchased Assets, Purchaser shall acquire the Purchased Assets free of such material impediment; and

(c)    Notwithstanding anything to the contrary contained herein, the Purchaser shall be entitled to remove and leave behind with Sellers, in its sole discretion, any asset that would constitute a Purchased Asset (and associated liabilities therewith) so long as no reduction in Purchase Price is made as a result of such removal.  Purchaser shall deliver notice to the Sellers of any such removal promptly after making such determination, but in any event, at least 2 Business Days prior to Closing Date.

ARTICLE IX.

CONDITIONS TO CLOSING

9.1     <u>Conditions Precedent to the Obligations of Purchaser and Sellers</u>.  The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by each of the Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)     there shall not be in effect any order, writ, injunction, judgment or decree entered by a Governmental Body of competent jurisdiction, or any Law preventing, enjoining, restraining, making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or the Ancillary Documents; and

(b)     the Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order (as provided in <u>Article VII</u>) and each of such orders shall be a Final Order and in form and substance reasonably satisfactory to Sellers and Purchaser, which orders shall not have been reversed, modified, amended or stayed.

9.2     <u>Conditions Precedent to the Obligations of Sellers</u>.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Sellers in their sole discretion:

(a)     the representations and warranties made by Purchaser in this Agreement or in any Ancillary Document shall be true and correct in all material respects (without giving effect to any materiality or similar qualification contained therein), in each case as of the Agreement Date and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations or warranties to be so true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Purchaser's ability to consummate the transactions contemplated hereby;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date; and

(c)     Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in <u>Section 3.3</u>.

9.3     <u>Conditions Precedent to the Obligations of Purchaser</u>.  The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Purchaser in its sole discretion:

(a)     Sellers shall have (i) obtained entry of the Sale Order (which shall contain the terms described in <u>Section 7.3</u>, reasonably reflect the terms set forth in this Agreement, and be in a form reasonably acceptable to Purchaser) and (ii) provided to Purchaser copies of all affidavits of service of the Sale and Bidding Procedures Motion or notice of such motion filed by or on behalf of Sellers (which service shall comply with <u>Section 7.2(d)</u>);

(b)     the representations and warranties made by Sellers in this Agreement or in any Ancillary Document shall be true and correct in all material respects (provided that any such representation or warranty that is subject to any materiality, Material Adverse Effect or similar qualification shall be true and correct in all respects after giving effect to any such qualification), in each case as of the Agreement Date and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date);

(c)     Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it on or prior to the Closing Date;

(d)     Sellers shall have delivered, or caused to be delivered, to Purchaser, all of the items set forth in <u>Section 3.2</u>;

(e)     Sellers shall have complied with the sale process deadlines set forth in the Bidding Procedures Order; and

(f)     Sellers shall have delivered such other documents, agreements and instruments as may be required or reasonably requested by Purchaser as a result of any Updating Information; and

(g)     Purchaser shall have received binding commitments from certain key employees of Sellers, as determined by Purchaser, to be employed by Purchaser subsequent to Closing, on terms and conditions reasonably acceptable to Sellers; and

(h)     Purchaser shall have entered into a rail services agreement with the Canada Pacific Railway for servicing the Terminal prior to Closing.

(i)     Purchaser shall have received a binding commitment from Unimin Corporation to thruput frac sand at the Terminal on terms and conditions that are materially and substantially similar to those that are provided under the Terminal Operating Contract by and between Seller and Unimin Corporation dated on or about July 31, 2013, or have received an assignment of said Terminal Operating Contract.

ARTICLE X.

ADDITIONAL DEFINITIONS

10.1    <u>Definitions</u>.  As used herein:

28

(a)　"*Affiliate*" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means (i) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise or (ii) an officer, director, or any Person that has the power, directly or indirectly, to vote 5% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person.

(b)　"*Affiliate Agreement*" means any agreement or contract between any director, officer, employee or greater than five percent (5%) stockholder of Sellers or Affiliate of any such Person, on one hand, and Sellers, on the other hand, related to the Purchased Assets, including any contract providing for the employment, furnishing of services by, rental of real or personal property from or otherwise requiring payments to any such Person or firm, other than employment-at-will arrangements in the ordinary course of business.

(c)　"*Agreement*" shall have the meaning set forth in the preamble.

(d)　"*Agreement Date*" shall have the meaning set forth in the preamble.

(e)　"*Allocation*" shall have the meaning set forth in Section 11.2.

(f)　"*Alternative Transaction*" means (i) the approval by the Bankruptcy Court of a sale or sales of a material portion of the Purchased Assets to a Person other than Purchaser, or (ii) the filing of a plan of reorganization that does not contemplate the sale of the Purchased Assets to Purchaser in accordance with the terms hereof.

(g)　"*Ancillary Documents*" means any certificate, agreement, document or other instrument (other than this Agreement) to be executed and delivered by a Party in connection with the consummation of the transactions contemplated this Agreement.

(h)　"*Assigned Contracts*" shall have the meaning set forth in Section 1.1(m).

(i)　"*Assignment and Assumption Agreement*" shall have the meaning set forth in Section 3.2(b).

(j)　"*Assumed Liabilities*" shall have the meaning set forth in Section 1.3.

(k)　"*Auction*" has that meaning ascribed to such term by the Bidding Procedures Order.

(l)　"*Avoidance Actions*" shall have the meaning set forth in Section 1.1(r)**.**

(m)　"*Back-up Bidder*" shall have the meaning set forth in Section 7.2(c).

(n)　"*Bankruptcy Case*" shall have the meaning set forth in the Recitals.

(o)      "***Bankruptcy Code***" shall have the meaning set forth in the Recitals.

(p)      "***Bankruptcy Court***" shall have the meaning set forth in the Recitals.

(q)      "***Bankruptcy Rules***" shall have the meaning set forth in the Recitals.

(r)      "***Benefit Plan***" means, to the extent related to the Sellers or the Purchased Assets, (i) all "***employee benefit plans***" (including, without limitation, as defined in Section 3(3) of ERISA), including all employee benefit plans which are "***Pension Plans***" (including, without limitation, as defined in Section 3(2) of ERISA) and any other employee benefit arrangements or payroll practices (including severance pay, vacation pay, company awards, salary continuation for disability, sick leave, death benefit, hospitalization, welfare benefit, group or individual health, dental, medical, life, insurance,  fringe benefit, deferred compensation, profit sharing, retirement, retiree medical, supplemental retirement, bonus or other incentive compensation, stock purchase, equity-based, stock option, stock appreciation rights, restricted stock and phantom stock arrangements or policies) and (ii) all other employment, termination, bonus, severance, change in control, collective bargaining or other similar plans, programs, contracts, or arrangements (whether written or unwritten), in each case, maintained, contributed to, or required to be contributed to by Sellers or any ERISA Affiliate for the benefit of any current or former employee, director, officer or independent contractor of Sellers or under which Sellers or any ERISA Affiliate has any liability.

(s)      "***Bidding Procedures Order***" means an order substantially in the form attached hereto as Exhibit E and otherwise in form and substance reasonably satisfactory to Sellers and Purchaser.

(t)      "***Bill of Sale***" shall have the meaning set forth in Section 3.2(a).

(u)      "***Break-Up Fee***" shall have the meaning set forth in Section 7.1.

(v)      "***Business Day***" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(w)      "***Cash and Cash Equivalents***" means all of Sellers' cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held (but specifically excluding any cash payable by Purchaser to Sellers pursuant to this Agreement, and any customer deposits, advances or prepayments deposited, made or paid to Sellers).

(x)      "***Cash Consideration***" shall have the meaning set forth in Section 2.3(e).

(y)      "***Chapter 11 Petition***" shall have the meaning set forth in the Recitals.

(z)     "*Claim*" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, _inter alia,_ all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment right, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

(aa)     "*Closing*" shall have the meaning set forth in Section 3.1.

(bb)     "*Closing Date*" means the date on which the Closing occurs.

(cc)     "*Closing Date Payment*" shall have the meaning set forth in Section 2.3(d).

(dd)     "*Closing Statement*" shall have the meaning set forth in Section 2.3(a).

(ee)     "*Code*" means the United States Internal Revenue Code of 1986, as the same may be amended from time to time.

(ff)     "*Companies*" shall have the meaning set forth in the preamble.

(gg)     "*Competing Bid*" shall have the meaning set forth in Section 7.2(b).

(hh)     "*Confidentiality Agreement*" means that certain Confidentiality and Non-Disclosure Agreement by and between Purchaser and Dakota Plains Holdings, Inc, dated ___, 2016.

(ii)     "*Contract*" means any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, license, permit, understanding, instrument or other agreement, arrangement or commitment that is binding upon a Person or its property, whether express or implied.

(jj)     "*Crude Business*" means any and all revenue or expected revenue related to the business  of crude-by-rail transportation or storage, and any and all revenue or expected revenue related to or arising out of access to crude oil supply from the Pelican Pipeline or any other pipeline connected to the Terminal involving crude oil.

(kk)     "*Crude Oil Inventory*" means and all crude oil owned by the Sellers but excluding (i) any crude oil held by consignment, (ii) being stored by the Sellers and not owned, or (ii) otherwise not owned by the Sellers.

(ll)     "*Cure Costs*" shall have the meaning set forth in Section 1.3(b).

(mm)     "*Deposit*" shall have the meaning set forth in Section 2.2.

(nn)     "*Disclosure Schedules*" has the meaning set forth in Article IV.

(oo)     "*Documents*" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans,

31

operating records, safety and environmental plans and reports, data, Permits and Permit applications, studies and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form relating to the Purchased Assets.

(pp)   "*Employee*" means an individual who, as of the applicable date, is employed by Sellers.

(qq)   "*Encumbrance*" means any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, restrictive covenants, encroachments, rights of first refusal, preemptive rights, judgments, conditional sale or other title retention agreements and other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever.

(rr)   "**Environmental Law**" means all applicable federal, state and local laws, statutes, codes, ordinances, and any judicial and administrative rules, regulations, and orders, relating to (i) human health or safety, (ii) the protection of the environment, or (iii) emissions, discharges or releases of Hazardous Materials or otherwise relating to the treatment, storage, disposal, transport or handling of Hazardous Materials including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. § 321, et seq., the Oil Pollution Act, 33 U.S.C. § 2702, et seq., the Clean Water Act, 33 U.S.C. § 1251, et seq., and the Clean Air Act, 42 U.S.C. § 7401, et seq., and their state and local counterparts.

(ss)   "*Environmental Liabilities and Obligations*" means all Liabilities arising from any actual or threatened impairment, impact or damage to the environment, health or safety, or any actual or threatened failure to comply with Environmental Law in connection with the prior or ongoing ownership or operation of the Purchased Assets or the Owned Real Property, including Liabilities related to: (i) the transportation, storage, use, arrangement for disposal or disposal of Hazardous Materials; (ii) the Release of Hazardous Materials, including migration onto or from the Owned Property; (iii) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments; (iv) any other obligations imposed under Environmental Law including all applicable Permits; (v) Orders, notices to comply, notices of violation, alleged non-compliance and inspection reports; and (vi) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under applicable Law as a result of any of the matters identified in clauses (i)-(v) of this definition.

(tt)   "*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

(uu)    "*ERISA Affiliate*" means any entity which is a member of (A) a controlled group of corporations (as defined in Section 414(b) of the Code), (B) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), (C) an affiliated service group (as defined under Section 414(m) of the Code) or (D) any group specified in Treasury Regulations promulgated under Section 414(o) of the Code, any of which includes or included Sellers.

(vv)    "*Escrow Agent*" means a third-party entity approved by the parties hereto, which entity will have fiduciary obligations with respect to the transfer of funds related to this Agreement and whose actions will be governed by an escrow agreement approved by the parties hereto.

(ww)    "*Excluded Assets*" shall have the meaning set forth in Section 1.2.

(xx)    "*Excluded Liabilities*" shall have the meaning set forth in Section 1.4.

(yy)    "*Expense Reimbursement*" shall mean the reasonable out-of-pocket fees, costs and expenses of the Purchaser, subject to a cap of $150,000.

(zz)    "*Final Order*" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction entered by the Clerk of the Bankruptcy Court or such other court on the docket in Sellers' Bankruptcy Case or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari,* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari* new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

(aaa)    "*FIRPTA Certificate*" shall have the meaning set forth in Section 11.4.

(bbb)    "*GAAP*" means United States generally accepted accounting principles as in effect from time to time.

(ccc)    "*Governmental Body*" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

33

(ddd)   "*Hazardous Material*" means any substance, material or waste which is regulated by any Governmental Body, including petroleum and its by-products, asbestos, and any material or substance which is defined or identified as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" or otherwise regulated under or the subject of any provision of Environmental Law.

(eee)   "*Inventory*" means all inventory (including crude oil and frac sand) owned by Sellers and stored at the Terminal.

(fff)   "*Knowledge*" or ("*Knowledge of Sellers*" or "*Sellers' Knowledge*") means the actual knowledge of Sellers' President/CEO, CFO and VP of Operations, respectively being Gabe Claypool, Jim Thornton, and James Tate.

(ggg)   "*Law*" means any federal, state, local, municipal, foreign or international, multinational or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body, in each case as in effect as of the Closing Date.

(hhh)   "*Liability*" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(iii)   "*Material Adverse Effect*" means any event, change, occurrence or state of facts that has had, or is reasonably likely to have, individually or in the aggregate, a material adverse effect on the value or usability of the Purchased Assets or the Assumed Liabilities, provided, however, that in no event shall any of the following, alone or in combination, be deemed to constitute**,** or be taken into account, in determining whether there has been, or would be, a Material Adverse Effect:  (a) changes in the U.S. economy or capital markets in general but that do not have a disproportionate effect on the Purchased Assets, (b) changes that affect generally the fracking industry but that do not have a disproportionate effect on the Purchased Assets, (c) changes after the Agreement Date in any applicable Law or GAAP or other applicable accounting standards or interpretations thereof, (d) national or international political or social actions or conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof, and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack, (e) the operation of any oil or gas pipeline that connects North Dakota and any other state or location (and which shall expressly include the pipeline commonly called the "Dakota Access Pipeline") or material reduction in revenue as a result thereof; (f) material reduction in revenue of crude-by-rail transportation; (g) any current or expected loss on account of the Crude Business; or (h) the commencement of the Bankruptcy Case.

34

(jjj)    "*Order*" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, mandate, precept, command, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Body.

(kkk)    "*Ordinary Course of Business*" means the ordinary and usual course of normal day to day operations of the Business consistent with past practice.

(lll)    "*Organizational Documents*" means, with respect to a particular entity Person, (i) if a corporation, the articles or certificate of incorporation and bylaws, (ii) if a general partnership, the partnership agreement and any statement of partnership, (iii) if a limited partnership, the limited partnership agreement and certificate of limited partnership, (iv) if a limited liability company, the articles or certificate of organization or formation and any limited liability company or operating agreement, (v) if another type of Person, all other charter and similar documents adopted or filed in connection with the creation, formation or organization of the Person, and (vi) all amendments and supplements to any of the foregoing.

(mmm)    "*Outside Back-up Date*" shall have the meaning set forth in Section 7.2(c).

(nnn)    "*Outside Date*" shall have the meaning set forth in Section 3.4(b).

(ooo)    "*Overbid Protection*" shall have the meaning set forth in Section 7.1.

(ppp)    "*Owned Real Property*" shall have the meaning set forth in Section 4.6.

(qqq)    "*Party*" shall have the meaning set forth in the preamble.

(rrr)    "*Permits*" means to the fullest extent permitted under applicable law, all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, variances, orders, tariffs, rate schedules and other similar documents and authorizations issued by any Governmental Body to any of the Sellers and used, or held for use, applicable to ownership of the Purchased Assets or assumption of the Assumed Liabilities.

(sss)    "*Permitted Encumbrances*" means (i) Encumbrances for utilities and current Taxes not yet due and payable or being contested in good faith; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the use or operation of the Purchased Assets and, in the case of the Owned Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Owned Real Property as it relates to the operation or use of the Purchased Assets or materially detract from the value of the Owned Real Property, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law, and (iv) such other Encumbrances or title exceptions as Purchaser may approve in writing in its sole discretion or which do not, individually or in the aggregate, materially and adversely affect the operation or use of the Purchased Assets.

(ttt)   "*Person*" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(uuu)   "*Petition Date*" means the date on which the Sellers commenced the Bankruptcy Case.

(vvv)   "*Pre-Closing Period*" means the period commencing on the Agreement Date and ending on the earlier of the date upon which this Agreement is terminated pursuant to Section 3.4 or the Closing Date.

(www)   "*Pre-Closing Tax Period*" means any taxable period (or portion thereof) ending on or before the Closing Date.

(xxx)   "*Prevailing Bidder*" shall have the meaning set forth in Section 7.2(c).

(yyy)   "*Purchase Price*" shall have the meaning set forth in Section 2.1(a).

(zzz)   "*Purchased Assets*" shall have the meaning set forth in Section 1.1.

(aaaa)   "*Purchaser*" shall have the meaning set forth in the preamble.

(bbbb)   "*Purchaser Designee*" shall have the meaning set forth in Section 1.1.

(cccc)   "*Purchaser Statement*" shall have the meaning set forth in Section 2.3(b).

(dddd)   "*Release*" means any actual or threatened release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal or leaching into the indoor or outdoor environment, or including migration to or from a property, including but not limited to any Owned Real Property.

(eeee)   "*Remedial Action*" means all actions to (i) investigate, clean up, remove, treat or in any other way address any Hazardous Material; (ii) prevent the Release of any Hazardous Material; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (iv) to correct a condition of noncompliance with Environmental Laws.

(ffff)   "*Representatives*" shall have the meaning set forth in Section 8.2.

(gggg)   "*Sale and Bidding Procedures Motion*" shall have the meaning set forth in Section 7.2(a).

(hhhh)   "*Sale Hearing*" means the hearing to approve this Agreement and seeking entry of the Sale Order.

(iiii)   "*Sale Motion*" means the motion or motions of Sellers, in form and substance reasonably acceptable to Sellers and Purchaser, seeking approval and entry of the Bidding Procedures Order and Sale Order.

36

(jjjj)    "*Sale Order*" means an order substantially in the form attached hereto as Exhibit D and otherwise in form and substance reasonably satisfactory to Sellers and Purchaser.

(kkkk) "*Sellers*" shall have the meaning set forth in the preamble.

(llll)    "*Straddle Period*" shall have the meaning set forth in Section 11.1(b).

(mmmm)    "*Tax*" and "*Taxes*" mean (a) any and all taxes, including any federal, state, provincial, local, foreign or other income, gross receipts, sales, value added, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, capital, production, recapture, net worth, surplus, customs, duties, levies, surtaxes or other taxes, fees, assessments, reassessments or charges of any kind whatsoever, together with any interest, additions, installments or penalties with respect thereto and any interest in respect of such additions or penalties, (b) any Liability for the payment of any items described in clause (a) above as a result of being (or ceasing to be) a member of an affiliated, consolidated, combined, unitary or aggregate group (or being included (or being required to be included)) in any Tax Return related to such group (including any Liability pursuant to Section 1.1502-6 of the Treasury Regulations, or any similar provision of state, local or non-U.S. law), and (c) any Liability for the payment of any amounts as a result of any express or implied obligation to indemnify any other Person, or any successor or transferee liability, by contract or otherwise in respect of any items described in clause (a) or (b) above.

(nnnn) "*Tax Proceeding*" means any action, suit, investigation, audit, Claim, investigation, or other action or proceeding with respect to Taxes.

(oooo) "*Tax Refunds*" shall have the meaning set forth in Section 1.1(n).

(pppp) "*Tax Return*" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

(qqqq) "*Treasury Regulations*" means the regulations promulgated under the Code by the United States Department of the Treasury (whether in final, proposed or temporary form), as the same may be amended from time to time.

(rrrr)    "*Updating Information*" shall have the meaning set forth in Section 8.11.

(ssss)    "*Vendor Actions*" shall have the meaning set forth in Section 1.1(r).

(tttt)    "*WARN Act*" means the United States Worker Adjustment and Retraining Notification Act, and the rules and regulations promulgated thereunder.

ARTICLE XI.

TAXES

37

11.1    Certain Taxes.

(a)    Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby, and that are not exempt under Section 1146(a) of the Bankruptcy Code, shall be borne and timely paid by the Sellers.  The Sellers shall, at their own expense, timely file any Tax Return or other document required to be filed with respect to such Taxes, and Purchaser shall join in the execution of any such Tax Return if required by Law.

(b)    In the case of any taxable period that begins before, and ends after, the Closing Date (a "*Straddle Period*"), any real property, personal property, ad valorem and similar Taxes allocable to the portion of such Straddle Period ending with the end of the day on the Closing Date shall be equal to the amount of such Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days during the Straddle Period that is in the Pre-Closing Tax Period and the denominator of which is the number of days in the entire Straddle Period, which amount shall be an Excluded Liability.

11.2    Allocation of Purchase Price.  As soon as reasonably practicable after the Closing Date, the Purchaser shall determine the allocation of (a) the Purchase Price, plus (b) the Assumed Liabilities, plus (c) all other items required to be treated as consideration for federal income Tax purposes, among the Purchased Assets and the agreements provided for herein, for all purposes (including financial, accounting and Tax) (the "*Allocation*").  The Purchaser and the Sellers shall each report the federal, state and local income and other Tax consequences of the transactions contemplated hereby in a manner consistent with the Allocation, including, if applicable, the preparation and filing of Forms 8594 under Section 1060 of the Code (or any successor form or successor provision of any future Tax Law) with their respective federal income Tax Returns for the taxable year which includes the Closing Date, and neither will take any position inconsistent with the Allocation unless otherwise required under applicable Law.  The Sellers shall provide the Purchaser and the Purchaser shall provide Sellers with a copy of any information required to be furnished to the Secretary of the Treasury under Code Section 1060.

11.3    Cooperation on Tax Matters.  The Purchaser and the Sellers agree to provide each other with such information and assistance as is reasonably necessary, including access to records, Tax Returns and personnel, for the preparation of any Tax Returns or for the defense of any Tax claim or assessment, whether in connection with a Tax Proceeding or otherwise.

11.4    FIRPTA Certificate.  The Sellers shall deliver to the Purchaser on the date hereof a properly executed affidavit of non-foreign status, reasonably satisfactory to Purchaser, that complies with Section 1445 of the Code and Section 1.1445-2(b)(2) of the Treasury Regulations (the "*FIRPTA Certificate*").  If the Purchaser does not so receive a properly executed FIRPTA Certificate from the Sellers, then the Purchaser shall be permitted to withhold from any payment to be made (or deemed to be made) pursuant to this Agreement to the Sellers any required withholding Tax under Section 1445 of the Code as determined by the Purchaser. Any amounts withheld shall be treated for all purposes of this Agreement as having been paid to the Sellers in respect of which such withholding was made.

11.5    Tax Refunds.  The Sellers agrees to cooperate with the Purchaser in all respects, and take or cause to be taken any steps necessary, in order to apply for and obtain any Tax Refunds with respect to the Purchased Assets for any taxable year, provided that the Purchaser pays all reasonable expenses incurred in connection therewith.

ARTICLE XII.

MISCELLANEOUS

12.1    Payment of Expenses.    Except as otherwise provided in this Agreement (including, but not limited to Section 3.5 and Section 7.1) and whether or not the transactions contemplated hereby are consummated, Sellers and the Purchaser shall bear their own expenses incurred or to be incurred in connection with the negotiation and execution of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby.

12.2    Survival of Representations and Warranties; Survival of Confidentiality.   The Parties agree that the representations and warranties contained in this Agreement shall expire upon the Closing Date.  The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed.

12.3    Entire Agreement; Amendments and Waivers.  This Agreement, together with the Confidentiality Agreement and the Ancillary Documents, represents the entire understanding and agreement between the Parties with respect to the subject matter hereof.  This Agreement may be amended, supplemented or changed, and any provision hereof may be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought, except for in connection with any amendment or updating procedures for schedules as provided for herein. No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by applicable Law.

12.4    Execution of Agreement; Counterparts; Electronic Signatures.

(a)    This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument, and shall become effective when counterparts have been signed by each of the Parties and delivered to the other Parties; it being understood that all Parties need not sign the same counterparts.

(b)     The exchange of copies of this Agreement and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether mediated by the worldwide web), by electronic mail in "portable document format" ("*pdf*") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the Parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

12.5    Governing Law.   THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF MINNESOTA SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT FOR ANY LAWS OF THAT STATE WHICH WOULD RENDER SUCH CHOICE OF LAWS INEFFECTIVE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

12.6    Jurisdiction, Waiver of Jury Trial.

(a)     THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NORTH DAKOTA AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN NORTH DAKOTA WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)     EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.7    Notices.   Unless otherwise set forth herein, any notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a Party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid), or (b) sent by facsimile or e-mail, in each case, if sent during the normal business hours of the recipient, with confirmation of transmission by the transmitting equipment confirmed with a copy delivered as provided in clause (a), in the case of each of clauses (a) and (b), to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a Party may designate by notice to the other Parties):

If to Sellers, to:

610117643.1

Dakota Plains Holdings, Inc.
Dakota Petroleum Transport Solutions, LLC
294 Grove Lane East
Wayzata, MN 55391
Tel: 1-952-473-9950
Attn: Gabe Claypool, President & Chief Executive Officer


With a copy (which shall not constitute effective notice) to:

BakerHostetler LLP
200 S Orange Ave suite 2300
Orlando, Florida 32801
Tel: 1-407-649-4036
Fax: 1-407-841-0168
Attn: Elizabeth Green


If to Purchaser, to:

BioUrja Trading, LLC
Eldridge Oaks I
1080 Eldridge Pkwy, Suite 1175
Houston, TX 77077
Tel: 1-832-775-9000
Fax: 1-281-558-6920
Attn: Amit Bhandari, Chairman & CEO


With a copy (which shall not constitute effective notice) to:

BioUrja Trading, LLC
Eldridge Oaks I
1080 Eldridge Pkwy, Suite 1175
Houston, TX 77077
Tel: 1-832-775-9000
Fax: 1-281-558-6920
Attn: Shék Jain, COO & General Counsel


12.8    Binding Effect; Assignment.   This Agreement shall be binding upon Purchaser
and, subject to entry of the Bidding Procedures Order (with respect to the matters covered
thereby) and the Sale Order, Sellers, and inure to the benefit of the Parties and their respective
successors and permitted assigns, including any trustee or estate representative appointed in the
Bankruptcy Case or any successor Chapter 7 case.   Nothing in this Agreement shall create or be
deemed to create any third party beneficiary rights in any Person or entity not a party to this
Agreement except as provided below.   No assignment of this Agreement or of any rights or

41

obligations hereunder may be made by Sellers or Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties and any attempted assignment without such required consents shall be void.

12.9     Severability.   Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction and in lieu of such invalid, illegal or unenforceable provision or portion of any provision, there will be added automatically as a part of this Agreement a valid legal and enforceable provision as similar in terms to such invalid, illegal or unenforceable provision as may be possible.

12.10     Post-Closing Access to Information.   Notwithstanding anything herein, Purchaser agrees to provide Seller access to such information as is necessary for the wind-down of the Sellers Chapter 11 case including any information relating to pre-closing business operations of the Sellers.   Sellers, or any assignee thereof, shall provide the Purchaser with reasonable notice of any requests in accordance with this provision.

12.12     Bulk Sales Laws.   Each Party hereby waives compliance by the Parties with the "***bulk sales***," "***bulk transfers***" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement or any Ancillary Document.

12.13     Purchase Guarantee.   To the extent Purchaser breaches any provisions hereunder and Purchaser fails to promptly pay any amounts, for which Purchaser is determined to be liable by a court of law exercising appropriate jurisdiction, resulting from such breach, Amit Bhandari hereby agrees to pay such amounts to the Sellers upon demand.   Provided that, in no event, shall Amit Bhandari be liable to pay any amounts in excess of the Purchase Price and reasonable costs and expenses in connection with enforcement of this Agreement.


**[Remainder of page intentionally left blank]**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed and delivered as of the date first above written.

**BIOURJA TRADING, LLC**

By: _____
Name:   Shék Jain
Title:  Chief Operating Officer

**AMIT BHANDARI, AS TO SECTION 12.13**

By: _____
Name:   Amit Bhandari
Title:

**DAKOTA PLAINS HOLDINGS, INC.**

By: _____
Name: GABRIEL G. CLAYPOOL
Title: PRESIDENT, CEO + COO

**DAKOTA PETROLEUM TRANSPORT SOLUTIONS, LLC**

By: _____
Name: GABRIEL G. CLAYPOOL
Title: PRESIDENT, CEO + COO

43

## **EXHIBIT D**

MEMORANDUM OF LAW

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | | |
|---|---|---|
| Dakota Plains Holdings, Inc., | | Case No. 16-43711 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Transloading, LLC, | | Case No. 16-43712 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Sand, LLC, | | Case No. 16-43715 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Marketing, LLC, | | Case No. 16-43716 |
| | Debtor. | Chapter 11 Case |
| DPTS Marketing LLC, | | Case No. 16-43717 |
| | Debtor. | Chapter 11 Case |
| Dakota Petroleum Transport Solutions, LLC, | | Case No. 16-43718 |
| | Debtor. | Chapter 11 Case |
| DPTS Sand, LLC, | | Case No. 16-43721 |
| | Debtor. | Chapter 11 Case |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF THE DEBTORS FOR
ENTRY OF (I) AN EXPEDITED ORDER (A) APPROVING BIDDING PROCEDURES
AND BID PROTECTIONS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY
ALL OF THE DEBTORS' ASSETS, (B) APPROVING THE FORM AND MANNER OF
NOTICE THEREOF, (C) SCHEDULING AN AUCTION AND SALE HEARING, (D)
APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF
CONTRACTS, AND (E) GRANTING RELATED RELIEF AND (II) AN ORDER (A)
APPROVING THE ASSET PURCHASE AGREEMENT BETWEEN THE DEBTORS
AND THE PURCHASER, (B) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL
OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS, (C) AUTHORIZING THE ASSUMPTION AND
ASSIGNMENT OF CONTRACTS, (D) AUTHORIZING THE DISTRIBUTION OF
EXCESS SALE PROCEEDS TO SECURED CREDITORS, AND (E) GRANTING
RELATED RELIEF**

Dakota Plains Holdings, Inc. and its affiliated debtors and debtors in possession in these

proceedings (collectively, the "**Debtors**"), submit this memorandum of law in support of the

motion submitted herewith (the "**Motion**") in accordance with Local Rule 9013-2(a).

## BACKGROUND

1.      The supporting facts are set forth in the Motion, verified by Marty Beskow, Chief Financial Officer of Dakota Plains Holdings, Inc.  All capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

## LEGAL ANALYSIS

**I.      The Relief Sought in the Bidding Procedures Is in the
Best Interests of the Debtors' Estates and Should be Approved**

2.      Courts have found that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See*, *e.g.*, *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate … if he has an 'articulated business justification'"); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *Schipper*); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test.'"); *In re Channel One Commc'ns., Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (applying sound business purpose test under section 363); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

3.      The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value

for the estate."); *Integrated Res.*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

4.      To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See*, *e.g.*, *Integrated Res.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets … [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

5.      The Debtors believe that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets.  The proposed Bidding Procedures will allow the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close a transaction.  The Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

6.      At the same time, the Bidding Procedures provide the Debtors with an opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale.  Entering into the Stalking Horse Purchase Agreement ensures that the

Debtors obtain fair market value by setting a minimum purchase price for the Assets that will be tested in the marketplace.  As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above market.

7.      The Debtors submit that the proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with procedures that have recently been approved by other courts in this district and elsewhere.  *See, e.g.*, *In re Quicksilver Res., Inc.*, No. 15-10585 (LSS) [ECF No. 681] (Bankr. D. Del. Oct. 6, 2015); *In re Source Home Entm't, LLC*, No. 14-11553 (KG) [ECF No. 160] (Bankr. D. Del. July 21, 2014); *In re Purified Renewable Energy, LLC*, No. 13-41446 (KAC) [ECF Nos. 112, 123 & 126] (Bankr. D. Minn. May 31, 2013).

## II.      The Bid Protections Have a Sound Business Purpose and Should be Approved

8.      The Debtors also seek authority to offer customary bid protections.  The Debtors have agreed to pay the Breakup Fee to the Stalking Horse Bidder as an allowed administrative expense priority claim.  The use of a stalking horse in a public auction process for sales pursuant to section 363 is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value."  *Official Comm. of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, No. 11-CV-219, *1 n.1 (E.D. Wis. July 7, 2011).  As a result, stalking horse bidders normally require breakup fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement."  *Id.*  The use of bidding protections has become an established practice in chapter 11 cases.

9.      Indeed, breakup fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code: "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets …. In fact, because the … corporation has a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value." *Integrated Res.*, 147 B.R. at 659–60 (emphasis added). Specifically, bid protections may be legitimately necessary to convince a white knight bidder to enter the bidding by providing some form of compensation for the risks it is undertaking. *See Integrated Res.*, 147 B.R. at 660–61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's … due diligence.").

10.     As a result, courts can approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999). The Debtors believe that the allowance of the Bidding Protections is in the best interests of the Debtors' estates, as the Stalking Horse Bid will establish a floor for further bidding that may increase the consideration given in exchange for the Assets for the benefit of the Debtors' estates.

11.     Here, the Bid Protections were, and remain, a critical component of the Stalking Horse Bidder's commitment. The Stalking Horse Bidder has expended and will continue to expend time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale transactions, despite the fact that its bid will be subject not only to Court

approval, but also to overbidding by third parties.  The parties negotiated the requested Breakup Fee in good faith and at arm's length with significant give-and-take with respect to proposed Bid Protections.  As a result, by agreeing to the Bid Protections, the Debtors ensured that their estates would have the benefit of the transactions with the Stalking Horse Bidder without sacrificing the potential for interested parties to submit overbids at the Auction.

12.    If the Court does not approve the Bid Protections, the Stalking Horse Bidder may elect not to serve as the stalking horse, to the detriment of the Debtors' estates.  Further, if the Bid Protections were to be paid, it will likely be because the Debtors have received higher or otherwise superior offers for the Assets.  In sum, the proposed Bid Protections are fair and reasonable under the circumstances because the Breakup Fee constitutes a "fair and reasonable percentage of the proposed purchase price" and is "reasonably related to the risk, effort, and expenses of the prospective purchaser."  *Integrated Res.*, 147 B.R. at 662.  Thus, the Bid Protections should be approved.

**III.    The Form and Manner of the Sale Notice Should be Approved**

13.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of the Sale Hearing.  *See* Fed. R. Bankr. P. 2002(a).  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

14.    Within three (3) business days of entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice upon the following parties or their respective counsel, if known:  (a) the United States Trustee for the District of Minnesota; (b) proposed counsel to the Committee (if any); (c) counsel to the Stalking Horse Bidder; (d) the Contract Counterparties; (e) all parties who have expressed a written interest in some or all of the Assets; (f) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien,

encumbrance, claim, or interest in the Assets; (g) the District Counsel and the District Director of the Internal Revenue Service; (h) the Collection Division of the Minnesota Department of Revenue; (i) all applicable state and local taxing authorities; (j) all of the creditors listed on the Debtors' matrix filed under Local Rule 1007-2(a); (k) the United States Attorney for the District of Minnesota; (l) the United States Bureau of Land Management; (m) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (n) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002 and Local Rules 6004-1(e), 2002-1(b) and 2002-4(a).

15.     The Debtors submit that notice of the Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, the Contract Notice, and the Assumption Notice, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002 and the Local Rules.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

## IV.     <u>The Assumption Procedures Are Appropriate and Should be Approved</u>

16.     The Sale contemplates the assumption and assignment of the Contracts to the Stalking Horse Bidder or Successful Bidder arising from the Auction, if any.  In connection with this process, the Debtors believe it is necessary to establish a process by which:  (a) the Debtors and Contract Counterparties can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such counterparties can object to the assumption and assignment of the Contracts and/or related cure amounts (the "**Assumption Procedures**").

17.     As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable Contract pursuant to section 365

of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts identified in the Contract Notice. *See*, *e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *In re Shary*, 152 B.R. 724, 725-26 (Bankr. N.D. Ohio 1993) (same); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same); *see also Veltman v. Whetzal*, 93 F.3d 517, 521 n.5 (8th Cir. 1996) ("some courts have found implied consent … when a party with an interest in the bankruptcy estate fails to object after receiving notice of the sale").

18.     The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to the Contract Counterparties, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof. Accordingly, the Debtors request the Court approve the Assumption Procedures set forth in the Bidding Procedures Order.

## V.     The Sale Should be Approved as an Exercise of Sound Business Judgment

19.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. *See*, *e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) (under section 363, the debtor in possession can sell property of the estate if "there is a legitimate business justification"); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc's, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

20.     Once the Debtors articulate a valid business justification, under the business judgment rule there "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action

taken was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, No. 11-13511, 2014 WL 1713416, at \*12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate"); *Integrated Res.*, 147 B.R. at 656 ("The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions.").

## A.   <u>A Sound Business Purpose Exists for the Sale</u>

21.   The Debtors have a sound business justification for selling the Assets.  <u>First</u>, the Debtors believe the Sale will maximize the Assets' going-concern value by allowing a party to bid on business assets that would have substantially less value on a stand-alone basis.  Since the Stalking Horse Purchase Agreement contemplates the assumption of certain of the Debtors' estates' Contracts, it will result in payment in full for a number of the Debtors' estates' creditors.

22.   <u>Second</u>, the sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets.  The successful bid, after being subject to a "market check" in the form of the Auction, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practicably available alternative.  *See*, *e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at \*4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure," "[t]he auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

- 9 -

23.    The Debtors submit that the Successful Bidder's Purchase Agreement will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  Thus, the Debtors' determination to sell the Assets through an Auction process and subsequently to enter into the Successful Bidder's Purchase Agreement will be a valid and sound exercise of the Debtors' business judgment.  The Debtors will submit evidence at the Sale Hearing to support these conclusions.  The Debtors request that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

### B.    **Adequate and Reasonable Notice of the Sale Will be Provided**

24.    The Sale Notice:  (a) will be served in a manner that provides at least 21 days' notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale. The form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest.

### C.    **The Sale and Purchase Price Reflects a Fair Value Transaction**

25.    Where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also Trans World Airlines*, 2001 WL 1820326, *4 (while a "section 363(b) sale transaction does not require an auction procedure," "[t]he auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

26.    Moreover, even as the Debtors move forward with the Sale, Canaccord will continue to market the Assets and solicit other offers consistent with the Bidding Procedures,

including, for example, by contacting previously solicited parties, continuing to provide

acceptable bidders with data room access and requested information, considering a variety of

alternative transaction structures, and otherwise assisting the Debtors with all efforts to increase

transaction value.  The number of bidders that are eligible to participate in a competitive Auction

process will be maximized, or, if no Auction is held because no Auction is necessary, the

Stalking Horse Purchase Agreement's purchase price will, conclusively, be fair value.

### D.     The Sale Has Been Proposed in Good Faith and Without Collusion, and the Stalking Horse Bidder or Successful Bidder Is a "Good Faith Purchaser"

27.     The Debtors request that the Court find the Stalking Horse Bidder and/or other

Successful Bidder arising from the Auction, if any, are entitled to the benefits and protections

provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Assets.

28.     Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease or property does not
> affect the validity of a sale or lease under such authorization to an entity
> that purchased or leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such authorization and
> such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

29.     Section 363(m) of the Bankruptcy Code, thus, protects the purchaser of assets

sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in

the purchased assets if the order allowing the sale is reversed on appeal, as long as such

purchaser leased or purchased the assets in "good faith."  While the Bankruptcy Code does not

define "good faith," courts have held that a purchaser shows its good faith through the integrity

of its conduct during the course of the sale proceedings, finding that where there is a lack of such

integrity, a good-faith finding may not be made.  *See*, *e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788

F.2d 143, 147 (3d Cir. 1986) ("Typically, the misconduct that would destroy a [buyer's] good

faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other

bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In re*

*Andy Frain Servs., Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986) (same).

30.     The Debtors submit that the Stalking Horse Bidder, or any other Successful

Bidder arising from the Auction, is or would be "good faith purchasers" within the meaning of

section 363(m) of the Bankruptcy Code, and the Stalking Horse Purchase Agreement, or any

marked versions thereof, are or would be good-faith agreements on arms'-length terms entitled to

the protections of section 363(m) of the Bankruptcy Code.[1]  <u>First</u>, as set forth in more detail

above, the consideration to be received by the Debtors pursuant to the Stalking Horse Purchase

Agreement is substantial, fair, and reasonable.  <u>Second</u>, the parties entered into the Stalking

Horse Purchase Agreement in good faith and after extensive, arm's-length negotiations, during

which all parties were represented by counsel, and any sale agreement with a Successful Bidder

will be the culmination of a competitive Auction process in which all parties will presumably be

represented by counsel and all negotiations will be conducted on an arm's-length, good-faith

basis.  <u>Third</u>, there is no indication of any "fraud, collusion between the purchaser and other

bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar

conduct that would cause or permit the Sale or Stalking Horse Purchase Agreement to be

avoided under section 363(n) of the Bankruptcy Code.  And, with respect to potential bidders,

the Bidding Procedures are designed to ensure that no party is able to exert undue influence over

---

[1]  The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code
will be appropriate for any Successful Bidder arising from the Auction.  Pursuant to the Bidding Procedures, any
Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures.  In addition, the
Debtors will not choose as the Successful Bidder or Backup Bidder (as defined in the Bidding Procedures) any
entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be
prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of
section 363(m) of the Bankruptcy Code has been satisfied.

the process.  Finally, the Stalking Horse Bidder's offer was evaluated and approved by the Debtors in consultation with their advisors, and any other bids that the Debtors ultimately determine to be a successful bid will have been evaluated in a similar fashion.  The Debtors believe that the Stalking Horse Bidder (or other Successful Bidder arising from the Auction, if any) and Stalking Horse Purchase Agreement (or marked version thereof) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

### E.  The Sale Should be Approved "Free and Clear" Under Section 363(f)

31.   Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if:  (a) applicable non-bankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

32.   Section 363(f) is disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtors' sale of the Assets free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed liabilities under the applicable Purchase Agreement.  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

33.   The Debtors submit that any interest that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors request authority to convey the

Assets to the Stalking Horse Bidder or other Successful Bidder arising from the Auction, if any, free and clear of all liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Sale.

### F.    Credit Bidding Should be Authorized Under Section 363(k)

34.    A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value. *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) ("It is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under § 363(k)."). In the event that the Agent, for itself and for and on behalf of the Lenders, elects, it is entitled to credit bid some or all of the claims secured by its collateral pursuant to section 363(k) of the Bankruptcy Code.

### VI.    The Assumption and Assignment of the Contracts Should be Approved

#### A.    The Assumption and Assignment of the Contracts
Reflects the Debtors' Reasonable Business Judgment

35.    To facilitate and effectuate the sale of the Assets, the Debtors are seeking authority to assign or transfer the Contracts to the Stalking Horse Bidder or other Successful Bidder arising from the Auction, if any, to the extent required by such bidders.

36.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign his executory contracts and unexpired leases, subject to the approval of the court, provided that

the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See*, *e.g.*, *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code."); *In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule").

37.     Here, the Court should approve the decision to assume and assign the Assumed Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment. First, the Assumed Contracts are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets.  Second, it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the contracts and leases needed to manage the day-to-day operations were included in the transaction.  Third, the Stalking Horse Purchase Agreement provides that the assumption and assignment of the Assumed Contracts is integral to, and inextricably integrated in, the Sale.  Finally, the Assumed Contracts will be assumed and assigned though the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these Cases.  The Debtors submit that the

assumption and assignment of the Assumed Contracts by way of the Assumption Procedures should be approved as an exercise of their business judgment.

**B.**     **Defaults Under the Assumed Contracts Will be Cured Through the Sale**

38.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain.

39.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because the Stalking Horse Purchase Agreement requires that the Stalking Horse Bidder cure all defaults associated with, or that are required to properly assume, the Assumed Contracts.  *See* Stalking Horse Purchase Agreement § 1.6. Because the Bidding Procedures Order (once approved) provides a clear process by which to resolve disputes over cure amounts or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

**C.**     **Non-Debtor Parties Will be Adequately Assured of Future Performance**

40.     Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  "The phrase 'adequate assurance of  future   performance'

adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

41.    The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder (or other Successful Bidder arising from the Auction, if any) will be satisfied. As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Assumed Contracts) and will demonstrate such financial wherewithal, willingness, and ability to perform under the Assumed Contracts assigned to the Stalking Horse Bidder or any Successful Bidder arising from the Auction. Further, the Assumption Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Stalking Horse Bidder or any Successful Bidder arising from the Auction to provide adequate assurance of future performance and object to the assumption of the Assumed Contracts or proposed cure amounts. The Court, therefore,

should have a sufficient basis to authorize the Debtors to reject or assume and assign the

Assumed Contracts as set forth in the Stalking Horse Purchase Agreement.

**VII.**   **Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate**

42.   Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or

lease of property . . . is stayed until the expiration of fourteen days after the entry of the order,

unless the court orders otherwise."   Additionally, Bankruptcy Rule 6006(d) provides that an

"order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed

until the expiration of fourteen days after the entry of the order, unless the court orders

otherwise."   The Debtors request that the Sale Order be effective immediately upon its entry by

providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

43.   The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient

time for an objecting party to appeal before an order can be implemented.   *See* Advisory

Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).   Although Bankruptcy Rules

6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should

"order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on

bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other

transaction to close immediately "where there has been no objection to procedure."   10 COLLIER

ON BANKRUPTCY ¶ 6004.10 (15th rev. ed. 2006).   Furthermore, if an objection is filed and

overruled, and the objecting party informs the court of its intent to appeal, the stay may be

reduced to the amount of time actually necessary to file such appeal.   *Id.*

44.   To maximize the value received for the Assets, the Debtors seek to close the Sale

as soon as possible after the Sale Hearing.   Thus, the Debtors hereby request that the Court waive

the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

- 18 -

## <u>CONCLUSION</u>

For the foregoing reasons, the Debtors respectfully request that the Court grant the relief requested in the Motion.

Dated:  December 21, 2016                    Respectfully submitted,


/e/ Michael F. McGrath
Michael F. McGrath (#168610)
Will R. Tansey (#323056)
RAVICH MEYER KIRKMAN MCGRATH NAUMAN
& TANSEY, PA
150 S. Fifth Street, Suite 3450
Minneapolis, MN  55402
Telephone:  612.317.4744
Email: mfmcgrath@ravichmeyer.com
        wrtanser@ravichmeyer.com

Elizabeth A. Green
Jimmy D. Parrish
BAKER & HOSTETLER LLP
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL  32801-3432
Telephone:  407.649.4000
Email: egreen@bakerlaw.com
        jparrish@bakerlaw.com

Eric R. Goodman
BAKER & HOSTETLER LLP
Key Tower, 127 Public Square
Suite 2000
Cleveland, OH  44114-1214
Telephone:  216.621.0200
Email: egoodman@bakerlaw.com

*Proposed Counsel for the Debtors and Debtors*
*in Possession*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | | |
|---|---|---|
| Dakota Plains Holdings, Inc., | | Case No. 16-43711 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Transloading, LLC, | | Case No. 16-43712 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Sand, LLC, | | Case No. 16-43715 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Marketing, LLC, | | Case No. 16-43716 |
| | Debtor. | Chapter 11 Case |
| DPTS Marketing LLC, | | Case No. 16-43717 |
| | Debtor. | Chapter 11 Case |
| Dakota Petroleum Transport Solutions, LLC, | | Case No. 16-43718 |
| | Debtor. | Chapter 11 Case |
| DPTS Sand, LLC, | | Case No. 16-43719 |
| | Debtor. | Chapter 11 Case |

## CERTIFICATE OF SERVICE

Jimmy D. Parrish of Baker & Hostetler LLP, under penalty of perjury, states that on December 21, 2016 he caused to be served the following documents:

1. Notice of Motion of the Debtors for Entry of (I) an Expedited Order (A) Approving Bidding Procedures and Bid Protections in Connection With the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief and (II) an Order (A) Approving the Asset Purchase Agreement Between the Debtors and the Purchaser, (B) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, (D) Authorizing the Distribution of Excess Sale Proceeds to Secured Creditors, and (E) Granting Related Relief;

2. Proposed Expedited Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling

an Auction and a Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief;

3.     Proposed Order (A) Approving the Asset Purchase Agreement Between the Debtors and the Purchaser, (B) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, (D) Authorizing the Distribution of Excess Sale Proceeds to Secured Creditors, and (E) Granting Related Relief; and

4.     Memorandum of Law in Support of Motion of the Debtors for Entry of (I) an Expedited Order (A) Approving Bidding Procedures and Bid Protections in Connection With the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief and (II) an Order (A) Approving the Asset Purchase Agreement Between the Debtors and the Purchaser, (B) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, (D) Authorizing the Distribution of Excess Sale Proceeds to Secured Creditors, and (E) Granting Related Relief;

upon:

| | | |
|---|---|---|
| Advanced Imaging Solutions<br>PO Box 790448<br>Saint Louis, MO  63179-0448 | Ally Financial<br>PO Box 380901<br>Bloomington, MN  55438 | Applied Business Strategy LLC<br>1100 Superior Avenue East<br>Suite 1750<br>Cleveland, OH  44114 |
| Boatworks II, LLC<br>294 Grove Lane East<br>Suite 100<br>Wayzata, MN  55391 | BNSF Railway Company<br>3110 Solutions Center<br>Chicago IL 60677-3001<br>Fax:  (651) 298-2814<br>Email:<br>Christina.Mcfarlane@BNSF.com | Boxcar Companies LLC<br>374 Wickaboag Valley Rd.<br>West Brookfield, MA  01585<br>Email:  dan@boxcarco.com |
| Butte, Anaconda & Pacific Railway<br>300 West Commercial<br>Anaconda, MT  59711<br>Fax:  (904) 210-7424<br>Email:<br>Lisette.Leavens@patriotrail.com | Canadian Pacific Railway Co.<br>CM-9527<br>Saint Paul, MN  55170-9527<br>Fax:  (888) 872-7245<br>Email:  Ryan_Jordan@cpr.ca | CSX Transportation, Inc.<br>P.O. Box 116651<br>Atlanta, GA  30368-6651<br>Email:<br>er_accounts_receivable@csx.com |
| Faegre Baker & Daniels<br>2200 Wells Fargo Center<br>90 S. 7th Street<br>Minneapolis, MN  55402-3901<br>Fax:  (612) 766-1600<br>Email:<br>morgan.burns@faegrebd.com | Foote Oilfield Services, LLC<br>PO Box 878<br>New Town, ND  58763<br>Email:  jr.foote@hotmail.com | Gabriel G. Claypool<br>20330 Western Road<br>Deephaven, MN  55331 |

| | | |
|---|---|---|
| Global Companies, LLC<br>800 South Street<br>Waltham, MA 02453 | Hennepin County Assessor<br>A-2103 Government Center<br>300 South 6th Street<br>Minneapolis, MN 55487 | Hiland Crude, LLC<br>1001 Louisiana<br>Suite 1000<br>Houston, TX 77002 |
| Integra<br>6160 Golden Hills Drive<br>Minneapolis, MN 55416 | Internal Revenue Service<br>Centralized Insolvency Ops<br>PO Box 7346<br>Philadelphia, PA 19101 | Iowa Traction Railway<br>P.O. Box 1277<br>Lakeville, MN 55044-1277<br>Fax: (952) 985-5911<br>Email:<br>bbement@progressiverail.com |
| IRS District Counsel<br>380 Jackson Street, Suite 650<br>St. Paul, MN 55101-4804 | Internal Revenue Service<br>Wells Fargo Place<br>30 E. Seventh Street<br>Mail Stop 5700<br>St. Paul, MN 55101 | Keokuk Junction Railway Co.<br>1318 S. Johnson Rd.<br>Peoria, IL 61607<br>Fax: (309) 697-5387<br>Email:        kbouris@pioneer-railcorp.com |
| McGrath North Mullin & Kratz,<br>PC LLP<br>First National Tower<br>Suite 3700<br>1601 Dodge St.<br>Omaha, NE 68102<br>Fax: (402) 341-0216<br>Email: info@mcgrathnorth.com | MN Department of Revenue<br>Collection    Div    Bankruptcy<br>Section<br>551 Bankruptcy Section<br>PO Box 64447<br>St. Paul, MN 55164-0447 | Minnesota Dept. of Revenue<br>600 North Robert Street<br>Saint Paul, MN 55146 |
| Mountrail County Treasurer's<br>PO Box 69<br>Stanley, ND 58784<br>Email:<br>shenaw@co.mountrail.nd.us | Mountrail Williams Electric<br>Cooperative<br>PO Box 1346<br>Williston, ND 58802-1346<br>Fax: (701) 627-3502 | Murex, LLC<br>55 Waugh Drive<br>Suite 510<br>Houston, TX 77007 |
| North Dakota Dept. of Revenue<br>600 E. Boulevard Avenue<br>Bismarck, ND 58505-0599 | Office of U.S. Trustee<br>1015 US Courthouse<br>300 South Fourth Street<br>Minneapolis, MN 55415 | Pearce & Durick<br>314 E. Thayer Ave.<br>P.O. Box 400<br>Bismarck, ND 58502<br>Fax: (701) 223-7865<br>Email: llb@pearce-durick.com |
| Reed Smith LLP<br>10 S. Wacker Dr. 40th Floor<br>Chicago, IL 60606-7507 | Ryan Gilbertson<br>1675 Neal Avenue<br>Delano, MN 55328 | San Luis & Rio Grande Railroad<br>118 S. Clinton St.<br>Suite 400<br>Chicago, IL 60661<br>Fax: (312) 248-1232<br>Email:<br>burkittb@iowapacific.com |
| Sard Verbinnen & Co., LLC<br>630 Third Avenue<br>9th Floor<br>New York, NY 10017<br>Fax: (212) 293-0055<br>Email: jrudnick@sardverb.com | Securities        and        Exchange<br>Commission<br>175 West Jackson Blvd., Suite<br>900<br>Chicago, IL 60604 | Stone Phillips, LLC<br>PO Box 500787<br>Atlanta, GA 31150 |

| | | |
|---|---|---|
| SunTrust Bank<br>303 Peachtree Street NE<br>Atlanta, GA  30326<br>Email:  alanpope@mvalaw.com | Thompson Hine LLP<br>Two Alliance Center<br>3560 Lenox Road NE<br>Suite 1600<br>Atlanta, GA  30326-4266 | Troy Hutchinson<br>Rock Hutchinson, PLLP<br>1907 E. Wayzata Blvd.<br>Suite 330<br>Wayzata, MN  55391<br>Email:<br>thutchinson@rockhutchinson.com |
| Union Pacific Railroad Company<br>5074 Collections<br>Center Dr.<br>Chicago, IL  60693<br>Email:  smpetrow@up.com | US Attorney<br>600 US Courthouse<br>300 S. Fourth Street<br>Minneapolis, MN  55415 | U.S. Environmental Protection<br>Agency<br>77 W. Jackson Blvd.<br>Chicago, IL  60604-3507 |
| U.S. Oil & Refining Company<br>P.O. Box 2255<br>Tacoma, WA  98401 | Unimin Corporation<br>258 Elm Street<br>New Canaan, CT  06840 | United Quality Cooperative<br>240 3rd Street S.<br>New Town, ND  58763 |
| Vinson & Elkins, LLP<br>PO Box 301019<br>Dallas, TX  75303-1019<br>Fax:  (713) 758-2346<br>Email:  kliekefett@velaw.com | Wells Fargo Dealer Services<br>PO Box 25341<br>Santa Ana, CA  92799-5341 | World Fuel Services, Inc.<br>ATTN:  Carlos Fornari<br>9800 NW 41st St., Suite 400<br>Miami, FL  33178 |
| Woodburn & Wedge<br>6100 Neil Road<br>Suite 500<br>Reno, NV  89505<br>Fax:  (775) 688-3088<br>Email:<br>GBarnard@woodburnandwedge.<br>com | | |

via facsimile (where available), email (where available), or U.S. Mail to the addresses listed above, and electronically by Notice of Electronic Filing upon all parties who have requested electronic service in these cases by filing the same via ECF with the Bankruptcy Court in the District of Minnesota.

/e/ Jimmy D. Parrish
Jimmy D. Parrish