# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Dakota Plains Holdings, Inc., | Case No. 16-43711 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Transloading, LLC, | Case No. 16-43712 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Sand, LLC, | Case No. 16-43715 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Marketing, LLC, | Case No. 16-43716 |
| Debtor. | Chapter 11 Case |
| DPTS Marketing LLC, | Case No. 16-43717 |
| Debtor. | Chapter 11 Case |
| Dakota Petroleum Transport Solutions, LLC, | Case No. 16-43718 |
| Debtor. | Chapter 11 Case |
| DPTS Sand, LLC, | Case No. 16-43721 |
| Debtor. | Chapter 11 Case |

**NOTICE OF HEARING AND MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) GRANTING AN EXPEDITED HEARING, (II) AUTHORIZING THE DEBTORS (A) TO UTILIZE CASH COLLATERAL OF THE PREPETITION SECURED PARTIES, (B) TO OBTAIN POSTPETITION SECURED FINANCING, AND (C) TO PROVIDE ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF**

TO:  The parties-in-interest as defined in Local Rule 9013-3(a)(2).

1.      Dakota Plains Holdings, Inc. and its affiliated debtors and debtors in possession in these proceedings (collectively, the "**Debtors**"), file this motion (this "**Motion**") requesting the relief described below, and give notice of hearing.

2.      The Court will hold a hearing on the portion of this Motion seeking interim relief at 9:00 a.m. on December 29, 2016 (the "**Interim Hearing**") in Courtroom No. 7 West, U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota, 55415.  A hearing on the portion

of this Motion seeking final relief will be held at a date, time and location to be determined (the "**Final Hearing**").

3.       Local Rule 9006-1(c) provides deadlines for responses to this Motion.  However, given the expedited basis on which the Motion is being heard in connection with the **interim relief** requested, the Debtors hereby waive any objections to written responses thereto being served and filed up to two hours prior to the Interim Hearing.  Any responses to the Motion in connection with the **final relief** requested herein must be filed and served in accordance with Local Rule 9006-1(c).  **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE RELIEF REQUESTED HEREIN ON A FINAL BASIS WITHOUT HOLDING THE FINAL HEARING**.

4.       This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, Rule 5005 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule 1070-1.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  On December 20, 2016 (the "**Petition Date**"), each of the above-captioned Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**").  The cases are currently pending in this Court.

5.       This Motion arises under sections 105, 361, 362, 363(c), 364(c), 364(d)(1) and 364(e) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, Local Rule 4001-2(a) and Paragraph 10 of the Instructions for Filing a Chapter 11 Case in the United States Bankruptcy Court for the District of Minnesota.  This Motion is filed under Local Rules 9013-1, 9013-2 and 9013-3.  Notice of the hearing on this Motion is provided pursuant to Local Rules 9013-2(a) and 9013-3(a)(2).

6.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed.

7.      A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the Declaration of Marty Beskow in Support of Chapter 11 Petitions and First Day Motions (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated by reference herein.  Additional facts and circumstances supporting this Motion are set forth in the *Declaration of Michael V. Balistreri in Support of Motion for Entry of Interim and Final Orders (I) Granting an Expedited Hearing, (II) Authorizing the Debtors (A) to Utilize Cash Collateral of the Prepetition Secured Parties, (B) to Obtain Postpetition Secured Financing, and (C) to Provide Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "**Balistreri Declaration**").

<u>**PRELIMINARY STATEMENT**</u>

8.      As more fully described in this Motion and in the First Day Declaration, several factors have severely impacted the Debtors' financial condition and near-term liquidity, precipitating the commencement of these chapter 11 cases and requiring the Debtors to seek immediate access to the Debtors' proposed debtor in possession financing facility (the "**DIP Facility**").

9.      The Debtors have determined that the best alternative for preserving and maximizing the value of their estates for the benefit of creditors is to consummate a going-concern sale of their assets.  The Debtors were able to reach an agreement with their prepetition

lenders on the terms of a postpetition financing arrangement that addresses the Debtors' liquidity needs during an expedited sale process.  As will be discussed in further detail in the Debtors' bidding procedures and sale motion, the Debtors do not expect that any bids will be submitted in excess of the full amount of the prepetition lenders' claims.

10.     The proposed postpetition financing and related sale framework is the best option to maximize the value of the Debtors' estates under the circumstances.  The DIP Facility will, among other things, provide capital necessary to allow the Debtors to continue normal business operations while they move forward with the sale process.

11.     As a result, by this Motion, the Debtors seek authorization to obtain postpetition financing pursuant to the terms set forth in this Motion, that certain *Postpetition Revolving Credit Agreement*, a copy of which is attached hereto as **Exhibit A** (as further defined below, the "**DIP Credit Agreement**"), the proposed interim DIP order (in substantially the form attached hereto as **Exhibit B**) (the "**Interim DIP Order**"), and the proposed final DIP order (in substantially the form attached hereto as **Exhibit C**) (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**").  The Debtors intent to use the proceeds of the DIP Facility immediately upon the entry of, and on the terms set forth in, the Interim DIP Order.

## BACKGROUND

12.     On December 20, 2016, each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

### *The Debtors' Business and Operations*

13.     The Debtors are an integrated midstream energy company whose headquarters are located in Wayzata, Minnesota.  Founded in 2008, the Debtors own and operate a 200-acre rail

terminal (the "**Pioneer Terminal**") in the heart of the Bakken and Three Forks plays of the Williston Basin in North Dakota—Mountrail, McKenzie, Williams and Dunn.  The Pioneer Terminal is located at the terminus of the Canadian Pacific line and has strategic proximity to the only Missouri River Bridge crossing for nearly 80 miles.

14.  The Debtors' business is comprised of "outbound operations," which includes transloading crude oil from trucks and pipelines, storing in tanks and transloading onto trains, and "inbound operations," which includes offloading frac sand from trains, storing in silos and transloading onto trucks.  In 2013, the Pioneer Terminal had nearly $70 million in capital expenditure projects for crude oil and frac sand operations.  In the fiscal year 2015, the Debtors transloaded approximately 16.8 million barrels of crude oil and 600,000 tons of sand, which generated a total revenue of approximately $29 million.

15.  The Debtors fortunes changed as a result in the global decline in oil prices, which adversely impacted the demand for the services offered by the Debtors at the Pioneer Terminal. For twelve months ended December 31, 2015, the Debtors had a net income of approximately $8.5 million and an adjusted EBITDA of approximately $23.4 million.  For the nine months ended September 30, 2016, the Debtors had an adjusted EBITDA loss of approximately $4.5 million.  As of September 30, 2016, the Debtors had cash and cash equivalents and trade receivables of approximately $7.0 million and accounts payable and accrued expenses of approximately $13.4 million.  The Debtors have approximately 25 employees.  A key goal of these proceedings is to facilitate a going concern sale that preserves these jobs.

***The Debtors' Prepetition Revolving Credit and Term Loan Agreement***

16.  Debtors Dakota Plains Transloading, LLC, Dakota Plains Sand, LLC, and Dakota Plains Marketing, LLC, as borrowers (collectively, "**Borrowers**"), Dakota Plains Holdings, Inc.

("**Holdings**"), the lenders party thereto from time to time (the "**Prepetition Lenders**"), SunTrust Bank, as administrative agent (in such capacity, the "**Prepetition Agent**" and as Prepetition Lender, the "**Prepetition Secured Parties**"), are parties to that certain *Revolving Credit and Term Loan Agreement* (the "**Original Credit Agreement**") dated as of December 5, 2014, as amended by that certain *Amendment No. 1 to Revolving Credit and Term Loan Agreement* dated as of August 6, 2015 (the "**First Amendment**"), that certain *Amendment No. 2 and Waiver to Revolving Credit and Term Loan Agreement* dated as of December 4, 2015 (the "**Second Amendment**"), and that certain *Amendment No. 3 to Revolving Credit and Term Loan Agreement* dated as of July 5, 2016 (the "**Third Amendment**"), and that certain *Amendment No. 4 to Revolving Credit and Term Loan Agreement and One Time Waiver of Borrower Requirements* dated as of August 5, 2016 (the "**Fourth Amendment**" and together with the Original Credit Agreement, the First Amendment the Second Amendment, and the Third Amendment, the "**Prepetition Credit Agreement**" and together with each of the Loan Documents thereto (each as defined therein), the "**Prepetition Loan Documents**").

17.     The Prepetition Credit Agreement provided for $55,425,000 of loans consisting of a "Tranche A" Term Loan of $12,925,000, a "Tranche B" Term Loan of $22,500,000 and a Revolving Loan of $20,000,000 (the "**Prepetition Facility**").

18.     Pursuant to (a) that certain *Guaranty and Security Agreement* dated as of December 5, 2012 by the Borrowers, Holdings, and the Prepetition Agent, and (b) that certain *Joinder Agreement* dated as of December 5, 2014 by DPTS Marketing LLC, Dakota Petroleum Transport Solutions, LLC, and DPTS Sand, LLC (collectively, the "**Prepetition Subsidiary Guarantors**") and the Prepetition Agent, the indebtedness owed to the Prepetition Secured Parties is secured by first priority liens on, and security interests in, substantially all of the assets

of the Borrowers, Holdings, and the Prepetition Subsidiary Guarantors (the "**Prepetition Collateral**").  As of the Petition Date, the Debtors were indebted and liable to the Prepetition Agent and the Prepetition Secured Parties under the Prepetition Loan Documents, without objection, defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $56,925,000 with respect to the Prepetition Facility, plus accrued interest (including paid-in-kind interest) in the amount of $4,719,401.06, plus unpaid amendment fees thereon in the additional amount of approximately just over $1,019,250 plus, in connection with the foregoing amounts, certain expenses, and all other obligations payable under the Prepetition Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the Prepetition Loan Documents.

### The Debtors' Subordinated Obligations

19.      As of December 5, 2014, the Borrowers and certain affiliates and certain Subordinated Sellers[1] entered into certain WFS Transaction documents[2] pursuant to which the Borrowers and certain of their affiliates agreed to make certain operation override payments, indemnify WFS and other parties for certain lease obligations, and guarantee certain obligations and grant a lien in certain of their assets to secure such obligations (collectively, the "**Subordinated Obligations**").

20.      Pursuant to the terms of that certain Seller Subordination Agreement dated as of December 5, 2014 (the "**Subordination Agreement**"), the Subordinated Sellers agreed to

---

[1]  The "**Subordinated Sellers**" are Petroleum Transport Solutions, LLC ("**PTS**"), World Fuel Services, Inc. ("**WFS**"), and Western Petroleum Company ("**WPC**").

[2]  The "**WFS Transaction Documents**" are: (a) the Membership Interest Purchase Agreement, dated as of December 5, 2014, (b) the Seller Guaranty and Security Agreement, dated as of December 5, 2014, (c) the Escrow Agreement, dated as of December 5, 2014, (d) the Indemnification and Release Agreement, dated as of December 5, 2014, and (e) the Second Mortgage, Collateral Real Estate Mortgage, Deed of Trust, Assignment, Security Agreement and Financing Statement.

subordinate and postpone the payment and performance of any and all of the Subordinated

Obligations to and in favor of the full payment of the amounts owed in respect of the Prepetition

Facility.  Under the Subordination Agreement, no Subordinated Seller is entitled to assert any

right to adequate protection in connection with the relief sought herein, and has waived the right

to contest, oppose or object to any debtor in possession financing provided by the Prepetition

Lenders, including any debtor in possession financing secured by priming liens on the

Prepetition Collateral.

## **RELIEF REQUESTED**

21.     By this Motion, the Debtors seek the following relief:

a.      the Court's authorization, pursuant to sections 363 and 364(c)(1), (2), (3), and (d)(1) of the Bankruptcy Code, for (i) Dakota Plains Transloading, LLC, Dakota Plains Sand, LLC, and Dakota Plains Marketing, LLC (the "**DIP Borrowers**") to enter into a senior secured superpriority postpetition credit facility (the "**DIP Facility**") provided by SunTrust Bank, as administrative agent (in such capacity, the "**DIP Agent**"), and postpetition lender (the "**DIP Lenders**"), pursuant to the Postpetition Revolving Credit Agreement in substantially the form attached to this Motion as Exhibit A (the "**DIP Credit Agreement**"), the Interim DIP Order, the Final DIP Order and all other agreements, documents and instruments delivered or executed in connection therewith, as hereafter amended, supplemented or otherwise modified from time to time, including the DIP Budget (as defined below), collectively, the "**DIP Loan Documents**"), and (ii) the DIP Borrowers to obtain extensions of credit thereunder on a senior secured and superpriority basis, (a) during the period (the "**Interim Period**") from the date hereof through and including the earlier to occur of (1) the date of entry of the Final DIP Order by this Court and (2) the Termination Date (as defined below), in an aggregate principal amount not to exceed $500,000, and (b) upon entry of the Final DIP Order and thereafter until the Termination Date, in an aggregate principal amount not to exceed $2,000,000, in each case at any time outstanding (all financial accommodations and extensions of credit under the DIP Credit Agreement and the DIP Facility, the "**DIP Extensions of Credit**"), and (c) for Dakota Plains Holdings, Inc., DPTS Marketing LLC, Dakota Petroleum Transport Solutions, LLC, and DPTS Sand, LLC (collectively, the "**DIP Loan Guarantors**," and together with the DIP Borrowers, the "**Loan Parties**") to jointly and severally guarantee on a secured basis the Debtors' obligations in respect of the DIP Facility;

b.      the Court's authorization for each of the Loan Parties to execute the DIP Loan Agreement and the other DIP Loan Documents to which it is a party and to perform such other and further acts as may be necessary or appropriate in connection therewith;

c.      the Court's authorization to use DIP Extensions of Credit in accordance with the proposed budget prepared by the Debtors and attached hereto as **Exhibit D** (as updated from time to time pursuant to the DIP Loan Documents and, in each case, subject to the prior approval of the DIP Agent, the "**DIP Budget**"), and as otherwise provided herein and in the other DIP Loan Documents;

d.      the Court's authorization to grant the DIP Agent for the benefit of the DIP Lenders and the other secured parties under the DIP Loan Documents (collectively, the "**DIP Secured Parties**"), in respect of the DIP Obligations (as defined below), a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and first priority priming liens on and security interests in all assets and property of the Debtors (no owned or hereafter acquired) pursuant to sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, in each case as and to the extent set forth more fully below and subject to the Carve-Out (as defined below);

e.      the Court's authorization to use "cash collateral" as such term is defined in section 363 of the Bankruptcy Code (the "**Cash Collateral**") in which the Prepetition Secured Parties have an interest;

f.      the Court's authorization to grant, as of the Petition Date, the Adequate Protection Superpriority Claim (as defined below) and Adequate Protection Liens (as defined below), to the extent of and as compensation for any Diminution in Value (as defined below), and the payment of fees and expenses to the Prepetition Agent (as defined below) for the benefit of the Prepetition Lenders, in each case, as set forth more fully below and subject to the Carve-Out;

g.      the modification by the Court of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility, the Interim DIP Order and the other DIP Loan Documents;

h.      the scheduling by the Court of a final hearing (the "**Final Hearing**") to consider entry of a Final DIP Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing and the transactions contemplated by the Motion; and

      i.     the Court's waiving of any applicable stay (including under Bankruptcy Rule 6004) and providing for the immediate effectiveness of the DIP Orders.

***The Debtors' Immediate Need for Liquidity***
***and Debtors' Efforts to Obtain Postpetition Financing***

22.    Despite the Debtors' prepetition efforts to improve ongoing operations, reduce costs and improve liquidity, their liquidity continued to deteriorate.  As a result, the Debtors have struggled to generate sufficient cash flow to satisfy their prepetition debt obligations.

23.    In connection with determining that the commencement of these cases was necessary, the Debtors, with the assistance of their professional advisors, explored their options with respect to postpetition liquidity.   The Debtors ultimately determined that a financing proposed by the Prepetition Lenders provided the Debtors with the best opportunity to continue operations and explore a potential going-concern sale of their assets.

## RULE 4001 STATEMENT

24.    The material terms of the proposed DIP Facility, together with reference to the applicable sections of the relevant source documents, are as follows:[3]

| Bankruptcy Code / Local Rule | Summary of Material Terms |
| --- | --- |
| Borrowers<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Dakota Plains Transloading, LLC, Dakota Plains Sand, LLC, and Dakota Plains Marketing, LLC.<br><br>*See* DIP Credit Agreement at Preamble. |
| Guarantors<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Dakota Plains Holdings, Inc., DPTS Marketing LLC, Dakota Petroleum Transport Solutions, LLC, and DPTS Sand, LLC.<br><br>*See* DIP Credit Agreement at Preamble and § 1.1. |
| Loan Parties<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Borrowers Dakota Plains Transloading, LLC, Dakota Plains Sand, LLC, and Dakota Plains Marketing, LLC, and Guarantors Dakota Plains Holdings, Inc., DPTS Marketing LLC, Dakota Petroleum Transport Solutions, LLC, and DPTS Sand, LLC. |

---

[3]   The summarizes contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Credit Agreement or the DIP Orders, as applicable.

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | *See* DIP Credit Agreement at § 1.1. |
| Lenders<br>Fed. R. Bankr. P. 4001(c)(1)(B) | SunTrust Bank, in its capacity as administrative agent, and several banks and other financial institutions and lenders from time to time as a "Lender."<br><br>*See* DIP Credit Agreement at Preamble. |
| Maturity Date<br>Fed. R. Bankr. P. 4001(b)(1)(B)(iii) & 4001(c)(1)(B) | "Maturity Date" shall mean the earlier of (i) 90 days from the Closing Date, (ii) the consummation of the sale transaction contemplated by the Bid Procedures Order, (iii) the date upon which any plan of reorganization or liquidation becomes effective, and (iv) the acceleration of the obligations of the Borrowers under this Agreement in accordance with the terms hereof.<br><br>*See* DIP Credit Agreement at § 1.1. |
| Conditions Precedent<br>Fed. R. Bankr. P. 4001(c)(1)(B) | The obligations of the Lenders to make Loans shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 10.2):<br><br>Payment of Fees and Expenses.  The DIP Agent shall have received payment of all fees, expenses and other amounts due and payable on or prior to the Closing Date, including reimbursement or payment of all out-of-pocket expenses of the DIP Agent, (including reasonable fees, charges and disbursements of counsel to the DIP Agent) required to be reimbursed or paid by the Borrowers hereunder, under any other Loan Document and under any agreement with the DIP Agent.<br><br>Closing Documents.  The DIP Agent shall have received all of the documents (as listed in Section 3.1(b) of the DIP Credit Agreement), duly executed and delivered and in form, substance and date reasonably satisfactory to DIP Agent.<br><br>Collateral Requirement.  On or prior to the Closing Date, the Guaranty and Security Agreement and the Interim DIP Order, upon entry of the Interim DIP Order, shall be effective to create in favor of the DIP Agent, for the benefit of the Secured Parties, a legal, valid and enforceable first priority (except for Existing Liens entitled to priority under applicable laws) perfected security interest in and lien on the Collateral, subject to the Carve-Out.  All filings, recordings, deliveries of instruments and other actions necessary or desirable in the reasonable opinion of the DIP Agent to protect and preserve such security interests shall have been duly effected.  The DIP Agent shall have received evidence thereof in form and substance satisfactory to the DIP Agent.<br><br>Interim DIP Order.  Prior to the Closing Date, the Bankruptcy Court shall have entered the Interim DIP Order, which Interim DIP Order shall be in full force and effect and shall not have been amended, modified, stayed or reversed.<br><br>First Day Orders.  On the Closing Date, all of the "first day orders" entered by the Bankruptcy Court in the Chapter 11 Case and all adequate protection payments and critical vendor payments approved by the Bankruptcy Court in the Interim DIP Order or otherwise shall be reasonably satisfactory in form and substance to the Required Lenders.<br><br>Other Orders.  On the Closing Date, all orders (if any) providing for payment of Prepetition indebtedness of the Loan Parties or affecting in any way the Obligations or the Collateral submitted for entry in the Chapter 11 Case shall be in form and substance satisfactory to each Lender, as entered, shall not deviate from the form thereof approved by each Lender in any material respect which is adverse to the interests of the Lenders or the Prepetition Lenders.<br><br>Approved Budget; Financial Statements.  On the Closing Date, the Lenders shall have received and be satisfied with (i) an initial cash flow budget, depicting on a |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | weekly basis receipts and disbursements, cash receipts, cash balance and loan balance for the first 13 weeks from the Closing Date, to be attached to the Interim DIP Order which shall be in form and substance satisfactory to each Lender (the "**Approved Budget**"), together with a good faith estimate of all initial drawings of Loans within the first week following the Closing Date and (ii) such historical and pro forma financial statements for such periods as the DIP Agent may reasonably request, which shall be in form and substance reasonably satisfactory to the Required Lenders.<br><br>Acceptable Sale Process.  The Sale Motion and the Bid Procedures Motion shall have been filed as required by the Acceptable Sale Process.<br><br>Other Documentation.  DIP Agent shall have received all documents and instruments (in form and substance satisfactory to DIP Agent) that DIP Agent has then reasonably requested, in addition to those described in this Section 4.1.<br><br>Chapter 11 Case Jurisdiction.  The Loan Parties shall have commenced the Chapter 11 Case in a jurisdiction reasonably acceptable to the Lenders.<br><br>Orders; Approved Budget.  At the time of each Borrowing and also after giving effect thereto, (x) if an extension of credit has been requested before the Final DIP Order has been entered by the Bankruptcy Court, the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, stayed, or modified or amended in any respect and (y) if an extension of credit is requested after the Final DIP Order has been entered by the Bankruptcy Court, the DIP Agent and the Lenders shall have received a copy of the Final DIP Order and the Final DIP Order shall be in full force and effect and shall not have been vacated, reversed, stayed, or modified or amended in any respect.  If either the Interim DIP Order or the Final DIP Order is the subject of a pending appeal in any respect, none of such Order, the making of the Loans or the performance by a Borrower or any Guarantor of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.  The Loan Parties, the DIP Agent and the Lenders shall be entitled to rely in good faith upon the Orders, notwithstanding objection thereto or appeal therefrom by any interested party.  The Loan Parties, the DIP Agent and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction.<br><br>Additional Conditions Precedent.  The obligation of each Lender to make any Loan (including Loans made on the Closing Date) are subject at the time of each such Credit Event to the satisfaction of the conditions set forth in Section 3.2 of the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement at §§ 3.1 & 3.2. |
| Interest Rates<br>Fed. R. Bankr. P. 4001(c)(1)(B) | The Borrowers shall pay interest on the Loans at a rate equal to eight percent (8.0%) per annum.  If an Event of Default has occurred and is continuing, the Borrowers shall pay interest at the rate per annum equal to 200 basis points above the otherwise applicable interest rate for such Loans.<br><br>*See* DIP Credit Agreement at §§ 2.13. |
| Reporting Information<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Holdings and the Borrowers will, and will cause each of their Subsidiaries to, permit any representative of the DIP Agent or any Lender to visit and inspect their properties, to examine their books and records and to make copies and take extracts therefrom, and to discuss their affairs, finances and accounts with any of their officers and with their independent certified public accountants, all at such |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | reasonable times and as often as the DIP Agent or any Lender may reasonably request after reasonable prior notice to the Borrowers; provided that if an Event of Default has occurred and is continuing, no prior notice shall be required; provided, further, that, unless an Event of Default shall have occurred and is continuing, the DIP Agent and the Lenders shall not exercise such rights under this Section 5.7 more often than once per year. *See* DIP Credit Agreement at § 5.17. |
| <u>Sale Milestones</u> Fed. R. Bankr. P. 4001(c)(1)(B) | Loan Parties shall cause, or shall cause the following actions (collectively, the "**Milestones**") to occur no later than the applicable date set forth below: <ul><li>No later than fifteen (15) calendar days after the Petition Date, obtain Bankruptcy Court approval and entry of the Bid Procedures Order;</li><li>By no later than thirty (30) calendar days after the Petition Date, complete the process of soliciting binding bids to acquire substantially all of the assets of the Loan Parties pursuant to the Bid Procedures Order;</li><li>No later than forty-five (45) calendar days after the Petition Date, commence and complete, subject to the supervision of the Bankruptcy Court and in accordance with the Bid Procedures Order, the Auction (as defined in the Bid Procedures Order), upon the completion of which the Loan Parties shall evaluate each bid at the Auction and, in accordance with the Bid Procedures Order, select the successful bid for subsequent approval by the Bankruptcy Court pursuant to the Sale Order;</li><li>No later than five (5) business days after the conclusion of the Auction, obtain approval of a Sale to a buyer on the terms of the successful bid (the "**Approved Sale**") pursuant to a sale order in form and substance reasonably acceptable to DIP Agent, Prepetition Agent and the Loan Parties (the "**Sale Order**"); and</li><li>No later than sixty (60) calendar days after the Petition Date, consummate the Approved Sale pursuant to the Sale Order.</li></ul> *See* DIP Credit Agreement at § 5.15. |
| <u>Events of Default</u> Fed. R. Bankr. P. 4001(c)(1)(B) | The DIP Credit Agreement provides for certain events of default standard for this type of facility and the following bankruptcy-related defaults: <ul><li>the Chapter 11 Case shall be dismissed (which dismissal does not require as a condition to such dismissal the termination of the Lenders' Commitments and the payment in full in cash of all Obligations and the Prepetition Facility Obligations) or converted to a case under Chapter 7 of the Bankruptcy Code or the Loan Parties shall file a motion or other pleading seeking the dismissal or conversion of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise without the consent of the Lenders; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Chapter 11 Case; the board of directors of one or more of the Loan Parties shall authorize a liquidation of any Loan Party's business, except pursuant to the Acceptable Sale Process; or an application shall be filed by the Loan Parties for the approval of any other Superpriority Claim (other than the Carve-Out, which shall have a Superpriority</li></ul> |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | Claim ranking senior to the Obligations, and which shall be paid by the Loan Parties at the times and in the amounts permitted by an order of the Bankruptcy Court) in the Chapter 11 Case which is senior to the claims of the Lenders against the Loan Parties hereunder or under any of the other Loan Documents if it is not used to repay the Obligations in full in cash, or there shall arise or be granted any such senior Superpriority Claim;<br><br>• the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code pertaining to the Collateral to the holder or holders of any security interest to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Loan Parties in an amount not to exceed $250,000, individually or in the aggregate or (ii) permit other actions that would have a Material Adverse Effect;<br><br>• (i) the Final Order Entry Date shall not have occurred on or prior to the date occurring thirty (30) calendar days after the Petition Date, (ii) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim DIP Order and/or the Final DIP Order without the prior written consent of each Lender, or any Loan Party shall apply for authority to do so, without the prior written consent of each Lender, (iii) an order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court without the express prior written consent of the Lenders to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties equal or superior to the priority of the Secured Parties in respect of the Obligations except as otherwise provided in this Agreement, (iv) an order of the Bankruptcy Court shall be entered permitting the grant of a Lien on the Collateral (other than Permitted Encumbrances), (v) the Interim DIP Order and/or the Final DIP Order shall cease to create a valid and perfected first priority Lien (subject to Permitted Encumbrances) on the Collateral or otherwise cease to be valid and binding and in full force and effect, (vi) any of the Loan Parties shall fail to comply with any material provision (or any provision in such a way as is materially adverse to the interests of the Secured Parties) of the Interim DIP Order and/or the Final DIP Order, (vii) any Loan Party shall seek any modification of the Interim DIP Order and/or the Final DIP Order or assert in any pleading filed in any court that any material provision of the Interim DIP Order and/or the Final DIP Order is not valid and binding for any reason or otherwise modifying the Interim DIP Order and/or the Final DIP Order in a manner adverse to the Secured Parties, (viii) the period provided by Section 1121 of the Bankruptcy Code for the Loan Parties' exclusive right to file a plan shall expire or terminate, or (ix) if any Loan Party is enjoined, restrained or in any way prevented by court order from continuing or conducting all or any material part of its business or affairs;<br><br>• except as permitted by the DIP Facility, the Orders, the Approved Budget or as otherwise agreed to by the Required Lenders, the Loan Parties shall make (or shall have made) any Prepetition Payment other than Prepetition Payments authorized by the Bankruptcy Court in accordance with orders of the Bankruptcy Court entered with the |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | consent of (or non-objection by) the Required Lenders; |
| | • the Bankruptcy Court shall enter an order avoiding or requiring disgorgement by the Secured Parties of any amounts received in respect of the Obligations; |
| | • the Bankruptcy Court shall enter an order or orders to sell, transfer, lease, exchange, alienate or otherwise dispose of any assets, properties or equity of any Loan Party pursuant to Section 363 of the Bankruptcy Code other than pursuant to the Acceptable Sale Process without the consent of the Lenders unless such order or orders contemplate the repayment in full in cash of and termination in full of all Commitments and Obligations under the DIP Facility; |
| | • any of the Loan Parties shall take any action in support of any matter set forth in Section 8.1(i)(i-vii) or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal; |
| | • any Loan Party shall file a motion, pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment; |
| | • any Loan Party shall file a motion in the Chapter 11 Case (i) to use Cash Collateral under Section 363(c) of the Bankruptcy Code without the consent of the Lenders and the Prepetition Lenders, (ii) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted under this Agreement or (iii) to take any other action or actions adverse to DIP Agent, the Lenders, the Prepetition Agent or the Prepetition Lenders or their rights and remedies hereunder or under any of the other Loan Documents, the Prepetition Credit Documents or the Orders, or DIP Agent's, Prepetition Agent's, Lenders' or Prepetition Lenders' interest in any of the Collateral, except that the Loan Parties are entitled to conduct the Acceptable Sale Process in a manner consistent with the Bid Procedures Order; |
| | • the filing by any Loan Party of any plan of reorganization or liquidation that is not approved by the DIP Agent and the Lenders unless such plan of reorganization or liquidation provides for the repayment in full in cash of and termination in full of all Commitments and Obligations under the DIP Facility; or |
| | • entry of an order by the Bankruptcy Court authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral. |
| | *See* DIP Credit Agreement at § 8.1(o). |
| DIP Facility<br>Fed. R. Bankr. P.<br>4001(b)(1)(B)(ii) | The Borrowers have requested that the Lenders provide a senior secured superpriority debtor-in-possession credit facility to the Borrowers in an aggregate principal amount not to exceed $2,000,000.  During the Interim Period, the Debtors are authorized to borrow under the DIP Facility up to an aggregate principal amount of $500,000.<br><br>*See* Interim DIP Order at ¶ 2; DIP Credit Agreement at Recitals. |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| Use of Cash Collateral<br>Fed. R. Bankr. P.<br>4001(b)(1)(B)(ii) | Upon authorization from the Court and on the terms of the Interim DIP Order, the Debtors may use Cash Collateral, as defined by section 363 of the Bankruptcy Code, subject to the DIP Budget.<br><br>*See* Interim DIP Order at ¶ 3. |
| Fees and Expenses<br>Fed. R. Bankr. P. 4001(c)(1)(B) | The Debtors will pay all expenses incurred by the DIP Secured Parties, the Prepetition Agent and the Prepetition Secured Parties (including, without limitation, the reasonable fees and disbursements of their counsel, any other local counsel that they shall retain and any internal or third-party appraisers, consultants, financial, restructuring or other advisors, consultants, financial, restructuring or other advisors and auditors advising any such counsel) in connection with (i) the preparation, execution, delivery, funding an administration of the DIP Loan Documents, including, without limitation, all due diligence fees and expenses incurred or sustained in connection with the DIP Loan Documents, (ii) the administration of the Prepetition Loan Documents and monitoring of the Sale Conditions and Milestones, (iii) the Cases or any Successor Cases, or (iv) the enforcement of any rights or remedies under the DIP Loan Documents or the Prepetition Loan Documents, in each case whether or not the transactions contemplated hereby are fully consummated.<br><br>Interim DIP Order at ¶ 20(b). |
| Priority and Security<br>Fed. R. Bankr. P.<br>4001(c)(1)(B)(i) | Effective immediately upon the entry of the Interim DIP Order, and subject to the Carve-Out, as set forth more fully in the Interim DIP Order, the DIP Agent for the ratable benefit of the DIP Secured Parties is hereby granted the following securities interests and liens, which shall immediately be valid, binding, perfected, continuing, enforceable and non-avoidable (all liens and security interests granted to the DIP Agent for the benefit of the DIP Secured Parties pursuant to the Interim DIP Order, any Final DIP Order and the other DIP Loan Documents, the "**DIP Liens**"):<br><br>• pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable first priority liens on and security interests in all DIP Collateral that was not encumbered by valid, enforceable, perfected and non-avoidable liens as of the Petition Date;<br><br>• pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable liens on and security interests in (x) all DIP Collateral which is unencumbered by the Prepetition Liens but on which a third party, *i.e.*, not the Prepetition Secured Parties (a "**Third Party Lienholder**"), had a pre-existing lien on the Petition Date and (y) all DIP Collateral encumbered by the Prepetition Liens on which a Third Party Lienholder had a pre-existing lien on the Petition Date that was senior to the Prepetition Liens, in each case junior only to such liens and security interests of Third Party Lienholders, but solely to the extent that such liens and security interests of Third Party Lienholders were in each case valid, enforceable, perfected and non-avoidable as of the Petition Date, and were permitted by the terms of the Prepetition Loan Documents (the "**Senior Third Party Liens**"); and<br><br>• pursuant to section 364(d) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable liens on and security interests in all Prepetition Collateral, which liens and security interests shall be senior to and prime the Prepetition Liens and the liens of all Third Party |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | Lienholders which are *pari passu* with or junior and subject to the Prepetition Liens. |
| | The DIP Liens shall secure all of the DIP Obligations.  The DIP Liens shall not, without the consent of the DIP Agent, be made subject to, or *pari passu* with, any other lien or security interest, other than to the extent expressly provided herein and to the Carve-Out, by any court order heretofore or hereafter entered in the Cases, and shall be valid and enforceable against any trustee appointed in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (such cases or proceedings, "**Successor Cases**"), and/or upon the dismissal of any of the Cases.  The DIP Liens and the Adequate Protection Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code or, upon the entry of the Final DIP Order, the "equities of the case" exception of section 552 of the Bankruptcy Code or section 506(c) of the Bankruptcy Code. |
| | The DIP Obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, at all times constitute an allowed superpriority claim (the "**DIP Superpriority Claim**") of the DIP Agent for the benefit of the DIP Secured Parties, and be payable from and have recourse to all DIP Collateral.  The DIP Superpriority Claim shall be subject and subordinate only to the Carve-Out.  Other than as expressly provided in the Interim DIP Order, including in Paragraph 11 and with respect to the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or *pari passu* with the DIP Liens, the DIP Superpriority Claim or any of the DIP Obligations, or with any other claims of the DIP Secured Parties arising under the Interim DIP Order or under the other DIP Loan Documents, or otherwise in connection with the DIP Facility. |
| | Interim DIP Order at ¶ 2(d)-(g); DIP Credit Agreement at § 2.27(a). |
| Carve-Out<br>Fed. R. Bankr. P. 4001(c)(1)(B) | The DIP Liens, the DIP Superpriority Claim, the Prepetition Liens, the Adequate Protection Claim and the Adequate Protection Superpriority Claim are subject and subordinate to a carve-out (the "**Carve-Out**"), which shall be comprised of the following:  (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) plus (ii) an amount equal to the unpaid professional fees and expenses incurred by the Debtors and the Committee on or after the Petition Date through the date (if any) upon with the DIP Agent provides written notice (as "**Carve-Out Trigger Notice**") to counsel to the Debtors and counsel to the Committee, if one, that an Event of Default (as defined in the DIP Credit Agreement) has occurred and the DIP Agent is electing to trigger the Carve-Out, plus (iii) $50,000 ("**Default Carve-Out Amount**"), which amount may be used subject to the terms of the Interim DIP Order and any Final DIP Order to pay any allowed fees or expenses incurred by the Debtors and the Committee after the date of delivery of the Carve-Out Trigger Notice.  In addition to the foregoing, upon the closing of an Approved Sale (and only upon the closing of an Approved Sale), a fund shall be established in the amount of $225,000 to be used solely for professional fees and expenses incurred by the Debtors' estates after the closing of an Approved Sale, including in connection with a plan of reorganization permitted hereunder or under the Final DIP Order, with any used portion thereof to be available for distribution to any unpaid administrative expenses or unsecured claims; provided that the use of the Post-Sale Carve-Out shall be consistent with the DIP |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | Budget; provided, further, that the Post-Sale Carve-Out shall be reduced on a dollar for dollar basis by the amount of the Default Carve-Out Amount in the event that the DIP Agent issues a Carve-Out Trigger Notice.<br><br>*See* Interim DIP Order at ¶ 9; DIP Credit Agreement at § 2.27(a). |
| Section 552(b)<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Subject to the entry of the Final DIP Order, the DIP Secured Parties and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or the DIP Collateral.<br><br>*See* Interim DIP Order at ¶ 20(g). |
| Adequate Protection<br>Fed. R. Bankr. P. 4001(b)(1)(B)(iv) & 4001(c)(1)(B)(ii) | To the extent of, and in an aggregate amount equal to, the diminution in value of such interests, from and after the Petition Date, calculated in accordance with section 506(c) of the Bankruptcy Code, resulting from, among other things, the use, sale or lease by the Debtors of the Prepetition Collateral (including the use of Cash Collateral), the granting of the DIP Liens, the subordination of the Prepetition Liens thereto and to the Carve-Out, the imposition or enforcement of the automatic stay of section 362(a) (collectively, "**Diminution in Value**"), the Prepetition Secured Parties shall have pursuant to section 361, 363(e) and 364(d) of the Bankruptcy Code, replacement security interests in and liens upon (the "**Adequate Protection of Liens**") all of the DIP Collateral. The Adequate Protection Liens of the Prepetition Secured Parties shall be junior and subject to the DIP Liens and any Senior Third Party Liens. The Adequate Protection Liens shall in all cases be subject to the Carve-Out.<br><br>To the extent of the aggregate Diminution in Value, the Prepetition Secured Parties shall have, subject to the payment of the Carve-Out, an allowed superpriority administrative expense claim (the "**Adequate Protection Superpriority Claim**") as provided for in section 507(b) of the Bankruptcy Code, immediately junior and subject to the DIP Superpriority Claim, and payable from and having recourse to all DIP Collateral; provided, that the Prepetition Secured Parties shall not receive or retain any payments, property, distribution or other amounts in respect of the Adequate Protection Superpriority Claim unless and until the DIP Obligations and (without duplication) the DIP Superpriority Claim have indefeasibly been paid in full in cash.<br><br>The Prepetition Agent (on behalf of the Prepetition Secured Parties) shall receive from the Debtors upon the entry of this Interim DIP Order, immediate cash payment of all accrued and unpaid fees and disbursements (including legal and advisory fees and expenses) owing to the Prepetition Agent or the Prepetition Secured Parties under the Prepetition Loan Documents and incurred prior to the Petition Date.<br><br>*See* Interim DIP Order at ¶ 4. |
| Modification of the Automatic Stay<br>Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | The automatic stay imposed under section 362(a) of the Bankruptcy Code shall be modified pursuant to the terms of the DIP Loan Documents as necessary to (i) permit the Debtors to grant the Adequate Protection Liens and the DIP Liens and to incur all DIP Obligations and all liabilities and obligations to the Prepetition Secured Parties hereunder and under the other DIP Loan Documents, as the case may be, and (ii) authorize the DIP Agent and the Prepetition Agent to retain and apply payments, and otherwise enforce their respective rights and remedies under the DIP Orders. |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | *See* Interim DIP Order at ¶ 17.d. |
| Waiver / Modification of Applicable Non-Bankruptcy Law Relating to Perfection or Enforceability of Liens<br>Fed. R. Bankr. P. 4001(c)(1)(B)(vii) | This Interim DIP Order shall be sufficient and conclusive evidence of the validity, perfection and priority of the DIP Liens and the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted in the Interim DIP Order.<br><br>*See* Interim DIP Order at ¶ 7. |
| Debtor Stipulations<br>Fed. R. Bankr. P. 4001(c)(1)(B)(iii) | As of the Petition Date, the Debtors were indebted and liable to the Prepetition Agent and the Prepetition Secured Parties under the Prepetition Loan Documents, without objection, defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $56,925,000 with respect to the Prepetition Facility, plus accrued interest (including paid-in-kind interest) in the amount of $4,719,401.06, plus unpaid amendment fees thereon in the additional amount of approximately just over $1,019,250 plus, in connection with the foregoing amounts, certain expenses, and all other obligations payable under the Prepetition Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the Prepetition Loan Documents (collectively, the "**Prepetition Facility Obligations**").<br><br>The Prepetition Loan Documents and the Prepetition Secured Obligations are (a) legal, valid, binding, and enforceable against each Debtor, and (b) not subject to any contest, attack, objection, recoupment, defense, counterclaim, offset, subordination, re-characterization, avoidance or other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.<br><br>The liens and security interests (collectively, the "**Prepetition Liens**") granted by the Debtors under the Prepetition Loan Documents to or for the benefit of the Prepetition Agent and the other Prepetition Secured Parties as security for the Prepetition Secured Obligations encumber substantially all of the Debtors' assets and property (all such assets and property, as the same existed on or at any time prior to the Petition Date, including, without limitation, the Prepetition Collateral). The Prepetition Liens have been properly recorded and perfected under applicable non-bankruptcy law, and are legal, valid, enforceable, non-avoidable, and not subject to contest, avoidance, attack, offset, re-characterization, subordination or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise. As of the Petition Date, and without giving effect to the Interim DIP Order, the Debtors are not aware of any liens or security interests having priority over the Prepetition Liens, except the Senior Third Party Liens. The Prepetition Liens were granted to or for the benefit of the Prepetition Agent and the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby.<br><br>*See* Interim DIP Order at ¶ I(i)-(iii). |
| Indemnification<br>Fed. R. Bankr. P. 4001(c)(1)(B)(ix) | The Prepetition Agent, the Prepetition Secured Parties and the DIP Secured Parties shall be indemnified and held harmless by the Debtors in respect of any claim or liability incurred in connection with or related in any way to |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | negotiating, implementing, documenting or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to all transactions contemplated by the foregoing. *See* Interim DIP Order at ¶ I(iv). |
| Release<br>Fed. R. Bankr. P. 4001(c)(1)(B)(viii) | The Debtors forever and irrevocably release, discharge, and acquit all former, current and future (a) DIP Secured Parties, (b) Prepetition Secured Parties (c) Affiliates of the DIP Secured Parties and the Prepetition Secured Parties and (d) officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors and successors in interest of each of the DIP Secured Parties, the Prepetition Secured Parties and each of their respective Affiliates, in each case acting in such capacity (collectively, the "**Releasees**") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Loan Documents, the Prepetition Loan Documents and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Agent, the Prepetition Secured Parties and/or the DIP Secured Parities. *See* Interim DIP Order at ¶ I(vii). |
| Challenge Period<br>Fed. R. Bankr. P. 4001(c)(1)(B)(viii) | Except as set forth below in the immediately following sentence, all of the findings, agreements, terms, provisions and stipulations set forth in Paragraph I of the Interim DIP Order (the "**Claims Stipulations**"), shall be immediately and irrevocably binding on all persons and entities.  Notwithstanding the foregoing, nothing in the Interim DIP Order shall prejudice any rights (if any) a Committee (or any other party with standing to do so) may have (a) to object to or challenge any of the Claims Stipulations, including in relation to (i) the validity, extent, perfection or priority of the Prepetition Liens on the Prepetition Collateral, or (ii) the validity, allowability, priority, status or amount of the Prepetition Secured Obligations, or (b) to bring suit against any of the Prepetition Secured Parties in connection with or related to the matters covered by the Claims Stipulations; provided, that unless any Committee or such other party with standing to do so, commences an adversary proceeding or contested matter (as applicable) raising such objection or challenge, including without limitation any claim against the Prepetition Secured Parties in the nature of a setoff, counterclaim or defense to the Prepetition Secured Obligations (including but not limited to, those under sections 506 (subject to the waiver of section 506(c) claims as may be provided in the Interim DIP Order and the Final DIP Order, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition Secured Parties), by the date that is the later of |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | (x) 30 days following the appointment of a Committee, but with such date in no event later than 60 days following the entry of the Interim DIP Order and (y) 45 days following entry of Interim DIP Order (the period described in the immediately preceding clause shall be referred to as the "**Challenge Period**," and the date that is the next calendar day after the termination of the Challenge Period shall be referred to as the "**Challenge Period Termination Date**"), upon the Challenge Period Termination Date, any and all such challenges and objections by and Committee, and chapter 11 or chapter 7 trustee appointed herein or in any Successor Case, and any other party in interest shall be deemed to be forever waived and barred, and the Prepetition Secured Obligations shall be deemed to be an allowed secured claim within the meaning of sections 502 and 506 of the Bankruptcy Code for all purposes in connection with the Cases up to the amount of the value of the Prepetition Collateral and an allowed unsecured claim for any amount in excess of the value of the Prepetition Collateral, and the Claims Stipulations shall be binding on all creditors, interest holders and parties in interest.  To the extent any such objection or complaint is filed, the Claims Stipulations shall nonetheless remain binding and preclusive except to the extent expressly challenged in such objection or complaint. *See* Interim DIP Order at ¶ 8. |
| 506(c) Waiver<br>Fed. R. Bankr. P.<br>4001(c)(1)(B)(x) | Subject to the entry of the Final DIP Order, as a further condition of the DIP Facility, any obligation of the DIP Secured Parties to make DIP Extensions of Credit, and the Debtors' authorization to use the Cash Collateral, the Debtors (and any successor thereto or any representative thereof, including any trustee appointed in the Cases or any Successor Cases) shall be deemed to have waived any rights, benefits or causes of action under section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Secured Parties, the DIP Liens, the DIP Collateral, the Prepetition Secured Parties, the Adequate Protection Liens, the Prepetition Liens or the Prepetition Collateral.  Nothing contained in the Interim DIP Order, in the Final DIP Order or in the other DIP Loan Documents shall be deemed a consent by the Prepetition Secured Parties or the DIP Secured Parties to any charge, lien, assessment or claim against, or in respect of, the DIP Collateral or the Prepetition Collateral under section 506(c) of the Bankruptcy Code or otherwise. *See* Interim DIP Order at ¶ 11. |
| Lien on Avoidance Actions<br>Fed. R. Bankr. P.<br>4001(c)(1)(B)(xi) | For the avoidance of doubt, the DIP Collateral shall not include Avoidance Actions, but shall, upon entry of a Final DIP Order, include the proceeds of Avoidance Actions, which shall be avoidable to pay any administrative claim held by the Prepetition Agent and/or any Prepetition Lender in respect of any obligations under the Prepetition Credit Documents and by the DIP Agent and/or any Lender in respect of the DIP Facility. *See* Interim DIP Order at ¶ 2(d). |

## **REQUEST FOR EXPEDITED RELIEF**

25.     The Debtors request expedited relief on this Motion.  The Debtors have scheduled and served a number of "first day" motions designed to facilitate an orderly transition to chapter 11.  The granting of this Motion on an expedited basis will ensure the Debtors' continued

uninterrupted operations.  Any shutdown of the Debtors' operations would damage relationships with customers and vendors, undermine employee confidence and, at this critical juncture, further impair the Debtors' liquidity and financial position.  Expedited relief is essential to preserve the going-concern value of the Debtors' estates for their employees, customers, vendors, lenders and other parties in interest, and to induce stakeholders to continue working for or with the Debtors.

26.     Pursuant to Local Rule 9013-2, this Motion is verified and is accompanied by a memorandum of law (attached hereto as **Exhibit E**), a proposed order and proof of service.

27.     Pursuant to Local Rule 9013-2, the Debtors give notice that they may, if necessary, call (i) Gabriel G. Claypool, Chief Executive Officer of Dakota Plains Holdings, Inc., 294 Grove Lane East, Wayzata, MN  55391 or (ii) Marty Beskow, Chief Financial Officer, Dakota Plains Holdings, Inc., 294 Grove Lane East, Wayzata, MN  55391, and/or (iii) Michael V. Balistreri of Canaccord Genuity, Inc., 350 Madison Avenue, New York, NY  10017 to testify at the hearing on the Motion regarding the facts set forth herein.

## REQUEST FOR FINAL HEARING

28.     Pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

29.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

30.     Notice of this Motion has been given to all parties entitled to notice under Local Rule 9013-3(a)(2).   In light of the nature of the relief requested, the Debtors submit that no further notice is necessary.

## NO PRIOR REQUEST

31.     No prior request for the relief sought in this Motion has been made by the Debtors to this or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully requests that the Court enter the DIP Orders granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  December 21, 2016                    Respectfully submitted,


                                             /e/ Michael F. McGrath
                                             Michael F. McGrath (#168610)
                                             Will R. Tansey (#323056)
                                             RAVICH MEYER KIRKMAN MCGRATH NAUMAN
                                             & TANSEY, PA
                                             150 S. Fifth Street, Suite 3450
                                             Minneapolis, MN  55402
                                             Telephone:  612.317.4744
                                             Email: mfmcgrath@ravichmeyer.com
                                                     wrtanser@ravichmeyer.com


                                             Elizabeth A. Green
                                             Jimmy D. Parrish
                                             BAKER & HOSTETLER LLP
                                             SunTrust Center, Suite 2300
                                             200 South Orange Avenue
                                             Orlando, FL  32801-3432
                                             Telephone:  407.649.4000
                                             Email: egreen@bakerlaw.com
                                                     jparrish@bakerlaw.com


                                             Eric R. Goodman
                                             BAKER & HOSTETLER LLP
                                             Key Tower, 127 Public Square
                                             Suite 2000
                                             Cleveland, OH  44114-1214
                                             Telephone:  216.621.0200
                                             Email: egoodman@bakerlaw.com


                                             *Proposed Counsel for the Debtors and Debtors
                                             in Possession*

## VERIFICATION

I, Marty Beskow, Chief Financial Officer of Dakota Plains Holdings, Inc., based upon my personal information and belief, declare under penalty of perjury that the facts set forth in the preceding Motion for Entry of Interim and Final Orders (I) Granting an Expedited Hearing, (II) Authorizing the Debtors (A) to Utilize Cash Collateral of the Prepetition Secured Parties, (B) to Obtain Postpetition Secured Financing, and (C) to Provide Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief are true and correct to the best of my knowledge, information and belief.

Dated:  December 20, 2016                    Signed:  _Marty J Beskow_

                                                      Marty Beskow

## EXHIBIT A

DIP CREDIT AGREEMENT

**POST-PETITION REVOLVING CREDIT AGREEMENT**

dated as of December [__], 2016

among

**DAKOTA PLAINS TRANSLOADING, LLC,**
**DAKOTA PLAINS SAND, LLC and**
**DAKOTA PLAINS MARKETING, LLC**
as Borrowers

**DAKOTA PLAINS HOLDINGS, INC.**

**THE LENDERS FROM TIME TO TIME PARTY HERETO**

and

**SUNTRUST BANK**
as Administrative Agent

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS; CONSTRUCTION ...................................................................2
Section 1.1.    Definitions...............................................................................2
Section 1.2.    [Reserved].............................................................................22
Section 1.3.    Accounting Terms and Determination.................................22
Section 1.4.    Terms Generally ....................................................................22

Article II AMOUNT AND TERMS OF THE COMMITMENTS .............................23
Section 2.1.    General Description of Facilities..........................................23
Section 2.2.    Revolving Loans....................................................................23
Section 2.3.    Procedure for Revolving Borrowings...................................23
Section 2.4.    [Reserved].............................................................................23
Section 2.5.    [Reserved].............................................................................23
Section 2.6.    Funding of Borrowings.........................................................23
Section 2.7.    Reserved................................................................................24
Section 2.8.    Optional Reduction and Termination of Commitments .......24
Section 2.9.    Repayment of Loans..............................................................25
Section 2.10.   Evidence of Indebtedness ....................................................25
Section 2.11.   Optional Prepayments...........................................................25
Section 2.12.   Mandatory Prepayments.......................................................26
Section 2.13.   Interest on Loans ..................................................................27
Section 2.14.   Reserved................................................................................27
Section 2.15.   Computation of Interest and Fees.........................................27
Section 2.16.   Reserved................................................................................27
Section 2.17.   Reserved................................................................................27
Section 2.18.   Reserved................................................................................27
Section 2.19.   Reserved................................................................................27
Section 2.20.   Taxes.....................................................................................27
Section 2.21.   Payments Generally; Pro Rata Treatment; Sharing of Set-offs ............30
Section 2.22.   Reserved................................................................................32
Section 2.23.   Reserved................................................................................32
Section 2.24.   Mitigation of Obligations.....................................................32
Section 2.25.   [Reserved].............................................................................32
Section 2.26.   [Reserved].............................................................................32
Section 2.27.   Priority and Liens .................................................................32

Article III CONDITIONS PRECEDENT TO LOANS .............................................34
Section 3.1.    Conditions to Effectiveness .................................................34
Section 3.2.    Conditions to Each Credit Event ..........................................38
Section 3.3.    Delivery of Documents.........................................................38

Article IV REPRESENTATIONS AND WARRANTIES...........................................38
Section 4.1.    Existence; Power ..................................................................38
Section 4.2.    Organizational Power; Authorization...................................39

i

Section 4.3.      Governmental Approvals; No Conflicts ...............................................39
Section 4.4.       Reserved...............................................................................................39
Section 4.5.      Litigation and Environmental Matters...............................................39
Section 4.6.      Compliance with Laws and Agreements ............................................40
Section 4.7.      Investment Company Act ...................................................................40
Section 4.8.      Taxes...................................................................................................40
Section 4.9.      Margin Regulations ...........................................................................40
Section 4.10.     ERISA.................................................................................................40
Section 4.11.     Ownership of Property; Insurance......................................................41
Section 4.12.     Disclosure ..........................................................................................41
Section 4.13.     Labor Relations .................................................................................42
Section 4.14.     Subsidiaries .......................................................................................42
Section 4.15.     [Reserved] ..........................................................................................42
Section 4.16.     Deposit and Disbursement Accounts..................................................42
Section 4.17.     Collateral Documents ........................................................................42
Section 4.18.     Material Agreements ..........................................................................42
Section 4.19.     Reserved.............................................................................................43
Section 4.20.     OFAC..................................................................................................43
Section 4.21.     Patriot Act ..........................................................................................43
Section 4.22.     Inactive Subsidiaries .........................................................................43
Section 4.23.     Bankruptcy Matters ...........................................................................43

Article V AFFIRMATIVE COVENANTS ...........................................................44

Section 5.1.      Approved Budget Reconciliations......................................................44
Section 5.2.      Notices of Material Events.................................................................44
Section 5.3.      Existence; Conduct of Business .........................................................45
Section 5.4.      Compliance with Laws ......................................................................45
Section 5.5.      Payment of Obligations .....................................................................45
Section 5.6.      Books and Records ............................................................................46
Section 5.7.      Visitation and Inspection ...................................................................46
Section 5.8.      Maintenance of Properties; Insurance ...............................................46
Section 5.9.      Use of Proceeds; Margin Regulations ...............................................46
Section 5.10.     Casualty and Condemnation ..............................................................47
Section 5.11.     Agreement to Deliver Collateral Documents......................................47
Section 5.12.     Reserved.............................................................................................47
Section 5.13.     Reserved.............................................................................................48
Section 5.14.     Further Assurances .............................................................................48
Section 5.15.     Acceptable Sale Process Milestones ..................................................48
Section 5.16.     Prepetition Credit Documents Reporting Requirements .....................48
Section 5.17.     Performance of Postpetition Obligations............................................48

Article VI FINANCIAL COVENANTS...............................................................49

Section 5.17.     Approved Budget Variance ................................................................49

Article VII NEGATIVE COVENANTS ...............................................................49

Section 7.1.      Indebtedness and Preferred Equity.....................................................49
Section 7.2.      Liens ..................................................................................................50

ii

Section 7.3. Fundamental Changes ........................................................................50
Section 7.4. Investments, Loans ...........................................................................50
Section 7.5. Restricted Payments ..........................................................................51
Section 7.6. Sale of Assets ...................................................................................51
Section 7.7. Transactions with Affiliates ...............................................................51
Section 7.8. Restrictive Agreements ......................................................................51
Section 7.9. Sale and Leaseback Transactions ........................................................52
Section 7.10. Hedging Transactions ........................................................................52
Section 7.11. Amendment to Material Documents .....................................................52
Section 7.12. [Reserved] .......................................................................................52
Section 7.13. Accounting Changes ..........................................................................52
Section 7.14. Lease Obligations .............................................................................52
Section 7.15. Government Regulation ......................................................................52
Section 7.16. Inactive Subsidiaries .........................................................................52
Section 7.17. Bankruptcy Matters ..........................................................................53

Article VIII EVENTS OF DEFAULT .............................................................................53

Section 8.1. Events of Default ..............................................................................53
Section 8.2. Application of Proceeds from Collateral ..............................................58

Article IX THE ADMINISTRATIVE AGENT ..................................................................58

Section 9.1. Appointment of the Administrative Agent ............................................58
Section 9.2. Nature of Duties of the Administrative Agent .......................................59
Section 9.3. Lack of Reliance on the Administrative Agent .......................................59
Section 9.4. Certain Rights of the Administrative Agent ..........................................60
Section 9.5. Reliance by the Administrative Agent ..................................................60
Section 9.6. The Administrative Agent in its Individual Capacity ...............................60
Section 9.7. Successor Administrative Agent ..........................................................60
Section 9.8. Withholding Tax ................................................................................61
Section 9.9. The Administrative Agent May File Proofs of Claim ...............................62
Section 9.10. Authorization to Execute Other Loan Documents ..................................63
Section 9.11. Collateral and Guaranty Matters .........................................................63
Section 9.12. Reserved .........................................................................................63
Section 9.13. Right to Realize on Collateral and Enforce Guarantee...........................63
Section 9.14. [Reserved] .......................................................................................64

Article X MISCELLANEOUS .......................................................................................64

Section 10.1. Notices ...........................................................................................64
Section 10.2. Waiver; Amendments ........................................................................67
Section 10.3. Expenses; Indemnification .................................................................69
Section 10.4. Successors and Assigns .....................................................................70
Section 10.5. Governing Law; Jurisdiction; Consent to Service of Process...................74
Section 10.6. WAIVER OF JURY TRIAL ...................................................................75
Section 10.7. Right of Set-off ................................................................................75
Section 10.8. Counterparts; Integration ..................................................................75
Section 10.9. Survival ..........................................................................................75
Section 10.10. Severability .....................................................................................76

iii

Section 10.11.   Confidentiality................................................................................76
Section 10.12.   Interest Rate Limitation ....................................................................77
Section 10.13.   Waiver of Effect of Corporate Seal ...................................................77
Section 10.14.   Patriot Act ........................................................................................77
Section 10.15.   No Advisory or Fiduciary Responsibility ...........................................77
Section 10.16.   Location of Closing ...........................................................................78
Section 10.17.   Swaps................................................................................................78
Section 10.18.   Joint and Several ..............................................................................78

iv

Schedules

| Schedule I | Commitment Amounts |
| Schedule 4.5 | Environmental Matters |
| Schedule 4.11 | Real Estate |
| Schedule 4.14 | Subsidiaries |
| Schedule 4.16 | Deposit and Disbursement Accounts |
| Schedule 4.18 | Material Agreements |

Exhibits

| Exhibit A | Form of Assignment and Acceptance |
| Exhibit 2.3 | Form of Notice of Revolving Borrowing |

CHAR2\1829046v7

## POST-PETITION REVOLVING CREDIT AGREEMENT

**THIS POST-PETITION REVOLVING CREDIT AGREEMENT** (this "<u>Agreement</u>") is made and entered into as of [December __, 2016], by and among **DAKOTA PLAINS TRANSLOADING, LLC,** a Minnesota limited liability company ("<u>Dakota Transloading</u>"), **DAKOTA PLAINS SAND, LLC,** a Minnesota limited liability company ("<u>Dakota Sand</u>"), **DAKOTA PLAINS MARKETING, LLC,** a Minnesota limited liability company ("<u>Dakota Marketing</u>" and, together with Dakota Transloading and Dakota Sand, collectively, the "<u>Borrowers</u>" and, individually, each, a "<u>Borrower</u>"), **DAKOTA PLAINS HOLDINGS, INC.,** a Nevada corporation ("<u>Holdings</u>"), the several banks and other financial institutions and lenders from time to time party hereto (the "<u>Lenders</u>") and **SUNTRUST BANK,** in its capacity as administrative agent for the Lenders (the "<u>Administrative Agent</u>").

## WITNESSETH:

WHEREAS, on [December __, 2016] (the "<u>Petition Date</u>"), the Loan Parties filed voluntary petitions for relief under Title 11 of the United States Code entitled "<u>Bankruptcy</u>" (as now or hereafter in effect, or any successor thereto, the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Minnesota (the "<u>Bankruptcy Court</u>") (such cases being jointly administered under Case No. [_____] are herein referred to as the "<u>Chapter 11 Case</u>"), and such Loan Parties continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrowers have requested that the Lenders provide a senior secured superpriority debtor-in-possession credit facility to the Borrowers in an aggregate principal amount not to exceed $2,000,000 (the "<u>DIP Facility</u>");

WHEREAS, the Lenders are willing to make certain loans at the request of the Borrowers of up to the amount of the Commitments under the DIP Facility upon the terms and conditions set forth herein;

WHEREAS, each of the Borrowers and Holdings acknowledges that such Borrower or Holdings, as applicable, will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrowers as provided in this Agreement;

WHEREAS, to provide security for the repayment of all obligations of any kind of the Loan Parties hereunder and under the other Loan Documents, each of the Loan Parties will provide to the Administrative Agent (for the benefit of the Lenders) the Liens, status and protection set forth in the Interim DIP Order and Final DIP Order; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and the Loans to be made by Lenders, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

# ARTICLE I

# DEFINITIONS; CONSTRUCTION

**Section 1.1.    Definitions**.  In addition to the other terms defined herein, the following terms used herein shall have the meanings herein specified (to be equally applicable to both the singular and plural forms of the terms defined):

"Acceptable Sale Process" means that on or about the Petition Date (a) the Borrowers shall have filed a motion (the "Sale Motion") pursuant to Section 363 of the Bankruptcy Code, in form and substance satisfactory to the Administrative Agent, to sell all or substantially all of the assets as provided by and in accordance with the Bid Procedures Order and (b) the Borrowers shall have filed a motion (the "Bid Procedures Motion"), in form and substance satisfactory to the Administrative Agent, seeking approval of the Bid Procedures Order.

"Acquisition" shall mean (a) any Investment by any Borrower or any of its Subsidiaries in any other Person organized in the United States (with substantially all of the assets of such Person and its Subsidiaries located in the United States), pursuant to which such Person shall become a Subsidiary of any Borrower or any of its Subsidiaries or shall be merged with any Borrower or any of its Subsidiaries or (b) any acquisition by any Borrower or any of its Subsidiaries of the assets of any Person (other than a Subsidiary of any Borrower) that constitute all or substantially all of the assets of such Person or a division or business unit of such Person, whether through purchase, merger or other business combination or transaction (and substantially all of such assets, division or business unit are located in the United States).  With respect to a determination of the amount of an Acquisition, such amount shall include all consideration (including any deferred payments) set forth in the applicable agreements governing such Acquisition as well as the assumption of any Indebtedness in connection therewith.

"Additional Lender" shall have the meaning set forth in Section 2.23.

"Administrative Agent" shall have the meaning set forth in the introductory paragraph hereof.

"Administrative Questionnaire" shall mean, with respect to each Lender, an administrative questionnaire in the form provided by the Administrative Agent and submitted to the Administrative Agent duly completed by such Lender.

"Affiliate" shall mean, as to any Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person.  For purposes of this definition, "Control" shall mean the power, directly or indirectly, either to (i) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of a Person or (ii) direct or cause the direction of the management and policies of a Person, whether through the ability to exercise voting power, by control or otherwise.  The terms "Controlled by" and "under common Control with" have the meanings correlative thereto.

"Aggregate Revolving Commitment Amount" shall mean the aggregate principal amount of the Aggregate Revolving Commitments from time to time.

"Aggregate Revolving Commitments" shall mean all Revolving Commitments of all Lenders at any time outstanding.

"Anti-Corruption Laws" shall mean all laws, rules, and regulations of any jurisdiction applicable to Holdings or any of its Subsidiaries from time to time concerning or relating to bribery or corruption.

"Anti-Terrorism Order" shall mean Executive Order 13224, signed by President George W. Bush on September 23, 2001.

"Applicable Lending Office" shall mean, for each Lender, the "Lending Office" of such Lender (or an Affiliate of such Lender) in the Administrative Questionnaire submitted by such Lender or such other office of such Lender (or such Affiliate of such Lender) as such Lender may from time to time specify to the Administrative Agent and the Borrowers as the office by which its Loans are to be made and maintained.

"Approved Budget" shall have the meaning set forth in Section 3.1(g).

"Approved Fund" shall mean any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (i) a Lender, (ii) an Affiliate of a Lender or (iii) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignment and Acceptance" shall mean an assignment and acceptance entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 10.4(b)) and accepted by the Administrative Agent, in the form of Exhibit A attached hereto or any other form approved by the Administrative Agent.

"Availability Period" shall mean the period from the Closing Date to but excluding the Maturity Date.

"Avoidance Actions" means actions for preferences, fraudulent conveyances, and other avoidance power claims under Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code.

"Base Rate" shall mean the highest of (i) the rate which the Administrative Agent announces from time to time as its prime lending rate, as in effect from time to time, and (ii) the Federal Funds Rate, as in effect from time to time, plus one-half of one percent (0.50%) *per annum*. The Administrative Agent's prime lending rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. The Administrative Agent may make commercial loans or other loans at rates of interest at, above, or below the Administrative Agent's prime lending rate.

"Bid Procedures Order" shall mean an order substantially in the form that is attached to the Bid Procedures Motion.

"Borrower" and "Borrowers" shall have the meanings set forth in the introductory paragraph hereof.

3

"Borrowing" shall mean a borrowing consisting of Loans.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which commercial banks in Atlanta, Georgia are authorized or required by law to close.

"Capital Lease Obligations" of any Person shall mean all obligations of such Person to pay rent or other amounts under any lease (or other arrangement conveying the right to use) of real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Capital Stock" shall mean all shares, options, warrants, general or limited partnership interests, membership interests or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity whether voting or nonvoting, including common stock, preferred stock or any other "equity security" (as such term is defined in Rule 3a1 1-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Exchange Act).

"Carve-Out" has the meaning given to such term in the Interim DIP Order and, as applicable, the Final DIP Order.

"Carve-Out Trigger Notice" has the meaning given to such term in the Interim DIP Order and, as applicable, the Final DIP Order.

"Cash Collateral" means, all "Cash Collateral" as defined by Section 363 of the Bankruptcy Code, all deposits subject to setoff and cash arising from the collection or other conversion to cash of property of the Loan Parties in which the Prepetition Lenders or Prepetition Agent has a security interest, Lien or mortgage, whether such security interests, liens or mortgages existed as of the commencement of the Chapter 11 Case or arise thereafter pursuant to an Order, and whether the property converted to cash existed as of the commencement of the Chapter 11 Case or arose or was generated thereafter, including, without limitation, all proceeds from the sale or other disposition of the Prepetition Collateral or Collateral.

"Cash Collateralize" shall mean, in respect of any obligations, to provide and pledge (as a first priority perfected security interest) cash collateral for such obligations in Dollars with the Administrative Agent pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent (and "Cash Collateralized" and "Cash Collateralization" have the corresponding meanings).

"Change in Control" shall mean the occurrence of one or more of the following events: (i) any sale, lease, exchange or other transfer (in a single transaction or a series of related transactions) of all or substantially all of the assets of Holdings to any Person or "group" (within the meaning of the Exchange Act and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof), (ii) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or "group" (within the meaning of the Exchange Act and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof) of 30% or more of the outstanding shares of the voting equity interests of Holdings, (iii) during any period of 24 consecutive months, a majority of the members of the board of directors or other equivalent

4

governing body of Holdings cease to be composed of individuals who are Continuing Directors or (iv) Holdings ceases to own, directly or indirectly, 100% of the aggregate ordinary voting and economic power represented by the issued and outstanding equity interests of the Borrowers.

"Change in Law" shall mean (i) the adoption of any applicable law, rule or regulation after the date of this Agreement, (ii) any change in any applicable law, rule or regulation, or any change in the interpretation, implementation or application thereof, by any Governmental Authority after the date of this Agreement, or (iii) compliance by any Lender (or its Applicable Lending Office) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that for, purposes of this Agreement, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Closing Date" shall mean the date on which the conditions precedent set forth in Section 3.1 and Section 3.2 have been satisfied or waived in accordance with Section 10.2.

"Code" shall mean the Internal Revenue Code of 1986, as amended and in effect from time to time, and any successor statute thereto.

"Collateral" shall mean all tangible and intangible property, real and personal, of any Loan Party that is or purports to be the subject of a Lien in favor of the Administrative Agent to secure the whole or any part of the Obligations or any Guarantee thereof, and shall include all casualty insurance proceeds and condemnation awards with respect to any of the foregoing; provided that in no event shall Collateral include Excluded Property (as defined in the Guaranty and Security Agreement).

"Collateral Access Agreement" shall mean each landlord waiver or bailee agreement granted to, and in form and substance reasonably acceptable to, the Administrative Agent.

"Collateral Documents" shall mean, collectively, the Guaranty and Security Agreement, any Real Estate Documents, all Control Account Agreements, all perfection certificates, all Copyright Security Agreements, all Patent Security Agreements, all Trademark Security Agreements, all Collateral Access Agreements, all assignments of key man life insurance policies and all other instruments and agreements now or hereafter securing or perfecting the Liens securing the whole or any part of the Obligations or any Guarantee thereof, all UCC financing statements, fixture filings and stock powers, and all other documents, instruments, agreements and certificates executed and delivered by any Loan Party to the Administrative Agent and the Lenders in connection with the foregoing.

"Commitment" means the Revolving Commitments.

"Commodity Exchange Act" shall mean the Commodity Exchange Act of 1936, as amended and in effect from time to time, and any successor statute thereto.

"Continuing Director" shall mean, with respect to any period, any individuals (A) who were members of the board of directors or other equivalent governing body of Holdings on the first day of such period, (B) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (A) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body, or (C) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (A) and (B) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body.

"Contractual Obligation" of any Person shall mean any provision of any security issued by such Person or of any agreement, instrument or undertaking under which such Person is obligated or by which it or any of the property in which it has an interest is bound.

"Control Account Agreement" shall mean any tri-party agreement by and among a Loan Party, the Administrative Agent and a depositary bank or securities intermediary at which such Loan Party maintains a Controlled Account, in each case in form and substance satisfactory to the Administrative Agent.

"Controlled Account" shall have the meaning set forth in Section 5.11.

"Copyright" shall have the meaning assigned to such term in the Guaranty and Security Agreement.

"Copyright Security Agreement" shall mean any copyright security agreement or similar document executed by a Loan Party owning registered Copyrights or applications for Copyrights in favor of the Administrative Agent for the benefit of the Secured Parties.

"Default" shall mean any condition or event that, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Interest" shall have the meaning set forth in Section 2.13(c).

"Dollar(s)" and the sign "$" shall mean lawful money of the United States.

"Domestic Subsidiary" shall mean each Subsidiary of each Borrower that is organized under the laws of the United States or any state or district thereof.

"DPTSM" shall mean DPTS Marketing, LLC, a Minnesota limited liability company.

"Environmental Claim" shall mean any liens, damages, losses, penalties, claims, litigation, demands, judgments, suits or legal proceedings directly or indirectly resulting from or based upon (i) any actual or alleged violation of any Environmental Law, (ii) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (iii) any actual or alleged exposure to any Hazardous Materials, (iv) the Release or threatened Release of any Hazardous Materials or (v) any contract, agreement or other consensual arrangement pursuant to which liability of another Person is assumed by or imposed upon Holdings or any of its Subsidiaries with respect to any of the foregoing.

CHAR2\1829046v7

"<u>Environmental Indemnity</u>" shall mean each environmental indemnity made by each Loan Party with Real Estate required to be pledged as Collateral in favor of the Administrative Agent for the benefit of the Secured Parties, in each case in form and substance satisfactory to the Administrative Agent.

"<u>Environmental Laws</u>" shall mean all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by or with any Governmental Authority relating in any way to the environment, the preservation or reclamation of natural resources, the management, Release or threatened Release of any Hazardous Material, the protection of human health and the environment or health and safety matters.

"<u>ERISA</u>" shall mean the Employee Retirement Income Security Act of 1974, as amended and in effect from time to time, and any successor statute thereto and the regulations promulgated and rulings issued thereunder.

"<u>ERISA Affiliate</u>" shall mean any person that for purposes of Title I or Title IV of ERISA or Section 412 of the Code would be deemed at any relevant time to be a "single employer" or otherwise aggregated with Holdings or any of its Subsidiaries under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"<u>ERISA Event</u>" shall mean (i) any "reportable event" as defined in Section 4043 of ERISA with respect to a Plan (other than an event as to which the PBGC has waived under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4043 the requirement of Section 4043(a) of ERISA that it be notified of such event); (ii) any failure to make a required contribution to any Plan that would result in the imposition of a lien or other encumbrance or the provision of security under Section 430 of the Code or Section 303 or 4068 of ERISA, or the arising of such a lien or encumbrance, there being or arising any "unpaid minimum required contribution" or "accumulated funding deficiency" (as defined or otherwise set forth in Section 4971 of the Code or Part 3 of Subtitle B of Title 1 of ERISA), whether or not waived, or any filing of any request for or receipt of a minimum funding waiver under Section 412 of the Code or Section 303 of ERISA with respect to any Plan or Multiemployer Plan, or that such filing may be made, or any determination that any Plan is, or is expected to be, in at-risk status under Title IV of ERISA; (iii) any incurrence by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of any liability under Title IV of ERISA with respect to any Plan or Multiemployer Plan (other than for premiums due and not delinquent under Section 4007 of ERISA); (iv) any institution of proceedings, or the occurrence of an event or condition which would reasonably be expected to constitute grounds for the institution of proceedings by the PBGC, under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (v) any incurrence by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan, or the receipt by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of any notice that a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA; (vi) any receipt by Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of any notice, or any receipt by any Multiemployer Plan from Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization,

7

within the meaning of Title IV of ERISA; (vii) engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA; or (viii) any filing of a notice of intent to terminate any Plan if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA, any filing under Section 4041(c) of ERISA of a notice of intent to terminate any Plan, or the termination of any Plan under Section 4041(c) of ERISA.

"Event of Default" shall have the meaning set forth in Section 8.1.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended and in effect from time to time.

"Excluded Taxes" shall mean, with respect to any Recipient of any payment to be made by or on account of any obligation of the Borrowers hereunder, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, and (b) any U.S. federal withholding Taxes that (i) are imposed on amounts payable to such Recipient pursuant to a law in effect on the date on which such Recipient becomes a Recipient under this Agreement (other than pursuant to an assignment request by the Borrowers under Section 2.25) or designates a new lending office, except in each case to the extent that amounts with respect to such Taxes were payable either (A) to such Recipient's assignor immediately before such Recipient became a Recipient under this Agreement or (B) to such Recipient immediately before it designated a new lending office, (ii) are attributable to such Recipient's failure to comply with Section 2.20(f), or (iii) are imposed as a result of a failure by such Recipient to satisfy the conditions for avoiding withholding under FATCA.

"FATCA" shall mean Sections 1471 through 1474 of the Code as of the date of this Agreement, any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b) of the Code.

"Federal Funds Rate" shall mean, for any day, the rate *per annum* (rounded upwards, if necessary, to the next 1/100 of 1%) equal to the weighted average of the rates on overnight federal funds transactions with member banks of the Federal Reserve System arranged by federal funds brokers, as published by the Federal Reserve Bank of New York on the next succeeding Business Day or, if such rate is not so published for any Business Day, the Federal Funds Rate for such day shall be the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day on such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by the Administrative Agent.

"Final DIP Order" means, collectively, the final order or orders entered by the Bankruptcy Court with respect to the Loan Parties in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2), authorizing and approving the DIP Facility and the terms of this Agreement and the other Loan Documents (including the payment of interest, fees, costs and expenses hereunder and thereunder) and granting the Liens, status and protections set forth in Section 2.27 hereof and provided for in the Collateral Documents, which order or judgment is in

CHAR2\1829046v7

effect and not stayed, and as to which the time to appeal, petition for certiorari, or move for re-argument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for re-argument or rehearing shall then be pending, or, if pending, no stay pending appeal shall have been granted, as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof.

"Final Order Entry Date" means, the date on which the Final DIP Order (which, for the purpose of this definition, shall be determined without regard to whether or not the time to appeal, petition for certiorari, or move for re-argument or rehearing has expired) shall have been entered on the docket of the Bankruptcy Court.

"Fiscal Quarter" shall mean any fiscal quarter of Holdings.  "Fiscal Year" shall mean any fiscal year of Holdings.

"Flood Insurance Laws" shall mean, collectively, (i) the National Flood Insurance Act of 1968, as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973, as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994, as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto, in each case, together with all statutory and regulatory provisions consolidating, amending, replacing, supplementing, implementing or interpreting any of the foregoing, as amended or modified from time to time.

"Foreign Person" shall mean any Person that is not a U.S. Person.

"Foreign Subsidiary" shall mean each Subsidiary of Holdings that is organized under the laws of a jurisdiction other than one of the fifty states of the United States or the District of Columbia.

"GAAP" shall mean generally accepted accounting principles in the United States applied on a consistent basis and subject to the terms of Section 1.3.

"Governmental Authority" shall mean the government of the United States, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Group Members" shall mean Holdings, the Borrowers and the Subsidiaries of the Borrowers.

"Guarantee" of or by any Person (the "guarantor") shall mean any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly and including any obligation, direct or indirect, of the guarantor (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (ii) to purchase or lease property, securities or services for the purpose of

9

assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) as an account party in respect of any letter of credit or letter of guaranty issued in support of such Indebtedness or obligation; underlined provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made or, if not so stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.  The term "Guarantee" used as a verb has a corresponding meaning.

"Guarantors" shall mean Holdings and the Subsidiary Loan Parties which are not Borrowers.

"Guaranty and Security Agreement" shall mean that certain Guaranty and Security Agreement, dated as of the date hereof, made by the Loan Parties in favor of the Administrative Agent for the benefit of the Secured Parties.

"Hazardous Materials" shall mean all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas and infectious or medical wastes regulated pursuant to any Environmental Law.

"Hedging Obligations" of any Person shall mean any and all obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired under (i) any and all Hedging Transactions, (ii) any and all cancellations, buy backs, reversals, terminations or assignments of any Hedging Transactions and (iii) any and all renewals, extensions and modifications of any Hedging Transactions and any and all substitutions for any Hedging Transactions.

"Hedging Transaction" of any Person shall mean (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into by such Person that is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap or option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, spot transaction, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with

10

any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Inactive Subsidiary" shall mean each of Dakota Plains Storage, LLC, a Minnesota limited liability company, and Dakota Plains Trucking, LLC, a Minnesota limited liability company.

"Indebtedness" of any Person shall mean, without duplication, (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person in respect of the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of business), (iv) all obligations of such Person under any conditional sale or other title retention agreement(s) relating to property acquired by such Person, (v) all Capital Lease Obligations of such Person, (vi) all obligations, contingent or otherwise, of such Person in respect of letters of credit, acceptances or similar extensions of credit, (vii) all Guarantees of such Person of the type of Indebtedness described in clauses (i) through (vi) above, (viii) all Indebtedness of a third party secured by any Lien on property owned by such Person, whether or not such Indebtedness has been assumed by such Person, (ix) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person, (x) all Off-Balance Sheet Liabilities and (xi) all Hedging Obligations.  The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, except to the extent that the terms of such Indebtedness provide that such Person is not liable therefor.  The amount of any Indebtedness of a Person for which recourse is limited to an identified asset or assets of such Person shall be equal to the lesser of (x) the amount of such Indebtedness and (y) the fair market value of such asset or assets.  For purposes of this definition, the amount of any Indebtedness represented by a Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation, or portion thereof, in respect of which such Guarantee is made (or, if less, the maximum amount of such primary obligation for which such person may be liable, whether singly or jointly, pursuant to the terms of the instrument, agreements or other documents evidencing such Guarantee) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such person is required to perform thereunder) as determined by such person in good faith.

"Indemnified Taxes" shall mean Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"Interim DIP Order" means, collectively, the interim order or orders entered by the Bankruptcy Court with respect to the Loan Parties in the Chapter 11 Case on or prior to the date occurring five (5) calendar days after the Petition Date, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to each Lender, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents, as applicable, and incur (and guarantee) and secure the Loans and other Obligations in connection therewith, which order shall be in form and substance satisfactory to each Lender, and which shall be deemed satisfactory to each Lender if such order is substantially in the form of [Exhibit     ].

"Investments" shall have the meaning set forth in Section 7.4.

"Lenders" shall have the meaning set forth in the introductory paragraph hereof.

"Lien" shall mean any mortgage, pledge, security interest, lien (statutory or otherwise), charge, encumbrance, hypothecation, assignment, deposit arrangement, or other arrangement having the practical effect of any of the foregoing or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having the same economic effect as any of the foregoing).

"Loan Documents" shall mean, collectively, this Agreement, the Collateral Documents, all Notices of Revolving Borrowing, any promissory notes issued hereunder and any and all other instruments, agreements, documents and writings executed in connection with any of the foregoing.

"Loan Parties" shall mean Holdings, the Borrowers and the Subsidiary Loan Parties.

"Loans" shall mean all Revolving Loans in the aggregate or any of them, as the context shall require, and shall include, where appropriate, any loan made pursuant to Section 2.23.

"Material Adverse Effect" shall mean, with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singularly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences whether or not related, resulting in a material adverse change in, or a material adverse effect on, (i) the business, results of operations, financial condition, assets, liabilities or prospects of Holdings and its Subsidiaries taken as a whole, (ii) the ability of the Loan Parties to perform any of their respective obligations under the Loan Documents, (iii) the rights and remedies of the Administrative Agent or the Lenders under any of the Loan Documents or (iv) the legality, validity or enforceability of any of the Loan Documents.

"Material Agreements" shall mean (i) all agreements, indentures or notes governing the terms of any Material Indebtedness, (ii) all employment and non-compete agreements with any executive officers of Holdings, (iii) all leases of Real Estate, and (iv) all other agreements, documents, contracts, indentures and instruments pursuant to which (A) any Loan Party or any of its Subsidiaries are obligated to make payments in any twelve month period of $1,000,000 or more, (B) any Loan Party or any of its Subsidiaries expects to receive revenue in any twelve month period of $1,000,000 or more or (C) a default, breach or termination thereof could reasonably be expected to result in a Material Adverse Effect.

"Material Indebtedness" shall mean any Indebtedness (other than the Loans) of Holdings or any of its Subsidiaries individually or in an aggregate committed or outstanding principal amount exceeding $2,500,000. For purposes of determining the amount of attributed Indebtedness from Hedging Obligations, the "principal amount" of any Hedging Obligations at any time shall be the Net Mark-to-Market Exposure of such Hedging Obligations.

12

"Maturity Date" shall mean the earlier of (i) 90 days from the Closing Date, (ii) the consummation of the sale transaction contemplated by the Bid Procedures Order, (iii) the date upon which any plan of reorganization or liquidation becomes effective, and (iv) the acceleration of the obligations of the Borrowers under this Agreement in accordance with the terms hereof.

"Moody's" shall mean Moody's investors Service, Inc.

"Mortgaged Property" shall mean, collectively, the Real Estate subject to the Mortgages.

"Mortgages" shall mean each mortgage, deed of trust, deed to secure debt or other real estate security document delivered by any Loan Party to the Administrative Agent from time to time, all in form and substance satisfactory to the Administrative Agent.

"Multiemployer Plan" shall mean any "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or may be an obligation to contribute of) Holdings, any of its Subsidiaries or an ERISA Affiliate, and each such plan for the five-year period immediately following the latest date on which Holdings, any of its Subsidiaries or an ERISA Affiliate contributed to or had an obligation to contribute to such plan.

"Net Mark-to-Market Exposure" of any Person shall mean, as of any date of determination with respect to any Hedging Obligation, the excess (if any) of all unrealized losses over all unrealized profits of such Person arising from such Hedging Obligation. "Unrealized losses" shall mean the fair market value of the cost to such Person of replacing the Hedging Transaction giving rise to such Hedging Obligation as of the date of determination (assuming such Hedging Transaction were to be terminated as of that date), and "unrealized profits" shall mean the fair market value of the gain to such Person of replacing such Hedging Transaction as of the date of determination (assuming such Hedging Transaction were to be terminated as of that date).

"Non-Public Information" shall mean any material non-public information (within the meaning of United States federal and state securities laws) with respect to Holdings, its Affiliates or any of their securities or loans.

"Notice of Revolving Borrowing" shall have the meaning set forth in Section 2.3.

"Obligations" shall mean all amounts owing by the Loan Parties to the Administrative Agent or any Lender pursuant to or in connection with this Agreement or any other Loan Document or otherwise with respect to any Loan including all principal, interest (including any interest accruing after the filing of any petition in bankruptcy or the commencement of any insolvency, reorganization or like proceeding relating to any Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), reimbursement obligations, fees, expenses, indemnification and reimbursement payments, costs and expenses (including all fees and expenses of counsel to the Administrative Agent and any Lender incurred pursuant to this Agreement or any other Loan Document), whether direct or indirect, absolute or contingent, liquidated or unliquidated, now existing or hereafter arising hereunder or thereunder.

"OFAC" shall mean the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Off-Balance Sheet Liabilities" of any Person shall mean (i) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (ii) any liability of such Person under any sale and leaseback transactions that do not create a liability on the balance sheet of such Person, (iii) any Synthetic Lease Obligation or (iv) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

"Orders" shall mean the Interim DIP Order and the Final DIP Order.

"OSHA" shall mean the Occupational Safety and Health Act of 1970, as amended and in effect from time to time, and any successor statute thereto.

"Other Connection Taxes" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" shall mean any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made hereunder or under any other Loan Document or from the execution, delivery, performance or enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any other Loan Document.

"Parent Company" shall mean, with respect to a Lender, the "bank holding company" as defined in Regulation Y, if any, of such Lender, and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the shares of such Lender.

"Participant" shall have the meaning set forth in Section 10.4(d).

"Patent" shall have the meaning assigned to such term in the Guaranty and Security Agreement.

"Patent Security Agreement" shall mean any patent security agreement or similar document executed by a Loan Party owning Patents or licenses of Patents in favor of the Administrative Agent for the benefit of the Secured Parties.

"Patriot Act" shall mean the USA PATRIOT Improvement and Reauthorization Act of 2005 (Pub. L. 109-177 (signed into law March 9, 2006)), as amended and in effect from time to time.

"Payment Office" shall mean the office of the Administrative Agent located at 303 Peachtree Street, N.E., Atlanta, Georgia 30308, or such other location as to which the Administrative Agent shall have given written notice to the Borrowers and the other Lenders.

"PBGC" shall mean the U.S. Pension Benefit Guaranty Corporation referred to and defined in ERISA, and any successor entity performing similar functions.

CHAR2\1829046v7

"<u>Permitted Acquisition</u>" shall mean none.

"<u>Permitted Encumbrances</u>" shall mean:

(i)      Liens for taxes, assessments or governmental charges or claims that are not yet delinquent for more than 30 days or which are being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves are being maintained in accordance with GAAP;

(ii)      statutory Liens of landlords, carriers, warehousemen, mechanics, materialmen and other Liens imposed by law in the ordinary course of business for amounts that are not yet overdue by more than 30 days or which are being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves are being maintained in accordance with GAAP;

(iii)      pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(iv)      deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(v)      judgment and attachment liens not giving rise to an Event of Default or Liens created by or existing from any litigation or legal proceeding that are currently being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves are being maintained in accordance with GAAP;

(vi)      customary rights of set-off, revocation, refund or chargeback under deposit agreements or under the Uniform Commercial Code or common law of banks or other financial institutions where Holdings or any of its Subsidiaries maintains deposits (other than deposits intended as cash collateral) in the ordinary course of business;

(vii)      minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real property or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of Holdings and its Subsidiaries taken as a whole;

(viii)      the filing of Uniform Commercial Code financing statements solely as a precautionary measure in connection with operating leases or consignment of goods entered into in the ordinary course of business and covering only the assets so leased or consigned;

(ix)    Liens encumbering cash deposits made to secure obligations to any Governmental Authority as required by applicable law as a condition to the transaction of any business or the exercise of any privilege or license;

(x)    Liens (A) that are contractual rights of set-off relating to purchase orders and other agreements entered into with customers of any of the Loan Parties in the ordinary course of business, (B) that are encumbering cash deposits relating to purchase orders and other agreements entered into with customers of any of the Loan Parties in the ordinary course of business and (C) solely on any cash earnest money deposits made by any Loan Party in connection with any letter of intent or purchase agreement permitted hereunder, not to exceed, in the aggregate for clauses (A), (B) and (C), $1,000,000 at any time outstanding; and

(xi)    leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (A) interfere in any material respect with the business of Holdings and its Subsidiaries, taken as a whole, or (B) secure any Indebtedness;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Investments" shall mean:

(i)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States), in each case maturing within one year from the date of acquisition thereof;

(ii)    commercial paper having the highest rating, at the time of acquisition thereof, of S&P or Moody's and in either case maturing within six months from the date of acquisition thereof;

(iii)    certificates of deposit, bankers' acceptances and time deposits maturing within 180 days of the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States or any state thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(iv)    fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (i) above and entered into with a financial institution satisfying the criteria described in clause (iii) above; and

(v)    mutual funds investing solely in any one or more of the Permitted Investments described in clauses (i) through (iv) above.

CHAR2\1829046v7

"<u>Permitted Third Party Bank</u>" shall mean any bank or other financial institution with whom any Loan Party maintains a Controlled Account and with whom a Control Account Agreement has been executed.

"<u>Person</u>" shall mean any individual, partnership, firm, corporation, association, joint venture, limited liability company, trust or other entity, or any Governmental Authority.

"<u>Plan</u>" shall mean any "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) maintained or contributed to by any Borrower or any ERISA Affiliate or to which any Borrower or any ERISA Affiliate has or may have an obligation to contribute, and each such plan that is subject to Title IV of ERISA for the five-year period immediately following the latest date on which any Borrower or any ERISA Affiliate maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan.

"<u>Postpetition</u>" means, the time period beginning immediately upon the filing of the Chapter 11 Case.

"<u>Postpetition Indebtedness</u>" means, the obligations of the Loan Parties arising on or after the Petition Date relating to the Loan Parties' bankruptcy estates, including related to the Postpetition operation of the Loan Parties' business (including the Obligations).

"<u>Platform</u>" shall have the meaning set forth in <u>Section 10.1(c)</u>.

"<u>Prepetition</u>" means, the time period prior to filing of the Chapter 11 Case.

"<u>Prepetition Agent</u>" means, the "Administrative Agent" under and as defined in the Prepetition Credit Agreement.

"<u>Prepetition Collateral</u>" means all collateral securing the obligations under the Prepetition Credit Documents.

"<u>Prepetition Credit Agreement</u>" has the meaning given to such term in the definition of "Prepetition Facility".

"<u>Prepetition Credit Documents</u>" means, the "Loan Documents" under and as defined in the Prepetition Credit Agreement

"<u>Prepetition Facility</u>" means that certain Revolving Credit and Term Loan Agreement dated as of December 5, 2014 (as amended by that certain Amendment No. 1 to Revolving Credit and Term Loan Agreement dated as of August 6, 2015, that certain Amendment No. 2 and Waiver to Revolving Credit and Term Loan Agreement dated as of December 4, 2015, that certain Amendment No. 3 to Revolving Credit and Term Loan Agreement, Amendment No. 1 to Forbearance Agreement and One Time Waiver of Revolving Loan Borrowing Requirements dated as of July 5, 2016, that certain Amendment No. 4 to Revolving Credit and Term Loan Agreement and One Time Waiver of Revolving Loan Borrowing Requirements and as further amended or

CHAR2\1829046v7

modified from time to time, the "<u>Prepetition Credit Agreement</u>"), among the Borrowers, Holdings, the Lenders from time to time party thereto and SunTrust Bank, as Administrative Agent.

"<u>Prepetition Facility Obligations</u>" means all obligations from time to time owing by any Loan Party to the Prepetition Agent or any Prepetition Lender under the Prepetition Facility.

"<u>Prepetition Lenders</u>" means, the Lenders under the Prepetition Credit Agreement and the other Beneficiaries (if any) under and as defined in that certain Guaranty and Security Agreement, dated as of December 5, 2014, as amended or modified from time to time, executed by the Loan Parties in favor of the Prepetition Agent.

"<u>Prepetition Payment</u>" means, a direct or indirect payment, redemption, purchase, defeasance or acquisition for value (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition (i) Indebtedness (including, without limitation, the Indebtedness under the Prepetition Credit Documents), (ii) "critical vendor payments" or (iii) trade payables (including, without limitation, in respect of reclamation claims), or other Prepetition claims against any Loan Party.

"<u>Prepetition Required Lenders</u>" shall mean the "Required Lenders" under and as defined in the Prepetition Credit Agreement.

"<u>Primed Liens</u>" has the meaning given to such term in Section 2.27(a)(iii).

"<u>Priming Lien</u>" has the meaning given to such term in Section 2.27(a)(iii).

"<u>Pro Rata Share</u>" shall mean (i) with respect to any Commitment or Loan of any Lender at any time, a percentage, the numerator of which shall be such Lender's Commitment (or, if such Commitment has been terminated or expired or the Loans have been declared to be due and payable, such Lender's Revolving Credit Exposure, as applicable), and the denominator of which shall be the sum of all Commitments of all Lenders (or, if such Commitments have been terminated or expired or the Loans have been declared to be due and payable, all Revolving Credit Exposure, as applicable, of all Lenders) and (ii) with respect to the Commitments and Loans of any Lender at any time, the numerator of which shall be the sum of such Lender's Revolving Commitment (or, if such Revolving Commitment has been terminated or expired or the Loans have been declared to be due and payable, such Lender's Revolving Credit Exposure) and the denominator of which shall be the sum of all Lenders' Revolving Commitments (or, if such Revolving Commitments have been terminated or expired or the Loans have been declared to be due and payable, all Revolving Credit Exposure of all Lenders funded under such Commitments).

"<u>Public Lender</u>" shall mean any Lender who does not wish to receive Non-Public Information and who may be engaged in investment and other market related activities with respect to Holdings, its Affiliates or any of their securities or loans.

"<u>Real Estate</u>" shall mean all real property owned or leased by Holdings, the Borrowers and their Subsidiaries.

"<u>Real Estate Documents</u>" shall mean, collectively, all Mortgages, all Environmental Indemnities and all other documents, instruments, agreements and certificates executed and

18

delivered by any Loan Party to the Administrative Agent and the Lenders in connection with the foregoing.

"Recipient" shall mean, as applicable, (a) the Administrative Agent and (b) any Lender.

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System, as the same may be in effect from time to time, and any successor regulations.

"Regulation T" shall mean Regulation T of the Board of Governors of the Federal Reserve System, as the same may be in effect from time to time, and any successor regulations.

"Regulation U" shall mean Regulation U of the Board of Governors of the Federal Reserve System, as the same may be in effect from time to time, and any successor regulations.

"Regulation X" shall mean Regulation X of the Board of Governors of the Federal Reserve System, as the same may be in effect from time to time, and any successor regulations.

"Regulation Y" shall mean Regulation Y of the Board of Governors of the Federal Reserve System, as the same may be in effect from time to time, and any successor regulations.

"Related Parties" shall mean, with respect to any specified Person, such Person's Affiliates and the respective managers, administrators, trustees, partners, directors, officers, employees, agents, advisors or other representatives of such Person and such Person's Affiliates.

"Release" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into the environment (including ambient air, surface water, groundwater, land surface or subsurface strata).

"Required Lenders" shall mean, at any time, Lenders holding more than 50% of the aggregate outstanding Revolving Commitments at such time or, if the Lenders have no Commitments outstanding, then Lenders holding more than 50% of the aggregate outstanding Revolving Credit Exposure of the Lenders at such time.

"Requirement of Law" for any Person shall mean the articles or certificate of incorporation, bylaws, partnership certificate and agreement, or limited liability company certificate of organization and agreement, as the case may be, and other organizational and governing documents of such Person, and any law, treaty, rule or regulation, or determination of a Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer" shall mean any of the president, the chief executive officer, the chief operating officer, the chief financial officer, the treasurer or a vice president of any Borrower or such other representative of any Borrower as may be designated in writing by any one of the foregoing with the consent of the Administrative Agent.

"Restricted Payment" shall mean, for any Person, any dividend or distribution on any class of its Capital Stock, or any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, retirement, defeasance or other acquisition of any

shares of its Capital Stock, any Indebtedness subordinated to the Obligations or any Guarantee thereof or any options, warrants or other rights to purchase such Capital Stock or such Indebtedness, whether now or hereafter outstanding, or any management or similar fees.

"Revolving Commitment" shall mean, with respect to each Lender, the commitment of such Lender to make Revolving Loans to the Borrowers in an aggregate principal amount not exceeding the amount set forth with respect to such Lender on Schedule I, as such schedule may be amended pursuant to Section 2.23, or, in the case of a Person becoming a Lender after the Closing Date, the amount of the assigned "Revolving Commitment" as provided in the Assignment and Acceptance executed by such Person as an assignee, or the joinder executed by such Person, in each case as such commitment may subsequently be increased or decreased pursuant to the terms hereof.

"Revolving Credit Exposure" shall mean, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Revolving Loans.

"Revolving Loan" shall mean a loan made by a Lender to the Borrowers under its Revolving Commitment.

"S&P" shall mean Standard & Poor's, a division of The McGraw-Hill Companies, Inc.

"Sanctions" shall mean economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State.

"Sanctioned Country" shall mean, at any time, a country or territory which is itself the subject or target of any Sanctions (including at the time of this Agreement, Cuba, Iran, North Korea, Sudan and Syria).

"Sanctioned Person" shall mean, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b).

"Secured Parties" shall mean the Administrative Agent and the Lenders.

"Subsidiary" shall mean, with respect to any Person (the "parent") at any date, any corporation, partnership, joint venture, limited liability company, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, partnership, joint venture, limited liability company, association or other entity (i) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (ii) that is, as of such date, otherwise controlled, by the parent or one or more

subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.  Unless otherwise indicated, all references to "Subsidiary" hereunder shall mean a Subsidiary of Holdings.

"Subsidiary Loan Party" shall mean any Subsidiary that executes or becomes a party to the Guaranty and Security Agreement; provided that the Inactive Subsidiaries are not, are not required to be and shall have no liabilities as Subsidiary Loan Parties.

"Superpriority Claim" means, a claim against any Borrower or Guarantor in the Chapter 11 Case which is an administrative expense claim having priority over any or all administrative expenses of a Chapter 11 and Chapter 7 trustee, subject and subordinate to the Carve-Out, of the kind specified in Sections 364(c)(1), 503(b), 507(a)(2) and 507(d) of the Bankruptcy Code.

"Synthetic Lease" shall mean a lease transaction under which the parties intend that (i) the lease will be treated as an "operating lease" by the lessee pursuant to Accounting Standards Codification Sections 840-10 and 840-20, as amended, and (ii) the lessee will be entitled to various tax and other benefits ordinarily available to owners (as opposed to lessees) of like property.

"Synthetic Lease Obligations" shall mean, with respect to any Person, the sum of (i) all remaining rental obligations of such Person as lessee under Synthetic Leases which are attributable to principal and, without duplication, (ii) all rental and purchase price payment obligations of such Person under such Synthetic Leases assuming such Person exercises the option to purchase the lease property at the end of the lease term.

"Taxes" shall mean any and all present or future taxes, levies, imposts, duties, deductions withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including an interest, additions to tax or penalties applicable thereto.

"Trademark" shall have the meaning assigned to such term in the Guaranty and Security Agreement.

"Trademark Security Agreement" shall mean any trademark security agreement or similar document executed by a Loan Party owning registered Trademarks or applications for Trademarks in favor of the Administrative Agent for the benefit of the Secured Parties.

"Trading with the Enemy Act" shall mean the Trading with the Enemy Act of the United States of America (50 U.S.C. App. §§ 1 et seq.), as amended and in effect from time to time.

"Unfunded Pension Liability" of any Plan shall mean the amount, if any, by which the value of the accumulated plan benefits under the Plan, determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all Plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

"Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code as amended and in effect from time to time in the State of New York.

"United States" or "U.S." shall mean the United States of America.

CHAR2\1829046v7

"U.S. Person" shall mean any Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" shall have the meaning set forth in Section 2.20(f)(ii).

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withholding Agent" shall mean any Borrower, any other Loan Party or the Administrative Agent, as applicable.

"World Fuels" shall mean World Fuel Services Corporation and any of its affiliates and subsidiaries.

"World Fuels Disputed Claims" shall mean the pending litigation and disputed claims between the Loan Parties and World Fuels.

**Section 1.2.**   **[Reserved]**

**Section 1.3.**   **Accounting Terms and Determination**.   Unless otherwise defined or specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared, in accordance with GAAP as in effect from time to time, applied on a basis consistent with the most recent audited consolidated financial statements of Holdings delivered pursuant to Section 5.1(a).   Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Accounting Standards Codification Section 825-10 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Loan Party or any Subsidiary of any Loan Party at "fair value", as defined therein.

**Section 1.4.**   **Terms Generally**.   The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.   Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.   The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".   The word "will" shall be construed to have the same meaning and effect as the word "shall".   In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the word "to" means "to but excluding".   Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as it was originally executed or as it may from time to time be amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (ii) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (iii) the words "hereof", "herein" and "hereunder" and words of similar import shall be construed to refer to this Agreement as a whole and not to any particular provision hereof, (iv) all references to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles, Sections, Exhibits and Schedules to this Agreement and (v)

22

all references to a specific time shall be construed to refer to the time in the city and state of the Administrative Agent's principal office, unless otherwise indicated.

## ARTICLE II

## AMOUNT AND TERMS OF THE COMMITMENTS

**Section 2.1.    General Description of Facilities**.  Subject to and upon the terms and conditions herein set forth, the Lenders hereby establish in favor of the Borrowers a revolving credit facility pursuant to which each Lender severally agrees (to the extent of such Lender's Revolving Commitment) to make Revolving Loans to the Borrowers in accordance with Section 2.2.

**Section 2.2.    Revolving Loans**.  Subject to the terms and conditions set forth herein, each Lender severally agrees to make Revolving Loans, ratably in proportion to its Pro Rata Share of the Aggregate Revolving Commitments, to the Borrowers, from time to time during the Availability Period, in an aggregate principal amount outstanding at any time that will not result in (a) such Lender's Revolving Credit Exposure exceeding such Lender's Revolving Commitment or (b) the aggregate Revolving Credit Exposures of all Lenders exceeding the Aggregate Revolving Commitment Amount.  During the Availability Period, the Borrowers shall be entitled to borrow, prepay and reborrow Revolving Loans in accordance with the terms and conditions of this Agreement; provided that the Borrowers may not borrow or reborrow should there exist a Default or Event of Default; provided, further, that the Borrowers may not borrow more than $500,000 of Revolving Loans prior to entry of the Final DIP Order.

**Section 2.3.    Procedure for Revolving Borrowings**.  The Borrowers shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) of each Revolving Borrowing, substantially in the form of Exhibit 2.3 attached hereto (a "Notice of Revolving Borrowing"), prior to 11:00 a.m. one (1) Business Day prior to the requested date of such Borrowing.  Each Notice of Revolving Borrowing shall be irrevocable and shall specify (i) the aggregate principal amount of such Borrowing and (ii) the date of such Borrowing (which shall be a Business Day).  The aggregate principal amount of each Borrowing shall not be less than $100,000 or a larger multiple of $100,000.  Promptly following the receipt of a Notice of Revolving Borrowing in accordance herewith, the Administrative Agent shall advise each Lender of the details thereof and the amount of such Lender's Revolving Loan to be made as part of the requested Revolving Borrowing.

**Section 2.4.    [Reserved]**.

**Section 2.5.    [Reserved]**.

**Section 2.6.    Funding of Borrowings**.

(a)    Each Lender will make available each Loan to be made by it hereunder on the proposed date thereof by wire transfer in immediately available funds by 11:00 a.m. to the Administrative Agent at the Payment Office.  The Administrative Agent will make such Loans available to the Borrowers by promptly crediting the amounts that it receives, in like funds by the close of business on such proposed date, to an account maintained by any

Borrower with the Administrative Agent or, at the Borrowers' option, by effecting a wire transfer of such amounts to an account designated by the Borrowers to the Administrative Agent.

(b)      Unless the Administrative Agent shall have been notified by any Lender prior to 5:00 p.m. one (1) Business Day prior to the date of a Borrowing in which such Lender is to participate that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date, and the Administrative Agent, in reliance on such assumption, may make available to the Borrowers on such date a corresponding amount.  If such corresponding amount is not in fact made available to the Administrative Agent by such Lender on the date of such Borrowing, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest (x) at the Federal Funds Rate until the second Business Day after such demand and (y) at the Base Rate at all times thereafter.  If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrowers, and the Borrowers shall promptly pay such corresponding amount to the Administrative Agent together with interest at the rate specified for such Borrowing. Nothing in this subsection shall be deemed to relieve any Lender from its obligation to fund its Pro Rata Share of any Borrowing hereunder or to prejudice any rights which the Borrowers may have against any Lender as a result of any default by such Lender hereunder.

(c)      All Revolving Borrowings shall be made by the Lenders on the basis of their respective Pro Rata Shares.  No Lender shall be responsible for any default by any other Lender in its obligations hereunder, and each Lender shall be obligated to make its Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Loans hereunder.

**Section 2.7.      Reserved**.

**Section 2.8.      Optional Reduction and Termination of Commitments**.

(a)      Unless previously terminated, all Revolving Commitments shall terminate on the Maturity Date.

(b)      Upon at least three (3) Business Days' prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent (which notice shall be irrevocable), the Borrowers may reduce the Aggregate Revolving Commitments in part or terminate the Aggregate Revolving Commitments in whole; provided that (i) any partial reduction shall apply to reduce proportionately and permanently the Revolving Commitment of each Lender, (ii) any partial reduction pursuant to this Section shall be in an amount of at least $100,000 and any larger multiple of $100,000, and (iii) no such reduction shall be permitted which would reduce the Aggregate Revolving Commitment Amount to an amount less than the aggregate outstanding Revolving Credit Exposure of all Lenders.

**Section 2.9.    Repayment of Loans**.

(a)    The outstanding principal amount of all Revolving Loans shall be due and payable (together with accrued and unpaid interest thereon) on the Maturity Date.

**Section 2.10.  Evidence of Indebtedness**.

(a)    Each Lender shall maintain in accordance with its usual practice appropriate records evidencing the Indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable thereon and paid to such Lender from time to time under this Agreement. The Administrative Agent shall maintain appropriate records in which shall be recorded (i) the Revolving Commitment of each Lender, (ii) the amount of each Loan made hereunder by each Lender, (iii) the date and amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder in respect of the Loans and (iv) both the date and amount of any sum received by the Administrative Agent hereunder from the Borrowers in respect of the Loans and each Lender's Pro Rata Share thereof. At the Borrowers' request, the Administrative Agent shall provide the Borrowers a month-end summary statement (in the form from time to time used by the Administrative Agent) of the opening and closing daily balances of the Loans during such month and setting forth the information described in the foregoing subsections (i) through (iv). The entries made in the Administrative Agent's records shall be *prima facie* evidence of the existence and amounts of the obligations of the Borrowers therein recorded unless the Administrative Agent receives a statement of exceptions to any month-end summary statement requested and delivered pursuant to this Section 2.10(a) within thirty (30) days after the Borrowers receive such statement; provided that the failure or delay of any Lender or the Administrative Agent in maintaining or making entries into any such record or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans (both principal and unpaid accrued interest) of such Lender in accordance with the terms of this Agreement.

(b)    This Agreement evidences the obligation of the Borrowers to repay the Loans and is being executed as a "noteless" credit agreement. However, at the request of any Lender at any time, each Borrower agrees that it will prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form reasonably approved by the Administrative Agent. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment permitted hereunder) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

**Section 2.11.  Optional Prepayments**. The Borrowers shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, without premium or penalty, by giving written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent no later than 11:00 a.m. not less than two (2) Business Days prior to the date of such prepayment. Each such notice shall be irrevocable and shall specify the proposed date of such

25

prepayment and the principal amount of each Borrowing or portion thereof to be prepaid.  Upon receipt of any such notice, the Administrative Agent shall promptly notify each affected Lender of the contents thereof and of such Lender's Pro Rata Share of any such prepayment.  If such notice is given, the aggregate amount specified in such notice shall be due and payable on the date designated in such notice, together with accrued interest to such date on the amount so prepaid in accordance with Section 2.13(d).  Each partial prepayment of any Loan shall be in an amount that would be permitted in the case of an advance of a Revolving Borrowing pursuant to Section 2.2.  Each prepayment of a Borrowing shall be applied ratably to the Loans comprising such Borrowing.

**Section 2.12.  <u>Mandatory Prepayments</u>.**

(a)    Promptly upon receipt by Holdings or any of its Subsidiaries of any proceeds of any sale or disposition by Holdings or any of its Subsidiaries of any of its assets, or any proceeds from any casualty insurance policies or eminent domain, condemnation or similar proceedings, the Borrowers shall prepay the Obligations in an amount equal to all such proceeds, net of commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by the Borrowers in connection therewith (in each case, paid to non-Affiliates); <u>provided</u> that the Borrowers shall not be required to prepay the Obligations with respect to proceeds from the sales of assets in the ordinary course of business.  Any such prepayment shall be applied in accordance with subsection (c) of this Section.

(b)    No later than the Business Day following the date of receipt by Holdings or any of its Subsidiaries of any proceeds from any issuance of Indebtedness or equity securities by Holdings or any of its Subsidiaries, the Borrowers shall prepay the Obligations in an amount equal to all such proceeds, net of underwriting discounts and commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by the Borrowers in connection therewith.  Any such prepayment shall be applied in accordance with subsection (c) of this Section.

(c)    Any prepayments made by the Borrowers pursuant to subsection (a) or (b) of this Section shall be applied as follows: first, to the Administrative Agent's fees and reimbursable expenses then due and payable pursuant to any of the Loan Documents; <u>second</u>, to all reimbursable expenses of the Lenders then due and payable pursuant to any of the Loan Documents, *pro rata* to the Lenders based on their respective *pro rata* shares of such fees and expenses; <u>third</u>, to interest and fees then due and payable hereunder, *pro rata* to the Lenders based on their respective *pro rata* shares of such interest and fees; and <u>fourth</u>, to the principal balance of the Revolving Loans, until the same shall have been paid in full, *pro rata* to the Lenders based on their respective Revolving Commitments.  The Revolving Commitments of the Lenders shall not be permanently reduced by the amount of any prepayments made pursuant to the <u>fourth</u> clause above unless (i) an Event of Default has occurred and is continuing and the Required Lenders so request, or (ii) consummation of an Approved Sale pursuant to the Sale Order.

(d)    If at any time the aggregate Revolving Credit Exposure of all Lenders exceeds the Aggregate Revolving Commitment Amount, as reduced pursuant to Section

26

2.8 or otherwise, the Borrowers shall promptly repay the Revolving Loans in an amount equal to such excess, together with all accrued and unpaid interest on such excess amount and any amounts due under Section 2.19.

(e)      If at any time the Loan Parties' cash exceeds $500,000 (such amount determined on a book balance basis) as of the end of any three Business Day period, the Borrowers shall on the next Business Day prepay the Revolving Loans in an amount equal to the amount of such excess in increments of $100,000 so that such excess after making such payment is less than $100,000.

**Section 2.13.   Interest on Loans**.

(a)      The Borrowers shall pay interest on the Loans at a rate equal to eight percent (8.0%) per annum.

(b)      [Reserved].

(c)      Notwithstanding subsection (a) of this Section, if an Event of Default has occurred and is continuing, the Borrowers shall pay interest ("Default Interest") at the rate *per annum* equal to 200 basis points above the otherwise applicable interest rate for such Loans.

(d)      Interest on the principal amount of all Loans shall accrue from and including the date such Loans are made to but excluding the date of any repayment thereof. Interest on all outstanding Loans shall be payable monthly in arrears on the last day of each month and on the Maturity Date.  All Default Interest shall be payable on demand.

**Section 2.14.   Reserved**. .

**Section 2.15.   Computation of Interest and Fees**.  All interest and all fees hereunder shall be computed on the basis of a year of 360 days and paid for the actual number of days elapsed (including the first day but excluding the last day).  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be made in good faith and, except for manifest error, shall be final, conclusive and binding for all purposes.

**Section 2.16.   Reserved**.

**Section 2.17.   Reserved**.

**Section 2.18.   Reserved**.

**Section 2.19.   Reserved**.

**Section 2.20.   Taxes**.

(a)      For purposes of this Section 2.20, the term "applicable law" includes FATCA.

27

(b)     Any and all payments by or on account of any obligation of any Borrower or any other Loan Party hereunder or under any other Loan Document shall be made without deduction or withholding for any Taxes; provided that if any applicable law requires the deduction or withholding of any Tax from any such payment, then the applicable Withholding Agent shall make such deduction or withholding and timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax or Other Tax, then the sum payable by such Borrower or other Loan Party, as applicable, shall be increased as necessary so that after making all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient shall receive an amount equal to the sum it would have received had no such deductions or withholdings been made.

(c)     In addition, without limiting the provisions of subsection (a) of this Section, the Borrowers shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)     The Borrowers shall indemnify each Recipient, within ten (10) Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid or payable by such Recipient or required to be withheld or deducted from a payment to such Recipient (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrowers by the applicable Recipient (with a copy to the Administrative Agent in the case of a Recipient other than the Administrative Agent) shall be conclusive, absent manifest error.

(e)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Borrower or any other Loan Party to a Governmental Authority, such Borrower or other Loan Party, as applicable, shall deliver to the Administrative Agent an original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)     Tax Forms.

(i)     Any Lender that is a U.S. Person shall deliver to the Borrowers and the Administrative Agent, on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), duly executed originals of IRS Form W-9 certifying, to the extent such Lender is legally entitled to do so, that such Lender is exempt from U.S. federal backup withholding tax.

CHAR2\1829046v7

(ii)      Any Lender that is a Foreign Person and that is entitled to an exemption from or reduction of withholding tax under the Code or any treaty to which the United States is a party with respect to payments under this Agreement shall deliver to the Borrowers and the Administrative Agent, at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law or reasonably requested by the Borrowers or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  Without limiting the generality of the foregoing, each Lender that is a Foreign Person shall, to the extent it is legally entitled to do so, (w) on or prior to the date such Lender becomes a Lender under this Agreement, (x) on or prior to the date on which any such form or certification expires or becomes obsolete, (y) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this subsection, and (z) from time to time upon the reasonable request by the Borrowers or the Administrative Agent, deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the Borrowers or the Administrative Agent), whichever of the following is applicable:

(A)      if such Lender is claiming eligibility for benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, duly executed originals of IRS Form W-8BEN, or any successor form thereto, establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "interest" article of such tax treaty, and (y) with respect to any other applicable payments under any Loan Document, duly executed originals of IRS Form W-8BEN, or any successor form thereto, establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "business profits" or "other income" article of such tax treaty;

(B)      duly executed originals of IRS Form W-8EC1, or any successor form thereto, certifying that the payments received by such Lender are effectively connected with such Lender's conduct of a trade or business in the United States;

(C)      if such Lender is claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, duly executed originals of IRS Form W-8BEN, or any successor form thereto, together with a certificate (a "U.S. Tax Compliance Certificate") upon which such Lender certifies that (1) such Lender is not a bank for purposes of Section 881(c)(3)(A) of the Code, or the obligation of the each Borrower hereunder is not, with respect to such Lender, a loan agreement entered into in the ordinary course of its trade or business, within the meaning of that Section, (2) such Lender is not a 10% shareholder of any Borrower within the meaning of Section 871(h)(3) or Section 881(c)(3)(B) of the Code, (3) such Lender is not a controlled foreign corporation that is related to any Borrower within the meaning of Section 881(c)(3)(C) of the Code, and (4)

CHAR2\1829046v7

the interest payments in question are not effectively connected with a U.S. trade or business conducted by such Lender; or

(D)    if such Lender is not the beneficial owner (for example, a partnership or a participating Lender granting a typical participation), duly executed originals of IRS Form W-8IMY, or any successor form thereto, accompanied by IRS Form W-9, IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate, and/or other certification documents from each beneficial owner, as applicable.

(iii)    Each Lender agrees that if any form or certification it previously delivered under this Section expires or becomes obsolete or inaccurate in any respect and such Lender is not legally entitled to provide an updated form or certification, it shall promptly notify the Borrowers and the Administrative Agent of its inability to update such form or certification.

(g)    If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.

**Section 2.21.    <u>Payments Generally; Pro Rata Treatment; Sharing of Set-offs</u>**.

(a)    The Borrowers shall make each payment required to be made by it hereunder (whether of principal, interest, fees, or of amounts payable under <u>Section 2.20</u>, or otherwise) prior to 2:00 p.m. on the date when due, in immediately available funds, free and clear of any defenses, rights of set-off, counterclaim, or withholding or deduction of taxes. Any amounts received after such time on any date may, in the reasonable discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at the Payment Office, except that payments pursuant to <u>2.20</u> and <u>10.3</u> shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be made payable for the period of such extension. All payments hereunder shall be made in Dollars.

CHAR2\1829046v7

(b)    If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal and interest and fees then due hereunder, such funds shall be applied as follows: first, to all fees and reimbursable expenses of the Administrative Agent then due and payable pursuant to any of the Loan Documents; second, to all reimbursable expenses of the Lenders then due and payable pursuant to any of the Loan Documents, *pro rata* to the Lenders based on their respective *pro rata* shares of such fees and expenses; third, to all interest and fees then due and payable hereunder, *pro rata* to the Lenders based on their respective *pro rata* shares of such interest and fees; and fourth, to all principal of the Loans then due and payable hereunder, *pro rata* to the parties entitled thereto based on their respective *pro rata* shares of such principal.

(c)    If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans that would result in such Lender receiving payment of a greater proportion of the aggregate amount of its Revolving Credit Exposure and accrued interest and fees thereon than the proportion received by any other Lender with respect to its Revolving Credit Exposure, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Revolving Credit Exposure of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Revolving Credit Exposure; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this subsection shall not be construed to apply to any payment made by any Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Revolving Credit Exposure to any assignee or participant, other than to any Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this subsection shall apply).  Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

(d)    Unless the Administrative Agent shall have received notice from the Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders, as the case may be, the amount or amounts due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

31

**Section 2.22.  Reserved**.

**Section 2.23.  Reserved**.

**Section 2.24.  Mitigation of Obligations**.  If the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.20, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the sole judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable under Section 2.20 in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agree to pay all costs and expenses incurred by any Lender in connection with **such** designation or assignment.

**Section 2.25.  [Reserved]**.

**Section 2.26.  [Reserved]**.

**Section 2.27.  Priority and Liens**.

(a)     Superpriority Claims and Liens.  Each of the Loan Parties hereby covenants, represents and warrants that, upon entry of the Interim DIP Order, the Obligations authorized by the Orders of the Borrowers and the Guarantors under the Loan Documents:

(i)      pursuant to Sections 364(c)(1) and 507(b) of the Bankruptcy Code, constitute joint and several allowed administrative expense claims in the Chapter 11 Case having superpriority over all administrative expenses of the kind specified in Section 364(c)(1), 503(b), 507(a)(2), 507(b) or 507(d) of the Bankruptcy Code;

(ii)     pursuant to Sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and the Collateral Documents, shall be secured by, and each Loan Party shall have granted to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority Lien on all presently owned and hereafter acquired unencumbered tangible and intangible property and assets of the Borrowers, the Guarantors and their respective estates wherever located, and any proceeds and products thereof, including, without limitation, accounts, deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities accounts, commercial tort claims, causes of action (other than Avoidance Actions, but including, in any case, the proceeds of such Avoidance Actions, subject to entry of the Final DIP Order), investments, instruments, documents, inventory, contract rights, general intangibles, intellectual property, real property, fixtures, goods, equipment, vessels and other fixed assets and proceeds and products of all of the foregoing (including earnings and insurance proceeds);

(iii)    pursuant to Section 364(d)(1) of the Bankruptcy Code and the Collateral Documents, shall be secured by, and each Loan Party shall have granted

32

to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority, senior priming Lien (the "Priming Lien") on the Collateral under and as defined in each of the Prepetition Facility (the "Prepetition Collateral"), which Priming Lien shall prime all Liens securing the Prepetition Facility and any Liens that are junior thereto, and shall also be senior to any Liens arising after the Petition Date to provide adequate protection in respect of any Liens to which the Priming Lien is senior (collectively, the "Primed Liens"); and

(iv)     pursuant to Section 364(c)(3) of the Bankruptcy Code and the Collateral Documents, shall be secured by, and each Loan Party shall have granted to the Administrative Agent, for the benefit of the Secured Parties, a perfected junior priority Lien on all presently owned and hereafter acquired tangible and intangible property and assets of the Borrowers, the Guarantors and their respective estates wherever located, and any proceeds and products thereof, including, without limitation, accounts, deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities accounts, commercial tort claims, causes of action (other than Avoidance Actions, subject to the last sentence in the definition of "Collateral"), investments, instruments, documents, inventory, contract rights, general intangibles, intellectual property, real property, fixtures, goods, equipment, vessels and other fixed assets and proceeds and products of all of the foregoing (including earnings and insurance proceeds) that are subject to (x) valid and perfected Liens in existence on the Petition Date or (y) valid Liens in existence on the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, if any (in each case, other than Liens securing the Prepetition Facility) (the "Existing Liens").

Each of Section 2.27(a)(i), Section 2.27(a)(ii), Section 2.27(a)(iii), Section 2.27(a)(iv) shall be subject to the Carve-Out.

(b)     Collateral Security Perfection.  Each of the Loan Parties agrees to take all action that the Administrative Agent or the Required Lenders may reasonably request as a matter of nonbankruptcy law to perfect and protect the Administrative Agent's Liens for the benefit of the Secured Parties, and upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby, including, without limitation, executing and delivering such documents and instruments, financing statements, providing such notices and assents of third parties, obtaining such governmental authorizations and providing such other instruments and documents in recordable form as the Administrative Agent or any Lender may reasonably request.  Each Loan Party hereby irrevocably authorizes the Administrative Agent at any time and from time to time to file in any filing office in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of such Loan Party or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether such Loan Party is an organization, the type of organization and any organization identification number issued to such Loan Party and, (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral

CHAR2\1829046v7

relates. Such Loan Party agrees to furnish any such information to the Administrative Agent promptly upon request.  Notwithstanding the provisions of this Section 2.27(b), the Administrative Agent and the Lenders shall have the benefits of the Interim DIP Order and the Final DIP Order.

(c)    <u>Real Property</u>.  Subject in all respects to the priorities set forth in Section 2.27(a) above and to the Carve-Out, the Borrowers and the Guarantors shall grant to the Administrative Agent on behalf of the Secured Parties a security interest in, and mortgage on, all of the right, title and interest of the Borrowers and the Guarantors in all real property, if any, owned or leased by the Borrowers or any of the Guarantors, together in each case with all of the right, title and interest of the Borrowers and such Guarantor in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof.  The Borrowers and the Guarantors shall acknowledge that, pursuant to the Orders, the Liens in favor of the Administrative Agent on behalf of the Secured Parties in all of such real property and leasehold interests shall be perfected without the recordation of any instruments of mortgage or assignment and the Administrative Agent and the Lenders shall have the benefits of the Orders.  Notwithstanding the foregoing, the Loan Parties shall enter into separate fee mortgages in recordable form with respect to such properties on terms reasonably satisfactory to the Administrative Agent, which the Administrative Agent may, in its sole discretion, elect to record.

## ARTICLE III

## CONDITIONS PRECEDENT TO LOANS

**Section 3.1.    Conditions to Effectiveness**.  The obligations of the Lenders to make Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with <u>Section 10.2</u>):

(a)    The Administrative Agent shall have received payment of all fees, expenses and other amounts due and payable on or prior to the Closing Date, including reimbursement or payment of all out-of-pocket expenses of the Administrative Agent, (including reasonable fees, charges and disbursements of counsel to the Administrative Agent) required to be reimbursed or paid by the Borrowers hereunder, under any other Loan Document and under any agreement with the Administrative Agent;

(b)    The Administrative Agent (or its counsel) shall have received the following, each to be in form and substance satisfactory to the Administrative Agent:

(i)    a counterpart of this Agreement signed by or on behalf of each party hereto or written evidence satisfactory to the Administrative Agent (which may include telecopy transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement;

(ii)    a certificate of the Secretary, the Assistant Secretary or any Responsible Officer of each Loan Party who is familiar with and maintains control

34

of such Loan Party's organizational documents and minute books, attaching and certifying copies of its bylaws, partnership agreement or limited liability company agreement, and of the resolutions of its board of directors or other equivalent governing body, or comparable organizational documents and authorizations, authorizing the execution, delivery and performance of the Loan Documents to which it is a party and certifying the name, title and true signature of each officer of such Loan Party executing the Loan Documents to which it is a party;

(iii)    certified copies of the articles or certificate of incorporation, certificate of organization or limited partnership, or other registered organizational documents of each Loan Party, together with certificates of good standing or existence, as may be available from the Secretary of State of the jurisdiction of organization of such Loan Party;

(iv)    a certificate, dated as of the Closing Date and signed by a Responsible Officer, certifying that after giving effect any initial Revolving Borrowing, (x) no Default or Event of Default exists and (y) all representations and warranties of each Loan Party set forth in the Loan Documents are true and correct;

(v)    a duly executed Notice of Revolving Borrowing for any initial Revolving Borrowing;

(vi)    if requested by the Administrative Agent, a duly executed funds disbursement agreement, together with a report setting forth the sources and uses of the proceeds hereof;

(vii)    the Guaranty and Security Agreement, duly executed by Holdings, the Borrowers and each of their Domestic Subsidiaries, together with (A) UCC financing statements and other applicable documents under the laws of all necessary or appropriate jurisdictions with respect to the perfection of the Liens granted under the Guaranty and Security Agreement, as reasonably requested by the Administrative Agent in order to perfect such Liens, duly authorized by the Loan Parties, (B) copies of favorable UCC, tax, judgment and fixture lien search reports in all necessary or appropriate jurisdictions and under all legal and trade names of the Loan Parties, as reasonably requested by the Administrative Agent, indicating that there are no prior Liens on any of the Collateral other than Permitted Encumbrances and Liens to be released on the Closing Date, (C) a perfection certificate, as requested by the Administrative Agent, duly completed and executed by Holdings, (D) certificates evidencing all issued and outstanding shares of Capital Stock of all Subsidiaries owned directly by any Loan Party to the extent such Capital Stock is certificated (or, if the pledge of all of the voting Capital Stock of any Foreign Subsidiary would result in materially adverse tax consequences, limited to 65% of the issued and outstanding voting Capital Stock of such Foreign Subsidiary and 100% of the issued and outstanding nonvoting Capital Stock of such Foreign Subsidiary, as applicable) and (E) stock or membership interest powers or other appropriate instruments of transfer executed in blank; provided, if such deliverables were delivered to the Prepetition Agent, the Prepetition Agent shall be

deemed to hold the deliverables identified in clauses (D) and (E) of this Section 3.1(b)(viii) as bailee for the Administrative Agent.

(viii)   with respect to all Real Estate owned or leased by the Loan Parties, (A) "Life of Loan" Federal Emergency Management Agency Standard Flood Hazard determinations, (B) notices, in the form required under the Flood Insurance Laws, about special flood hazard area status and flood disaster assistance duly executed by each Loan Party, and (C) if any improved real property encumbered by any Mortgage is located in a special flood hazard area, a policy of flood insurance that is on terms satisfactory to the Administrative Agent;

(ix)   certificates of insurance, in form and detail acceptable to the Administrative Agent, describing the types and amounts of insurance (property and liability) maintained by any of the Loan Parties, in each case naming the Administrative Agent as loss payee or additional insured, as the case may be, together with a lender's loss payable endorsement in form and substance satisfactory to the Administrative Agent;

(x)   documentation and information with respect to the Loan Parties required by regulatory authorities under applicable "know your customer" and anti-money laundering laws;

(c)   Collateral Requirement.  On or prior to the Closing Date, the Guaranty and Security Agreement and the Interim DIP Order, upon entry of the Interim DIP Order, shall be effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable first priority (except for Existing Liens entitled to priority under applicable laws) perfected security interest in and lien on the Collateral, subject to the Carve-Out.  All filings, recordings, deliveries of instruments and other actions necessary or desirable in the reasonable opinion of the Administrative Agent to protect and preserve such security interests shall have been duly effected.  The Administrative Agent shall have received evidence thereof in form and substance satisfactory to the Administrative Agent.

(d)   Interim DIP Order.  Prior to the Closing Date, the Bankruptcy Court shall have entered the Interim DIP Order, which Interim DIP Order shall be in full force and effect and shall not have been amended, modified, stayed or reversed.

(e)   First Day Orders.  On the Closing Date, all of the "first day orders" entered by the Bankruptcy Court in the Chapter 11 Case and all adequate protection payments and critical vendor payments approved by the Bankruptcy Court in the Interim DIP Order or otherwise shall be reasonably satisfactory in form and substance to the Required Lenders.

(f)   Other Orders.  On the Closing Date, all orders (if any) providing for payment of Prepetition indebtedness of the Loan Parties or affecting in any way the Obligations or the Collateral submitted for entry in the Chapter 11 Case shall be in form and substance satisfactory to each Lender, as entered, shall not deviate from the form

CHAR2\1829046v7

thereof approved by each Lender in any material respect which is adverse to the interests of the Lenders or the Prepetition Lenders.

(g)     Approved Budget; Financial Statements.  On the Closing Date, the Lenders shall have received and be satisfied with (i) an initial cash flow budget, depicting on a weekly basis receipts and disbursements, cash receipts, cash balance and loan balance for the first 13 weeks from the Closing Date, to be attached to the Interim DIP Order which shall be in form and substance satisfactory to each Lender (the "Approved Budget"), together with a good faith estimate of all initial drawings of Loans within the first week following the Closing Date and (ii) such historical and pro forma financial statements for such periods as the Administrative Agent may reasonably request, which shall be in form and substance reasonably satisfactory to the Required Lenders.

(h)     Acceptable Sale Process.  The Sale Motion and the Bid Procedures Motion shall have been filed as required by the Acceptable Sale Process.

(i)     Chapter 11 Case Jurisdiction.  The Loan Parties shall have commenced the Chapter 11 Case in a jurisdiction reasonably acceptable to the Lenders.

(j)     Orders; Approved Budget.

(i)     At the time of each Borrowing and also after giving effect thereto, (x) if an extension of credit has been requested before the Final DIP Order has been entered by the Bankruptcy Court, the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, stayed, or modified or amended in any respect and (y) if an extension of credit is requested after the Final DIP Order has been entered by the Bankruptcy Court, the Administrative Agent and the Lenders shall have received a copy of the Final DIP Order and the Final DIP Order shall be in full force and effect and shall not have been vacated, reversed, stayed, or modified or amended in any respect.  If either the Interim DIP Order or the Final DIP Order is the subject of a pending appeal in any respect, none of such Order, the making of the Loans or the performance by a Borrower or any Guarantor of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.  The Loan Parties, the Administrative Agent and the Lenders shall be entitled to rely in good faith upon the Orders, notwithstanding objection thereto or appeal therefrom by any interested party.  The Loan Parties, the Administrative Agent and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction.

Without limiting the generality of the provisions of this Section, for purposes of determining compliance with the conditions specified in this Section, each Lender that has signed this Agreement shall be deemed to have consented to, approved of, accepted or been satisfied with each document or other matter required thereunder to be consented to, approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**Section 3.2.** **Conditions to Each Credit Event**.  The obligation of each Lender to make a Loan on the occasion of any Borrowing is subject to the satisfaction of the following conditions:

(a) at the time of and immediately after giving effect to such Borrowing, no Default or Event of Default shall exist;

(b) at the time of and immediately after giving effect to such Borrowing, all representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case such representations and warranties shall be true and correct in all respects), except to the extent that any such representation or warranty relates solely to a specified prior date, in which case such representation or warranty shall have been true and correct on and as of such specified prior date;

(c) since the Petition Date, there shall have been no change which has had or could reasonably be expected to have a Material Adverse Effect;

(d) the Borrowers shall have delivered the required Notice of Revolving Borrowing; and

(e) the Administrative Agent shall have received such other documents, certificates, information or legal opinions as the Administrative Agent or the Required Lenders may reasonably request, all in form and substance reasonably satisfactory to the Administrative Agent or the Required Lenders,

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrowers on the date thereof as to the matters specified in subsections (a), (b) and (c) of this Section.

**Section 3.3.** **Delivery of Documents**.  All of the Loan Documents, certificates, legal opinions and other documents and papers referred to in this Article, unless otherwise specified, shall be delivered to the Administrative Agent for the account of each of the Lenders and in sufficient counterparts or copies for each of the Lenders and shall be in form and substance satisfactory in all respects to the Administrative Agent.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

Each of Holdings and the Borrowers represents and warrants, both before and after giving effect to this Agreement, to the Administrative Agent and each Lender as follows:

**Section 4.1.** **Existence; Power**.  Each of Holdings and its Subsidiaries (i) is duly organized, validly existing and in good standing as a corporation, partnership or limited liability company under the laws of the jurisdiction of its organization, (ii) has all requisite power and authority to carry on its business as now conducted, and (iii) is duly qualified to do business, and

38

is in good standing, in each jurisdiction where such qualification is required, except where a failure to be so qualified could not reasonably be expected to result in a Material Adverse Effect.

**Section 4.2.   Organizational Power; Authorization**.  Subject to entry of the Interim DIP Order and, as applicable, the Final DIP Order, the execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party are within such Loan Party's organizational powers and have been duly authorized by all necessary organizational and, if required, shareholder, partner or member action.  This Agreement has been duly executed and delivered by Holdings and the Borrowers and constitutes, and each other Loan Document and Related Transaction Document to which any Loan Party is a party, when executed and delivered by such Loan Party, will constitute, valid and binding obligations of such Loan Party, enforceable against it in accordance with their respective terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

**Section 4.3.   Governmental Approvals; No Conflicts**.  Subject to entry of the Interim DIP Order and, as applicable, the Final DIP Order, the execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party (a) do not require any consent or approval of, registration or filing with, or any action by, any Governmental Authority, except those as have been obtained or made and are in full force and effect and except for filings necessary to perfect or maintain perfection of the Liens created under the Loan Documents, (b) will not violate any Requirement of Law applicable to Holdings or any of its Subsidiaries or any judgment, order or ruling of any Governmental Authority, (c) will not violate or result in a default under any Contractual Obligation of Holdings or any of its Subsidiaries or any of its assets or give rise to a right thereunder to require any payment to be made by Holdings or any of its Subsidiaries and (d) will not result in the creation or imposition of any Lien on any asset of Holdings or any of its Subsidiaries, except Liens (if any) created under the Loan Documents, except, in the case of clauses (a) through (c) of this Section, to the extent the failure to comply with such requirement or the existence of such violation, as the case may be, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**Section 4.4.   Reserved.**.

**Section 4.5.   Litigation and Environmental Matters**.

(a)     No litigation, investigation or proceeding of or before any arbitrators or Governmental Authorities is pending against or, to the knowledge of Holdings or any Borrower, threatened in writing against or affecting Holdings or any of its Subsidiaries (i) as to which there is a reasonable possibility of an adverse determination that could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect or (ii) which in any manner draws into question the validity or enforceability of this Agreement or any other Loan Document or Related Transaction Document.

(b)     Except for the matters set forth on Schedule 4.5 or which, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, neither Holdings nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other

39

approval required under any Environmental Law, (ii) has received notice of any Environmental Claim or (iv) knows of any basis for any Environmental Claim against Holdings or any of its Subsidiaries.

**Section 4.6.    Compliance with Laws and Agreements**.    Each of Holdings and its Subsidiaries is in compliance with (a) all Requirements of Law and all judgments, decrees and orders of any Governmental Authority and (b) all indentures, agreements or other instruments binding upon it or its properties, except, in the case of clauses (a) and (b) of this Section, where non-compliance, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**Section 4.7.    Investment Company Act**.    Neither Holdings nor any of its Subsidiaries is an "investment company" or is "controlled" by an "investment company", as such terms are defined in, or subject to regulation under, the Investment Company Act of 1940, as amended and in effect from time to time, or (b) otherwise subject to any other regulatory scheme limiting its ability to incur debt or requiring any approval or consent from, or registration or filing with, any Governmental Authority in connection therewith.

**Section 4.8.    Taxes**.    Holdings and its Subsidiaries and each other Person for whose taxes Holdings or any of its Subsidiaries could become liable have timely filed (or timely requested an extension) or caused to be filed (or caused an extension to be timely requested) all federal income tax returns and all other material tax returns that are required to be filed by them, and have paid all taxes shown to be due and payable on such returns or on any assessments made against it or its property and all other taxes, fees or other charges imposed on it or any of its property by any Governmental Authority, except where the same are currently being contested in good faith by appropriate proceedings and for which Holdings or such Subsidiary, as the case may be, has set aside on its books adequate reserves in accordance with GAAP.  The charges, accruals and reserves on the books of Holdings and its Subsidiaries in respect of such taxes are adequate, and no tax liabilities that could be materially in excess of the amount so provided are anticipated.

**Section 4.9.    Margin Regulations**.    None of the proceeds of any of the Loans will be used, directly or indirectly, for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of such terms under Regulation U or for any purpose that violates the provisions of Regulation T, Regulation U or Regulation X.    Neither Holdings nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying "margin stock".

**Section 4.10.    ERISA**.    Each Plan is in substantial compliance in form and operation with its terms and with ERISA and the Code (including the Code provisions compliance with which is necessary for any intended favorable tax treatment) and all other applicable laws and regulations, except where the failure to comply, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No ERISA Event has occurred or is reasonably expected to occur that could reasonably be expected to result in a Material Adverse Effect.  There exists no Unfunded Pension Liability with respect to any Plan.  None of Holdings, any of its Subsidiaries or any ERISA Affiliate is making or accruing an obligation to make contributions, or has, within any of the five calendar years immediately preceding the date this assurance is given or deemed given, made or accrued an obligation to make, contributions to any Multiemployer Plan

40

or any Plan subject to Title IV of ERISA.  Holdings, each of its Subsidiaries and each ERISA Affiliate have made all contributions to or under each Plan and Multiemployer Plan required by law within the applicable time limits prescribed thereby, by the terms of such Plan or Multiemployer Plan, respectively, or by any contract or agreement requiring contributions to a Plan or Multiemployer Plan.  No Plan which is subject to Section 412 of the Code or Section 302 of ERISA has applied for or received an extension of any amortization period within the meaning of Section 412 of the Code or Section 303 or 304 of ERISA.  None of Holdings, any of its Subsidiaries or any ERISA Affiliate have ceased operations at a facility so as to become subject to the provisions of Section 4068(a) of ERISA, withdrawn as a substantial employer so as to become subject to the provisions of Section 4063 of ERISA or ceased making contributions to any Plan subject to Section 4064(a) of ERISA to which it made contributions.

**Section 4.11.  <u>Ownership of Property; Insurance</u>.**

(a)      Each of Holdings and its Subsidiaries has good title to, or valid leasehold interests in, all of its real and personal property material to the operation of its business, including all such properties reflected in the most recent audited consolidated balance sheets referred to in <u>Section 4.4</u> or purported to have been acquired by Holdings or any of its Subsidiaries after said date (except as sold or otherwise disposed of in the ordinary course of business), in each case free and clear of Liens, other than Liens expressly permitted by <u>Section 7.2</u>.  All leases that individually or in the aggregate are material to the business or operations of Holdings and its Subsidiaries are valid and subsisting and are in full force, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

(b)      Each of Holdings and its Subsidiaries owns, or is licensed or otherwise has the right to use, all patents, trademarks, service marks, trade names, copyrights and other intellectual property material to its business, and the use thereof by Holdings and its Subsidiaries does not infringe on the rights of any other Person where such infringement, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

(c)      The properties of Holdings and its Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of Holdings, in such amounts with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where Holdings or any of its Subsidiaries operates.

(d)      <u>Schedule 4.11</u> lists all of the Real Estate owned by the Loan Parties as of the Closing Date.

**Section 4.12.  <u>Disclosure</u>.**  Holdings and the Borrowers have disclosed to the Lenders all agreements, instruments, and corporate or other restrictions to which Holdings or any of its Subsidiaries is subject, and all other matters known to any of them, that, either individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports (including all reports that Holdings is required to file with the Securities and Exchange

41

Commission), financial statements, certificates or other information furnished by or on behalf of Holdings or any Borrower to the Administrative Agent or any Lender in connection with the negotiation or syndication of this Agreement or any other Loan Document or delivered hereunder or thereunder (as modified or supplemented by any other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, taken as a whole in light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected financial information, Holdings and the Borrowers represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time furnished.

Section 4.13. **Labor Relations**.  There are no strikes, lockouts or other material labor disputes or grievances against Holdings or any of its Subsidiaries, or, to the knowledge of Holdings or any Borrower, threatened in writing against or affecting Holdings or any of its Subsidiaries, and no significant unfair labor practice charges or grievances are pending against Holdings or any of its Subsidiaries, or, to the knowledge of Holdings or any Borrower, threatened in writing against any of them before any Governmental Authority.  There are no collective bargaining agreements to which Holdings or any of its Subsidiaries is subject.

Section 4.14. **Subsidiaries**.  Schedule 4.14 sets forth the name of, the ownership interest of the applicable Loan Party in, the jurisdiction of incorporation or organization of, and the type of each Subsidiary of Holdings, the Borrowers and the other Loan Parties and identifies each Subsidiary that is a Subsidiary Loan Party, in each case as of the Closing Date.

Section 4.15. **[Reserved]**.

Section 4.16. **Deposit and Disbursement Accounts**.  Schedule 4.16 lists all banks and other financial institutions at which any Loan Party maintains deposit accounts, lockbox accounts, disbursement accounts, investment accounts or other similar accounts as of the Closing Date, and such Schedule correctly identifies the name, address and telephone number of each financial institution, the name in which the account is held, the type of the account, and the complete account number therefor.

Section 4.17. **Collateral Documents**.  Each of the Interim DIP Order and, as applicable, the Final DIP Order, shall be effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral and proceeds thereof.

Section 4.18. **Material Agreements**.  As of the Closing Date, all Material Agreements of Holdings and its Subsidiaries are described on Schedule 4.18, and each such Material Agreement is in full force and effect, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.  Neither Holdings nor any Borrower has any knowledge of any pending amendments or threatened termination of any of the Material Agreements.  As of the Closing Date, the Borrowers have delivered to the Administrative Agent a true, complete and correct copy of each Material Agreement (including all schedules, exhibits, amendments, supplements, modifications, assignments and all other documents delivered pursuant thereto or in connection therewith) in effect as of the Closing Date.

42

**Section 4.19.  Reserved**.

**Section 4.20.  OFAC**.  Holdings and the Borrowers have implemented and maintain in effect policies and procedures designed to ensure compliance by Holdings, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and Holdings, its Subsidiaries and their respective officers and employees and, to the knowledge of Holdings, its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.  None of (a) the Borrower, any Subsidiary or any of their respective directors, officers or employees or (b) to the knowledge of any Borrower, any agent of any Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Borrowing, use of proceeds or other transaction contemplated by this Agreement will violate any Anti-Corruption Law or applicable Sanctions.

**Section 4.21.  Patriot Act**.  Neither any Loan Party nor any of its Subsidiaries is an "enemy" or an "ally of the enemy" within the meaning of Section 2 of the Trading with the Enemy Act or any enabling legislation or executive order relating thereto.  Neither any Loan Party nor any of its Subsidiaries is in violation of (a) the Trading with the Enemy Act, (b) any of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto or (c) the Patriot Act.  None of the Loan Parties (i) is a blocked person described in Section 1 of the Anti-Terrorism Order or (ii) to the best of its knowledge, engages in any dealings or transactions, or is otherwise associated, with any such blocked person.

**Section 4.22.  Inactive Subsidiaries**.  Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, no Inactive Subsidiary employs any employees, owns any assets, has incurred any obligations or conducts any business activity.

**Section 4.23.  Bankruptcy Matters**.

(a)     The Interim DIP Order and, at all times after its entry by the Bankruptcy Court, the Final DIP Order, is in full force and effect, and has not been reversed, modified, amended, stayed or vacated absent the written consent of each Lender.

(b)     Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lenders shall, subject to the provisions of the Final DIP Order, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder in accordance with the terms hereof, without further application to or order by the Bankruptcy Court.

(c)     If either the Interim DIP Order or the Final DIP Order is the subject of a pending appeal in any respect, none of such Order, the making of the Loans or the performance by the Borrowers or the Guarantors of any of their obligations under any of the Loan Documents is or shall be the subject of a presently effective stay pending appeal. The Loan Parties, the Administrative Agent and the Lenders shall be entitled to rely in good faith upon the Orders, notwithstanding objection thereto or appeal therefrom by any interested party.  The Loan Parties, the Administrative Agent and the Lenders shall be

43

permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction.

## ARTICLE V

## AFFIRMATIVE COVENANTS

Each of Holdings and the Borrowers covenants and agrees that so long as any Lender has a Commitment hereunder or any Obligation remains unpaid or outstanding:

**Section 5.1.    Approved Budget Reconciliations**.    Commencing on [the first Tuesday following the Closing Date] and on each successive [Tuesday] thereafter, the Borrowers shall deliver to the Administrative Agent and the Lenders a reconciliation of actual cash receipts and cash expenditures against the projected cash receipts and cash expenditures set forth in the Approved Budget.

**Section 5.2.    Notices of Material Events**.    The Borrowers will furnish to the Administrative Agent and each Lender prompt written notice of the following:

(a)    the occurrence of any Event of Default;

(b)    the filing or commencement of, or any material development in, any action, suit or proceeding by or before any arbitrator or Governmental Authority against or, to the knowledge of Holdings or any Borrower, affecting Holdings or any of its Subsidiaries which, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

(c)    the occurrence of any event or any other development by which Holdings or any of its Subsidiaries (i) fails to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) becomes subject to any Environmental Claim, (iii) receives notice of any Environmental Claim or (iv) becomes aware of any basis for any Environmental Claim, in each case which, either individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(d)    (i) the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of Holdings and any of its Subsidiaries in an aggregate amount exceeding $1,000,000 or which, either individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, or (ii) the adoption of, or the commencement of contributions to, any Plan subject to Title IV of ERISA or any Multiemployer Plan by Holdings, any of its Subsidiaries or any ERISA Affiliate;

(e)    [Reserved.];

44

(f)  any material amendment or modification to any Material Agreement (together with a copy thereof), and prompt notice of any termination or loss of any Material Agreement;

(g)  any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

The Borrowers will furnish to the Administrative Agent and each Lender the following:

(x)  promptly and in any event at least 30 days prior thereto, notice of any change (i) in any Loan Party's legal name, (ii) in any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility), (iii) in any Loan Party's identity or legal structure, (iv) in any Loan Party's federal taxpayer identification number or organizational number or (v) in any Loan Party's jurisdiction of organization; and

(y)  as soon as available and in any event within 30 days after receipt thereof, a copy of any environmental report or site assessment obtained by or for Holdings or any of its Subsidiaries after the Closing Date on any Real Estate.

Each notice or other document delivered under this Section shall be accompanied by a written statement of a Responsible Officer setting forth the details of the event or development requiring such notice or other document and any action taken or proposed to be taken with respect thereto.

**Section 5.3.   Existence; Conduct of Business**.  Holdings and the Borrowers will, and will cause each of their Subsidiaries to, do or cause to be done all things necessary to preserve, renew and maintain in full force and effect (i) its legal existence and (ii) its respective rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except, in the case of this clause (ii), where the failure to do so, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; provided that nothing in this Section shall prohibit any merger, consolidation, liquidation or dissolution permitted under Section 7.3.

**Section 5.4.   Compliance with Laws**.  Holdings and the Borrowers will, and will cause each of their Subsidiaries to, comply with all laws, rules, regulations and requirements of any Governmental Authority applicable to its business and properties, including all Environmental Laws, ERISA and OSHA, except where the failure to do so, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The Borrowers will maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrowers, their Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

**Section 5.5.   Payment of Obligations**.  Holdings and the Borrowers will, and will cause each of their Subsidiaries to, pay and discharge at or before maturity all of its Postpetition obligations and liabilities (including all taxes, assessments and other governmental charges, levies

45

and all other claims that could result in a statutory Lien) before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Group Member has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

**Section 5.6.** **Books and Records**.  Holdings and the Borrowers will, and will cause each of their Subsidiaries to, keep proper books of record and account in which full, true and correct entries shall be made of all dealings and transactions in relation to its business and activities to the extent necessary to prepare the consolidated financial statements of Holdings in conformity with GAAP.

**Section 5.7.** **Visitation and Inspection**.  Holdings and the Borrowers will, and will cause each of their Subsidiaries to, permit any representative of the Administrative Agent or any Lender to visit and inspect their properties, to examine their books and records and to make copies and take extracts therefrom, and to discuss their affairs, finances and accounts with any of their officers and with their independent certified public accountants, all at such reasonable times and as often as the Administrative Agent or any Lender may reasonably request after reasonable prior notice to the Borrowers; provided that if an Event of Default has occurred and is continuing, no prior notice shall be required; provided, further, that, unless an Event of Default shall have occurred and be continuing, the Administrative Agent and the Lenders shall not exercise such rights under this Section 5.7 more often than once per year.

**Section 5.8.** **Maintenance of Properties; Insurance**.  Holdings and the Borrowers will, and will cause each of their Subsidiaries to, (a) keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, (b) maintain with financially sound and reputable insurance companies which are not Affiliates of Holdings (i) insurance with respect to its properties and business, and the properties and business of its Subsidiaries, against loss or damage of the kinds customarily insured against by companies in the same or similar businesses operating in the same or similar locations (including, in any event, if any improved real property is located in a special flood hazard area, a policy of flood insurance that is on terms satisfactory to the Administrative Agent) and (ii) all insurance required to be maintained pursuant to the Collateral Documents, and will, upon request of the Administrative Agent, furnish to each Lender at reasonable intervals a certificate of a Responsible Officer setting forth the nature and extent of all insurance maintained by Holdings and its Subsidiaries in accordance with this Section, and (c) at all times shall name the Administrative Agent as additional insured on all liability policies of Holdings and its Subsidiaries and as lender loss payee (pursuant to a lender loss payee endorsement reasonably approved by the Administrative Agent) on all casualty and property insurance policies of Holdings and its Subsidiaries.

**Section 5.9.** **Use of Proceeds; Margin Regulations**.  The Borrowers will use the proceeds of all Loans for general working capital, subject to the Approved Budget.  No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that would violate any rule or regulation of the Board of Governors of the Federal Reserve System, including Regulation T, Regulation U or Regulation X.  The Borrowers will not request any Loans, and the Borrowers shall not use, and shall procure that Holdings and its Subsidiaries and their respective

46

directors, officers, employees and agents shall not use, the proceeds of any Loans (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

**Section 5.10.  Casualty and Condemnation**.  The Borrowers (a) will furnish to the Administrative Agent and the Lenders prompt written notice of any casualty or other insured damage to any material portion of any Collateral or the commencement of any action or preceding for the taking of any material portion of any Collateral or any part thereof or interest therein under power of eminent domain or by condemnation or similar proceeding and (b) will ensure that the net cash proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of this Agreement and the Collateral Documents.

**Section 5.11.  Agreement to Deliver Collateral Documents**.  Holdings shall, and shall cause each other Loan Parties to, deliver, to further secure the Obligations whenever requested by Administrative Agent in its discretion, deeds of trust, mortgages, chattel mortgages, security agreements, financing statements and other Collateral Documents in form and substance satisfactory to Administrative Agent for the purpose of granting, confirming, and perfecting first and prior liens or security interests in any real or personal property now owned or hereafter acquired by any Loan Party.  Holdings shall, and shall cause each other Loan Party to, deliver, whenever requested by Administrative Agent, in its discretion, transfer orders or letters in lieu thereof with respect to the production and proceeds of production from the Collateral, in form and substance reasonably satisfactory to Administrative Agent.  Holdings shall, and shall cause each other Loan Party to, deliver, whenever requested by Administrative Agent in its discretion, favorable title opinions from legal counsel acceptable to Administrative Agent with respect to any Loan Party's properties and interests designated by Administrative Agent, based upon abstract or record title examinations to dates acceptable to Administrative Agent and (a) stating that such Loan Party has good and defensible title to such properties and interests, free and clear of all Liens other than Permitted Encumbrances, (b) confirming that such properties and interests are subject to Collateral Documents securing the Obligations that constitute and create legal, valid and duly perfected first deed of trust or mortgage liens in such properties and interests and first priority assignments of and security interests in the oil and gas attributable to such properties and interests and the proceeds thereof, and (c) covering such other matters as Administrative Agent may request. Upon request, Holdings shall, and shall cause each other Loan Party to, deliver duly executed control agreements from each institution holding any of its or their deposit accounts pursuant to which such institution recognizes Administrative Agent's Lien in such deposit accounts and, upon the occurrence and during the continuance of a Default, agrees to transfer collected balances in all such deposit accounts to Administrative Agent pursuant to its instructions from time to time; provided that no such control agreement shall be required with respect to deposit accounts that are designated solely as payroll funding accounts.

**Section 5.12.  Reserved.**.

CHAR2\1829046v7

**Section 5.13.** **Reserved.**.

**Section 5.14.** **Further Assurances**.  Holdings and the Borrowers will, and will cause each other Loan Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, Mortgages and other documents and the receipt of flood zone certifications and related regulatory compliance), which may be required under any applicable law, or which the Administrative Agent or the Required Lenders may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created by the Collateral Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties.  Holdings and the Borrowers also agrees to provide to the Administrative Agent, from time to time upon request, evidence reasonably satisfactory to the Administrative Agent as to the perfection and priority of the Liens created or intended to be created by the Collateral Documents.

**Section 5.15.** **Acceptable Sale Process Milestones**.  The Loan Parties shall cause the following actions (collectively, the "Milestones") to occur no later than the applicable date set forth below:

(a)      No later than [fifteen (15)] calendar days after the Petition Date, obtain Bankruptcy Court approval and entry of the Bid Procedures Order;

(b)      By no later than [thirty (30)] calendar days after the Petition Date, complete the process of soliciting binding bids to acquire substantially all of the assets of the Loan Parties pursuant to the Bid Procedures Order;

(c)      No later than [forty-five (45)] calendar days after the Petition Date, commence and complete, subject to the supervision of the Bankruptcy Court and in accordance with the Bid Procedures Order, the Auction (as defined in the Bid Procedures Order), upon the completion of which the Loan Parties shall evaluate each bid at the Auction and, in accordance with the Bid Procedures Order, select the successful bid for subsequent approval by the Bankruptcy Court pursuant to the Sale Order;

(d)      No later than [five (5)] business days after the conclusion of the Auction, obtain approval of a Sale to a buyer on the terms of the successful bid (the "Approved Sale") pursuant to a sale order in form and substance reasonably acceptable to Administrative Agent, Prepetition Agent and the Loan Parties (the "Sale Order"); and

(e)      No later than [sixty (60)] calendar days after the Petition Date, consummate the Approved Sale pursuant to the Sale Order.

**Section 5.16.** **Prepetition Credit Documents Reporting Requirements**.  Holdings shall deliver to each Secured Party any documents or information that is required to be delivered to the Prepetition Agent or any Prepetition Lender pursuant to the Prepetition Credit Agreement or any other Prepetition Credit Documents (each as in effect on the date hereof).

**Section 5.17.** **Performance of Postpetition Obligations**.  The Loan Parties shall perform all of their material Postpetition obligations.

48

# ARTICLE VI

# FINANCIAL COVENANTS.

**Section 6.1.    Approved Budget Variance..**

(a)    Borrowers shall not expend any funds or monies for any purpose other than those line items set forth in the Approved Budget.  Borrowers' actual cash payments for any measurement period covered by the Approved Budget set forth in (c) below may not exceed the budgeted amount (both as to individual line items and as to total disbursements) through the conclusion of such measurement period set forth in (c) below, plus, the applicable variance set forth in (d) below.

(b)    Borrowers shall comply with the cash receipt projections set forth in the Approved Budget for any measurement period covered by the Approved Budget set forth in (c) below plus the applicable variance set forth in (d) below.  Variances shall be determined by comparing the actual results to the applicable total receipts projections set forth in the Approved Budget.

(c)    Compliance shall be measured each week on rolling four week periods covered by the Approved Budget ("Test Period").

(d)    During any Test Period there will be (i) a permitted variance to Approved Budget amounts for line item disbursements is ten percent (10%) for any single line item contained in the Approved Budget and (ii) a permitted variance to Approved Budget amounts for cash receipts of twenty percent (20%) over any two week period.  Except as provided above, there shall be no other variance to the Approved Budget.

# ARTICLE VII

# NEGATIVE COVENANTS

Each of Holdings and the Borrowers covenants and agrees that so long as any Lender has a Commitment hereunder or any Obligation remains outstanding:

**Section 7.1.    Indebtedness and Preferred Equity**.  Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to, create, incur, assume or suffer to exist any Postpetition Indebtedness, except:

(a)    Indebtedness created pursuant to the Loan Documents;

(b)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; provided that such Indebtedness is extinguished within five (5) Business Days of incurrence;

49

(c)      Indebtedness arising in connection with the endorsement of instruments for deposit in the ordinary course of business;

(d)      Indebtedness representing deferred compensation to employees of Holdings or any of its Subsidiaries incurred in the ordinary course of business.

Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to, issue any preferred stock or other preferred equity interest.

**Section 7.2.**      **Liens**.  Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to, create, incur, assume or suffer to exist any Postpetition Lien on any of its assets or property now owned or hereafter acquired, except:

(a)      Liens securing the Obligations; and

(b)      Permitted Encumbrances.

**Section 7.3.**      **Fundamental Changes**.

(a)      Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to, merge into or consolidate into any other Person, or permit any other Person to merge into or consolidate with it, or sell, lease, transfer or otherwise dispose of (in a single transaction or a series of transactions) all or substantially all of its assets (in each case, whether now owned or hereafter acquired) or all or substantially all of the stock of any of their Subsidiaries (in each case, whether now owned or hereafter acquired) or liquidate or dissolve, except as contemplated by the Bid Procedures Order.

(b)      Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to, engage in any business other than businesses of the type conducted by Holdings and its Subsidiaries on the date hereof and businesses reasonably related thereto.

**Section 7.4.**      **Investments, Loans**.  Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to, purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any Capital Stock, evidence of Indebtedness or other securities (including any option, warrant, or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person (all of the foregoing being collectively called "Investments"), or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person that constitute a business unit, or create or form any Subsidiary, except:

(a)      Investments (other than Permitted Investments) existing on the date hereof; and

(b)      Permitted Investments.

**Section 7.5.    Restricted Payments**.  Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment.

**Section 7.6.    Sale of Assets**.  Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to, convey, sell, lease, assign, transfer or otherwise dispose of any of their assets, business or property or, in the case of any Subsidiary, any shares of such Subsidiary's Capital Stock, in each case whether now owned or hereafter acquired, to any Person other than any Loan Party (or to qualify directors if required by applicable law), except:

> (a)    the sale or other disposition for fair market value of obsolete or worn out property or other property not necessary for operations disposed of in the ordinary course of business;

> (b)    the sale of inventory and Permitted Investments in the ordinary course of business;

> (c)    dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of Holdings or any of its Subsidiaries; and

> (d)    the sale contemplated by the Bid Procedures Order.

**Section 7.7.    Transactions with Affiliates**.  Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except:

> (a)    in the ordinary course of business at prices and on terms and conditions not less favorable to such Group Member than could be obtained on an arm's-length basis from unrelated third parties; and

> (b)    transactions between or among any Group Member and any other Group Members not involving any other Affiliates.

**Section 7.8.    Restrictive Agreements**.  Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any agreement that prohibits, restricts or imposes any condition upon (a) the ability of Holdings or any of its Subsidiaries to create, incur or permit any Lien upon any of its assets or properties, whether now owned or hereafter acquired, or (b) the ability of any of its Subsidiaries to pay dividends or other distributions with respect to its Capital Stock, to make or repay loans or advances to Holdings or any other Subsidiary thereof, to Guarantee Indebtedness of Holdings or any other Subsidiary thereof or to transfer any of its property or assets to Holdings or any other Subsidiary thereof; provided that (i) the foregoing shall not apply to restrictions or conditions imposed by law or by this Agreement or any other Loan Document, (ii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is sold and such sale is permitted hereunder, (iii) clause (a) shall not apply to restrictions or conditions

51

imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions and conditions apply only to the property or assets securing such Indebtedness and (iv) clause (a) shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

Section 7.9.    **Sale and Leaseback Transactions**.  Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereinafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred.

Section 7.10.  **Hedging Transactions**.  Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to, enter into any Hedging Transaction.

Section 7.11.  **Amendment to Material Documents**.  Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to, amend, modify or waive any of its rights under (a) its certificate of incorporation, bylaws or other organizational documents or (b) any Material Agreements, except, in the case of clauses (a) and (b), in any manner that would not have a material adverse effect on the Lenders, the Administrative Agent, Holdings or any of its Subsidiaries.

Section 7.12.  **[Reserved]**.

Section 7.13.  **Accounting Changes**.  Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to, make any significant change in accounting treatment or reporting practices, except as required by GAAP, or change the fiscal year of Holdings or of any of its Subsidiaries, except to change the fiscal year of a Subsidiary to conform its fiscal year to that of Holdings.

Section 7.14.  **Lease Obligations**.  Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to, create or suffer to exist any obligations for the payment under operating leases or agreements to lease (but excluding any obligations under leases required to be classified as capital leases under GAAP having a term of five years or more) on a Postpetition basis.

Section 7.15.  **Government Regulation**.  Holdings and the Borrowers will not, and will not permit any of their Subsidiaries to, (a) be or become subject at any time to any law, regulation or list of any Governmental Authority of the United States (including the OFAC list) that prohibits or limits the Lenders or the Administrative Agent from making any advance or extension of credit to the Borrowers or from otherwise conducting business with the Loan Parties, or (b) fail to provide documentary and other evidence of the identity of the Loan Parties as may be reasonably requested by the Lenders or the Administrative Agent at any time to enable the Lenders or the Administrative Agent to verify the identity of the Loan Parties or to comply with any applicable law or regulation, including Section 326 of the Patriot Act at 31 U.S.C. Section 5318.

Section 7.16.  **Inactive Subsidiaries**. Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, no Inactive Subsidiary shall employ any

CHAR2\1829046v7

employees, own any assets, incur any obligations or conduct any business activity, other than liquidating or dissolving.

Section 7.17.  **Bankruptcy Matters**.  Neither Holdings nor any other Loan Party will:

(a)  at any time, seek or consent to any reversal, modification, amendment, stay or vacation of (i) any "first day order" entered by the Bankruptcy Court in the Chapter 11 Case, if such reversal, modification, amendment, stay or vacation could have an adverse effect on the rights of the Lenders under this Agreement, (ii) the Interim DIP Order or (iii) the Final DIP Order;

(b)  at any time, seek or consent to a priority for any administrative expense or unsecured claim against Holdings or any other Loan Party (now existing or hereafter arising) of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, Sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code equal or superior to the priority of the Secured Parties' in respect of the Obligations; or

(c)  prior to the date on which the Obligations have been paid in cash in full (or as otherwise provided pursuant to the Acceptable Sale Process) and the Commitments have been cancelled and terminated, (i) pay any administrative expense claims of the Loan Parties except (A) the Obligations then due and payable hereunder or (B) other administrative expense and professional claims set forth in the Approved Budget, in each case to the extent and having the order of priority set forth in the Orders or (ii) file with the Bankruptcy Court any alternative debtor-in-possession financing proposal that does not provide for the Obligations and the Prepetition Facility Obligations to be paid in cash in full (or as otherwise provided pursuant to the Acceptable Sale Process) and for the Commitments to be cancelled and terminated.

# ARTICLE VIII

# EVENTS OF DEFAULT

Section 8.1.  **Events of Default**.  If any of the following events (each, an "Event of Default") shall occur:

(a)  the Borrowers shall fail to pay any principal of any Loan, when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment or otherwise; or

(b)  the Borrowers shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount payable under subsection (a) of this Section) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) Business Days; or

(c)  any representation or warranty made or deemed made by or on behalf of Holdings or any of its Subsidiaries in or in connection with this Agreement or any other

53

Loan Document (including the Schedules attached hereto and thereto), or in any amendments or modifications hereof or waivers hereunder, or in any certificate, report, financial statement or other document submitted to the Administrative Agent or the Lenders by any Loan Party or any representative of any Loan Party pursuant to or in connection with this Agreement or any other Loan Document shall prove to be incorrect in any material respect (other than any representation or warranty that is expressly qualified by a Material Adverse Effect or other materiality, in which case such representation or warranty shall prove to be incorrect in any respect) when made or deemed made or submitted; or

(d)     any Loan Party shall fail to observe or perform any covenant or agreement contained in <u>Section 5.1</u>, <u>5.2</u>, <u>5.3</u>, <u>5.15</u> and <u>6.1</u> (with respect to any Loan Party's legal existence) or <u>Article VII</u>; or

(e)     any Loan Party shall fail to observe or perform any covenant or agreement contained in this Agreement (other than those referred to in subsections (a), (b) and (d) of this Section) or any other Loan Document, and such failure shall remain unremedied for 30 days after the earlier of (i) any officer of any Borrower becomes aware of such failure, or (ii) notice thereof shall have been given to the Borrowers by the Administrative Agent or any Lender; or

(f)     Holdings or any of its Subsidiaries (whether as primary obligor or as guarantor or other surety) shall fail to pay any principal of, or premium or interest on, any Material Indebtedness that is outstanding, when and as the same shall become due and payable (whether at scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument evidencing or governing such Indebtedness; or any other event shall occur or condition shall exist under any agreement or instrument relating to any Material Indebtedness and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or permit the acceleration of, the maturity of such Indebtedness; or any Material Indebtedness shall be declared to be due and payable, or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, or any offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case prior to the stated maturity thereof; or

(g)     Holdings or any of its Subsidiaries shall become unable to pay, shall admit in writing its inability to pay, or shall fail to pay, its debts as they become due; or

(h)     (i) an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with other ERISA Events that have occurred, could reasonably be expected to result in liability to Holdings and its Subsidiaries in an aggregate amount exceeding $1,000,000, (ii) there is or arises an Unfunded Pension Liability (not taking into account Plans with negative Unfunded Pension Liability) in an aggregate amount exceeding $1,000,000, or (iii) there is or arises any potential Withdrawal Liability in an aggregate amount exceeding $1,000,000; or

(i)      any judgment or order for the payment of money in excess of $1,000,000 in the aggregate (excluding amounts covered by insurance to the extent the relevant independent third-party insurer has not denied coverage therefor) shall be rendered against Holdings or any of its Subsidiaries, and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be a period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(j)      any non-monetary judgment or order shall be rendered against Holdings or any of its Subsidiaries that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, and there shall be a period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(k)      a Change in Control shall occur or exist; or

(l)      any provision of the Guaranty and Security Agreement or any other Collateral Document shall for any reason (other than in accordance with its terms) cease to be valid and binding on, or enforceable against, any Loan Party, or any Loan Party shall so state in writing, or any Loan Party shall seek to terminate its obligation under the Guaranty and Security Agreement or any other Collateral Document (other than the release of any guaranty or collateral to the extent permitted pursuant to Section 9.11); or

(m)      any Lien purported to be created under any Collateral Document shall fail or cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any Collateral, with the priority required by the applicable Collateral Documents, subject to Liens expressly permitted by Section 7.2 (other than Section 7.2(b));

(n)      any Lien purported to be created under any Collateral Document shall fail or cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any Collateral, with the priority required by the applicable Collateral Documents, subject to Liens expressly permitted by Section 7.2 (other than Section 7.2(b));

(o)      any of the following shall occur:

(i) the Chapter 11 Case shall be dismissed (which dismissal does not require as a condition to such dismissal the termination of the Lenders' Commitments and the payment in full in cash of all Obligations and the Prepetition Facility Obligations) or converted to a case under Chapter 7 of the Bankruptcy Code or the Loan Parties shall file a motion or other pleading seeking the dismissal or conversion of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise without the consent of the Lenders; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Chapter 11 Case; the board of directors of one or more of the Loan Parties shall authorize a liquidation of any Loan Party's

business, except pursuant to the Acceptable Sale Process; or an application shall be filed by the Loan Parties for the approval of any other Superpriority Claim (other than the Carve-Out, which shall have a Superpriority Claim ranking senior to the Obligations, and which shall be paid by the Loan Parties at the times and in the amounts permitted by an order of the Bankruptcy Court) in the Chapter 11 Case which is senior to the claims of the Lenders against the Loan Parties hereunder or under any of the other Loan Documents if it is not used to repay the Obligations in full in cash, or there shall arise or be granted any such senior Superpriority Claim;

(ii) the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code pertaining to the Collateral to the holder or holders of any security interest to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Loan Parties in an amount not to exceed $250,000, individually or in the aggregate or (ii) permit other actions that would have a Material Adverse Effect;

(iii) (i) the Final Order Entry Date shall not have occurred on or prior to the date occurring thirty (30) calendar days after the Petition Date, (ii) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim DIP Order and/or the Final DIP Order without the prior written consent of each Lender, or any Loan Party shall apply for authority to do so, without the prior written consent of each Lender, (iii) an order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court without the express prior written consent of the Lenders to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties equal or superior to the priority of the Secured Parties in respect of the Obligations except as otherwise provided in this Agreement, (iv) an order of the Bankruptcy Court shall be entered permitting the grant of a Lien on the Collateral (other than Permitted Encumbrances), (v) the Interim DIP Order and/or the Final DIP Order shall cease to create a valid and perfected first priority Lien (subject to Permitted Encumbrances) on the Collateral or otherwise cease to be valid and binding and in full force and effect, (vi) any of the Loan Parties shall fail to comply with any material provision (or any provision in such a way as is materially adverse to the interests of the Secured Parties) of the Interim DIP Order and/or the Final DIP Order, (vii) any Loan Party shall seek any modification of the Interim DIP Order and/or the Final DIP Order or assert in any pleading filed in any court that any material provision of the Interim DIP Order and/or the Final DIP Order is not valid and binding for any reason or otherwise modifying the Interim DIP Order and/or the Final DIP Order in a manner adverse to the Secured Parties, (viii) the period provided by Section 1121 of the Bankruptcy Code for the Loan Parties' exclusive right to file a plan shall expire or terminate, or (ix) if any Loan Party is enjoined, restrained or in any way prevented by court order from continuing or conducting all or any material part of its business or affairs;

(iv) except as permitted by the DIP Facility, the Orders, the Approved Budget or as otherwise agreed to by the Required Lenders, the Loan Parties shall

CHAR2\1829046v7

make (or shall have made) any Prepetition Payment other than Prepetition Payments authorized by the Bankruptcy Court in accordance with orders of the Bankruptcy Court entered with the consent of (or non-objection by) the Required Lenders;

(v) the Bankruptcy Court shall enter an order avoiding or requiring disgorgement by the Secured Parties of any amounts received in respect of the Obligations;

(vi) the Bankruptcy Court shall enter an order or orders to sell, transfer, lease, exchange, alienate or otherwise dispose of any assets, properties or equity of any Loan Party pursuant to Section 363 of the Bankruptcy Code other than pursuant to the Acceptable Sale Process without the consent of the Lenders unless such order or orders contemplate the repayment in full in cash of and termination in full of all Commitments and Obligations under the DIP Facility;

(vii) any of the Loan Parties shall take any action in support of any matter set forth in Section 8.1(i)(i-vii) or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal;

(viii) any Loan Party shall file a motion, pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment;

(ix) any Loan Party shall file a motion in the Chapter 11 Case (i) to use Cash Collateral under Section 363(c) of the Bankruptcy Code without the consent of the Lenders and the Prepetition Lenders, (ii) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted under this Agreement or (iii) to take any other action or actions adverse to Administrative Agent, the Lenders, the Prepetition Agent or the Prepetition Lenders or their rights and remedies hereunder or under any of the other Loan Documents, the Prepetition Credit Documents or the Orders, or Administrative Agent's, Prepetition Agent's, Lenders' or Prepetition Lenders' interest in any of the Collateral, except that the Loan Parties are entitled to conduct the Acceptable Sale Process in a manner consistent with the Bid Procedures Order;

(x) the filing by any Loan Party of any plan of reorganization or liquidation that is not approved by the Administrative Agent and the Lenders unless such plan of reorganization or liquidation provides for the repayment in full in cash of and termination in full of all Commitments and Obligations under the DIP Facility; or

(xi) entry of an order by the Bankruptcy Court authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral;

CHAR2\1829046v7

then, and in every such event and at any time thereafter during the continuance of such event, the Administrative Agent may, and upon the written request of the Required Lenders shall, by notice to the Borrowers, take any or all of the following actions, at the same or different times: (i) terminate the Commitments, whereupon the Commitment of each Lender shall terminate immediately, (ii) declare the principal of and any accrued interest on the Loans, and all other Obligations owing hereunder, to be, whereupon the same shall become, due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers, (iii) exercise all remedies contained in any other Loan Document, and (iv) exercise any other remedies available at law or in equity; provided that, if an Event of Default specified in either subsection (h) or (i) shall occur, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon, and all fees and all other Obligations shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers.

**Section 8.2.** **Application of Proceeds from Collateral**. All proceeds from each sale of, or other realization upon, all or any part of the Collateral by any Secured Party after an Event of Default arises shall be applied as follows:

(a)     first, to the reimbursable expenses of the Administrative Agent incurred in connection with such sale or other realization upon the Collateral, until the same shall have been paid in full;

(b)     second, to the fees and other reimbursable expenses of the Administrative Agent then due and payable pursuant to any of the Loan Documents, until the same shall have been paid in full;

(c)     third, to all reimbursable expenses, if any, of the Lenders then due and payable pursuant to any of the Loan Documents, until the same shall have been paid in full;

(d)     fourth, to the fees and interest then due and payable under the terms of this Agreement, until the same shall have been paid in full;

(e)     fifth, to the aggregate outstanding principal amount of the Loans;

(f)     sixth, to the extent any proceeds remain, to the Borrowers or as otherwise provided by a court of competent jurisdiction.

All amounts allocated pursuant to the foregoing clauses third through sixth to the Lenders as a result of amounts owed to the Lenders under the Loan Documents shall be allocated among, and distributed to, the Lenders pro rata based on their respective Pro Rata Shares.

## ARTICLE IX

## THE ADMINISTRATIVE AGENT

**Section 9.1.** **Appointment of the Administrative Agent**. Each Lender irrevocably appoints SunTrust Bank as the Administrative Agent and authorizes it to take such actions on its

behalf and to exercise such powers as are delegated to the Administrative Agent under this Agreement and the other Loan Documents, together with all such actions and powers that are reasonably incidental thereto. The Administrative Agent may perform any of its duties hereunder or under the other Loan Documents by or through any one or more sub-agents or attorneys-in-fact appointed by the Administrative Agent. The Administrative Agent and any such subagent or attorney-in-fact may perform any and all of its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions set forth in this Article shall apply to any such sub-agent, attorney-in-fact or Related Party and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Administrative Agent.

**Section 9.2.    <u>Nature of Duties of the Administrative Agent</u>**. The Administrative Agent shall not have any duties or obligations except those expressly set forth in this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except those discretionary rights and powers expressly contemplated by the Loan Documents that the Administrative Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 10.2</u>), and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Holdings or any of its Subsidiaries that is communicated to or obtained by the Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it, its sub-agents or its attorneys-in-fact with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 10.2</u>) or in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents or attorneys-in-fact selected by it with reasonable care. The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof (which notice shall include an express reference to such event being a "Default" or "Event of Default" hereunder) is given to the Administrative Agent by any Borrower or any Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements, or other terms and conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in <u>Article III</u> or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent. The Administrative Agent may consult with legal counsel (including counsel for the Borrowers) concerning all matters pertaining to such duties.

**Section 9.3.    <u>Lack of Reliance on the Administrative Agent</u>**. Each of the Lenders acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate,

59

made its own credit analysis and decision to enter into this Agreement. Each of the Lenders also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, continue to make its own decisions in taking or not taking any action under or based on this Agreement, any related agreement or any document furnished hereunder or thereunder. Each of the Lenders acknowledges and agrees that outside legal counsel to the Administrative Agent in connection with the preparation, negotiation, execution, delivery and administration (including any amendments, waivers and consents) of this Agreement and the other Loan Documents is acting solely as counsel to the Administrative Agent and is not acting as counsel to any Lender (other than the Administrative Agent and its Affiliates) in connection with this Agreement, the other Loan Documents or any of the transactions contemplated hereby or thereby.

**Section 9.4.    Certain Rights of the Administrative Agent**. If the Administrative Agent shall request instructions from the Required Lenders with respect to any action or actions (including the failure to act) in connection with this Agreement, the Administrative Agent shall be entitled to refrain from such act or taking such act unless and until it shall have received instructions from such Lenders, and the Administrative Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, no Lender shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders where required by the terms of this Agreement.

**Section 9.5.    Reliance by the Administrative Agent**. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, posting or other distribution) believed by it to be genuine and to have been signed, sent or made by the proper Person. The Administrative Agent may also rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (including counsel for the Borrowers), independent public accountants and other experts selected by it and shall not be liable for any action taken or not taken by it in accordance with the advice of such counsel, accountants or experts.

**Section 9.6.    The Administrative Agent in its Individual Capacity**. The bank serving as the Administrative Agent shall have the same rights and powers under this Agreement and any other Loan Document in its capacity as a Lender as any other Lender and may exercise or refrain from exercising the same as though it were not the Administrative Agent; and the terms "Lenders", "Required Lenders", or any similar terms shall, unless the context clearly otherwise indicates, include the Administrative Agent in its individual capacity. The bank acting as the Administrative Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of business with any Borrower or any Subsidiary or Affiliate of any Borrower as if it were not the Administrative Agent hereunder.

**Section 9.7.    Successor Administrative Agent**.

(a)    The Administrative Agent may resign at any time by giving notice thereof to the Lenders and the Borrowers. Upon any such resignation, the Required Lenders

CHAR2\1829046v7

shall have the right to appoint a successor Administrative Agent, subject to approval by the Borrowers provided that no Default or Event of Default shall exist at such time.  If no successor Administrative Agent shall have been so appointed, and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be a commercial bank organized under the laws of the United States or any state thereof or a bank which maintains an office in the United States, having a combined capital and surplus of at least $500,000,000.

(b)     Upon the acceptance of its appointment as the Administrative Agent hereunder by a successor, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents.  If, within 45 days after written notice is given of the retiring Administrative Agent's resignation under this Section, no successor Administrative Agent shall have been appointed and shall have accepted such appointment, then on such 45th day (i) the retiring Administrative Agent's resignation shall become effective, (ii) the retiring Administrative Agent shall thereupon be discharged from its duties and obligations under the Loan Documents and (iii) the Required Lenders shall thereafter perform all duties of the retiring Administrative Agent under the Loan Documents until such time as the Required Lenders appoint a successor Administrative Agent as provided above.  After any retiring Administrative Agent's resignation hereunder, the provisions of this Article shall continue in effect for the benefit of such retiring Administrative Agent and its representatives and agents in respect of any actions taken or not taken by any of them while it was serving as the Administrative Agent.

## Section 9.8.   <u>Withholding Tax</u>.

(a)     To the extent required by any applicable law, the Administrative Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding tax.  If the Internal Revenue Service or any authority of the United States or any other jurisdiction asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender (because the appropriate form was not delivered or was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason), such Lender shall indemnify the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrowers and without limiting the obligation of the Borrowers to do so) fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including penalties and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses.

(b)     Without duplication of any indemnity provided under subsection (a) of this Section, each Lender shall also indemnify the Administrative Agent, within 10 days after

CHAR2\1829046v7

demand therefor, for (i) any Indemnified Taxes or Other Taxes attributable to such Lender (to the extent that the Administrative Agent has not already been reimbursed by the Borrowers and without limiting the obligation of the Borrowers to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.4(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this subsection.

**Section 9.9.    The Administrative Agent May File Proofs of Claim**.

(a)    In case of the pendency the Chapter 11 Case, the Administrative Agent (irrespective of whether the principal of any Loan or any Revolving Credit Exposure shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(i)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans or Revolving Credit Exposure and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and its agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 10.3) allowed in such judicial proceeding; and

(ii)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same.

(b)    Any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 10.3.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or

CHAR2\1829046v7

to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

**Section 9.10.  <u>Authorization to Execute Other Loan Documents</u>**.  Each Lender hereby authorizes the Administrative Agent to execute on behalf of all Lenders all Loan Documents (including the Collateral Documents and any subordination agreements) other than this Agreement.

**Section 9.11.  <u>Collateral and Guaranty Matters</u>**.  The Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion:

(a)      to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon the termination of all Revolving Commitments and the payment in full of all Obligations (other than contingent indemnification obligations and such Cash Collateralized reimbursement obligations), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing in accordance with Section 10.2; and

(b)      to release any Loan Party from its obligations under the applicable Collateral Documents if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release its interest in particular types or items of property, or to release any Loan Party from its obligations under the applicable Collateral Documents pursuant to this Section.  In each case as specified in this Section, the Administrative Agent is authorized, at the Borrowers' expense, to execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the Liens granted under the applicable Collateral Documents, or to release such Loan Party from its obligations under the applicable Collateral Documents, in each case in accordance with the terms of the Loan Documents and this Section.

**Section 9.12.  <u>Reserved</u>**.

**Section 9.13.  <u>Right to Realize on Collateral and Enforce Guarantee</u>**.  Anything contained in any of the Loan Documents to the contrary notwithstanding, each Borrower, the Administrative Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral or to enforce the Collateral Documents, it being understood and agreed that all powers, rights and remedies hereunder and under the Collateral Documents may be exercised solely by the Administrative Agent, and (ii) in the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Administrative Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Administrative Agent, as agent for and representative of the Lenders (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing), shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for

all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent at such sale or other disposition.

Section 9.14.  [**Reserved**].

# ARTICLE X

# MISCELLANEOUS

Section 10.1.  Notices.

(a)  Written Notices.

(i)  Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications to any party herein to be effective shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

| | |
|---|---|
| To Holdings and the Borrowers: | c/o Dakota Plains Holdings, Inc.<br>294 Grove Lane East<br>Wayzata, Minnesota 55391<br>Attention: Craig McKenzie, Chief Executive Officer<br>E-mail Address: cmckenzie@dakotaplains.com |
| To the Administrative Agent: | [SunTrust Bank<br>1155 Peachtree Road, 8th Floor<br>Atlanta, Georgia 30309<br>Attention: Jan Naifeh<br>Telecopy Number: ] |
| With a copy to: | Moore & Van Allen PLLC<br>100 N. Tryon St., Suite 4700<br>Charlotte, NC 28202<br>Attention: Alan W. Pope<br>Telecopy Number: (704) 378-2014 |

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All such notices and other communications shall be effective upon actual receipt by the relevant Person or, if delivered by overnight courier service, upon the first Business Day after the date deposited with such courier service for overnight (next-day) delivery or, if sent by telecopy, upon transmittal in legible form by facsimile machine or, if mailed, upon the third Business Day after the date deposited into the mail or, if delivered by hand, upon delivery; provided that notices delivered to the Administrative Agent shall not be effective until actually received by such Person at its address specified in this Section.

CHAR2\1829046v7

(ii) Any agreement of the Administrative Agent or any Lender herein to receive certain notices by telephone or facsimile is solely for the convenience and at the request of the Borrowers. The Administrative Agent and each Lender shall be entitled to rely on the authority of any Person purporting to be a Person authorized by the Borrowers to give such notice and the Administrative Agent and the Lenders shall not have any liability to any Borrower or other Person on account of any action taken or not taken by the Administrative Agent or any Lender in reliance upon such telephonic or facsimile notice. The obligation of the Borrowers to repay the Loans and all other Obligations hereunder shall not be affected in any way or to any extent by any failure of the Administrative Agent or any Lender to receive written confirmation of any telephonic or facsimile notice or the receipt by the Administrative Agent or any Lender of a confirmation which is at variance with the terms understood by the Administrative Agent and such Lender to be contained in any such telephonic or facsimile notice.

(b)     Electronic Communications.

(i) Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and internet or intranet websites) pursuant to procedures approved by the Administrative Agent. The Borrowers hereby agree to accept notices and other communications to it hereunder by e-mail and by other electronic communications pursuant to procedures approved by it. The Administrative Agent may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(ii) Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     Certification of Public Information. Each Borrower and each Lender acknowledges that certain of the Lenders may be Public Lenders and, if documents or notices required to be delivered pursuant to Section 5.1 or Section 5.2 (collectively, "Borrower Materials") otherwise are being distributed through Syndtrak, Intralinks or any other internet or intranet website or other information platform (the "Platform"), any document or notice that the Borrowers have indicated contains Non-Public Information shall not be posted on that portion of the Platform designated for such Public Lenders. The

Borrowers hereby agree that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrowers shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrowers or their securities for purposes of United States Federal and state securities laws; (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent and the Lenders shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information".

(d)     The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".   NEITHER THE ADMINISTRATIVE AGENT (INCLUDING ANY SUB-AGENT THEREOF), NOR ANY LENDER OR ANY RELATED PARTY OF ANY OF THE FOREGOING PERSONS WARRANTS THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND THE ADMINISTRATIVE AGENT, EACH LENDER AND EACH RELATED PARTY OF THE FOREGOING PERSONS EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent (or any sub-agent thereof), any Lender or any Related Party of any of the foregoing Persons have any liability to the Borrowers, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrowers' or the Administrative Agent's transmission of Borrower Materials through the internet or the use by others of any information or other materials obtained through any Platform.

(e)     Private Side Information Contacts.  Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including Unites States federal and state securities laws, to make reference to information that is not made available through the "Public Side Information" portion of the Platform and that may contain Non-Public Information with respect to any Borrower, any Affiliates of any Borrower or any of their securities or loans for purposes of United States federal or state securities laws.  In the event that any Public Lender has determined for itself not to access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) other Lenders may have availed themselves of such information and (ii) none of the Borrowers nor the Administrative Agent has any responsibility for such Public Lender's

66

decision to limit the scope of the information it has obtained in connection with this Agreement and the other Loan Documents.

**Section 10.2.   Waiver; Amendments**.

(a)      No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document, and no course of dealing between any Borrower and the Administrative Agent or any Lender, shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power hereunder or thereunder.   The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies provided by law.   No waiver of any provision of this Agreement or of any other Loan Document or consent to any departure by any Borrower therefrom shall in any event be effective unless the same shall be permitted by subsection (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.   Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default or Event of Default at the time.

(b)      No amendment or waiver of any provision of this Agreement or of the other Loan Documents, nor consent to any departure by any Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Borrowers and the Required Lenders, or the Borrowers and the Administrative Agent with the consent of the Required Lenders, and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; underlined provided that, in addition to the consent of the Required Lenders, no amendment, waiver or consent shall:

(i)      increase the Commitment of any Lender without the written consent of such Lender;

(ii)      reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender affected thereby;

(iii)      postpone the date fixed for any payment of any principal of, or interest on, any Loan or any fees hereunder or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date for the termination or reduction of any Commitment, without the written consent of each Lender affected thereby;

(iv)      change Section 2.21(b) or      in a manner that would alter the *pro rata* sharing of payments required thereby, without the written consent of each Lender;

CHAR2\1829046v7

(v)     change any of the provisions of this subsection (b) or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders which are required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the consent of each Lender;

(vi)    release all or substantially all of the guarantors, or limit the liability of such guarantors, under any guaranty agreement guaranteeing any of the Obligations, without the written consent of each Lender; or

(vii)   release all or substantially all collateral (if any) securing any of the Obligations, without the written consent of each Lender;

provided, further, that no such amendment, waiver or consent shall amend, modify or otherwise affect the rights, duties or obligations of the Administrative Agent without the prior written consent of such Person.

(c)     [reserved]

(d)     Notwithstanding anything to the contrary herein, this Agreement may be amended (or amended and restated) without the consent of any Lender (but with the consent of the Borrowers and the Administrative Agent) if, upon giving effect to such amendment and restatement, such Lender shall no longer be a party to this Agreement (as so amended and restated), the Commitments of such Lender shall have terminated (but such Lender shall continue to be entitled to the benefits of Sections 2.19, 2.20 and 10.3), such Lender shall have no other commitment or other obligation hereunder and such Lender shall have been paid in full all principal, interest and other amounts owing to it or accrued for its account under this Agreement.

(e)     Notwithstanding anything to the contrary herein, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent, the Borrowers and the other Loan Parties to change, modify or alter Section 2.21(b) or (c) or any other provision hereof relating to pro rata sharing of payments among the Lenders to the extent necessary to effectuate any of the amendments (or amendments and restatements) enumerated in subsection (d) or (f) of this Section.

(f)     Notwithstanding anything to the contrary herein:

(i)     The Borrowers may, by written notice to the Administrative Agent from time to time, make one or more offers (each, a "Loan Modification Offer") to all the Lenders to make one or more amendments or modifications to (A) allow the maturity and scheduled amortization of the Loans of the accepting Lenders to be extended and (B) increase the fees payable with respect to the Loans and Commitments of the accepting Lenders (each, a "Permitted Amendment") pursuant to procedures reasonably specified by the Administrative Agent and reasonably acceptable to the Borrowers. Such notice shall set forth (x) the terms and conditions of the requested Permitted Amendment and (y) the date on which such Permitted Amendment is requested to become effective. A Permitted Amendment shall

become effective only with respect to the Loans and/or Commitments of the Lenders that accept the applicable Loan Modification Offer (such Lenders, the "<u>Accepting Lenders</u>") and, in the case of any Accepting Lender, only with respect to such Lender's Loans and/or Commitments as to which such Lender's acceptance has been made.  Each Borrower, each other Loan Party and each Accepting Lender shall execute and deliver to the Administrative Agent a modification agreement (a "<u>Loan Modification Agreement</u>") and such other documentation as the Administrative Agent shall reasonably specify to evidence the acceptance of such Permitted Amendment and the terms and conditions thereof.  The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Loan Modification Agreement.  Each of the parties hereto hereby agrees that, upon the effectiveness of any Loan Modification Agreement, this Agreement shall be deemed amended to the extent (but only to the extent) necessary to reflect the existence and terms of the Permitted Amendment evidenced thereby and only with respect to the Loans and Commitments of the Accepting Lenders as to which such Lenders' acceptance has been made.

**Section 10.3.  <u>Expenses; Indemnification</u>.**

(a)     The Borrowers shall pay (i) all reasonable, out-of-pocket costs and expenses of the Administrative Agent and its Affiliates in connection with the syndication of the credit facilities provided for herein, the preparation and administration of the Loan Documents and any amendments, modifications or waivers thereof (whether or not the transactions contemplated in this Agreement or any other Loan Document shall be consummated), including the reasonable fees, charges and disbursements of counsel for the Administrative Agent and its Affiliates, (ii) [reserved], (iii) all out-of-pocket costs and expenses (including the reasonable fees, charges and disbursements of outside counsel) incurred by the Administrative Agent or any Lender in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section, or in connection with the Loans made, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)     The Borrowers shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>"), against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document, any other Related Transaction Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by Holdings or any of its Subsidiaries,

or any environmental liability related in any way to Holdings or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from (x) the gross negligence or willful misconduct of such Indemnitee or (y) a claim brought by any Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document.

(c)     The Borrowers shall pay, and hold the Administrative Agent and each of the Lenders harmless from and against, any and all present and future stamp, documentary, and other similar taxes with respect to this Agreement and any other Loan Documents, any collateral described therein or any payments due thereunder, and save the Administrative Agent and each Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission to pay such taxes.

(d)     To the extent that the Borrowers fail to pay any amount required to be paid to the Administrative Agent under subsection (a), (b), or (c) hereof, each Lender severally agrees to pay to the Administrative Agent such Lender's *pro rata* share (in accordance with its respective Revolving Commitment (or Revolving Credit Exposure, as applicable) determined as of the time that the unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified payment, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.

(e)     To the extent permitted by applicable law, the Borrowers shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to actual or direct damages) arising out of, in connection with or as a result of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated therein, any Loan or the use of proceeds thereof.

(f)     All amounts due under this Section shall be payable promptly after written demand therefor.

**Section 10.4.   <u>Successors and Assigns</u>.**

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrowers may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection

70

(d) of this Section or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments, Loans and other Revolving Credit Exposure at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)     Minimum Amounts.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitments, Loans and other Revolving Credit Exposure at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans and Revolving Credit Exposure outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans and Revolving Credit Exposure of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Acceptance, as of the Trade Date) shall not be less than $1,000,000 with respect to Revolving Loans and in minimum increments of $1,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrowers otherwise consent (each such consent not to be unreasonably withheld or delayed).

(ii)     Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans, other Revolving Credit Exposure or the Commitments assigned, except that this subsection (b)(ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Commitments on a non-pro *rata* basis.

(iii)     Required Consents.   No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section.

(iv)    <u>Assignment and Acceptance</u>.  The parties to each assignment shall deliver to the Administrative Agent (A) a duly executed Assignment and Acceptance, (B) a processing and recordation fee of $3,500, (C) an Administrative Questionnaire unless the assignee is already a Lender and (D) the documents required under <u>Section 2.20(f)</u>.

(v)    <u>No Assignment to any Borrower</u>.  No such assignment shall be made to any Borrower or any Affiliate or Subsidiary of any Borrower.

(vi)    <u>No Assignment to Natural Persons</u>.  No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Sections 2.19</u>, <u>2.20</u> and <u>10.3</u> with respect to facts and circumstances occurring prior to the effective date of such assignment.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.  If the consent of the Borrowers to an assignment is required hereunder (including a consent to an assignment which does not meet the minimum assignment thresholds specified above), the Borrowers shall be deemed to have given its consent unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after notice thereof has actually been delivered by the assigning Lender (through the Administrative Agent) to the Borrowers.

(c)    The Administrative Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at one of its offices in Atlanta, Georgia a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Loans and Revolving Credit Exposure owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>").  Information contained in the Register with respect to any Lender shall be available for inspection by such Lender at any reasonable time and from time to time upon reasonable prior notice; information contained in the Register shall also be available for inspection by the Borrowers at any reasonable time and from time to time upon reasonable prior notice.    In establishing and maintaining the Register, the Administrative Agent shall serve as the Borrowers' agent solely for tax purposes and solely with respect to the actions described in this Section, and each Borrower hereby agrees that, to the extent SunTrust Bank serves in such capacity, SunTrust Bank and its officers, directors, employees, agents, sub-agents and affiliates shall constitute "Indemnitees".

(d)    Any Lender may at any time, without the consent of, or notice to, the Borrowers or the Administrative Agent sell participations to any Person (other than a

natural person, any Borrower or any Affiliate or Subsidiary of any Borrower) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver with respect to the following to the extent affecting such Participant: (i) increase the Commitment of such Lender; (ii) reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder; (iii) postpone the date fixed for any payment of any principal of, or interest on, any Loan or any fees hereunder or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date for the termination or reduction of any Commitment; (iv) change Section 2.21(b) or (c) in a manner that would alter the *pro rata* sharing of payments required thereby; (v) change any of the provisions of Section 10.2(b) or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders which are required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder; (vi) release all or substantially all of the guarantors, or limit the liability of such guarantors, under any guaranty agreement guaranteeing any of the Obligations; or (vii) release all or substantially all collateral (if any) securing any of the Obligations. Subject to subsection (e) of this Section, each Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.19 and 2.20 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section; provided that such Participant agrees to be subject to Section 2.24 as though it were a Lender. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.7 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.21 as though it were a Lender.

Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrowers, maintain a register in the United States on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(e)      A Participant shall not be entitled to receive any greater payment under Section 2.20 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrowers' prior written consent.  A Participant shall not be entitled to the benefits of Section 2.20 unless the Borrowers are notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrowers, to comply with Section 2.20(f) and (g) as though it were a Lender.

(f)      Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

**Section 10.5.   Governing Law; Jurisdiction; Consent to Service of Process**.

(a)      This Agreement and the other Loan Documents and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be construed in accordance with and be governed by the law of the State of New York.

(b)      Each Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the United States District Court for the Southern District of New York, and of the Supreme Court of the State of New York sitting in New York county, and of any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document or the transactions contemplated hereby or thereby, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such District Court or New York state court or, to the extent permitted by applicable law, such appellate court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or any other Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Borrower or its properties in the courts of any jurisdiction.

(c)      Each Borrower irrevocably and unconditionally waives any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding described in subsection (b) of this Section and brought in any court referred to in subsection (b) of this Section.  Each of the parties hereto irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to the service of process in the manner provided for notices in <u>Section 10.1</u>. Nothing in this Agreement or in any other Loan Document will affect the right of any party hereto to serve process in any other manner permitted by law.

**Section 10.6. <u>WAIVER OF JURY TRIAL</u>.** EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 10.7. <u>Right of Set-off</u>.** In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, each Lender shall have the right, at any time or from time to time upon the occurrence and during the continuance of an Event of Default, without prior notice to the Borrowers, any such notice being expressly waived by each Borrower to the extent permitted by applicable law, to set off and apply against all deposits (general or special, time or demand, provisional or final) of any Borrower at any time held or other obligations at any time owing by such Lender to or for the credit or the account of any Borrower against any and all Obligations held by such Lender irrespective of whether such Lender shall have made demand hereunder and although such Obligations may be unmatured. Each Lender agrees promptly to notify the Administrative Agent and the Borrowers after any such set-off and any application made by such Lender; <u>provided</u> that the failure to give such notice shall not affect the validity of such set-off and application. Each Lender a grees to apply all amounts collected from any such set-off to the Obligations before applying such amounts to any other Indebtedness or other obligations owed by Holdings and any of its Subsidiaries to such Lender.

**Section 10.8. <u>Counterparts; Integration</u>.** This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. This Agreement, the other Loan Documents, and any separate letter agreements relating to any fees payable to the Administrative Agent and its Affiliates constitute the entire agreement among the parties hereto and thereto and their affiliates regarding the subject matters hereof and thereof and supersede all prior agreements and understandings, oral or written, regarding such subject matters. Delivery of an executed counterpart to this Agreement or any other Loan Document by facsimile transmission or by electronic mail in pdf format shall be as effective as delivery of a manually executed counterpart hereof.

**Section 10.9. <u>Survival</u>.** All covenants, agreements, representations and warranties made by Holdings or any Borrower herein and in the certificates, reports, notices or other instruments

delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the other Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Sections 2.19, 2.20, and 10.3 and Article IX shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

Section 10.10. **Severability**.   Any provision of this Agreement or any other Loan Document held to be illegal, invalid or unenforceable in any jurisdiction, shall, as to such jurisdiction, be ineffective to the extent of such illegality, invalidity or unenforceability without affecting the legality, validity or enforceability of the remaining provisions hereof or thereof; and the illegality, invalidity or unenforceability of a particular provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.11. **Confidentiality**.  Each of the Administrative Agent and the Lenders agrees to take normal and reasonable precautions to maintain the confidentiality of any information relating to Holdings or any of its Subsidiaries or any of their respective businesses, to the extent designated in writing as confidential and provided to it by Holdings or any of its Subsidiaries, other than any such information that is available to the Administrative Agent or any Lender on a non-confidential basis prior to disclosure by Holdings or any of its Subsidiaries, except that such information may be disclosed (i) to any Related Party of the Administrative Agent or any such Lender including accountants, legal counsel and other advisors, (ii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (iii) to the extent requested by any regulatory agency or authority purporting to have jurisdiction over it (including any self-regulatory authority such as the National Association of Insurance Commissioners), (iv) to the extent that such information becomes publicly available other than as a result of a breach of this Section, or which becomes available to the Administrative Agent, any Lender or any Related Party of any of the foregoing on a non-confidential basis from a source other than Holdings or any of its Subsidiaries, (v) in connection with the exercise of any remedy hereunder or under any other Loan Documents or any suit, action or proceeding relating to this Agreement or any other Loan Documents or the enforcement of rights hereunder or thereunder, (vi) subject to execution by such Person of an agreement containing provisions substantially the same as those of this Section, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, or (B) any actual or prospective party (or its Related Parties) to any swap or derivative or other transaction under which payments are to be made by reference to the Borrowers and their obligations, this Agreement or payments hereunder, (vii) to any rating agency, (viii) to the CUSIP Service Bureau or any similar organization, or (ix) with the consent of the Borrowers.  Any Person required to maintain the confidentiality of any information as provided for in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such information as such Person would accord its own confidential information.  In the event of any

76

conflict between the terms of this Section and those of any other Contractual Obligation entered into with any Loan Party (whether or not a Loan Document), the terms of this Section shall govern.

Section 10.12. **Interest Rate Limitation**.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which may be treated as interest on such Loan under applicable law (collectively, the "Charges"), shall exceed the maximum lawful rate of interest (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by a Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Rate to the date of repayment (to the extent permitted by applicable law), shall have been received by such Lender.

Section 10.13. **Waiver of Effect of Corporate Seal**.  Each of Holdings and the Borrowers represents and warrants that neither it nor any other Loan Party is required to affix its corporate seal to this Agreement or any other Loan Document pursuant to any Requirement of Law, agrees that this Agreement is delivered by Holdings and the Borrowers under seal and waives any shortening of the statute of limitations that may result from not affixing the corporate seal to this Agreement or such other Loan Documents.

Section 10.14. **Patriot Act**.  The Administrative Agent and each Lender hereby notifies the Loan Parties that, pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the Patriot Act.

Section 10.15. **No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Borrower and each other Loan Party acknowledges and agrees and acknowledges its Affiliates' understanding that (i) (A) the services regarding this Agreement provided by the Administrative Agent and/or the Lenders are arm's-length commercial transactions between each Borrower, each other Loan Party and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (B) each of the Borrowers and the other Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate, and (C) each Borrower and each other Loan Party is capable of evaluating and understanding, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each of the Administrative Agent and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Borrower, any other Loan Party or any of their respective Affiliates, or any other Person, and (B) neither the Administrative Agent nor any Lender has any obligation to any Borrower, any other Loan Party or any of their Affiliates with respect to the transaction contemplated hereby except those

obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrowers, the other Loan Parties and their respective Affiliates, and each of the Administrative Agent and the Lenders has no obligation to disclose any of such interests to any Borrower, any other Loan Party or any of their respective Affiliates.  To the fullest extent permitted by law, each of the Borrowers and the other Loan Parties hereby waives and releases any claims that it may have against the Administrative Agent or any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.16. **Location of Closing**.  Each Lender acknowledges and agrees that it has delivered, with the intent to be bound, its executed counterparts of this Agreement to the Administrative Agent, c/o Moore & Van Allen PLLC, 100 N. Tryon St., Suite 4700, Charlotte, NC 28202.  Each Loan Party acknowledges and agrees that it has delivered, with the intent to be bound, its executed counterparts of this Agreement and each other Loan Document, together with all other documents, instruments, opinions, certificates and other items required under Section 3.1, to the Administrative Agent, c/o Moore & Van Allen PLLC, 100 N. Tryon St., Suite 4700, Charlotte, NC 28202.  All parties agree that the closing of the transactions contemplated by this Agreement has occurred in New York.

Section 10.17. **Swaps**.  Nothing herein constitutes an offer or recommendation to enter into any "swap" or trading strategy involving a "swap" within the meaning of Section 1 a(47) of the Commodity Exchange Act.  Any such offer or recommendation, if any, will only occur after the Administrative Agent has received appropriate documentation from the applicable Loan Party regarding whether such Loan Party is qualified to enter into a swap under applicable law.

Section 10.18. **Joint and Several**.  The obligations of the Borrowers hereunder and under the other Loan Documents are joint and several.

*(remainder of page left intentionally blank)*

78

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**DAKOTA PLAINS TRANSLOADING, LLC**

By: _____
Name: Gabriel G. Claypool
Title: President, Chief Executive Officer and Secretary

**DAKOTA PLAINS SAND, LLC**

By: _____
Name: Gabriel G. Claypool
Title: President, Chief Executive Officer and Secretary

**DAKOTA PLAINS MARKETING, LLC**

By: _____
Name: Gabriel G. Claypool
Title: President, Chief Executive Officer and Secretary

**DAKOTA PLAINS HOLDINGS, INC.**

By: _____
Name: Gabriel G. Claypool
Title: President and Chief Operating Officer

**SUNTRUST BANK**
as the Administrative Agent and as a Lender


By: _____
Name:
Title:

**<u>EXHIBIT B</u>**

INTERIM DIP ORDER

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | | |
|---|---|---|
| Dakota Plains Holdings, Inc., | | Case No. 16-43711 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Transloading, LLC, | | Case No. 16-43712 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Sand, LLC, | | Case No. 16-43715 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Marketing, LLC, | | Case No. 16-43716 |
| | Debtor. | Chapter 11 Case |
| DPTS Marketing LLC, | | Case No. 16-43717 |
| | Debtor. | Chapter 11 Case |
| Dakota Petroleum Transport Solutions, LLC, | | Case No. 16-43718 |
| | Debtor. | Chapter 11 Case |
| DPTS Sand, LLC, | | Case No. 16-43721 |
| | Debtor. | Chapter 11 Case |

**INTERIM ORDER (I) GRANTING AN EXPEDITED HEARING, (II) AUTHORIZING
THE DEBTORS (A) TO UTILIZE CASH COLLATERAL OF THE PREPETITION
SECURED PARTIES, (B) TO OBTAIN POSTPETITION SECURED FINANCING, AND
(C) TO PROVIDE ADEQUATE PROTECTION TO THE PREPETITION SECURED
PARTIES, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED
RELIEF**

THIS MATTER having come before the Court upon the motion, dated December 21,

2016 (the "**Motion**") of Dakota Plains Holdings, Inc. and the above-captioned debtors and debtor

in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the

"**Cases**"), for the entry of an order (I) granting an expedited hearing, (II) authorizing the Debtors

to (A) utilize cash collateral of the Prepetition Secured Parties (as defined below) pursuant to

section 363 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**"),

(B) obtain postpetition secured financing pursuant to sections 361, 362 and 364 of the

Bankruptcy Code and (C) provide adequate protection to the Prepetition Secured Parties pursuant to sections 361, 362 and 363 of the Bankruptcy Code, (III) scheduling a final hearing pursuant to Rule 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure (as amended, the "**Bankruptcy Rules**"), and (IV) granting related relief, the Debtors sought, among other things, the following relief:

i. the Court's authorization, pursuant to sections 363 and 364(c)(1), (2), (3), and (d)(1) of the Bankruptcy Code, for (A) Dakota Plains Transloading, LLC, Dakota Plains Sand, LLC, and Dakota Plains Marketing, LLC (the "**DIP Borrowers**") to enter into a senior secured superpriority postpetition credit facility (the "**DIP Facility**") provided by SunTrust Bank, as administrative agent (in such capacity, the "**DIP Agent**"), and postpetition lender (the "**DIP Lenders**"), pursuant to the Postpetition Revolving Credit Agreement in substantially the form attached to the Motion as Exhibit A (the "**DIP Credit Agreement**,"[1] and together with this Order (the "**Interim DIP Order**"), the Final DIP Order (as defined below), and all other agreements, documents and instruments delivered or executed in connection therewith, as hereafter amended, supplemented or otherwise modified from time to time, including the DIP Budget (as defined below), collectively, the "**DIP Loan Documents**"), and (B) the DIP Borrowers to obtain extensions of credit thereunder on a senior secured and superpriority basis, (1) during the period (the "**Interim Period**") from the date hereof through and including the earlier to occur of (x) the date of entry of the Final DIP Order by this Court and (y) the Termination Date (as defined below), in an aggregate principal amount not to exceed $500,000, and (2) upon entry of the Final DIP Order and thereafter until the Termination Date, in an aggregate principal amount not to exceed $2,000,000, in each case at any time outstanding (all financial accommodations and extensions of credit under the DIP Credit Agreement and the DIP Facility, the "**DIP Extensions of Credit**"), and (C) Dakota Plains Holdings, Inc., DPTS Marketing LLC, Dakota Petroleum Transport Solutions, LLC, and DPTS Sand, LLC (collectively, the "**DIP Loan Guarantors**," and together with the DIP Borrowers, the "**Loan Parties**") to jointly and severally guarantee on a secured basis the Debtors' obligations in respect of the DIP Facility;

ii. the Court's authorization for each of the Loan Parties to execute the DIP Loan Agreement and the other DIP Loan Documents to which it is a party and to perform such other and further acts as may be necessary or appropriate in connection therewith;

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the DIP Credit Agreement.

iii.    the Court's authorization to use DIP Extensions of Credit in accordance with the proposed budget prepared by the Debtors and attached to the Motion as Exhibit D (as updated from time to time pursuant to the DIP Loan Documents and, in each case, subject to the prior approval of the DIP Agent, the "**DIP Budget**"), and as otherwise provided herein and in the other DIP Loan Documents;

iv.    the Court's authorization to grant the DIP Agent for the benefit of the DIP Lenders and the other secured parties under the DIP Loan Documents (collectively, the "**DIP Secured Parties**"), in respect of the DIP Obligations (as defined below), a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and first priority priming liens on and security interests in all assets and property of the Debtors (no owned or hereafter acquired) pursuant to sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, in each case as and to the extent set forth more fully below and subject to the Carve-Out (as defined below);

v.    the Court's authorization to use "cash collateral" as such term is defined in section 363 of the Bankruptcy Code (the "**Cash Collateral**") in which the Prepetition Secured Parties (as defined below) have an interest;

vi.    the Court's authorization to grant, as of the Petition Date, the Adequate Protection Superpriority Claim (as defined below) and Adequate Protection Liens (as defined below), to the extent of and as compensation for any Diminution in Value (as defined below), and the payment of fees and expenses to the Prepetition Agent (as defined below) for the benefit of the Prepetition Lenders (as defined below), in each case, as set forth more fully below and subject to the Carve-Out;

vii.    the modification by the Court of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility, the Interim DIP Order and the other DIP Loan Documents;

viii.    the scheduling by the Court of a final hearing (the "**Final Hearing**") to consider entry of a Final DIP Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing and the transactions contemplated by the Motion; and

ix.    the Court's waiving of any applicable stay (including under Bankruptcy Rule 6004) and providing for the immediate effectiveness of the DIP Orders.

The Court having considered the Motion, the terms of the DIP Facility and the DIP Loan Documents, the Declaration of Marty Beskow in Support of the First Day Motions and the Declaration of Michael V. Balistreri in Support of the Motion, and the evidence submitted at the Interim Hearing held before this Court to consider the entry of this Interim DIP Order; and in

accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), 6004, and 9014, and the Local

Rules 9013-1, 9013-2 and 9013-3, due and proper notice of the Motion and the Interim Hearing

having been given; and it appearing that approval of the interim relief requested in the Motion is

necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and

is otherwise essential for the continued operation of the Debtors' businesses; and, subject to the

terms hereof, the Court having determined that there is adequate protection of the liens of the

Prepetition Secured Parties; and all objections, if any, to the entry of this Interim DIP Order

having been withdrawn, resolved or overruled by the Court; and after due deliberation and

consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:

A.    **Petition Date**.  On December 20, 2016 (the "**Petition Date**"), the Debtors filed

voluntary petitions under chapter 11 of the Bankruptcy Code with the United States Bankruptcy

Court for the District of Minnesota (the "**Court**").   The Debtors have continued in the

management and operation of their businesses and properties pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Case.

B.    **Jurisdiction and Venue**.  The Court has jurisdiction over these proceedings

pursuant to 28 U.S.C. § 1334.  Consideration of this Motion constitute a core proceeding under

28 U.S.C. § 157(b)(2).  Venue for the Cases and the proceedings on the Motion is proper in this

district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    **Committee Formation**.  No official committee of unsecured creditors has been

appointed in the Cases (the "**Creditors' Committee**," and together with any other statutory

committee, a "**Committee**").

D.      **Notice**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, by telecopy, email, overnight courier and/or hand delivery, to all parties entitled to notice under Local Rule 9013-3(a)(2) (collectively, the "**Notice Parties**"). Under the circumstances, such notice of the Interim Hearing and the relief requested in the Motion complies with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002 and 4001(b) and (c).

E.      **The Prepetition Facility**.

i.      Debtors Dakota Plains Transloading, LLC, Dakota Plains Sand, LLC, and Dakota Plains Marketing, LLC, as borrowers (collectively, "**Borrowers**"), Dakota Plains Holdings, Inc. ("**Holdings**"), the lenders party thereto from time to time (the "**Prepetition Lenders**"), SunTrust Bank, as administrative agent (in such capacity, the "**Prepetition Agent**" and as Prepetition Lender, the "**Prepetition Secured Parties**"), are parties to that certain *Revolving Credit and Term Loan Agreement* (the "**Original Credit Agreement**") dated as of December 5, 2014, as amended by that certain *Amendment No. 1 to Revolving Credit and Term Loan Agreement* dated as of August 6, 2015 (the "**First Amendment**"), that certain *Amendment No. 2 and Waiver to Revolving Credit and Term Loan Agreement* dated as of December 4, 2015 (the "**Second Amendment**"), and that certain *Amendment No. 3 to Revolving Credit and Term Loan Agreement* dated as of July 5, 2016 (the "**Third Amendment**"), and that certain *Amendment No. 4 to Revolving Credit and Term Loan Agreement and One Time Waiver of Borrower Requirements* dated as of August 5, 2016 (the "**Fourth Amendment**" and together with the Original Credit Agreement, the First Amendment, the Second Amendment and the Third Amendment, the "**Prepetition Credit Agreement**" and together with each of the Loan Documents thereto (each as defined therein), the "**Prepetition Loan Documents**").

ii.      The Prepetition Credit Agreement provided for $55,425,000 of loans consisting of a "Tranche A" Term Loan of $12,925,000, a "Tranche B" Term Loan of $22,500,000 and a Revolving Loan of $20,000,000 (the "**Prepetition Facility**").

iii.      Pursuant to (a) that certain *Guaranty and Security Agreement* dated as of December 5, 2012 by the Borrowers, Holdings, and the Prepetition Agent, and (b) that certain *Joinder Agreement* dated as of December 5, 2014 by DPTS Marketing LLC, Dakota Petroleum Transport Solutions, LLC, and DPTS Sand, LLC (collectively, the "**Prepetition Subsidiary Guarantors**") and the Prepetition Agent, the Prepetition Secured Parties are secured by first priority liens on, and security interests in, substantially all of the assets of the Borrowers, Holdings, and the Prepetition Subsidiary Guarantors (the "**Prepetition Collateral**").

F.      **The Subordinated Debt**.      Pursuant to (i) that certain Membership Interest Purchase Agreement dated as of December 5, 2014 (as amended, supplemented or otherwise modified from time to time, the "**Subordinated Purchase Agreement**"); (ii) that certain Seller Guaranty and Security Agreement dated as of December 5, 2014 (as amended, supplemented or otherwise modified from time to time, the "**Subordinated Guaranty and Security Agreement**"); (iii) that certain Escrow Agreement dated as of December 5, 2014 (as amended, supplemented or otherwise modified from time to time, the "**Subordinated Escrow Agreement**"); (iv) that certain Indemnification and Release Agreement dated as of December 5, 2014 (as amended, supplemented or otherwise modified from time to time, the "**Subordinated Indemnification Agreement**"); (v) that certain Second Mortgage, Collateral Real Estate Mortgage, Deed of Trust Assignment, Security Agreement and Financing Statement executed by Holdings in favor of World Fuel Services Corporation ("**WFS**") (as amended, supplemented or otherwise modified from time to time, the "**Subordinated Mortgage**"); and (vi) that certain

Seller Subordination Agreement dated as of December 5, 2014 (as amended, supplemented and otherwise modified from time to time, the "**Seller Subordination Agreement**" and, together with the Subordinated Purchase Agreement, the Subordinated Guaranty and Security Agreement, the Subordinated Escrow Agreement, the Subordinated Indemnification Agreement and the Subordinated Mortgage, the "**Subordinated Debt Documents**") by and among WFS, Petroleum Transport Solutions, LLC ("**PTS**"), World Fuel Services, Inc. ("**WF Inc.**"), Western Petroleum Company ("**Western**" and together with WFS, PTS and WF Inc., the "**Subordinated Debtholders**"), the DIP Borrowers and certain of their affiliates agreed to make certain payments to PTS in connection with the Subordinated Purchase Agreement, to indemnify WFS and the other parties entitled thereto pursuant to the terms of the Subordinated Indemnification Agreement, and otherwise guarantee the obligations of DPTS Marketing, LLC under the Railcar Leases (as defined in the Existing Credit Agreement) (all such obligations arising under the Subordinated Debt Documents, the "**Subordinated Debt Obligations**").

G.   **Subordination of Subordinated Debt Obligations**.   The Subordinated Debt Obligations are secured pursuant to the Subordinated Guaranty and Security Agreement and the Subordinated Mortgage.  However, because the Prepetition Collateral is worth substantially less than the Bank Debt Obligations (approximately $55,000,000 — $58,000,000 less), the Subordinated Debt Obligations constitute unsecured claims.  Moreover, the Subordinated Debt Obligations are subordinated in right of payment to all outstanding obligations under or in connection with the Prepetition Facility pursuant to the Seller Subordination Agreement.

H.   **Waivers by Subordinated Debtholders**.   Pursuant to the Seller Subordination Agreement, the Subordinated Debtholders have waived any right to contest, oppose or object to any debtor-in-possession financing provided by the Prepetition Lenders, including any debtor in

possession financing secured by priming liens on the assets of the Loan Parties.

I.      **Stipulation as to Prepetition Secured Obligations**.  Without limiting the rights

of a Committee or any other party in interest as and to the extent set forth in Paragraph 8 hereof,

the Debtors permanently, immediately, and irrevocably acknowledge, represent, stipulate and

agree:

i.      **Prepetition Credit Facility Obligations**.  As of the Petition Date, the

Debtors were indebted and liable to the Prepetition Agent and the Prepetition Secured Parties

under the Prepetition Loan Documents, without objection, defense, counterclaim or offset of any

kind, in the aggregate principal amount of not less than $56,925,000 with respect to the

Prepetition Facility, plus accrued interest (including paid-in-kind interest) in the amount of

$4,719,401.06, plus unpaid amendment fees thereon in the additional amount of approximately

just over $1,019,250 plus, in connection with the foregoing amounts, certain expenses, and all

other obligations payable under the Prepetition Loan Documents, including any attorneys',

accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable

or reimbursable under the Prepetition Loan Documents (collectively, the "**Prepetition Facility**

**Obligations**").

ii.      **Enforceability, etc. of the Prepetition Secured Obligations**.  The

Prepetition Loan Documents and the Prepetition Secured Obligations are (a) legal, valid,

binding, and enforceable against each Debtor, and (b) not subject to any contest, attack,

objection, recoupment, defense, counterclaim, offset, subordination, re-characterization,

avoidance or other claim, cause of action or other challenge of any kind or nature under the

Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

iii.      **Enforceability, etc. of Prepetition Liens**.  The liens and security interests

(collectively, the "**Prepetition Liens**") granted by the Debtors under the Prepetition Loan Documents to or for the benefit of the Prepetition Agent and the other Prepetition Secured Parties as security for the Prepetition Secured Obligations encumber substantially all of the Debtors' assets and property (all such assets and property, as the same existed on or at any time prior to the Petition Date, including, without limitation, the Prepetition Collateral). The Prepetition Liens have been properly recorded and perfected under applicable non-bankruptcy law, and are legal, valid, enforceable, non-avoidable, and not subject to contest, avoidance, attack, offset, re-characterization, subordination or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise. As of the Petition Date, and without giving effect to this Interim DIP Order, the Debtors are not aware of any liens or security interests having priority over the Prepetition Liens, except the Senior Third Party Liens (defined below). The Prepetition Liens were granted to or for the benefit of the Prepetition Agent and the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby. The value of the Prepetition Collateral is estimated to be approximately $8,000,000 to $12,000,000.

       iv.   **Indemnity**. The Prepetition Agent, the Prepetition Secured Parties and the DIP Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens (defined below) and the Adequate Protection Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to all transactions contemplated by the foregoing.

Accordingly, the Prepetition Agent, the Prepetition Secured Parties and the DIP Secured Parties shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto.  No exception or defense in contract, law or equity exists as to any obligation set forth, as the case may be, in this Paragraph I, in the Prepetition Loan Documents or in the DIP Loan Documents, to indemnify and/or hold harmless the Prepetition Agent, the DIP Agent, or any other Prepetition Secured Party or DIP Secured Party, as the case may be, and any such defenses are hereby waived.

v.       **No Control**.  None of the DIP Secured Parties or the Prepetition Secured Parties are (a) control persons or insiders of the Debtors or any of their affiliates or (b) "responsible persons" or "owners or operators" (as such terms or any similar terms are used in the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq*., the Resource Conservation and Recovery Act, 42 U.S.C. §§ 9601 *et seq*., as either may be amended from time to time, or any similar federal, state, or local law, statute or ordinance), in either case by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Facility, the DIP Loan Documents and/or the Prepetition Loan Documents.

vi.       **No Claims, Causes of Action**.  As of the date hereof, there exist no claims or causes of action against any of the Prepetition Agent, the Prepetition Secured Parties or the DIP Secured Parties with respect to, in connection with, related to, or arising from the Prepetition Loan Documents and/or the DIP Loan Documents that may be asserted by the Debtors or any other person or entity.

vii.       **Release**.  The Debtors forever and irrevocably release, discharge, and acquit all former, current and future (a) DIP Secured Parties, (b) Prepetition Secured Parties

(c) Affiliates of the DIP Secured Parties and the Prepetition Secured Parties and (d) officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors and successors in interest of each of the DIP Secured Parties, the Prepetition Secured Parties and each of their respective Affiliates, in each case acting in such capacity (collectively, the "**Releasees**") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Loan Documents, the Prepetition Loan Documents and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Agent, the Prepetition Secured Parties and/or the DIP Secured Parities.

J.      **Immediate Need for Postpetition Financing and Use of Cash Collateral**.  The Debtors have requested immediate entry of this Interim DIP Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Good cause has been shown for entry of this Interim DIP Order.  An immediate need exists for the Debtors to obtain funds and liquidity in order to continue

operations and to administer and preserve the value of their estates pending a restructuring or a sale of all or substantially all of their assets pursuant to an agreed restructuring or sale process. The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets and to maximize the return for all creditors requires the availability of the DIP Facility and the use of Cash Collateral.  In the absence of the availability of such funds and liquidity in accordance with the terms hereof, the continued operation of the Debtors' businesses would not be possible, and serious and irreparable harm to the Debtors and their estates and creditors would occur.  Further, the possibility for a successful reorganization would be jeopardized in the absence of the availability of funds in accordance with the terms of this Interim DIP Order.  Thus, the ability of the Debtors to preserve and maintain the value of their assets and maximize the return for creditors requires the availability of working capital from the DIP Facility and the use of Cash Collateral.

K.     **No Credit Available on More Favorable Terms**.  The Debtor have been unable to obtain on more favorable terms and conditions than those provided in this Interim DIP Order (1) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, (2) credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, (3) credit for money borrowed secured by a lien on property of the estate that is not otherwise subject to a lien, or (4) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien.  The Debtors are unable to obtain credit for borrowed money without granting the DIP Liens and the DIP Superpriority Claim (defined below) to (or for the benefit of) the DIP Secured Parties.

L.     **Use of Cash Collateral and Proceeds of the DIP Facility, DIP Collateral and**

- 12 -

**Prepetition Collateral**.  All Cash Collateral, all proceeds of the Prepetition Collateral and the DIP Collateral (defined below), including proceeds realized from a sale or disposition thereof, or from payment thereon, and all proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses payable under this Interim DIP Order or the Final DIP Order) shall be used and/or applied in accordance with the terms and conditions of this Interim DIP Order, the DIP Budget and the other DIP Loan Documents, for the expenditures in the DIP Budget and for no other purpose; provided, that, subject to the limitations set forth in the DIP Budget, up to $25,000 in the aggregate of the proceeds of the DIP Facility, DIP Collateral, Prepetition Collateral or Cash Collateral, may be used by any Committee solely to investigate the matters covered by the Claims Stipulations (defined below).  For the avoidance of doubt, proceeds of the Prepetition Collateral and the DIP Collateral shall include proceeds from the Approved Sale.

M.    **Adequate Protection for the Prepetition Secured Parties**.  The Prepetition Agent and the Prepetition Secured Parties have negotiated in good faith regarding the Debtors' use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses, in accordance with the terms hereof.  The Prepetition Agent and the Prepetition Secured Parties have agreed to permit the Debtors to use the Prepetition Collateral, including the Cash Collateral, in accordance with the terms hereof and the DIP Budget during the Interim Period subject to the terms and conditions set forth herein, including the protections afforded parties acting in "good faith" under section 363(m) of the Bankruptcy Code.  The Prepetition Agent and the other Prepetition Secured Parties are entitled to the adequate protection as and to the extent set forth herein pursuant to sections 361, 362 and 363 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and

of the use of the Prepetition Collateral (including the Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the Prepetition Agent's and the other Prepetition Secured Parties' consent thereto; <u>provided</u>, that nothing in this Interim DIP Order or the other DIP Loan Documents shall be construed as a consent by any Prepetition Secured Party that it would be adequately protected in the event debtor in possession financing is provided by a third party (*i.e.*, other than the DIP Lenders), a consent to the terms of any other such financing, including the consent to any lien encumbering the Prepetition Collateral (whether senior or junior) or to the use of Cash Collateral (except under the terms hereof).

N.    **Section 552**.  Subject to the entry of a Final DIP Order, in light of, as applicable, the subordination of the Prepetition Liens and the Adequate Protection Liens of the Prepetition Secured Parties to the DIP Liens and the Carve-Out, and the granting of the DIP Liens on the Prepetition Collateral, the Prepetition Agent and the Prepetition Secured Parties are each entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply.

O.    **Extensions of Financing**.  The DIP Secured Parties have indicated a willingness to provide financing to the Debtors in accordance with the DIP Credit Agreement and the other DIP Loan Documents (including the DIP Budget) and subject to (i) the entry of this Interim DIP Order no later than 5 days following the Petition Date and the entry of the Final DIP Order no later than 30 days following the Petition Date, (ii) entry of the Bid Procedures Order relating to the Acceptable Sale Process pursuant to the Milestones (collectively, the "**Sale Conditions**"), and (iii) findings by this Court that such financing is essential to the Debtors' estates, that the DIP Secured Parties are good faith financiers, and that the DIP Secured Parties' claims,

superpriority claims, security interests and liens and other protections granted pursuant to this

Interim DIP Order (and the Final DIP Order) and the DIP Facility (including the DIP

Superpriority Claim and the DIP Liens), including the Sale Conditions, will not be affected by

any subsequent reversal, modification, vacatur or amendment of, as the case may be, this Interim

DIP Order, the Final DIP Order or any other order, as provided in section 364(e) of the

Bankruptcy Code.

P.    **Business Judgment and Good Faith Pursuant to Section 364(e)**.

i.    The terms and conditions of the DIP Facility, and the fees paid and to be

paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the

Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are

supported by reasonably equivalent value and consideration;

ii.    the DIP Facility was negotiated in good faith and at arm's length among

the Debtors, the DIP Agent and the DIP Secured Parties; and

iii.    the use of the proceeds to be extended under the DIP Facility will be so

extended in good faith and for valid business purposes and uses, as a consequence of which the

DIP Secured Parties are entitled to the protections and benefits of section 364(e) of the

Bankruptcy Code.

Q.    **Relief Essential; Best Interest**.  The relief requested in the Motion (and provided

in this Interim DIP Order) is necessary, essential and appropriate for the continued operation of

the Debtors' businesses and the management and preservation of the Debtors' assets and

property.  The use of Cash Collateral and the DIP Facility are critical to the Debtors' continued

operations because they are the primary source of funds available to meet the Debtors'

anticipated expenses while they reorganize and seek to sell their assets and maximize the value

of their estates.  It is in the best interest of the Debtors' estates that the Debtors be allowed to enter into the DIP Facility, incur the DIP Obligations and use the Cash Collateral as contemplated herein.

NOW, **THEREFORE**, on the Motion of the Debtors and the record before this Court with respect to the Motion, including the record made during the Interim Hearing, and with the consent of the Debtors, the Prepetition Agent and the Prepetition Secured Parties and the DIP Secured Parties, and good and sufficient cause appearing therefor,

**IT IS SO ORDERED** that:

1.      **Motion Granted**.  The Motion is granted on an interim basis in accordance with the terms and conditions set forth in this Interim DIP Order.  Any objections to the Motion with respect to entry of this Interim DIP Order to the extent not withdrawn, waived or otherwise resolved, and all reservation of rights included therein, are hereby denied and overruled.

2.      **DIP Facility**.

a)      **DIP Obligations, etc**.  The Debtors are expressly and immediately empowered to enter into the DIP Facility and to incur and to perform the DIP Obligations in accordance with and subject to this Interim DIP Order (and, upon its entry, a Final DIP Order) and the other DIP Loan Documents, to execute and/or deliver all DIP Loan Documents and all other instruments, certificates, agreements and documents, and to take all actions, which may be reasonably required or otherwise necessary for the performance by the Debtors under the DIP Facility, including the creation and perfection of the DIP Liens described and provided for herein.  The Debtors are hereby authorized and directed to pay all principal, interest, fees and expenses, indemnities and other amounts described herein and in the other DIP Loan Documents as such shall accrue and become due hereunder or thereunder, including, without limitation, the

reasonable fees and expenses of the attorneys and financial and other advisors and consultants of the DIP Agent and the DIP Lenders as and to the extent provided for herein and in the other DIP Loan Documents (collectively, all loans, advances, extensions of credit, financial accommodations, fees, expenses and other liabilities and obligations (including indemnities and similar obligations) in respect of DIP Extensions of Credit, the DIP Facility and the DIP Loan Documents, the "**DIP Obligations**").   The DIP Loan Documents and all DIP Obligations shall represent, constitute and evidence, as the case may be, valid and binding obligations of the Debtors, enforceable against the Debtors, their estates and any successors thereto in accordance with their terms.   The term of the DIP Facility shall commence on the date of entry of this Interim DIP Order and end on the Termination Date, subject to the terms and conditions set forth herein and in the other DIP Loan Documents, including the protections afforded a party acting in good faith under section 364(e) of the Bankruptcy Code.

b)       **Authorization to Borrow, etc**.   In order to continue to operate their businesses, subject to the terms and conditions of this Interim DIP Order and the other DIP Loan Documents (including the DIP Budget), the Debtors are hereby authorized to borrow under the DIP Facility during the Interim Period, and the other Debtors set forth in the DIP Loan Documents are authorized to guarantee repayment of, such DIP Obligations, up to an aggregate principal amount of $500,000.

c)       **Conditions Precedent**.   The DIP Lenders shall have no obligation to make any DIP Extension of Credit or any other financial accommodation hereunder or under the other DIP Loan Documents (and the Debtors shall not make any request therefor) unless all conditions precedent to making DIP Extensions of Credit under the DIP Loan Documents have been satisfied or waived in accordance with the terms of the DIP Loan Documents.

d) **DIP Collateral**.  As used herein, "DIP Collateral" shall mean, all now owned or hereafter acquired assets and property, whether real or personal, of the Debtors including, without limitation, all Prepetition Collateral, all assets and property pledged under the DIP Loan Documents, and all cash, any investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investment property, inventory, deposit accounts, "core concentration accounts," "cash collateral accounts", and in each case all amounts on deposit therein from time to time, equity interests, securities accounts, securities entitlements, securities, commercial tort claims, books, records, plants, equipment, general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property, fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, tradenames, other intellectual property, all licenses therefor, and all proceeds, rents, profits, products and substitutions, if any, of any of the foregoing.  For the avoidance of doubt, the DIP Collateral shall not include actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (the "**Avoidance Actions**"), but shall, upon entry of a Final DIP Order, include the proceeds of Avoidance Actions, which shall be available to pay any administrative claim held by the Prepetition Agent or any Prepetition Secured Party in respect of the Prepetition Secured Obligations and by the DIP Agent or any DIP Lender in respect of the DIP Facility.

e) **DIP Liens**.  Effective immediately upon the entry of this Interim DIP Order, and subject to the Carve-Out, as set forth more fully in this Interim DIP Order, the DIP

Agent for the ratable benefit of the DIP Secured Parties is hereby granted the following security interests and liens, which shall immediately be valid, binding, perfected, continuing, enforceable and non-avoidable (all liens and security interests granted to the DIP Agent for the benefit of the DIP Secured Parties pursuant to this Interim DIP Order, any Final DIP Order and the other DIP Loan Documents, the "**DIP Liens**"):

> I.       pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable first priority liens on and security interests in all DIP Collateral that was not encumbered by valid, enforceable, perfected and non-avoidable liens as of the Petition Date;

> II.      pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable liens on and security interests in (x) all DIP Collateral which is unencumbered by the Prepetition Liens but on which a third party, *i.e.*, not the Prepetition Secured Parties (a "**Third Party Lienholder**"), had a pre-existing lien on the Petition Date and (y) all DIP Collateral encumbered by the Prepetition Liens on which a Third Party Lienholder had a pre-existing lien on the Petition Date that was senior to the Prepetition Liens, in each case junior only to any such liens and security interests of Third Party Lienholders, but solely to the extent that such liens and security interests of Third Party Lienholders were in each case valid, enforceable, perfected and non-avoidable as of the Petition Date, and were permitted by the terms of the Prepetition Loan Documents (the "**Senior Third Party Liens**"); and

> III.     pursuant to section 364(d) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable liens on and security interests in all Prepetition Collateral, which liens and security interests shall be senior to and prime the Prepetition Liens

and the liens of all Third Party Lienholders which are *pari passu* with or junior and subject to the Prepetition Liens, including the Subordinated Mortgage.

f) **Other Provisions Relating to the DIP Liens**.  The DIP Liens shall secure all of the DIP Obligations.  The DIP Liens shall not, without the consent of the DIP Agent, be made subject to, or *pari passu* with, any other lien or security interest, other than to the extent expressly provided herein and to the Carve-Out, by any court order heretofore or hereafter entered in the Cases, and shall be valid and enforceable against any trustee appointed in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (such cases or proceedings, "**Successor Cases**"), and/or upon the dismissal of any of the Cases.  The DIP Liens and the Adequate Protection Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code or, upon the entry of the Final DIP Order, the "equities of the case" exception of section 552 of the Bankruptcy Code or section 506(c) of the Bankruptcy Code.

g) **Superpriority Administrative Claim Status**.  The DIP Obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, at all times constitute an allowed superpriority claim (the "**DIP Superpriority Claim**") of the DIP Agent for the benefit of the DIP Secured Parties, and be payable from and have recourse to all DIP Collateral.  The DIP Superpriority Claim shall be subject and subordinate only to the Carve-Out.  Other than as expressly provided herein, including in Paragraph 11 and with respect to the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or *pari passu* with the DIP Liens, the DIP Superpriority Claim or any

of the DIP Obligations, or with any other claims of the DIP Secured Parties arising hereunder or under the other DIP Loan Documents, or otherwise in connection with the DIP Facility.

3.     **Authorization and Approval to Use Cash Collateral and Proceeds of DIP Facility**.  Subject to the terms and conditions of this Interim DIP Order and the other DIP Loan Documents, and to the adequate protection granted to or for the benefit of the Prepetition Secured Parties as hereinafter set forth, each Debtor is authorized during the Interim Period (and not beyond) to (a) use the Cash Collateral and (b) request and use proceeds of the DIP Extensions of Credit, in each case in the amounts and for the line item expenditures set forth in the DIP Budget.  The DIP Budget may only be amended, supplemented, modified, restated, replaced, or extended in accordance with the DIP Loan Documents and the prior written consent of the DIP Agent.  Notwithstanding anything herein to the contrary, subject only to the Debtors' rights under Paragraph 17(b), the Debtors' right to request or use proceeds of DIP Extensions of Credit or to use Cash Collateral shall terminate on the Termination Date.  Nothing in this Interim DIP Order shall authorize the disposition of any assets of the Debtors or their estates or other proceeds resulting therefrom outside the ordinary course of business, except as permitted herein (subject to any required Court approval).

4.     **Adequate Protection for Prepetition Secured Parties**.  As adequate protection for the interests of the Prepetition Agent and the Prepetition Secured Parties in the Prepetition Collateral (including Cash Collateral), the Prepetition Agent for the benefit of the Prepetition Secured Parties shall receive adequate protection as follows:

a)     **Adequate Protection Liens**.  To the extent of, and in an aggregate amount equal to, the diminution in value of such interests, from and after the Petition Date, calculated in accordance with section 506(a) of the Bankruptcy Code, resulting from, among

other things, the use, sale or lease by the Debtors of the Prepetition Collateral (including the use

of Cash Collateral), the granting of the DIP Liens, the subordination of the Prepetition Liens

thereto and to the Carve-Out, and the imposition or enforcement of the automatic stay of section

362(a) (collectively, "**Diminution in Value**"), the Prepetition Secured Parties shall have

pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, replacement security

interests in and liens upon (the "**Adequate Protection Liens**") all of the DIP Collateral.  The

Adequate Protection Liens of the Prepetition Secured Parties shall be junior and subject to the

DIP Liens and any Senior Third Party Liens.  The Adequate Protection Liens shall in all cases be

subject to the Carve-Out.

b)     **Adequate Protection Superpriority Claims**.   To the extent of the

aggregate Diminution in Value, the Prepetition Secured Parties shall have, subject to the

payment of the Carve-Out, an allowed superpriority administrative expense claim (the

"**Adequate Protection Superpriority Claim**") as provided for in section 507(b) of the

Bankruptcy Code, immediately junior and subject to the DIP Superpriority Claim, and payable

from and having recourse to all DIP Collateral; provided, that the Prepetition Secured Parties

shall not receive or retain any payments, property, distribution or other amounts in respect of the

Adequate Protection Superpriority Claim unless and until the DIP Obligations and (without

duplication) the DIP Superpriority Claim have indefeasibly been paid in full in cash.

c)     **Adequate Protection Payments, etc**.  The Prepetition Agent (on behalf of

the Prepetition Secured Parties) shall receive from the Debtors upon the entry of this Interim DIP

Order, immediate cash payment of all accrued and unpaid fees and disbursements (including

legal and advisory fees and expenses) owing to the Prepetition Agent or the Prepetition Secured

Parties under the Prepetition Loan Documents and incurred prior to the Petition Date.

d)     Promptly upon receipt of invoices therefor, the Debtors shall pay all reasonable professional and advisory fees, costs and expenses of the Prepetition Agent and the other Prepetition Secured Parties incurred in connection with the administration and monitoring of the Prepetition Loan Documents and/or the DIP Facility as and to the extent provided in the Prepetition Loan Documents or the DIP Loan Documents, including, without, limitation, the reasonable documented postpetition fees and expenses of legal, financial and other advisory, tax, investment banking and other professionals (including, without limitation, Moore & Van Allen, any other local counsel and any replacement or addition thereto, and consultants and other advisors (including, without limitation, engineers and accountants).

e)     **Credit-Bid Protection**.   Upon commencement of the Acceptable Sale Process, the DIP Agent and the Prepetition Agent shall each have the right to credit-bid up to the amount of the DIP Obligations and the Prepetition Facility Obligations in connection with any sale of some or all of the Debtors' assets and property (whether in whole or in lots), including, without limitation, any sale occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan of reorganization subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

5.     **Monitoring of Collateral**.   The Prepetition Agent and the DIP Agent, and their respective consultants and advisors, shall be given reasonable access to the Debtors' books, records, assets and properties for purposes of monitoring the Debtors' business and the value of the DIP Collateral, and shall be permitted to conduct, at their discretion and at the Debtors' cost and expense, field audits, collateral examinations and inventory appraisals in respect of the DIP Collateral all as and to the extent provided in the DIP Loan Documents.

6.     **Financial Reporting, etc**.  The Debtors shall provide the DIP Agent and the Prepetition Agent with the monthly financial reporting given to the United States Trustee and all of the financial reporting as required under and in all instances consistent with the DIP Loan Documents and the Prepetition Loan Documents.

7.     **DIP Lien and Adequate Protection Replacement Lien Perfection**.  This Interim DIP Order shall be sufficient and conclusive evidence of the validity, perfection and priority of the DIP Liens and the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent may, in its sole discretion, file such financing statements, mortgages, security agreements, notices of liens and other similar documents, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Cases.  The Debtors shall execute and deliver to the DIP Agent all such financing statements, mortgages, security agreements, notices and other documents as the DIP Agent may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens and the Adequate Protection Liens.  The DIP Agent, in its sole discretion, may file a photocopy of this Interim DIP Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property and, in such

- 24 -

event, the subject filing or recording officer shall be authorized to file or record such copy of this

Interim DIP Order.   To the extent that the Prepetition Agent is the secured party under any

account control agreements, listed as loss payee under any of the Debtors' insurance policies or

is the secured party under any Prepetition Loan Document, the DIP Agent is also deemed to be

the secured party under such account control agreements, loss payee under the Debtors'

insurance policies and the secured party under each such Prepetition Loan Document, and shall

have all rights and powers attendant to that position (including, without limitation, rights of

enforcement) and shall act in that capacity and distribute any proceeds recovered or received in

accordance with the terms of this Interim DIP Order and/or the Final DIP Order, as applicable,

and the other DIP Loan Documents.   The Prepetition Agent shall serve as agent for the DIP

Agent for purposes of perfecting their respective security interests and liens on all DIP Collateral

that is of a type such that perfection of a security interest therein may be accomplished only by

possession or control by a secured party.

8.      **Reservation of Certain Third Party Rights and Bar of Challenges and**

**Claims**.  Except as set forth below in the immediately following sentence, all of the findings,

agreements, terms, provisions and stipulations set forth in Paragraph I of this Interim DIP Order

(the "**Claims Stipulations**"), shall be immediately and irrevocably binding on all persons and

entities.   Notwithstanding the foregoing, nothing in this Interim DIP Order shall prejudice any

rights (if any) a Committee (or any other party with standing to do so) may have (a) to object to

or challenge any of the Claims Stipulations, including in relation to (i) the validity, extent,

perfection or priority of the Prepetition Liens on the Prepetition Collateral, or (ii) the validity,

allowability, priority, status or amount of the Prepetition Secured Obligations, or (b) to bring suit

against any of the Prepetition Secured Parties in connection with or related to the matters

covered by the Claims Stipulations; <u>provided</u>, that unless any Committee or such other party

with standing to do so, commences an adversary proceeding or contested matter (as applicable)

raising such objection or challenge, including without limitation any claim against the

Prepetition Secured Parties in the nature of a setoff, counterclaim or defense to the Prepetition

Secured Obligations (including but not limited to, those under sections 506 (subject to the waiver

of section 506(c) claims as may be provided herein and in the Final DIP Order), 544, 547, 548,

549, 550 and/or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition

Secured Parties), by the date that is the later of (x) 30 days following the appointment of a

Committee, but with such date in no event later than 60 days following the entry of the Interim

DIP Order and (y) 45 days following entry of the Interim DIP Order (the period described in the

immediately preceding clause shall be referred to as the "**Challenge Period**," and the date that is

the next calendar day after the termination of the Challenge Period shall be referred to as the

"**Challenge Period Termination Date**"), upon the Challenge Period Termination Date, any and

all such challenges and objections by any Committee, any chapter 11 or chapter 7 trustee

appointed herein or in any Successor Case, and any other party in interest shall be deemed to be

forever waived and barred, and the Prepetition Secured Obligations shall be deemed to be an

allowed secured claim within the meaning of sections 502 and 506 of the Bankruptcy Code for

all purposes in connection with the Cases up to the amount of the value of the Prepetition

Collateral and an allowed unsecured claim for any amount in excess of the value of the

Prepetition Collateral, and the Claims Stipulations shall be binding on all creditors, interest

holders and parties in interest.  To the extent any such objection or complaint is filed, the Claims

Stipulations shall nonetheless remain binding and preclusive except to the extent expressly

challenged in such objection or complaint.

9.      **Carve-Out**.  Subject to the terms and conditions contained in this Paragraph 9, the DIP Liens, the DIP Superpriority Claim, the Prepetition Liens, the Adequate Protection Liens and the Adequate Protection Superpriority Claims, which have the relative lien and payment priorities as set forth herein, shall, in any event, in all cases be subject and subordinate to a carve-out (the "**Carve-Out**"), which shall be comprised of the following:  (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) plus (ii) an amount equal to the unpaid professional fees and expenses incurred by the Debtors and the Committee on or after the Petition Date through the date (if any) upon which the DIP Agent provides written notice (a "**Carve-Out Trigger Notice**") to counsel to the Debtors and counsel to the Committee, if one, that an Event of Default (as defined in the DIP Credit Agreement) has occurred and the DIP Agent is electing to trigger the Carve-Out, plus (iii) $50,000 (the "**Default Carve-Out Amount**"), which amount may be used subject to the terms of this Interim DIP Order and any Final DIP Order to pay any allowed fees or expenses incurred by the Debtors and the Committee after the date of delivery of the Carve-Out Trigger Notice.  In addition to the foregoing, upon the closing of an Approved Sale (and only upon the closing of an Approved Sale), a fund shall be established in the amount of $225,000 (the "**Post-Sale Carve-Out**") to be used solely for professional fees and expenses incurred by the Debtors' estates after the closing of an Approved Sale, including in connection with a plan of reorganization permitted hereunder or under the Final DIP Order, with any unused portion thereof to be held for distribution as proceeds of the Prepetition Collateral; provided that the use of the Post-Sale Carve-Out shall be consistent with the DIP Budget; provided, further, that the Post-Sale Carve-Out shall be reduced on a dollar for dollar basis by the amount of the Default Carve-Out Amount in the event that the DIP Agent issues a Carve-Out Trigger Notice.  The

Post-Sale Carve-Out shall be funded immediately after the Approved Sale from the Debtors'

cash on hand after the indefeasible payment in full of the DIP Facility, with the balance of all

remaining proceeds of the Approved Sale other than the GUC Carveout (as defined below) to the

Prepetition Agent on behalf of the Prepetition Lenders except to the extent that a Committee (or

any other party with standing to do so) has successfully objected to or challenged any of the

Claims Stipulations prior to the Challenge Period Termination Date.   Notwithstanding the

foregoing, the amount of $30,000 shall be reserved from the distribution to the Prepetition Agent

on behalf of the Prepetition Lenders and held for later distribution to general unsecured creditors

holding allowed claims (including any deficiency claims of the Prepetition Lenders) or to a

liquidating trust created to hold, prosecute and distribute assets to such unsecured creditors (such

amount, the "**GUC Carve-Out**").  The dollar limitation in clause (ii) above on fees and expenses

shall not be reduced or increased by the amount of any compensation or reimbursement of

expenses paid prior to the issuance of a Carve-Out Trigger Notice.  The ability of any party to

object to the fees, expenses, reimbursement or compensation described above shall not be

impaired by the terms of the Carve-Out.  No portion of the Carve-Out, the Post-Sale Carve-Out

or the GUC Carve-Out, no proceeds of the DIP Facility or DIP Extensions of Credit, and no

proceeds of the Prepetition Collateral, including Cash Collateral, or any other amounts, may be

used for the payment of the fees and expenses of any person incurred (i) in challenging, or in

relation to the challenge of, any of the Prepetition Secured Parties' or the DIP Secured Parties'

liens or claims (or the value of their respective Prepetition Collateral or the DIP Collateral), or

the initiation or prosecution of any claim or action against any of the Prepetition Secured Parties

or DIP Secured Parties, including, without limitation, any claim under chapter 5 of the

Bankruptcy Code, or any state law or foreign law, in respect of the Prepetition Secured

Obligations or the DIP Facility, or in preventing, hindering or delaying the realization by the Prepetition Secured Parties or the DIP Secured Parties upon any Prepetition Collateral or DIP Collateral, respectively, or the enforcement of their respective rights under this Interim DIP Order, the Final DIP Order, any other DIP Loan Document or any Prepetition Loan Document, (ii) in requesting authorization, or supporting any request for authorization, to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than (x) from the DIP Lenders or (y) if such financing is sufficient to indefeasibly pay and satisfy all DIP Obligations in full in cash and such financing is immediately so used or (iii) in connection with any claims or causes of actions against the Releasees, including formal or informal discovery proceedings in anticipation thereof, and/or in challenging any Prepetition Secured Obligations, DIP Obligations, Prepetition Liens, Adequate Protection Liens or DIP Liens.

10.    **Payment of Compensation**.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors or any Committee or shall limit or otherwise affect the right of the DIP Secured Parties and/or the Prepetition Secured Parties to object to the allowance and payment of any such fees and expenses.  So long as no Event of Default exists that has not been waived in writing, the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code and in accordance with the DIP Budget, with the variations permitted herein, as the same may be due and payable and the same shall not reduce the Carve- Out.

11.    **Section 506(c) Claims**.  Subject to the entry of the Final DIP Order, as a further condition of the DIP Facility, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Cases or any Successor Cases) shall be deemed

to have waived any rights, benefits or causes of action under section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Secured Parties, the DIP Liens, the DIP Collateral, the Prepetition Secured Parties, the Adequate Protection Liens, the Prepetition Liens or the Prepetition Collateral.  Nothing contained in this Interim DIP Order, in the Final DIP Order or in the other DIP Loan Documents shall be deemed a consent by the Prepetition Secured Parties or the DIP Secured Parties to any charge, lien, assessment or claim against, or in respect of, the DIP Collateral or the Prepetition Collateral under section 506(c) of the Bankruptcy Code or otherwise.

12. **Collateral Rights; Limitations in Respect of Subsequent Court Orders**. Without limiting any other provisions of this Interim DIP Order, unless the DIP Agent and the Prepetition Agent have provided their prior written consent or the DIP Obligations and the Prepetition Secured Obligations shall have been indefeasibly paid and satisfied in full in cash, there shall not be entered in these proceedings, or in any Successor Case, any order which authorizes (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or entitled to priority administrative status which is superior to or *pari passu* with those granted pursuant to this Interim DIP Order to or for the benefit of the DIP Secured Parties or the Prepetition Secured Parties, or (ii) the use of Cash Collateral for any purpose other than as set forth in the DIP Budget, including to wind down the estates.

13. **Proceeds of Subsequent Financing**.  Without limiting the provisions and protections of Paragraph 12 above, if at any time prior to the indefeasible repayment and satisfaction in full in cash of all DIP Obligations and all Prepetition Secured Obligations, and the termination of the DIP Secured Parties' obligations to make DIP Extensions of Credit, including

subsequent to the confirmation of any chapter 11 plan or plans (the "**Plan**") with respect to the

Debtors, the Debtors' estates, any trustee, any examiner with enlarged powers or any responsible

officer subsequently appointed, shall obtain credit or incur debt in violation of this Interim DIP

Order or the other DIP Loan Documents, then all of the cash proceeds derived from such credit

or debt and all Cash Collateral shall immediately be turned over to the DIP Agent or the

Prepetition Agent, as the case may be, for application in accordance with Paragraph 18(b) of this

Interim DIP Order, the DIP Loan Documents and the Prepetition Loan Documents, as applicable.

For the avoidance of doubt, the Debtors may, at their option, upon notice as provided in the DIP

Credit Agreement, prepay all of the Loans, on any date.

14.     **Cash Management**.  The Debtors' cash management system shall at all times be

maintained (i) in accordance with the terms of the DIP Loan Documents including the "anti-

hoarding" provisions thereof requiring cash balances in excess of $500,000 for three consecutive

business days be applied to the DIP Obligations in the manner set forth in the DIP Credit

Agreement, and any order of this Court approving the maintenance of the Debtors' cash

management system, and (ii) in a manner which in any event shall be reasonably satisfactory to

the DIP Agent.  The DIP Agent shall be deemed to have "control" over such accounts for all

purposes of perfection under the Uniform Commercial Code.  Until the occurrence of an Event

of Default, all amounts collected in the cash collection accounts may be used in accordance with

this Interim DIP Order, the DIP Budget and the other DIP Loan Documents; after the occurrence

and during the continuance of an Event of Default, subject only to the Debtors' rights under

Paragraph 17(b), all such amounts shall be applied in accordance with Paragraph 18(b).

15.     **Disposition of DIP Collateral**.  The Debtors shall not sell, transfer, lease,

encumber or otherwise dispose of any portion of the DIP Collateral, except as permitted by the

DIP Loan Documents, or as approved by the Court.  Upon the closing of an Approved Sale (and only upon the closing of an Approved Sale), the Debtors shall retain sufficient cash on hand to satisfy the following costs (the "**Post-Closing Costs**"):  (i) any accrued but unpaid professional or U.S. Trustee fees and expenses that are part of the Carve-Out (if any), plus (ii) the unfunded costs set forth in the Approved Budget, including the Post-Sale Carve-Out.

16.    **Survival of Certain Provisions**.  In the event of the entry of any order converting any of these Cases into a Successor Case, the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens and the Adequate Protection Superpriority Claim shall continue in these proceedings and in any Successor Case, and such DIP Liens, DIP Superpriority Claim, Adequate Protection Liens and Adequate Protection Superpriority Claim shall maintain their respective priorities as provided in this Interim DIP Order.

17.    **Events of Default; Rights and Remedies Upon Event of Default**.

a)    Any automatic stay otherwise applicable to the DIP Secured Parties and the Prepetition Agent is hereby modified so that, upon and after the occurrence of the Termination Date, the DIP Agent and the Prepetition Agent shall, subject to subparagraph (b) of this Paragraph 17, be immediately entitled to exercise all of their rights and remedies in respect of the DIP Collateral and the Prepetition Collateral, in accordance with this Interim DIP Order, the other DIP Loan Documents and/or the Prepetition Loan Documents, as applicable.  The term "**Termination Date**" shall mean:  (a) prior to entry of the Final DIP Order, the earliest to occur of (i) thirty (30) days after the Petition Date, (ii) the Maturity Date (as defined in the DIP Credit Agreement), (iii) the DIP Agent's decision to accelerate the indebtedness under the DIP Facility as a result of an Event of Default thereunder (including as a result of a breach of this Interim DIP Order) and (iv) this Interim DIP Order ceasing to be in full force and effect for any reason, and

(b) subsequent to entry of the Final DIP Order, the earliest to occur of (i) the Maturity Date (as defined in the DIP Credit Agreement), (ii) the DIP Agent's decision to accelerate the indebtedness under the DIP Facility as a result of an Event of Default thereunder (including as a result of a breach of the Final DIP Order), and (iii) the Final DIP Order ceasing to be in full force and effect for any reason.

b)      Notwithstanding the foregoing subparagraph (a) of this Paragraph 17, immediately following the giving of notice by the DIP Agent to the Debtors, counsel to the Debtors, counsel for any Committee appointed in the Cases and the Office of the United States Trustee for the District of Minnesota (the "**U.S. Trustee**") of the occurrence of an Event of Default:  (i) all Commitments of the DIP Lenders to provide any DIP Extensions of Credit shall immediately be suspended; (ii) subject to the immediately succeeding sentence, the Debtors shall have no right to request or use any proceeds of any Loans or DIP Collateral, or to use Cash Collateral, other than towards the satisfaction of the DIP Obligations and the Carve-Out, as provided in the applicable DIP Loan Documents; (iii) the Debtors shall deliver and cause the delivery of the proceeds of the Loans and the DIP Collateral to the DIP Agent as provided herein and in the DIP Loan Documents; and (iv) the DIP Agent shall be permitted to apply such proceeds in accordance with the terms of this Interim DIP Order and the DIP Loan Documents. The Debtors and any Committee shall be entitled to an emergency hearing before this Court within seven (7) days after the giving of written notice by the DIP Agent and the Prepetition Agent of the occurrence of an Event of Default and the Debtors shall be entitled to continue to use Cash Collateral as provided in the DIP Budget until the conclusion of such hearing; provided, that the only issue that may be raised at such hearing shall be whether an Event of Default has in fact occurred and is continuing, and such entities hereby waive their right to seek

any relief, whether under section 105 of the Bankruptcy Code or otherwise, that would in any

way impair, limit, restrict or delay the rights and remedies of the DIP Agent and the Prepetition

Agent under the DIP Loan Documents or the Prepetition Loan Documents.  If the Debtors or any

Committee do not contest the occurrence of the Event of Default within seven (7) days after the

giving of notice thereof, or if the Debtors or any Committee do timely contest the occurrence of

an Event of Default and the Court after notice and a hearing declines to stay the enforcement

thereof, the Termination Date shall be deemed to have occurred for all purposes and the

automatic stay, as to the DIP Agent and the Prepetition Agent, shall automatically terminate in

all respects.  Nothing herein shall preclude the DIP Agent or the Prepetition Agent from seeking

an order from the Court upon written notice (electronically (including via facsimile) in a manner

that generates a receipt for delivery, or via overnight mail) to the U.S. Trustee, counsel to the

Debtors and counsel to the Committee, if any, authorizing the DIP Agent and/or the Prepetition

Agent to exercise any enforcement rights or remedies with respect to the DIP Collateral on less

than seven (7) days' notice, or the Debtors' right to contest such relief.

    c)  Upon the occurrence of the Termination Date (but subject, only in the case

of the occurrence of the Termination Date resulting from an Event of Default, to the provisions

of Paragraph 17(b)), the DIP Agent and the Prepetition Agent are authorized to exercise all

remedies and proceed under or pursuant to the applicable DIP Loan Documents and the

Prepetition Loan Documents.  All proceeds realized in connection with the exercise of the rights

and remedies of the applicable DIP Secured Parties and Prepetition Secured Parties shall be

turned over and applied in accordance with Paragraph 18(b).

    d)  The automatic stay imposed under section 362(a) of the Bankruptcy Code

is hereby modified pursuant to the terms of the DIP Loan Documents as necessary to (i) permit

the Debtors to grant the Adequate Protection Liens and the DIP Liens and to incur all DIP

Obligations and all liabilities and obligations to the Prepetition Secured Parties hereunder and

under the other DIP Loan Documents, as the case may be, and (ii) authorize the DIP Agent and

the Prepetition Agent to retain and apply payments, and otherwise enforce their respective rights

and remedies hereunder.

> e)      Nothing included herein shall prejudice, impair, or otherwise affect the

Prepetition Agent's or the DIP Agent's rights to seek (on behalf of the Prepetition Secured

Parties and the DIP Secured Parties, respectively) any other or supplemental relief in respect of

the Debtors, nor the DIP Agent's or Prepetition Agent's rights to suspend or terminate the

making of DIP Extensions of Credit or use of Cash Collateral pursuant to the terms of this Order

and the DIP Loan Documents.

> f)      Notwithstanding anything in this Interim DIP Order to the contrary, the

Prepetition Agent shall not be permitted to exercise any rights or remedies for itself or the

Prepetition Secured Parties unless and until the DIP Obligations are indefeasibly paid and

satisfied in full in cash.

> 18.    **Applications of Proceeds of Collateral, Payments and Collections**.

> a)      As a condition to the DIP Extensions of Credit and the authorization to use

Cash Collateral, each Debtor has agreed that proceeds of any DIP Collateral and Prepetition

Collateral, any amounts held on account of the DIP Collateral or Prepetition Collateral, and all

payments and collections received by the Debtors with respect to all proceeds of DIP Collateral

and Prepetition Collateral, shall be used and applied in accordance with the DIP Loan

Documents (including repayment and reduction of the DIP Obligations) and the DIP Budget.

For the avoidance of doubt, proceeds of the Prepetition Collateral and the DIP Collateral shall include proceeds from the Approved Sale.

b)      Subject to the Debtors' rights under Paragraph 17(b) and the funding of the Carve-Out, upon and after the occurrence of the Termination Date all proceeds of DIP Collateral and Prepetition Collateral, whenever received, shall be paid and applied as follows: (i) first, to permanently and indefeasibly repay and reduce the DIP Obligations then due and owing in accordance with the DIP Loan Documents, until paid and satisfied in full in cash; (ii) second, to permanently and indefeasibly repay and reduce the Prepetition Secured Obligations then due and owing in accordance with the Prepetition Loan Documents, until paid and satisfied in full in cash; and (iii) third, to the Debtors' estates.  For avoidance of doubt, nothing in this Interim DIP Order shall be construed to limit the voluntary and mandatory repayment provisions set forth in the DIP Loan Documents.

19.    **Proofs of Claim, etc**.  None of the DIP Secured Parties or the Prepetition Secured Parties shall be required to file proofs of claim in any of the Cases or any Successor Cases for any claim allowed herein.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Cases or any Successor Cases to the contrary, the DIP Agent, on behalf of itself and the DIP Secured Parties and the Prepetition Agent, on behalf of itself and the Prepetition Secured Parties, respectively, are hereby authorized and entitled, in each of their sole and absolute discretion, but not required, to file (and amend and/or supplement, as each sees fit) a proof of claim and/or aggregate proofs of claim in each of the Cases or any Successor Cases for any claim allowed herein; for avoidance of doubt, any such proof of claim may (but is not required to be) filed as one consolidated proof of claim against all of the Debtors, rather than as separate proofs of claim against each Debtor.  Any proof of claim filed by the DIP

Agent or the Prepetition Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the respective DIP Secured Parties or Prepetition Secured Parties.  Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in any of the Cases or any Successor Cases shall not apply to the DIP Agent, the other DIP Secured Parties, the Prepetition Agent or the other Prepetition Secured Parties.

20.     **Other Rights and Obligations**.

a)     **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim DIP Order**.  Based on the findings set forth in this Interim DIP Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility as approved by this Interim DIP Order, in the event any or all of the provisions of this Interim DIP Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code, and no such appeal, modification, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or the liens or priority authorized or created hereby.  Notwithstanding any such modification, amendment or vacation, any claim granted to the DIP Secured Parties hereunder arising prior to the effective date of such modification, amendment or vacation of any DIP Liens or of the DIP Superpriority Claim granted to or for the benefit of the DIP Secured Parties shall be governed in all respects by the original provisions of this Interim DIP Order, and the DIP Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Liens and the DIP Superpriority Claim granted herein, with respect to any such claim. Because the DIP Extensions of Credit are made in reliance on this Interim DIP Order, the DIP

Obligations incurred by the Debtors or owed the DIP Secured Parties prior to the effective date

of any stay, modification or vacation of this Interim DIP Order shall not, as a result of any

subsequent order in the Cases or in any Successor Cases, be subordinated, lose their lien priority

or superpriority administrative expense claim status, or be deprived of the benefit of the status of

the liens and claims granted to the DIP Secured Parties under this Interim DIP Order.

b)      **Expenses**.  To the fullest extent provided in the DIP Loan Documents, the

Prepetition Loan Documents and this Interim DIP Order, the Debtors will pay all expenses

incurred by the DIP Secured Parties, the Prepetition Agent and the Prepetition Secured Parties

(including, without limitation, the reasonable fees and disbursements of their counsel, any other

local counsel that they shall retain and any internal or third-party appraisers, consultants,

financial, restructuring or other advisors and auditors advising any such counsel) in connection

with (i) the preparation, execution, delivery, funding and administration of the DIP Loan

Documents, including, without limitation, all due diligence fees and expenses incurred or

sustained in connection with the DIP Loan Documents, (ii) the administration of the Prepetition

Loan Documents and monitoring of the Sale Conditions and Milestones, (iii) the Cases or any

Successor Cases, or (iv) enforcement of any rights or remedies under the DIP Loan Documents

or the Prepetition Loan Documents, in each case whether or not the transactions contemplated

hereby are fully consummated.  The Prepetition Agent, the Prepetition Secured Parties and the

DIP Secured Parties, and their advisors and professionals, shall not be required to comply with

the U.S. Trustee fee guidelines, but shall provide reasonably detailed statements (redacted if

necessary for privileged, confidential or otherwise sensitive information) to the Office of the

U.S. Trustee and counsel for any Committee and the Debtors.  Thereafter, within seven (7) days

of presentment of such statements, if no written objections to the reasonableness of the fees and

expenses charged in any such invoice (or portion thereof) is made, the Debtors shall pay in cash all such fees and expenses of the Prepetition Agent, the Prepetition Secured Parties, the DIP Agent and the DIP Secured Parties, and their advisors and professionals.  Any objection to the payment of such fees or expenses shall be made only on the basis of "reasonableness," and shall specify in writing the amount of the contested fees and expenses and the detailed basis for such objection.  To the extent an objection only contests a portion of an invoice, the undisputed portion thereof shall be promptly paid.  If any such objection to payment of an invoice (or any portion thereof) is not otherwise resolved between the Debtors, any Committee or the U.S. Trustee and the issuer of the invoice, either party may submit such dispute to the Court for a determination as to the reasonableness of the relevant disputed fees and expenses set forth in the invoice.  This Court shall resolve any dispute as to the reasonableness of any fees and expenses.

c)      **Binding Effect**.  The provisions of this Interim DIP Order shall be binding upon and inure to the benefit of the DIP Secured Parties and the Prepetition Secured Parties, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) whether in the Cases, in any Successor Cases, or upon dismissal of any such chapter 11 or chapter 7 case.

d)      **No Waiver**.  The failure of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim DIP Order, the other DIP Loan Documents or the Prepetition Loan Documents or otherwise, as applicable, shall not constitute a waiver of any of the DIP Secured Parties' or Prepetition Secured Parties' rights hereunder, thereunder, or otherwise.  Notwithstanding anything herein, the entry of this Interim DIP Order is without prejudice to, and does not constitute a waiver of, expressly

or implicitly, or otherwise impair any of the rights, claims, privileges, objections, defenses or remedies of the DIP Secured Parties or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law against any other person or entity in any court, including without limitation, the rights of the DIP Agent and the Prepetition Agent (i) to request conversion of the Cases to cases under chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases, or (ii) to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Plan, or (iii) to exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) on behalf of the DIP Secured Parties or the Prepetition Secured Parties.

e) **No Third Party Rights**. Except as explicitly provided for herein, this Interim DIP Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, third party or incidental beneficiary.

f) **No Marshalling**. Neither the DIP Secured Parties nor the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.

g) **Section 552(b)**. Subject to the entry of the Final DIP Order, the DIP Secured Parties and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or the DIP Collateral.

h) **Amendment**. The Debtors and the DIP Agent (with the consent of the requisite DIP Secured Parties as provided in and consistent with their respective rights under the

DIP Loan Documents) may amend, modify, supplement or waive any provision of the DIP Loan Documents without further notice to or approval of the Court, unless such amendment, modification, supplement or waiver (x) increases the interest rate (other than as a result of the imposition of the default rate) or fees charged in connection with the DIP Facility, (y) increases the commitments of the DIP Lenders to make DIP Extensions of Credit under the DIP Loan Documents, or (z) changes the Termination Date.  Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by, or on behalf of, all the Debtors and the DIP Agent (after having obtained the approval of the requisite DIP Secured Parties as provided in the DIP Loan Documents).

i)      **Priority of Terms**.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim DIP Order, on the other hand, unless such term or provision herein is phrased in terms of "defined in" or "as set forth in" the DIP Credit Agreement, the terms and provisions of this Interim DIP Order shall govern.

j)      **Survival of Interim DIP Order**.  The provisions of this Interim DIP Order and any actions taken pursuant hereto shall survive entry of any order which may be entered confirming any Plan in the Cases, (ii) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, (iii) to the extent authorized by applicable law, dismissing any of the Cases, (iv) withdrawing of the reference of any of the Cases from this Court or (v) providing for abstention from handling or retaining of jurisdiction of any of the Cases in this Court.  The terms and provisions of this Interim DIP Order, including the DIP Liens and DIP

Superpriority Claim granted pursuant to this Interim DIP Order, and any protections granted to

or for the benefit of the Prepetition Secured Parties (including the Adequate Protection Liens and

the Adequate Protection Superpriority Claim), shall continue in full force and effect

notwithstanding the entry of such order, and such DIP Liens and DIP Superpriority Claim and

protections for the Prepetition Secured Parties (including the Adequate Protection Liens and the

Adequate Protection Superpriority Claim) shall maintain their priority as provided by this

Interim DIP Order, the other DIP Loan Documents and the Prepetition Loan Documents (as the

case may be), until all of the DIP Obligations and the Prepetition Secured Obligations have been

indefeasibly paid and satisfied in full in cash and discharged.

k)      **Enforceability**.  This Interim DIP Order shall constitute findings of fact

and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully

enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

l)      **No Waiver or Modification of Interim DIP Order**.  The Debtors

irrevocably waive any right to seek any modification or extension of this Interim DIP Order

without the prior written consent of the DIP Agent and the Prepetition Agent, and no such

consent shall be implied by any other action, inaction or acquiescence of the DIP Agent and the

Prepetition Agent.  This Interim DIP Order may not be modified to alter relative lien priority of

the DIP Liens, the Prepetition Liens and the Adequate Protection Liens.

m)      **Waiver of Any Applicable Stay**.  Any applicable stay (including, without

limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim

DIP Order.

21.    **Final Hearing**.

a)    The Final Hearing to consider entry of the Final DIP Order and final approval of the DIP Facility is scheduled for January [__], 2017 at [__:__ _].m. (CT) at the United States Bankruptcy Court for the District of Minnesota.  If no objections to the relief sought in the Final DIP Hearing are filed and served in accordance with this Interim DIP Order, no Final Hearing may be held, and a separate Final DIP Order may be presented by the Debtors and entered by this Court.

b)    On or before January [__], 2017, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim DIP Order and of the Final Hearing substantially in the form attached hereto as **Exhibit 1** (the "**Final Hearing Notice**"), together with copies of this Interim DIP Order and the Motion, on the Notice Parties.  The Final Hearing Notice shall state that any response to the Motion must be filed and delivered not later than January [__], 2017 and that any reply to any response to the Motion must be filed and delivered not later than January [__], 2017.

c)    **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce this Interim DIP Order according to its terms.


Dated:                                    _____
                                          Michael E. Ridgway
                                          United States Bankruptcy Judge

**<u>EXHIBIT 1</u>**

FORM OF FINAL HEARING NOTICE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Dakota Plains Holdings, Inc., | Case No. 16-43711 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Transloading, LLC, | Case No. 16-43712 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Sand, LLC, | Case No. 16-43715 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Marketing, LLC, | Case No. 16-43716 |
| Debtor. | Chapter 11 Case |
| DPTS Marketing LLC, | Case No. 16-43717 |
| Debtor. | Chapter 11 Case |
| Dakota Petroleum Transport Solutions, LLC, | Case No. 16-43718 |
| Debtor. | Chapter 11 Case |
| DPTS Sand, LLC, | Case No. 16-43721 |
| Debtor. | Chapter 11 Case |

**NOTICE OF HEARING FOR ENTRY OF FINAL ORDER (I) AUTHORIZING THE
DEBTORS (A) TO UTILIZE CASH COLLATERAL OF THE PREPETITION SECURED
PARTIES, (B) TO OBTAIN POSTPETITION SECURED FINANCING, AND (C) TO
PROVIDE ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES,
(II) AND GRANTING RELATED RELIEF**

TO:    The parties-in-interest as specified in Local Rule 9013-3(a)(2).

**PLEASE TAKE NOTICE** that, on December 21, 2016, Dakota Plains Holdings, Inc.
and the above-captioned debtors and debtor in possession (collectively, the "**Debtors**") filed the
Notice of Hearing and Motion for Entry of Interim and Final Orders (I) Granting an Expedited
Hearing, (II) Authorizing the Debtors (A) to Utilize Cash Collateral of the Prepetition Secured
Parties, (B) to Obtain Postpetition Secured Financing, and (C) to Provide Adequate Protection to
the Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related
Relief ECF No. [__] (the "**Motion**") with the United States Bankruptcy Court for the District of
Minnesota (the "**Court**").

**PLEASE TAKE FURTHER NOTICE** that, on December [__], 2016, the Court entered
the Interim Order (I) Granting an Expedited Hearing, (II) Authorizing the Debtors (A) to Utilize
Cash Collateral of the Prepetition Secured Parties, (B) to Obtain Postpetition Secured Financing,
and (C) to Provide Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a

Final Hearing, and (IV) Granting Related Relief ECF No. [__] (the "**Interim DIP Order**"), which approved the relief requested in the Motion on an interim basis.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the portion of the Motion seeking final relief will be held on January [__], 2017 at [__:__ _].m. (prevailing Central time) before the Honorable Michael E. Ridgway, United States Bankruptcy Judge for the District of Minnesota, in Courtroom No. 7 West, U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota, 55415.

**PLEASE TAKE FURTHER NOTICE** that any response to the Motion must be filed and delivered to the parties-in-interest as specified in Local Rule 9013-3(b) not later than **12:00 p.m. (prevailing Central time on January [__], 2017**. **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION ON A FINAL BASIS WITHOUT A HEARING**.

**PLEASE TAKE FURTHER NOTICE** that any reply to any response to the Motion must be filed and delivered to (i) counsel for the Debtors, Baker Hostetler, Attn: Elizabeth Green, SunTrust Center, Suite 2300, 200 South Orange Avenue, Orlando, Florida 32801-3432, facsimile: (407) 841-0168, Email: egreen@bakerlaw.com; and Eric Goodman, Key Tower, 127 Public Square, Suite 2000, Cleveland, Ohio 44114-1214, facsimile: (216) 696-0740, Email: egoodman@bakerlaw.com; (ii) counsel for the DIP Agent and the Prepetition Agent, Moore & Van Allen, Attn: Alan W. Pope, 100 North Tryon Street, Suite 4700, Charlotte, North Carolina 28202-4003; (iii) counsel to any Committee, [_____]; and (iv) the Office of the United States Trustee, 1015 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, not later than **12:00 p.m. (prevailing Central time) on January [__], 2017**.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and Interim DIP Order may be obtained for a fee at http://www.mnb.uscourts.gov/

[*Remainder of Page Intentionally Left Blank*]

Dated:  January [__], 2017

Respectfully submitted,


/s/ Michael F. McGrath
Michael F. McGrath (#168610)
Will R. Tansey (#323056)
RAVICH MEYER KIRKMAN MCGRATH NAUMAN
& TANSEY, PA
150 S. Fifth Street, Suite 3450
Minneapolis, MN  55402
Telephone:  612.317.4744
Email: mfmcgrath@ravichmeyer.com
        wrtanser@ravichmeyer.com


Elizabeth A. Green
Jimmy D. Parrish
BAKER & HOSTETLER LLP
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL  32801-3432
Telephone:  407.649.4000
Email: egreen@bakerlaw.com
        jparrish@bakerlaw.com


Eric R. Goodman
BAKER & HOSTETLER LLP
Key Tower, 127 Public Square
Suite 2000
Cleveland, OH  44114-1214
Telephone:  216.621.0200
Email: egoodman@bakerlaw.com


*Proposed Counsel for the Debtors and Debtors
in Possession*

## **EXHIBIT C**

FINAL DIP ORDER

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Dakota Plains Holdings, Inc., | Case No. 16-43711 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Transloading, LLC, | Case No. 16-43712 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Sand, LLC, | Case No. 16-43715 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Marketing, LLC, | Case No. 16-43716 |
| Debtor. | Chapter 11 Case |
| DPTS Marketing LLC, | Case No. 16-43717 |
| Debtor. | Chapter 11 Case |
| Dakota Petroleum Transport Solutions, LLC, | Case No. 16-43718 |
| Debtor. | Chapter 11 Case |
| DPTS Sand, LLC, | Case No. 16-43721 |
| Debtor. | Chapter 11 Case |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS (A) TO UTILIZE CASH COLLATERAL OF THE PREPETITION SECURED PARTIES, (B) TO OBTAIN POSTPETITION SECURED FINANCING, AND (C) TO PROVIDE ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (II) AND GRANTING RELATED RELIEF**

THIS MATTER having come before the Court upon the motion, dated December 21, 2016 (the "**Motion**") of Dakota Plains Holdings, Inc. and the above-captioned debtors and debtor in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Cases**"), for the entry of an order (I) granting an expedited hearing, (II) authorizing the Debtors to (A) utilize cash collateral of the Prepetition Secured Parties (as defined below) pursuant to section 363 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), (B) obtain postpetition secured financing pursuant to sections 361, 362 and 364 of the Bankruptcy Code and (C) provide adequate protection to the Prepetition Secured Parties pursuant

to sections 361, 362 and 363 of the Bankruptcy Code, (III) scheduling a final hearing pursuant to

Rule 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure (as amended, the

"**Bankruptcy Rules**"), and (IV) granting related relief, the Debtors sought, among other things,

the following relief:

i. the Court's authorization, pursuant to sections 363 and 364(c)(1), (2), (3), and (d)(1) of the Bankruptcy Code, for (A) Dakota Plains Transloading, LLC, Dakota Plains Sand, LLC, and Dakota Plains Marketing, LLC (the "**DIP Borrowers**") to enter into a senior secured superpriority postpetition credit facility (the "**DIP Facility**") provided by SunTrust Bank, as administrative agent (in such capacity, the "**DIP Agent**"), and postpetition lender (the "**DIP Lenders**"), pursuant to the Postpetition Revolving Credit Agreement in substantially the form attached to the Motion as Exhibit A (the "**DIP Credit Agreement**,"[1] and together with this Order (the "**Interim DIP Order**"), the Final DIP Order (as defined below), and all other agreements, documents and instruments delivered or executed in connection therewith, as hereafter amended, supplemented or otherwise modified from time to time, including the DIP Budget (as defined below), collectively, the "**DIP Loan Documents**"), and (B) the DIP Borrowers to obtain extensions of credit thereunder on a senior secured and superpriority basis, (1) during the period (the "**Interim Period**") from the date hereof through and including the earlier to occur of (x) the date of entry of the Final DIP Order by this Court and (y) the Termination Date (as defined below), in an aggregate principal amount not to exceed $500,000, and (2) upon entry of the Final DIP Order and thereafter until the Termination Date, in an aggregate principal amount not to exceed $2,000,000, in each case at any time outstanding (all financial accommodations and extensions of credit under the DIP Credit Agreement and the DIP Facility, the "**DIP Extensions of Credit**"), and (C) for Dakota Plains Holdings, Inc., DPTS Marketing LLC, Dakota Petroleum Transport Solutions, LLC, and DPTS Sand, LLC (collectively, the "**DIP Loan Guarantors**," and together with the DIP Borrowers, the "**Loan Parties**") to jointly and severally guarantee on a secured basis the Debtors' obligations in respect of the DIP Facility;

ii. the Court's authorization for each of the Loan Parties to execute the DIP Loan Agreement and the other DIP Loan Documents to which it is a party and to perform such other and further acts as may be necessary or appropriate in connection therewith;

iii. the Court's authorization to use DIP Extensions of Credit in accordance with the proposed budget prepared by the Debtors and attached to the Motion as Exhibit D (as updated from time to time pursuant to the DIP Loan Documents and, in each

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the DIP Credit Agreement.

case, subject to the prior approval of the DIP Agent, the "**DIP Budget**"), and as otherwise provided herein and in the other DIP Loan Documents;

iv.  the Court's authorization to grant the DIP Agent for the benefit of the DIP Lenders and the other secured parties under the DIP Loan Documents (collectively, the "**DIP Secured Parties**"), in respect of the DIP Obligations (as defined below), a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and first priority priming liens on and security interests in all assets and property of the Debtors (no owned or hereafter acquired) pursuant to sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, in each case as and to the extent set forth more fully below and subject to the Carve-Out (as defined below);

v.   the Court's authorization to use "cash collateral" as such term is defined in section 363 of the Bankruptcy Code (the "**Cash Collateral**") in which the Prepetition Secured Parties (as defined below) have an interest;

vi.  the Court's authorization to grant, as of the Petition Date, the Adequate Protection Superpriority Claim (as defined below) and Adequate Protection Liens (as defined below), to the extent of and as compensation for any Diminution in Value (as defined below), and the payment of fees and expenses to the Prepetition Agent (as defined below) for the benefit of the Prepetition Lenders (as defined below), in each case, as set forth more fully below and subject to the Carve-Out;

vii. the modification by the Court of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility, the Interim DIP Order and the other DIP Loan Documents;

viii. the scheduling by the Court of a final hearing (the "**Final Hearing**") to consider entry of a Final DIP Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing and the transactions contemplated by the Motion; and

ix.  the Court's waiving of any applicable stay (including under Bankruptcy Rule 6004) and providing for the immediate effectiveness of the DIP Orders.

The Court having considered the Motion, the terms of the DIP Facility and the DIP Loan Documents, the Declaration of Marty Beskow in Support of the First Day Motions, the Declaration of Michael V. Balistreri in Support of the Motion, and the evidence submitted at the Interim Hearing held before this Court on December [__], 2016 to consider the entry of the Interim DIP Order and at the Final Hearing held before this Court on January [__], 2017 to

consider the entry of the Final DIP Order; and the Court having entered on December [__], 2016,

after the Interim Hearing, that certain *Interim Order (I) Granting an Expedited Hearing, (II)*

*Authorizing the Debtors (A) to Utilize Cash Collateral of the Prepetition Secured Parties, (B) to*

*Obtain Postpetition Secured Financing, and (C) to Provide Adequate Protection to the*

*Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief*

(the "**Interim DIP Order**") approving the DIP Facility and the Debtors' use of Cash Collateral

on an interim basis; and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), 6004,

and 9014, and the Local Rules 9013-1, 9013-2 and 9013-3, due and proper notice of the Motion,

the Interim Hearing, and the Final Hearing having been given; and the Final Hearing having been

held before the Court and concluded on January [__], 2017; and it appearing that approval of the

interim and final relief requested in the Motion is necessary to avoid immediate and irreparable

harm to the Debtors pending the Final Hearing and is otherwise essential for the continued

operation of the Debtors' businesses; and, subject to the terms hereof, the Court having

determined that there is adequate protection of the liens of the Prepetition Secured Parties; and

all objections, if any, to the entry of this Final DIP Order having been withdrawn, resolved or

overruled by the Court; and after due deliberation and consideration, and for good and sufficient

cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND
CONCLUSIONS OF LAW**:

A.      **Petition Date**.  On December 20, 2016 (the "**Petition Date**"), the Debtors filed

voluntary petitions under chapter 11 of the Bankruptcy Code with the United States Bankruptcy

Court for the District of Minnesota (the "**Court**").   The Debtors have continued in the

management and operation of their businesses and properties pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Case.

B.     **Jurisdiction and Venue**.  The Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1334.  Consideration of this Motion constitute a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     **Committee Formation**.  An official committee of unsecured creditors was appointed in the Cases on [_____], 2016 (the "**Creditors' Committee**," and together with any other statutory committee, a "**Committee**").  On [_____], 2016, the Committee moved to retain [_____] as its counsel in the Cases.

D.     **Interim DIP Order**.  At the Interim Hearing, the Court approved the DIP Facility on an interim basis pending the Final Hearing and entry of this Final DIP Order.  Pursuant to the Interim Order, the Final Hearing to consider final approval of the DIP Facility was scheduled for January [__], 2017.

E.     **Notice**.  Notice of the Final Hearing and the relief requested in the Motion has been provided by the Debtors, by telecopy, email, overnight courier and/or hand delivery, to all parties entitled to notice under Local Rule 9013-3(a)(2).  Under the circumstances, such notice of the Final Hearing and the relief requested in the Motion complies with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002 and 4001(b) and (c).

F.     **The Prepetition Facility**.

i.     Debtors Dakota Plains Transloading, LLC, Dakota Plains Sand, LLC, and Dakota Plains Marketing, LLC, as borrowers (collectively, "**Borrowers**"), Dakota Plains Holdings, Inc. ("**Holdings**"), the lenders party thereto from time to time (the "**Prepetition Lenders**"), SunTrust Bank, as administrative agent (in such capacity, the "**Prepetition Agent**"

and as Prepetition Lender, the "**Prepetition Secured Parties**"), are parties to that certain *Revolving Credit and Term Loan Agreement* (the "**Original Credit Agreement**") dated as of December 5, 2014, as amended by that certain *Amendment No. 1 to Revolving Credit and Term Loan Agreement* dated as of August 6, 2015 (the "**First Amendment**"), that certain *Amendment No. 2 and Waiver to Revolving Credit and Term Loan Agreement* dated as of December 4, 2015 (the "**Second Amendment**"), and that certain *Amendment No. 3 to Revolving Credit and Term Loan Agreement* dated as of July 5, 2016 (the "**Third Amendment**"), and that certain *Amendment No. 4 to Revolving Credit and Term Loan Agreement and One Time Waiver of Borrower Requirements* dated as of August 5, 2016 (the "**Fourth Amendment**" and together with the Original Credit Agreement, the First Amendment, the Second Amendment and the Third Amendment, the "**Prepetition Credit Agreement**" and together with each of the Loan Documents thereto (each as defined therein), the "**Prepetition Loan Documents**").

ii.     The Prepetition Credit Agreement provided for $55,425,000 of loans consisting of a "Tranche A" Term Loan of $12,925,000, a "Tranche B" Term Loan of $22,500,000 and a Revolving Loan of $20,000,000 (the "**Prepetition Facility**").

iii.     Pursuant to (a) that certain *Guaranty and Security Agreement* dated as of December 5, 2012 by the Borrowers, Holdings, and the Prepetition Agent, and (b) that certain *Joinder Agreement* dated as of December 5, 2014 by DPTS Marketing LLC, Dakota Petroleum Transport Solutions, LLC, and DPTS Sand, LLC (collectively, the "**Prepetition Subsidiary Guarantors**") and the Prepetition Agent, the Prepetition Secured Parties are secured by first priority liens on, and security interests in, substantially all of the assets of the Borrowers, Holdings, and the Prepetition Subsidiary Guarantors (the "**Prepetition Collateral**").

G.     **The Subordinated Debt**.     Pursuant to (i) that certain Membership Interest

Purchase Agreement dated as of December 5, 2014 (as amended, supplemented or otherwise modified from time to time, the "**Subordinated Purchase Agreement**"); (ii) that certain Seller Guaranty and Security Agreement dated as of December 5, 2014 (as amended, supplemented or otherwise modified from time to time, the "**Subordinated Guaranty and Security Agreement**"); (iii) that certain Escrow Agreement dated as of December 5, 2014 (as amended, supplemented or otherwise modified from time to time, the "**Subordinated Escrow Agreement**"); (iv) that certain Indemnification and Release Agreement dated as of December 5, 2014 (as amended, supplemented or otherwise modified from time to time, the "**Subordinated Indemnification Agreement**"); (v) that certain Second Mortgage, Collateral Real Estate Mortgage, Deed of Trust Assignment, Security Agreement and Financing Statement executed by Holdings in favor of World Fuel Services Corporation ("**WFS**") (as amended, supplemented or otherwise modified from time to time, the "**Subordinated Mortgage**"); and (vi) that certain Seller Subordination Agreement dated as of December 5, 2014 (as amended, supplemented and otherwise modified from time to time, the "**Seller Subordination Agreement**" and, together with the Subordinated Purchase Agreement, the Subordinated Guaranty and Security Agreement, the Subordinated Escrow Agreement, the Subordinated Indemnification Agreement and the Subordinated Mortgage, the "**Subordinated Debt Documents**") by and among WFS, Petroleum Transport Solutions, LLC ("**PTS**"), World Fuel Services, Inc. ("**WF Inc.**"), Western Petroleum Company ("**Western**" and together with WFS, PTS and WF Inc., the "**Subordinated Debtholders**"), the DIP Borrowers and certain of their affiliates agreed to make certain payments to PTS in connection with the Subordinated Purchase Agreement, to indemnify WFS and the other parties entitled thereto pursuant to the terms of the Subordinated Indemnification Agreement, and otherwise guarantee the obligations of DPTS Marketing, LLC under the Railcar

Leases (as defined in the Existing Credit Agreement) (all such obligations arising under the Subordinated Debt Documents, the "**Subordinated Debt Obligations**").

H.      **Subordination of Subordinated Debt Obligations**.    The Subordinated Debt Obligations are secured pursuant to the Subordinated Guaranty and Security Agreement and the Subordinated Mortgage.    However, because the Prepetition Collateral is worth substantially less than the Bank Debt Obligations (approximately $55,000,000 — $58,000,000 less), the Subordinated Debt Obligations constitute unsecured claims.    Moreover, the Subordinated Debt Obligations are subordinated in right of payment to all outstanding obligations under or in connection with the Prepetition Facility pursuant to the Seller Subordination Agreement.

I.      **Waivers by Subordinated Debtholders**.    Pursuant to the Seller Subordination Agreement, the Subordinated Debtholders have waived any right to contest, oppose or object to any debtor-in-possession financing provided by the Prepetition Lenders, including any debtor in possession financing secured by priming liens on the assets of the Loan Parties.

J.      **Stipulation as to Prepetition Secured Obligations**.    Without limiting the rights of a Committee or any other party in interest as and to the extent set forth in Paragraph 8 hereof, the Debtors permanently, immediately, and irrevocably acknowledge, represent, stipulate and agree:

      i.      **Prepetition Credit Facility Obligations**.    As of the Petition Date, the Debtors were indebted and liable to the Prepetition Agent and the Prepetition Secured Parties under the Prepetition Loan Documents, without objection, defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $56,925,000 with respect to the Prepetition Facility, plus accrued interest (including paid-in-kind interest) in the amount of $4,719,401.06, plus unpaid amendment fees thereon in the additional amount of approximately

just over $1,019,250 plus, in connection with the foregoing amounts, certain expenses, and all other obligations payable under the Prepetition Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the Prepetition Loan Documents (collectively, the "**Prepetition Facility Obligations**").

ii.        **Enforceability, etc. of the Prepetition Secured Obligations**.    The Prepetition Loan Documents and the Prepetition Secured Obligations are (a) legal, valid, binding, and enforceable against each Debtor, and (b) not subject to any contest, attack, objection, recoupment, defense, counterclaim, offset, subordination, re-characterization, avoidance or other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

iii.        **Enforceability, etc. of Prepetition Liens**.  The liens and security interests (collectively, the "**Prepetition Liens**") granted by the Debtors under the Prepetition Loan Documents to or for the benefit of the Prepetition Agent and the other Prepetition Secured Parties as security for the Prepetition Secured Obligations encumber substantially all of the Debtors' assets and property (all such assets and property, as the same existed on or at any time prior to the Petition Date, including, without limitation, the Prepetition Collateral).  The Prepetition Liens have been properly recorded and perfected under applicable non-bankruptcy law, and are legal, valid, enforceable, non-avoidable, and not subject to contest, avoidance, attack, offset, re-characterization, subordination or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  As of the Petition Date, and without giving effect to the Interim DIP Order or this Final DIP Order, the Debtors are not aware of any liens or security interests having priority over the Prepetition Liens, except the

Senior Third Party Liens (defined below).  The Prepetition Liens were granted to or for the benefit of the Prepetition Agent and the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby.  The value of the Prepetition Collateral is estimated to be approximately $8,000,000 to $12,000,000.

iv.     **Indemnity**.  The Prepetition Agent, the Prepetition Secured Parties and the DIP Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens (defined below) and the Adequate Protection Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to all transactions contemplated by the foregoing. Accordingly, the Prepetition Agent, the Prepetition Secured Parties and the DIP Secured Parties shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto.  No exception or defense in contract, law or equity exists as to any obligation set forth, as the case may be, in this Paragraph J, in the Prepetition Loan Documents or in the DIP Loan Documents, to indemnify and/or hold harmless the Prepetition Agent, the DIP Agent, or any other Prepetition Secured Party or DIP Secured Party, as the case may be, and any such defenses are hereby waived.

v.     **No Control**.  None of the DIP Secured Parties or the Prepetition Secured Parties are (a) control persons or insiders of the Debtors or any of their affiliates or (b) "responsible persons" or "owners or operators" (as such terms or any similar terms are used in the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C.

§§ 9601 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. §§ 9601 *et seq.*, as either may be amended from time to time, or any similar federal, state, or local law, statute or ordinance), in either case by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Facility, the DIP Loan Documents and/or the Prepetition Loan Documents.

vi.      **<u>No Claims, Causes of Action</u>**.   As of the date hereof, there exist no claims or causes of action against any of the Prepetition Agent, the Prepetition Secured Parties or the DIP Secured Parties with respect to, in connection with, related to, or arising from the Prepetition Loan Documents and/or the DIP Loan Documents that may be asserted by the Debtors or any other person or entity.

vii.      **<u>Release</u>**.   The Debtors forever and irrevocably release, discharge, and acquit all former, current and future (a) DIP Secured Parties, (b) Prepetition Secured Parties (c) Affiliates of the DIP Secured Parties and the Prepetition Secured Parties and (d) officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors and successors in interest of each of the DIP Secured Parties, the Prepetition Secured Parties and each of their respective Affiliates, in each case acting in such capacity (collectively, the "**Releasees**") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising

under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Loan Documents, the Prepetition Loan Documents and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Agent, the Prepetition Secured Parties and/or the DIP Secured Parities.

K.  **Immediate Need for Postpetition Financing and Use of Cash Collateral**.  The Debtors have requested immediate entry of this Final DIP Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Good cause has been shown for entry of this Final DIP Order.  An immediate need exists for the Debtors to obtain funds and liquidity in order to continue operations and to administer and preserve the value of their estates pending a restructuring or a sale of all or substantially all of their assets pursuant to an agreed restructuring or sale process. The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets and to maximize the return for all creditors requires the availability of the DIP Facility and the use of Cash Collateral.  In the absence of the availability of such funds and liquidity in accordance with the terms hereof, the continued operation of the Debtors' businesses would not be possible, and serious and irreparable harm to the Debtors and their estates and creditors would occur.  Further, the possibility for a successful reorganization would be jeopardized in the absence of the availability of funds in accordance with the terms of this Final DIP Order.  Thus, the ability of the Debtors to preserve and maintain the value of their assets and maximize the return for creditors requires the availability of working capital from the DIP

Facility and the use of Cash Collateral.

L.     **No Credit Available on More Favorable Terms**.  The Debtor have been unable

to obtain on more favorable terms and conditions than those provided in this Final DIP Order

(1) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an

administrative expense, (2) credit for money borrowed with priority over any or all

administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy

Code, (3) credit for money borrowed secured by a lien on property of the estate that is not

otherwise subject to a lien, or (4) credit for money borrowed secured by a junior lien on property

of the estate which is subject to a lien.  The Debtors are unable to obtain credit for borrowed

money without granting the DIP Liens and the DIP Superpriority Claim (defined below) to (or

for the benefit of) the DIP Secured Parties.

M.     **Use of Cash Collateral and Proceeds of the DIP Facility, DIP Collateral and
Prepetition Collateral**.  All Cash Collateral, all proceeds of the Prepetition Collateral and the

DIP Collateral (defined below), including proceeds realized from a sale or disposition thereof, or

from payment thereon, and all proceeds of the DIP Facility (net of any amounts used to pay fees,

costs and expenses payable under the Interim DIP Order or this Final DIP Order) shall be used

and/or applied in accordance with the terms and conditions of the Interim DIP Order or this Final

DIP Order, the DIP Budget and the other DIP Loan Documents, for the expenditures in the DIP

Budget and for no other purpose; provided, that, subject to the limitations set forth in the DIP

Budget, up to $25,000 in the aggregate of the proceeds of the DIP Facility, DIP Collateral,

Prepetition Collateral or Cash Collateral, may be used by any Committee solely to investigate the

matters covered by the Claims Stipulations (defined below).  For the avoidance of doubt,

proceeds of the Prepetition Collateral and the DIP Collateral shall include proceeds from the

Approved Sale.

N.    **Adequate Protection for the Prepetition Secured Parties**.    The Prepetition

Agent and the Prepetition Secured Parties have negotiated in good faith regarding the Debtors'

use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the

Debtors' estates and continued operation of their businesses, in accordance with the terms

hereof.    The Prepetition Agent and the Prepetition Secured Parties have agreed to permit the

Debtors to use the Prepetition Collateral, including the Cash Collateral, in accordance with the

terms hereof and the DIP Budget subject to the terms and conditions set forth herein, including

the protections afforded parties acting in "good faith" under section 363(m) of the Bankruptcy

Code.    The Prepetition Agent and the other Prepetition Secured Parties are entitled to the

adequate protection as and to the extent set forth herein pursuant to sections 361, 362 and 363 of

the Bankruptcy Code.    Based on the Motion and on the record presented to the Court at the

Interim Hearing and the Final Hearing, the terms of the proposed adequate protection

arrangements and of the use of the Prepetition Collateral (including the Cash Collateral) are fair

and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute

reasonably equivalent value and fair consideration for the Prepetition Agent's and the other

Prepetition Secured Parties' consent thereto; underline(provided), that nothing in the Interim DIP Order, this

Final DIP Order, or the other DIP Loan Documents shall be construed as a consent by any

Prepetition Secured Party that it would be adequately protected in the event debtor in possession

financing is provided by a third party (*i.e.*, other than the DIP Lenders), a consent to the terms of

any other such financing, including the consent to any lien encumbering the Prepetition

Collateral (whether senior or junior) or to the use of Cash Collateral (except under the terms

hereof).

O.    **Section 552**.  Subject to the entry of a Final DIP Order, in light of, as applicable, the subordination of the Prepetition Liens and the Adequate Protection Liens of the Prepetition Secured Parties to the DIP Liens and the Carve-Out, and the granting of the DIP Liens on the Prepetition Collateral, the Prepetition Agent and the Prepetition Secured Parties are each entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply.

P.    **Extensions of Financing**.  The DIP Secured Parties have indicated a willingness to provide financing to the Debtors in accordance with the DIP Credit Agreement and the other DIP Loan Documents (including the DIP Budget) and subject to (i) the entry of this Final DIP Order no later than 30 days following the Petition Date, (ii) entry of the Bid Procedures Order relating to the Acceptable Sale Process pursuant to the Milestones (collectively, the "**Sale Conditions**"), and (iii) findings by this Court that such financing is essential to the Debtors' estates, that the DIP Secured Parties are good faith financiers, and that the DIP Secured Parties' claims, superpriority claims, security interests and liens and other protections granted pursuant to the Interim DIP Order, this Final DIP Order, and the DIP Facility (including the DIP Superpriority Claim and the DIP Liens), including the Sale Conditions, will not be affected by any subsequent reversal, modification, vacatur or amendment of, as the case may be, the Interim DIP Order, this Final DIP Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

Q.    **Business Judgment and Good Faith Pursuant to Section 364(e)**.

i.    The terms and conditions of the DIP Facility, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are

supported by reasonably equivalent value and consideration;

ii.      the DIP Facility was negotiated in good faith and at arm's length among the Debtors, the DIP Agent and the DIP Secured Parties; and

iii.      the use of the proceeds to be extended under the DIP Facility will be so extended in good faith and for valid business purposes and uses, as a consequence of which the DIP Secured Parties are entitled to the protections and benefits of section 364(e) of the Bankruptcy Code.

R.      **Relief Essential; Best Interest**.  The relief requested in the Motion (and provided in this Final DIP Order) is necessary, essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of the Debtors' assets and property. The use of Cash Collateral and the DIP Facility are critical to the Debtors' continued operations because they are the primary source of funds available to meet the Debtors' anticipated expenses while they reorganize and seek to sell their assets and maximize the value of their estates.  It is in the best interest of the Debtors' estates that the Debtors be allowed to enter into the DIP Facility, incur the DIP Obligations and use the Cash Collateral as contemplated herein.

**NOW**, **THEREFORE**, on the Motion of the Debtors and the record before this Court with respect to the Motion, including the record made during the Interim Hearing and the Final Hearing, and with the consent of the Debtors, the Prepetition Agent and the Prepetition Secured Parties and the DIP Secured Parties, and good and sufficient cause appearing therefor,

**IT IS SO ORDERED** that:

1.      **Motion Granted**.  The Motion is granted on a final basis in accordance with the terms and conditions set forth in this Final DIP Order.  Any objections to the Motion with respect

to entry of this Final DIP Order to the extent not withdrawn, waived or otherwise resolved, and all reservation of rights included therein, are hereby denied and overruled.

2.      **DIP Facility**.

a)      **DIP Obligations, etc**.   The Debtors are expressly and immediately empowered to enter into the DIP Facility and to incur and to perform the DIP Obligations in accordance with and subject to the Interim DIP Order, this Final DIP Order, and the other DIP Loan Documents, to execute and/or deliver all DIP Loan Documents and all other instruments, certificates, agreements and documents, and to take all actions, which may be reasonably required or otherwise necessary for the performance by the Debtors under the DIP Facility, including the creation and perfection of the DIP Liens described and provided for herein.   The Debtors are hereby authorized and directed to pay all principal, interest, fees and expenses, indemnities and other amounts described herein and in the other DIP Loan Documents as such shall accrue and become due hereunder or thereunder, including, without limitation, the reasonable fees and expenses of the attorneys and financial and other advisors and consultants of the DIP Agent and the DIP Lenders as and to the extent provided for herein and in the other DIP Loan Documents (collectively, all loans, advances, extensions of credit, financial accommodations, fees, expenses and other liabilities and obligations (including indemnities and similar obligations) in respect of DIP Extensions of Credit, the DIP Facility and the DIP Loan Documents, the "**DIP Obligations**").   The DIP Loan Documents and all DIP Obligations shall represent, constitute and evidence, as the case may be, valid and binding obligations of the Debtors, enforceable against the Debtors, their estates and any successors thereto in accordance with their terms.   The term of the DIP Facility commenced on the date of entry of the Interim DIP Order and end on the Termination Date, subject to the terms and conditions set forth herein

and in the other DIP Loan Documents, including the protections afforded a party acting in good faith under section 364(e) of the Bankruptcy Code.

b)     **Authorization to Borrow, etc**.   In order to continue to operate their businesses, subject to the terms and conditions of the Interim DIP Order, this Final DIP Order, and the other DIP Loan Documents (including the DIP Budget), the Debtors was authorized to borrow under the DIP Facility during the Interim Period and is hereby authorized to borrow under the DIP Facility on a final basis, and the other Debtors set forth in the DIP Loan Documents are authorized to guarantee repayment of, such DIP Obligations, up to an aggregate principal amount of $2,000,000.

c)     **Conditions Precedent**.   The DIP Lenders shall have no obligation to make any DIP Extension of Credit or any other financial accommodation hereunder or under the other DIP Loan Documents (and the Debtors shall not make any request therefor) unless all conditions precedent to making DIP Extensions of Credit under the DIP Loan Documents have been satisfied or waived in accordance with the terms of the DIP Loan Documents.

d)     **DIP Collateral**.   As used herein, "DIP Collateral" shall mean, all now owned or hereafter acquired assets and property, whether real or personal, of the Debtors including, without limitation, all Prepetition Collateral, all assets and property pledged under the DIP Loan Documents, and all cash, any investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investment property, inventory, deposit accounts, "core concentration accounts," "cash collateral accounts", and in each case all amounts on deposit therein from time to time, equity interests, securities accounts, securities entitlements, securities, commercial tort claims, books, records,

plants, equipment, general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property, fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, tradenames, other intellectual property, all licenses therefor, and all proceeds, rents, profits, products and substitutions, if any, of any of the foregoing.   For the avoidance of doubt, the DIP Collateral shall not include actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (the "**Avoidance Actions**"), but shall, upon entry of a Final DIP Order, include the proceeds of Avoidance Actions, which shall be available to pay any administrative claim held by the Prepetition Agent or any Prepetition Secured Party in respect of the Prepetition Secured Obligations and by the DIP Agent or any DIP Lender in respect of the DIP Facility.

e)       **DIP Liens**.   Effective immediately upon the entry of the Interim DIP Order, and subject to the Carve-Out, as set forth more fully in the Interim DIP Order and this Final DIP Order, the DIP Agent for the ratable benefit of the DIP Secured Parties is hereby granted the following security interests and liens, which shall immediately be valid, binding, perfected, continuing, enforceable and non-avoidable (all liens and security interests granted to the DIP Agent for the benefit of the DIP Secured Parties pursuant to the Interim DIP Order, this Final DIP Order and the other DIP Loan Documents, the "**DIP Liens**"):

I.       pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable first priority liens on and security interests in all DIP Collateral that was not encumbered by valid, enforceable, perfected and non-avoidable liens as of the Petition Date;

- 19 -

II.        pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable liens on and security interests in (x) all DIP Collateral which is unencumbered by the Prepetition Liens but on which a third party, *i.e.*, not the Prepetition Secured Parties (a "**Third Party Lienholder**"), had a pre-existing lien on the Petition Date and (y) all DIP Collateral encumbered by the Prepetition Liens on which a Third Party Lienholder had a pre-existing lien on the Petition Date that was senior to the Prepetition Liens, in each case junior only to any such liens and security interests of Third Party Lienholders, but solely to the extent that such liens and security interests of Third Party Lienholders were in each case valid, enforceable, perfected and non-avoidable as of the Petition Date, and were permitted by the terms of the Prepetition Loan Documents (the "**Senior Third Party Liens**"); and

III.        pursuant to section 364(d) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable liens on and security interests in all Prepetition Collateral, which liens and security interests shall be senior to and prime the Prepetition Liens and the liens of all Third Party Lienholders which are *pari passu* with or junior and subject to the Prepetition Liens, including the Subordinated Mortgage.

f)        **Other Provisions Relating to the DIP Liens**.  The DIP Liens shall secure all of the DIP Obligations.  The DIP Liens shall not, without the consent of the DIP Agent, be made subject to, or *pari passu* with, any other lien or security interest, other than to the extent expressly provided herein and to the Carve-Out, by any court order heretofore or hereafter entered in the Cases, and shall be valid and enforceable against any trustee appointed in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (such cases or proceedings, "**Successor Cases**"), and/or upon the dismissal of any of the Cases.  The DIP Liens and the

Adequate Protection Liens shall not be subject to Sections 510, 549, 550 or 551 of the Bankruptcy Code or, upon the entry of the Final DIP Order, the "equities of the case" exception of section 552 of the Bankruptcy Code or section 506(c) of the Bankruptcy Code.

g)    **Superpriority Administrative Claim Status**.  The DIP Obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, at all times constitute an allowed superpriority claim (the "**DIP Superpriority Claim**") of the DIP Agent for the benefit of the DIP Secured Parties, and be payable from and have recourse to all DIP Collateral.  The DIP Superpriority Claim shall be subject and subordinate only to the Carve-Out.  Other than as expressly provided herein, including in Paragraph 11 and with respect to the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or *pari passu* with the DIP Liens, the DIP Superpriority Claim or any of the DIP Obligations, or with any other claims of the DIP Secured Parties arising hereunder or under the other DIP Loan Documents, or otherwise in connection with the DIP Facility.

3.    **Authorization and Approval to Use Cash Collateral and Proceeds of DIP Facility**.  Subject to the terms and conditions of the Interim DIP Order, this Final Order and the other DIP Loan Documents, and to the adequate protection granted to or for the benefit of the Prepetition Secured Parties as hereinafter set forth, each Debtor was authorized during the Interim Period and is hereby authorized on a final basis to (a) use the Cash Collateral and (b) request and use proceeds of the DIP Extensions of Credit, in each case in the amounts and for the line item expenditures set forth in the DIP Budget.  The DIP Budget may only be amended, supplemented, modified, restated, replaced, or extended in accordance with the DIP Loan

Documents and the prior written consent of the DIP Agent.  Notwithstanding anything herein to the contrary, subject only to the Debtors' rights under Paragraph 17(b), the Debtors' right to request or use proceeds of DIP Extensions of Credit or to use Cash Collateral shall terminate on the Termination Date.  Nothing in this Final DIP Order shall authorize the disposition of any assets of the Debtors or their estates or other proceeds resulting therefrom outside the ordinary course of business, except as permitted herein (subject to any required Court approval).

4.      **Adequate Protection for Prepetition Secured Parties**.  As adequate protection for the interests of the Prepetition Agent and the Prepetition Secured Parties in the Prepetition Collateral (including Cash Collateral), the Prepetition Agent for the benefit of the Prepetition Secured Parties shall receive adequate protection as follows:

a)      **Adequate Protection Liens**.   To the extent of, and in an aggregate amount equal to, the diminution in value of such interests, from and after the Petition Date, calculated in accordance with section 506(a) of the Bankruptcy Code, resulting from, among other things, the use, sale or lease by the Debtors of the Prepetition Collateral (including the use of Cash Collateral), the granting of the DIP Liens, the subordination of the Prepetition Liens thereto and to the Carve-Out, and the imposition or enforcement of the automatic stay of section 362(a) (collectively, "**Diminution in Value**"), the Prepetition Secured Parties shall have pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, replacement security interests in and liens upon (the "**Adequate Protection Liens**") all of the DIP Collateral.  The Adequate Protection Liens of the Prepetition Secured Parties shall be junior and subject to the DIP Liens and any Senior Third Party Liens.  The Adequate Protection Liens shall in all cases be subject to the Carve-Out.

b)  **Adequate Protection Superpriority Claims**.  To the extent of the aggregate Diminution in Value, the Prepetition Secured Parties shall have, subject to the payment of the Carve-Out, an allowed superpriority administrative expense claim (the "**Adequate Protection Superpriority Claim**") as provided for in section 507(b) of the Bankruptcy Code, immediately junior and subject to the DIP Superpriority Claim, and payable from and having recourse to all DIP Collateral; provided, that the Prepetition Secured Parties shall not receive or retain any payments, property, distribution or other amounts in respect of the Adequate Protection Superpriority Claim unless and until the DIP Obligations and (without duplication) the DIP Superpriority Claim have indefeasibly been paid in full in cash.

c)  **Adequate Protection Payments, etc**.  The Prepetition Agent (on behalf of the Prepetition Secured Parties) received from the Debtors upon the entry of the Interim DIP Order, immediate cash payment of all accrued and unpaid fees and disbursements (including legal and advisory fees and expenses) owing to the Prepetition Agent or the Prepetition Secured Parties under the Prepetition Loan Documents and incurred prior to the Petition Date.

d)  Promptly upon receipt of invoices therefor, the Debtors shall pay all reasonable professional and advisory fees, costs and expenses of the Prepetition Agent and the other Prepetition Secured Parties incurred in connection with the administration and monitoring of the Prepetition Loan Documents and/or the DIP Facility as and to the extent provided in the Prepetition Loan Documents or the DIP Loan Documents, including, without, limitation, the reasonable documented postpetition fees and expenses of legal, financial and other advisory, tax, investment banking and other professionals (including, without limitation, Moore & Van Allen, any other local counsel and any replacement or addition thereto, and consultants and other advisors (including, without limitation, engineers and accountants).

e)      **Credit-Bid Protection**.   Upon commencement of the Acceptable Sale Process, the DIP Agent and the Prepetition Agent shall each have the right to credit-bid up to the amount of the DIP Obligations and the Prepetition Facility Obligations in connection with any sale of some or all of the Debtors' assets and property (whether in whole or in lots), including, without limitation, any sale occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan of reorganization subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

5.      **Monitoring of Collateral**.   The Prepetition Agent and the DIP Agent, and their respective consultants and advisors, shall be given reasonable access to the Debtors' books, records, assets and properties for purposes of monitoring the Debtors' business and the value of the DIP Collateral, and shall be permitted to conduct, at their discretion and at the Debtors' cost and expense, field audits, collateral examinations and inventory appraisals in respect of the DIP Collateral all as and to the extent provided in the DIP Loan Documents.

6.      **Financial Reporting, etc**.   The Debtors shall provide the DIP Agent and the Prepetition Agent with the monthly financial reporting given to the United States Trustee and all of the financial reporting as required under and in all instances consistent with the DIP Loan Documents and the Prepetition Loan Documents.

7.      **DIP Lien and Adequate Protection Replacement Lien Perfection**.   This Final DIP Order shall be sufficient and conclusive evidence of the validity, perfection and priority of the DIP Liens and the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Liens

and the Adequate Protection Liens to the priorities granted herein. Notwithstanding the foregoing, the DIP Agent may, in its sole discretion, file such financing statements, mortgages, security agreements, notices of liens and other similar documents, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Cases. The Debtors shall execute and deliver to the DIP Agent all such financing statements, mortgages, security agreements, notices and other documents as the DIP Agent may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens and the Adequate Protection Liens. The DIP Agent, in its sole discretion, may file a photocopy of this Final DIP Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property and, in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Final DIP Order. To the extent that the Prepetition Agent is the secured party under any account control agreements, listed as loss payee under any of the Debtors' insurance policies or is the secured party under any Prepetition Loan Document, the DIP Agent is also deemed to be the secured party under such account control agreements, loss payee under the Debtors' insurance policies and the secured party under each such Prepetition Loan Document, and shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement) and shall act in that capacity and distribute any proceeds recovered or received in accordance with the terms of the Interim DIP Order and/or this Final DIP Order, as applicable, and the other DIP Loan Documents. The Prepetition Agent shall serve as agent for the DIP Agent for

purposes of perfecting their respective security interests and liens on all DIP Collateral that is of

a type such that perfection of a security interest therein may be accomplished only by possession

or control by a secured party.

       8. **Reservation of Certain Third Party Rights and Bar of Challenges and**

**Claims**.  Except as set forth below in the immediately following sentence, all of the findings,

agreements, terms, provisions and stipulations set forth in Paragraph J of this Final DIP Order

(the "**Claims Stipulations**"), shall be immediately and irrevocably binding on all persons and

entities.  Notwithstanding the foregoing, nothing in this Final DIP Order shall prejudice any

rights (if any) a Committee (or any other party with standing to do so) may have (a) to object to

or challenge any of the Claims Stipulations, including in relation to (i) the validity, extent,

perfection or priority of the Prepetition Liens on the Prepetition Collateral, or (ii) the validity,

allowability, priority, status or amount of the Prepetition Secured Obligations, or (b) to bring suit

against any of the Prepetition Secured Parties in connection with or related to the matters

covered by the Claims Stipulations; provided, that unless any Committee or such other party

with standing to do so, commences an adversary proceeding or contested matter (as applicable)

raising such objection or challenge, including without limitation any claim against the

Prepetition Secured Parties in the nature of a setoff, counterclaim or defense to the Prepetition

Secured Obligations (including but not limited to, those under sections 506 (subject to the waiver

of section 506(c) claims as may be provided herein and in the Final DIP Order), 544, 547, 548,

549, 550 and/or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition

Secured Parties), by the date that is the later of (x) 30 days following the appointment of a

Committee, but with such date in no event later than 60 days following the entry of the Interim

DIP Order and (y) 45 days following entry of the Interim DIP Order (the period described in the

immediately preceding clause shall be referred to as the "**Challenge Period**," and the date that is the next calendar day after the termination of the Challenge Period shall be referred to as the "**Challenge Period Termination Date**"), upon the Challenge Period Termination Date, any and all such challenges and objections by any Committee, any chapter 11 or chapter 7 trustee appointed herein or in any Successor Case, and any other party in interest shall be deemed to be forever waived and barred, and the Prepetition Secured Obligations shall be deemed to be an allowed secured claim within the meaning of sections 502 and 506 of the Bankruptcy Code for all purposes in connection with the Cases up to the amount of the value of the Prepetition Collateral and an allowed unsecured claim for any amount in excess of the value of the Prepetition Collateral, and the Claims Stipulations shall be binding on all creditors, interest holders and parties in interest.  To the extent any such objection or complaint is filed, the Claims Stipulations shall nonetheless remain binding and preclusive except to the extent expressly challenged in such objection or complaint.

9.      **Carve-Out**.  Subject to the terms and conditions contained in this Paragraph 9, the DIP Liens, the DIP Superpriority Claim, the Prepetition Liens, the Adequate Protection Liens and the Adequate Protection Superpriority Claims, which have the relative lien and payment priorities as set forth herein, shall, in any event, in all cases be subject and subordinate to a carve-out (the "**Carve-Out**"), which shall be comprised of the following:  (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) plus (ii) an amount equal to the unpaid professional fees and expenses incurred by the Debtors and the Committee on or after the Petition Date through the date (if any) upon which the DIP Agent provides written notice (a "**Carve-Out Trigger Notice**") to counsel to the Debtors and counsel to the Committee, if one, that an Event of Default (as defined in the DIP

Credit Agreement) has occurred and the DIP Agent is electing to trigger the Carve-Out, plus

(iii) $50,000 (the "**Default Carve-Out Amount**"), which amount may be used subject to the

terms of the Interim DIP Order and this Final DIP Order to pay any allowed fees or expenses

incurred by the Debtors and the Committee after the date of delivery of the Carve-Out Trigger

Notice.  In addition to the foregoing, upon the closing of an Approved Sale (and only upon the

closing of an Approved Sale), a fund shall be established in the amount of $225,000 (the "**Post-

Sale Carve-Out**") to be used solely for professional fees and expenses incurred by the Debtors'

estates after the closing of an Approved Sale, including in connection with a plan of

reorganization permitted hereunder or under the Final DIP Order, with any unused portion

thereof to be held for distribution as proceeds of the Prepetition Collateral; _provided_ that the use

of the Post-Sale Carve-Out shall be consistent with the DIP Budget; _provided_, _further_, that the

Post-Sale Carve-Out shall be reduced on a dollar for dollar basis by the amount of the Default

Carve-Out Amount in the event that the DIP Agent issues a Carve-Out Trigger Notice.  The

Post-Sale Carve-Out shall be funded immediately after the Approved Sale from the Debtors'

cash on hand after the indefeasible payment in full of the DIP Facility, with the balance of all

remaining proceeds of the Approved Sale other than the GUC Carveout (as defined below) to the

Prepetition Agent on behalf of the Prepetition Lenders except to the extent that a Committee (or

any other party with standing to do so) has successfully objected to or challenged any of the

Claims Stipulations prior to the Challenge Period Termination Date.  Notwithstanding the

foregoing, the amount of $30,000 shall be reserved from the distribution to the Prepetition Agent

on behalf of the Prepetition Lenders and held for later distribution to general unsecured creditors

holding allowed claims (including any deficiency claims of the Prepetition Lenders) or to a

liquidating trust created to hold, prosecute and distribute assets to such unsecured creditors (such

amount, the "**GUC Carve-Out**").  The dollar limitation in clause (ii) above on fees and expenses shall not be reduced or increased by the amount of any compensation or reimbursement of expenses paid prior to the issuance of a Carve-Out Trigger Notice.  The ability of any party to object to the fees, expenses, reimbursement or compensation described above shall not be impaired by the terms of the Carve-Out.  No portion of the Carve-Out, the Post-Sale Carve-Out or the GUC Carve-Out, no proceeds of the DIP Facility or DIP Extensions of Credit, and no proceeds of the Prepetition Collateral, including Cash Collateral, or any other amounts, may be used for the payment of the fees and expenses of any person incurred (i) in challenging, or in relation to the challenge of, any of the Prepetition Secured Parties' or the DIP Secured Parties' liens or claims (or the value of their respective Prepetition Collateral or the DIP Collateral), or the initiation or prosecution of any claim or action against any of the Prepetition Secured Parties or DIP Secured Parties, including, without limitation, any claim under chapter 5 of the Bankruptcy Code, or any state law or foreign law, in respect of the Prepetition Secured Obligations or the DIP Facility, or in preventing, hindering or delaying the realization by the Prepetition Secured Parties or the DIP Secured Parties upon any Prepetition Collateral or DIP Collateral, respectively, or the enforcement of their respective rights under the Interim DIP Order, this Final DIP Order, any other DIP Loan Document or any Prepetition Loan Document, (ii) in requesting authorization, or supporting any request for authorization, to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than (x) from the DIP Lenders or (y) if such financing is sufficient to indefeasibly pay and satisfy all DIP Obligations in full in cash and such financing is immediately so used or (iii) in connection with any claims or causes of actions against the Releasees, including formal or informal discovery proceedings in anticipation

thereof, and/or in challenging any Prepetition Secured Obligations, DIP Obligations, Prepetition

Liens, Adequate Protection Liens or DIP Liens.

10.     **Payment of Compensation**.  Nothing herein shall be construed as consent to the

allowance of any professional fees or expenses of any of the Debtors or any Committee or shall

limit or otherwise affect the right of the DIP Secured Parties and/or the Prepetition Secured

Parties to object to the allowance and payment of any such fees and expenses.  So long as no

Event of Default exists that has not been waived in writing, the Debtors shall be permitted to pay

compensation and reimbursement of expenses allowed and payable under sections 330 and 331

of the Bankruptcy Code and in accordance with the DIP Budget, with the variations permitted

herein, as the same may be due and payable and the same shall not reduce the Carve- Out.

11.     **Section 506(c) Claims**.  Subject to the entry of the Final DIP Order, as a further

condition of the DIP Facility, the Debtors (and any successors thereto or any representatives

thereof, including any trustees appointed in the Cases or any Successor Cases) shall be deemed

to have waived any rights, benefits or causes of action under section 506(c) of the Bankruptcy

Code as they may relate to or be asserted against the DIP Secured Parties, the DIP Liens, the DIP

Collateral, the Prepetition Secured Parties, the Adequate Protection Liens, the Prepetition Liens

or the Prepetition Collateral.  Nothing contained in the Interim DIP Order, in this Final DIP

Order or in the other DIP Loan Documents shall be deemed a consent by the Prepetition Secured

Parties or the DIP Secured Parties to any charge, lien, assessment or claim against, or in respect

of, the DIP Collateral or the Prepetition Collateral under section 506(c) of the Bankruptcy Code

or otherwise.

12.     **Collateral Rights; Limitations in Respect of Subsequent Court Orders**.

Without limiting any other provisions of this Final DIP Order, unless the DIP Agent, and the

Prepetition Agent have provided their prior written consent or the DIP Obligations and the Prepetition Secured Obligations shall have been indefeasibly paid and satisfied in full in cash, there shall not be entered in these proceedings, or in any Successor Case, any order which authorizes (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or entitled to priority administrative status which is superior to or *pari passu* with those granted pursuant to the Interim DIP Order or this Final DIP Order to or for the benefit of the DIP Secured Parties or the Prepetition Secured Parties, or (ii) the use of Cash Collateral for any purpose other than as set forth in the DIP Budget, including to wind down the estates.

13. **Proceeds of Subsequent Financing**. Without limiting the provisions and protections of Paragraph 12 above, if at any time prior to the indefeasible repayment and satisfaction in full in cash of all DIP Obligations and all Prepetition Secured Obligations, and the termination of the DIP Secured Parties' obligations to make DIP Extensions of Credit, including subsequent to the confirmation of any chapter 11 plan or plans (the "**Plan**") with respect to the Debtors, the Debtors' estates, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt in violation of the Interim DIP Order, this Final DIP Order, or the other DIP Loan Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Agent or the Prepetition Agent, as the case may be, for application in accordance with Paragraph 18(b) of this Final DIP Order, the DIP Loan Documents and the Prepetition Loan Documents, as applicable. For the avoidance of doubt, the Debtors may, at their option, upon notice as provided in the DIP Credit Agreement, prepay all of the Loans, on any date.

14.    **Cash Management**.  The Debtors' cash management system shall at all times be maintained (i) in accordance with the terms of the DIP Loan Documents including the "anti-hoarding" provisions thereof requiring cash balances in excess of $500,000 for three consecutive business days be applied to the DIP Obligations in the manner set forth in the DIP Credit Agreement, and any order of this Court approving the maintenance of the Debtors' cash management system, and (ii) in a manner which in any event shall be reasonably satisfactory to the DIP Agent.  The DIP Agent shall be deemed to have "control" over such accounts for all purposes of perfection under the Uniform Commercial Code.  Until the occurrence of an Event of Default, all amounts collected in the cash collection accounts may be used in accordance with the Interim DIP Order, this Final DIP Order, the DIP Budget and the other DIP Loan Documents; after the occurrence and during the continuance of an Event of Default, subject only to the Debtors' rights under Paragraph 17(b), all such amounts shall be applied in accordance with Paragraph 18(b).

15.    **Disposition of DIP Collateral**.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as permitted by the DIP Loan Documents, or as approved by the Court.  Upon the closing of an Approved Sale (and only upon the closing of an Approved Sale), the Debtors shall retain sufficient cash on hand to satisfy the following costs (the "**Post-Closing Costs**"):  (i) any accrued but unpaid professional or U.S. Trustee fees and expenses that are part of the Carve-Out (if any), plus (ii) the unfunded costs set forth in the Approved Budget, including the Post-Sale Carve-Out.

16.    **Survival of Certain Provisions**.  In the event of the entry of any order converting any of these Cases into a Successor Case, the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens and the Adequate Protection Superpriority Claim shall continue in

these proceedings and in any Successor Case, and such DIP Liens, DIP Superpriority Claim,

Adequate Protection Liens and Adequate Protection Superpriority Claim shall maintain their

respective priorities as provided in this Final DIP Order.

17.    **Events of Default; Rights and Remedies Upon Event of Default**.

a)    Any automatic stay otherwise applicable to the DIP Secured Parties and

the Prepetition Agent is hereby modified so that, upon and after the occurrence of the

Termination Date, the DIP Agent and the Prepetition Agent shall, subject to subparagraph (b) of

this Paragraph 17, be immediately entitled to exercise all of their rights and remedies in respect

of the DIP Collateral and the Prepetition Collateral, in accordance with the Interim DIP Order,

this Final DIP Order, the other DIP Loan Documents and/or the Prepetition Loan Documents, as

applicable.   The term "**Termination Date**" shall mean the earliest to occur of (i) the Maturity

Date (as defined in the DIP Credit Agreement, (ii) the DIP Agent's decision to accelerate the

indebtedness under the DIP Facility as a result of an Event of Default thereunder (including as a

result of a breach of this Final DIP Order, and (iii) this Final DIP Order ceasing to be in full

force and effect for any reason.

b)    Notwithstanding the foregoing subparagraph (a) of this Paragraph 17,

immediately following the giving of notice by the DIP Agent to the Debtors, counsel to the

Debtors, counsel for any Committee appointed in the Cases and the Office of the United States

Trustee for the District of Minnesota (the "**U.S. Trustee**") of the occurrence of an Event of

Default:  (i) all Commitments of the DIP Lenders to provide any DIP Extensions of Credit shall

immediately be suspended; (ii) subject to the immediately succeeding sentence, the Debtors shall

have no right to request or use any proceeds of any Loans or DIP Collateral, or to use Cash

Collateral, other than towards the satisfaction of the DIP Obligations and the Carve-Out, as

provided in the applicable DIP Loan Documents; (iii) the Debtors shall deliver and cause the delivery of the proceeds of the Loans and the DIP Collateral to the DIP Agent as provided herein and in the DIP Loan Documents; and (iv) the DIP Agent shall be permitted to apply such proceeds in accordance with the terms of the Interim DIP Order, this Final DIP Order, and the DIP Loan Documents.   The Debtors and any Committee shall be entitled to an emergency hearing before this Court within seven (7) days after the giving of written notice by the DIP Agent and the Prepetition Agent of the occurrence of an Event of Default and the Debtors shall be entitled to continue to use Cash Collateral as provided in the DIP Budget until the conclusion of such hearing; provided, that the only issue that may be raised at such hearing shall be whether an Event of Default has in fact occurred and is continuing, and such entities hereby waive their right to seek any relief, whether under section 105 of the Bankruptcy Code or otherwise, that would in any way impair, limit, restrict or delay the rights and remedies of the DIP Agent and the Prepetition Agent under the DIP Loan Documents or the Prepetition Loan Documents.   If the Debtors or any Committee do not contest the occurrence of the Event of Default within seven (7) days after the giving of notice thereof, or if the Debtors or any Committee do timely contest the occurrence of an Event of Default and the Court after notice and a hearing declines to stay the enforcement thereof, the Termination Date shall be deemed to have occurred for all purposes and the automatic stay, as to the DIP Agent and the Prepetition Agent shall automatically terminate in all respects.   Nothing herein shall preclude the DIP Agent or the Prepetition Agent from seeking an order from the Court upon written notice (electronically (including via facsimile) in a manner that generates a receipt for delivery, or via overnight mail) to the U.S. Trustee, counsel to the Debtors and counsel to the Committee, if any, authorizing the DIP Agent and/or the

Prepetition Agent to exercise any enforcement rights or remedies with respect to the DIP Collateral on less than seven (7) days' notice, or the Debtors' right to contest such relief.

   c) Upon the occurrence of the Termination Date (but subject, only in the case of the occurrence of the Termination Date resulting from an Event of Default, to the provisions of Paragraph 17(b)), the DIP Agent and the Prepetition Agent are authorized to exercise all remedies and proceed under or pursuant to the applicable DIP Loan Documents and the Prepetition Loan Documents.  All proceeds realized in connection with the exercise of the rights and remedies of the applicable DIP Secured Parties and Prepetition Secured Parties shall be turned over and applied in accordance with Paragraph 18(b).

   d) The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of the DIP Loan Documents as necessary to (i) permit the Debtors to grant the Adequate Protection Liens and the DIP Liens and to incur all DIP Obligations and all liabilities and obligations to the Prepetition Secured Parties hereunder and under the other DIP Loan Documents, as the case may be, and (ii) authorize the DIP Agent and the Prepetition Agent to retain and apply payments, and otherwise enforce their respective rights and remedies hereunder.

   e) Nothing included herein shall prejudice, impair, or otherwise affect the Prepetition Agent's or the DIP Agent's rights to seek (on behalf of the Prepetition Secured Parties and the DIP Secured Parties, respectively) any other or supplemental relief in respect of the Debtors, nor the DIP Agent's or Prepetition Agent's rights to suspend or terminate the making of DIP Extensions of Credit or use of Cash Collateral pursuant to the terms of this Order and the DIP Loan Documents.

f)     Notwithstanding anything in this Final DIP Order to the contrary, the Prepetition Agent shall not be permitted to exercise any rights or remedies for itself or the Prepetition Secured Parties unless and until the DIP Obligations are indefeasibly paid and satisfied in full in cash.

18.     **Applications of Proceeds of Collateral, Payments and Collections**.

a)     As a condition to the DIP Extensions of Credit and the authorization to use Cash Collateral, each Debtor has agreed that proceeds of any DIP Collateral and Prepetition Collateral, any amounts held on account of the DIP Collateral or Prepetition Collateral, and all payments and collections received by the Debtors with respect to all proceeds of DIP Collateral and Prepetition Collateral, shall be used and applied in accordance with the DIP Loan Documents (including repayment and reduction of the DIP Obligations) and the DIP Budget. For the avoidance of doubt, proceeds of the Prepetition Collateral and the DIP Collateral shall include proceeds from the Approved Sale.

b)     Subject to the Debtors' rights under Paragraph 17(b) and the funding of the Carve-Out, upon and after the occurrence of the Termination Date all proceeds of DIP Collateral and Prepetition Collateral, whenever received, shall be paid and applied as follows: (i) first, to permanently and indefeasibly repay and reduce the DIP Obligations then due and owing in accordance with the DIP Loan Documents, until paid and satisfied in full in cash; (ii) second, to permanently and indefeasibly repay and reduce the Prepetition Secured Obligations then due and owing in accordance with the Prepetition Loan Documents, until paid and satisfied in full in cash; and (iii) third, to the Debtors' estates.  For avoidance of doubt, nothing in this Final DIP Order shall be construed to limit the voluntary and mandatory repayment provisions set forth in the DIP Loan Documents.

19.    **Proofs of Claim, etc**.  None of the DIP Secured Parties or the Prepetition Secured Parties shall be required to file proofs of claim in any of the Cases or any Successor Cases for any claim allowed herein.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Cases or any Successor Cases to the contrary, the DIP Agent, on behalf of itself and the DIP Secured Parties and the Prepetition Agent, on behalf of itself and the Prepetition Secured Parties, respectively, are hereby authorized and entitled, in each of their sole and absolute discretion, but not required, to file (and amend and/or supplement, as each sees fit) a proof of claim and/or aggregate proofs of claim in each of the Cases or any Successor Cases for any claim allowed herein; for avoidance of doubt, any such proof of claim may (but is not required to be) filed as one consolidated proof of claim against all of the Debtors, rather than as separate proofs of claim against each Debtor.  Any proof of claim filed by the DIP Agent or the Prepetition Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the respective DIP Secured Parties or Prepetition Secured Parties.  Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in any of the Cases or any Successor Cases shall not apply to the DIP Agent, the other DIP Secured Parties, the Prepetition Agent or the other Prepetition Secured Parties.

20.    **Other Rights and Obligations**.

a)    **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Final DIP Order**.  Based on the findings set forth in this Final DIP Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility as approved by the Interim DIP Order and this Final DIP Order, in the event any or all of the provisions of this Final DIP Order are hereafter modified, amended or vacated by a

subsequent order of this Court or any other court, the DIP Secured Parties are entitled to the

protections provided in section 364(e) of the Bankruptcy Code, and no such appeal,

modification, amendment or vacation shall affect the validity and enforceability of any advances

made hereunder or the liens or priority authorized or created hereby.  Notwithstanding any such

modification, amendment or vacation, any claim granted to the DIP Secured Parties hereunder

arising prior to the effective date of such modification, amendment or vacation of any DIP Liens

or of the DIP Superpriority Claim granted to or for the benefit of the DIP Secured Parties shall be

governed in all respects by the original provisions of this Final DIP Order, and the DIP Secured

Parties shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP

Liens and the DIP Superpriority Claim granted herein, with respect to any such claim.  Because

the DIP Extensions of Credit are made in reliance on the Interim DIP Order and this Final DIP

Order, the DIP Obligations incurred by the Debtors or owed the DIP Secured Parties prior to the

effective date of any stay, modification or vacation of the Interim DIP Order or this Final DIP

Order shall not, as a result of any subsequent order in the Cases or in any Successor Cases, be

subordinated, lose their lien priority or superpriority administrative expense claim status, or be

deprived of the benefit of the status of the liens and claims granted to the DIP Secured Parties

under the Interim DIP Order or this Final DIP Order.

　　　　　b)　　　**Expenses**.  To the fullest extent provided in the DIP Loan Documents, the

Prepetition Loan Documents and this Final DIP Order, the Debtors will pay all expenses incurred

by the DIP Secured Parties, the Prepetition Agent and the Prepetition Secured Parties (including,

without limitation, the reasonable fees and disbursements of their counsel, any other local

counsel that they shall retain and any internal or third-party appraisers, consultants, financial,

restructuring or other advisors and auditors advising any such counsel) in connection with (i) the

preparation, execution, delivery, funding and administration of the DIP Loan Documents, including, without limitation, all due diligence fees and expenses incurred or sustained in connection with the DIP Loan Documents, (ii) the administration of the Prepetition Loan Documents and monitoring of the Sale Conditions and Milestones, (iii) the Cases or any Successor Cases, or (iv) enforcement of any rights or remedies under the DIP Loan Documents or the Prepetition Loan Documents, in each case whether or not the transactions contemplated hereby are fully consummated.  The Prepetition Agent, the Prepetition Secured Parties and the DIP Secured Parties, and their advisors and professionals, shall not be required to comply with the U.S. Trustee fee guidelines, but shall provide reasonably detailed statements (redacted if necessary for privileged, confidential or otherwise sensitive information) to the Office of the U.S. Trustee and counsel for any Committee and the Debtors.  Thereafter, within seven (7) days of presentment of such statements, if no written objections to the reasonableness of the fees and expenses charged in any such invoice (or portion thereof) is made, the Debtors shall pay in cash all such fees and expenses of the Prepetition Agent, the Prepetition Secured Parties, the DIP Agent and the DIP Secured Parties, and their advisors and professionals.  Any objection to the payment of such fees or expenses shall be made only on the basis of "reasonableness," and shall specify in writing the amount of the contested fees and expenses and the detailed basis for such objection.  To the extent an objection only contests a portion of an invoice, the undisputed portion thereof shall be promptly paid.  If any such objection to payment of an invoice (or any portion thereof) is not otherwise resolved between the Debtors, any Committee or the U.S. Trustee and the issuer of the invoice, either party may submit such dispute to the Court for a determination as to the reasonableness of the relevant disputed fees and expenses set forth in the invoice.  This Court shall resolve any dispute as to the reasonableness of any fees and expenses.

c)      **Binding Effect**.  The provisions of this Final DIP Order shall be binding upon and inure to the benefit of the DIP Secured Parties and the Prepetition Secured Parties, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) whether in the Cases, in any Successor Cases, or upon dismissal of any such chapter 11 or chapter 7 case.

d)      **No Waiver**.  The failure of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under the Interim DIP Order, this Final DIP Order, the other DIP Loan Documents or the Prepetition Loan Documents or otherwise, as applicable, shall not constitute a waiver of any of the DIP Secured Parties' or Prepetition Secured Parties' rights hereunder, thereunder, or otherwise. Notwithstanding anything herein, the entry of the Interim DIP Order and this Final DIP Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights, claims, privileges, objections, defenses or remedies of the DIP Secured Parties or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law against any other person or entity in any court, including without limitation, the rights of the DIP Agent and the Prepetition Agent (i) to request conversion  of the Cases to cases under chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases, or (ii) to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Plan, or (iii) to exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) on behalf of the DIP Secured Parties or the Prepetition Secured Parties.

e)     **No Third Party Rights**.  Except as explicitly provided for herein, this Final DIP Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, third party or incidental beneficiary.

f)     **No Marshalling**.  Neither the DIP Secured Parties nor the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.

g)     **Section 552(b)**.  Subject to the entry of the Final DIP Order, the DIP Secured Parties and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or the DIP Collateral.

h)     **Amendment**.  The Debtors and the DIP Agent (with the consent of the requisite DIP Secured Parties as provided in and consistent with their respective rights under the DIP Loan Documents) may amend, modify, supplement or waive any provision of the DIP Loan Documents without further notice to or approval of the Court, unless such amendment, modification, supplement or waiver (x) increases the interest rate (other than as a result of the imposition of the default rate) or fees charged in connection with the DIP Facility, (y) increases the commitments of the DIP Lenders to make DIP Extensions of Credit under the DIP Loan Documents, or (z) changes the Termination Date.  Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by, or on behalf of, all the Debtors and the DIP Agent (after having

obtained the approval of the requisite DIP Secured Parties as provided in the DIP Loan Documents).

    i)  **Priority of Terms**. To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Final DIP Order, on the other hand, unless such term or provision herein is phrased in terms of "defined in" or "as set forth in" the DIP Credit Agreement, the terms and provisions of this Final DIP Order shall govern.

    j)  **Survival of Final DIP Order**. The provisions of this Final DIP Order and any actions taken pursuant hereto shall survive entry of any order which may be entered confirming any Plan in the Cases, (ii) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, (iii) to the extent authorized by applicable law, dismissing any of the Cases, (iv) withdrawing of the reference of any of the Cases from this Court or (v) providing for abstention from handling or retaining of jurisdiction of any of the Cases in this Court.  The terms and provisions of the Interim DIP Order, this Final DIP Order, including the DIP Liens and DIP Superpriority Claim granted pursuant to the Interim DIP Order, this Final DIP Order, and any protections granted to or for the benefit of the Prepetition Secured Parties (including the Adequate Protection Liens and the Adequate Protection Superpriority Claim), shall continue in full force and effect notwithstanding the entry of such order, and such DIP Liens and DIP Superpriority Claim and protections for the Prepetition Secured Parties (including the Adequate Protection Liens and the Adequate Protection Superpriority Claim) shall maintain their priority as provided by the Interim DIP Order, this Final DIP Order, the other DIP Loan Documents and the Prepetition Loan Documents (as the case may be), until all of the DIP Obligations and the

Prepetition Secured Obligations have been indefeasibly paid and satisfied in full in cash and discharged.

k)    **Enforceability**. This Final DIP Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

l)    **No Waiver or Modification of Final DIP Order**.  The Debtors irrevocably waive any right to seek any modification or extension of this Final DIP Order without the prior written consent of the DIP Agent and the Prepetition Agent, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent and the Prepetition Agent. This Final DIP Order may not be modified to alter relative lien priority of the DIP Liens, the Prepetition Liens and the Adequate Protection Liens.

m)    **Waiver of Any Applicable Stay**. Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Final DIP Order.

n)    **Retention of Jurisdiction**. The Court has and will retain jurisdiction to enforce this Final DIP Order according to its terms.

Dated: _____

                    Michael E. Ridgway
                    United States Bankruptcy Judge

## **EXHIBIT D**

DIP BUDGET



**DAKOTA PLAINS HOLDINGS, INC.**
**CASH FLOW ANALYSIS**
As of 12/17/2016

| Cash Flow<br>Week Ended | Actual<br>12/17/16 | Forecast<br>12/24/16 | Forecast<br>12/31/16 | Forecast<br>1/7/17 | Forecast<br>1/14/17 | Forecast<br>1/21/17 | Forecast<br>1/28/17 | Forecast<br>2/4/17 | Forecast<br>2/11/17 | Forecast<br>2/18/17 | Forecast<br>2/25/17 | Forecast<br>3/4/17 | Forecast<br>3/11/17 | Forecast<br>3/18/17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash from DIP Availability - Beginning** | **670,619** | **244,539** | **436,543** | **425,497** | **221,621** | **77,515** | **480,955** | **109,308** | **53,075** | **15,091** | **372,141** | **196,901** | **141,940** | **92,267** |
| + Transloading Crude Revenue | - | 496,752 | - | - | - | 352,680 | - | - | - | - | 212,903 | - | - | - |
| + Sand Revenue | 67,077 | 57,599 | 36,481 | 73,784 | 32,493 | 61,655 | 48,677 | 70,000 | 70,000 | 70,000 | 70,000 | 56,000 | 56,000 | 56,000 |
| + Rail Car Sublease Revenue | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| + Rental Income | - | - | - | 10,609 | - | - | - | 10,609 | - | - | - | - | 10,609 | - |
| + Railcar Storage Fees | - | 22,000 | - | - | - | 22,000 | - | - | - | - | 12,000 | - | - | - |
| + Other | - | 1,076 | - | - | - | 12,000 | - | - | - | - | - | - | - | - |
| **+ Total Cash Receipts** | **67,077** | **577,426** | **36,481** | **84,393** | **32,493** | **448,335** | **48,677** | **80,609** | **70,000** | **70,000** | **294,903** | **56,000** | **66,609** | **56,000** |
| - Crude & Sand Exp (excl. Personnel & Ins) | 26,072 | 1,646 | 14,331 | 55,120 | 6,109 | 28,109 | 14,609 | 9,940 | 5,928 | 27,928 | 14,428 | 8,779 | 4,842 | 26,842 |
| - Insurance Expense | 84,584 | - | 88,753 | - | 27,408 | - | - | 88,753 | 27,408 | - | - | 88,753 | 27,408 | - |
| - Marketing Expense | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| - Personnel & Benefits | 206,089 | 51,478 | 18,143 | 24,774 | 228,008 | 3,412 | 52,652 | 24,774 | 59,773 | 171,647 | 52,652 | 2,729 | 73,332 | 387,760 |
| - Rent Expense | - | 13,013 | 1,675 | - | - | - | 14,688 | - | - | - | 14,688 | - | - | - |
| - Legal Expense | 58,435 | 27,524 | - | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 7,000 | 7,000 | 7,000 |
| - G&A (excl. Personnel, Ins & Rent) | 3,595 | 2,143 | 24,625 | 4,625 | 6,325 | 4,625 | 24,625 | 4,625 | 6,125 | 4,625 | 24,625 | 3,700 | 3,700 | 5,200 |
| - Interest Payments, Net | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| - Principal Repayments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| - CapEx | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| - Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **- Total Operating Cash Disbursements** | **378,776** | **95,804** | **147,527** | **93,269** | **276,599** | **44,895** | **115,324** | **136,842** | **107,984** | **212,950** | **115,143** | **110,961** | **116,282** | **426,802** |
| **Total Operating Cash Flows** | **(311,699)** | **481,623** | **(111,046)** | **(8,876)** | **(244,106)** | **403,440** | **(66,647)** | **(56,233)** | **(37,984)** | **(142,950)** | **179,760** | **(54,961)** | **(49,673)** | **(370,802)** |
| - Debtor Legal Fees | 114,380 | 284,437 | | | | | 200,000 | | | | 250,000 | | | |
| - Debtor Financial Advisor Fees | | 5,181 | | 40,000 | | | 40,000 | | | | 40,000 | | | |
| - Debtor Other Fees | | | | | | | 15,000 | | | | 15,000 | | | |
| - Lender Legal Fees | | | | 155,000 | | | 50,000 | | | | 50,000 | | | |
| - Lender Financial Advisor Fees | | | | | | | | | | | | | | |
| - Unsecured Creditor Legal Fees | | | | | | | | | | | | | | |
| - Unsec. Creditor Fin. Advisor Fees | | | | | | | | | | | | | | |
| - US Bankruptcy Trustee Fees | | | | | | | | | | | | | | |
| **- Total Restructuring Cash Disbursements** | **114,380** | **289,619** | **-** | **195,000** | **-** | **-** | **305,000** | **-** | **-** | **-** | **355,000** | **-** | **-** | **-** |
| + Loan Over-Advance / DIP Financing | | | 100,000 | | 100,000 | | | | | | 500,000 | | | 600,000 |
| - DIP Interest Payments | | | | | | | | | | | | | | |
| - DIP Principal Payments | | | | | | | | | | | | | | |
| **- Total DIP Financing Cash Flows** | **-** | **-** | **100,000** | **-** | **100,000** | **-** | **-** | **-** | **-** | **-** | **500,000** | **-** | **-** | **600,000** |
| **Cash from DIP Availability - Ending** | **244,539** | **436,543** | **425,497** | **221,621** | **77,515** | **480,955** | **109,308** | **53,075** | **15,091** | **372,141** | **196,901** | **141,940** | **92,267** | **321,465** |
| Check | | (0.01) | | | | | | | | | | | | |

PRELIMINARY DRAFT - SUBJECT TO CHANGE
FOR DISCUSSION PURPOSES ONLY
12/20/2016

SUBJECT TO CONFIDENTIALITY AGREEMENT
CF Summary - Weekly
Page 1 of 1



**DAKOTA PLAINS HOLDINGS, INC.**
**CASH FLOW ANALYSIS**
As of 12/17/2016

| Cash Flow | Forecast Dec-16 | Forecast Jan-17 | Forecast Feb-17 | Forecast Mar-17 | Forecast Apr-17 | Forecast May-17 | Dec '16 - May '17 Totals |
|---|---|---|---|---|---|---|---|
| **Cash from DIP Availability - Beginning** | **589,190** | **425,497** | **109,308** | **196,901** | **184,133** | **9,183** | **589,190** |
| | | | | | | | |
| + Transloading Crude Revenue | 496,752 | 352,680 | 212,903 | 242,903 | - | - | 1,305,237 |
| + Sand Revenue | 268,646 | 216,609 | 280,000 | 280,000 | - | - | 1,045,256 |
| + Rail Car Sublease Revenue | - | - | - | - | - | - | - |
| + Rental Income | 10,300 | 10,609 | 10,609 | 10,609 | - | - | 42,127 |
| + Railcar Storage Fees | 22,000 | 22,000 | - | - | - | - | 44,000 |
| + Other | 1,076 | 12,000 | 12,000 | 12,000 | - | - | 37,076 |
| **+ Total Cash Receipts** | **798,774** | **613,898** | **515,512** | **545,512** | **-** | **-** | **2,473,695** |
| | | | | | | | |
| - Crude & Sand Exp (excl. Personnel & Ins) | 52,942 | 103,946 | 58,224 | 221,402 | - | - | 436,514 |
| - Insurance Expense | 181,345 | 27,408 | 116,161 | 278,669 | - | - | 603,583 |
| - Marketing Expense | - | - | - | - | - | - | - |
| - Personnel & Benefits | 288,442 | 308,846 | 308,846 | 518,521 | - | 171,000 | 1,595,654 |
| - Rent Expense | 14,688 | 14,688 | 14,688 | 14,688 | - | - | 58,752 |
| - Legal Expense | 88,459 | 35,000 | 35,000 | 35,000 | - | - | 193,459 |
| - G&A (excl. Personnel, Ins & Rent) | 32,591 | 40,200 | 40,000 | 40,000 | - | - | 152,791 |
| - Interest Payments, Net | - | - | - | - | - | - | - |
| - Principal Repayments | - | - | - | - | - | - | - |
| - CapEx | - | - | - | - | - | - | - |
| - Other | - | - | - | - | - | - | - |
| **- Total Operating Cash Disbursements** | **658,467** | **530,088** | **572,918** | **1,108,280** | **-** | **171,000** | **3,040,753** |
| | | | | | | | |
| **Total Operating Cash Flow** | **140,307** | **83,810** | **(57,407)** | **(562,768)** | **-** | **(171,000)** | **(567,058)** |
| | | | | | | | |
| - Debtor Legal Fees | 398,818 | 200,000 | 250,000 | 150,000 | 75,000 | 150,000 | 1,223,818 |
| - Debtor Financial Advisor Fees | 5,181 | 80,000 | 40,000 | - | - | - | 125,181 |
| - Debtor Other Fees | - | 15,000 | 15,000 | 50,000 | 50,000 | 50,000 | 180,000 |
| - Lender Legal Fees | - | 205,000 | 50,000 | 50,000 | 35,000 | 35,000 | 375,000 |
| - Lender Financial Advisor Fees | - | - | - | - | - | - | - |
| - Unsecured Creditor Legal Fees | - | - | - | - | - | - | - |
| - Unsec. Creditor Fin. Advisor Fees | - | - | - | - | - | - | - |
| - US Bankruptcy Trustee Fees | - | - | - | - | 14,950 | 14,950 | 29,900 |
| **- Total Restructuring Cash Disbursements** | **403,999** | **500,000** | **355,000** | **250,000** | **174,950** | **249,950** | **1,933,899** |
| | | | | | | | |
| + Loan Over-Advance / DIP Financing | 100,000 | 100,000 | 500,000 | 800,000 | - | 500,000 | 2,000,000 |
| - DIP Interest Payments | - | - | - | - | - | - | - |
| - DIP Principal Payments | - | - | - | - | - | - | - |
| **- Total Restructuring Cash Disbursements** | **100,000** | **100,000** | **500,000** | **800,000** | **-** | **500,000** | **2,000,000** |
| | | | | | | | |
| **Cash from DIP Availability - Ending** | **425,497** | **109,308** | **196,901** | **184,133** | **9,183** | **88,233** | **88,233** |

**Assumptions:**
*Transloading*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Barrels Per Day | 16,560 | 8,000 | 10,000 | 10,000 | | | 11,140 |
| Price per BBLS | $0.69 | $0.89 | $0.81 | $0.81 | | | $0.80 |

*Sand*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total Tons Transloaded | 27,815 | 35,000 | 35,000 | 35,000 | | | 132,815 |
| Avg. Tons Transloaded per Month | | | | | | | 33,204 |
| Transloading Fee Per Ton | $7.00 | $8.00 | $8.00 | $8.00 | | | $7.75 |

PRELIMINARY DRAFT - SUBJECT TO CHANGE
FOR DISCUSSION PURPOSES ONLY
12/20/2016

SUBJECT TO CONFIDENTIALITY AGREEMENT
CF Summary - Monthly
Page 1 of 1

## **EXHIBIT E**

MEMORANDUM OF LAW

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Dakota Plains Holdings, Inc., | Case No. 16-43711 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Transloading, LLC, | Case No. 16-43712 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Sand, LLC, | Case No. 16-43715 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Marketing, LLC, | Case No. 16-43716 |
| Debtor. | Chapter 11 Case |
| DPTS Marketing LLC, | Case No. 16-43717 |
| Debtor. | Chapter 11 Case |
| Dakota Petroleum Transport Solutions, LLC, | Case No. 16-43718 |
| Debtor. | Chapter 11 Case |
| DPTS Sand, LLC, | Case No. 16-43721 |
| Debtor. | Chapter 11 Case |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) GRANTING AN EXPEDITED HEARING,
(II) AUTHORIZING THE DEBTORS (A) TO UTILIZE CASH COLLATERAL OF THE
PREPETITION SECURED PARTIES, (B) TO OBTAIN POSTPETITION SECURED
FINANCING, AND (C) TO PROVIDE ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES, (III) SCHEDULING A FINAL HEARING, AND
(IV) GRANTING RELATED RELIEF**

Dakota Plains Holdings, Inc. and its affiliated debtors and debtors in possession in these

proceedings (collectively, the "**Debtors**"), submit this memorandum of law in support of the

motion submitted herewith (the "**Motion**") in accordance with Local Rule 9013-2(a).

## BACKGROUND

1.      The supporting facts are set forth in the Motion, verified by Marty Beskow, Chief

Financial Officer of Dakota Plains Holdings, Inc.  All capitalized terms used but not otherwise

defined herein shall have the meanings given to them in the Motion.

## LEGAL ANALYSIS

### I.  The Debtors' Request for Expedited Relief Should be Granted

2.     The Debtors request expedited relief on the Motion.  Bankruptcy Rule 9006(c) provides that the Court may reduce the notice period for a Motion "for cause shown."  Cause exists here to grant the Motion on an expedited basis.  As described in the Motion, the liquidity to be provided under the DIP Facility is essential to the Debtors' continued operations and the success of the Debtors' efforts to sell their businesses as a going concern for the benefit of all stakeholders.  Without the proceeds of the DIP Facility, the Debtors would be at serious risk of a shutdown, which would likely result in the loss of jobs and prejudice creditors.  In the days and weeks leading up to the Petition Date, the Debtors have exhausted every reserve, resource and strategy for operating with the cash available to them, but have reached the limit of what can be achieved under the circumstances.  Accordingly, expedited relief is necessary to avoid immediate and irreparable harm.

### II.  The Debtors Should be Authorized to Enter into the DIP Credit Agreement

3.     The Debtors meet the requirements for relief under section 364 of the Bankruptcy Code, which permits a debtor to obtain postpetition financing and, in return, to grant superpriority administrative status and liens on its property.  Section 364(c) of the Bankruptcy Code provides:

> If the [debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)      secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

Section 364(d)(1) of the Bankruptcy Code provides:

The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if —

(A)      the [debtor in possession] is unable to obtain such credit otherwise; and

(B)      there is adequate protection of the interest of the holder of the lien on property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

4.      Provided that an agreement to obtain secured credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in exercising its sound business judgment in obtaining such credit. *See*, *e.g.*, *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgement to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment").

- 3 -

5.      Further, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Loan Documents, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

6.      Here, given all the facts and circumstances present in these cases, the Debtors have amply satisfied the necessary conditions under sections 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP Credit Agreement.  The Debtors exercised proper business judgment in securing the DIP Facility on terms that are fair and reasonable and the best available to them in the current market.  Given the circumstances, the Debtors could not obtain credit on an unsecured or administrative expense basis, and the Debtors have provided the Prepetition Secured Parties with adequate protection against any potential diminution in value of their interests. Moreover, the Prepetition Lenders have consented to both the terms of the DIP Credit Agreement and the adequate protection proposed in connection therewith.  For all the reasons discussed further below, therefore, the Court should grant the Debtors' request to enter into the DIP Credit Agreement pursuant to sections 364(c) and (d) of the Bankruptcy Code.

A.      **The Debtors Exercised Sound and Reasonable Business
Judgment in Deciding to Enter into the DIP Credit Agreement**

7.      Based on the facts of these Cases, the DIP Facility represents a proper exercise of

the Debtors' business judgment.  Bankruptcy courts routinely defer to the debtor's business

judgment on most business decisions, including decisions about whether and how to borrow

money.  *Group of Inst. Investors v. Chi., Milwaukee, St. Paul & Pac. R.R.*, 318 U.S. 523, 550

(1943); *In re Farmland Indus., Inc.*, 294 B.R. 855, 882 (Bankr. W.D. Mo. 2003) ("Business

judgments should be left to the board room and not to this Court.") (quoting *In re Simasko Prod.*

*Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985)); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17

(Bankr. S.D. Ohio 1983).  "More exacting scrutiny would slow the administration of the debtor's

estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of

administration of the estate, and threaten the court's ability to control a case impartially."

*Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

8.      In general, a bankruptcy court defers to a debtor's business judgment regarding

the need for, and the proposed use of, funds, unless the debtor's decision improperly leverages

the bankruptcy process or its purpose is not so much to benefit the estate as it is to benefit a party

in interest.  *See Ames Dep't Stores*, 115 B.R. at 40; *see also In re Curlew Valley Assocs.*, 14 B.R.

506, 511-13 (Bankr. D. Utah 1981).  Courts generally will not second-guess a debtor's business

decisions when those decisions involve "a business judgment made in good faith, upon a

reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code."  *Id.* at

513-14 (footnote omitted).

9.      To determine whether the business judgment test is met, "the court 'is required to

examine whether a reasonable business person would make a similar decision under similar

circumstances.'"  *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at

*272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs., Inc.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

10.     Here, the Debtors have exercised sound business judgment in determining that the DIP Facility is appropriate.  The DIP Facility provides additional liquidity to the Debtors sufficient to enable them to, among other things, (i) minimize disruption to their businesses and operations, (ii) preserve and maximize the value of their estates for the benefit of all creditors, (iii) avoid immediate and irreparable harm o their businesses, their creditors and their employees, and their assets and (iv) permit the Debtors to pursue a sale transaction for the purpose of maximizing the value of the Debtors' estates for the benefit of all the Debtors' stakeholders. Without the financing provided under the DIP Facility, the Debtors will not be able to meet their operating expenses, will be unable to continue as a going concern, will be unable to fund the costs of these proceedings, and as a result, will suffer irreparable harm.  The Debtors' decision is therefore sound and reasonable under the circumstances.

> **B.      The Debtors Meet the Conditions Necessary Under Section 364(c) to**
> **Obtain Postpetition Financing on a Senior Secured and Superpriority Basis**

11.     Section 364(c) of the Bankruptcy Code authorizes a debtor to obtain postpetition financing on a secured or superpriority basis, or both, where the Court finds, after notice and a hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code] . . . ." 11 U.S.C. § 364(c).

12.     Courts have articulated a three-part test to determine whether a debtor is entitled to obtain financing under section 364(c) of the Bankruptcy Code.   Specifically, courts look to whether:

> a)      the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative expense claim;
>
> b)      the credit transaction is necessary to preserve the assets of the estate; and

c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*Ames Dep't Stores*, 115 B.R. at 37-39; *accord In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

13.     In order to satisfy this test, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *accord Ames Dep't Stores*, 115 B.R. at 37 (debtor must show that it has made reasonable efforts to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy  Code); *In re Crouse Group, Inc.*, 71 B.R. at 549 (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Snowshoe*, 789 F.2d at 1088; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  This is true especially when time is of the essence.  *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987).  When few lenders are likely to be able and willing to extend the necessary credit, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

14.     As set forth in the Balistreri Declaration, the Debtors made every reasonable effort to secure the best postpetition financing possible under the circumstances.  However, given the Debtors' urgent need for liquidity, the challenging state of the oil and gas industry and the Debtors' balance sheets, the Debtors were unable to solicit any viable proposals that authorized financing on an unsecured or administrative expense basis.  On the contrary, the Debtors' negotiations made clear that the Debtors could only obtain the financing necessary to preserve their estates if they extended superpriority to any new extensions of credit.  The Court should therefore authorize the Debtors to provide the DIP Agent, on behalf of the DIP Lenders, superpriority administrative expense status for any obligations arising under the DIP Credit Agreement as provided for in section 364(c)(1) of the Bankruptcy Code.

### C.     The Debtors Should be Authorized to Obtain Postpetition Credit Secured by Liens that Are Senior to the Prepetition Liens

15.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, a court may also authorize a debtor to obtain postpetition credit secured by a lien that is senior in priority to existing liens on the encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected or consent is obtained. *See* 11 U.S.C. § 364(d)(1).

16.     When determining whether to authorize a debtor to obtain credit secured by a lien that is senior or equal to a prepetition lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtor's assets. Courts consider a number of factors, including, without limitation:

a)      whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

b)      whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's businesses;

c)     whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); and

d)     whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See*, *e.g.*, *Ames Dep't Stores*, 115 B.R. at 37-39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862-79; *Barbara K. Enters.*, 2008 WL 2439649, at *10.

17.     The DIP Facility satisfies each of these factors.  First, the Debtors conducted arm's-length negotiations with the SunTrust Bank, and the ultimate agreement reflects the most favorable terms on which the Debtors were able to obtain financing.  The Debtors are not able to obtain financing on equal or better terms from the DIP Lenders, or any other source, without granting liens senior in priority to the Prepetition Liens.

18.     Second, the Debtors urgently need the funds to be provided under the DIP Facility to preserve the value of their estates for the benefit of all creditors and other parties in interest.  Absent the DIP Facility, the Debtors will continue to be significantly liquidity constrained.  Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these Cases is in the best interests of all stakeholders.

19.     Third, the terms of the DIP Facility are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these Cases, as the DIP Facility will allow the Debtors to maintain their operations and their relationships with key constituents notwithstanding the commencement of these Cases.

20.     Fourth, as described in greater detail above and in the Balistreri Declaration, the Debtors and the DIP Lenders negotiated the DIP Loan Documents in good faith and at arms'-length, and the Debtors' entry into the DIP Loan Documents is an exercise of their

sound business judgment. The DIP Facility is on the most favorable terms available to the
Debtors under current market conditions and the Debtors' financial condition. In light of all these
factors, therefore, it is clear that the Debtors should be authorized to secure the DIP Facility with
first priority senior priming liens.

### D.     The Interests of the Prepetition Secured Parties Are Adequately Protected

21.     A debtor may obtain postpetition credit "secured by a senior or equal lien on
property of the estate that is subject to a lien only if" the debtor, among other things, provides
"adequate protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B).
What constitutes adequate protection is decided on a case-by-case basis, and adequate protection
may be provided in various forms, including payment of adequate protection fees, payment of
interest or granting of replacement liens or administrative claims. *See*, *e.g.*, *In re Martin*, 761
F.2d 472, 474 (8th Cir. 1985) ("[S]uch matters 'are [to be] left to case-by-case interpretation and
development.'") (quoting H.R. Rep. No. 595, 95th Cong., 2d Sess. 339, reprinted in 1978 U.S.
Code Cong. & Ad. News 5963, 6295); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996)
("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of
each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus.
Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left
to the vagaries of each case, but its focus is protection of the secured creditor from diminution in
the value of its collateral during the reorganization process") (citation omitted). The critical
purpose of adequate protection is to guard against the diminution of a secured creditor's
collateral during the period when such collateral is being used by the debtor in possession. *See
Martin*, 761 F.2d at 474; *In re Johnson*, 90 B.R. 973, 978 (Bankr. D. Minn. 1988) (holding that
secured creditor is not impaired and is not entitled to receive adequate protection payments

where value of collateral does not decline); *Beker Indus.*, 58 B.R. at 736; *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

22.     Here, the interests of the Prepetition Agent and the Prepetition Secured Parties in the Prepetition Collateral (including Cash Collateral) are adequately protected by the Adequate Protection Lien in all of the DIP Collateral.  To the extent of the aggregate Diminution in Value, the Prepetition Secured Parties will also have, subject to the payment of the Carve-Out, an allowed superpriority administrative expense claim that is immediately junior and subject to the DIP Superpriority Claim.  The Prepetition Secured Parties are also advantaged by the DIP Facility since it will enable the Debtors to preserve the going concern value of their assets.

23.     Further, courts in this district and others have approved similar forms of adequate protection for prepetition secured creditors.  *See, e.g.*, *In re Magnetation LLC*, No. 15-50307 (Bankr. D. Minn. May 7, 2015) [ECF No. 60] (interim order authorizing adequate protection liens to prepetition secured creditors); *In re Duke & King Acquisition Corp.*, No. 10-38652 (GFK) (Bankr. D. Minn. Jan. 24, 2011) [ECF No. 138] (authorizing replacement liens to prepetition secured creditors for the use of cash collateral); *In re Otter Tail AG Enters., LLC*, 2009 Bankr. LEXIS 5352, at *10-11 (Bankr. D. Minn. Nov. 20, 2009) (grating, *inter alia*, adequate protection liens for the use of cash collateral); *In re Schwing Am., Inc.*, No. 09-36760 (NCD) (Bankr. D. Minn. Oct. 2, 2009) [ECF No. 15] (granting replacement liens in authorizing postpetition financing on an interim basis); *In re Polaroid Corp.*, No. 08-46617 (GFK) (Bankr. D. Minn. Jan. 27, 2009) [ECF No. 70] (authorizing replacement liens to prepetition secured creditors for the use of cash collateral).  Accordingly, the Court should find that the adequate protection provided to the Prepetition Secured Parties is fair and reasonable, and satisfies the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

### III.    The Debtors Should be Authorized to Use the Cash Collateral

24.    In connection with their need for debtor in possession financing, the Debtors also require the use of Cash Collateral.  Section 363(c)(2) of the Bankruptcy Code provides, in pertinent part, that:

The [debtor in possession] may not use, sell, or lease cash collateral . . . unless—

A.    each entity that has an interest in such cash collateral consents; or

B.    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

25.    The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the Cash Collateral.  First, as explained above, the Prepetition Agent and the Prepetition Secured Parties have consented to the use of their Cash Collateral.  Second, as described above, the Debtors are providing the Prepetition Secured Parties with Adequate Protection Liens and an Adequate Protection Superpriority Claim.  The interests of the Prepetition Secured Parties are thus adequately protected from diminution under the DIP Facility.  Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

### IV.    The Debtors Should be Authorized to Pay Expenses Related to the DIP Facility

26.    The Debtors have agreed, subject to Court approval, to pay certain expenses incurred by the DIP Secured Parties, the Prepetition Agent and the Prepetition Secured Parties.  Specifically, the Debtors will pay the reasonable fees and disbursements of their counsel, and

any consultants, financial, restructuring or other advisors and auditors advising such counsel, in connection with DIP Loan Documents, the administration of the Prepetition Loan Documents, the Cases or any Successor Cases, or the enforcement of any rights or remedies under the DIP Loan Documents or the Prepetition Loan Documents.  The expenses the Debtors have agreed to pay to the DIP Secured Parties, the Prepetition Agent and the Prepetition Secured Parties represent the most favorable terms on which the DIP Secured Parties would agree to make the DIP Facility available.  The Debtors considered the expenses described above when determining in their sound business judgment that the DIP Loan Documents constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and prosecute these Cases.

## V.      The Scope of the Carve-Out Is Appropriate

27.      The DIP Facility subjects the DIP Liens, the DIP Superpriority Claim, the Prepetition Liens, the Adequate Protection Liens and the Adequate Protection Superpriority Claim to the Carve-Out. Such carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from their professionals in certain circumstances during an event of default under the terms of the debtor's postpetition financing.  *See Ames Dep't Stores*, 115 B.R. at 40.  The DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *Id.* at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the course of these Cases by ensuring that assets remain for the payment of

- 13 -

U.S. Trustee fees and professional fees of the Debtors and the Creditors' Committee notwithstanding the grant of superpriority claims and DIP and adequate protection liens.

28.     Courts in this district and others routinely approve of carve-outs agreed to by the debtors and their DIP financing lenders.  *See*, *e.g.*, *In re Magnetation LLC*, No. 15-50307 (Bankr. D. Minn. May 7, 2015) [ECF No. 60]; *In re Genmar Holdings, Inc.*, No. 09-43537 (Bankr. D. Minn. June 4, 2009) [ECF No. 23]; *In re US Fidelis, Inc.*, 2010 Bankr. LEXIS 5837, at *18 (Bankr. E.D. Mo. May 28, 2010); *In re Trilogy Dev. Co.*, 2009 Bankr. LEXIS 5178, at *18-19 (Bankr. W.D. Mo. July 14, 2009); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 18, 2012); *In re The Great Atl. & Pac. Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011).

## VI.     The DIP Lenders Should be Deemed Good Faith Lenders Under Section 364(e)

29.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

30.     As explained in detail herein and in the Balistreri Declaration, the DIP Loan Documents are the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing, and

of arm's-length, good faith negotiations between the Debtors and the DIP Lenders. The terms and conditions of the DIP Loan Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

**VII.**   **The Modification of the Automatic Stay Is Warranted**

31.   Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The proposed DIP Orders contemplate the modification of the automatic stay (to the extent applicable), to the extent necessary to implement the terms of the DIP Orders. Stay modification provisions of this type are standard features of postpetition debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. *See, e.g.*, *In re Magnetation LLC*, No. 15-50307 (Bankr. D. Minn. May 7, 2015) [ECF No. 60]; *In re Premium Protein Prods., LLC*, 2009 Bankr. LEXIS 5285, at *31–32 (Bankr. D. Neb. Nov. 18, 2009); *In re Trilogy Dev. Co.*, 2009 Bankr. LEXIS 5178, at *19 (Bankr. W.D. Mo. July 14, 2009); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 18, 2012); *In re Patriot Coal Corp.*, No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Feb. 16, 2012); *In re Roomstore, Inc.*, No. 11-37790 (KLP) (Bankr. E.D. Va. Jan. 5, 2012); *In re The Great Atl. & Pac. Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011); *In re Canal Corp. f/k/a Chesapeake Corp.*, No. 08-36642 (DOT) (Bankr. E.D. Va. Feb. 3, 2009); *In re Circuit City Stores, Inc.*, No. 08-35653 (KRH) (Bankr. E.D. Va. Dec. 23, 2008).

## VIII.   The Debtors Require Immediate Access to the DIP Facility

32.    The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2) & (c)(2).  In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions.  *See Ames Dep't Stores*, 115 B.R. at 36.

33.    The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to borrow up to $500,000 under the DIP Facility, is not granted promptly after the Petition Date.  Further, the Debtors anticipate that the commencement of these Cases will significantly and immediately increase the demands on their free cash as a result of, among other things, the costs of administering these Cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of these Cases.  Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their businesses, maintain their relationships with customers, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain the Debtors' enterprise value for the benefit of all parties in interest.

34.    The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district and others in similar circumstances.  *See*, *e.g.*, *In re Magnetation LLC*, No. 15-50307 (Bankr. D. Minn. May 7, 2015) [ECF No. 60] (interim order authorizing debtor to obtain secured postpetition financing on a superpriority basis); *In re Genmar Holdings, Inc.*, No. 09-43537

(Bankr. D. Minn. June 4, 2009) [ECF No. 23] (approving DIP loan with granting of senior lien); *In re US Fidelis, Inc.*, 2010 Bankr. LEXIS 5837, at \*10 (Bankr. E.D. Mo. May 28, 2010) (authorizing secured postpetition financing on a superpriority basis); *In re Premium Protein Prods., LLC*, 2009 Bankr. LEXIS 5285, at \*6-9 (Bankr. D. Neb. Nov. 18, 2009) (authorizing debtor to incur postpetition secured indebtedness on an interim basis); *In re Trilogy Dev. Co.*, 2009 Bankr. LEXIS 5178, at \*7 (Bankr. W.D. Mo. July 14, 2009) (authorizing postpetition secured financing with superpriority DIP liens priming prepetition secured construction loan); *In re Va. United Methodist Homes of Williamsburg, Inc.*, No. 13-31098 (KRH) (Bankr. E.D. Va. Mar. 6, 2013) (approving postpetition financing on an interim basis); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (KRH) (Bankr. E.D. Va. Nov. 14, 2012) (same); *In re Patriot Coal Corp.*, No. 12- 12900 (ALG) (Bankr. S.D.N.Y. July 11, 2012); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 20, 2012) (same); *In re Roomstore, Inc.*, No. 11-37790 (KLP) (Bankr. E.D. Va. Dec. 14, 2011) (same); *In re Bear Island Paper Co., L.L.C.*, No. 10-31202 (DOT) (Bankr. E.D. Va. Feb. 26, 2010) (same); *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) (same).  Accordingly, for the reasons set forth above, prompt entry of the Interim DIP Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

## **CONCLUSION**

For the foregoing reasons, the Debtors respectfully request that the Court grant the relief requested in the Motion.

Dated:  December 21, 2016          Respectfully submitted,

/e/ Michael F. McGrath

Michael F. McGrath (#168610)
Will R. Tansey (#323056)
RAVICH MEYER KIRKMAN MCGRATH NAUMAN
& TANSEY, PA
150 S. Fifth Street, Suite 3450
Minneapolis, MN  55402
Telephone:  612.317.4744
Email:  mfmcgrath@ravichmeyer.com
        wrtanser@ravichmeyer.com

Elizabeth A. Green
Jimmy D. Parrish
BAKER & HOSTETLER LLP
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL  32801-3432
Telephone:  407.649.4000
Email:  egreen@bakerlaw.com
        jparrish@bakerlaw.com

Eric R. Goodman
BAKER & HOSTETLER LLP
Key Tower, 127 Public Square
Suite 2000
Cleveland, OH  44114-1214
Telephone:  216.621.0200
Email:  egoodman@bakerlaw.com

*Proposed Counsel for the Debtors and Debtors
in Possession*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Dakota Plains Holdings, Inc., | Case No. 16-43711 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Transloading, LLC, | Case No. 16-43712 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Sand, LLC, | Case No. 16-43715 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Marketing, LLC, | Case No. 16-43716 |
| Debtor. | Chapter 11 Case |
| DPTS Marketing LLC, | Case No. 16-43717 |
| Debtor. | Chapter 11 Case |
| Dakota Petroleum Transport Solutions, LLC, | Case No. 16-43718 |
| Debtor. | Chapter 11 Case |
| DPTS Sand, LLC, | Case No. 16-43721 |
| Debtor. | Chapter 11 Case |

## CERTIFICATE OF SERVICE

Jimmy D. Parrish of Baker & Hostetler LLP, under penalty of perjury, states that on December 21, 2016 he caused to be served the following documents:

1.  Notice of Hearing and Motion for Entry of Interim and Final Orders (I) Granting an Expedited Hearing, (II) Authorizing the Debtors (A) to Utilize Cash Collateral of the Prepetition Secured Parties, (B) to Obtain Postpetition Secured Financing, and (C) to Provide Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief;

2.  Proposed Interim Order (I) Granting an Expedited Hearing, (II) Authorizing the Debtors (A) to Utilize Cash Collateral of the Prepetition Secured Parties, (B) to Obtain Postpetition Secured Financing, and (C) to Provide Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief;

3.  Proposed Final Order (I) Authorizing the Debtors (A) to Utilize Cash Collateral of the Prepetition Secured Parties, (B) to Obtain Postpetition Secured Financing, and (C) to Provide Adequate Protection to the Prepetition Secured Parties, (II) and Granting Related Relief; and

4.      Memorandum of Law in Support of Motion for Entry of Interim and Final Orders
(I) Granting an Expedited Hearing, (II) Authorizing the Debtors (A) to Utilize
Cash Collateral of the Prepetition Secured Parties, (B) to Obtain Postpetition
Secured Financing, and (C) to Provide Adequate Protection to the Prepetition
Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related
Relief;

upon:

| | | |
|---|---|---|
| Advanced Imaging Solutions<br>PO Box 790448<br>Saint Louis, MO  63179-0448 | Ally Financial<br>PO Box 380901<br>Bloomington, MN  55438 | Applied Business Strategy LLC<br>1100 Superior Avenue East<br>Suite 1750<br>Cleveland, OH  44114 |
| Boatworks II, LLC<br>294 Grove Lane East<br>Suite 100<br>Wayzata, MN  55391 | BNSF Railway Company<br>3110 Solutions Center<br>Chicago IL 60677-3001<br>Fax: (651) 298-2814<br>Email:<br>Christina.Mcfarlane@BNSF.com | Boxcar Companies LLC<br>374 Wickaboag Valley Rd.<br>West Brookfield, MA  01585<br>Email:  dan@boxcarco.com |
| Butte,    Anaconda    &    Pacific<br>Railway<br>300 West Commercial<br>Anaconda, MT  59711<br>Fax: (904) 210-7424<br>Email:<br>Lisette.Leavens@patriotrail.com | Canadian Pacific Railway Co.<br>CM-9527<br>Saint Paul, MN  55170-9527<br>Fax: (888) 872-7245<br>Email:  Ryan_Jordan@cpr.ca | CSX Transportation, Inc.<br>P.O. Box 116651<br>Atlanta, GA  30368-6651<br>Email:<br>er_accounts_receivable@csx.com |
| Faegre Baker & Daniels<br>2200 Wells Fargo Center<br>90 S. 7th Street<br>Minneapolis, MN  55402-3901<br>Fax: (612) 766-1600<br>Email:<br>morgan.burns@faegrebd.com | Foote Oilfield Services, LLC<br>PO Box 878<br>New Town, ND  58763<br>Email:  jr.foote@hotmail.com | Gabriel G. Claypool<br>20330 Western Road<br>Deephaven, MN  55331 |
| Global Companies, LLC<br>800 South Street<br>Waltham, MA  02453 | Hennepin County Assessor<br>A-2103 Government Center<br>300 South 6th Street<br>Minneapolis, MN  55487 | Hiland Crude, LLC<br>1001 Louisiana<br>Suite 1000<br>Houston, TX  77002 |
| Integra<br>6160 Golden Hills Drive<br>Minneapolis, MN  55416 | Internal Revenue Service<br>Centralized Insolvency Ops<br>PO Box 7346<br>Philadelphia, PA  19101 | Iowa Traction Railway<br>P.O. Box 1277<br>Lakeville, MN  55044-1277<br>Fax: (952) 985-5911<br>Email:<br>bbement@progressiverail.com |
| IRS District Counsel<br>380 Jackson Street, Suite 650<br>St. Paul, MN  55101-4804 | Internal Revenue Service<br>Wells Fargo Place<br>30 E. Seventh Street<br>Mail Stop 5700<br>St. Paul, MN  55101 | Keokuk Junction Railway Co.<br>1318 S. Johnson Rd.<br>Peoria, IL  61607<br>Fax: (309) 697-5387<br>Email:     kbouris@pioneer-railcorp.com |

| | | |
|---|---|---|
| McGrath North Mullin & Kratz, PC LLP<br>First National Tower<br>Suite 3700<br>1601 Dodge St.<br>Omaha, NE 68102<br>Fax: (402) 341-0216<br>Email: info@mcgrathnorth.com | MN Department of Revenue<br>Collection Div Bankruptcy Section<br>551 Bankruptcy Section<br>PO Box 64447<br>St. Paul, MN 55164-0447 | Minnesota Dept. of Revenue<br>600 North Robert Street<br>Saint Paul, MN 55146 |
| Mountrail County Treasurer's<br>PO Box 69<br>Stanley, ND 58784<br>Email: shenaw@co.mountrail.nd.us | Mountrail Williams Electric Cooperative<br>PO Box 1346<br>Williston, ND 58802-1346<br>Fax: (701) 627-3502 | Murex, LLC<br>55 Waugh Drive<br>Suite 510<br>Houston, TX 77007 |
| North Dakota Dept. of Revenue<br>600 E. Boulevard Avenue<br>Bismarck, ND 58505-0599 | Office of U.S. Trustee<br>1015 US Courthouse<br>300 South Fourth Street<br>Minneapolis, MN 55415 | Pearce & Durick<br>314 E. Thayer Ave.<br>P.O. Box 400<br>Bismarck, ND 58502<br>Fax: (701) 223-7865<br>Email: llb@pearce-durick.com |
| Reed Smith LLP<br>10 S. Wacker Dr. 40th Floor<br>Chicago, IL 60606-7507 | Ryan Gilbertson<br>1675 Neal Avenue<br>Delano, MN 55328 | San Luis & Rio Grande Railroad<br>118 S. Clinton St.<br>Suite 400<br>Chicago, IL 60661<br>Fax: (312) 248-1232<br>Email: burkittb@iowapacific.com |
| Sard Verbinnen & Co., LLC<br>630 Third Avenue<br>9th Floor<br>New York, NY 10017<br>Fax: (212) 293-0055<br>Email: jrudnick@sardverb.com | Securities and Exchange Commission<br>175 West Jackson Blvd., Suite 900<br>Chicago, IL 60604 | Stone Phillips, LLC<br>PO Box 500787<br>Atlanta, GA 31150 |
| SunTrust Bank<br>303 Peachtree Street NE<br>Atlanta, GA 30326<br>Email: alanpope@mvalaw.com | Thompson Hine LLP<br>Two Alliance Center<br>3560 Lenox Road NE<br>Suite 1600<br>Atlanta, GA 30326-4266 | Troy Hutchinson<br>Rock Hutchinson, PLLP<br>1907 E. Wayzata Blvd.<br>Suite 330<br>Wayzata, MN 55391<br>Email: thutchinson@rockhutchinson.com |
| Union Pacific Railroad Company<br>5074 Collections<br>Center Dr.<br>Chicago, IL 60693<br>Email: smpetrow@up.com | US Attorney<br>600 US Courthouse<br>300 S. Fourth Street<br>Minneapolis, MN 55415 | U.S. Environmental Protection Agency<br>77 W. Jackson Blvd.<br>Chicago, IL 60604-3507 |
| U.S. Oil & Refining Company<br>P.O. Box 2255<br>Tacoma, WA 98401 | Unimin Corporation<br>258 Elm Street<br>New Canaan, CT 06840 | United Quality Cooperative<br>240 3rd Street S.<br>New Town, ND 58763 |

| Vinson & Elkins, LLP<br>PO Box 301019<br>Dallas, TX  75303-1019<br>Fax:  (713) 758-2346<br>Email:  kliekefett@velaw.com | Wells Fargo Dealer Services<br>PO Box 25341<br>Santa Ana, CA  92799-5341 | World Fuel Services, Inc.<br>ATTN:  Carlos Fornari<br>9800 NW 41st St., Suite 400<br>Miami, FL  33178 |
|---|---|---|
| Woodburn & Wedge<br>6100 Neil Road<br>Suite 500<br>Reno, NV  89505<br>Fax:  (775) 688-3088<br>Email:<br>GBarnard@woodburnandwedge.<br>com | | |

via facsimile (where available), email (where available), or U.S. Mail to the addresses listed above, and electronically by Notice of Electronic Filing upon all parties who have requested electronic service in these cases by filing the same via ECF with the Bankruptcy Court in the District of Minnesota.

/e/ Jimmy D. Parrish
Jimmy D. Parrish