UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | | |
|---|---|---|
| Dakota Plains Holdings, Inc., | | Case No. 16-43711 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Transloading, LLC, | | Case No. 16-43712 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Sand, LLC, | | Case No. 16-43715 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Marketing, LLC, | | Case No. 16-43716 |
| | Debtor. | Chapter 11 Case |
| DPTS Marketing LLC, | | Case No. 16-43717 |
| | Debtor. | Chapter 11 Case |
| Dakota Petroleum Transport Solutions, LLC, | | Case No. 16-43718 |
| | Debtor. | Chapter 11 Case |
| DPTS Sand, LLC, | | Case No. 16-43721 |
| | Debtor. | Chapter 11 Case |

**DECLARATION OF MARTY BESKOW IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Marty Beskow, declare as follows:

1. I am the Chief Financial Officer, Dakota Plains Holdings, Inc., one of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"). In this capacity, I am familiar with the day-to-day operations, businesses and financial affairs of the Debtors.

2. Dakota Plains Holdings, Inc. is the parent of Dakota Plains Transloading, LLC, Dakota Plains Sand, LLC, and Dakota Plains Marketing, LLC. Dakota Petroleum Transport Solutions, LLC is a wholly-owned subsidiary of Dakota Plains Transloading, LLC. DPTS Sand,

LLC is a wholly-owned subsidiary of Dakota Plains Sand, LLC.  And, DPTS Marketing LLC is a wholly-owned subsidiary of Dakota Plains Marketing, LLC.

3. As described more fully below, the commencement of these cases resulted from the significant and well publicized pressures in the North American oil and gas industry, the global decline in oil prices and the liquidity pressures placed upon the Debtors stemming from the foregoing.  In 2016, the Debtors, upon consultations with their Boards of Directors and advisors, decided to evaluate all of their options, including the marketing of their assets for a sale to maximize the value of the assets for the benefit of all creditors and preserve jobs.  It was contemplated that if a buyer could be found, the sale would be consummated through a sale in bankruptcy.  The Debtors engaged Canaccord Genuity Inc. ("**Canaccord**") to develop and execute a marketing strategy and sale process with respect to the Debtors' businesses as going concerns on an expedited basis to maximize value for the benefit of all stakeholders and constituents.  The Debtors intend to seek court approval of a sale transaction to achieve this goal.

4. I submit this Declaration in support of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code, the "first-day" relief that the Debtors have requested in certain motions filed with the Court (collectively, the "**First Day Motions**"), and to assist the Court and other interested parties in understanding the circumstances that compelled the commencement of these chapter 11 cases.

5. The relief sought in the First Day Motions is intended to enable to the Debtors to operate effectively and minimize disruptions that might otherwise result from the commencement of these chapter 11 while the Debtors' assets are sold.  In particular, the First Day Motions seek relief aimed to maintain employee morale and supplier confidence, both of which are critical to the Debtors' efforts to maximize the value of their estates.  I have reviewed

the First Day Pleadings and I believe that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business for the benefit of all parties in interest.

6. Part I of this Declaration provides an overview of the Debtors' businesses, organizational structure, significant indebtedness, and financial performance. Part II provides an overview of the Debtors' proposed sale and postpetition financing. Part III sets forth relevant facts in support of the First Day Pleadings.

**I.     The Debtors' Businesses, Organizational Structure, Indebtedness and Performance**

*Core Business Operations*

7. The Debtors are an integrated midstream energy company whose headquarters are located in Wayzata, Minnesota. Founded in 2008, the Debtors own and operate a 200-acre rail terminal (the "**Pioneer Terminal**") in the heart of the Bakken and Three Forks plays of the Williston Basin in North Dakota—Mountrail, McKenzie, Williams and Dunn. The Pioneer Terminal is located at the terminus of the Canadian Pacific line and has strategic proximity to the only Missouri River Bridge crossing for nearly 80 miles. The Debtors' business is comprised of "outbound operations," which includes transloading crude oil from trucks and pipelines, storing in tanks and transloading onto trains, and "inbound operations," which includes offloading frac sand from trains, storing in silos and transloading onto trucks.

*Organizational Structure*[1]

8. Dakota Plains Holdings, Inc. ("**Holdings**") is an integrated midstream energy company, principally focused on developing and owning transloading facilities and transloading crude oil and related products with the Williston Basin in North Dakota.

---

[1] A copy of the current corporate organizational chart is attached hereto as **Exhibit A**.

9. Debtor Dakota Plains Transloading, LLC ("**Dakota Transloading**"), a wholly-owned subsidiary of Holdings, was formed in August 2011 primarily to participate in the ownership and operation of a transloading facility near New Town, North Dakota through which producers, transporters and marketers could transload crude oil and related products from and onto the Canadian Pacific Railway.

10. Debtor Dakota Plains Sand, LLC ("**Dakota Sand**"), a wholly-owned subsidiary of Holdings, was formed in May 2014 primarily to participate in the ownership and operation of a sand transloading facility near New Town, North Dakota.

11. Debtor Dakota Plains Marketing, LLC ("**Dakota Marketing**"), a wholly-owned subsidiary of Holdings, was formed in April 2011 primarily to engage in the purchase, sale, storage, transport and marketing of hydrocarbons produced within North Dakota to or from refineries and other end-users or persons. Effective November 30, 2014, Dakota Marketing ceased the purchase and sale of crude oil.

12. Debtors Dakota Petroleum Transport Solutions, LLC ("**Dakota Petroleum**"), DPTS Sand, LLC ("**DPTS Sand**") and DPTS Marketing LLC ("**DPTS Marketing**") were acquired on December 5, 2014 pursuant to the Purchase Agreement (discussed below) and are subsidiaries of Dakota Transloading, Dakota Sand, and Dakota Marketing, respectively.

*Significant Indebtedness*

13. Consistent with the information reported in the Form 10-Q filed by Dakota Plains Holdings, Inc. with the Securities and Exchange Commission for the quarter ended September 30, 2016 (the "**Form 10-Q**"), the Debtors' chapter 11 petitions identify consolidated liabilities totaling approximately $76.4 million. The Debtors' debt obligations consist primarily of the following:

*The Prepetition Credit Facility*

14. Debtors Dakota Plains Transloading, LLC, Dakota Plains Sand, LLC, and Dakota Plains Marketing, LLC (collectively, the "**Borrowers**") are borrowers under that certain *Revolving Credit and Term Loan Agreement* (the "**Original Credit Agreement**") dated as of December 5, 2014, by and among: (a) the Borrowers, (b) Holdings, (c) the lenders party thereto from time to time (the "**Prepetition Lenders**"), and (d) SunTrust Bank, as administrative agent (in such capacity, the "**Prepetition Agent**" and, together with the Prepetition Lenders, the "**Prepetition Secured Parties**").

15. Pursuant to the terms of the Original Credit Agreement, the Prepetition Lenders extended a revolving credit facility and term loans to the Borrowers to provide (a) funds for closing the Membership Purchase Agreement (discussed below), (b) refinance existing indebtedness, (c) funds for future permitted acquisitions, (d) funds for the Borrowers' working capital and capital expenditures, and for other general corporate purposes, and (e) other permitted purposes.

16. The Original Credit Agreement provides for a revolving credit facility of $20 million (the "**Revolving Loan Facility**") and one or more tranches of term loans in the aggregate amount of $37.5 million (the "**Term Loans**" and, together with the Revolving Loan Facility, the "**Prepetition Facility**"). The Revolving Loan Facility matures on December 5, 2017, at which time all borrowings under the Revolving Loan Facility must be repaid in full. The first tranche of the Term Loans in the amount of $15 million is payable in quarterly installments with the first payment due on March 31, 2015 and a maturity date of December 5, 2017. Repayment of the second tranche of Term Loans in the amount of $22.5 million is due on January 5, 2017. The

Debtors were in default under the Revolving Loan Facility and have executed a Forbearance Agreement (discussed below).

17. Pursuant to (a) that certain *Guaranty and Security Agreement* dated as of December 5, 2012 by the Borrowers, Holdings, and the Prepetition Agent, and (b) that certain *Joinder Agreement* dated as of December 5, 2014 by DPTS Marketing, Dakota Petroleum, and DPTS Sand (collectively, the "**Prepetition Subsidiary Guarantors**") and the Prepetition Agent, the indebtedness owed to the Prepetition Secured Parties is secured by first priority liens on, and security interests in, substantially all of the assets of the Borrowers, Holdings, and the Prepetition Subsidiary Guarantors (the "**Prepetition Collateral**").

18. The Original Credit Agreement contains customary events of default, including nonpayment of principal when due; nonpayment of interest after stated grace period; fees or other amounts after stated grace period; material inaccuracy of representations and warranties; violations of covenants; certain bankruptcies and liquidations; any cross-default to material indebtedness; certain material judgments; certain events related to the Employee Retirement Income Security Act of 1974, as amended, or "ERISA," actual or asserted invalidity of any guarantee, security document or subordination provision or non-perfection of security interest, and a change in control (as defined the Original Credit Agreement).

19. Beginning in August 2015, the Debtors executed a series of amendments to the Original Credit Agreement: (a) that certain *Amendment No. 1 to Revolving Credit and Term Loan Agreement* dated as of August 6, 2015 (the "**First Amendment**"), (b) that certain *Amendment No. 2 and Waiver to Revolving Credit and Term Loan Agreement* dated as of December 4, 2015 (the "**Second Amendment**"), (c) that certain *Amendment No. 3 to Revolving Credit and Term Loan Agreement* dated as of July 5, 2016 (the "**Third Amendment**") and

(d) that certain *Amendment No. 4 to Revolving Credit and Term Loan Agreement and One Time Waiver of Borrower Requirements* dated as of August 5, 2016 (the "**Fourth Amendment**" and together with the Original Credit Agreement, the First Amendment the Second Amendment, and the Third Amendment, the "**Prepetition Credit Agreement**" and together with each of the Loan Documents thereto (each as defined therein), the "**Prepetition Loan Documents**"). Pursuant to the foregoing amendments, and the *Forbearance Agreement* entered into on May 3, 2016, the Prepetition Lenders agreed to forbear from exercising their rights and remedies under the Prepetition Credit Agreement.

20. As of December 20, 2016, the Debtors were indebted and liable to the Prepetition Agent and the Prepetition Secured Parties under the Prepetition Loan Documents, without objection, defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $56,925,000 with respect to the Prepetition Facility, plus accrued interest (including paid-in-kind interest) in the amount of $4,719,401.06, plus unpaid amendment fees thereon in the additional amount of approximately just over $1,019,250 plus, in connection with the foregoing amounts, certain expenses, and all other obligations payable under the Prepetition Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the Prepetition Loan Documents.

### *The 2014 Transactions and the Subordinated Obligations*

21. On December 5, 2014, Holdings entered into a *Membership Interest Purchase Agreement* (the "**Purchase Agreement**") with Dakota Transloading, Dakota Sand, Dakota Marketing, and Petroleum Transport Solutions, LLC ("**PTS**"). Pursuant to this Purchase Agreement, in exchange for $43 million and the Operational Override (as defined below), (a) Dakota Transloading acquired all of the membership interests of Dakota Petroleum,

- 7 -

(b) Dakota Sand acquired all of the membership interests of DPTS Sand, and (c) Dakota Marketing acquired all of the membership interests of DPTS Marketing. The Purchase Agreement contains certain representations, warranties, covenants and indemnification obligations of the parties.

22.     In addition to the $43 million in cash paid to PTS at closing, Holdings agreed to pay PTS an amount equal to $0.225 per barrel of crude oil arriving at the Pioneer Terminal, up to a maximum of 80,000 barrels of crude oil per day (for a per day maximum payment of $18,000 through December 31, 2026 (the "**Operational Override**"). In the event such Operational Override payments, in the aggregate, are less than $10 million, Holdings is obligated to pay PTS the difference on or before January 31, 2027. Holdings also has the option of paying an amount equal to the then-present value (using a 9% discount rate) of the maximum remaining Operational Override payments (assuming maximum volume for the period between the prepayment date and December 31, 2026). Consistent with the Form 10-Q, Holdings estimates that its liability in respect of the Operational Override is approximately $7.4 million.

23.     In connection with the Purchase Agreement, on December 5, 2014 Holdings entered into an *Indemnification and Release Agreement* (the "**Indemnification Agreement**") with World Fuel Services Corporation ("**WFS**"). Pursuant to this Indemnification Agreement, WFS, on behalf of itself and its subsidiaries, agreed to indemnify Holdings, Dakota Petroleum and DPTS Marketing for third party claims relating to a train car derailment that occurred in Lac-Mėgantic, Quebec on July 6, 2013 (the "**Derailment**").

24.     In addition, Holdings, Dakota Transloading and Dakota Marketing agreed to indemnify WFS for (a) 50% of the documented out-of-pocket costs and expenses incurred by WFS as a result of or arising out of certain obligations to railcar lessors and (b) 50% of the

documented out-of-pocket defense costs and legal expenses incurred by WFS in connection with the Derailment (the "**WFS Indemnity Obligations**"). Holdings' and its affiliate's total exposure under the Indemnification Agreement is limited to $10 million in the aggregate. All of the WFS Indemnity Obligations are net of any insurance proceeds received. To support its indemnification obligations, Holdings placed $3 million in escrow.

25. Also, on December 5, 2014, Holdings, Dakota Transloading, Dakota Sand, and Dakota Marketing entered into a *Seller Guaranty and Security Agreement* dated December 5, 2014 (the "**Guaranty and Security Agreement**") in favor of WFS. Pursuant to this Guaranty and Security Agreement, Dakota Transloading, Dakota Sand, Dakota Marketing and Holdings guaranteed (a) Holdings' obligations under Section 2.2(b) of the Purchase Agreement in respect of the Operational Override (the "**Operational Override Payments**"), (b) Holdings' WFS Indemnity Obligations arising under Section 2(b) of the Indemnification Agreement, and (c) DPTS Marketing's obligations under certain railcar sublease agreements between DPTS and Western Petroleum Company ("**Western**") (the "**Railcar Lease Obligations**").

26. The parties' obligations for the Operational Override Payments, the WTS Indemnity Obligations, and the Railcar Lease Obligations (collectively, the "**Subordinated Obligations**") are (a) secured by a second priority lien in all of the parties' assets and (b) are contractually subordinated to senior indebtedness owed to the Prepetition Lenders (as defined below) pursuant to the terms of the *Seller Subordination Agreement* dated as of December 5, 2014 (the "**Subordination Agreement**") between WFS, PTS, World Fuel Services, Inc., Western and SunTrust Bank, as administrative agent for the Prepetition Lenders.

*2016 Settlement with WFS*

27.   On March 15, 2016, Holdings and certain of its affiliates executed a Settlement Agreement with WFS and certain of its affiliates. Pursuant to this Settlement Agreement, the $3 million of previously restricted cash was released by WFS. Holdings received approximately $1.9 million of the previously restricted cash, and $1.1 million of the previously restricted cash was paid to WFS as reimbursement for Holdings' portion of the legal and professional costs incurred in connection with the Indemnification Agreement. Holdings and certain of its affiliates also released certain claims against WFS related to the historical railcar storage fees of approximately $1.3 million and rights to indemnification under the Indemnification Agreement. As an additional condition to the Settlement Agreement, Holdings and its affiliates also released 89,894 barrels of crude oil that had been retained due to the non-payment of outstanding railcar storage and crude oil transloading invoices.

*Financial Performance*

28.   In 2013, the Pioneer Terminal had nearly $70 million in capital expenditure projects for crude oil and frac sand operations. In the fiscal year 2015, the Debtors transloaded approximately 16.8 million barrels of crude oil and 600,000 tons of sand, which generated a total revenue of approximately $29 million.

29.   The Debtors fortunes changed as a result in the global decline in oil prices, which adversely impacted the demand for the services offered by the Debtors at the Pioneer Terminal. For twelve months ended December 31, 2015, the Debtors had a net income of approximately $8.5 million and an adjusted EBITDA of approximately $23.4 million. For the nine months ended September 30, 2016, the Debtors had an adjusted EBITDA loss of approximately $4.5 million. As of September 30, 2016, the Debtors had cash and cash equivalents and trade

receivables of approximately $7.0 million and accounts payable and accrued expenses of approximately $13.4 million. The Debtors have approximately 25 employees. A key goal of these proceedings is to facilitate a going concern sale that preserves these jobs.

*Ongoing Litigation*

30.    There are two ongoing litigations matters. First, there is litigation pending between WFS and the Debtors. On April 13, 2016, notwithstanding the March 2016 Settlement Agreement discussed above, WFS filed a complaint against the Debtors in the United States District Court for the Southern District of New York (Case No. 1:16-cv-02774-RA) asserting that (a) the Debtors materially breached the Guaranty and Security Agreement and that certain Joinder Agreement dated as of December 5, 2014 by failing to satisfy the obligations of Holdings to make Operational Override Payments (Count I), and (b) the Debtors materially breached the Guaranty and Security Agreement and that certain Joinder Agreement dated as of December 5, 2014 by failing to satisfy the obligations of DPTS Marketing to pay certain Railcar Lease Obligations (Count II). The Debtors moved to dismiss WFS's complaint on May 25, 2016.

31.    Second, there is currently litigation pending between Mr. Ryan Gilbertson and Holdings. On September 28, 2016, Mr. Gilbertson filed a complaint against Holdings in the District Court of Hennepin County, Minnesota (Case No. 27-CV-16-14393) asserting that Holdings breached an indemnification provision found in a December 2013 *Adjustment, Extension and Loan Agreement*. Mr. Gilbertson seeks the immediate payment of $344,099.32 in legal fees, plus the payment of his ongoing and future legal fees incurred in connection with an SEC investigation against him.

32.    On October 13, 2016, Holdings filed is *Answer, Affirmative and Other Defenses, and Counterclaims*, denying certain of Mr. Gilbertson's allegations, raising multiple defenses

against his claims, and asserting counterclaims against Mr. Gilbertson for fraud in the inducement (Count I) and unjust enrichment (Count II). The Debtors estimate that Mr. Gilbertson is liable to Holdings for amounts in excess of $18 million. On October 31, 2016, the SEC filed a lawsuit against Mr. Gilbertson in the United States District Court for the District of Minnesota (Case No. 16 CV 3779).

## II.     The Proposed Sale and Postpetition Financing

33.     Before the Petition Date, the Debtors explored several strategic alternatives to address balance sheet issues and the financial pressures caused by the global decline in oil prices, including (a) engaging in discussions with SunTrust Bank focused on restructuring the existing promissory note obligations, (b) minimizing capital expenditures, (c) reducing general and administrative expenses, (d) managing the operating costs at the transloading facility, and (e) considering bankruptcy protection. Having explored these alternatives, the Debtors have determined that a sale of substantially all of their assets would maximize the value of their assets for all stakeholders. The Debtors engaged in a sale process prepetition, spanning a sixth month period, in order to locate a purchaser for its assets.

34.     Further, the Debtors negotiated a $2.0 million postpetition financing facility with SunTrust Bank, as administrative agent on behalf of financial institutions comprised of certain Prepetition Lenders, to provide them with sufficient runway to execute a value-maximizing sale process. Pursuant to the proposed *Interim Order (I) Granting an Expedited Hearing, (II) Authorizing the Debtors (A) to Utilize Cash Collateral of the Prepetition Secured Parties, (B) to Obtain Postpetition Secured Financing, and (C) to Provide Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief*, the Debtors are required to expeditiously move toward a number of sale milestones. The sale

milestones are structured to allow for the Debtors' sale of substantially all of their assets to be closed within approximately 60 days of the start of these cases.

35. In order to fully and adequately market their assets, the Debtors engaged Canaccord to serve as their investment banker. Over the past six (6) months, Canaccord has employed a comprehensive marketing process to identify potential bidders for the Debtors' assets.

36. Beginning in June 2016, Canaccord initially contacted sixty-six (66) potential bidders, representing both financial and strategic potential buyers, using its proprietary databases and market knowledge. Of these contacted potential bidders, all either reviewed a teaser document or participated in high-level discussions about the transaction. Twelve (12) of these initial bidders ultimately negotiated non-disclosure agreements ("**NDAs**") and were either provided access to a virtual data room ("**VDR**") containing detailed information about the Debtors' assets, the confidential information memorandum ("**CIM**") or to management to conduct substantial due diligence.

37. Interested parties participated in initial discussions with Canaccord to conduct preliminary diligence. Parties that indicated additional interest and provided reasonable proof of financial wherewithal received a NDA. Upon executing the NDA, parties were provided with further due diligence, including a copy of the CIM as well as access to a VDR with over 4,500 pages of information. In addition to the detailed diligence opportunity, Canaccord hosted multiple management calls and had extensive discussions regarding the assets, transaction timing and purchase price. Two parties submitted term sheets; however, one party declined to proceed with its offer and the other term sheet was not deemed actionable. As of the end of August 2016, Canaccord was unable to locate a buyer for all or substantially all of the Debtors' assets.

38. Following the initial submission of term sheets, Canaccord continued to field inbound inquiries from third parties and address due diligence requests. During this time, four (4) additional parties executed the NDA and received access to the due diligence materials, including the CIM and VDR.

39. Beginning in October 2016, Canaccord contacted the sixteen (16) parties that had previously executed an NDA with the Debtors up to that point and communicated to them SunTrust Bank's "release price" range. Initial feedback was positive and eleven (11) of the parties sought access to a revised CIM and updated VDR. Beginning on November 2, 2016, Canaccord initiated a larger outreach process, contacting over one hundred and nine (109) total parties, forty-three (43) of which were new process participants in addition to those initially contacted during the summer of 2016. In total, thirty-one (31) parties signed NDAs and received the CIM, process letter and were granted access to the VDR.

40. Canaccord's re-marketing process was successful. On November 18, 2016, Canaccord received five (5) signed letters of intent ("**LOIs**"). Following receipt of the LOIs, Canaccord posted the Debtors' form of purchase agreement and related schedules to the VDR. In addition, Canaccord circulated to all bidders a new process letter outlining the procedures to conduct final due diligence and describing the timeline and requirements to submit a qualified stalking horse bid. To assist bidders in completing their diligence, Canaccord facilitated three (3) onsite visits to the Debtors' Pioneer Terminal, three (3) customer calls, eleven (11) diligence and purchase agreement discussion calls and numerous supplemental document requests.

41. On December 13, 2016, Canaccord received four (4) bids, including marked purchase agreements. Following the bid deadline, Canaccord held numerous discussions with all bidders in an effort to improve the economic terms of their bids. As a result of these discussions,

BioUrja Trading, LLC agreed to increase its original purchase price by $200,000, along with consenting to other considerations requested by the Debtors in order to strengthen their bid terms. Following Canaccord's recommendation, and after consultation with the Debtors' senior lender, the Debtors selected BioUrja Trading, LLC as their "**Stalking Horse Bidder**" and the Debtors began immediately negotiating definitive documents.

42. On December 19, 2016, the Debtors and the Stalking Horse Bidder entered into an *Asset Purchase Agreement* (including all exhibits and schedules related thereto, the "**Stalking Horse Purchase Agreement**"), whereby the Stalking Horse Bidder proposes to purchase substantially all of the Debtors' assets for cash consideration of approximately $8.550 million. The Stalking Horse Purchase Agreement will serve as a competitive baseline of recovery for the Debtors' stakeholders. The proposed transaction, if approved, will generate significant value for the Debtors' estates, and among other things, satisfy a significant portion of the prepetition claims against the Debtors.

43. Based on all of the Debtors' efforts to facilitate a value maximizing sale and obtain sufficient financing to preserve the going concern value of the Debtors' businesses, I believe that no lender would lend to the Debtors without receiving a senior lien on the Prepetition Collateral. The terms of the proposed postpetition financing facility are fair and reasonable under the circumstances. In pursuing and negotiating both the Stalking Horse Purchase Agreement and the proposed postpetition financing facility, I and other representatives of the Debtors are exercising prudent business judgment consistent with our fiduciary duties. These negotiations are proceeding in good faith and at arm's length.

### III.    Relief Sought in First Day Pleadings to Maintain the Debtors' Businesses

44. Concurrently with the filing of their chapter 11 cases, the Debtors also filed a number of First Day Motions. The Debtors anticipated that the Court will conduct a hearing

soon after the commencement of their chapter 11 cases at which the Court will hear and consider certain First Day Motions. The Debtors also anticipate that the Court will consider other motions and applications file on the Petition Date at a later time.

45. Generally, the First Day Motions have been designed to meet the goals of (a) continuing the Debtors' operations in chapter 11 with as little disruption and loss of productivity as possible, (b) maintaining the confidence and support of customers, employees, vendors and service providers and certain other key constituencies, (c) obtaining necessary postpetition financing, and (d) establishing procedures for the smooth and efficient administrative of these chapter 11 cases. I have reviewed each of the First Day Motions, including the exhibits thereto and supporting memorandum of law, and I believe that the relief sought in each of the First Day Motion is tailored to meet these goals.

46. I also believe that it is critical that the First Day Motions be heard as soon as possible. If the First Day Motions are not granted on an expedited basis, the Debtors will not have access to cash and will be unable to fulfill their obligations to, among others, employees, customers, and suppliers. The impact of such stoppage would be immediate and irreparable. Accordingly, expedited approval of the First Day Motions is critical to the continued viability of the Debtors and in the best interests of all of the Debtors' stakeholders.

I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information and belief.

Dated: December 20, 2016

*/s/ Marty J Beskow*
Marty Beskow
Chief Financial Officer
Dakota Plains Holdings, Inc.