UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Dakota Plains Holdings, Inc., | Case No. 16-43711 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Transloading, LLC, | Case No. 16-43712 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Sand, LLC, | Case No. 16-43715 |
| Debtor. | Chapter 11 Case |
| Dakota Plains Marketing, LLC, | Case No. 16-43716 |
| Debtor. | Chapter 11 Case |
| DPTS Marketing LLC, | Case No. 16-43717 |
| Debtor. | Chapter 11 Case |
| Dakota Petroleum Transport Solutions, LLC, | Case No. 16-43718 |
| Debtor. | Chapter 11 Case |
| DPTS Sand, LLC, | Case No. 16-43721 |
| Debtor. | Chapter 11 Case |

**APPLICATION BY DEBTORS TO EMPLOY CANACCORD GENUITY INC. AS INVESTMENT BANKER *NUNC PRO TUNC* TO THE PETITION DATE**

TO:  United States Bankruptcy Judge and the United States Trustee and other parties in interest identified in Local Rule 2014-1.

1.      On December 20, 2016 (the "**Petition Date**"), Dakota Plains Holdings, Inc. and its affiliated debtors and debtors in possession in these proceedings (collectively, the "**Debtors**") commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**").

2.      The Debtors wish to employ Canaccord Genuity Inc. ("**Canaccord**") as their investment banker *nunc pro tunc* to the Petition Date, in accordance with the terms and conditions set forth in that certain Engagement Letter, dated as of June 10, 2016, and that certain

Amendment No. 1 to Agreement, dated as of December 15, 2016 (together, the "**Engagement Letter**"), a copy of which is attached hereto as **Exhibit A**.[1]

3.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, Rule 5005 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule 1070-1.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Debtors' chapter 11 cases are currently pending in this Court.

4.      This Application arises under sections 327(a) and 328 of the Bankruptcy Code and Bankruptcy Rule 2014(a).  This Application is filed under Local Rules 2014-1 and 9013-4.

5.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed.

6.      A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the Declaration of Marty Beskow in Support of Chapter 11 Petitions and First Day Motions (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated by reference herein.

### RELIEF REQUESTED

7.      By this application (the "**Application**"), the Debtors seek entry of an order in substantially the form included herewith authorizing the Debtors, pursuant to sections 327(a) and

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Engagement Letter.

328 of the Bankruptcy Code, Bankruptcy Rules 2014(a) and Local Rules 2014-1 and 9013-4, to

employ Canaccord as their investment banker *nunc pro tunc* to the Petition Date, in accordance

with the terms and conditions set forth in the Engagement Letter, as more fully described in this

Application and in the *Unsworn Declaration of Geoffrey Richards in Support of Application by*

*Debtors to Employ Canaccord Genuity Inc. as Investment Banker Nunc Pro Tunc to the Petition*

*Date* attached hereto as **Exhibit B** (the "**Richards Declaration**").

## DISCUSSION

8.      Canaccord is an independent and full-service global investment banking firm

offering investment banking, equity research, wealth management, institutional and private

brokerage and private capital solutions to individual and institutional clients.  Canaccord

employs over 2,000 individuals and has 20 locations in 10 countries worldwide, including

Chicago, New York, Boston, San Francisco, London, Toronto, Vancouver, Paris, Sydney, Hong

Kong, and Singapore.  In fiscal year 2015, Canaccord executed 267 public and private financing

transactions, raising approximately $30.1 billion.  During the same period, Canaccord advised on

39 M&A assignments with an aggregate value of over $8.1 billion.

9.      The Debtors selected Canaccord because Canaccord's professionals have

considerable expertise and experience in providing investment banking services to financially-

distressed companies and to creditors, purchasers, bondholders, and other constituencies in

chapter 11 as well as out-of-court proceedings.  Representative clients which investment bankers

at Canaccord have advised in prior chapter 11 engagements include AbitibiBowater; American

Eagle Energy Corporation; American IronHorse Motorcyles, Inc.; BI-LO, LLC; Diamond Glass

Companies, Inc.; Gateway Ethanol, LLC; Giordano's Enterprises, Inc.; Gulf Fleet Holdings, Inc.;

HMX Acquisitions Corp.; International Garden Products, Inc.; KeyLime Cove Waterpark, Inc.;

Loehmann's Holdings, Inc.; Max & Erma's, Inc.; National Envelope Corporation; OptiCanada,

Inc.; Renew Energy, Inc.; Response Genetics, Inc.; Robbins Bros. Corporation; Santa Fe Gold

Corporation; SynCardia Systems, Inc.; TimberWest; Waterworks, Inc.; and Yellow Media, Inc.

10.     As set forth in the Richards Declaration, Canaccord was engaged prior to the

Petition Date to provide investment banking services to the Debtors pursuant to the Engagement

Letter.  As a result of rendering prepetition services to the Debtors, Canaccord is intimately

familiar with the Debtors' corporate and capital structure, management, operations, and various

other aspects of their businesses.  Canaccord has a well-developed knowledge of the Debtors'

financial history and business operations and is well-suited to provide the Debtors with the

investment banking services contemplated by the Engagement Letter.

## SCOPE OF SERVICES

11.     Canaccord commenced its engagement as investment banker to the Debtors in

June 2016.  Pursuant to the Engagement Letter, Canaccord served as the Debtors' financial

advisors and investment banker in connection with any Recapitalization Transaction and M&A

Transaction (each as defined in the Engagement Letter, and collectively, a "**Transaction**").

12.     As outlined in the Engagement Letter, the Debtors propose to continue to retain

Canaccord to render, among other things, the following investment banking services to the

Debtors:

   (a)     review and analyze the Debtors' business and financial projections;

   (b)     evaluate the Debtors' strategic and financial alternatives;

   (c)     assist the Debtors in evaluating, structuring, negotiating and
           implementing a potential Transaction;

   (d)     assist the Debtors in preparing descriptive material to be provided
           to potential parties that might participate in potential Transactions;

   (e)     develop, update and review with the Debtors on an ongoing basis a
           list of parties that might participate in a potential Transaction;

- 4 -

(f)      contact potential parties to potential Transactions;

(g)      provide summaries to the Debtors of communications with potential parties to potential Transactions;

(h)      assist the Debtors and their counsel with evaluating potential term sheets, indications of interest, letters of intent and other Transaction agreements;

(i)      assist in the development of presentations to the Debtors' boards of directors and representatives, and to various creditors, committees and other parties, as the Debtors shall reasonably request;

(j)      in the event the Debtors seek relief under the Bankruptcy Code in order to pursue a possible Transaction or otherwise, and if requested by the Debtors and its counsel, participate in hearings before the Bankruptcy Court;

(k)      provide relevant testimony with respect to the matters described herein and arising in connection with any Transaction or any proposed plan of reorganization;

(l)      evaluate, structure and negotiate the terms and conditions of any proposed Transaction whether in connection with a confirmed chapter 11 plan or otherwise;

(m)      together with the Debtors and their counsel, prepare for and participate in meetings with the Debtors' existing lenders, creditor groups, official constituencies and other interested parties, as necessary;

(n)      assist the Debtors and their counsel in negotiating agreements and definitive contracts for Transactions; and

(o)      perform other such services as Canaccord and the Debtors may mutually agree upon in a separate writing.

## **COMPENSATION**

13.      Canaccord will seek the Court's approval of its compensation for professional services rendered and reimbursement of expenses incurred in connection with the Debtors' chapter 11 cases in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the guidelines established by the Office of the United States

Trustee for Region 12 (the "**U.S. Trustee**"), and any other applicable procedures and orders of the Court consistent with the proposed compensation set forth in the Engagement Letter.

14.     Investment bankers such as Canaccord do not charge for its services on an hourly basis.  Instead, they customarily charge fees that are contingent upon the occurrence of a specified type of transaction.  The Engagement Letter sets forth the transaction-based fees that are to be payable to Canaccord.

15.     As set forth more fully in the Engagement Letter, and subject thereto, Canaccord will be compensated as follows (the "**Fee Structure**"):

(a)     Monthly Fees.  In addition to the other fees described below and as further provided for in the Engagement Letter, the Debtors shall pay Canaccord a fee due, earned and fully payable in the amount of $35,000 on June 10, 2016 and on the first business day of each month thereafter, a fee in the amount of $35,000 (the "**Monthly Fees**").  The first three Monthly Fees actually paid to Canaccord shall be 50% credited against any Success Fee (as defined below). There shall be no crediting of any subsequent Monthly Fee against any Success Fee.

(b)     Success Fee.  A fee (the "**Recapitalization Fee**") equal to $600,000 upon the consummation of any Recapitalization Transaction.  Upon the consummation of an M&A Transaction, a fee (the "**M&A Fee**" and, together with the Recapitalization Fee, a "**Success Fee**") equal to the sum of (i) $600,000, plus (ii) 5.00% of that portion of the Aggregate Consideration (as defined below) in excess of $8,250,000 and less than or equal to $9,250,000, plus (iii) 10.00% of that portion of the Aggregate Consideration in excess of $9,250,000.  If a Transaction constitutes both a Recapitalization Transaction and an M&A Transaction, then Canaccord shall be entitled to the greater of such applicable minimum fees.

(c)     DIP Financing Fee.  A fee (the "**DIP Financing Fee**") in the amount of $75,000 due, earned and payable upon the consummation of a debtor-in-possession financing.  A DIP Financing Fee shall not be earned if debtor-in-possession financing is provided by SunTrust Bank, N.A.

(d)     Aggregate Consideration.  For purposes of the Engagement Letter, the term "**Aggregate Consideration**") means the cumulative value

of the M&A Transaction, representing the total value of the Debtors implied by the sum of (x) the total amount of cash and fair market value (on the date of payment) of all of the property paid or payable in connection with the M&A Transaction, including amounts paid or payable in respect of, if any, convertible securities, preferred equity securities, warrants, stock appreciation rights, options or similar rights, whether or not vested, plus (y) the principal amount of all indebtedness for borrowed money of the Debtors as set forth on the most recent balance sheet plus the excess of the projected liability of any pension plan over its assets for the last completed reporting period prior to close, or, in the case of the sale of assets, all liabilities assumed by the third party.

(e)     Expenses.  In addition to all of the other fees described in the Engagement Letter, the Debtors shall reimburse Canaccord, upon its request, for all reasonable expenses incurred by Canaccord in connection with the initiation and performance of the engagement, and the enforcement of the Engagement Letter.

16.     Indeed, Canaccord's industry and restructuring experience, its capital markets knowledge, financing skills, and mergers and acquisitions capabilities, some or all of which may be required by the Debtors during the term of Canaccord's engagement, were important factors in determining the Fee Structure.  The ultimate benefit to the Debtors of Canaccord's services could not be measured merely by reference to the number of hours to be expended by Canaccord's professionals in the performance of such services.  Moreover, the Fee Structure takes into consideration Canaccord's anticipation that it will need to provide a substantial commitment of professional time and effort in order to perform its duties under the Engagement Letter, and in light of the fact that such commitment may foreclose other opportunities for Canaccord.  Further, the actual time and commitment required of Canaccord and its professionals to render services to the Debtors may vary substantially from week to week or month to month, creaking "peak load" issues for the firm.

17.     Thus, because of Canaccord's expertise, commitment of resources to this engagement to the exclusion of other possible employment, and the time that Canaccord has

devoted and will continue to devote to this engagement, the Debtors request that the Court approve the Fee Structure for Canaccord pursuant to section 328(a) of the Bankruptcy Code and that the Court evaluate the final compensation and reimbursement of expense in the chapter 11 cases for Canaccord under the standards of section 328(a) of the Bankruptcy Code, rather than under those of section 330 of the Bankruptcy Code, subject to Canaccord filing a final fee application seeking approval of the payment of its fees and expenses.

18.     In accordance with Paragraph 9 of this Court's Instructions for Filing a Chapter 11 Case, the Debtors propose that (a) Canaccord be authorized to schedule a hearing on its interim application for allowance of fees and reimbursement of expenses not more than once every approximately 90 days, (b) Canaccord be allowed to submit monthly invoices to the Debtors, with copies to any official committee of unsecured creditors appointed in these chapter 11 cases and the Office of the U.S. Trustee for the District of Minnesota and (c) the Debtors be authorized to pay 80% of such fees and 100% of expenses on a monthly basis subject to later court approval.

**CANACCORD'S DISINTERESTEDNESS**

19.     To the best of the Debtors' knowledge, information and belief, and except to the extent disclosed herein and in the Richards Declaration, Canaccord:  (a) is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code; (b) does not hold or represent an interest materially adverse to the Debtors, their creditors, and shareholders for the matters for which Canaccord is to be employed; and (c) has no connection with the Debtors, their creditors, shareholders, or related parties herein except as disclosed in the Richards Declaration.

20.    As of the Petition Date, Canaccord does not hold a prepetition claim against the Debtors for services rendered.

21.    To the extent any new relevant facts or relationships bearing on the matters described herein during the period of Canaccord's retention are discovered or arise, Canaccord will use reasonable efforts to promptly file a supplemental declaration, as required by Bankruptcy Rule 2014(a).

## RECORDKEEPING

22.    It is not the general practice of investment banking firms, including Canaccord, to keep detailed time records similar to those customarily kept by attorneys.  Because Canaccord does not maintain contemporaneous time records in one-tenth hour increments or provide or conform to a schedule of hourly rates for its professionals, Canaccord respectfully requests that it be excused from compliance with any such requirements in this district.  Instead, Canaccord requests that it be required only to maintain time records in half-hour (0.50) increments setting forth, in a summary format, a description of the services rendered by each professional and the amount of time spent on each date by each such individual in rendering services on behalf of the Debtors.

23.    Canaccord will also maintain detailed records of any actual and necessary costs and expenses incurred in connection with the aforementioned services.  Canaccord's compensation and expenses will be paid by the Debtors pursuant to the terms of the Engagement Letter and Paragraph 9 of this Court's Instructions for Filing a Chapter 11 Case.

## INDEMNIFICATION AND CONTRIBUTION PROVISIONS

24.    The Debtors have agreed, among other things, to indemnify, and provide contribution and reimbursement to, Canaccord and certain related parties in accordance with the

indemnification provisions attached as Exhibit A to the Engagement Letter (the "**Indemnification Provisions**").

25.     The Debtors believe that such provisions are customary and reasonable for Canaccord's engagement. Unlike the market for other professionals that the Debtors may retain, such provisions are standard terms of the market for investment bankers. Canaccord and the Debtors believe that such provisions are comparable to those generally obtained by investment banking and financial advisory firms of similar stature to Canaccord and for comparable engagements, both in and out of court. Accordingly, as part of this Application, the Debtors request that the Court approve the Indemnification Provisions subject to the modifications set forth in the proposed Order.

<u>**NOTICE**</u>

26.     This Application has been served on the parties set out in Local Rule 2014-1(a).

<u>**NO PRIOR REQUEST**</u>

27.     No prior request for the relief sought in this Application has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully requests entry of an order granting the relief requested herein; and granting such other relief as the Court deems just and equitable.

Dated:  December 20, 2016

_____
Marty Beskow
Chief Financial Officer
Dakota Plains Holdings, Inc.

- 10 -

## **EXHIBIT A**

ENGAGEMENT LETTER

CANACCORD Genuity

535 Madison Avenue
New York, NY 10022
United States of America

T: 212.389.8000
www.canaccordgenuity.com

June 10, 2016

***Confidential***

Dakota Plains Holdings, Inc.
294 Grove Lane East
Wayzata, MN 55391
Attention: Craig M. McKenzie, CEO

Dear Mr. McKenzie:

This letter (the "***Agreement***") confirms the terms and conditions of the agreement by and among Dakota Plains Holdings, Inc. (including its controlled affiliates, successors, subsidiaries and assigns, the "***Company***") and Canaccord Genuity Inc. ("***CGI***") regarding the retention of CGI as financial advisor and investment banker to the Company in connection with any Recapitalization Transaction[1] and M&A Transaction[2] (each as defined below and collectively, a "***Transaction***").

Section 1.  Services to Be Rendered.

In connection with the formulation, analysis and implementation of various options for a Transaction or any series or combination of Transactions, CGI will perform the following services as the Company reasonably requests and to the extent feasible:

   (a)    Review and analyze the Company's business and financial projections;

---

[1] As used herein, "***Recapitalization Transaction***" shall mean any one or more of the following: (i) any transaction or series of transactions that effects material amendments to or other material changes in any of the Company's outstanding indebtedness or credit facilities, whether or not currently funded, and other liabilities including any exchange or repurchase of the Company's indebtedness; (ii) any restructuring, reorganization, confirmation of a Plan in the event that the Company files for or consents to relief under chapter 11 of the Bankruptcy Code (as defined herein), exchange offer, consent solicitation, tender offer, refinancing or similar transaction accepted by the Company; or (iii) any transaction similar to any of the foregoing, including a business combination in which the Company's creditors are materially involved in the transaction.

[2] As used herein, "***M&A Transaction***" shall mean any transaction or series of transactions involving (a) an acquisition, merger, consolidation or other transaction with another party through which assets constituting or accounting for not less than a majority of the business or assets of the Company are, directly or indirectly, combined with or transferred to another party; (b) the acquisition, directly or indirectly, by a buyer or buyers of equity interests or options, or any combination thereof constituting a majority or controlling portion of the stock of the Company or possessing a majority or controlling portion of the voting power of the Company; (c) any other purchase or acquisition, directly or indirectly, by a buyer or buyers of a majority or controlling portion of the securities or other interests of the Company (through tender offer, merger, sale, exchange or otherwise); (d) the formation of a joint venture or partnership with the Company or direct investment in the Company for the purposes of affecting a transfer of a majority or controlling interest in the Company to a third party; or (e) any combination of the foregoing.



Dakota Plains Holdings, Inc.
June 10, 2016
Page 2 of 15

(b)     Evaluate the Company's strategic and financial alternatives;

(c)     Assist the Company in evaluating, structuring, negotiating and implementing potential Transactions;

(d)     Assist the Company in preparing descriptive material to be provided to potential parties that might participate in potential Transactions;

(e)     Develop, update and review with the Company on an ongoing basis a list of parties that might participate in potential Transaction;

(f)     Contact potential parties to potential Transactions;

(g)     Provide summaries to the Company of communications with potential parties to potential Transactions;

(h)     Assist the Company and its counsel with evaluating potential term sheets, indications of interest, letters of intent and other Transaction agreements;

(i)     Assist in the development of presentations to the Company's Board of Directors and representatives, and to various creditors, committees and other parties, as the Company shall reasonably request;

(j)     In the event the Company seeks relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in order to pursue a possible Transaction or otherwise, and if requested by the Company and its counsel, participate in hearings before the Bankruptcy Court in which such cases are commenced (the "Bankruptcy Court") and provide relevant testimony with respect to the matters described herein and arising in connection with any Transaction or any proposed plan of reorganization;

(k)     Evaluate, structure and negotiate the terms and conditions of any proposed Transaction, whether in connection with a confirmed chapter 11 plan (a "Plan") or otherwise;

(l)     Together with the Company and its counsel, prepare for and participate in meetings with the Company's existing lenders, creditor groups, official constituencies and other interested parties, as necessary;

(m)     Assist the Company and its counsel in negotiating agreements and definitive contracts for Transactions; and

(n)     Perform other such services as CGI and the Company may mutually agree upon in a separate writing.

In performing its services pursuant to this Agreement, and notwithstanding anything to the contrary herein, CGI is not assuming any obligation or responsibility for the Company's decision to pursue (or not to pursue) any business strategy, or to effect (or not to effect) any Transaction nor designing or implementing operating, organizational, administrative, cash management or liquidity improvements. In addition, notwithstanding anything to the contrary herein, CGI shall not have any obligation or responsibility to provide accounting advice, reserve engineering, audit and "crisis



Dakota Plains Holdings, Inc.
June 10, 2016
Page 3 of 15

management" or business consultant services to the Company, nor any fairness, solvency or other opinions of the firm.

Section 2.  Information Provided by the Company.

(a)     The Company understands and agrees that the services to be rendered by CGI pursuant to Section 1 of this Agreement and the advice, whether formal or informal, relating thereto are solely for the benefit and use of the Company. The Company agrees that any written reports, recommendations or opinions ("**Advice**"), which are provided to the Company in the context of this engagement, shall not be summarized, excerpted from, disclosed publicly, made available to third parties (other than the Company and its subsidiaries' boards of directors and the Company's advisors and counsel each of whom agrees to be bound by the provisions of this Section 2(a), the "**Advice Disclosure**") or otherwise referred to, in whole or in part, without the prior written consent of CGI; provided, however, that if the Company determines in good faith based upon the advice of outside counsel (and after 48 hours advance notice to CGI) that such Advice Disclosure is necessary in order to not be in violation of any applicable law, regulation, order or other similar requirement of any governmental, regulatory, or supervisory authority, the Company will disclose only that portion of the Advice which is legally required to be disclosed. Any reference to CGI in a press release shall be submitted to CGI for its approval, in accordance with the provisions above, prior to the distribution or dissemination thereof. Notwithstanding anything to the contrary contained herein, CGI acknowledges and agrees that certain information derived from, or provided by CGI in connection with its providing its services hereunder may be disclosed by the Company in various public filings, whether under the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, the NYSE MKT or other self-regulatory organizations or equivalents, the Bankruptcy Court, or related press releases.

(b)     The Company will cooperate with CGI and furnish to, or cause to be furnished to, CGI any and all information CGI deems appropriate to enable CGI to render services hereunder (all such information being the "**Information**"). The Company recognizes and confirms that CGI (i) will use and rely on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having assumed any obligation to verify independently the same; (ii) do not assume responsibility for the accuracy or completeness of the Information and such other information; and (iii) will not act in the official capacity of an appraiser of specific assets of the Company or any other party.  The Company confirms that the information to be furnished by the Company, when delivered will be true and correct in all material respects, will be prepared in good faith, and will not contain any material misstatement of fact or omit to state any material fact. The Company will promptly notify CGI if it learns of any material inaccuracy or misstatement in, or material omission from, any Information theretofore delivered to CGI.

(c)     The Company acknowledges that in the course of this engagement it may be necessary for CGI and the Company to communicate electronically. The Company further acknowledges that although CGI will use commercially reasonable procedures to check for the most commonly known viruses and to ensure accuracy of such information and communications, the electronic transmission of information cannot be guaranteed to be secure or error-free. Furthermore, such information could be intercepted, corrupted, lost, destroyed, arrive late



Dakota Plains Holdings, Inc.
June 10, 2016
Page 4 of 15

or incomplete or otherwise be adversely affected or unsafe to use. Accordingly, the Company agrees that, to the extent CGI utilizes such commercially reasonable procedures, CGI shall have no liability to the Company with respect to any error or omission arising from or in connection with (i) the electronic communication of information to the Company or (ii) the Company's reliance on such information.

**Section 3. Fees to CGI.**

As compensation for the services rendered hereunder, the Company agrees to pay CGI the following fees, payable via wire transfer in United States currency:

(a) Monthly Work Fees: A monthly work fee in the amount of $35,000 due, earned and payable in advance in full, on the date hereof and $35,000 due, earned and payable in advance in full on the first business day of every month thereafter commencing on July 1, 2016 (the "*Monthly Work Fees*"). The first three (3) Monthly Work Fees actually paid to CGI shall be 50% credited against any Success Fee. Notwithstanding the foregoing, there shall be no crediting of any subsequent Monthly Work Fees against any Success Fee.

(b) Success Fee: A fee (the "*Recapitalization Fee*") equal to $600,000 upon the consummation of any Recapitalization Transaction. Upon the consummation of an M&A Transaction, a fee (the "*M&A Fee*") equal to 2.5% of Aggregate Consideration (defined below), subject to a $600,000 minimum fee (each as defined and collectively, a "*Success Fee*"). For the avoidance of doubt, if a Transaction constitutes both a Recapitalization Transaction and an M&A Transaction, then CGI shall be entitled to the greater of such applicable minimum fees. Notwithstanding the foregoing, in the event that (i) the Company fails to receive one or more bona fide offers to consummate a M&A Transaction or a Recapitalization Transaction which would result in Aggregate Consideration of not less than the amount set forth on Exhibit B and (ii) the Company consummates a Recapitalization Transaction with SunTrust Bank ("*SunTrust*") pursuant to which SunTrust becomes an insider (as defined in section 101(14) of the Bankruptcy Code) to the Company, as reorganized, through and including the dismissal of a bankruptcy case in which the Company is a debtor, then the Recapitalization Fee shall be limited to $487,500.

(c) DIP Financing Fee: A fee (the "*DIP Financing Fee*") in the amount of $75,000 due, earned and payable upon the consummation of a debtor-in-possession financing. For the avoidance of doubt, a DIP Financing Fee shall not be earned if debtor-in-possession financing is provided by any of the parties identified on Exhibit C, or their affiliates.

The Company and CGI acknowledge and agree that (i) the hours worked, (ii) the results achieved and (iii) the ultimate benefit to the Company of the work performed, in each case, in connection with this engagement, may be variable, and that the Company and CGI have taken such factors into account in setting the fees hereunder.

For purposes hereof, the term "Aggregate Consideration" means cumulative value of the M&A Transaction, representing the total value of the Company implied by the sum of (x) the total amount of cash and the fair market value (on the date of payment) of all of the property paid or payable in connection with the M&A Transaction, including amounts paid or payable in respect of, if any, convertible securities, preferred equity securities, warrants, stock appreciation rights, option or similar rights, whether or not vested, plus (y) the principal amount of all indebtedness for borrowed money of the Company as set forth on the most recent balance sheet plus the excess of the projected liability of any



Dakota Plains Holdings, Inc.
June 10, 2016
Page 5 of 15

pension plan over its assets for the last completed reporting period prior to close, or, in case of the sale of assets, all liabilities assumed by the third party. If the Aggregate Consideration is subject to increase by contingent payments related to future events, the portion of CGI's fee relating thereto shall be calculated by CGI in good faith subject to the Company's reasonable approval, with the full amount paid to CGI upon closing.

For purposes of calculating Aggregate Consideration: (i) in an M&A Transaction involving the sale or transfer, directly or indirectly, of 50% or more of the outstanding common stock or other equity interest in, or assets of, the Company, Aggregate Consideration shall be calculated as if 100% of the outstanding common stock or other equity interest in, or assets of, the Company were sold or transferred for the same amount paid (and otherwise on the same terms) in such M&A Transaction; (ii) the value of any security (as that term is defined in the Securities Act of 1933, as amended) issuable in connection with a M&A Transaction will be determined, if a publicly-traded security, on the basis of the volume-weighted average of the closing prices for the 20 trading days prior to the closing, or, if the security is not freely traded (or having no established public market) on the basis of the fair market value of such security at closing as determined in good faith by CGI and the Company; and (iii) the value of any property transferred in connection with a Transaction will be determined on the basis of the fair market value of such property at closing as determined in good faith by CGI and the Company.

Section 4. Expenses.

Without in any way reducing or affecting the provisions of Exhibit A hereto, the Company shall reimburse CGI, upon its request from time to time, for all reasonable expenses incurred by it in connection with the initiation and performance of the engagement hereunder, and the enforcement of this Agreement, including without limitation the reasonable fees, disbursements and other charges of CGI's legal counsel that are not duplicative of services to be performed by the Company's legal counsel. Other expenses shall also include, but not be limited to, expenses incurred in connection with travel (at coach or equivalent fare) and lodging, data processing and communication charges, research and courier services. Pursuant to this Section 4, the Company shall make an expense deposit (the "*Expense Deposit*") of $5,000 payable on the date hereof.

Section 5. Indemnity.

The Company agrees to the provisions of Exhibit A hereto which provide for indemnification by the Company of CGI and certain related persons. Such indemnification is an integral part of this Agreement and the terms thereof are incorporated by reference as if fully stated herein. Such indemnification shall survive any termination, expiration or completion of this Agreement or CGI's engagement hereunder.

Section 6. Application for Retention of CGI.

In the event the Company determines to commence chapter 11 proceedings in order to pursue a Transaction or otherwise, the Company shall apply promptly to the Bankruptcy Court pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure, applicable local rules and procedural orders of the Bankruptcy Court and procedural guidelines established by the Office of the United States Trustee, for approval of (a) this Agreement and (b) CGI's retention by the Company under the terms of this Agreement, nunc pro tunc to the date the Company commences its chapter 11 case, and shall use commercially reasonable efforts to obtain Bankruptcy Court authorization thereof. The Company shall use commercially reasonable efforts to obtain such Bankruptcy Court approval and authorization subject only to the subsequent review by the Bankruptcy Court under



Dakota Plains Holdings, Inc.
June 10, 2016
Page 6 of 15

the standard of review provided in section 328(a) of the Bankruptcy Code, and not subject to the standard of review set forth in section 330 of the Bankruptcy Code. The Company shall supply CGI and its counsel with a draft of such application and any proposed order authorizing CGI's retention sufficiently in advance of the filing of such application and proposed order to enable CGI and its counsel to review and comment thereon. From and after the commencement of such chapter 11 case, CGI shall have no obligation to continue to provide any services under this Agreement unless and until CGI's retention under the terms of this Agreement is approved under section 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court in form and substance acceptable to CGI. Subject to being so retained, CGI agrees that during the pendency of any such proceedings, it shall continue its obligations under this Agreement pursuant to the provisions of this Agreement so long as the Company is using commercially reasonable efforts to seek CGI's retention under section 328(a) of the Bankruptcy Code.

CGI acknowledges that in the event that the Bankruptcy Court approves its retention by the Company pursuant to the application process described in this Section, payment of CGI's fees and expenses shall be subject to (i) the jurisdiction and approval of the Bankruptcy Court under section 328(a) of the Bankruptcy Code and any order approving CGI's retention, (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing interim and final fee applications; provided, however, that CGI shall not be required to maintain time records. In the event that CGI's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of CGI hereunder as promptly as practicable in accordance with the terms hereof and the orders governing interim and final fee applications, and after obtaining all necessary further approvals from the Bankruptcy Court, if any.

With respect to CGI's retention under section 328(a) of the Bankruptcy Code, the Company acknowledges and agrees that CGI's industry and restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or all of which may be required by the Company during the term of CGI's engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit to the Company of CGI's services hereunder could not be measured merely by reference to the number of hours to be expended by CGI's professionals in the performance of such services. The Company also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of CGI and its professionals hereunder over the life of the engagement, and in light of the fact that such commitment may foreclose other opportunities for CGI and that the actual time and commitment required of CGI and its professionals to perform its services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm. In addition, the Company believes that given the numerous issues which CGI may be required to address in the performance of its services hereunder, CGI's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for CGI's services for engagements of this nature in an out-of-court context, the Company agrees that the fee arrangements hereunder are reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.

Section 7. Term.

The term of CGI's engagement shall extend until the final Transaction(s) contemplated by this Agreement. The engagement of CGI pursuant to this Agreement may be terminated by CGI at any time, with or without "cause" (as defined below), and by the Company (a) for *"cause"* (defined as bad faith, fraud, gross negligence or willful misconduct by the other party) at any time or (b) without "cause" after two (2) months from the date of this Agreement, after which the terminating party must provide five (5) days advance notice in writing. If terminated, CGI shall be entitled to payment of any fees which are due

Dakota Plains Holdings, Inc.
June 10, 2016
Page 7 of 15

and owing to CGI upon the effective date of termination; in addition, CGI will be entitled to reimbursement of any and all reasonable expenses described in Section 4 above. Termination of CGI's engagement hereunder shall not affect or impair the Company's continuing obligation to indemnify CGI and certain related persons as provided in Exhibit A. Without limiting any of the foregoing (except in the event of termination of the engagement of CGI pursuant to this Agreement by the Company for "cause" as set forth above and as finally determined by a court of law), the fees and obligations described in Section 3 above shall also be payable by the Company and enforceable against the Company in accordance with their respective terms in the event that the engagement of CGI pursuant to this Agreement is terminated by the Company and a Transaction is consummated prior to the expiration of twelve (12) months after such termination, or an agreement with respect thereto is executed at any time prior to twelve (12) months after such termination (which agreement subsequently results in the consummation of a Transaction).

Section 8. Miscellaneous.

(a) *Survival, Successors & Assigns*. Sections 2 through 7 hereof, inclusive, including the provisions set forth in Exhibit A hereto, shall survive the termination or expiration of this Agreement. The benefits of this Agreement and the indemnification and other obligations of the Company to CGI and certain related persons contained in Exhibit A hereto shall inure to the respective successors and assigns of the parties hereto and thereto and of the indemnified parties, and the obligations and liabilities assumed in this Agreement and Exhibit A by the parties hereto and thereto shall be binding upon their respective successors and assigns.

(b) *Benefit of Agreement; No Reliance by Third Parties*. CGI has been engaged only by the Company, and this engagement is not intended to confer rights upon any stockholder, partner or other owner of the Company or any other person not a party hereto. Unless otherwise expressly agreed, no one other than the Company is authorized to rely on any statements, advice, opinions or conduct by CGI. Any opinions or advice rendered by CGI to the Board or the Company's management in the course of this engagement are for the purpose of assisting the Board or the Company's management, as the case may be, in evaluating the Transactions contemplated hereby and such opinions or advice do not constitute a recommendation to any stockholder of the Company concerning action that such stockholder might or should take in connection with a Transaction. CGI does not provide accounting advice, tax advice or legal advice. The Company confirms that it will rely on its own independent counsel and independent accountants for such advice.

(c) *Nature of Relationship*. The relationship of CGI to the Company hereunder shall be that of an independent contractor and CGI shall have no authority to bind, represent or otherwise act as agent, executor, administrator, trustee, lawyer or guardian for the Company, nor shall CGI have the authority to manage money or property of the Company. The price of the instruments and any Transaction will be established by the Company following discussions and arm's-length negotiations with the investors or other participants and the Company is capable of evaluating and understanding the terms, risks and conditions of the transactions contemplated by this Agreement. The parties hereto acknowledge and agree that CGI's role in the services contemplated hereby is that of an independent contractor, and by providing the services contemplated hereunder, CGI will not act, nor will it be deemed to have acted, in any managerial or fiduciary capacity whatsoever with respect to the Company or any third party including security holders, creditors or employees of the Company. The Company waives, to the fullest extent permitted by law, any claims the Company and its

Dakota Plains Holdings, Inc.
June 10, 2016
Page 8 of 15

affiliates may have against CGI for breach of fiduciary duty or alleged breach of fiduciary duty and agrees that CGI shall have no liability (whether direct or indirect) to the Company or any of its affiliates in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of the Company, including stockholders, employees or creditors of the Company.

(d)  *CGI and Affiliated Entities.* CGI has indirect affiliate relationships with numerous investment banking institutions located worldwide (the "***Affiliated Entities***"). None of the Affiliated Entities is being retained by CGI hereunder nor, to CGI's knowledge, will any professionals or employees of the Affiliated Entities provide services to the Company in connection with the matters contemplated hereby. CGI and Affiliated Entities are involved in a wide range of investment banking and other activities which may involve interests that differ from those of the Company and CGI has no obligation to disclose such interests and transactions to the Company by virtue of any advisory or agency relationship. CGI can make no representation as to the "disinterestedness" of the professionals or employees of the Affiliated Entities. Information that is held by the Affiliated Entities will not for any purpose be taken into account in determining CGI's responsibilities to the Company hereunder. None of CGI and Affiliated Entities will have any duty to disclose to the Company or any other party, or utilize for the Company's benefit, any non-public information acquired in the course of providing services to any other person engaging in any transaction or otherwise carrying on its business.

(e)  *Required Information.* For your information, CGI may screen the Company against various databases to verify its identity.

(f)  *Public Announcements.* The Company acknowledges that CGI may, at its option and expense, after announcement of a Transaction, place announcements and advertisements or otherwise publicize the Transaction in such financial and other newspapers and journals as each may choose, stating that CGI acted as financial advisor to the Company in connection with such Transaction. The Company further consents to CGI's public use or display of the Company's logo, symbol or trademark as part of CGI's general marketing or promotional activities, provided such use or display is in the nature of a public record or tombstone announcement in relation to a Transaction.

(g)  *CHOICE OF LAW: JURISDICTION.* THIS AGREEMENT HAS BEEN NEGOTIATED, EXECUTED AND DELIVERED AT AND SHALL BE DEEMED TO HAVE BEEN MADE IN NEW YORK, NEW YORK. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAWS. REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH SUCH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY AND ALL CLAIMS OR DISPUTES BETWEEN THE PARTIES HERETO PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF NEW YORK. BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT. EACH PARTY HERETO HEREBY WAIVES ANY OBJECTION WHICH IT MAY HAVE BASED ON LACK OF PERSONAL

Dakota Plains Holdings, Inc.
June 10, 2016
Page 9 of 15

JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT. THE COMPANY CONSENTS TO THE SERVICE OF PROCESS IN ACCORDANCE WITH NEW YORK LAW, AND AGREES THAT THE CORPORATE ATTORNEY OF THE COMPANY SHALL BE AUTHORIZED TO ACCEPT SERVICE ON ITS BEHALF.

(h)   *Waiver of Jury Trial.* Each of the parties hereto hereby knowingly, voluntarily and irrevocably waives any right it may have to a trial by jury in respect of any claim upon, arising out of or in connection with this Agreement or any Transaction or other related transaction. Each of the parties hereto hereby certifies that no representative or agent of any other party hereto has represented expressly or otherwise that such party would not seek to enforce the provisions of this waiver. Each of the parties hereto hereby acknowledges that it has been induced to enter into this Agreement by and in reliance upon, among other things, the provisions of this paragraph.

(i)   *Entire Agreement.* This Agreement embodies the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings relating to the matters provided for herein. No alteration, waiver, amendment, change or supplement hereto shall be binding or effective unless the same is set forth in writing signed by a duly authorized representative of each of the parties hereto. This Agreement supersedes and replaces all previous agreements or understandings regarding the same, whether written or oral, except as to prior indemnity agreements which shall remain in full force and effect with respect to services provided during the course of any such agreements or understandings.

(j)   *Authority.* Each party hereto represents and warrants that it has all requisite power and authority to enter into this Agreement and Exhibit A and the transactions contemplated hereby. Each party hereto further represents that this Agreement has been duly and validly authorized by all necessary corporate action and has been duly executed and delivered by each of the parties hereto and constitutes the legal, valid and binding agreement thereof, enforceable in accordance with its terms. CGI will assume that any instructions, notices or requests have been properly authorized by the Company if they are given or purported to be given by, or is reasonably believed by CGI to be, a director, officer, employee or authorized agent.

(k)   *Counterparts.* This Agreement may be executed in as many counterparts as may be deemed necessary and convenient, and by the different parties hereto on separate counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by telecopier or PDF facsimile shall be effective as delivery of a manually executed counterpart to this Agreement.

(l)   *Notices.* Any notice given pursuant to, or relating to, this Agreement shall be in writing and shall be mailed or delivered by courier (a) if to the Company, at the address set forth above, Attn: Corporate Attorney and (b) if to CGI, to Canaccord Genuity Inc., 535 Madison Avenue, New York, NY 10022, Attn: General Counsel and Michael Balistreri.

If the foregoing correctly sets forth the understanding and agreement between CGI and the Company, please so indicate by signing the enclosed copy of this letter along with the $35,000 Monthly



Dakota Plains Holdings, Inc.
June 10, 2016
Page 10 of 15

Work Fee and $5,000 Expense Deposit via wire transfer, whereupon it shall become a binding agreement among the parties hereto as of the date first above written.

[Remainder of Page Intentionally Blank]

Dakota Plains Holdings, Inc.
June 10, 2016
Page 11 of 15

Very truly yours,

**CANACCORD GENUITY INC.**

By: _Geoffrey Richards_  _AF_
Geoffrey Richards
Head of U.S. Debt Finance & Restructuring
Managing Director

Accepted and Agreed:

**DAKOTA PLAINS HOLDINGS, INC.**

By: _____
    Name:    Craig M. McKenzie
    Title:     Chief Executive Officer

Dakota Plains Holdings, Inc.
June 10, 2016
Page 12 of 15

## Exhibit A

The Company shall indemnify and hold harmless each of CGI and its affiliates, counsel and other professional advisors, and the respective directors, officers, controlling persons, agents and employees of each of the foregoing (CGI and each of such other persons, an "***Indemnified Party***" and, collectively, the "***Indemnified Parties***"), from and against any losses, claims or proceedings, including, without limitation, stockholder actions, damages, judgments, assessments, investigation costs, settlement costs, fines, penalties, arbitration awards and any other liabilities, costs, fees and expenses (collectively, "***Losses***") (a) directly or indirectly related to or arising out of (i) oral or written information provided by the Company, the Company's employees or other agents, which either the Company or an Indemnified Party provides to any person or entity or (ii) any other action or failure to act by the Company, the Company's employees or other agents or any Indemnified Party at the Company's request or with the Company's consent, in each case in connection with, arising out of, based upon, or in any way related to this Agreement, the retention of and services provided by CGI under this Agreement, or any Transaction or other transaction; or (b) otherwise directly or indirectly in connection with, arising out of, based upon, or in any way related to the engagement of CGI under this Agreement or any transaction or conduct in connection therewith, <u>provided</u> that the Company shall not be required to indemnify any Indemnified Party for such Losses if and only to the extent that it is finally judicially determined by a court of competent jurisdiction that such Losses arose because of the gross negligence, willful misconduct or fraud of such Indemnified Party. If multiple claims are brought against an Indemnified Party, with respect to at least one of which indemnification is permitted under applicable law and provided for under this Agreement, the Company agrees that any judgment or award against such Indemnified Party shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for, except to the extent the judgment or award expressly states that it, or any portion thereof, is based on a claim as to which indemnification is not available.

The Company shall further reimburse any Indemnified Party promptly for any reasonable legal or other fees, disbursements or expenses as they are incurred (a) in investigating, preparing, pursuing or settling any action or other proceeding (whether formal or informal) or threat thereof, whether or not in connection with pending or threatened litigation or arbitration (each, an "***Action***") and (b) in connection with enforcing such Indemnified Party's rights under this Agreement; <u>provided</u>, <u>however</u>, that in the event and only to the extent that it is finally judicially determined by a court of competent jurisdiction that the Losses of such Indemnified Party arose because of the gross negligence, willful misconduct or fraud of such Indemnified Party, such Indemnified Party will promptly remit to the Company any amounts reimbursed under this paragraph.

The Company agrees that if any right of any Indemnified Party set forth in the preceding paragraphs is finally judicially determined to be unavailable (except by reason of the gross negligence, willful misconduct or fraud of such Indemnified Party), or is insufficient to hold such Indemnified Party harmless against such Losses as contemplated herein, then the Company shall contribute to such Losses (a) in such proportion as is appropriate to reflect the relative benefits received by the Company and its creditors and stockholders, on the one hand, and such Indemnified Party, on the other hand, in connection with the transactions contemplated hereby, and (b) if (and only if) the allocation provided in clause (a) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (a) but also the relative fault of the Company and such Indemnified Party; <u>provided</u>, that, in no event shall the aggregate contribution of all such Indemnified Parties exceed the amount of fees received by CGI under this Agreement. Benefits received by CGI shall be deemed to be equal to the compensation paid by the Company to CGI in connection with this Agreement. Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any other alleged conduct relates to information provided by the Company or other conduct



Dakota Plains Holdings, Inc.
June 10, 2016
Page 13 of 15

by the Company (or the Company's employees or other agents) on the one hand or by CGI on the other hand.

The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with advice or services rendered or to be rendered by any Indemnified Party pursuant to this Agreement, the transactions contemplated hereby or any Indemnified Party's actions or inactions in connection with any such advice, services or transactions except for and only to the extent that such Losses of the Company are finally judicially determined by a court of competent jurisdiction to have arisen because of the gross negligence, willful misconduct or fraud of such Indemnified Party in connection with any such advice, actions, inactions or services. The Company shall use commercially reasonable efforts to require, as a condition of the Company releasing from liability any creditor or other party-in-interest in the case, that such creditor or other party-in-interest release all Indemnified Parties from all claims or other liabilities directly or indirectly in connection with, arising out of, based upon, or in any way related to the engagement of CGI under this Agreement or any transaction or conduct in connection therewith, provided that the Company shall not be required to use commercially reasonable to obtain such release with respect to the gross negligence, willful misconduct or fraud of any Indemnified Party.

In the event that an Indemnified Party is requested or required to appear as a witness in any action brought by or on behalf of or against the Company relating to the engagement in which such Indemnified Party is not named as a defendant, the Company agrees to promptly reimburse such Indemnified Party on a monthly basis for all expenses reasonably incurred by it in connection with such Indemnified Party's appearing and preparing to appear as such a witness, including, without limitation, the reasonable fees and disbursements of its legal counsel.

The rights of the Indemnified Parties hereunder shall be in addition to any other rights that any Indemnified Party may have at common law, by statute or otherwise. Except as otherwise expressly provided for in this Agreement, if any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall all remain in full force and effect and shall in no way be affected, impaired or invalidated. The reimbursement, indemnity and contribution obligations of the Company set forth herein shall apply to any modification of this Agreement and shall remain in full force and effect regardless of any termination of, or the completion of any Indemnified Party's services under or in connection with, this Agreement.

Neither termination of the Agreement, nor termination of CGI's engagement, nor the filing of a petition under the United States Bankruptcy Code, shall affect these indemnification provisions, which shall hereafter remain operative and in full force and effect.

Dakota Plains Holdings, Inc.
June 10, 2016
Page 14 of 15

**Exhibit B**

$15,000,000 (Fifteen Million Dollars)

Dakota Plains Holdings, Inc.
June 10, 2016
Page 15 of 15

## Exhibit C

1. SunTrust Bank, NA

2. West Face Capital Inc.

3. PetroLama Energy Canada Inc.

4. Keyera Energy Inc.

5. Ferrellgas Partners, L.P.

**CANACCORD** Genuity

535 Madison Avenue
New York, NY 10022
United States of America

T: 212.389.8000
www.canaccordgenuity.com

**Amendment No. 1 to Agreement**

December 15, 2016

*Confidential*

Dakota Plains Holdings, Inc.
294 Grove Lane East
Wayzata, MN 55391
Attention: Tom Pratt, Chairman of the Board

Dear Mr. Pratt:

Reference is made to that certain letter agreement dated June 10, 2016 (the "*Agreement*") between Canaccord Genuity Inc. ("*CGI*") and Dakota Plains Holding, Inc. (including its controlled affiliates, successors, subsidiaries and assigns, the "*Company*") pursuant to which the Company engaged CGI as its investment banker in connection with any Transaction. Capitalized terms used in this Amendment No. 1 to the Agreement (the "*Amendment*") and not defined in the Amendment shall have the meanings ascribed to them in the Agreement.

The Company and CGI hereby acknowledge that the Agreement is hereby amended by this Amendment as follows.

1. Fees.

   a. Section 3(b) of the Agreement is replaced as follows:

      "*Success Fee:* A fee (the "*Recapitalization Fee*") equal to $600,000 upon the consummation of any Recapitalization Transaction. Upon the consummation of an M&A Transaction, a fee (the "*M&A Fee*" and, together with the Recapitalization Fee, a "*Success Fee*") equal to (i) $600,000 plus:

      1. 5.00% of that portion of Aggregate Consideration (as defined below) in excess of $8,250,000 and less than or equal to $9,250,000; plus

      2. 10.00% of that portion of Aggregate Consideration in excess of $9,250,000.

      For the avoidance of doubt, if a Transaction constitutes both a Recapitalization Transaction and an M&A Transaction, then CGI shall be entitled to the greater of such applicable minimum fees.

2. Exhibit B is deleted.

[SIGNATURE PAGE FOLLOWS]

Dakota Plains Holdings, Inc.
December 15, 2016
Page 2 of 2

Please indicate your acceptance of this Amendment by signing in the space provided below and returning the same to CGI.

Very truly yours,

**CANACCORD GENUITY INC.**

By: _____
Geoffrey Richards
Head of U.S. Debt Finance & Restructuring
Managing Director

Accepted and Agreed:

**DAKOTA PLAINS HOLDINGS, INC.**

By: _____
Name: Tom Smith
Title: Chairman

**<u>EXHIBIT B</u>**

RICHARDS DECLARATION

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | | |
|---|---|---|
| Dakota Plains Holdings, Inc., | | Case No. 16-43711 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Transloading, LLC, | | Case No. 16-43712 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Sand, LLC, | | Case No. 16-43715 |
| | Debtor. | Chapter 11 Case |
| Dakota Plains Marketing, LLC, | | Case No. 16-43716 |
| | Debtor. | Chapter 11 Case |
| DPTS Marketing LLC, | | Case No. 16-43717 |
| | Debtor. | Chapter 11 Case |
| Dakota Petroleum Transport Solutions, LLC, | | Case No. 16-43718 |
| | Debtor. | Chapter 11 Case |
| DPTS Sand, LLC, | | Case No. 16-43721 |
| | Debtor. | Chapter 11 Case |

**UNSWORN DECLARATION OF GEOFFREY RICHARDS IN SUPPORT OF
APPLICATION BY DEBTORS TO EMPLOY CANACCORD GENUITY INC. AS
INVESTMENT BANKER *NUNC PRO TUNC* TO THE PETITION DATE**

Geoffrey Richards, in support of the application of Dakota Plains Holdings, Inc. and its
affiliated debtors and debtors in possession in these proceedings (collectively, the "**Debtors**") to
employ Canaccord Genuity Inc. ("**Canaccord**") as chapter 11 counsel *nunc pro tunc* to the
Petition Date and in compliance with Bankruptcy Rules 2014(a) and 5002 and Local Rule
1007-1, declares as follows:

1.        I am a Managing Director and Head of U.S. Debt Finance and Restructuring of
Canaccord.  I submit this declaration (the "**Declaration**") in connection with the application (the

"**Application**"),[1] dated December 20, 2016, of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") for approval of the Debtors' retention of Canaccord as an investment banker pursuant to sections 327(a) and 328(a) of the Bankruptcy Code and to provide disclosure required under Bankruptcy Rules 2014(a) and 5002 and Local Rules 1007-1. Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.

2.      To the extent it is brought to my attention that any information disclosed herein requires amendment or modification upon Canaccord's completion of further review or as additional party in interest information becomes available to it, I intend to file a supplemental declaration reflecting such amended or modified information.

**Services to Be Provided**

3.      Canaccord commenced its engagement as investment banker to the Debtors in June 2016 pursuant to that certain engagement letter, dated as of June 10, 2016, and that certain Amendment No. 1 to Agreement, dated as of December 15, 2016 (together, the "**Engagement Letter**").  A true copy of the Engagement Letter is attached to the Motion as **Exhibit A**.

4.      Pursuant to the Engagement Letter, Canaccord will continue to serve as the Debtors' investment banker and financial advisor with respect to the review of the Debtors' strategic and financial alternatives, through purchase, sale, merger, or joint venture whether accomplished pursuant to a plan of reorganization or a section 363 sale of the Debtors' assets (the "**Transaction**").

5.      As outlined in the Engagement Letter, the Debtors propose to continue to retain Canaccord to render, among other things, the following investment services to the Debtors:

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Application.

(a)      review and analyze the Debtors' business and financial projections;

(b)      evaluate the Debtors' strategic and financial alternatives;

(c)      assist the Debtors in evaluating, structuring, negotiating and implementing a potential Transaction;

(d)      assist the Debtors in preparing descriptive material to be provided to potential parties that might participate in potential Transactions;

(e)      develop, update and review with the Debtors on an ongoing basis a list of parties that might participate in a potential Transaction;

(f)      contact potential parties to potential Transactions;

(g)      provide summaries to the Debtors of communications with potential parties to potential Transactions;

(h)      assist the Debtors and their counsel with evaluating potential term sheets, indications of interest, letters of intent and other Transaction agreements;

(i)      assist in the development of presentations to the Debtors' boards of directors and representatives, and to various creditors, committees and other parties, as the Debtors shall reasonably request;

(j)      in the event the Debtors seek relief under the Bankruptcy Code in order to pursue a possible Transaction or otherwise, and if requested by the Debtors and its counsel, participate in hearings before the Bankruptcy Court;

(k)      provide relevant testimony with respect to the matters described herein and arising in connection with any Transaction or any proposed plan of reorganization;

(l)      evaluate, structure and negotiate the terms and conditions of any proposed Transaction whether in connection with a confirmed chapter 11 plan or otherwise;

(m)      together with the Debtors and their counsel, prepare for and participate in meetings with the Debtors' existing lenders, creditor groups, official constituencies and other interested parties, as necessary;

(n)      assist the Debtors and their counsel in negotiating agreements and definitive contracts for Transactions; and

(o)    perform other such services as Canaccord and the Debtors may mutually agree upon in a separate writing.

**<u>Canaccord's Qualifications</u>**

6.    I believe that Canaccord and the professional it employs are uniquely qualified to advise the Debtors in the matters for which Canaccord is proposed to be employed.

7.    Canaccord is an independent and full-service global investment banking firm offering investment banking, equity research, wealth management, institutional and private brokerage and private capital solutions to individual and institutional clients.  Canaccord employs over 2,000 individuals and has 20 locations in 10 countries worldwide, including Chicago, New York, Boston, San Francisco, London, Toronto, Vancouver, Paris, Sydney, Hong Kong, and Singapore.  In fiscal year 2015, Canaccord executed 267 public and private financing transactions, raising approximately $30.1 billion.  During the same period, Canaccord advised on 39 M&A assignments with an aggregate value of over $8.1 billion.

8.    The Debtors selected Canaccord because Canaccord's professionals have considerable expertise and experience in providing investment banking services to financially-distressed companies and to creditors, purchasers, bondholders, and other constituencies in chapter 11 as well as in out-of-court proceedings.  Representative clients which investment bankers at Canaccord have advised in prior chapter 11 engagements include AbitibiBowater; American Eagle Energy Corporation; American IronHorse Motorcyles, Inc.; BI-LO, LLC; Diamond Glass Companies, Inc.; Gateway Ethanol, LLC; Giordano's Enterprises, Inc.; Gulf Fleet Holdings, Inc.; HMX Acquisitions Corp.; International Garden Products, Inc.; KeyLime Cove Waterpark, Inc.; Loehmann's Holdings, Inc.; Max & Erma's, Inc.; National Envelope Corporation; OptiCanada, Inc.; Renew Energy, Inc.; Response Genetics, Inc.; Robbins Bros.

Corporation; Santa Fe Gold Corporation; SynCardia Systems, Inc.; TimberWest; Waterworks, Inc.; and Yellow Media, Inc.

9.      Canaccord was engaged prior to the Petition Date to provide investment banking services to the Debtors pursuant to the Engagement Letter.

10.      As a result of rendering prepetition services to the Debtors, Canaccord is intimately familiar with the Debtors' corporate and capital structure, management, operations, and various other aspects of their businesses.  Canaccord has a well-developed knowledge of the Debtors' financial history and business operations and is well-suited to provide the Debtors with the investment banking services contemplated by the Engagement Letter.

11.      Due to Canaccord's industry experience and prepetition involvement with the Debtors, I believe that Canaccord is well qualified to serve as the Debtors' investment banker. Therefore, I believe that the retention of Canaccord will benefit the estate and its creditors.

## Professional Compensation

12.      Canaccord will seek the Court's approval of its compensation for professional services rendered and reimbursement of expenses incurred in connection with the Debtors' chapter 11 cases in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the guidelines established by the Office of the United States Trustee for Region 12 (the "**U.S. Trustee**"), and any other applicable procedures and orders of the Court entered in these cases, and consistent with the proposed compensation set forth in the Engagement Letter.

13.      Investment banks such as Canaccord do not charge for its services on an hourly basis.  Instead, they customarily charge fees that are contingent upon the occurrence of a

specified type of transaction.  The Engagement Letter sets forth the transaction-based fees that

are to be payable to Canaccord.

14.    As set forth more fully in the Engagement Letter, and subject thereto, Canaccord

will be compensated as follows (the "**Fee Structure**"):

(a)    <u>Monthly Fees</u>.  In addition to the other fees described below and as further provided for in the Engagement Letter, the Debtors shall pay Canaccord a fee due, earned and fully payable in the amount of $35,000 on June 10, 2016 and on the first business day of each month thereafter, a fee in the amount of $35,000 (the "**Monthly Fees**").  The first three Monthly Fees actually paid to Canaccord shall be 50% credited against any Success Fee (as defined below).  There shall be no crediting of any subsequent Monthly Fee against any Success Fee.

(b)    <u>Success Fee</u>.    A fee (the "**Recapitalization Fee**") equal to $600,000 upon the consummation of any Recapitalization Transaction.  Upon the consummation of an M&A Transaction, a fee (the "**M&A Fee**" and, together with the Recapitalization Fee, a "**Success Fee**") equal to the sum of (i) $600,000, <u>plus</u> (ii) 5.00% of that portion of the Aggregate Consideration (as defined below) in excess of $8,250,000 and less than or equal to $9,250,000, <u>plus</u> (iii) 10.00% of that portion of the Aggregate Consideration in excess of $9,250,000.    If a Transaction constitutes both a Recapitalization Transaction and an M&A Transaction, then Canaccord shall be entitled to the greater of such applicable minimum fees.

(c)    <u>DIP Financing Fee</u>.  A fee (the "DIP Financing Fee") in the amount of $75,000 due, earned and payable upon the consummation of a debtor-in-possession financing.    A DIP Financing Fee shall not be earned if debtor-in-possession financing is provided by SunTrust Bank, N.A.

(d)    <u>Aggregate Consideration</u>.  For purposes of the Engagement Letter, the term "**Aggregate Consideration**") means the cumulative value of the M&A Transaction, representing the total value of the Debtors implied by the sum of (x) the total amount of cash and fair market value (on the date of payment) of all of the property paid or payable in connection with the M&A Transaction, including amounts paid or payable in respect of, if any, convertible securities, preferred equity securities, warrants, stock appreciation rights, options or similar rights, whether or not vested, plus (y) the principal amount of all indebtedness for borrowed money of the

Debtors as set forth on the most recent balance sheet plus the excess of the projected liability of any pension plan over its assets for the last completed reporting period prior to close, or, in the case of the sale of assets, all liabilities assumed by the third party.

(e)     Expenses.   In addition to all of the other fees described in the Engagement Letter, the Debtors shall reimburse Canaccord, upon its request, for all reasonable expenses incurred by Canaccord in connection with the initiation and performance of the engagement, and the enforcement of the Engagement Letter.

15.     Indeed, Canaccord's industry and restructuring experience, its capital markets knowledge, financing skills, and mergers and acquisitions capabilities, some or all of which may be required by the Debtors during the term of Canaccord's engagement, were important factors in determining the Fee Structure.  The ultimate benefit to the Debtors of Canaccord's services could not be measured merely by reference to the number of hours to be expended by Canaccord's professionals in the performance of such services.  Moreover, the Fee Structure takes into consideration Canaccord's anticipation that it will need to provide a substantial commitment of professional time and effort in order to perform its duties under the Engagement Letter, and in light of the fact that such commitment may foreclose other opportunities for Canaccord.  Further, the actual time and commitment required of Canaccord and its professionals to render services to the Debtors may vary substantially from week to week or month to month, creaking "peak load" issues for the firm.

16.     Thus, because of Canaccord's expertise, commitment of resources to this engagement to the exclusion of other possible employment, and the time that Canaccord has devoted and will continue to devote to this engagement, the Debtors request that the Court approve the Fee Structure for Canaccord pursuant to section 328(a) of the Bankruptcy Code and that the Court evaluate the final compensation and reimbursement of expense in the chapter 11 cases for Canaccord under the standards of section 328(a) of the Bankruptcy Code, rather than

under those of section 330 of the Bankruptcy Code, subject to Canaccord filing a final fee

application seeking approval of the payment of its fees and expenses.

## Recordkeeping

17.    It is not the general practice of investment banking firms, including Canaccord, to

keep detailed time records similar to those customarily kept by attorneys.  Because Canaccord

does not maintain contemporaneous time records in one-tenth hour increments or provide or

conform to a schedule of hourly rates for its professionals, Canaccord respectfully requests that it

be excused from compliance with any such requirements in this district.  Instead, Canaccord

requests that it be required only to maintain time records in half-hour (0.50) increments setting

forth, in a summary format, a description of the services rendered by each professional and the

amount of time spent on each date by each such individual in rendering services on behalf of the

Debtors.

18.    Canaccord will also maintain detailed records of any actual and necessary costs

and expenses incurred in connection with the aforementioned services.  Canaccord's application

for compensation and expenses will be paid by the Debtors pursuant to the terms of the

Engagement Letter and Paragraph 9 of this Court's Instructions for Filing a Chapter 11 Case.

## Indemnification and Contribution Provisions

19.    The Debtors have agreed, among other things, to indemnify, and provide

contribution and reimbursement to, Canaccord and certain related parties in accordance with the

indemnification provisions attached as Exhibit A to the Engagement Letter (the

"**Indemnification Provisions**").

20.    I believe the Indemnification Provisions reflected in the Engagement Letter are

customary and reasonable terms of consideration for investment banking firms such as

- 8 -

Canaccord for engagements both out of court and in chapter 11.  The terms of the Engagement

Letter were fully negotiated between the Debtors and Canaccord at arm's length.

### Canaccord's Disinterestedness

21.     In connection with the preparation of this Declaration and its retention by the

Debtors, Canaccord conducted a review of its conflicts check systems of the list of potential

parties in interest that Canaccord received from the Debtors (the "**Conflicts Search**").

22.     Canaccord reviewed the relationships between Canaccord and the list of

individuals and entities that Canaccord has been informed may have an interest in the Debtors'

chapter 11 cases (collectively, the "**Parties in Interest**").  Based on the results of the Conflicts

Search conducted to date, to the best of my knowledge, neither myself, Canaccord, nor any of its

principals, partners, members, or professionals (collectively, the "**Professionals**"), insofar as I

have been able to ascertain based on the Conflicts Search (a) has any connection with the

Debtors, any of the Parties in Interest, the U.S. Trustee, or any person employed in the Office of

the U.S. Trustee or (b) represents an interest that is materially adverse to the interest of the

Debtors' estates or any class of equity security holders, by reason of any direct or indirect

relationship to, connection with or interest in, the Debtors or for any other reason of which I

know or about which I have been informed, with respect to the services to be performed pursuant

to the Engagement Letter, except as disclosed or otherwise described herein.

23.     To the best of my knowledge, and based on the results of the Conflicts Search,

Canaccord is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy

Code, in that, except as otherwise set forth herein, its Professionals:

> (a)     are not creditors, equity security holders or insiders of the Debtors;
>
> (b)     are not and were not, within 2 years before the date of the filing of
> the Debtors' chapter 11 petitions, a director, officer or employee of
> the Debtors; and

      (c)     do not have an interest materially adverse to the interests of the estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with or interest in the Debtors, or for any other reason.

24.    Some of the Professionals, in connection with their employment before joining Canaccord, may have appeared or were engaged in cases, proceedings, or transactions involving attorneys, accountants, investment bankers, and financial consultants, some of whom may represent claimants and Parties in Interest.

25.    As part of Canaccord's diverse business, Canaccord appears or may appear as a financial advisor or an investment banker in cases, proceedings, or transactions involving attorneys, accountants, investment bankers, and financial consultants, some of whom may represent claimants and Parties in Interest.  Further, Canaccord (including its Professionals through their prior employment) has in the past, and may in the future, be represented by several attorneys and law firms in the legal community, some of whom may be involved in the Debtors' chapter 11 cases.  In addition, Canaccord (including its Professionals through their prior employment) has in the past and will likely in the future be working with or against other professionals involved in the Debtors' chapter 11 cases in matters unrelated to these cases.  To the best of my knowledge, none of these business relations constitute interests materially adverse to the Debtors in matters upon which Canaccord is to be engaged in the Debtors' chapter 11 cases.

26.    On December 11, 2013, Canaccord acted as a 75% lead placement agent on a $15,050,000 direct registered stock offering for the Debtors, along with Northland Securities, Inc. as a 25% placement agent.  The fee realized by Canaccord for that transaction represented less than 0.10% of firm revenue in fiscal year 2014.  Furthermore, of the firm's approximately 1,900 personnel, none of those advising the Debtors were involved in the preceding transaction.

- 10 -

27.     Canaccord (including its Professionals through their prior employment) may have in the past represented, may currently represent, and likely in the future will represent, Parties in Interest of the Debtors in connection with matters unrelated to the Debtors and their chapter 11 cases.  Canaccord regularly calls on private and public companies in the sector related to M&A and capital raising opportunities.  This leads our team to have regular contact with various sources of potential new business in the sector, including investors (whether financial and strategic) who are active with private companies in the sector.

28.     Except as disclosed herein, Canaccord has not been retained to assist any entity or person other than the Debtors on matters relating to, or in connection with, the Debtors' chapter 11 cases.  If the Court approves the proposed employment of Canaccord by the Debtors, Canaccord will not accept any engagement or perform any services in relation to the Debtors' chapter 11 cases for any entity or person other than the Debtors.  Canaccord will, however, continue to provide professional services to entities or persons that may be creditors of the Debtors or Parties in Interest in the Debtors' chapter 11 cases; provided, however, that such services do not directly relate to, or have any direct connection with, the Debtors' chapter 11 cases.

29.     To the best of my knowledge, information, and belief after reasonable inquiry, other than as disclosed in this Declaration, neither I, Canaccord, nor any of our professionals or employees participating in or connected with Canaccord's engagement with the Debtors:  (a) is related to the Debtors or any other party in interest herein, the U.S. Trustee for the District of Minnesota or anyone employed in the Office of the U.S. Trustee (b) has any connection with or holds or represents any interest adverse to the Debtors, their estates, their creditors, or any other Party in Interest or their respective attorneys in matters on which Canaccord is proposed to be

retained; or (c) has advised any Party in Interest in connection with the Debtors' chapter 11 cases. Additionally, Canaccord does not believe that any relationship that Canaccord or any of our professionals or employees participating in or connected with Canaccord's engagement with the Debtors may have with any Party in Interest in connection with any unrelated matter will interfere with or impair Canaccord's representation of the Debtors in their chapter 11 cases.

30. Canaccord reserves its right to supplement this disclosure if any additional relationships come to its attention. In particular, among other things, Canaccord may have relationships with persons who are beneficial owners of Parties in Interest and persons whose beneficial owners include Parties in Interest or persons who otherwise have relationships with Parties in Interest. Moreover, Canaccord employees may have relationships with Parties in Interest, persons that may become parties in interest in the Debtors' chapter 11 cases, and/or persons that have business relationships with the Debtors, are competitors of the Debtors, or that are customers of the Debtors. If any new relevant facts or relationships are discovered or arise, Canaccord will use reasonable efforts to identify such further developments and will file promptly a supplemental declaration, as required by Bankruptcy Rule 2014(a).

## Affirmative Statement of Disinterestedness

31. Based on the Conflicts Search conducted to date and described herein, to the best of my knowledge and insofar as I have been able to ascertain, (a) Canaccord is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, and does not hold or represent an interest adverse to the Debtors' estates and (b) Canaccord has no connection to the Debtors, their creditors, or their related parties, except as is disclosed herein.

32.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of

the United States of America that the foregoing is true and correct and that this Declaration was

executed on the date set forth below.

Dated:  December 20, 2016

_____

Geoffrey Richards
Managing Director
Canaccord Genuity Inc.

# RAVICH MEYER

### RAVICH MEYER KIRKMAN MCGRATH NAUMAN & TANSEY, P.A.

### ATTORNEYS AND COUNSELORS AT LAW

Clerk of U.S. Bankruptcy Court                                    December 21, 2016
301 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN  55415

Re:    Dakota Plains Holdings, Inc. - Case No. 16-43711
       Dakota Plains Transloading, LLC - Case No. 16-43712
       Dakota Plains Sand, LLC - Case No. 16-43715
       Dakota Plains Marketing, LLC - Case No. 16-43716
       DPTS Marketing LLC – Case No. 16-43717
       Dakota Petroleum Transport Solutions, LLC - Case No. 16-43718
       DPTS Sand, LLC - Case No. 16-43721

Dear Clerk:

Enclosed for filing are the following documents:

1.     Application by Debtors to Employ Canaccord Genuity Inc. as Investment Banker *Nunc Pro Tunc* to
       the Petition Date;

2.     Unsworn Declaration of Geoffrey Richards in Support of Application by Debtors to Employ
       Canaccord Genuity Inc. as Investment Banker *Nunc Pro Tunc* to the Petition Date; and

3.     Proposed Order Approving Debtors' Application by Debtors to Employ Canaccord Genuity Inc. as
       Investment Banker *Nunc Pro Tunc* to the Petition Date.

By copy of this letter, these documents have been provided to the Office of U.S. Trustee.

Very truly yours,

MICHAEL F MCGRATH
612.317.4744
MFMCGRATH@RAVICHMEYER.COM

MFMtlj

Enclosures

cc:    Michael R. Fadlovich (w/enc)

## EXHIBIT C

PROPOSED ORDER

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Jointly Administered under<br>Case No. 16-43711 |
| Dakota Plains Holdings, Inc., et al, | Court File No. 16-43711 (MER) |
| Debtors. | |
| (includes: | Court File Nos.: |
| Dakota Plains Transloading, LLC, | 16-43712 |
| Dakota Plains Sand, LLC, | 16-43715 |
| Dakota Plains Marketing, LLC, | 16-43716 |
| DPTS Marketing LLC, | 16-43717 |
| Dakota Petroleum Transport Solutions, LLC, | 16-43718 |
| DPTS Sand, LLC, | 16-43721 |
| | Chapter 11 Cases<br>Judge Michael E. Ridgway |

**ORDER APPROVING DEBTORS' APPLICATION TO EMPLOY CANACCORD
GENUITY INC. AS INVESTMENT BANKER *NUNC PRO TUNC* TO THE PETITION
DATE**

Upon the application (the "**Application**")[1] of Dakota Plains Holdings, Inc. and its

affiliated debtors and debtors in possession in these proceedings (collectively, the "**Debtors**"),

for an order pursuant to sections 327(a) and 328 of the Bankruptcy Code, Bankruptcy Rules

2014(a) and Local Rules 2014-1 and 9013-4, for authorization to employ Canaccord Genuity Inc.

("**Canaccord**") as investment banker to the Debtors, pursuant to the terms set forth in the

Application and the Engagement Letter; and upon consideration of the Unsworn Declaration of

*Unsworn Declaration of Geoffrey Richards in Support of Application by Debtors to Employ*

*Canaccord Genuity Inc. as Investment Banker Nunc Pro Tunc to the Petition Date* attached to

the Application (the "**Richards Declaration**") and the Declaration of Marty Beskow in Support

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Application.

of Chapter 11 Petitions and First Day Motions; and the Court being satisfied, based on the representations made in the Application and the Richards Declaration that Canaccord and its professionals are "disinterested" as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and, as required by section 327(a) and referenced by section 328(c) of the Bankruptcy Code, neither hold nor represent any interest adverse to the Debtors and their estates; and the Court having jurisdiction to consider the Application and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Application and the requested relief being a core proceeding under 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided; and no other or further notice need be provided; and the relief requested in the Application being in the best interests of the Debtors, their estates, their creditors and other parties in interest; and the Court having reviewed the Application and having held a hearing with appearances of parties in interest noted in the transcript thereof (the "**Hearing**"); and the Court having determined that the legal and factual bases set forth in the Application and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY ORDERED:

1.      The Application is GRANTED.

2.      The Debtors are hereby authorized to employ and retain Canaccord as their investment banker *nunc pro tunc* to the Petition Date in the Debtors' chapter 11 cases, all as contemplated by the Application and on the terms provided in the Application, the Engagement Letter and the Richards Declaration.

3.     Canaccord is authorized to render the following professional services:

(a)     review and analyze the Debtors' business and financial projections;

(b)     evaluate the Debtors' strategic and financial alternatives;

(c)     assist the Debtors in evaluating, structuring, negotiating and implementing a potential Transaction;

(d)     assist the Debtors in preparing descriptive material to be provided to potential parties that might participate in potential Transactions;

(e)     develop, update and review with the Debtors on an ongoing basis a list of parties that might participate in a potential Transaction;

(f)     contact potential parties to potential Transactions;

(g)     provide summaries to the Debtors of communications with potential parties to potential Transactions;

(h)     assist the Debtors and their counsel with evaluating potential term sheets, indications of interest, letters of intent and other Transaction agreements;

(i)     assist in the development of presentations to the Debtors' boards of directors and representatives, and to various creditors, committees and other parties, as the Debtors shall reasonably request;

(j)     in the event the Debtors seek relief under the Bankruptcy Code in order to pursue a possible Transaction or otherwise, and if requested by the Debtors and its counsel, participate in hearings before the Bankruptcy Court;

(k)     provide relevant testimony with respect to the matters described herein and arising in connection with any Transaction or any proposed plan of reorganization;

(l)     evaluate, structure and negotiate the terms and conditions of any proposed Transaction whether in connection with a confirmed chapter 11 plan or otherwise;

(m)     together with the Debtors and their counsel, prepare for and participate in meetings with the Debtors' existing lenders, creditor groups, official constituencies and other interested parties, as necessary;

(n)     assist the Debtors and their counsel in negotiating agreements and definitive contracts for Transactions; and

- 3 -

(o)     perform other such services as Canaccord and the Debtors may mutually agree upon in a separate writing.

4.      The terms of the Engagement Letter are approved and Canaccord shall be compensated and reimbursed pursuant to section 328(a) of the Bankruptcy Code in accordance with the terms of the Engagement Letter, subject to Canaccord's filing a final fee application seeking approval of the payment of its fees and expenses, the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the U.S. Trustee Guidelines, and any other applicable orders of this Court.

5.      Notwithstanding the preceding paragraph of this Order and any provision to the contrary in the Application or the Engagement Letter, only the U.S. Trustee shall have the right to object to Canaccord's request for compensation and reimbursement based on the reasonableness standard provided in section 330 of the Bankruptcy Code, not section 328(a) of the Bankruptcy Code; provided, however, that "reasonableness" shall be evaluated by comparing (among other things) the fees payable in these cases to fees paid to comparable investment banking firms with similar experience and reputation offering comparable services in other chapter 11 cases and shall not be evaluated primarily on an hourly or length-of-case based criteria.

6.      Canaccord and any Indemnified Party shall not be entitled to any indemnification pursuant to the terms of the Engagement Letter for any claims, liabilities, losses, expenses, and damages incurred by the Indemnified Party resulting from the bad faith, willful misconduct or gross negligence of an Indemnified Party.

7.      The Indemnification Provisions set forth in the Engagement Letter are approved, subject during the pendency of these proceedings to the following:

(a)     Canaccord shall not be entitled to indemnification, contribution or reimbursement pursuant to the Engagement Letter for services

- 4 -

unless such services and the indemnification, contribution or reimbursement therefor are approved by the Court.

(b)    The Debtors shall have no obligation to indemnify Canaccord, or provide contribution or reimbursement to Canaccord, for any claim or expense that is either:   (i) judicially determined (the determination having become final) to have arisen from Canaccord's gross negligence, fraud, willful misconduct, breach of fiduciary duty, if any, bad faith or self-dealing; (ii) for a contractual dispute in which the Debtors allege the breach of Canaccord's contractual obligations, unless the Court determines that indemnification, contribution or reimbursement would be permissible pursuant to *In re United Artists Theatre Co.*, 315 F.3d 217 (3d Cir. 2003); or (iii) settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by this Court, after notice and a hearing, to be a claim or expense for which Canaccord should not receive indemnity, contribution or reimbursement under the terms of the Engagement Letter as modified by this Order.

(c)    If, before the earlier of (i) the entry of an order confirming a chapter 11 plan in the Debtors' chapter 11 cases (such order having become a final order no longer subject to appeal) and (ii) the entry of an order closing the Debtors' chapter 11 cases, Canaccord believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution and/or reimbursement obligations under the Engagement Letter (as modified by this Order), including, without limitation, the advancement of defense costs, Canaccord must file an application therefor in this Court, and the Debtors may not pay any such amounts to Canaccord before the entry of an order by this Court approving the payment.  This subparagraph (c) is intended only to specify the period of time under which the Court shall have jurisdiction over any request for fees and expenses by Canaccord for indemnification, contribution or reimbursement, and not a provision limiting the duration of the Debtors' obligations to indemnify Canaccord.  All parties in interest shall retain the right to object to any demand by Canaccord for indemnification, contribution or reimbursement.

(d)    Any limitation on liability or any amounts to be contributed by the parties to the Engagement Letter under the terms of the Engagement Letter shall be eliminated.

8.    Notwithstanding any provision in the Engagement Letter to the contrary, the contribution obligations of the Indemnified Parties (as such term is defined in the Engagement

Letter) shall not be limited to the aggregate amount in excess of the amount of fees actually received by Canaccord from the Debtors pursuant to the Engagement Letter, this Order or subsequent orders of this Court.

9.    Canaccord shall not be required to maintain contemporaneous time records in one-tenth hour increments or provide or conform to a schedule of hourly rates for its professionals.  Canaccord, however, shall be required only to maintain time records in half-hour (0.50) increments setting forth, in a summary format, a description of the services rendered by each professional and the amount of time spent on each date by each such individual in rendering services on behalf of the Debtors.

10.    In accordance with Paragraph 9 of the Court's Instructions for Filing a Chapter 11 Case, interim fee applications by Canaccord may be heard on approximately 90-day intervals from the commencement of the Debtors' chapter 11 cases.

11.    The Debtors are authorized to pay Canaccord's invoices under the procedures set forth in Paragraph 9 of the Court's Instructions for Filing a Chapter 11 Case.

12.    Canaccord shall make all reasonable efforts to avoid any inappropriate duplication of services provided by any of the Debtors' other retained professionals in these chapter 11 cases.

13.    The relief granted herein shall be binding upon any chapter 11 trustee appointed in any of these chapter 11 cases or upon any chapter 7 trustee appointed in the event of a subsequent conversion of any of these chapter 11 cases to cases under chapter 7.

14.    To the extent that there may be any inconsistencies between the terms of the Application or the Richards Declaration and this Order, the terms of this Order shall govern.

- 6 -

15.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

16.     Notwithstanding any Bankruptcy Rule or Local Rule that might otherwise delay the effectiveness of this Order, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

17.     The Court retains exclusive jurisdiction to hear and determine all matters arising from or related to the implementation or interpretation of this Order.

Dated: _____

                                              Michael E. Ridgway
                                              United States Bankruptcy Judge