UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Jointly Administered under<br>Case No. 16-43711 |
| Dakota Plains Holdings, Inc., et al, | Court File No. 16-43711 (MER) |
| Debtors. | |
| | Court File Nos.: |
| Dakota Plains Transloading, LLC, | 16-43712 |
| Dakota Plains Sand, LLC, | 16-43715 |
| Dakota Plains Marketing, LLC, | 16-43716 |
| DPTS Marketing LLC, | 16-43717 |
| Dakota Petroleum Transport Solutions, LLC, | 16-43718 |
| DPTS Sand, LLC, | 16-43721 |
| | Chapter 11 Cases<br>Judge Michael E. Ridgway |

**AMENDED DISCLOSURE STATEMENT OF DAKOTA PLAINS HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

COUNSEL FOR DEBTORS

RAVICH MEYER KIRKMAN MCGRATH
NAUMAN & TANSEY, PA

Michael F. McGrath
Will R. Tansey
150 S. Fifth Street, Suite 3450
Minneapolis, MN  55402
Telephone:  612.317.4744

BAKER & HOSTETLER LLP

Elizabeth A. Green
Jimmy D. Parrish
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL  32801-3432
Telephone:  407.649.4000

Jorian L. Rose
45 Rockefeller Center
New York, New York 10111
Telephone: 212.589.4200

June 9, 2017

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Jointly Administered under<br>Case No. 16-43711 |
| Dakota Plains Holdings, Inc., et al, | Court File No. 16-43711 (MER) |
| Debtors. | |
| | Court File Nos.: |
| Dakota Plains Transloading, LLC, | 16-43712 |
| Dakota Plains Sand, LLC, | 16-43715 |
| Dakota Plains Marketing, LLC, | 16-43716 |
| DPTS Marketing LLC, | 16-43717 |
| Dakota Petroleum Transport Solutions, LLC, | 16-43718 |
| DPTS Sand, LLC, | 16-43721 |
| | Chapter 11 Cases<br>Judge Michael E. Ridgway |

**AMENDED DISCLOSURE STATEMENT OF DAKOTA PLAINS HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

## I.   <u>INTRODUCTION AND SUMMARY</u>

This Disclosure Statement (the "Disclosure Statement") is filed pursuant to the requirements of Section 1125 of Title 11 of the United States Code (the "Bankruptcy Code"). This Disclosure Statement is intended to provide adequate information to enable holders of claims in the above-captioned jointly-administered bankruptcy cases (collectively, the "Bankruptcy Cases") pending in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court") to make informed judgments about the Joint Plan of Liquidation (the "Plan") submitted by DAKOTA PLAINS HOLDINGS, INC. ("DP Holdings") and its affiliates, DAKOTA PLAINS TRANSLOADING, LLC ("DP Transloading"), DAKOTA PLAINS SAND, LLC ("DP Sand"), DAKOTA PLAINS MARKETING, LLC ("DP

Marketing"), DPTS MARKETING, LLC ("DPTS Marketing"), DAKOTA PETROLEUM TRANSPORT SOLUTIONS, LLC ("DP Transport") and DPTS SAND, LLC ("DPTS Sand") (collectively, the "Debtors"). The overall purpose of the Plan is to liquidate and distribute the Debtors' remaining assets in a manner designed to maximize recoveries to all stakeholders. The Debtors believe the Plan is reasonably calculated to lead to the best possible outcome for all creditors in the shortest amount of time and preferable to all other alternatives.

**THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN. THIS INTRODUCTION AND SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN. THE PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT AND ANY HOLDER OF ANY CLAIM OR INTEREST SHOULD READ AND CONSIDER THE PLAN CAREFULLY IN LIGHT OF THIS DISCLOSURE STATEMENT IN MAKING AN INFORMED JUDGMENT ABOUT THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS. ALL CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE DEFINITIONS ASCRIBED TO THEM IN THE PLAN UNLESS OTHERWISE DEFINED HEREIN.**

**NO REPRESENTATION CONCERNING THE DEBTORS IS AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS MADE, WHICH ARE OTHER THAN AS CONTAINED HEREIN, SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION ABOUT THE PLAN.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AUDIT. FOR THAT REASON, AS WELL AS THE COMPLEXITY OF THE DEBTORS' BUSINESS AND FINANCIAL AFFAIRS, AND THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES, AND PROJECTIONS WITH COMPLETE ACCURACY, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACY, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE. THIS DISCLOSURE STATEMENT MAY INCLUDE FORWARD LOOKING STATEMENTS BASED LARGELY ON THE DEBTORS' CURRENT EXPECTATIONS**

**AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AND ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, CAUSES OF ACTION, AND OTHER ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.**

As prescribed by the Bankruptcy Code and the Rules, Claims asserted against, and Interests in, the Debtors are placed into "Classes." The Plan designates five (5) separate classes of Claims and Equity Interests. The Plan contains one (1) Class of Unsecured Claims. The classification of Claims and the treatment of each Class are discussed in detail below.

To the extent the legal, contractual, or equitable rights with respect to any Claim or Interest asserted against the Debtors are altered, modified, or changed by treatment proposed under the Plan, such Claim or Equity Interest is considered "Impaired" and the holder of such Claim or Equity Interest is entitled to vote in favor of or against the Plan. A ballot for voting in favor of or against the Plan (the "Ballot") will be mailed along with the order approving this Disclosure Statement.

**THE VOTE OF EACH CREDITOR OR INTEREST HOLDER WITH AN IMPAIRED CLAIM OR INTEREST IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS AND BY THE DATE SET FORTH IN THE BALLOT.**

<div style="border:1px solid black">

**VOTING DEADLINE**

**The last day to vote to accept or reject the Plan is _____, 2017. All votes must be received by Clerk of the U.S. Bankruptcy Court for the District of Minnesota, located at 301 U.S. Courthouse, 300 S. Fourth Street, Minneapolis, MN 55415, by 5:00 p.m. (CT) on that day.**

</div>

Upon receipt, the Ballots will be tabulated and the results of the voting will be presented to the Bankruptcy Court for its consideration. As described in greater detail in Section IV of this

Disclosure Statement, the Bankruptcy Code prescribes certain requirements for confirmation of a plan. The Bankruptcy Court will schedule a hearing (the "Confirmation Hearing") to consider whether the Debtors have complied with those requirements.

The Bankruptcy Code permits a court to confirm a plan even if all Impaired Classes have not voted in favor of a plan. Confirmation of a plan over the objection of an Impaired Class is sometimes called "cramdown." As described in greater detail in Section IV of this Disclosure Statement, the Debtors have expressly reserved the right to seek "cramdown" in the event all Impaired Classes do not vote in favor of the Plan.

**THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO <u>ACCEPT</u> THE PLAN.**

## II.   DESCRIPTION OF THE DEBTORS' BUSINESS

A.   <u>In General</u>.

The Debtors are an integrated midstream energy company whose headquarters are located in Wayzata, Minnesota. Founded in 2008, the Debtors own and operate a 200-acre rail terminal (the "Pioneer Terminal") in the heart of the Bakken and Three Forks plays of the Williston Basin in North Dakota – Mountrail, McKenzie, Williams and Dunn. The Pioneer Terminal is located at the terminus of the Canadian Pacific line and has strategic proximity to the only Missouri River Bridge crossing for nearly 80 miles. The Debtors' business is comprised of "outbound operations," which included transloading crude oil from trucks and pipelines, storing in tanks and transloading onto trains, and "inbound operations," which included offloading frac sand from trains, storing in silos and transloading onto trucks.

B.   <u>Events Leading to Bankruptcy Filings</u>.

As set forth more fully below, the Debtors filed these Bankruptcy Cases as a result of the significant and well publicized pressures in the North American oil and gas industry,

the global decline in oil prices and the liquidity pressures placed upon the Debtors stemming from the foregoing.

In 2013, the Pioneer Terminal had nearly $70 million in capital expenditure projects for crude oil and frac sand operations. In the fiscal year 2015, the Debtors transloaded approximately 16.8 million barrels of crude oil and 600,000 tons of sand, which generated a total revenue of approximately $29 million.

The Debtors' fortunes changed as a result of the global decline in oil prices, which adversely impacted the demand for services offered by the Debtors at the Pioneer Terminal. For the twelve months ended December 31, 2015, the Debtors had a net income of approximately $8.5 million and an adjusted EBITDA of approximately $23.4 million. For the nine months ended September 30, 2016, the Debtors had an adjusted EBITDA loss of approximately $4.5 million. As of September 30, 2016, the Debtors had cash and cash equivalents and trade receivables of approximately $7.0 million and accounts payable and accrued expenses of approximately $13.4 million.

Before the Petition Date, the Debtors explored several strategic alternatives to address balance sheet issues and financial pressures caused by the global decline in oil prices, including (a) engaging in discussions with SunTrust Bank, the administrative agent for the Prepetition Lenders, focused on restructuring the Debtors existing funded debt obligations, (b) minimizing capital expenditures, (c) reducing general and administrative expenses, (d) managing the operating costs at the transloading facility, and (e) considering bankruptcy protection. Having explored these alternatives, the Debtors determined that a sale of substantially all of their assets would maximize the value of their assets for all stakeholders.

It was contemplated that if a buyer could be found, the sale would be consummated through a sale in bankruptcy. The Debtors engaged Canaccord Genuity, Inc. ("Canaccord") to develop and execute a marketing strategy and sale process with respect to the Debtors' businesses as going concerns on an expedited basis to maximize value for the benefit of all stakeholders and constituents. For the six month leading up to the Petition Date, Canaccord employed a comprehensive marketing process to identify potential bidders for the Debtors' assets. A detailed description of the sale process is set forth in the Declaration of Marty Beskow in Support of Chapter 11 Petitions and First Day Motions, filed with the Bankruptcy Court on December 21, 2016 (Doc. No. 11).

As a result of the robust sale process spearheaded by Canaccord, the Debtors identified multiple potentially interested parties, and ultimately reached an agreement with a potential buyer to serve as their stalking horse bidder for a sale substantially all of the Debtors' assets within the Bankruptcy Cases. On December 19, 2016, the Debtors and the purchaser entered into an asset purchase agreement, under which the purchaser would buy substantially all of the Debtors' assets for cash consideration of approximately $8.550 million.

The Debtors also negotiated a $2.0 million postpetition financing facility with SunTrust Bank, as administrative agent on behalf of the Prepetition Lenders, which would provide the Debtors with operating capital for a sufficient time period to execute a value-maximizing sale process (the "Post-Petition Financing"). Under the Post-Petition Financing agreement with SunTrust Bank, the Debtors were required to expeditiously move toward a number of sale milestones. The sale milestones were structured to allow for the Debtors' sale of substantially all of their assets to be closed within approximately 60 days after the start of the Bankruptcy Cases.

On December 20, 2016, the Debtors commenced these Bankruptcy Cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

C.      Events Subsequent to Chapter 11 Filing.

At the beginning of the Bankruptcy Cases, the Debtors sought and obtained permission to jointly administer the Bankruptcy Cases to minimize Administrative Expenses (Doc. No. 32). The Debtors also sought and obtained permission to retain bankruptcy counsel, Baker & Hostetler LLP and Ravich Meyer Kirkman McGrath Nauman & Tansey, P.A. (Doc. Nos. 110, 111), retain an investment banker, Canaccord (Doc. No. 76), and retain various other professionals, including auditors, accountants and special legal counsel (Doc. Nos. 69, 70, and 71). The Debtors also sought and obtained Bankruptcy Court approval of the Post-Petition Financing arrangement with SunTrust Bank (Doc. No. 36, 72), which gave the Debtors access to sufficient operating capital to conduct a post-bankruptcy marketing and sale process.

On December 21, 2016, the Debtors filed their Bid Procedures Motion, which, among other things, disclosed the stalking horse offer to purchase the Debtors' assets, and sought approval of certain bid procedures to establish a competitive auction process to achieve the highest and best sale price for the Debtors' assets and ensure a smooth transition of the Debtors' assets to a purchaser — thus preserving the jobs of the Debtors' former employees. The Bankruptcy Court entered an order granting the Bid Procedures Motion on December 29, 2016. Thereafter, in accordance with the Bankruptcy Court approved bid procedures, the Debtors continued marketing their assets and negotiating with potentially interested parties. Ultimately, the Debtors conducted an auction of substantially all of their assets on January 23, 2017. BioUrja Trading, LLC (the "Purchaser") provided the highest and best bid in the amount of $10.850 million. Following a hearing on January 27, 2017, the Bankruptcy Court entered the

Sale Order, which, among other things, approved the auction results and authorized the sale of substantially all of the Debtors' assets to the Purchaser.

Also early on in the Bankruptcy Cases, the Debtors filed a motion seeking Bankruptcy Court approval of the Debtors' assumption of a Plan Support Agreement with the WFS Entities (Doc. No. 16) (the "Motion to Approve Plan Support Agreement"). As set forth more fully in the Motion to Approve Plan Support Agreement, the Debtors had significant obligations to the WFS Entities, and additionally, the Debtors and the WFS Entities were involved in multiple lawsuits against each other. Among other things, the Plan Support Agreement provided for a global settlement of all disputed issues between the Debtors and the WFS Entities, and limited the Claims of the WFS Entities against the Debtors to a single Allowed Unsecured Claim in the amount of $15,000,000 (the "WFS Entities' Claim"). The Court entered an order granting the motion to approve the Plan Support Agreement with the WFS Entities on January 24, 2017 (Doc. No. 97).

Following the closing of the sale of substantially all of the Debtors assets, the Debtors will no longer operate, but will continue to liquidate any remaining assets and claims up until such assets are transferred to the Liquidating Trust in accordance with the Plan.

## III.   THE PLAN

**THE FOLLOWING SUMMARY IS INTENDED ONLY TO PROVIDE AN OVERVIEW OF THE DEBTORS' PLAN. ANY PARTY IN INTEREST CONSIDERING A VOTE ON THE PLAN SHOULD CAREFULLY READ THE PLAN IN ITS ENTIRETY BEFORE MAKING A DETERMINATION TO VOTE IN FAVOR OF OR AGAINST THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.**

A.    <u>Overview</u>.

The purpose of the Plan is to provide for the orderly liquidation of the Debtors' assets remaining after the Sale Transaction, which consist primarily of Causes of Action, and the distribution of the net proceeds of such liquidation to the Holders of Allowed Claims. To

accomplish that purpose, the Plan contemplates the transfer of the Liquidating Trust Assets to one Liquidating Trust. The purpose of the Liquidating Trust shall be to liquidate the Liquidating Trust Assets for the benefit of the Holders of Allowed Claims against the Debtors. The Liquidating Trustee will control the Liquidating Trust, subject to the terms of the Liquidating Trust Agreement.

All Claims against the Debtors shall be classified and treated pursuant to the terms of the Plan. As noted more fully below, the Plan contains five (5) Classes of Claims and Equity Interests. There are two (2) Classes of Secured Claims, one (1) Class of Unsecured Claims, one (1) Class of Priority Non-Tax Claims, and one (1) Class of Equity Interests.

B.    Classification of Claims and Equity Interests.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant hereto and pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy Code. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the Debtors have not been classified, and the Holders thereof are not entitled to vote on the Plan. The Classes, which shall be mutually exclusive, are as follows:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Prepetition Lender Secured Claim | Impaired | Yes |
| Class 3 | WFS Entities' Claim | Impaired | Yes |
| Class 4 | General Unsecured Claims | Impaired | Yes |
| Class 5 | Equity Interests | Impaired | No (deemed to reject) |

C.     Treatment of Claims and Equity Interests.

    1.     Administrative Claims.

        a.     Filing Administrative Claims.

Any Person, including any Professional who has rendered services to Debtors during the course of the Bankruptcy Cases, that asserts an Administrative Claim arising before the Confirmation Date, including Claims under Section 503(b) of the Bankruptcy Code, but excluding Administrative Claims for an expense or liability incurred and payable in the ordinary course of business by the Debtors, shall, on or before the Administrative Claims Bar Date or other date as set by Bankruptcy Court Order, file an application, motion, or request, as called for by the Rules, with the Bankruptcy Court for allowance of such Claim as an Administrative Claim specifying the amount of and basis for such Claim; *provided, however,* that applicants or movants who have previously filed applications, motions, or requests with the Bankruptcy Court need not file another such paper for the same Claim. Failure to file a timely application, motion, or request for allowance pursuant to this Section by any Holder of an Administrative Claim for an expense or liability incurred that is not payable in the ordinary course of business by the Debtors, other than such a Holder engaged or employed by the Debtors, shall bar such a claimant from seeking recovery on such Administrative Claim.

The Debtors estimate that that the unpaid Administrative Claims in these Chapter 11 Cases will not exceed $1,550,000, approximately the amount that has been included in the budgets filed by the Debtors in these Chapter 11 Cases (Docs. No. 67, 126 and 165).

        b.     Treatment of Administrative Claims.

Except to the extent that a Holder of an Allowed Administrative Claim agrees to a different treatment, each Holder of an Allowed Administrative Claim shall

receive, in full satisfaction, settlement and release of and in exchange for such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim, either: (i) as soon as reasonably practicable after the Effective Date, or (ii) if the Administrative Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such Administrative Claim becomes an Allowed Administrative Claim; *provided*, *however*, an Allowed Administrative Claim representing obligations incurred in the ordinary course of business of the debtors may be paid by the Debtors in the ordinary course, consistent with past practice of the Debtors and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such liabilities, without further action by the Holders of such Administrative Claims or further approval by the Bankruptcy Court.

(c)     U.S. Trustee Fees.

Fees payable to the United States Trustee in accordance with 28 U.S.C. 1930 shall be paid by the Liquidating Trustee as and when such fees become due.  Fees payable to the United States Trustee through the Confirmation Date shall be paid as of the Effective Date.

2.     Priority Tax Claims.

Except to the extent that the Holder of an Allowed Priority Tax Claim agrees to a different treatment, on the first day of the full calendar quarter following the later of the Effective Date or the date that such Priority Tax Claim becomes an Allowed Claim, the Liquidating Trustee will commence quarterly payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, based on a five year amortization plus interest at five percent (5%), with final payment due on or before five years from the Petition Date. Such payments will be in full satisfaction of any Allowed Priority Tax Claim.

The Debtors do not believe it owes any Priority Tax Claims.

3.    <u>Class 1 – Priority Non-Tax Claims</u>.

The legal, equitable and contractual rights of the Holders of Class 1 Claims are unaltered by the Plan.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to different treatment, and after the date a Priority Non-Tax Claim becomes an Allowed Claim, on the Effective Date, or as soon thereafter as is reasonably practicable, the Holder of such Allowed Priority Non-Tax Claim shall receive cash from the Debtors or the Liquidating Trustee, as the case may be, in an amount equal to such Claim.  To the extent such claims exist, the Priority Non-Tax Claims are unimpaired and, as such, are not entitled to vote on the Plan.

4.    <u>Class 2 – Prepetition Lender Secured Claim</u>.

Class 2 consists of the Prepetition Lender Secured Claim.  As of December 20, 2016, the Debtors were indebted and liable to the Prepetition Lenders and Administrative Agent under the Prepetition Loan Documents, without objection, defense, counterclaim or offset of any kind, in in the aggregate principal amount of $56,925,000 plus accrued interest (including paid-in-kind interest) in the amount of $4,719,401.06, plus unpaid amendment fees thereon in the addition amount of approximately just over $1,019,250 plus, in connection with the foregoing amounts, certain expenses, and all other obligations payable under the Prepetition Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the Prepetition Loan Documents.

In full satisfaction of the Prepetition Lenders Allowed Class 2 Claim, the Prepetition Lenders shall, in addition to the previously received Prepetition Lender Sale Proceeds, retain their Lien, and (a) receive all the Cash subject to its Lien on the Effective Date,

except for an amount equal to $30,000 (the "Liquidating Trust Carveout"); and, (b) at the election of the Prepetition Lenders, either: (i) the proceeds of liquidation of all other Estate Assets subject to the Prepetition Lenders' Lien; or (ii) return of the Prepetition Lenders' collateral as the indubitable equivalent of such portion of the Secured Claim with the return to occur on the Effective Date. To the extent the Prepetition Lenders elect to have the Liquidating Trustee administer and collect on the Prepetition Lenders' non-cash collateral, the Liquidating Trustee and the Prepetition Lenders will first reach agreement as to the Prepetition Lenders payment of the fees and costs associated with liquidating the Prepetition Lenders' non-cash collateral.

The Prepetition Lenders Deficiency Claim shall be treated as an Allowed General Unsecured Claim in Class 4.

The Class 2 Claim of the Prepetition Lenders is Impaired and, as such, the Prepetition Lenders are entitled to vote on the Plan.

5.   <u>Class 3 – WFS Entities' Claim</u>.

Class 3 consists of the WFS Entities' Claim. Pursuant to the Bankruptcy Court's Order Authorizing the Debtors' Assumption of Plan Support Agreement (Doc. No. 97), the Bankruptcy Court authorized the Debtors' to assume the Plan Support Agreement between the WFS Entities and the Debtors. Among other things, the Plan Support Agreement included a global settlement of the Debtors' Claims against the WFS Entities and of the WFS Entities' Claims against the Debtors and an acknowledgement of the WFS Entities that the WFS Entities' Claim, and all Distributions in respect thereof is subject to that certain Seller Subordination Agreement dated as of December 5, 2014 by and between WFS, PTS, WFS Inc., Western, and the Administrative Agent. **See Exhibit "B"**

In full satisfaction of the WFS Entities' Allowed Class 3 Claims, and in accordance with the Court approved Plan Support Agreement, WFS shall receive an Allowed Unsecured Claim in the amount of $15,000,000.00, which shall be treated as an Allowed Unsecured Claim in Class 4, and which Claim shall not be subject to offset, objection, defense, or counterclaim.

The Class 3 Claim of the WFS Entities is impaired and, as such, the WFS Entities are entitled to vote on the Plan.

6.     Class 4 – Unsecured Claims.

Class 4 consists of all Allowed Unsecured Claims against the Debtors.  In full and final satisfaction of each Allowed Unsecured Claim, each Holder of an Allowed Unsecured Claim shall be entitled to a Pro Rata Share of the Beneficial Interests in the Liquidating Trust in accordance with the Liquidating Trust Agreement; provided that the Liquidating Trustee shall make all Distributions in respect of the Allowed Unsecured Claim of the WFS Entities received in satisfaction of the WFS Entities' Allowed Class 3 Claims to the Administrative Agent in accordance with the terms of the Seller Subordination Agreement dated as of December 5, 2014 by and between WFS, PTS, WFS Inc., Western, and the Administrative Agent.

The Class 4 Claims of Unsecured Creditors are Impaired and, as such, the Holders of Unsecured Claims are entitled to vote on the Plan.

The Debtors estimate Allowed General Unsecured Claims  to be treated in Class 4 (including the Prepetition Lenders Deficiency Claim and the Class 3 Claim of the WFS Entities) is estimated to be in excess of $69 million.  At this time, the Debtors are unable to provide an estimate of the likely net proceeds from the liquidation of the Liquidating Trust Assets because the primary asset of the Liquidating Trust will be causes of action.  Any recovery

by the Liquidating Trust is speculative and depends on various factors that are unknown at this time.  The Debtors do not anticipate that the Liquidating Trustee will make a distribution to the holders of Allowed Unsecured Claims until causes of action have been liquidated and collected.

      7.    <u>Class 5 — Equity Interests</u>.

Class 5 consists of all Equity Interests in the Debtors.  The Debtors' Equity Interests will be cancelled on the Effective Date of the Plan and the Liquidating Trustee will take any necessary steps to formally dissolve each of the Debtors in accordance with applicable law.  Because the Class 5 Equity Interests are being cancelled, Holders of Equity Interests are deemed to reject the Plan and, as such, they are not entitled to vote on the Plan.

      D.    <u>Means of Implementation</u>.

      1.    <u>Substantive Consolidation</u>.

The Plan shall serve as a motion requesting the substantive consolidation of the Debtors into a single entity.  Entry of the Confirmation Order shall constitute approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Bankruptcy Cases. On and after the Effective Date:  (i) all assets and liabilities of the Debtors shall be merged, so that all of the assets of the Debtors shall be available to pay all of the liabilities under the Plan; (ii) no distributions shall be made under the Plan on account of Intercompany Claims; (iii) all guarantees by the Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of the Debtor shall be one obligation of the substantively consolidated Debtors; and (iv) each and every Claim filed or Allowed, or to be filed or Allowed, in the case of any of the Debtors shall be deemed filed or allowed against the substantively consolidated Debtors.

2.      <u>Transfer of Property to the Liquidating Trust</u>.

On the Effective Date, the Debtors shall be deemed to have irrevocably transferred and assigned to the Liquidating Trust the Liquidating Trust Assets, to hold in trust for the benefit of all Holders of Allowed Claims against any and all of the Debtors, pursuant to the terms of the Plan and of the Liquidating Trust Agreement.

Unless otherwise provided by this Plan or the Liquidating Trust Agreement, upon the Effective Date, title to the Liquidating Trust Assets shall pass to the Liquidating Trust free and clear of all Claims and Equity Interests, in accordance with section 1141 of the Bankruptcy Code, except for validly perfected Liens on the Liquidating Trust Assets, which shall continue to encumber the Liquidating Trust Assets to the same validity, extent and priority as existed prior to the Effective Date.  For the avoidance of doubt, it is the intent of this section that all assets of the Debtors be transferred to the Liquidating Trust, and that after the Effective Date, the Debtors will retain no assets of any nature whatsoever.

3.      <u>Dissolution of the Debtors</u>.

Following the transfers contemplated in Article V(A)(2) of the Plan, the Debtors shall be deemed dissolved.  The Liquidating Trustee shall have all power to wind up the affairs of each of the Debtors under applicable state laws in addition to all rights, powers, and responsibilities conferred by the Bankruptcy Code, the Plan, the Liquidating Trust Agreement, and may, but shall not be required to, dissolve the Debtors under applicable state law.

4.      <u>Formation, Operations and Dissolution of the Liquidating Trust</u>.

On the Effective Date, the Debtors will form the Liquidating Trust, and the Liquidating Trust Assets shall automatically vest in the Liquidating Trust, free and clear of all Liens, Claims and encumbrances, except to the extent otherwise provided in the Plan.  The sole purpose of the Liquidating Trust shall be to liquidate and distribute the Liquidating Trust

Assets to the Holders of Beneficial Interests. The Liquidating Trust shall be governed in accordance with the Liquidating Trust Agreement and consistent with the Plan.

The Liquidating Trustee will be designated by the Debtors in a Plan Supplement filed not less than 10 days prior to the Confirmation Hearing. The Plan Supplement will include (a) the Liquidating Trust Agreement; (b) the Debtors' designation of the Liquidating Trustee; and (c) the size of the Liquidation Trust Carveout.

The Liquidating Trustee shall be responsible for making distributions from the Liquidating Trust as provided by the Plan and the Liquidating Trust Agreement. Any Liquidating Trust Assets available for distribution shall be applied (a) first, to pay or reimburse, as applicable, the reasonably, documented out-of-pocket fees, costs, expenses, and liabilities of the Liquidating Trust and Trustee, and (b) second, to distributions to Holders of Beneficial Interests.

The Liquidating Trustee may retain counsel and other professionals to assist in the Liquidating Trustee's duties on such terms as the Liquidating Trustee deems appropriate as set forth in the Liquidating Trust Agreement. The Liquidating Trustee may retain professionals who represented parties in interest in the Bankruptcy Cases. The Liquidating Trustee and professionals retained by the Liquidating Trustee shall be entitled to reasonable compensation from the Liquidating Trust as set forth in the Liquidating Trust Agreement.

The Liquidating Trust and the Liquidating Trustee shall be discharged or dissolved, as the case may be, at such time as (i) the Liquidating Trust Assets have been liquidated; (ii) all distributions required to be made by the Liquidating Trust under the Plan have been made, but the Liquidating Trust shall not be dissolved later than three (3) years after the Effective Date absent Bankruptcy Court approval.

The Liquidating Trustee and the Liquidating Trustee's agents and professionals, shall not be liable for actions taken or omitted in their capacity as, or on behalf of, the Liquidating Trustee, except for those acts arising out of its or their own willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty or *ultra vires* acts, each as determined by Final Order of the Bankruptcy Court, and each shall be entitled to indemnification and reimbursement for fees and expenses incurred in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Liquidating Trustee, except for actions or inactions for willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty or *ultra vires* acts, each as determined by Final Order of the Bankruptcy Court.   Any indemnification claim of the Liquidating Trustee, its agents or professionals, shall be satisfied from the Liquidating Trust Assets.   The Liquidating Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.

E.      Leases and Executory Contracts.

To the extent the Debtors reject any executory contract or unexpired lease prior to the Confirmation Date, any party asserting a Claim, pursuant to Section 365 of the Bankruptcy Code, arising from the rejection of an executory contract or unexpired lease shall file a proof of such Claim within thirty (30) days after the entry of an Order rejecting such contract or lease, and any Allowed Claim resulting from rejection shall be a Class 4 Unsecured Claim.   The Debtors shall have through and including the hearing on Confirmation within which to assume or reject any unexpired lease or executory contract; and, further, that in the event any such unexpired lease or executory contract is not assumed (or subject to a pending motion to assume) by such date, then such unexpired lease or executory contract shall be deemed rejected as of the Confirmation Date.   For the avoidance of doubt, it is the Debtors' position that the executory

contracts listed in the schedule of executory contracts filed pursuant to Rule 1007(b)(1)(B) are the only executory contracts to which any of the Debtors was a party on the Petition Date.

F.    Comprehensive Settlement of Claims and Controversies.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under this Plan, the provisions of this Plan will constitute a good faith compromise and settlement of all Claims and Equity Interests or controversies relating to the rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Allowed Equity Interest or any Distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Equity Interest.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises are (a) in the best interests (x) of the Debtors and their respective Estates and property, and (y) of the Claim and Equity Interest Holders; and (b) fair, equitable, and reasonable.

G.    Additional Provisions.

1.    Procedures For Resolving Disputed Claims.

a.    Prosecution of Objections to Claims.

Unless otherwise ordered by the Bankruptcy Court, after notice and a hearing, and except as otherwise provided in the Plan, only the Liquidating Trustee shall have the right to make and file objections to Claims, subject to prior orders of the Bankruptcy Court.

Pursuant to the Plan, unless another time is set by order of the Bankruptcy Court, all objections to Claims and Equity Interests shall be filed with the Court and

served upon the Holders of each of the Claims and Equity Interests to which objections are made within 90 days after the Effective Date.

Except as may be specifically set forth in the Plan and in the DIP Order, nothing in the Plan, the Disclosure Statement, the Confirmation Order or any Order in aid of Confirmation shall constitute, or be deemed to constitute, a waiver or release of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the commencement of the Bankruptcy Case, against or with respect to any Claim or Equity Interest. Except as set forth in the Plan, upon Confirmation, the Debtors and Liquidating Trust shall have, retain, reserve and be entitled to assert all such Claims, Causes of Action, rights of setoff and other legal or equitable defenses (i) that the Debtors had immediately prior to the commencement of the Bankruptcy Cases as if the Bankruptcy Cases had not been commenced, or (ii) that the Debtors possessed under the Bankruptcy Code  Without limiting the generality of the foregoing, a Summary of Reserved Claims describing certain claims in more detail is attached hereto as **Exhibit "A"**.

b.    <u>Estimation of Claims</u>.

Pursuant to the Plan, the Debtors or Liquidating Trustee may, at any time, request that the Bankruptcy Court estimate any contingent, disputed, or unliquidated Claim, pursuant to Section 502(c) of the Bankruptcy Code for purposes of determining the Allowed amount of such Claim, regardless of whether the Debtors or Liquidating Trustee have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any

contingent, disputed, or unliquidated Claim for allowance purposes, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or Liquidating Trustee may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

2.    <u>Cumulative Remedies</u>.

In accordance with the Plan, all of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court. Until such time as a Claim becomes or is otherwise deemed in this Plan to be an Allowed Claim, such Claim shall be treated as a Disputed Claim for purposes related to allocations, Distributions, and voting under the Plan.

3.    <u>Disallowance of Certain Claims and Equity Interests</u>.

According to the Plan, all Claims held by Persons against whom the Debtors have obtained a Final Order establishing liability for a cause of action under Sections 542, 543, 522(f), 522(h), 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code shall be deemed disallowed Claims, pursuant to Section 502(d) of the Bankruptcy Code, and Holders of such Claims may not vote to accept or reject the Plan, both consequences to be in effect until such time as such causes of action against that Person have been settled or resolved by a Final Order and all sums due the Debtors by that Person are turned over to Debtors or Liquidating Trustee.

4.      Controversy Concerning Impairment.

If a controversy arises as to whether any Claims or Equity Interests or any Class of Claims or Equity Interests are Impaired under the Plan, the Bankruptcy Court, after notice and a hearing, shall determine such controversy before the Confirmation Date. If such controversy is not resolved prior to the Effective Date, the Debtors' interpretation of the Plan shall govern.

5.      No Distribution Pending Allowance.

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no Plan Payment or Distribution shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.  On or after the Effective Date, if any Disputed Claim becomes an Allowed Claim, the Liquidating Trustee shall distribute to the Holder thereof the Distributions that such Holder would have received had its Claim been Allowed on the Effective Date.

**IV.    CONFIRMATION**

A.      Confirmation Hearing.

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing on the Plan at which time any party in interest may be heard in support of or in opposition to Confirmation.  The Confirmation Hearing may be adjourned from time-to-time without further notice except for an announcement to be made at the Confirmation Hearing.  Any objection to Confirmation must be made in writing and filed with the Clerk, and delivered to the following persons, at least seven (7) days prior to the Confirmation Hearing:

To Debtors:

Dakota Plains Holdings, Inc.
P.O. Box 1895
Maple Grove, MN 55311

{00354514 }                                    22

With copies to:

Counsel for the Debtors:

Elizabeth A. Green, Esquire
Jimmy D. Parrish, Esquire
Baker & Hostetler, LLP
200 S. Orange Avenue
SunTrust Center, Suite 2300
Orlando, Florida 32801-3432

To the Liquidating Trustee:

ADDRESS TO BE PROVIDED IN THE PLAN SUPPLEMENT

United States Trustee:

U.S. Trustee's Office
Attn: Michael R. Fadlovich
Suite 1015 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

B.    <u>Financial Information Relevant to Confirmation</u>.

Debtors note that the Plan calls for liquidation of the Debtors' remaining assets and distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code and the Plan.   At this time the Debtors are unable to provide an estimate of the likely net proceeds from liquidation and collection of the causes of action.  In the event of a conversion of the Bankruptcy Cases to Chapter 7, additional administrative expenses would be deducted prior to any distribution to holders of Allowed Unsecured Claims.  As a result, holders of Allowed Unsecured Claims are almost certain to receive less in the event the Debtors are forced into Chapter 7.  The Debtors believe that a conversion to Chapter 7 will increase legal and statutory fee due to a Chapter 7 Trustee and its counsel without the ability to pay since the Debtors DIP Loan will terminate and the Prepetition Lenders' agreement to pay the Liquidation Trust Carveout will also terminate.

C.      <u>Confirmation Standards</u>.

For a plan of reorganization to be confirmed, the Bankruptcy Code requires, among other things, that a plan be proposed in good faith and comply with the applicable provisions of Chapter 11 of the Code. Section 1129 of the Code also imposes requirements that at least one class of Impaired Claims accept a plan, that confirmation of a plan is not likely to be followed by the need for further financial reorganization, that a plan be in the best interests of creditors, and that a plan be fair and equitable with respect to each class of Claims or Interests which is Impaired under the plan.

The Bankruptcy Court shall confirm a plan only if it finds that all of the requirements enumerated in Section 1129 of the Bankruptcy Code have been met. The Debtors believe that the Plan satisfies all of the requirements for Confirmation.

1.      <u>Best Interests Test</u>.

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of an Allowed Claim or Equity Interest of such Class either:  (a) has accepted the Plan; or (b) will receive or retain under the Plan, on account of such Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were, on the Effective Date, liquidated under Chapter 7 of the Code.  The Debtors believe that satisfaction of this test will be established by the Liquidation Analysis.

2.      <u>Financial Feasibility</u>.

The Bankruptcy Code requires, as a condition to Confirmation, that Confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor unless the liquidation is proposed in the Plan.  The Debtors

assert that the Plan is feasible and believe that they will be able to prove such at the Confirmation Hearing.

        3.     <u>Acceptance by Impaired Classes</u>.

The Bankruptcy Code requires as a condition to Confirmation that each Class of Claims or Equity Interests that is Impaired under the Plan accept such plan, with the exception described in the following section. A Class of Claims has accepted the Plan if the Plan has been accepted by Creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class who vote to accept or to reject the Plan.

A Class of Equity Interests has accepted the Plan if the Plan has been accepted by holders of Equity Interests that hold at least two-thirds (2/3) in amount of the Allowed Equity Interests of such Class that vote to accept or reject the Plan. Holders of Claims or Equity Interests who fail to vote are not counted as either accepting or rejecting the Plan.

A Class that is not Impaired under a Plan is deemed to have accepted such Plan; solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless: (i) the legal, equitable, and contractual rights to which the Claim or Equity Interest entitles the holder of such Claim or Equity Interest are not modified; (ii) with respect to Secured Claims, the effect of any default is cured and the original terms of the obligation are reinstated; or (iii) the Plan provides that on the Effective Date the holder of the Claim or Equity Interest receives on account of such claim or interest, Cash equal to the Allowed Amount of such Claim or, with respect to any Equity Interest, any fixed liquidation preference to which the holder is entitled.

4.      <u>Confirmation Without Acceptance by all Impaired Classes: "Cramdown."</u>

The Bankruptcy Code contains provisions that enable the Bankruptcy Court to confirm the Plan, even though all Impaired Classes have not accepted the Plan, provided that the Plan has been accepted by at least one Impaired Class of Claims.  Section 1129(b)(1) of the Code states:

> "Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

This section makes clear that the Plan may be confirmed, notwithstanding the failure of an Impaired Class to accept the Plan, so long as the Plan does not discriminate unfairly and it is fair and equitable with respect to each Class of Claims that is Impaired under and has not accepted the Plan.

**THE DEBTORS BELIEVE THEY ARE ABLE TO MEET THE STATUTORY STANDARDS SET FORTH IN THE BANKRUPTCY CODE WITH RESPECT TO NONCONSENSUAL CONFIRMATION OF THE PLAN AND WILL SEEK SUCH RELIEF IF NECESSARY.**

D.      <u>Consummation</u>.

The Plan will be consummated and Plan Payments made if the Plan is confirmed pursuant to a Final Order of the Bankruptcy Court and Distributions under the Plan commence. It will not be necessary for the Debtors to await any required regulatory approvals from agencies or departments of the United States to consummate the Plan as the Debtors are not aware of any such required approvals.  The Plan will be implemented pursuant to its provisions and the Code.

E.      Effect of Confirmation.

        1.      Amendments to the Plan.

        The Debtors reserve all rights to amend, alter, or withdraw this Plan before

conclusion of the hearing on Confirmation and to amend, modify, or alter this Plan after the

Confirmation Date, all in accordance with the applicable provisions of the Bankruptcy Code.

        2.      Authority to Effectuate the Plan.

        Upon the entry of the Confirmation Order by the Bankruptcy Court, all

matters provided under the Plan will be deemed to be authorized and approved without further

approval from the Bankruptcy Court.  The Debtors and Liquidating Trustee shall be authorized,

without further application to or Order of the Bankruptcy Court to take whatever action is

necessary to achieve consummation and carry out the Plan in accordance with this Plan and the

Bankruptcy Code.

        3.      Post-Confirmation Status Report.

        Within 120 days of the entry of the Confirmation Order, the Debtors or

Liquidating Trustee will file a status report with the Bankruptcy Court explaining what progress

has been made toward consummation of the confirmed Plan. The status report will be served on

the United States Trustee and those parties who have requested special notice post-confirmation.

The Bankruptcy Court may schedule subsequent status conferences in its discretion.

        F.      Exculpation and Limited Liability.

        *None of the Debtors, the Administrative Agent, Prepetition Lenders, the DIP*

*Lenders, the DIP Agent, the WFS Entities, or their respective principals, shareholders, members,*

*officers, directors, employees, affiliates, agents, professionals, or representatives (collectively*

*the "Exculpation Parties") shall have or incur any liability to any Holder of a Claim or Equity*

*Interest or any other party in interest, or any of their respective principals, shareholders, members, officers, directors, employees, affiliates, agents, professionals, or representatives, or any of their successors or assigns, for any act or omission in connection with, related to, or arising out of the Bankruptcy Cases, including, without limitation, negotiations regarding or concerning the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Exculpation Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.*

## V.   ALTERNATIVE TO THE PLAN

If the Plan is not confirmed and consummated, the Debtors believe that the most likely alternatives are a sale of the Debtors or a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.  The Debtors believe that each alternative is a much less attractive to Creditors than the Plan because of the increased administrative expenses with no return to Creditors other than the Prepetition Lenders (which hold a first-priority lien on substantially all of the Debtors' assets).

## VI.   CONCLUSION

The Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan.

RESPECTFULLY SUBMITTED this 9th day of June, 2017.

**FOR DAKOTA PLAINS HOLDINGS, INC., ET AL.**

By: _____
     Marty Beskow
     Chief Financial Officer

**COUNSEL FOR THE DEBTORS**

/e/ Michael F. McGrath
Michael F. McGrath (#168610)
Will R. Tansey (#323056)
150 S. Fifth Street, Suite 3450
Minneapolis, MN 55402
Telephone: 612.317.4744
Email: mfmcgrath@ravichmeyer.com
     wrtanser@ravichmeyer.com

Elizabeth A. Green
Jimmy D. Parrish
BAKER & HOSTETLER LLP
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL 32801-3432
Telephone: 407.649.4000
Email: egreen@bakerlaw.com
     jparrish@bakerlaw.com

Jorian L. Rose
BAKER & HOSTETLER LLP
45 Rockefeller Center
New York, New York  10111
Telephone:  212.589.4200
Email: jrose@bakerlaw.com

Eric R. Goodman
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, Ohio  44114
Telephone:  216.621.0200
Email: egoodman@bakerlaw.com

## Exhibit "A"

## SUMMARY OF RESERVED CLAIMS

Except to the extent the Plan expressly provides otherwise, the Liquidating Trust shall reserve, retain, and be entitled to assert as Liquidating Trust Assets all Claims, Causes of Action, rights of setoff and other legal and equitable defenses (i) that the Debtors had immediately prior to the commencement of the Bankruptcy Cases as if the Bankruptcy Case had not been commenced, or (ii) that the Debtors had under the Bankruptcy Code.   Without limiting the foregoing, this schedule sets forth certain claims that are Liquidating Trust Assets in greater detail; the failure to refer to a potential Claim, Cause of Action, right of setoff or other legal or equitable defense does not waive it.   The Debtors' investigation of their potential claims has not been completed, and the following discussion is to the best of the Debtors' current understanding. The Debtor expects that the potential defendants will vigorously contest its potential claims and defenses.

## I.   INTRODUCTION

The Debtors' struggles in the face of declining oil and gas prices were exacerbated by the misconduct of the Debtors' founders, Ryan Gilbertson ("Gilbertson") and Michael Reger ("Reger"), and their co-conspirators, who schemed to siphon millions of dollars from the Debtors between 2008 and 2012.   Gilbertson and Reger founded the Debtors in 2008 and controlled the Debtors through their fathers, who were appointed as figurehead directors and officers.

Gilbertson and Reger's fathers both resigned in February 2011, one month after causing the cash-strapped Debtor Dakota Plains Holdings, Inc. ("**Dakota Plains**") to issue a $1.9 million dividend that paid Gilbertson alone $450,000.   Gilbertson and Reger subsequently caused Dakota Plains to hire them as consultants, and they advised Dakota Plains on transactions that were often for Gilbertson and Reger's own benefit. Between February and April 2011, on Gilbertson's

advice, Dakota Plains issued promissory notes to borrow $9 million at 12% interest from Gilbertson and other shareholders to replace the liquidity lost in the aforementioned dividend. The majority of these notes by principal balance contained a "synthetic conversion feature" that effectively paid the noteholder a bonus if Dakota Plains were to go public, based upon the average trading price during the first twenty days.  By November 2011, at Gilbertson's urging, Dakota Plains added the "synthetic conversion feature" to all of the notes.  Gilbertson then advised Dakota Plains to merge with a public shell company as quickly as possible.  Dakota Plains went public via a merger with a public shell company that was completed in March 2012.

After Dakota Plains merged with a public company, the vast majority of its stock was restricted and could not be traded.  Gilbertson and his associates obtained a significant fraction of the unrestricted stock and engaged in a series of choreographed trades to fraudulently inflate Dakota Plains' stock price from 30 cents to over $12 per share, triggering additional promissory notes under the "synthetic conversion feature" totaling approximately $32 million.  Gilbertson's share of the additional promissory notes exceeded $13 million.  The synthetic conversion feature debts were restructured twice:  once after other shareholders discovered and complained about the synthetic conversion feature, and once after Dakota Plains discovered a suspicious pattern of trading activity.

In September 2016, Gilbertson sued Dakota Plains and others demanding indemnification for his legal fees in defending ongoing investigations by the Department of Justice and Securities and Exchange Commission (the "Indemnification Action").  *Gilbertson v. Dakota Plains Holdings, Inc. et. al.*, Case No. 27-cv-16-14393 (4th Judicial Dist. Hennepin 2016).  Dakota Plains filed counterclaims against Gilbertson seeking damages for fraud in the inducement and unjust enrichment in the Indemnification Action.

On October 31, 2016, the Securities and Exchange Commission filed suit against Gilbertson and two associates that allegedly participated in the synthetic conversion feature scheme, Douglas Hoskins and Thomas Howells.  The matter is ongoing.  That same day, the Securities and Exchange Commission entered a consent order against Reger related to the same subject, through which Reger agreed to pay in excess of $7 million in disgorgement, interest, and penalties, among other things.

On March 22, 2017, the Department of Justice indicted Gilbertson, Hoskins, and Nicholas Shermeta for wire fraud in respect of the synthetic conversion feature scheme.

## II.    <u>SUMMARY OF CLAIMS</u>

Without limiting the Claims, Causes of Action, rights of setoff and other legal and equitable defenses retained by the Liquidating Trust, the Debtors believe the following items exist and will be transferred to, and reserved by, the Liquidating Trust.  References to Gilbertson and Reger herein include any trusts, corporations, business associations, or other entities or trust relationships under their control or for the benefit of their families.

1.    Claims and causes of action for avoidance and recovery under sections 541 – 553 of the Bankruptcy Code and applicable state law, including but not limited to (i) preference claims against all parties who received payments within 90 days prior to the bankruptcy, and all insiders who received payments within 1 year prior to the bankruptcy, including but not limited to all entities identified in Items 3(b) and 3(c) of the Debtors' statements of financial affairs, and (ii) turnover and fraudulent conveyance actions related to the February 2012 dividend, consulting fees paid to insiders, and the synthetic conversion feature, including payments or obligations to Gilbertson, Reger, 12 West Partners, 1242 Investments, LLC, Jack A. Norqual, JSC Trust U/A Dated 4/7/1999, Ken Evenstad, Mark Evenstad, Gilbertson, Ryan Gilbertson 2012 Family Trust, Total Depth Foundation, Weldon W. Gilbertson as Custodian for Holden Gilbertson.  Wayzata

Bay Capital, LLC, Jessica Gilbertson, Reger, Reger Gas Investments, LLC, and Joseph C. Reger as Custodian for John Michael Reger and Williston James Reger.

2.    Any and all claims, defenses and causes of action against Gilbertson and Reger related to their conduct while they controlled the Debtors, including the transfers, dividends, consulting fees, or synthetic conversion feature scheme referred to herein, with such claims and defenses including but not limited to the counterclaims and defenses raised in the Indemnification Action, conspiracy, aiding and abetting, breach of fiduciary duty, failure to abide by applicable standards of care, fraud, receipt of illegal dividends, negligent misrepresentation, self-dealing, breach of contract, negligence, conversion, embezzlement, conflict of interest, unjust enrichment, fraud in the inducement, or misuse of inside information.

3.    Any and all claims and causes of action against (i) beneficiaries of, or (ii) known or unknown co-conspirators with Gilbertson and Reger with respect to the February 2012 dividend, consulting fees paid to insiders, or the synthetic conversion feature fraud, including but not limited to claims against Reger and Gilbertson's fathers, Hoskins, Howells, Shermeta, James Sankovitz, any professionals who assisted Gilbertson and Reger with respect to their misconduct, 12 West Partners, 1242 Investments, LLC, Jack A. Norqual, JSC Trust U/A Dated 4/7/1999, Ken Evenstad, Mark Evenstad, Gilbertson, Ryan Gilbertson 2012 Family Trust, Total Depth Foundation, Weldon W. Gilbertson as Custodian for Holden Gilbertson. Wayzata Bay Capital, LLC, Jessica Gilbertson, Reger, Reger Gas Investments, LLC, and Joseph C. Reger as Custodian for John Michael Reger and Williston James Reger.  The claims include, but are not limited to conspiracy, aiding and abetting, breach of fiduciary duty, failure to abide by applicable standards of care, fraud, receipt of illegal dividends, negligent misrepresentation, self-dealing, breach of contract, negligence, conversion, embezzlement, conflict of interest, unjust enrichment, fraud in

the inducement, and misuse of inside information.

4.      Any and all rights as a victim of a crime to recover some or all of the funds recovered by the Securities and Exchange Commission, Department of Justice, or other governmental entities, including funds recovered from Gilbertson, Reger, Hoskins, Howells, Shermeta, or any other criminal or civil defendant.

5.      Any and all claims, causes of action, or defenses in any pending litigation.

6.      Any other claims, causes of action, or defenses arising out of the above Introduction and Summary.

7.      Any claims necessary to pursue collection from any defendant, including alter ego, resulting trust, and fraudulent transfer under state or federal law.

There may be numerous additional causes of action based upon state or federal law which currently exist or may arise that are not set forth in this Disclosure Statement, predominantly because the facts that form the basis for such causes of action are not fully currently known by the Debtors, given the fraud by their former management (the "Unknown Causes of Action"). It is the Debtors intent that all such Unknown Causes of Action shall be preserved and transferred to the Liquidating Trust.

EXECUTION VERSION

# Exhibit "B"

## SELLER SUBORDINATION AGREEMENT

**THIS SELLER SUBORDINATION AGREEMENT** (this "Agreement") is made as of December 5, 2014, by and among (i) **WORLD FUEL SERVICES CORPORATION**, a Florida corporation ("WFS"), **PETROLEUM TRANSPORT SOLUTIONS, LLC**, a Minnesota limited liability company ("PTS"), **WORLD FUEL SERVICES, INC.** ("WF Inc."), a Texas corporation, and **WESTERN PETROLEUM COMPANY**, a Minnesota corporation ("Western," and together with WFS, PTS and WF Inc., the "Subordinated Sellers"), (ii) **DAKOTA PLAINS TRANSLOADING, LLC**, a Minnesota limited liability company, **DAKOTA PLAINS SAND, LLC**, a Minnesota limited liability company, and **DAKOTA PLAINS MARKETING, LLC**, a Minnesota limited liability company (collectively, the "Borrowers"), (iii) the Guarantors party hereto and (iv) **SUNTRUST BANK**, a Georgia banking corporation (the "Administrative Agent") as administrative agent for the Lenders.

**WHEREAS**, the Borrowers, the Administrative Agent and the Lenders and the other parties thereto have entered into a Credit Agreement of even date herewith (as the same may be amended, supplemented or otherwise modified from time to time, the "Senior Credit Agreement") pursuant to which, among other things, Lenders have agreed to make certain loans and financial accommodations to the Borrowers. All of the Borrowers' obligations to the Administrative Agent, the Lenders and the other Senior Secured Parties under the Senior Credit Agreement and the other Senior Debt Documents (as hereinafter defined) are secured by Liens on and security interests in substantially all of the now existing and hereafter acquired real and personal property of the Borrowers and the Guarantors under the Senior Credit Agreement (the "Collateral").

**WHEREAS**, the Borrowers and/or certain of their affiliates and the Subordinated Sellers and the applicable other parties thereto have entered into, or will enter into, as applicable, (i) a Membership Interest Purchase Agreement, dated as of December 5, 2014 (as the same may be amended, supplemented or otherwise modified from time to time, the "Purchase Agreement"), (ii) a Seller Guaranty and Security Agreement, dated as of December 5, 2014 (as the same may be amended, supplemented or otherwise modified from time to time, the "Guaranty and Security Agreement"), (iii) an Escrow Agreement, dated as of December 5, 2014 (as the same may be amended, supplemented or otherwise modified from time to time, the "Escrow Agreement") ,(iv) an Indemnification and Release Agreement, dated as of December 5, 2014 (as the same may be amended, supplemented or otherwise modified from time to time, the "Indemnification Agreement") and (v) a Second Mortgage, Collateral Real Estate Mortgage, Deed of Trust, Assignment, Security Agreement and Financing Statement or similar agreement by Dakota Plains Holdings, Inc. to WFS, as Security Agent (as the same may be amended, supplemented or otherwise modified from time to time, the "Second Mortgage", and together with the Purchase Agreement, the Guaranty and Security Agreement, the Escrow Agreement, the Indemnification Agreement and the other documents and instruments executed in connection therewith, the "WFS Transaction Documents"), pursuant to which (a) Dakota Plains Transloading, LLC, a Minnesota limited liability company, has agreed to acquire all of the outstanding membership interests of Dakota Petroleum Transport Solutions, LLC, a Minnesota limited liability company, owned by PTS, (b) Dakota Plains Sand, LLC, a Minnesota limited liability company, has agreed to acquire all of the outstanding membership interests of DPTS Sand, LLC, a Minnesota limited

liability company owned by PTS and (c) Dakota Plains Marketing, LLC, a Minnesota limited liability company, has agreed to acquire all of the outstanding membership interests of DPTS Marketing, LLC, a Minnesota limited liability company ("DPTSM"), owned by PTS.

WHEREAS, pursuant to the WFS Transaction Documents, the Borrowers and certain of their affiliates have agreed (x) to make certain payments to PTS in accordance with and subject to the provisions of Section 2.2(b) of the Purchase Agreement (the "Operational Override Payments"), (y) to indemnify WFS and the other parties entitled thereto for certain obligations to lessors and certain other amounts (including certain costs and expenses incurred in connection therewith) pursuant to and subject to the terms of the Section 2(b) of the Indemnification Agreement (the "WFS Indemnity Obligations") up to the Indemnification Cap (as defined below) and (z) to guarantee the Subordinated Obligations (as hereinafter defined) and grant a Lien in certain of their assets (collectively, the "Seller Collateral") to secure the Subordinated Obligations pursuant to and subject to the terms of the Guaranty and Security Agreement and the Second Mortgage.

WHEREAS, as an inducement to and as one of the conditions precedent to the agreement of the Lenders to consummate the transactions contemplated by Senior Credit Agreement and as one of the conditions precedent to the effectiveness of the Purchase Agreement, the Administrative Agent and the Subordinated Sellers require the execution and delivery of this Agreement by Subordinated Sellers, the Borrowers and the Administrative Agent in order to set forth the relative rights and priorities of the Senior Secured Parties and Subordinated Sellers under the Senior Debt Documents (as hereinafter defined) and the Subordinated Obligations Documents (as hereinafter defined).

1.    DEFINITIONS

1.1    Specific Definitions.  Capitalized terms used herein but not defined herein shall have the meaning set forth in the Senior Credit Agreement.  As used in this Agreement, the term:

"Administrative Agent" has the meaning set forth in the introductory paragraphs of this Agreement.

"Agreement" has the meaning set forth in the introductory paragraphs of this Agreement.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Borrowers" has the meaning set forth in the introductory paragraphs of this Agreement.

"Collateral" has the meaning set forth in the introductory paragraphs of this Agreement.

"DIP Financing" has the meaning set forth in Section 3.8(b) hereof.

"DPTSM" has the meaning set forth in the introductory paragraphs of this Agreement.

"Enforcement Action" shall mean (a) to take from or for the account of the Borrowers or any guarantor of obligation to make Operational Override Payments or Excess Indemnification

Amounts, by set-off or in any other manner, the whole or any part of any moneys which may now or hereafter be owing by the Borrowers or any such guarantor with respect to such Operational Override Payments or Excess Indemnification Amounts, (b) to sue for payment of, or to initiate or participate with others in any suit, action or proceeding against the Borrowers or any such guarantor to (i) enforce payment of or to collect the whole or any part of the Operational Override Payments or Excess Indemnification Amounts or (ii) commence judicial enforcement of any of the rights and remedies under the Subordinated Obligations Documents or applicable law with respect to all or any part of the Operational Override Payments or Excess Indemnification Amounts, (c) to accelerate all or any part of the Operational Override Payments or Excess Indemnification Amounts, (d) to exercise any put option or to cause the Borrowers or any such guarantor to honor any redemption or mandatory prepayment obligation under any Subordinated Obligation Document with respect to all or any part of the Operational Override Payments or Excess Indemnification Amounts or (e) to take any action under the provisions of any state or federal law, including, without limitation, the Uniform Commercial Code, or under any contract or agreement, to enforce, foreclose upon, take possession of or sell any property or assets of the Borrowers or any such guarantor; provided, however, that receipt or making of payments by the Subordinated Sellers from the Escrow Account pursuant to the terms of the Escrow Agreement shall not constitute an "Enforcement Action" hereunder.

"Escrow Account" means the escrow account established by the Borrowers in favor of WFS pursuant to the Escrow Agreement.

"Escrow Agreement" has the meaning set forth in the introductory paragraphs of this Agreement.

"Excess Indemnification Amounts" has the meaning set forth in Section 2.1(b) hereof.

"Guaranty and Security Agreement" has the meaning set forth in the introductory paragraphs of this Agreement.

"Indemnification Agreement" has the meaning set forth in the introductory paragraphs of this Agreement.

"Indemnification Cap" means the "Cap" (as defined in the Indemnification Agreement, as in effect on the date hereof without giving effect to any subsequent increase thereof).

"Insolvency Proceeding" means any receivership, conservatorship, general meeting of creditors, insolvency or bankruptcy proceeding, assignment for the benefit of creditors, or any proceeding by or against the Borrowers or any Guarantor for any relief under any bankruptcy or insolvency law or other laws relating to the relief of debtors, readjustment of indebtedness, reorganizations, compositions or extensions, including, without limitation, proceedings under the Bankruptcy Code, or under other federal, state or local statutes, laws, rules and regulations, all whether now or hereafter in effect.

"Lien" means any mortgage, deed of trust, deed to secure debt, grant, pledge, security interest, assignment, encumbrance, judgment, financing statement, Lien or charge of any kind,

DMSLIBRARY01:24459186.10

whether perfected or unperfected, voidable or unavoidable, consensual or non-consensual including, without limitation, any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement under the Uniform Commercial Code of any jurisdiction.

"Operational Override Payments" has the meaning set forth in the introductory paragraphs of this Agreement.

"Payment Blockage Notice" has the meaning set forth in the definition of "Payment Blockage Period."

"Payment Blockage Period" means (i) any period during which the Borrowers or any Guarantor is subject to any Insolvency Proceeding and/or (ii) any period commencing from the date of the occurrence (such date to be specified in a written notice from the Administrative Agent to the Subordinated Sellers within five (5) Business Days of the Administrative Agent's actual knowledge of such date, which notice shall describe the applicable Senior Default or Senior Defaults in reasonable detail, such notice a "Payment Blockage Notice") of any Default under Section 8.1(a) or 8.1(b) of the Senior Credit Agreement or any Event of Default (each a "Senior Default"), and continuing until the earliest of (w) 240 days following such Payment Blockage Notice, (x) Payment in Full, (y) each such Senior Default is cured or (z) each such Senior Default is waived by the applicable Senior Secured Parties as provided in the Senior Debt Documents. The Borrowers shall provide the Subordinated Sellers with prompt notice of any cure or waiver described in clause (y) or (z) above.

"Payment in Full" means the occurrence of the following:  (i) the termination or expiration of the Lenders' commitments to advance or provide financial accommodations in respect of Senior Indebtedness (including the termination or expiration of the L/C Commitment and (ii) the indefeasible, unavoidable and full payment in cash of all Senior Indebtedness, except for (a) the undrawn portion of Letters of Credit that have been Cash Collateralized in accordance with the Senior Credit Agreement or have become subject to other arrangements satisfactory to the Administrative Agent and (b) future obligations consisting of continuing indemnities and other contingent obligations that may become owing to the Senior Secured Parties or any of their Related Parties pursuant to the Senior Debt Documents and that expressly survive termination of the Senior Debt Documents.

"Person" means an individual, a corporation, a limited liability company, a partnership, a joint venture, a trust, an unincorporated association, a government or political subdivision or agency thereof or any other entity.

"Purchase Agreement" has the meaning set forth in the introductory paragraphs of this Agreement.

"Railcar Lease Obligations" means the obligations of DPTS Marketing, LLC under the Railcar Leases (as defined in the Senior Credit Agreement).

"Second Mortgage" has the meaning set forth in the introductory paragraphs of this Agreement.

"Security" means, with respect to the Borrowers or any Guarantor or the assets of the Borrowers or any Guarantor, any security agreement, pledge, pledge agreement, guaranty agreement, mortgage, deed of trust, deed to secure debt, trust deed, land trust, indenture, indemnity deed of trust, indemnification agreement, proceeding in rem, reimbursement agreement, financing statement, purchase agreement, conditional sales contract, installment sales contract, collateral agreement, financing lease, letter of credit, bond, loan agreement, hypothecation agreement, deposit, financing statement or assignment.

"Seller Collateral" has the meaning set forth in the introductory paragraphs of this Agreement.

"Senior Credit Agreement" has the meaning set forth in the introductory paragraphs of this Agreement.

"Senior Debt Documents" shall mean the Senior Credit Agreement and all other agreements, documents and instruments executed from time to time in connection therewith, as the same may be amended, restated, substituted, extended, replaced, renewed, refinanced, supplemented or otherwise modified from time to time.

"Senior Default" has the meaning set forth in the definition of "Payment Blockage Period."

"Senior Enforcement Action" shall mean, (a) to sue for payment of, or to initiate or participate with others in any suit, action or proceeding against the Borrowers or any such guarantor to (i) enforce payment of or to collect the whole or any part of the Senior Indebtedness or (ii) commence judicial enforcement of any of the rights and remedies under the Senior Debt Documents or applicable law with respect to all or any part of the Senior Indebtedness, (b) to accelerate all or any part of the Senior Indebtedness, (c) to exercise any put option or to cause the Borrowers or any such guarantor to honor any redemption or mandatory prepayment obligation under any Senior Debt Document or (d) to take any action under the provisions of any state or federal law, including, without limitation, the Uniform Commercial Code, or under any contract or agreement, to enforce, foreclose upon, take possession of or sell any property or assets of the Borrowers or any such guarantor.

"Senior Indebtedness" means the Loans (defined in the Senior Credit Agreement), interest thereon, fees relating thereto and all other Obligations (defined in the Senior Credit Agreement) and all other indebtedness, liabilities and obligations of the Borrowers or any Guarantor to the Senior Secured Parties of every kind and nature whatsoever, whether now existing or hereafter arising or created at any time under the terms of the Senior Credit Agreement or any other Senior Debt Document, as the same may be amended, restated, substituted, extended, replaced, renewed, refinanced, supplemented or otherwise modified from time to time, including, without limitation, such indebtedness, liabilities and obligations of the Borrowers or any Guarantor to the Senior Secured Parties (i) which are direct, indirect, contingent, primary, secondary, alone, jointly with others, acquired directly or by assignment, due, to become due, unsecured, secured, future advances, incurred or assumed, (ii) which relate to or arise from the issuance of letters of credit, or guaranties, indemnifications or other similar

5

agreements in favor of third parties made by a Senior Secured Party at the request or for the benefit of the Borrowers or any Guarantor, (iii) which are claims of subrogation, indemnification, reimbursement or contribution of a Senior Secured Party against the Borrowers or any Guarantor or any other Person relating in any manner to obligations of the Borrowers or any Guarantor or the Collateral, (iv) which are claims of whatever nature and whenever arising on account of the avoidance of payments or other transfers to or for the benefit of a Senior Secured Party in Insolvency Proceedings or otherwise, or (v) which are claims (including, without limitation, claims arising or accruing after the commencement of Insolvency Proceedings by or against the Borrowers or any Guarantor or its assets, whether or not such claims are allowed) for principal, interest, expense payments, liquidation costs, and attorneys' fees and expenses, all of the foregoing whether arising under contract, by tort, at law, in equity or otherwise.

"Senior Secured Parties" means the Administrative Agent, the Lenders and the other "Secured Parties" as defined in the Senior Debt Documents.

"Subordinated Obligations" means, collectively, the Operational Override Payments, the WFS Indemnity Obligations and the Railcar Lease Obligations.

"Subordinated Obligations Documents" means the provisions of the WFS Transaction Documents in respect of the Subordinated Obligations.

"Subordinated Sellers" has the meaning set forth in the introductory paragraphs of this Agreement.

"WFS Indemnity Obligations" has the meaning set forth in the introductory paragraphs of this Agreement.

"WFS Transaction Documents" has the meaning set forth in the introductory paragraphs of this Agreement.

1.2    Other Definitional Provisions.  Unless otherwise defined herein, all terms used herein which are defined by the New York Uniform Commercial Code  have the same meanings as assigned to them by the New York Uniform Commercial Code unless and to the extent varied by this Agreement.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, schedule and exhibit references are references to sections or subsections of, or schedules or exhibits to, as the case may be, this Agreement unless otherwise specified.  As used herein, the singular number shall include the plural, the plural the singular and the use of the masculine, feminine or neuter gender shall include all genders, as the context may require.

2.    SUBORDINATION & ENFORCEMENT

2.1    Subordination & Restrictions on Payment.

(a)    The Subordinated Sellers hereby subordinate and postpone the payment and performance of and the time of payment and performance of any and all of the Subordinated

DMSLIBRARY01:24459186.10

Obligations to and in favor of the Payment in Full.  Each Senior Secured Party shall be deemed to have acquired its Senior Indebtedness (whether now outstanding or hereinafter arising) in reliance upon the provisions contained herein.  The Subordinated Sellers, the Borrowers and the Guarantors represent and warrant to the Administrative Agent that the only Subordinated Obligations existing and outstanding as of the date of this Agreement consists of the debt and other obligations evidenced by the Subordinated Obligations Documents.

(b)     Notwithstanding anything herein to the contrary, until the Payment in Full, each Subordinated Seller agrees that it shall not, without the prior written consent of the Administrative Agent (acting in accordance with the provisions of the Senior Debt Documents), accept or receive any payment of all or any part of (x) the Operational Override Payments and (y) amounts in respect of the WFS Indemnity Obligations (including payments from the Escrow Account) in excess of the Indemnification Cap (such amounts "Excess Indemnification Amounts"); provided, however, that until the occurrence of a Payment Blockage Period, the Subordinated Sellers may accept and receive Operational Override Payments (but not Excess Indemnification Amounts), but only so long as no Senior Default is or would be in existence after giving effect to any such payment; provided, further that so long as the Administrative Agent shall have submitted the related Payment Blockage Notice within the time period required by the definition of "Payment Blockage Period," the Subordinated Sellers hereby agree to disgorge and turnover to the Administrative Agent (on behalf of the Senior Secured Parties) any Operational Override Payments (or Excess Indemnification Amounts) received from the date of commencement of such Payment Blockage Period though the date of receipt of such Payment Blockage Notice by the Subordinated Sellers.  For the avoidance of doubt, irrespective of the occurrence and/or continuance of a Payment Blockage Period, the Subordinated Sellers (i) may receive or make payments from the Escrow Account pursuant to the terms of the Escrow Agreement, (ii) may otherwise receive amounts from the Borrowers and the Guarantors in respect of the WFS Indemnity Obligations in an aggregate amount for the preceding clauses (i) and (ii) not to exceed the Indemnification Cap and (iii) may receive amounts in respect of the Railcar Lease Obligations.

(c)     Notwithstanding anything set forth in this Agreement,  no payments with respect to any Operational Override Payments or Excess Indemnification Amounts shall be made by any Borrower or any Guarantor or received by Subordinated Seller, directly or indirectly, if prior to or at the time of such payment the Administrative Agent (on behalf of the Senior Secured Parties) is diligently pursuing a Senior Enforcement Action or any Borrower or Guarantor is then a debtor in an Insolvency Proceeding.

(d)     Should any payment or distribution (including distributions from the Escrow Account) not permitted by the provisions of this Agreement or property or proceeds thereof be received by the Subordinated Sellers upon or with respect to all or any part of the Subordinated Obligations, the Subordinated Sellers will deliver the same to the Administrative Agent in precisely the form received (except for the endorsement or assignment of the Subordinated Sellers when the Administrative Agent deems appropriate), for application to the Senior Indebtedness (whether due or not due and in such order and manner as the Administrative Agent may elect), and, until so delivered, the same shall be held in trust by the Subordinated Sellers as property of the Senior Secured Parties.  In the event of the failure of the Subordinated Sellers to make any such endorsement or assignment, the Administrative Agent, or any of its officers or

7

employees on behalf of the Administrative Agent, are hereby irrevocably authorized in their own name or in the name of the Subordinated Sellers to make the same.

(e)     Until all Senior Indebtedness has been indefeasibly paid in full in cash, each Subordinated Seller agrees that it shall not issue any instrument, security or other writing (other than the Subordinated Obligations Documents) evidencing any part of the Subordinated Obligations

2.2     <u>Security & Enforcement</u>.

(a)     Each Subordinated Seller, the Borrowers and the Guarantors agree, represent and warrant that the Subordinated Obligations are not, and shall not be secured in any way directly or indirectly by any Security covering any of Borrowers' or any Guarantor's assets other than by the Seller Collateral as expressly provided in the Guaranty and Security Agreement and the Second Mortgage and as permitted by the Senior Debt Documents and, notwithstanding any provisions of the Subordinated Obligations Documents or any other instrument to the contrary, any such Seller Collateral securing the Subordinated Obligations shall be expressly subordinated in priority to the Collateral securing the Senior Indebtedness as set forth below.   No Subordinated Seller shall take any Security or place any Lien on any Collateral other than the Seller Collateral as expressly provided in the Guaranty and Security Agreement and the Second Mortgage without the prior written consent of the Administrative Agent (acting in accordance with the Senior Debt Documents).  The Administrative Agent (on behalf of the Senior Secured Parties) hereby agrees that if any additional asset(s) are granted as Collateral securing the Senior Indebtedness under the Senior Debt Documents, the Administrative Agent (on behalf of the Senior Secured Parties) shall execute such documents and instruments as are reasonably requested by the Subordinated Sellers to allow the Borrowers and the Guarantors to grant a junior security interest in such asset(s) to the Subordinated Sellers as security for the Subordinated Obligations so long as such security interest is subordinated to the security interest of the Senior Secured Parties in such asset(s) on the same terms as the security interest in the Seller Collateral is subordinated to the security interest in the Collateral for the Senior Indebtedness under the terms of this Agreement.

(b)     Each Subordinated Seller hereby subordinates its Liens in the Seller Collateral or any other assets of the Borrowers, any Guarantor or their respective subsidiaries, and priority of such Subordinated Seller's existing and future Liens and other interests, if any, in and to any Security such Subordinated Seller may obtain or claim to the Senior Secured Parties' existing and future interest in the Collateral notwithstanding the time of attachment, manner or order of perfection of the interests of the Senior Secured Parties or such Subordinated Seller or the time the Senior Indebtedness or the Subordinated Obligations is incurred.  Notwithstanding anything to the contrary contained in this Agreement, under applicable law or otherwise, in the event that the Liens of the Senior Secured Parties are at any time unperfected with respect to any or all of the Collateral, the lack of perfection by the Senior Secured Parties as to any such Collateral shall not affect the validity, enforceability or priority of any Lien on the Collateral in favor of any such Senior Secured Party vis-à-vis any Subordinated Seller.  The Lien priorities provided in this <u>Section 2.2(b)</u> shall not be altered or otherwise affected by any amendment, modification, supplement, extension, renewal, restatement or refinancing of either the Senior Indebtedness or the Subordinated Obligations, nor by any action or inaction which either the Senior Secured

8

Parties or a Subordinated Seller may take or fail to take in respect of the Collateral, except as otherwise provided above in this subsection.

(c)     In the event that any Subordinated Seller obtains any Security or other Liens in the Collateral in violation of this Agreement (including without limitation, obtaining any Liens or Security in any Collateral other than the Seller Collateral), such Subordinated Seller(s) (i) shall (or shall cause their agent) to promptly execute and/or deliver to Administrative Agent such termination statements and releases as Administrative Agent shall request to effect the release of such Security or Liens of such Subordinated Seller and (ii) shall be deemed to have authorized Agent to file any and all termination statements required by Agent in respect of such Liens. In furtherance of the foregoing, each Subordinated Seller hereby irrevocably appoints Administrative Agent its attorney-in-fact, with full authority in the place and stead of such Subordinated Seller and in the name of such Subordinated Seller or otherwise, to execute and deliver any document or instrument which such Subordinated Seller may be required to deliver pursuant to this Section 2.2(c).

(d)     Until the earlier of (i) the Payment in Full, and (ii) the date that is 240 calendar days after written notice by the Subordinated Sellers to the Administrative Agent of a default or event of default under the Subordinated Obligations (the "Remedy Standstill Period"), unless in the case of this clause (ii), either (x) the Administrative Agent (on behalf of the Senior Secured Parties) is diligently pursuing a Senior Enforcement Action or diligently attempting to vacate any stay or other prohibition of any exercise of remedies against any of the Borrowers or any Guarantor, (y) the related default or event of default under the Subordinated Obligations has been cured or waived or (z) any Borrower or Guarantor is then a debtor in an Insolvency Proceeding, each Subordinated Seller agrees that it shall not, without the prior written consent of the Administrative Agent (acting in accordance with the Senior Debt Documents), liquidate, sell, foreclose, set off, collect, accept a surrender, receive any proceeds, petition, commence or otherwise initiate any Insolvency Proceedings (or join any other Person in so doing) against the Borrowers or any Guarantor or any of their respective assets or otherwise exercise any rights (including, without limitation, any voting rights) as to any Security or realize or seek to realize upon all or any part of the Collateral or otherwise take any Enforcement Action (other than the receipt of payments from the Escrow Account pursuant to the terms of the Escrow Agreement) against the Borrowers or any Guarantor or any of their respective subsidiaries. In the event the Administrative Agent (acting in accordance with the Senior Debt Documents) may from time to time execute releases, partial releases, terminations, reconveyances, subordinations or other documents releasing or otherwise limiting the Senior Secured Parties' interests in the Collateral in accordance with the terms of the Senior Debt Documents and so long as such release is not prohibited by the terms of the Subordinated Obligations Documents, each Subordinated Seller agrees to execute and deliver at such time such further documents as the Administrative Agent (acting in accordance with the Senior Debt Documents) may require to effect a corresponding change to such Subordinated Seller's position, if any, in the same Collateral; provided, however that in the event the Administrative Agent seeks to release or otherwise limit the Senior Secured Parties' interests in the Collateral in connection with a Senior Enforcement Action by the Administrative Agent and/or the Senior Secured Parties, each Subordinated Seller agrees to execute and deliver such releases or other documents as the Administrative Agent requests to effectuate such sale or other disposition irrespective of whether any such sale or other disposition is permitted under the terms of the Subordinated Obligations Documents. Notwithstanding

9

anything set forth in this Agreement, irrespective of the occurrence and/or continuance of a Remedy Standstill Period in no event shall the Subordinated Sellers be prevented from (a) commencing an action to pursue a judgment at law against any Borrower or Guarantor for the performance of the Subordinated Obligations or the Subordinated Obligations Documents, so long as in no event shall the Subordinated Sellers seek the enforcement thereof through levy or execution or otherwise or (b) accelerating the Operational Override Payments following an acceleration of the Senior Indebtedness and commencement of a Senior Enforcement Action.

(e)      Each Subordinated Seller acknowledges and agrees that (a) the grants of Liens pursuant to the Senior Debt Documents and the Subordinated Obligations Documents constitute two separate and distinct grants of Liens and (b) because of their differing rights in the Collateral, the Subordinated Obligations are fundamentally different from the Senior Indebtedness and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency Proceeding.  The Subordinated Sellers shall not seek in any Insolvency Proceeding to be treated as part of the same class of creditors as the Senior Secured Parties and shall not oppose any pleading or motion by the Senior Secured Parties for the Senior Secured Parties and the Subordinated Sellers to be treated as separate classes of creditors. Notwithstanding the foregoing, if it is held that the Senior Indebtedness and the Subordinated Obligations constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the Subordinated Sellers hereby acknowledge and agree that all distributions shall be made as if there were separate classes of senior and junior secured claims against the Borrowers and the Guarantors in respect of the Collateral, with the effect being that, to the extent that the aggregate value of the Collateral exceeds the amount of the Senior Indebtedness, the Senior Secured Parties shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, and fees, costs and charges incurred subsequent to the commencement of the applicable Insolvency Proceeding before any distribution is made in respect of any of the claims held by the Subordinated Sellers.  The Subordinated Sellers hereby acknowledge and agree to turn over to the Senior Secured Parties amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of the preceding sentence, even if such turnover has the effect of reducing the claim or recovery of the Subordinated Sellers. Nothing in this Agreement prohibits or limits the rights of a Subordinated Seller to receive and retain any debt or equity securities that are issued pursuant to any plan of reorganization in an Insolvency Proceeding or similar dispositive restructuring plan in connection with an Insolvency Proceeding.  If debt obligations issued pursuant to such plan of reorganization or similar dispositive plan are on account of both the Senior Indebtedness and the Subordinated Obligations, then to the extent the debt obligations distributed on account of the Senior Indebtedness and on account of the Subordinated Obligations are secured by Liens on the same property, the provisions of this Agreement will survive the distribution of such debt obligations and will apply with like effect to the Liens securing such debt obligations.

(f)      The Administrative Agent hereby agrees to hold any possessory collateral in its possession that is both Collateral and Seller Collateral as gratuitous bailee and/or agent for perfection for both the Senior Secured Parties and the Subordinated Sellers subject to the terms of the Senior Debt Documents and the Subordinated Obligations documents.  The duties and responsibilities of the Administrative Agent under this Section 2.2(f) shall be limited solely to holding any Collateral constituting Seller Collateral as gratuitous bailee and/or agent for the

benefit of the Subordinated Sellers for purposes of perfecting the Liens held by such Subordinated Sellers, subject to the terms of this Agreement, the Senior Debt Documents and the Subordination Obligations Documents, and the parties hereto hereby acknowledge and agree that the Administrative Agent is acting in such capacity as gratuitous bailee and/or agent for perfection merely as an accommodation and shall have no liability to the Subordinated Sellers for any action or inaction in such capacity.

2.3     Representations and Warranties.

(a)     The Subordinated Sellers represent and warrant to the Administrative Agent (on behalf of the Senior Secured Parties) that they are the sole and exclusive parties entitled (whether legally or beneficially) to all or any part of the Subordinated Obligations.

(b)     The Borrowers and the Guarantors represent and warrant to the Administrative Agent (on behalf of the Senior Secured Parties) that:  (i) true, correct and complete copies of all Subordinated Obligations Documents in effect as of the date hereof have been furnished to the Administrative Agent; and (ii) the execution, delivery and performance of this Agreement is within the powers of the Borrowers and the Guarantors party thereto, has been duly authorized by all necessary action, and does not contravene any statute, regulation, rule, order or judgment, or any organizational or other document, mortgage, indenture, contract or other agreement binding on the Borrowers or any Guarantor or affecting any of their respective properties, which would prohibit, or cause a default under or in any way prevent the execution, delivery, or carrying out of the terms of this Agreement.

(c)     Each Subordinated Seller represents and warrants to the Administrative Agent (on behalf of the Senior Secured Parties) that: (i) true, correct and complete copies of all Subordinated Obligations Documents in effect as of the date hereof have been furnished to the Administrative Agent; and  (ii) the execution, delivery and performance of this Agreement is within the powers of such Subordinated Seller, has been duly authorized by all necessary action, and does not contravene any statute, regulation, rule, order or judgment, or any organizational or other document, mortgage, indenture, contract or other agreement binding on such Subordinated Seller or affecting its properties, which would prohibit, or cause a default under or in any way prevent the execution, delivery, or carrying out of the terms of this Agreement.

2.4     Further Documents.  The Administrative Agent (on behalf of the Senior Secured Parties), the Subordinated Sellers, the Borrowers and the Guarantors agree that they shall promptly execute such further documents and acknowledgments (including, without limitation, amendments to and releases of financing statements and other documents of record) as the Administrative Agent or the Subordinated Sellers may reasonably require to confirm or evidence their respective obligations and Senior Secured Parties' and the Subordinated Sellers' rights under this Agreement.

2.5     Legends.   Until the Payment in Full, each of the Guaranty and Security Agreement and the Second Mortgage at all times shall contain in a conspicuous manner a legend substantially in the form of the following:

"This document and [the Borrowers'] obligations evidenced hereby are subordinate in the manner and to the extent set forth in that certain SELLER SUBORDINATION AGREEMENT (the "Subordination Agreement"), dated as of December 5, 2014, by and among (i) WORLD FUEL SERVICES CORPORATION, a Florida corporation, PETROLEUM TRANSPORT SOLUTIONS, LLC, a Minnesota limited liability company, WORLD FUEL SERVICES, INC., a Texas corporation, and WESTERN PETROLEUM COMPANY, a Minnesota corporation, (ii) DAKOTA PLAINS TRANSLOADING, LLC, a Minnesota limited liability company, DAKOTA PLAINS SAND, LLC, a Minnesota limited liability company, and DAKOTA PLAINS MARKETING, LLC, a Minnesota limited liability company, (iii) the guarantors party thereto and (iv) SUNTRUST BANK, a Georgia banking corporation; and each party to this document, by its acceptance hereof, shall be bound by the provisions of the Subordination Agreement."

     2.6    Restriction on Modification of Subordinated Obligations.

(a)    Until the Payment in Full and notwithstanding anything contained in the Subordinated Obligations Documents or the Senior Debt Documents to the contrary, no Subordinated Seller shall, without the prior written consent of Administrative Agent (acting in accordance with the Senior Debt Documents) amend or modify in any respect any of the Subordinated Obligations Documents if the effect of any such amendment or modification would be adverse to the Administrative Agent, the Lenders or the other Senior Secured Parties, including without limitation, any increase of the Indemnification Cap or any other increase or modification of the WFS Indemnity Obligations, the Railcar Lease Obligations or the Operational Override Payments in contravention of the Senior Debt Documents in effect as of the date hereof; provided that the foregoing restriction shall not apply to any amendments to the Guaranty and Security Agreement and/or Second Mortgage entered into solely to the extent of the last sentence of Section 2.2(a).

(b)    The Administrative Agent (on behalf of the Senior Secured Parties) hereby agrees that it will not amend or modify in any way the Senior Debt Documents so as to prevent the payment of the Subordinated Obligations in any manner in contravention of this Agreement; provided that this sentence shall not be construed to negate any restrictions on such payments in effect pursuant to the Senior Debt Documents in effect on the date hereof.

3.    ADDITIONAL AGREEMENTS

    3.1    Consents, Waivers, etc. Subject to Sections 2.2(d) and 2.6(b), each Subordinated Seller hereby consents that at any time and from time to time and with or without consideration, the Administrative Agent (acting in accordance with the Senior Debt Documents) may, without further consent of or notice to such Subordinated Seller and without in any manner affecting, impairing, lessening or releasing any of the provisions of this Agreement, renew, extend, change the manner, time, place and terms of payment of, sell, exchange, release, substitute, surrender, realize upon, modify, waive, grant indulgences with respect to and otherwise deal with in any manner: (a) all or any part of the Senior Indebtedness; (b) all or any of the Senior Debt Documents; (c) all or any part of any property at any time included within the Collateral; and (d)

DMSLIBRARY01:24459186.10

any Person at any time primarily or secondarily liable for all or any part of the Senior Indebtedness and/or any collateral and security therefor, all as if this Agreement and any interest which such Subordinated Seller has in the Collateral did not exist.  Each Subordinated Seller hereby waives demand, presentment for payment, protest, notice of dishonor and of protest with respect to the Senior Indebtedness, the Subordinated Obligations and/or the Collateral, notice of acceptance of this Agreement, notice of the making of any of the Senior Indebtedness and (other than in respect of the commencement of a Payment Blockage Period) notice of default under any of the Senior Debt Documents.

3.2     <u>Continuing Agreement</u>.  This is a continuing agreement until the Payment in Full.

3.3     <u>No Third Party Beneficiaries</u>.  The provisions of this Agreement are solely for the benefit of the Administrative Agent, the Senior Secured Parties and the Subordinated Sellers, and their respective successors and assigns, and to any Person which, with the Senior Secured Parties' concurrence in accordance with the terms of the Senior Debt Documents, replaces financing provided by the Senior Secured Parties and repays the Senior Indebtedness in full in cash, and there are no other parties or Persons whatsoever (including, without limitation, the Borrowers or any Guarantor, or their respective successors and assigns) who are intended to be benefited in any manner whatsoever by this Agreement.

3.4     <u>Transfer or Assignment of Senior Indebtedness and Subordinated Obligations</u>.

(a)     If any of the Senior Indebtedness should be transferred or assigned by a Senior Secured Party, this Agreement will inure to the benefit of such Senior Secured Party's transferee or assignee to the extent of such transfer or assignment or succession, provided that such Senior Secured Party shall continue to have the unimpaired right to enforce this Agreement as to any of the Senior Indebtedness not so transferred or assigned.  The Administrative Agent shall not assign its obligations hereunder unless prior to the consummation of any such assignment, the assignee thereof shall execute and deliver to the Subordinated Sellers a joinder substantially consistent with the terms of this Agreement confirming that such assignee is assuming the obligations of the Administrative Agent hereunder.

(b)     No Subordinated Seller sell, assign, dispose of or otherwise transfer all or any portion of the Subordinated Obligations unless prior to the consummation of any such action, the transferor and transferee thereof shall execute and deliver to Administrative Agent a joinder, in form and substance satisfactory to the Administrative Agent, providing for the continued subordination and forbearance of the Subordinated Obligations to the Senior Indebtedness as provided herein and for the continued effectiveness of all of the rights of Administrative Agent and the Senior Secured Parties arising under this Agreement.  Notwithstanding the failure to execute or deliver any such agreement, the subordination effected hereby shall survive any sale, assignment, disposition or other transfer of all or any portion of the Subordinated Obligations, and the terms of this Agreement shall be binding upon the successors and assigns of each Subordinated Seller, as provided in <u>Section 4.4</u> below.

3.5     <u>Actions Upon Breach</u>.     (a) If any Subordinated Seller, contrary to this Agreement, commences or participates in any action or proceeding against the Borrowers or any Guarantor or the Collateral, the Borrowers or such Guarantor may interpose as a defense or

DMSLIBRARY01:24459186.10

dilatory plea the making of this Agreement, and a Senior Secured Party (or the Administrative Agent acting on behalf of the Senior Secured Parties) may intervene and interpose such defense or plea in such party's name or in the name of the Borrowers or such Guarantor. Should any Subordinated Seller, contrary to this Agreement, in any way attempt to enforce payment of the Subordinated Obligations or any part thereof or to realize upon the Collateral or any part thereof, either the Administrative Agent (in its own name, on behalf of the Senior Secured Parties, or in the name of the Borrowers or any Guarantor), the Borrowers or any Guarantor itself, or both the Administrative Agent and the Borrowers or any Guarantor, may restrain such Subordinated Seller from so doing, it being understood and agreed by each Subordinated Seller that (i) the Administrative Agent's and/or the Borrowers' or any such Guarantor's damages from its actions may at that time be difficult to ascertain and may be irreparable, and (ii) each Subordinated Seller waives any defense that the Borrowers or any such Guarantor and/or that the Administrative Agent cannot demonstrate damage and/or can be made whole by the awarding of damages.

(b)     If either the Administrative Agent (on behalf of the Senior Secured Parties) or the Subordinated Sellers make, attempt to or threaten to make or receive any payment, take any action with respect to the Collateral or Seller Collateral or take any action contrary to this Agreement, or fail to take any action required by this Agreement, the other such party may obtain relief by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by each such party that (i) damages may at that time be difficult to ascertain and may be irreparable and (ii) each such party waives any defense or claim that the other parties cannot demonstrate damage and/or can be made whole by the awarding of damages.

(c)     The Borrowers jointly and severally agree to indemnify the Administrative Agent and the Senior Secured Parties and to hold the Administrative Agent and the Senior Secured Parties harmless for any and all reasonable costs and expenses (including, without limitation, reasonable attorney's fees) as they arise, relating to actions of the Borrowers or any Guarantor taken contrary to this Agreement.

3.6     <u>Statement of Debt</u>. Each Subordinated Seller and the Borrowers will, at any time or times upon the request of the Administrative Agent (on behalf of the Senior Secured Parties), promptly furnish to the Administrative Agent (on behalf of the Senior Secured Parties) a true, correct and complete statement of the outstanding Subordinated Obligations.

3.7     <u>Subrogation; Marshalling; Application of Proceeds</u>.

(a)     No Subordinated Seller shall be subrogated to, or be entitled to any assignment of any Senior Indebtedness or evidence of any evidence of Senior Indebtedness or any Security until the Payment in Full. Each Subordinated Seller hereby waives any and all rights to have any Collateral or any part thereof granted to the Senior Secured Parties marshaled in any Insolvency Proceedings or upon any foreclosure or other disposition of such Collateral by the Senior Secured Parties or otherwise.

(b)     The parties hereto hereby agree that to the extent there are proceeds of Collateral which constitutes Seller Collateral remaining after the Payment in Full (including proceeds arising from a Senior Enforcement Action on account of the Senior Indebtedness), such excess

14

proceeds will be turned over and applied to the payment of the Subordinated Obligations outstanding at such time (if any) prior to any payment or turnover thereof to any Borrower or Guarantor.

3.8     Certain Insolvency Proceedings Provisions.

(a)     During any Insolvency Proceeding, no Subordinated Seller shall be entitled to assert any right to adequate protection with respect to any interest any of them may have in any Collateral (other than adequate protection on a junior basis in replacement collateral which has also been given to the Senior Secured Parties on a senior basis and subject to subordination terms substantially identical to those set forth in this Agreement) and shall not object to or contest any request by the Senior Secured Parties for adequate protection.

(b)     If the Borrowers or any Guarantor shall become subject to an Insolvency Proceeding and the Borrowers or any Guarantor as debtor-in-possession (or a trustee appointed on behalf of the Borrowers or any Guarantor) shall move for either (x) approval of financing ("DIP Financing") to be provided, on or after the commencement of a case under the Bankruptcy Code, by the Senior Secured Parties under Section 364 of the Bankruptcy Code or (y) the use of cash collateral with the consent of the Senior Secured Parties under Section 363 of the Bankruptcy Code, each Subordinated Seller agrees as follows:   (a) adequate notice to a Subordinated Seller for such DIP Financing or use of cash collateral shall be deemed delivered to such Subordinated Seller if such Subordinated Seller receives notice five (5) Business Days prior to the hearing to approve such DIP Financing or use of cash collateral on an interim basis and at least fifteen (15) days in advance of the hearing to approve such DIP Financing or use of cash collateral on a final basis, (b) such DIP Financing may be secured by Liens on all or a part of the assets of the Borrowers or any Guarantor which shall be superior in priority to any claims against the assets of the Borrowers or any Guarantor claimed by any Subordinated Seller (including those claimed under the Subordinated Obligations Documents), provided that the Subordinated Sellers retain Liens on the Seller Collateral (c) no Subordinated Seller shall contest or oppose in any manner such DIP Financing or cash collateral use and shall be deemed to have waived any objections to such DIP Financing or cash collateral use, provided that the Subordinated Sellers retain Liens on the Seller Collateral and (d) no Subordinated Seller shall propose a DIP financing.  Nothing in this Section 3.8(b) limits or impairs the rights of the Subordinated Sellers to object to any motion regarding DIP Financing (including a DIP Financing proposed by one or more Senior Secured Parties) or cash collateral to the extent that (1) the objection could be asserted in an Insolvency Proceeding by unsecured creditors generally (so long as not otherwise inconsistent with the terms of this Agreement) or (2) the DIP Financing does not meet the conditions of this Section 3.8(b).

(c)     Each Subordinated Seller agrees that it will not object to or oppose a sale or other disposition of any property securing all of any part of the Senior Indebtedness free and clear of security interests, Liens or other claims (including those granted under the Subordinated Obligations Documents) of any Subordinated Seller under Section 363 of the Bankruptcy Code or any other provision of the Bankruptcy Code if the Senior Secured Parties have consented in writing to such sale or disposition; provided that either (A) pursuant to court order, the Liens of the Subordinated Sellers attach to the net proceeds of the disposition with the same priority and validity as the Liens held by the Subordinated Sellers in the Seller Collateral or (B) the proceeds

15

of a disposition of Collateral received by the Senior Secured Parties in excess of those necessary to achieve Payment in Full are distributed in accordance with the Uniform Commercial Code and applicable law.  Notwithstanding the preceding sentence, the Subordinated Sellers may object to any disposition of Collateral that could be raised in an Insolvency Proceeding by unsecured creditors generally so long as not otherwise inconsistent with the terms of this Agreement.

(d)    Each Subordinated Seller agrees not to initiate or prosecute or join with any other Person to initiate or prosecute any claim, action or other proceeding (i) challenging the enforceability of the Senior Secured Parties' claims as fully secured claims with respect to all or part of the Senior Indebtedness or for allowance of any Senior Indebtedness (including those consisting of post-petition interest, fees or expenses) or opposing any action by the Administrative Agent or the Senior Secured Parties to enforce their rights or remedies arising under the Senior Debt Documents in a manner which is not prohibited by the terms of this Agreement, (ii) challenging the enforceability, validity, priority or perfected status of any Collateral or other Liens on assets securing the Senior Indebtedness under the Senior Debt Documents, (iii) asserting any claims which the Borrowers or any Guarantor may hold with respect to the Senior Secured Parties, (iv) seeking to lift the automatic stay to the extent that such action is opposed by the Administrative Agent or (v) opposing a motion by the Administrative gent to lift the automatic stay.

(e)    To the extent that the Subordinated Sellers have not (i) executed, verified, delivered and/or filed any proofs of claim in respect of the Subordinated Obligations in connection with any Insolvency Proceeding and/or (ii) voted such claim in any such Insolvency Proceeding, each Subordinated Seller hereby irrevocably authorizes, empowers and appoints the Administrative Agent its agent and attorney-in-fact to (i) execute, verify, deliver and file any proofs of claim in respect of the Subordinated Obligations in connection with any Insolvency Proceeding and/or (ii) vote such claim in any such Insolvency Proceeding; provided, that the Administrative Agent shall have no obligation to execute, verify, deliver, and/or file any such proof of claim and/or vote any such claim.  In the event that the Administrative Agent votes any claim in accordance with the authority granted hereby, no Subordinated Seller shall be entitled to change or withdraw such vote.  No Subordinated Seller shall (i) execute, verify, deliver and/or file any proofs of claim in respect of the Subordinated Obligations in connection with any Insolvency Proceeding or (ii) vote such claim in any such Insolvency Proceeding in any manner in contravention of or inconsistent with the terms of this Agreement.

(f)    Each party hereto agrees that this Agreement shall be applicable both before and after the filing of any petition by or against the Borrowers or any Guarantor under the Bankruptcy Code or any other Insolvency Proceeding and all converted or succeeding cases in respect thereof, and all references herein to the Borrowers or any Guarantor shall be deemed to apply to the trustee for any such Borrower or Guarantor as a debtor-in-possession.  The relative rights of the Senior Secured Parties and the Subordinated Sellers in respect of any Collateral or proceeds thereof shall continue after the filing of such petition on the same basis as prior to the date of such filing, subject to any court order approving the financing of, or use of cash collateral by, the Borrowers or any Guarantor.   This Agreement shall constitute a "subordination agreement" for the purposes of Section 510(a) of the Bankruptcy Code and shall be enforceable in any Insolvency Proceeding in accordance with its terms.

16

4.      MISCELLANEOUS

4.1      <u>Additional Senior Indebtedness</u>. Nothing herein contained shall obligate any Senior Secured Party to grant credit to, or continue financing arrangements with, the Borrowers or any Guarantor.

4.2      <u>Continued Effectiveness</u>.  The Senior Indebtedness shall continue to constitute "Senior Indebtedness" under this Agreement and the provisions of this Agreement shall continue to govern the relative rights and priorities of the Senior Secured Parties and the Subordinated Sellers in the event of any amendment, restatement, substitution, extension, replacement, renewal, refinancing, supplement or other modification of the Senior Debt Documents from time to time without any consent of the Subordinated Sellers, even if all or a part of the Senior Indebtedness or the security interests in the Collateral for the Senior Indebtedness are subordinated, set aside, avoided, disallowed, or invalidated in connection with any Insolvency Proceeding and this Agreement shall be reinstated if at any time any payment of any Senior Indebtedness is rescinded or must otherwise be returned by a Senior Secured Party or any holder of Senior Indebtedness or any other representative of a Senior Secured Party or any holder of Senior Indebtedness.

4.3      <u>Delay in Enforcement, etc</u>. No delay or failure on the part of a Senior Secured Party to exercise any of its rights or remedies hereunder or now or hereafter existing at law or in equity or by statute or otherwise, or any partial or single exercise thereof, shall constitute a waiver thereof.  All such rights and remedies are cumulative and may be exercised singly or concurrently and the exercise of any one or more of them will not be a waiver of any other.  No waiver of any rights and remedies hereunder, and no modification or amendment of this Agreement shall be deemed to be made by a Senior Secured Party unless the same shall be in writing, duly signed by the Administrative Agent (acting on behalf of the Senior Secured Parties in accordance with the Senior Debt Documents) and the Subordinated Sellers, and each such waiver, if any, shall apply only with respect to the specific instance involved and shall in no way impair the rights and remedies of the Senior Secured Parties hereunder in any other respect at any other time.

4.4      <u>Successors and Assigns</u>. This Agreement shall be binding upon the Subordinated Sellers and the Borrowers and Subordinated Sellers' and the Borrowers' respective heirs, personal representatives, successors and assigns and shall inure to the benefit of the Senior Secured Parties, the Subordinated Sellers and their respective successors and assigns, other holders or obligees under the Senior Indebtedness and any Person which, with such Senior Secured Party's concurrence in accordance with the terms of the Senior Debt Documents replaces financing provided by a Senior Secured Party.

4.5      <u>Headings</u>.  The titles and headings of Articles, sections or other parts of this Agreement are for convenience only, and shall not limit or otherwise affect any of the terms hereof.

4.6      <u>Governing Law</u>.  This Agreement shall be governed and construed in accordance with the laws of the State of New York, with the same force and effect as if this Agreement had been executed, delivered, accepted and performed solely in the State of New York.

DMSLIBRARY01:24459186.10

4.7     <u>Submission to Jurisdiction</u>.  Any legal action or proceeding with respect to this Agreement may be brought in the courts of the State of New York located in the City of New York, Borough of Manhattan, or of the United States of America sitting for the Southern District of New York and, by execution and delivery of this Agreement, each party hereto hereby accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.  The parties hereto hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

4.8     **<u>WAIVER OF JURY TRIAL</u>.  THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY. THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.**

4.9     <u>Notices</u>.  All notices, requests and demands to or upon the parties to this Agreement shall be deemed to have been given or made when delivered by hand, or three (3) days after the date when deposited in the mail, postage prepaid by registered or certified mail, return receipt requested, or, in the case of telegraphic notice, when delivered to the telegraphic company and when properly transmitted, or, when sent by overnight courier, on the first business day after the day when delivered to such overnight courier. All such notices shall be addressed to the Administrative Agent and the Borrowers at their respective addresses set forth in the Senior Credit Agreement and to the Subordinated Sellers as set forth below their signature lines to this Agreement, or to such other address (including my email, facsimile or other method of electronic transmission) as may be hereafter designated by notice by the Administrative Agent, the Borrowers or the Subordinated Sellers to one another.

4.10     <u>Severability</u>.  Any provision of this Agreement held to be illegal, invalid or unenforceable in any jurisdiction, shall, as to such jurisdiction, be ineffective to the extent of such illegality, invalidity or unenforceability without affecting the legality, validity or enforceability of the remaining provisions hereof or thereof; and the illegality, invalidity or unenforceability of a particular provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

4.11     <u>No Reliance</u>.  Each of the Administrative Agent (on behalf of the Senior Secured Parties), on the one hand, and the Subordinated Sellers, on the other, agree that it has independently (and without reliance on the other such party) made its own credit analysis with respect to the Borrower and the Guarantors and their respective assets, including, without limitation, the Collateral and the Seller Collateral.

[SIGNATURES CONTAINED ON NEXT PAGE]

18

IN WITNESS THEREOF, the signatures of the parties hereto as of the date first written above.

**SUBORDINATED SELLERS:**

**WORLD FUEL SERVICES CORPORATION**

By: _____

Name:   Adrienne B. Urban

Title:   Sr. Vice President and Treasurer

**PETROLEUM TRANSPORT SOLUTIONS, LLC**

By: _____

Name:   Ronald Crowell

Title:   Sr. Vice President – Finance

**WORLD FUEL SERVICES, INC.**

By: _____

Name:   Ronald Crowell

Title:   Sr. Vice President – Finance

**WESTERN PETROLEUM COMPANY**

By: _____

Name:   Ronald Crowell

Title:   Sr. Vice President – Finance

Address:  World Fuel Services Corporation
9800 N.W. 41st Street
Miami, Florida  33178
Attention:  General Counsel
Fax:  305.392.5645
Email:  alake@wfscorp.com

**BORROWERS & GUARANTORS:**

**DAKOTA PLAINS TRANSLOADING, LLC**

By: _Gabe Claypool_
Name: Gabriel G. Claypool
Title: President, Chief Executive Officer and Secretary

**DAKOTA PLAINS SAND, LLC**

By: _Gabe Claypool_
Name: Gabriel G. Claypool
Title: President, Chief Executive Officer and Secretary

**DAKOTA PLAINS MARKETING, LLC**

By: _Gabe Claypool_
Name: Gabriel G. Claypool
Title: President, Chief Executive Officer and Secretary

**DAKOTA PLAINS HOLDINGS, INC.**

By: _Gabe Claypool_
Name: Gabriel G. Claypool
Title: President and Chief Operating Officer

After giving effect to the Closing Date Acquisition, each of the following Guarantors hereby becomes a party to this Agreement:

**DAKOTA PETROLEUM TRANSPORT SOLUTIONS, LLC**

By: _____
Name: Timothy R. Brady
Title: Treasurer

**DPTS SAND, LLC**

By: _____
Name: Timothy R. Brady
Title: Treasurer

**DPTS MARKETING LLC**

By: _____
Name: Timothy R. Brady
Title: Treasurer

[Signature Page to Subordination Agreement]

**ADMINISTRATIVE AGENT:**

**SUNTRUST BANK**

By: _____

Name:  Scott Mackey

Title:   Director